UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                        Plaintiff,<br><br>        v.<br><br>MOHAMMED ALI RASHID,<br><br>                  Defendant. | No. 17-cv-8223<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

       Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Mohammed Ali Rashid ("Rashid" or "Defendant"), alleges as follows:

<u>SUMMARY OF ALLEGATIONS</u>

      1.     From at least January 2010 to June 2013 ("Relevant Period"), Rashid, an experienced and highly compensated investment adviser for a well-known advisory firm, intentionally misappropriated approximately $290,000 from private equity funds that he advised. While acting as an investment adviser, Rashid defrauded his fund clients by using their money for his personal expenses, including paying for elaborate vacations, frequent trips to an expensive hair salon, spa services, and luxury retail items.

      2.     During the Relevant Period, Rashid was a Partner and later a Senior Partner at Apollo Management, L.P. ("Apollo"), a multi-billion dollar investment adviser registered with the Commission.  Rashid provided investment advice to at least five private equity funds managed by Apollo affiliates.  As investment advisers, Apollo and Rashid owed fiduciary duties

to the client funds that they advised.  At all times, they were required to act in their clients' best interests and owed those clients a duty of undivided loyalty and utmost good faith.

3.       During the Relevant Period, Rashid received millions of dollars each year related to his advisory services as an Apollo partner.  Nevertheless, by at least 2010, Rashid began misappropriating the private equity funds' money by submitting false expense reports to obtain reimbursement for claimed business expenses that were, in fact, his personal expenses, in violation of both Rashid's and Apollo's fiduciary duties to these funds.

4.       Over the Relevant Period, Rashid fraudulently charged more than one thousand personal items and services to the private equity funds that he advised.  In 2010, for example, Rashid sought over $1,100 in reimbursement from two private equity funds by falsely claiming that the charges were for business-related meals.  In fact, Rashid sought the $1,100 to cover the cost of his visits to a hair salon.  Later in 2010, Apollo discovered that Rashid charged these – and other – personal expenses to the private equity funds that he advised, and required Rashid to repay these expenses.  But Apollo took no specific steps to ensure that Rashid did not again misappropriate their clients' funds.

5.       Despite Apollo's knowledge of Rashid's unlawful conduct, Rashid continued to improperly charge personal expenses to the private equity funds that he and Apollo advised.  For example, he charged expenses for several personal vacations to private equity funds that he advised, including international vacations with his family for holidays and trips to attend his friends' weddings.

6.       Rashid knew that his conduct was wrong, and he took active steps to conceal it. In 2012, for example, after his administrative assistant questioned whether Rashid's $3,500 charge at a high-end men's clothing store was business related, Rashid falsified a receipt to

2

justify the expense as business-related holiday gifts for executives of companies in which the funds invested, when, in fact, Rashid had spent that money on a suit for his father.

7.     Apollo discovered Rashid's attempt to charge two of the private equity funds for his father's suit before it was charged to the funds, and required Rashid to repay that expense to Apollo, along with other personal expenses that Rashid admitted he charged to the funds he advised.  Despite Apollo's additional discoveries, Rashid continued to charge thousands of dollars of his personal expenses to funds he advised.

8.     After an extensive internal investigation into Rashid's expense issues and Rashid's repayment of approximately $290,000 in personal expenses Rashid had charged to clients, Apollo entered into a separation agreement with Rashid effective February 2014.

## VIOLATIONS AND RELIEF SOUGHT

9.     By misappropriating his clients' funds as alleged in this Complaint, Rashid violated Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and (2), and/or aided and abetted Apollo's violations of those provisions. Unless enjoined, Rashid is likely to commit such violations again in the future.

10.     The Commission seeks a judgment from the Court:  (a) enjoining Rashid from engaging in future violations of Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2), and aiding and abetting such violations; and (b) ordering Rashid to pay civil monetary penalties pursuant to Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

## JURISDICTION AND VENUE

11.     The Commission brings this action pursuant to Section 209(d) and 209(e) of the Advisers Act, 15 U.S.C. §§ 80b-9(d) and (e).

12.     This Court possesses jurisdiction over this action pursuant to Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.  Rashid, directly or indirectly, has used the means or instrumentalities of interstate commerce in connection with his actions as alleged in this Complaint.  Among other things, Rashid, through his work at Apollo, conducted investment adviser activities and engaged in the unlawful acts alleged herein throughout the United States using the instrumentalities of interstate commerce, such as regularly using the telephone and email, including numerous emails and telephone calls relating to Rashid's fraudulent conduct alleged herein.  Apollo also sent invoices to the private equity funds containing Rashid's false expense claims using the instrumentalities of interstate commerce, and these funds paid and were later reimbursed for these expenses via wire transfers.

13.     Venue lies in this District pursuant to Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because Rashid resides in this District, he maintained an office in this District while working at Apollo during the Relevant Period, and he has transacted business in this District, including certain of the acts alleged in this Complaint.

14.     Rashid and the Commission entered into three successive tolling agreements that collectively tolled the running of any applicable statute of limitations for the period from June 13, 2016, to December 13, 2017.  Securities law violations from June 13, 2011 to June 2013 are encompassed by the tolling agreements and are within the five-year limitation period for certain relief as set forth in 28 U.S.C. § 2462.

4

**DEFENDANT**

15.     **Mohammed Ali Rashid**, age 41, is an individual residing in New York, New York.  Rashid was an employee of Apollo from August 2000 through February 2014, ultimately rising to the title of Senior Partner.  During the Relevant Period, Rashid was engaged in the business of advising private equity funds managed by Apollo affiliates, including Apollo Investment Fund III, L.P., Apollo Investment Fund V, L.P., Apollo Investment Fund VI, L.P., Apollo Investment Fund VII, L.P., and Apollo Natural Resource Partners, L.P. ("the Relevant Funds").

**OTHER RELEVANT ENTITIES**

16.     **Apollo Management, L.P.** ("Apollo") is an indirect subsidiary of Apollo Global Management, LLC, an alternative investment manager founded in 1990 and headquartered in New York, New York, that is engaged in private equity, credit, and real estate lines of business.  Apollo operates the private equity business segment of its indirect parent's business.  Apollo is organized as a Delaware limited partnership with its principal place of business in New York, New York.  Apollo is registered with the Commission as an investment adviser.

17.     Apollo controls various affiliated private equity fund managers that are registered with the Commission as relying advisers under Apollo's Form ADV.  Apollo shares office space and personnel with some of those affiliated fund managers, including the following entities through which Rashid provided investment advice to the Relevant Funds:

- Apollo Management III, L.P. ("AM III");
- Apollo Management V, L.P. ("AM V");
- Apollo Management VI, L.P. ("AM VI");
- Apollo Management VII, L.P. ("AM VII"); and

- Apollo Commodities Management, L.P. ("ACM").

## THE RELEVANT FUND CLIENTS

18.     **Apollo Investment Fund III, L.P.** ("Fund III") is a Delaware limited partnership and private investment fund formed in 1995 to make private equity investments.  Fund III had an Apollo-controlled general partner that had exclusive authority over the "management, operation and control of [Fund III], and its business and the formulation of investment policy."  Fund III's general partner, in turn, delegated this authority to AM III pursuant to Fund III's Limited Partnership Agreement.  AM III managed Fund III's investments primarily through a group of private equity professionals that included Rashid.

19.     **Apollo Investment Fund V, L.P.** ("Fund V") is a Delaware limited partnership and private investment fund formed in 2000 to make private equity investments.  Fund V had an Apollo-controlled general partner that had exclusive authority over the "management, operation and control of [Fund V], and its business and the formulation of investment policy."  Fund V's general partner, in turn, delegated this authority to AM V pursuant to Fund V's Limited Partnership Agreement.  AM V managed Fund V's investments primarily through a group of private equity professionals that included Rashid.

20.     **Apollo Investment Fund VI, L.P.** ("Fund VI") is a Delaware limited partnership and private investment fund formed in 2005 to make private equity investments. Fund VI had an Apollo-controlled general partner that had exclusive authority over the "management, operation and control of [Fund VI], and its business and the formulation of investment policy."  Fund VI's general partner, in turn, delegated this authority to AM VI pursuant to Fund VI's Limited Partnership Agreement.  AM VI managed Fund VI's investments primarily through a group of private equity professionals that included Rashid.

21.    **Apollo Investment Fund VII, L.P.** ("Fund VII") is a Delaware limited partnership and private investment fund formed in 2007 to make private equity investments. Fund VII had an Apollo-controlled general partner that had exclusive authority over the "management, operation and control of [Fund VII], and its business and the formulation of investment policy." Fund VII's general partner, in turn, delegated this authority to AM VII pursuant to Fund VII's Limited Partnership Agreement. AM VII managed Fund VII's investments primarily through a group of private equity professionals that included Rashid.

22.    **Apollo Natural Resource Partners, L.P.** ("ANRP") is a Delaware limited partnership and private investment fund formed in 2008 to make private equity investments. ANRP had an Apollo-controlled general partner that had exclusive authority over the "management, operation and control of [ANRP], and its business and the formulation of investment policy." ANRP's general partner, in turn, delegated this authority to ACM pursuant to ANRP's Limited Partnership Agreement. ACM managed ANRP's investments primarily through a group of private equity professionals that included Rashid.

## FACTUAL ALLEGATIONS

**I.    Rashid and Apollo Were Investment Advisers Who Owed Fiduciary Duties to the Funds They Advised**

23.    Apollo has been registered with the Commission as an investment adviser since 2007. Along with certain of its affiliated advisers, Apollo manages more than $46 billion in assets.

24.    Since being registered as an investment adviser, Apollo has managed multiple private equity funds that invest in distressed or undervalued companies with the goal of later exiting the investments for a profit. The companies in which Apollo's private equity funds invest are referred to as "portfolio companies."

25.     During the Relevant Period, Rashid was an investment adviser to Apollo's private equity funds.  At the beginning of the Relevant Period, Rashid was a Partner at Apollo, and by 2012, Apollo promoted him to Senior Partner.  During the Relevant Period, Rashid was a member of the private equity investment group and advised the Relevant Funds.  Specifically, Rashid sourced, evaluated, and recommended investment opportunities to the Relevant Funds as well as monitored the performance of investments made by the private equity funds and, when appropriate, developed and recommended disposition strategies.  He regularly participated in weekly meetings that took place amongst the investment professionals in the private equity group, where they discussed and determined, among other things, potential investments for the private equity funds and the disposition of investments in those funds, including the Relevant Funds.

26.     As described in a private placement memorandum for ANRP, for example, Apollo stated that Rashid "leads [Apollo's] efforts in metals and mining and has helped generate, evaluate and execute a majority of [Apollo's] transactions in the sector."

27.     Rashid further monitored the Relevant Funds' portfolio companies and implemented plans to enhance their financial performance.  He also conducted due diligence to determine when and how the Relevant Funds could profitably liquidate or reduce their ownership interests in the portfolio companies they owned.  Rashid served as a member of the boards of directors of at least three publicly-traded portfolio companies.  Rashid further acted as a principal point of contact between these portfolio companies' executives and the Relevant Funds.

28.     Rashid received compensation for providing investment advice to the Relevant Funds.  He also received director fees for serving on the portfolio companies' boards of directors.  In total, Rashid received millions of dollars per year related to his advisory services

with Apollo during the Relevant Period.  Rashid had an interest as a limited partner in the

general partners of Fund V, Fund VI, Fund VII, and ANRP, as well as equity interests in the

Relevant Funds.

29.     As investment advisers, Rashid and Apollo had a fundamental obligation to act in

the best interests of their clients, to provide investment advice that was in their clients' best

interests, and to exercise the utmost good faith in dealing with their clients.

**II.     The Relevant Funds' Governing Documents and Apollo's Policies Prohibited Rashid
         From Charging Personal Expenses to the Relevant Funds**

30.     The Relevant Funds' governing documents permitted Apollo and Rashid to

charge expenses to the Relevant Funds only if the expenses related to the funds' investments and

operations.  The governing documents did not permit Rashid or Apollo to charge personal

expenses to the Relevant Funds.

31.     Apollo's limited partnership agreement for ANRP, for example, stated that ANRP

was responsible only for operating expenses "arising in connection with [ANRP's] operations

and the acquisition, ownership, and maintenance of investments in the Portfolio Companies."

ANRP's limited partnership agreement did not permit Apollo to charge its employees' personal

expenses to the fund.

32.     Similarly, during the Relevant Period, Apollo's Travel and Expense

Reimbursement Policies and Procedures ("T&E Policies") permitted its employees to charge

their clients only with reasonable business and travel expenses incurred in the performance of

their duties.  It stated, "Apollo will reimburse employees for business and travel expenses

incurred while performing their duties, provided the expenses are necessary, reasonable and

appropriately documented."  It further required employees to "use best efforts to appropriately

allocate the expense," including using project codes to identify amounts that should be billed to Apollo's funds' portfolio companies, investment funds, or other special projects.

33.     Apollo's T&E Policies further stated that "[e]thics, integrity, and efficiency are the cornerstones of success for all professional service companies," and that "[e]very employee who incurs expenses on behalf of the Company has a fiduciary obligation – to know, understand and adhere to the Company's Travel & Expense Reimbursement Policies and Procedures."  It warned that "[a]ny attempt to knowingly submit a false claim will be treated as a serious disciplinary offense."

34.     Apollo's T&E Policies further gave examples of "Typical Non-Reimbursable T&E Items" that included "Barber/Beauty Shop or Spa charges," "Clothing," "Non-Business (e.g. personal) travel and entertainment expenses," "Personal items," and "spousal or other companion expenses."  Notwithstanding Apollo's T&E Policies, Rashid charged each of these specified, non-reimbursable items to the Relevant Funds.

35.     In addition, Apollo's Employee Handbook stated that employees may be reimbursed for "reasonable business expenses at the discretion of the Company," and that "[e]xpensing items that are not business related is a serious offense."

36.     During the Relevant Period, Rashid signed annual certifications that he had completed Apollo's compliance training that included training concerning Apollo's T&E Policies.  Rashid also signed Apollo's Code of Ethics, which stated, among other things, that "[t]he falsification of any book, record or account relating to the business of Apollo, its clients or to the disposition of assets of the Firm or its clients (including, without limitation, the submission of any false personal expense statement, claim for reimbursement of a non-business expense or a false record or claim under an employee benefit plan) is prohibited."

37.     Rashid knew, or was reckless in not knowing, that the Relevant Funds' offering documents, other governing documents, and Apollo's T&E Policies prohibited him from charging his personal expenses to the Relevant Funds.  Rashid received documents regarding Apollo's T&E Policies, attended mandatory training regarding such policies and procedures, and confirmed that he understood such policies and procedures as an adviser with Apollo.

**III.     Apollo's Business Expense Reimbursement Process**

38.     Pursuant to Apollo's T&E Policies, Apollo gave employees such as Rashid a corporate credit card to pay for business-related expenses.  Apollo's T&E Policies emphasized that "**Employees generally should NOT use their [corporate credit card] for personal expenses.**"  It further directed that "[i]f for some reason you do need to charge a personal expense on the [corporate credit card] . . . , you are required to remit payment directly" to the credit card company.

39.     To obtain reimbursement for claimed business expenses, Apollo's T&E Policies required employees to submit expense reports each month to address the "WHO, WHAT, WHEN WHERE and WHY" of each business expense.

40.     Apollo's T&E Policies permitted employees to delegate expense report preparation to other individuals, such as an assistant, but noted that "the employee is ultimately responsible for timely and accurate submission of his/her expenses regardless of who prepares the expense report."  In addition, for at least part of the Relevant Period, before submitting expense reports, Apollo's T&E policies required employees to certify that they (1) "have read, understood and complied with [Apollo's T&E Policies]"; and (2) "affirm that the reimbursable expenses included in this expense report are valid business expenses."

41.     Pursuant to these policies, Apollo gave Rashid a corporate credit card to pay for his business expenses.  The corporate credit card company sent Apollo monthly bills containing Rashid's charges.  Apollo paid Rashid's bill directly, and then sent Rashid draft expense reports for Rashid to identify who should ultimately be responsible for each of Rashid's expenses and to provide justifications for all business expenses.

42.     Apollo required Rashid to personally approve each monthly expense report before submitting it to Apollo's expense manager for review and approval.

43.     Although Rashid's administrative assistants prepared the initial drafts of his expense reports, Rashid approved them and provided supporting details and instructions concerning how Apollo should bill the expenses.  Rashid often provided verbal explanations to his assistants when they had questions about particular expenses.  He also highlighted and annotated draft expense reports to identify the business purpose and the client or entity that should pay for each expense, which his administrative assistants then finalized and submitted to Apollo for final disposition in accordance with Rashid's instructions.

44.     At least in 2010, Rashid also submitted affidavits "to prove the legitimate business purpose" for claimed business expenses when he did not provide receipts.  Even after Apollo no longer required employees to submit these affidavits, Rashid continued to review and approve his expense reports before his assistants submitted them to Apollo.

45.     After Rashid or his administrative assistants submitted a final expense report to Apollo, Apollo would allocate Rashid's expenses to the individual funds for which each expense was related as Rashid had indicated in his expense reports.

46.     Rashid knew, or was reckless in not knowing, that the Relevant Funds would be charged for any expense that he allocated to a Relevant Fund or one of its portfolio companies as a claimed business expense in his monthly expense reports.

47.     Apollo sent the Relevant Funds periodic (often quarterly) statements setting forth reimbursement for Rashid's (and other Apollo employees') claimed business expenses.  The Relevant Funds then reimbursed Apollo for Rashid's claimed business expenses via wire transfers.

**IV.    During the Relevant Period, Rashid Fraudulently Charged Nearly $290,000 of His Personal Expenses to the Relevant Funds**

48.     By no later than 2010, Rashid began fraudulently charging personal expenses to the Relevant Funds in breach of the Relevant Funds' governing documents, Apollo's  T&E Policies, and his and Apollo's fiduciary duties to the Relevant Funds.

49.     Throughout the Relevant Period, Rashid regularly charged personal expenses to his corporate credit card and then fraudulently claimed them as business expenses on his monthly expense reports to Apollo.  In most cases, Apollo then obtained reimbursement from the Relevant Funds for these expenses based on Rashid's false representations that they were business related.

50.     During the Relevant Period, Rashid misappropriated approximately $290,000 (of which at least approximately $170,000 post-dated June 13, 2011) from the Relevant Funds by falsely claiming that his personal expenses were legitimate business expenses.  These expenses comprised hundreds of different charges including charges for personal travel, consumer electronics and restaurant meals.

**A.      In 2010, Rashid Admitted to Fraudulently Billing Certain Personal Expenses**

51.     During 2010, Rashid regularly charged expenses related to personal grooming services that he received at a high-end hair salon to his Apollo corporate credit card.  In completing his expense reports, Rashid falsely claimed that this hair salon was a restaurant and that more than $1,100 of expenses were business-related "meals with management," sometimes identifying specific executives he claimed to have taken to dinner.  Based on Rashid's false representations, certain of the Relevant Funds paid for personal hair salon charges that Rashid claimed were business expenses.

52.     In or around September 2010, Rashid's administrative assistant became suspicious of Rashid's explanations for these recurring expenses.  After determining that there was no restaurant in New York with the name of the vendor on the credit card statement, but that a New York hair salon had that name, she reported her concerns to Apollo's expense manager. The expense manager escalated the matter to Apollo's Chief Financial Officer ("CFO"), who decided to conduct a review of Rashid's expense reports for the previous six months.  Upon review of those expense reports, the expense manager identified a number of other suspicious entries, such as approximately $5,000 in New York City apartment realtor expenses that Rashid charged to a Relevant Fund, claiming that they were for "research reports" relating to the fund's investments when, in fact, they were Rashid's personal expenses.

53.     In November 2010, Apollo's CFO confronted Rashid about these questionable expenses.  Rashid admitted that they were his personal expenses, and ultimately agreed to pay back almost $8,000 in fraudulently billed personal expenses.  Apollo's CFO told Rashid that billing personal expenses to the private equity funds was not acceptable and instructed him not to repeat the conduct.

54.     Despite this incident, Rashid failed to acknowledge to Apollo or any of the Relevant Funds that he had previously billed additional personal expenses to the Relevant Funds.

55.     For example, Rashid failed to disclose to Apollo or any of the Relevant Funds a $965 personal charge at high-end clothing store Ermenegildo Zegna ("Zegna") from June 2010, which Rashid charged to a Relevant Fund on his expense report by claiming that it was a "client gift."

56.     When Apollo management asked Rashid about this charge in September 2010, Rashid falsely claimed that it was "shirts and ties" for fifteen specific portfolio company executives to celebrate the company's IPO.  The named executives, however, did not receive clothing or any other gifts from Rashid.  Rashid had falsely made this claim to obtain reimbursement from a Relevant Fund for his own personal charges.

57.     Rashid also failed to disclose to Apollo or any of the Relevant Funds in November 2010 that he had charged the following personal expenses to the Relevant Funds as business expenses: over $2,300 in charges at the Apple Store in May 2010 for purported "IPO gifts," an additional $1,265 in charges at Zegna in July 2010 for purported "office gifts," and a $275 charge at Bliss Spa for "a missed appointment due to [portfolio company] conference call that ran over – no last minute cancellations."  None of these expenses were client gifts, and the $275 charge at Bliss was, in fact, for approximately $75 in services for his sister and an approximately $200 gift card used for Rashid's personal purposes.

**B.      Rashid Continued to Charge Personal Expenses to the Relevant Funds After November 2010**

58.     Nor did the November 2010 incident deter Rashid from continuing to charge personal expenses to the Relevant Funds.  Only a month later in December 2010, Rashid emailed an Apollo compliance officer to request pre-approval to give purported holiday gifts from Zegna

and the Apple Store to executives of at least two of the Relevant Funds' portfolio companies.  To justify his request, Rashid provided a list of twenty-six portfolio company executives for whom he intended to purchase gifts.  Based on Rashid's misrepresentations, the Apollo compliance officer approved Rashid's request.

59.     A few weeks later, Rashid charged more than $3,800 at Zegna and $800 at the Apple Store.  He allocated these expenses in his expense report to certain of the Relevant Funds in accordance with the purported business justifications in his email to the Apollo compliance officer.

60.     Rashid never gave any gifts to the executives that he identified.  Instead, he bought items at these stores for himself and his family members.

**C.     Rashid Fraudulently Charged His Vacation Expenses to the Relevant Funds**

61.     Rashid also billed the Relevant Funds for tens of thousands of dollars in expenses for family vacations.

62.     For example, Rashid billed two of the Relevant Funds for about $7,500 in airfare and hotel charges for a vacation Rashid and his wife took to attend a friend's wedding in Hawaii in 2010.  Rashid allocated the couple's five-night stay at the ocean-front Ritz Carlton and rental car fees to a portfolio company owned by Fund V, and he separately allocated both his and his wife's airfare to Hawaii to a portfolio company owned by Fund III.  In his expense reports, Rashid justified charging these Relevant Funds for this personal trip by claiming on his expense report that it was for a "business trip to Dallas for [portfolio company] meetings" and a "[h]otel for [portfolio company] conference."

63.     The justifications Rashid provided were false.  This trip was personal and had no connection to the Relevant Funds' or their portfolio companies.  Nor was it to Dallas.  Rashid knew, or was reckless in not knowing, that these were false business justifications.

64.     In addition, Rashid charged expenses relating to the following vacations to certain of the Relevant Funds:  (1) approximately $7,500 for trips to Cancun, Mexico, with his wife over the New Year's holidays in 2010 and 2011; (2) over $4,500 for a trip to Rio de Janeiro, Brazil, with his wife over the New Year's holiday in 2012; (3) approximately $1,400 for trips to bed-and-breakfast hotels near the New Jersey shore in 2009, 2010, and 2011; (4) approximately $5,000 for a trip to the St. Regis Bal Harbour resort in Florida with his parents and sister over the Thanksgiving holiday in 2012; and (5) approximately $4,000 for weekend trips to Las Vegas, Nevada in 2012 and 2013.

65.     All of these trips were personal holiday trips and vacations that were not appropriate client charges, yet, in each instance, Rashid submitted expense reports fraudulently claiming them as business expenses, and Apollo obtained reimbursement for these expenses from the Relevant Funds.

### D.     In 2012, Rashid Made Misrepresentations and Falsified a Receipt to Justify Billing Additional Personal Expenses to the Relevant Funds, and Again Admitted to Charging Certain Personal Expenses to the Relevant Funds

66.     In January 2012, Rashid again sought and obtained approval from Apollo's compliance department to purchase "holiday gifts" at Zegna and Bliss Spa for a list of portfolio company executives.  In this request, Rashid represented that he would "stay at the limit of $100 per person" and specified that he would be purchasing "Zegna ties for the men and Bliss gift cards for the Women."  Rashid's pre-approved request specified thirty-eight portfolio company executives to whom he intended to give holiday gifts.

17

67.     Following his request, in February 2012, Rashid charged $400 at Bliss to his Apollo credit card and allocated the charge to certain of the Relevant Funds as "Holiday Gifts." On April 27, 2012, Rashid charged $3,500 at Zegna to his Apollo credit card.

68.     On the same day that Rashid made the $3,500 charge at Zegna, he forwarded to his assistant the compliance department's email approving the purchase of thirty-eight corporate gifts of "Zegna ties for the men and Bliss gift cards for the Women." Thereafter, in May 2012, when Rashid's assistant received the initial draft of Rashid's monthly Apollo credit card charges, she noticed the $3,500 charge at Zegna and asked him if it was personal. Rashid responded that it was a business expense and should be allocated to certain of the Relevant Funds as holiday gifts. Because Rashid was travelling at the time, his assistant called Zegna to request a receipt in keeping with Apollo's T&E policies.

69.     The Zegna store clerk emailed Rashid's assistant a receipt for the $3,500 charge on his Apollo credit card. The receipt showed the charge was for a suit for Rashid's father, not for a business expense or business gifts as Rashid had claimed.

70.     Shortly after Rashid's assistant received the Zegna receipt, she received a telephone call from Rashid asking why she called Zegna for a receipt. She explained that Apollo's T&E policies required a vendor receipt. Rashid then told her the $3,500 receipt Zegna had sent her for his father's suit was the wrong receipt and that he would obtain the correct receipt. Thereafter, Rashid emailed a form receipt from Zegna to his assistant that was blank except for a handwritten note stating "35 ties for gifts . . . $3,500." Unlike the prior receipt for Rashid's father's suit, this receipt had no date, no credit card number, and no typed information generated from a cash register.

18

71.     Suspicious of these events, Rashid's assistant notified the expense manager, who eventually spoke with Apollo's CFO, and they decided to review Rashid's prior six months of expenses for other suspicious charges.

72.     As a result of the expense manager's second review of Rashid's expenses in 2012, Rashid admitted to Apollo that he had improperly charged an additional $7,072.36 in personal expenses, including his father's $3,500 suit, $400 in the Bliss Spa charges, and the personal flight that his wife took to Rio de Janeiro over New Year's holiday in 2012, to certain of the Relevant Funds that he advised.

73.     The Relevant Funds were never charged with Rashid's $3,500 Zegna charge because Apollo uncovered Rashid's fraudulent conduct before Rashid submitted his false expense report.  However, the Relevant Funds had already paid the remaining $3,572.36 in purported business expenses that Rashid admitted were personal, including the $400 in Bliss Spa charges and his wife's flight to Rio de Janeiro.

74.     As in 2010, Apollo required Rashid to reimburse Apollo for the improper personal expenses that he admitted he had submitted.  Apollo reversed the improper personal expenses billed to the Relevant Funds, and credited their respective accounts.  As he had done previously in 2010, Apollo's CFO instructed Rashid that improper billing was unacceptable.

**V.     In 2013, Rashid Admitted that He Misappropriated an Additional $220,000 in Personal Expenses from the Relevant Funds**

75.     In Spring 2013, Apollo conducted a firm-wide review of expense allocations. Although Apollo's initiation of the firm-wide expense review was unrelated to Rashid's prior conduct, the results of the review identified certain of Rashid's expenses that warranted further review because, at least in part, he had submitted business expense reimbursements for several holiday weekends in 2012.

76.     Apollo conducted a further review of Rashid's expenses from May 2012 – the month Rashid had last repaid Apollo for inappropriately claimed personal expenses – through May 2013.  They focused on certain suspicious charges, including travel during holiday weekends; travel to vacation spots; and travel to sporting events.

77.     On July 1, 2013, Apollo's counsel met with Rashid concerning his expenses. During that meeting, Rashid admitted that he had requested a fake receipt in May 2012 to support the $3,500 expense he submitted for his father's suit.

78.     Immediately following counsel's July 1, 2013 meeting with Rashid, Apollo placed him on leave.

79.     Thereafter, Apollo retained an accounting firm to conduct a forensic review of all of Rashid's expenses from January 2010 through June 2013.

80.     Prior to the independent forensic review, Apollo gave Rashid an opportunity to review all of his expenses since January 2010, and to make any necessary adjustments.

81.     As a result of his review, Rashid admitted that over $220,000 in business expenses he charged to the Relevant Funds during the Relevant Period were, in fact, his personal expenses, including at least approximately $120,000 of admitted personal expenses after June 13, 2011.  The $220,000 in personal charges was in addition to the more than $10,000 in personal expenses that Rashid had charged to the Relevant Funds and paid back to Apollo in 2010 and 2012, as previously alleged in this Complaint.

82.     Rashid repaid Apollo for all of his improperly allocated personal expense charges identified through the expense review process.   Apollo reimbursed the Relevant Funds for all such charges billed to them.

83.     In 2013, Rashid repaid approximately $290,000 for personal expenses that he had fraudulently charged to the Relevant Funds, including, among other personal expenses, the approximately $220,000 in expenses he self-identified as personal in 2013, and approximately $61,000 in additional expenses the accounting firm identified as personal.

84.     The approximately $290,000 in personal expenses charged to the Relevant Funds that Rashid repaid in 2013 was comprised of over one thousand charges that he submitted virtually every month throughout the Relevant Period.

85.     Rashid submitted these false expense reports despite the substantial compensation that he received as an investment adviser to the Relevant Funds.  He knew, or was reckless in not knowing, that he was defrauding his clients by falsely claiming that personal expenses were business-related such that Apollo would bill the Relevant Funds for these expenses based on Rashid's fraudulent business expense reports.  Rashid's misconduct violated his fiduciary duties to the Relevant Funds.

86.     Apollo, through Rashid's conduct, knew, or was reckless in not knowing, that it was defrauding its clients when it sought reimbursement from the Relevant Funds for Rashid's personal expenses that Apollo claimed were business expenses based on Rashid's fraudulent business expense reports.  Apollo, through Rashid's conduct, violated its fiduciary duties to the Relevant Funds.

87.     Furthermore, in 2010, Apollo specifically confronted Rashid about the numerous personal expenses that he charged to clients and required the misappropriated funds to be repaid.  Despite the initial confrontation about Rashid's expenses, in 2012, Apollo again discovered additional personal expenses Rashid had charged to the Relevant Funds.

88.     Apollo entered into a separation agreement with Rashid effective February 28, 2014.

89.     Rashid's fraudulent conduct alleged in this Complaint was material.  The Relevant Funds' offering documents, other governing documents, and Apollo's T&E Policies prohibited Rashid from charging his personal expenses to the Relevant Funds.  Rashid, and Apollo through Rashid's conduct, over the course of almost three years misappropriated client funds in breach of the fiduciary duties they owed the Relevant Funds as investment advisers.  This breach of fiduciary duty through the repeated misappropriation of client funds for Rashid's personal use would have been important to a reasonable investor or client.

## FIRST CLAIM FOR RELIEF

### Violations of Section 206(1) of the Advisers Act
(Against Rashid)

90.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through  89 of this Complaint as if fully set forth herein.

91.     By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Rashid was acting as an investment adviser to the Relevant Funds within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11) because he was a person who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

92.     Rashid, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as an investment adviser, employed devices, schemes, or artifices to defraud any client or prospective client, with scienter.

93.     As an investment adviser, Rashid owed the Relevant Funds a fiduciary duty of utmost good faith, undivided loyalty, and care to make full disclosure to them of all material facts, as well as the duty to act in the Relevant Funds' best interests, and not to act in his own interest to the detriment of the Relevant Funds.

94.     Rashid breached his fiduciary duties to the Relevant Funds and engaged in fraudulent conduct that violated Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1), as alleged above, by misappropriating up to $290,000 from the Relevant Funds for his personal expenses.

95.     By reason of the foregoing, Rashid has violated, and unless enjoined will again violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

## SECOND CLAIM FOR RELIEF

### Violations of Section 206(2) of the Advisers Act
(Against Rashid)

96.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97.     By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Rashid was acting as an investment adviser to the Relevant Funds within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because he was a person who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

98.     Rashid, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as an investment adviser,

engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client, with at least negligence.

99.    As an investment adviser, Rashid owed the Relevant Funds a fiduciary duty of utmost good faith, undivided loyalty, and care to make full disclosure to them of all material facts, as well as the duty to act in the Relevant Funds' best interests, and not to act in his own interest to the detriment of the Relevant Funds.

100.    Rashid breached his fiduciary duties to the Relevant Funds and engaged in fraudulent conduct that violated Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2), as alleged above, by misappropriating up to $290,000 from the Apollo Funds for his personal expenses.

101.    By reason of the foregoing, Rashid has violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 206(1) of the Advisers Act
(Against Rashid)

102.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 101 of this Complaint as if fully set forth herein.

103.    By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Apollo was acting as an investment adviser to the Relevant Funds within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11) because it was a person who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

104.    Apollo, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as an investment adviser, employed devices, schemes, or artifices to defraud any client or prospective client, with scienter.

105.    As an investment adviser, Apollo owed the Relevant Funds a fiduciary duty of utmost good faith, undivided loyalty, and care to make full disclosure to them of all material facts, as well as the duty to act in the Relevant Funds' best interests, and not to act in its own interest to the detriment of the Relevant Funds.

106.    Apollo breached its fiduciary duties to the Relevant Funds and engaged in fraudulent conduct that  violated Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1), as alleged above, by misappropriating up to $290,000 from the Relevant Funds for Rashid's personal expenses.

107.    By engaging in the acts and conduct alleged in this Complaint, Rashid knowingly provided substantial assistance to Apollo's violations of Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1), and thereby is liable under that provision as an aider and abettor, pursuant to Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f).

108.    By reason of the foregoing, Rashid has violated, and unless enjoined will again violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1), as an aider and abettor of Apollo's violations pursuant to Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f).

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 206(2) of the Advisers Act
(Against Rashid)

109.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.    By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Apollo was acting as an investment adviser to the Relevant Funds within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because it was a person who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

111.    Apollo, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as an investment adviser engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client, with at least negligence.

112.    As an investment adviser, Apollo owed the Relevant Funds a fiduciary duty of utmost good faith, undivided loyalty, and care to make full disclosure to them of all material facts, as well as the duty to act in the Relevant Funds' best interests, and not to act in its own interest to the detriment of the Relevant Funds.

113.    Apollo breached its fiduciary duties to the Relevant Funds and engaged in fraudulent conduct that violated Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2), as alleged above, by misappropriating up to $290,000 from the Relevant Funds for Rashid's personal expenses.

114.    By engaging in the acts and conduct alleged in this Complaint, Rashid knowingly provided substantial assistance to Apollo's violations of Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2), and thereby is liable under that provision as an aider and abettor, pursuant to Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f).

115.    By reason of the foregoing, Rashid has violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2), as an aider and abettor of Apollo's violations pursuant to Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f).

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter judgment:

### I.

Permanently restraining and enjoining Rashid and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80 b-6(1) and (2)] or alternatively from aiding and abetting violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

### II.

Ordering Rashid to pay civil monetary penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**III.**

Granting such other and further relief as the Court may deem just and proper.

Of Counsel:
Corey A. Schuster
Donna K. Norman
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549

Duane K. Thompson
Derek Bentsen, (DB8369)
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549

ATTORNEYS FOR PLAINTIFF

Dated:  October 25, 2017