UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,  Plaintiff,  v.  MOHAMMED ALI RASHID,  Defendant. | No. 17-cv-8223 (PKC)  DECLARATION OF DUANE K. THOMPSON |

I, DUANE K. THOMPSON, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information and belief:

1.     I serve as Assistant Chief Litigation Counsel in the Trial Unit of the Division of Enforcement at the United States Securities and Exchange Commission ("Commission") in Washington, DC.  I am a member in good standing of the bars of the District of Columbia, the State of Maryland and the federal district courts in those jurisdictions.  I have been admitted *pro hac vice* in the above-referenced case and serve as counsel to the Commission.  I am making this declaration in support of the Commission's Letter Request for an Order overruling objections asserted by counsel to defendant Mohammed Ali Rashid as a basis to instruct Glen McGorty, Esq. to decline to answer questions during his deposition on October 30, 2018.

2.     Attached hereto as Exhibit 1 is a true and correct copy of an Initial Information Request Letter dated April 18, 2013 from William J. Delmage, Assistant Regional Director, SEC Office of Compliance Inspections and Examinations to John J. Suydam, Chief Compliance Officer, Apollo Capital Management, L.P. and Cindy Z. Michel, Chief Compliance Officer, Apollo Investment Corporation.

3.      Attached hereto is a true and correct copy of a Power Point presentation titled "Apollo Global Management Expense Review – Preliminary Results" that Paul, Weiss, Rifkind, Wharton & Garrison LLP made to the SEC's Office of Compliance Inspections and Examinations on or about September, 16, 2013.   We have redacted what otherwise would have been the second to last page of the power point presentation (all pages are Bastes numbered "Apollo 00001") because that page contains discussion concerning Rashid's former spouse.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of November 2018

_Duane K Thompson_
Duane K. Thompson

# EXHIBIT 1



IN REPLYING, PLEASE QUOTE

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
NEW YORK REGIONAL OFFICE
3 WORLD FINANCIAL CENTER
NEW YORK, NY 10281**

<u>Initial
Information
Request</u>

April 18, 2013

<u>DELIVERY VIA SECURED EMAIL</u>

Mr. John J. Suydam, Chief Compliance Officer
Apollo Capital Management, L.P.

Ms. Cindy Z. Michel, Chief Compliance Officer
Apollo Investment Corporation
9 West 57th Street, 48th Floor
New York, NY 10019

Re:       Apollo Capital Management, L.P.
            Apollo Investment Management, L.P.
            Apollo Management, L.P.
            Apollo Global Real Estate Management, L.P.
            Apollo Credit Management, LLC
            Apollo Commodities Management, L.P.
                (collectively, the "Advisers")

            Apollo Investment Corporation
            Apollo Tactical Income Fund Inc.
            Apollo Senior Floating Rate Fund Inc.
                (collectively, the "Funds")

Dear Mr. Suydam and Ms. Michel:

The staff of the U.S. Securities and Exchange Commission is conducting an examination of the Advisers and the Funds pursuant to Section 204 of the Investment Advisers Act of 1940 (the "Advisers Act") and Section 31(b) of the Investment Company Act of 1940 (the "IC Act"). The purpose of the examination is to assess the Advisers' and the Funds' compliance with provisions of the Advisers Act and the IC Act and the rules thereunder.

Additional information about compliance examinations and the examination process is included in the enclosed "*Examination Information*" brochure (SEC Form 2389). Also enclosed is information regarding the Commission's authority to obtain the information requested and

1

additional information: *"Supplemental Information for Regulated Entities Directed to Supply Information Other Than Pursuant to a Commission Subpoena"* (SEC Form 1661).

**Information is Requested**

Please provide all of the information specified in the enclosed information request list. The information is to be provided to the staff by mail in advance of the staff's on-site examination. The staff requests that certain items be provided in an electronic format to the extent possible. Additional information about the desired electronic format is included in the document request list.

If the Advisers become aware of the need for delay in the production of any requested information that extends beyond the first day of the on-site examination, the Advisers should immediately contact the undersigned at the telephone number indicated. During the examination, the staff may also request additional or follow-up information, and will discuss timeframes for the Advisers to produce this information.

**The On-Site Phase of Examination**

The on-site phase of the examination is **to be determined**. The staff appreciates the Advisers' cooperation in facilitating the examination process.

We request that you make adequate office facilities available to the staff during the on-site examination, to ensure the confidentiality and efficiency of the examination. After arriving on-site, the staff would like to speak with at least one member of senior management to obtain an overall view of the Advisers' organization, business, compliance program, and compliance culture. Early in the on-site portion of the examination, the staff would also like to discuss the Advisers' overall compliance program as well as specific policies and procedures with the Advisers' Chief Compliance Officer. Also during the on-site portion of the examination, in order to understand fully the Adviser's operations and compliance controls in these areas, the staff will want to interview persons responsible for functions such as risk management, portfolio management, trade execution, research, back office/administration, information technology, anti-money laundering and marketing.

**Background Regarding the Information Requested**

Each investment adviser and investment company that is registered with the Commission is required to adopt and implement written policies and procedures reasonably designed to prevent violations of the federal securities laws, and to review those policies and procedures annually for their continued adequacy and the effectiveness of their implementation. In addition, registered advisers and funds are required to designate a chief compliance officer responsible for administering the policies and procedures. Each adviser should adopt policies and procedures that take into consideration the nature of that firm's operations. The policies and procedures should be designed to prevent violations from occurring, detect violations that have occurred, and correct promptly any violations that have occurred.

The initial phase of a routine examination generally includes a review of the firm's business and investment activities and its corresponding compliance policies and procedures. The examination staff will request information and documents and speak with the firm's employees to ensure an understanding of the firm's business and investment activities and the operation of its compliance program. Using the information obtained, the staff will assess whether the firm's policies and procedures appear to effectively address the firm's compliance risks. The initial phase of a routine examination also includes testing of the firm's compliance program in particular areas. The information requested and the purpose for requesting the information is described below.

- Certain general information is requested, such as the firm's organizational charts, demographic and other data for advisory clients, including privately offered funds, and a record of all trades placed for its clients/funds (trade blotter) -- to provide an understanding of the firm's business and its investment activities.

- Information about the firm's compliance risks is requested, and the written policies and procedures that the firm has established and implemented to address those risks -- to provide an understanding of the firm's compliance risks and its corresponding controls. This information would include, for example, any inventory performed of the firm's compliance risks and its compliance manual or policies and procedures.

- Documents relating to the firm's compliance testing is requested -- to provide an understanding of how effectively a firm has implemented its compliance policies and procedures. This information would include, for example, the results of any compliance reviews, quality control analyses, surveillance, and/or forensic or transactional tests performed by the firm.

- Information regarding actions taken as a result of compliance testing is requested -- to provide an understanding of steps taken by the firm to address the results of any compliance reviews, quality control analyses, surveillance, and/or forensic or transactional tests performed by the firm. This information would include, for example, any warnings to or disciplinary action of employees, changes in policies or procedures, redress to affected clients, or other measures.

- Other information is requested -- to allow the staff to perform testing for compliance in various areas.

As part of the pre-examination planning process, the staff actively coordinates examination oversight to ensure that regulatory efforts are not duplicative. If you have any concerns in this regard, please contact the undersigned.

Your cooperation is greatly appreciated in the examination process. If you have any questions, please contact Majid S. Mahmood at (212) 336-0030.

Sincerely,

William J. Delmage
Assistant Regional Director

Enclosures:
    Information Request List
    Examination Information Brochure (Form 2389)
    Supplemental Information (Form 1661)

# Information Request List

## Examination Period

Information is requested for the period **October 1, 2012** through **March 31, 2013** (the "Examination Period") unless otherwise noted.

## Organizing the Information to be Provided

In order to efficiently process the material assembled for the Staff's review, please group the information so that it corresponds to the item number in the request list. If information provided is responsive to more than one request item, you may provide it only once and refer to it when responding to the other request item numbers. If any request item does not apply to your business, please indicate "N/A" (not applicable). *Please provide all responses in searchable electronic format – Excel, Word, PDF, etc.* (Note: For certain, items we may request a specific format).

## Information to be provided by close of business on Friday, April 26, 2013.

1. Provide the following items for each Adviser as of **March 31, 2013**:
    a. Organizational chart;
    b. List of current employees, partners, officers and/or directors and their respective titles;
    c. List of all access persons, including contract employees, required to report transactions.
    d. Number of *discretionary* clients and assets under management (please list by type of client, e.g., funds, separate accounts, etc.); and
    e. Number of *non-discretionary* clients and assets under management listed by type of client, e.g., funds, separate accounts, etc.

2. Provide the information below for all advisory clients, including privately offered funds as of **March 31, 2013**, including: (The preferred format for this information is Microsoft Excel)
    a. the Account number, name, and balance;
    b. whether the client is a related person, affiliated person, or a proprietary account;
    c. the type of account (e.g. registered fund, unregistered fund)
    d. the account custodian and location;
    e. whether or not the custodian sends periodic account statements directly to the client; whether or not the delivery is electronic, if so, a copy of the authorization; and the form of electronic delivery (*e.g.*, email or website login);
    f. whether or not the Adviser has discretionary authority;
    g. whether the Adviser, an officer, an employee, or an affiliate acts as trustee, co-trustee, or successor trustee or has full power of attorney for the account;
    h. whether the Adviser or related persons are deemed to have custody of, possession of or access to the client's assets, and if so, the location of the assets;

    i.   the investment strategy (*e.g.*, global equity, high-yield, aggressive growth, long-short, or statistical arbitrage) and the performance composite in which it is included, if any;

    j.   whether client has a directed brokerage arrangement, including commission recapture (provide the name of broker(s), details of the arrangement and any reports used to monitor payments of commissions);

    k.   the account portfolio manager(s);

    l.   the value of each client's account that was used for purposes of calculating its advisory fee for the most recent billing period;

    m.  whether the client pays a performance fee and the most recent account performance figures;

    n.   whether or not advisory fees are paid directly from the client's custodial account; and

    o.   for clients obtained during the Examination Period, provide account inception date and name(s) of consultant(s) related to obtaining the client, if any.

3. Provide the information below regarding each private investment fund managed by the Advisers as of **March 31, 2013**, including:

    a.   Name as shown in organizational documents (as amended);

    b.   Domicile (country);

    c.   Investment strategy (*e.g.*, US Private Equity, European Private Equity, US Real Estate, long-short, statistical arbitrage, fund of funds);

    d.   If funds are part of a master/feeder fund structure, full name and domicile of each fund;

    e.   Name of Fund Family, if applicable;

    f.   Number of investors, total committed capital and total assets remaining;

    g.   Amount, if any, of each adviser's equity interest in each fund;

    h.   Amount, if any, of each adviser's affiliated persons' interest;

    i.   Date the fund began accepting unaffiliated investors;

    j.   Whether the fund is currently closed to new investors;

    k.   Lock-up periods for both initial and subsequent investments;

    l.   Specific exemption(s) from registration under the Securities Act of 1933 and/or the Investment Company Act of 1940 upon which each fund relies;

    m.  Services the Adviser or an affiliate (*e.g.*, general partner, adviser, sub-adviser, managing member) is providing;

    n.   Name of any unaffiliated Sub-Adviser used to manage the fund;

    o.   the fund portfolio manager(s);

    p.   Whether the fund is audited annually and, if so, name of auditor;

    q.   Whether the fund is subject to an annual surprise examination of its assets and, if so, the date of the most recent Form ADV-E filing;

    r.   Amount of leverage, both explicit (on-balance sheet) and off-balance sheet (futures and certain other derivatives), used by the fund as measured by the Adviser for risk- management purposes; and

    s.   Indicate any funds that have been extended beyond their expected lifespan.

4. Copy of the Form ADV Part 2A and Part 2B furnished to clients during the Examination Period and any disclosure document used in conjunction with or in lieu of Part 2.

5. Names of any of the Advisers' officers and/or directors who resigned during the period October 1, 2012 through March 31, 2013 and information regarding the reason for their departure.

6. Names of any of the Advisers' employees who resigned during the Examination Period and information regarding the reason for their departure. In addition, please provide the names of employees who were terminated during the Examination Period and the reason for termination.

7. Please provide a copy of the compliance policies and procedures that were in effect during the Examination Period for the Adviser and its affiliates pursuant to Rule 206(4)-7 under the Advisers Act.

8. A copy of the Advisers' and affiliates' Code of Ethics and insider trading policies and procedures.

9. A record of any non-compliance with the Advisers' compliance policies and procedures and of any action taken as a result of such non-compliance.

10. Copy of the Advisers' most recent annual review(s).

11. All affiliated broker-dealers including a description of the affiliation and of their clearing arrangements.

12. A current inventory of the Advisers' compliance risks that forms the basis for its policies and procedures, including any changes made to the inventory during the Examination Period and the dates of the changes.

13. Any documents maintained that map the Advisers' inventory of risks to their written policies and procedures.

14. Any written guidance that the Advisers have provided to their employees regarding the compliance risk assessment process and the process for creating policies and procedures to mitigate and manage compliance risks.

15. Information relating to the Advisers' compliance testing, including any compliance reviews, quality control analyses, surveillance, and/or forensic or transactional tests performed by the Advisers. This information should include any significant findings, both positive and negative, of such testing and any information about corrective or remedial actions taken regarding these findings.

7

16. Information about the oversight process that the Advisers use for any remote offices, independent advisory contractors, and consolidated businesses, and any policies and procedures with respect to such oversight.

17. A list of internal audit review schedules and completed audits including the subject and the date of the report during the Examination Period.

18. Please provide a copy of the Advisers' most recent SAS 70 report.

19. Any client and investor complaints during the Examination Period.

20. Any threatened, pending and settled litigation or arbitration involving the Advisers or any "supervised person" (if it relates to the individual's association with the Advisers or a securities-related matter) including a description of the allegations, the status, and a brief description of any "out of court" or informal settlement. Note that "supervised person" is any partner, officer, director (or other person occupying a similar status or performing similar functions), or employee of an investment adviser, or other person who provides investment advice on behalf of the investment adviser and is subject to the supervision and control of the investment adviser (defined in Section 202(a)(25) of the Advisers Act). If none, please provide a written statement to that effect.

21. A list of all committees, the members of each committee, and the responsibilities of each committee, and whether meeting minutes are maintained.

22. Please provide a list of all new investment products for which capital was raised or brought to the market for the 18-month period ended **March 31, 2013**.

23. Please provide copies of the portfolio management agreements for all CLOs managed by the Advisers as of **March 31, 2013**.

24. Please provide a list of all private equity deals/transactions that the Advisers were involved in for the two year period ended March 31, 2013. For each transaction, please include the following at a minimum: date of deal/transaction, parties involved, including the target company, description of deal/transaction, etc.

**Advisers to Registered Investment Companies**

25. Please provide a copy of the Funds' policies and procedures adopted pursuant to the Compliance Rule.

26. Please provide the composition of the Boards of Directors (the "Board"), including the names, titles, and whether each Board member is interested or disinterested.

27. The most recent annual report submitted to the Board by the CCO.

28. A list of threatened, pending and settled litigation or arbitration to which the Funds were a party during the inspection period. Provide a description of the

allegations forming the basis for each issue, the status of each pending issue, and a brief description of any "out of court" or informal settlement.  If none, please provide a written statement to that effect.

29. Minutes and materials of Board meetings for the 18-month period ended **March 31, 2013,** meeting agenda for each meeting and, the agenda and a draft of the minutes for the most recent Board meeting.

30. A chart listing all Funds and the following information as of **March 31, 2013** for each fund:

|   |   |
|---|---|
| a.  Registration number | f.  Number of shareholder accounts |
| b.  Net assets | g.  Name of portfolio manager(s) |
| c.  Total shares outstanding | h. Commencement date of operations |
| d.  Maximum sales load | i. Portfolio turnover rate for the last 2 years |
| e.  Investment objective | |



### EXAMINATION INFORMATION FOR BROKER-DEALERS, TRANSFER AGENTS, CLEARING AGENCIES, INVESTMENT ADVISERS, AND INVESTMENT COMPANIES

This brochure, prepared by the staff of the Securities and Exchange Commission (SEC or Commission), provides information about examinations conducted by the SEC examination staff, including the examination process and the methods employed by the staff for resolving problems found during examinations. This information, provided to firms under examination, should help you to better understand the Commission's objectives in this area.

## I.    PURPOSE OF EXAMINATIONS

The Securities Exchange Act of 1934, the Investment Advisers Act of 1940, and the Investment Company Act of 1940 authorize the SEC to conduct examinations of firms that are registered with the SEC, including registered broker-dealers, transfer agents, clearing agencies, investment advisers, and investment companies. These statutes also authorize the SEC, by rule, to require registered firms to maintain certain books and records. The purpose of SEC examinations is to protect investors. Thus, during examinations, the SEC staff will seek to determine whether the firm is: conducting its activities in accordance with the federal securities laws and rules adopted under these laws (including, where applicable, the rules of self-regulatory organizations subject to the SEC's oversight); adhering to the disclosures it has made to investors; and implementing supervisory systems and/or compliance policies and procedures that are reasonably designed to ensure that the firm's operations are in compliance with the law. The SEC staff appreciates your cooperation with the examination process.

## II.    THE EXAMINATION PROCESS

Examinations are conducted by professional examination staff from the SEC's 11 regional offices, and its headquarters office in Washington, DC. The Office of Compliance Inspections and Examinations, located in Washington, DC, is responsible for the SEC's overall examination program.

Firms may be selected for examination for any number of reasons, including for a routine examination, because of an investor complaint, or in connection with a review of a particular compliance risk area. The reason why firms have been selected for examination is non-public information, and typically will not be shared with the firm under examination.

Examinations may be conducted on an announced or unannounced basis. When the examination is announced, the staff will send the firm a letter notifying it of the examination and containing a request list that identifies certain information or documents that SEC examiners will review as part of the examination. In some instances, the examiners may request that certain of the

information and documents be provided in an electronic format. The request list may ask that the information and documents: (1) be delivered to the SEC's offices by a specified date; (2) be made available for review at the firm's offices on a specified date; or (3) some combination of the two.

Please communicate promptly with the examiners if you have any questions about the documents and information requested. In all cases, producing requested information and documents in a timely manner will facilitate the efficient completion of the examination.

As part of our pre-examination planning process, we actively work to ensure that our regulatory efforts are not duplicative. If you have any concerns in this regard, please contact the examiners responsible for the examination.

The examiners will provide the firm with SEC Form 1661, "*Supplemental Information for Regulated Entities Directed to Supply Information Other Than Pursuant to a Commission Subpoena,*" which provides information concerning the possible uses of information provided to the SEC (this form can also be accessed at www.sec.gov/about/forms/sec1661.pdf.) Upon request, the examiners will also provide the name and telephone number of their supervisor.

In many examinations, the examiners will visit the firm to conduct examination work on-site. Upon arrival, the examiners will identify themselves and present their SEC identifications. The examiners may conduct an initial interview. During this initial interview, the examiners will ask a series of questions about the firm and the activities to be examined. This information assists examiners in understanding the firm and its operations, and often assists examiners in determining the scope of the examination. The examiners may also ask for a walk-through of the firm's offices to gain an overall understanding of the firm's organization, flow of work, and control environment. Some examinations may be completed through the examiners' review of records in the SEC's offices along with telephonic or other interviews, as needed.

If the examination is unannounced, as soon as the examiners arrive they will provide the firm with an information or document request list and conduct an initial interview. During the initial interview, the examiners will go over the information or document request list to ensure that you understand the information and documents requested.

Following this initial phase of the examination, the examiners will review the information and documents provided by the firm. During this review, the examiners may make supplemental requests for additional information and documents. They may also request meetings with firm employees to discuss the firm's operations and the information and documents provided. These meetings help the examiners gain a better understanding of the firm's activities and compliance processes. The examiners may also request relevant information and documents from third parties that, for example, perform work for, or in conjunction with, the firm or where the third party activity may have a material impact on the firm.

On the last day of the on-site visit, the examiners will typically conduct an "exit interview" during which they will discuss the status of the examination and any outstanding information and document requests and, if appropriate, the issues identified during the examination to that point.

During an exit interview, the firm will be given an opportunity to discuss any of the issues that the examiners found and provide additional relevant information, including with respect to any actions that the firm has taken or plans to take to address the issues.

The examiners will then return to the SEC offices. In many cases, the examiners will perform additional analyses of the information or data obtained during the examination. This may include contacting the firm to ask clarifying questions or to request additional information or documents. In formulating the findings of the examination, the examiners may consult with other staff within the SEC, including supervisory staff and staff in relevant offices and divisions, to ensure that the findings are consistent with Commission rules, regulations, and interpretations.

If work performed subsequent to completion of the on-site portion of the examination identifies issues in addition to those discussed during the exit interview conducted on the last day of the on-site visit, the examiners will contact the firm, usually by telephone, to discuss these additional findings. During this discussion, which may constitute a "final exit interview," the firm will be given an opportunity to discuss any of the issues that the examiners found and provide additional relevant information, including with respect to any actions that the firm has taken or plans to take to address the issues identified.

## III.   COMPLETING AN EXAMINATION

After the completion of the on-site portion of the examination, the examiners will normally complete the examination within 120 days. If the examiners are unable to complete their work within that time, on or about the 120th day they will contact the firm to discuss the status of the examination and the likely schedule for completing the examination and for providing a final exit interview.

When an examination has been completed, the firm will be sent a written notification. This notification will generally take one of two forms: (1) the examination staff may send the firm a letter indicating that the examination has concluded without findings (often referred to as a "*no-further action letter*"); or (2) the examination staff may send the firm a letter that describes the issues identified, asks the firm to undertake corrective action and to provide the staff with a written response outlining those actions, and possibly requests a conference at the SEC's office (often referred to as a "*deficiency letter*"). If serious problems are found, in addition to sending the firm a deficiency letter, the examination staff may refer the problems to the Commission's Division of Enforcement, or to a self-regulatory organization, state regulatory agency, or other regulator for possible action. Notwithstanding the above, on occasion (usually in the context of certain exigent circumstances) problems may be referred to the Division of Enforcement without an exit interview or a deficiency letter.

As described above, a written notification that the examination has concluded will generally be sent to the firm no later than 120 days following the end of the fieldwork phase of the examination. The firm will be asked to respond in writing to any issues identified in a deficiency letter, including any steps that it has taken or will take to address the problems and to ensure that they do not reoccur. This response will generally be due within 30 days of the date of the deficiency letter.

Providing a timely and complete response to a deficiency letter will facilitate the examination staff's review of your response. In particular, please be sure to address all of the issues identified by the examiners. If the examiners have comments on your response, they will generally either provide them to you within 60 days, or contact you toward the end of that period to discuss their schedule for providing them to you. If the examiners have no further comments after receiving your response to a deficiency letter, they will send no further communication and the examination will be closed.

*     *     *

If you have any questions, comments, complaints, or concerns during an examination or after it is completed, please raise them with the examiners or with the examiners' supervisors in the respective regional office or headquarters office. Most questions and issues can be resolved by discussing them with members of the examination team. You may also communicate comments, complaints, or concerns through the *Examination Hotline*, (202) 551-EXAM. The *Examination Hotline* offers you a choice to speak with either a senior-level attorney in the Office of Compliance Inspections and Examinations in Washington, DC, *or* a staff member in the SEC's Office of Inspector General. The Office of Inspector General is an independent office within the SEC that conducts audits of Commission programs and investigates allegations of employee misconduct. When you speak with staff on the *Examination Hotline*, you may identify yourself or request anonymity.

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Entities Subject to Inspection by the Commission and Directed to Supply Information Other Than Pursuant to Commission Subpoena

### A. Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgement of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self addressed envelope.

### B. Authority for Solicitation of the Information

1.  Mandatory Information.

    (a) All records of persons identified in Section 17(a) of the Securities Exchange Act of 1934 and investment advisers, including but not limited to required records, must be made available for examination by representatives of the Commission.[1] See Sections 17(a) and (b) of the Securities Exchange Act of 1934 and rules thereunder, and Section 204 of the Investment Advisers Act of 1940 and rules thereunder. Records required to be maintained and preserved pursuant to Section 31(a) of the Investment Company Act of 1940 and rules thereunder must be made available for examination by representatives of the Commission. See Section 31(b) of the Investment Company Act of 1940. Other persons subject to examination by representatives of the Commission pursuant to the Federal securities laws and rules must make certain records, as described by statute or rule, available for examination by representatives of the Commission.[2] See Sections 13(n)(2), 13A(c)(2), and 15F(f)(1)(C) of the Securities Exchange Act of 1934 and Section 32(c) of the Investment Company Act of 1940.

    (b) Security-based swap execution facilities registered with the Commission are required to provide certain information to the Commission pursuant to Section 3D(d)(5) of the Securities Exchange Act of 1934.

    (c) The Commodity Exchange Act requires certain persons who are required to maintain books and records prescribed by the United States Commodity Futures Trading Commission to keep certain books and records open to inspection and examination by the Commission or representatives of the Commission.

2.  Other Information. The production of information other than the records and documents described in paragraph B.1 above is voluntary.

### C. Effect of Not Supplying Information

1.  Mandatory Information.

    (a) A willful failure to permit inspection by authorized Commission personnel of the records and documents described in paragraph B.1 may result in legal proceedings the penalty for which, upon conviction, is a fine of not more than $5,000,000 or imprisonment for not more than 20 years, or both. When the person failing to permit inspection is a person other than a natural person, a fine not exceeding $25,000,000 may be imposed.

    (b) Failure to produce the records and documents described in paragraph B.1 for inspection, and/or aiding or abetting someone in such failure may have the following consequences: (i) regulated persons may

---

[1] Section 204(a) of the Investment Advisers Act of 1940 provides that all records of investment advisers, other than investment advisers specifically exempt from registration pursuant to Section 203(b) of the Act, are subject to examination by representatives of the Commission.

[2] Any person that is subject to regulation and examination by a Federal financial institution regulatory agency (as defined under 18 U.S.C. 212(c)(2)) may satisfy an examination request, information request, or document request described under Section 204(d)(1) of the Investment Advisers Act or Section 31(b)(4)(A) of the Investment Company Act of 1940, by providing the Commission with a detailed listing, in writing, of the securities, deposits or credits of the client or registered investment company within the custody or use of such person. See Section 204(d)(2) of the Investment Advisers Act of 1940 and Section 31(b)(4)(B) of the Investment Company Act of 1940.

be censured or their registration and/or exchange or association status may be suspended, revoked, or subject to various other sanctions; (ii) members of national securities exchanges may be censured, suspended or expelled from membership; and (iii) members of a registered securities association may be censured, suspended or expelled from membership in a registered association, or subject to various other sanctions. Employees of and persons associated with the foregoing may be suspended or barred from association with regulated entities and/or they may be censured or subject to various other sanctions.

(c)  If there is a failure to permit inspection of the records and documents described in paragraph B.1, the Commission may seek an injunction against, among other things, continuing to fail to permit an inspection. The continuance of such failure thereafter may result in civil and/or criminal sanctions for contempt of court.

2.  Other Information. There are no direct sanctions and thus no direct effects for failure to provide all or any part of the information requested to be supplied on a voluntary basis.

## D. False Statements and Documents

Section 1001 of Title 18 of the United States Code provides as follows:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

## E. Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation.  Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding.  Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner.  It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him.  This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings.  That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## F. Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which

2

the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

## G.  Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors.  There is a likelihood that information supplied by you will be made available to such agencies where appropriate.  Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1.  To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2.  To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3.  To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4.  By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

* * * * *

*Small Business Owners*:  The SEC always welcomes comments on how it can better assist small businesses.  If you have comments about the SEC's enforcement of the securities laws, please contact the Office of Chief Counsel in the SEC's Division of Enforcement at 202-551-4933 or the SEC's Small Business Ombudsman at 202-551-3460.  If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR.  The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

# EXHIBIT 2

Paul|Weiss

# Apollo Global Management
# Expense Review -- Preliminary Results

September 16, 2013

Paul, Weiss, Rifkind, Wharton & Garrison LLP

FOIA Confidential Treatment Requested by Apollo Global Management

APOLLO 00001

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

# Overview

- On August 29, 2012, Apollo engaged Paul, Weiss to assist in a review of its expense allocations and procedures.

- Paul, Weiss in turn engaged PricewaterhouseCoopers ("PwC") in October 2012 to assist in providing this advice, including, among other things, T&E spending.

- PwC reviewed all travel and expense reports for 101 Apollo employees with the greatest T&E expenditures between 1/1/2011 through 3/15/2013.
  - PwC analyzed T&E reports comprising more than 80,000 expenditures, totaling approximately $39 million

- As part of its review, Apollo asked approximately 300 current employees in PE, Credit, Marketing, Finance, and Legal to review the accuracy of their own T&E reports from January 1, 2011 through April 30, 2013, and to note any corrections or adjustments required.  These reports comprised 173,217 expenditures totaling $46,276,493.05.

- The T&E review led us to identify one employee – Mohammed ("Ali") Rashid whose expenditures warranted more in-depth review.

- As a result, Paul, Weiss engaged BDO Consulting to conduct a forensic analysis of Rashid's expenses from January 2010 to June 2013.

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

APOLLO 00001

# 1. Employee T&E Review

## PRELIMINARY RESULTS AS OF SEPTEMBER 12, 2013

- ➤ As part of the T&E Review, 173,217 expenditures were reviewed for the time period 1/1/11-3/31/13.  Of the 173,217 expenditures reviewed, **6,838** entries, or **3.95%**, were reallocated.

- ➤ In dollar terms, the 173,217 expenditures reviewed totaled $46,276,493.05.  Of the $46,276,493.05 of expenditures reviewed, **$689,730**, or **1.49%**, were reallocated.

- ➤ Apollo is in the process of making accounting adjustments based on the results obtained to date from the T&E review.

- ➤ Certain limited reviews are continuing, which we expect to yield some additional adjustments.  We will continue to update you on the progress of our work.

Paul, Weiss, Rifkind, Wharton & Garrison LLP          FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT3

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

APOLLO 00001

# 1. Employee T&E Review

## PRELIMINARY RESULTS AS OF SEPTEMBER 12, 2013

➢ Preliminary results indicate that on a net basis (excluding adjustments related to Ali Rashid), the following allocation adjustments are required:

| Overall T&E Impact to AGM and Fund and Portfolio Companies | | | | |
|---|---|---|---|---|
| Expense Type | AGM | Fund | Portfolio Co. | Personal |
| Airfare | $ 450,652 | $(302,986) | $ (125,888) | $ 8,549 |
| Hotel and Lodging | 133,583 | (83,739) | (53,475) | (674) |
| Meals and Client Entertainment | 120,282 | (96,427) | (23,960) | (762) |
| Taxi and Limousine | 86,138 | (47,554) | (24,924) | (16,390) |
| Board Meeting expense | (159,150) | 177,569 | (18,655) | (37) |
| Other | 58,226 | (24,406) | (23,410) | (10,201) |
| Net Profit (Loss) Impact | $ 689,730 | $ (377,544) | $ (270,312) | $ (19,514) |

⌧ $689,730 in expenses will be reallocated from AGM;

⌧ $377,544 in expenses will be reallocated to Funds managed by AGM;

⌧ $270,312 in expenses will be reallocated to Portfolio Companies;

⌧ $19,514 in expenses will be reallocated to employees as personal expenses;

⌧ $22,360 (the difference between AGM net profit and net loss to Funds, Portfolio Companies and personal expenses) remains under review

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO                                        APOLLO 00001

# 2. Mohammed ("Ali") Rashid

## BACKGROUND

- ➢ Of all of the reviews conducted to date, only one individual's T&E's have raised questions of possible misconduct.

- ➢ During the review of Rashid's T&E, Shared Services (a unit within the Apollo accounting department) noticed that Rashid, a partner who has worked at Apollo for 13 years, had submitted expenditures for reimbursement during several holiday weekends in 2012, including July 4th, Labor Day, and Thanksgiving.

- ➢ Rashid had been selected for review as one of the 101 employees with the highest T&E expenditures.  He was also asked to re-review his expense reports and was given the opportunity to make necessary adjustments.  Twice before (in 2010 and 2012) Rashid had been the subject of reviews that led to the repayment of inappropriately taken personal expense charges.

- ➢ On at least one and possibly both occasions, Gene Donnelly, Apollo's then-CFO, spoke to Rashid.  According to Rashid, Donnelly told him to resolve the inappropriate expenses with Seth Dunayer, Apollo's expense manager.

Paul, Weiss, Rifkind, Wharton & Garrison LLP        FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT 5

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

APOLLO 00001

# 2. Mohammed ("Ali") Rashid

## PRIOR REIMBURSEMENTS

➢ **2010 Reimbursement:** Rashid's then-administrative assistant reported to the expense manager that Rashid was expensing monthly charges for an Italian restaurant named "La Contessa" which she believed was actually his barber. (La Contessa was in fact a high-end barber shop).

  ▪ This incident prompted the expense manager to review Rashid's expenses for approximately the prior six months.

  ▪ Rashid admitted that additional expenses were personal, including personal trips and weekend dinners, and in November 2010 reimbursed the firm $7,828.86.

➢ **2012 Reimbursement:** In December 2011, Rashid sought and received permission from the Compliance Department to purchase $100 holiday gifts for executives of certain portfolio companies.

  ▪ The charges for the gifts appeared on Rashid's February Amex statement.

  ▪ The timing of the charges prompted further inquiry by the expense manager, which revealed that instead of purchasing gifts for executives, Rashid had spent $3,500 on a suit for his father at Zegna, a high-end clothing store.

Paul, Weiss, Rifkind, Wharton & Garrison LLP      FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT6

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

APOLLO 00001

# 2. Mohammed ("Ali") Rashid

## PRIOR REIMBURSEMENTS

- When asked to produce a receipt for the gifts he claimed to have purchased, Rashid asked a salesman to create and forward a false receipt reflecting the purchase of 35 "Ties for gifts."

- Gene Donnelly asked the expense manager to review another six months of Rashid's expenses, which uncovered a number of additional inappropriate expenses Rashid had submitted for reimbursement.

- As a result of this process, Rashid, who notes that Donnelly instructed him not to engage in this kind of conduct again, paid back an additional $7,072.36 on May 31, 2012.



Ermenegildo Zegna

# 2. Mohammed ("Ali") Rashid

## CURRENT EXAMINATION OF RASHID'S EXPENSES

➢ As a result of the expense review and the apparent anomalies, in May 2013, Apollo asked Paul, Weiss to investigate further the expenses of Ali Rashid.

➢ Paul, Weiss's review focused on certain "red flags," including specifically travel during holiday weekends; travel to vacation spots; and travel to sporting events, between May 2012—the date of Rashid's last repayment to Apollo—and May 2013.

➢ Paul, Weiss examined Rashid's expense statements (both as historically submitted and as annotated and amended during the 2013 self-review); his Amex statements; his e-mails; his travel records; his Outlook calendar entries; and his assistant's emails.

➢ The results suggested that Rashid had expensed numerous trips that appeared to have been exclusively (or at least predominantly) personal, including several vacations and several weekend trips to sporting events.

# 2. Mohammed ("Ali") Rashid

## CURRENT EXAMINATION OF RASHID'S EXPENSES

- ➤ On July 1, 2013, Paul, Weiss interviewed Rashid.
  - ▪ Although he initially defended his expenditures as appropriate business expenses and noted his assistant handled his expense reports, Rashid ultimately acknowledged that many of his expenses could fairly be characterized as personal.
  - ▪ Rashid also admitted to requesting a fake receipt from a salesperson, and said that he likely told the store clerk that the receipt should state "for gifts."
- ➤ Immediately following that interview, Rashid was suspended without pay pending a more comprehensive review of his expenses.
  - ▪ Rashid, who remains on leave, has cooperated with efforts to re-examine and (as appropriate) re-allocate his expenses.
- ➤ On July 8, 2013, Paul, Weiss engaged BDO Consulting to assist in a comprehensive "line by line" analysis of Rashid's expenses between January 2010 and June 2013.

Paul, Weiss, Rifkind, Wharton & Garrison LLP         FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT9

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

APOLLO 00001

# 2. Mohammed ("Ali") Rashid

## BDO FORENSIC REVIEW

- ➤ First, Rashid and his counsel reviewed the expenses and identified those expenses that he was willing to have re-classified as personal.
  - These and any other expenses Rashid had previously identified as personal (either when incurred or during his self-review in April 2013) were not reviewed.

- ➤ BDO reviewed the remaining items, looking for documentary support for their business purpose in emails and calendar entries.
  - BDO had access to Rashid's emails, calendar events, American Express bills, travel agency and car service schedules, and his assistant's emails.

- ➤ Expenses without specific supporting documentation were assumed to be personal.

- ➤ BDO separated the expenses into three categories for review (applying specific "rules" for classifying the expenses in each category):
  - (1) expenses incurred as part of business trips;
  - (2) non-trip related expenses (including local meals, gifts, etc.); and
  - (3) local transportation expenses (primarily car services and taxis).

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

# 2. Mohammed ("Ali") Rashid

## BDO FORENSIC REVIEW: BUSINESS TRAVEL-RELATED EXPENSES

- For each claimed business trip, BDO reviewed the available documents to ensure the trip was primarily business related and, if so, the number of days Rashid needed to be out-of-town for business.

  - If there was no calendar event related to the trip, or if email communications suggested the trip was primarily for personal reasons, all expenses related to the trip were reclassified as personal.

  - If, on the other hand, documents indicated that the trip was business related, all hotel, meals, and transportation expenses related to the trip were classified as reimbursable business expenses except to the extent that they exceeded existing expense limits.

- **Meals**: BDO verified that the total expense was within the maximums established by Apollo's T&E Policy in effect at the time the expense was incurred. Amounts in excess of the limits in effect at the time were classified as personal.

  - For the period November 2011 to May 2013, when no specific maximums were in effect, BDO used the 2013 maximum rates plus 20%.

Paul, Weiss, Rifkind, Wharton & Garrison LLP          FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT11

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

APOLLO 00001

# 2. Mohammed ("Ali") Rashid

## BDO FORENSIC REVIEW: BUSINESS TRAVEL-RELATED EXPENSES

- ➤ ***Hotels***: BDO searched for documents (e.g., invoices or confirmations) indicating the nightly room rate.
  - Where a rate was identified, BDO compared the total charges to the maximum room rates allowed under Apollo's policy limits (applying a tax rate, either specifically identified with the room rate or assumed).  Amounts in excess of the limits in effect at the time were classified as personal.
    - The total calculated hotel stay was also compared to the total hotel charge. Where BDO could not find documentation supporting the additional charges, they were reclassified as personal.
  - Where the specific room rate could not be determined, the total hotel charge was compared to the maximum room rates allowed under Apollo's policy limits. Amounts in excess of the policy limits were reclassified as a personal expense.
  - ***Additional charges on invoices***: BDO determined whether the charges were related to allowable out-of-town expenses (e.g., meals, internet access).
    - Charges identified as "Paid Out" were confirmed with some hotels to be cash advances (in some instances the charges were too old for the hotel to provide the underlying detail).  BDO classified all "paid out" charges as personal.

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

APOLLO 00001

# 2. Mohammed ("Ali") Rashid

## BDO FORENSIC REVIEW: BUSINESS TRAVEL-RELATED EXPENSES

➤ *Taxis*:

- Expense items identified as "Taxi & Limousine" in the T&E schedule where the merchant was a hotel were classified as personal.

- Rashid's current assistant explained that she had entered some "paid out" amounts as taxi expenses because Rashid had told her that he used the cash to pay for taxis to his meetings.  BDO classified these expenses as personal.

- All other taxis/car service expense items identified by Rashid and his counsel as part of a business trip were left as a business expense, where

  - (1) the amount seemed reasonable, and

  - (2) there was no evidence suggesting the charge was not related to the business purpose of the trip.

Paul, Weiss, Rifkind, Wharton & Garrison LLP          FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT13

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO                                                          APOLLO 00001

## 2. Mohammed ("Ali") Rashid

### BDO FORENSIC REVIEW: NON-TRAVEL RELATED EXPENSES

- ➢ BDO reviewed emails and other documents to determine whether the primary purpose of the expense was business related or personal.

- ➢ Where a calendar event related to the expense and the email communications suggested the expense was for a business purpose, BDO classified the expense item as a business expense.

- ➢ However, if there was no calendar event related to the expense or the email communications suggested that the expense was personal, BDO classified the expense item as personal.

- ➢ ***Meals***: BDO verified that the total expense was within the maximums established by Apollo's T&E Policy in effect at the time the expense was incurred. Amounts in excess of the limits in effect at the time were classified as personal.

Paul, Weiss, Rifkind, Wharton & Garrison LLP          FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT14

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

APOLLO 00001

# 2. Mohammed ("Ali") Rashid

## BDO FORENSIC REVIEW: LOCAL TRANSPORTATION EXPENSES

- For taxi/car services not identified by Rashid or his counsel as related to a business trip, BDO charged the amounts to Rashid personally.

- As a result, and in the absence of supporting documentation, all taxi and car service expenses not associated with a business trip were classified as personal without review of specific rides.

- This rule for reclassification was based on the decision that, under the circumstances, Rashid should pay for all expenses for which he could not document a business purpose.

# 2. Mohammed ("Ali") Rashid

## SUMMARY OF ADJUSTMENTS TO RASHID'S T&E

- ➤ Following BDO's review, $315,320.99 of Rashid's expenses (approximately 38%) were reclassified as personal.
  - ▪ Of those adjustments, more than $220,000 were initially identified by Rashid himself.

- ➤ The final reclassified amount may significantly overstate the actual amount of Rashid's improperly-expensed costs because of the over-inclusive approach adopted by Apollo (and which Rashid appears to also have taken) during this process.

- ➤ The breakdown of the expense classifications is as follows:
  - ▪ Rashid reclassified $220,796.87 as personal.
  - ▪ BDO reclassified an additional $61,349.59 as personal.
  - ▪ $ 23,654.91 in taxi and car service charges were taken as a whole and reclassified as personal.
  - ▪ $9,282.62 was determined to be over Apollo's established policy limits and reclassified as personal.

Paul, Weiss, Rifkind, Wharton & Garrison LLP          FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT.16

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO                                                                      APOLLO 00001

# 2. Mohammed ("Ali") Rashid

## SUMMARY OF ADJUSTMENTS TO RASHID'S T&E

➤ Summary of Items Reviewed by Category

| Status | Count of Expense Items | Total Expense Amt | % of Total Dollar Amount |
|---|---|---|---|
| Non-Travel Expenses | 1,153 | 270,717.87 | 32.3% |
| Travel Related Expenses | 853 | 543,516.71 | 64.9% |
| Taxi/Car Service (Not Reviewed*) | 824 | 23,654.91 | 2.8% |
| Grand Total | 2,830 | 837,889.49 | 100% |

➤ Summary Table of Adjustments Made

| | Business Amount | Personal Amount | % of Total Exp. Reimb. Amt. | Previously Paid Back or Not Reimbursed | Total Due to Apollo |
|---|---|---|---|---|---|
| Business Expenses | 522,568.50 | | 62% | | 9,282.62 |
| Over the Policy Limit | | 9,282.62 | 1% | | 9,282.62 |
| Personal - Identified by BDO | | 61,349.59 | 7% | 513.60 | 60,835.99 |
| Personal - Identified by Rashid | | 220,796.87 | 26% | 17,139.82 | 203,657.05 |
| Policy Violation | | 237.00 | 0% | | 237.00 |
| Taxi/Car Service | | 23,654.91 | 3% | | 23,654.91 |
| Grand Total | 522,568.50 | 315,320.99 | 100% | 17,653.42 | 297,667.57 |

Paul, Weiss, Rifkind, Wharton & Garrison LLP

FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT 17

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO

APOLLO 00001

## 2. Mohammed ("Ali") Rashid

### RASHID'S COOPERATION WITH APOLLO'S INVESTIGATION

- ➤ Rashid has cooperated fully with Apollo, Paul, Weiss, and BDO at all stages of the process.

- ➤ He has spent considerable time reviewing his expenses to reclassify charges as personal in the first instance, and to group travel-related expenses with their associated trips.

- ➤ He has endorsed an over-inclusive approach to the effort that, we believe, may substantially overstate the amounts improperly charged as business expenses.

- ➤ He promptly provided all requested documents to aid in the review of his expenses and the investigation of his wife's trading accounts during their marriage.

THIS PAGE REDACTED

## 2. Mohammed ("Ali") Rashid

### EMPLOYMENT ACTION

- ➤ Rashid has been on unpaid leave since July 1, 2013.

- ➤ The findings from this review are being presented to the Apollo Executive Committee, which will make a determination about any disciplinary action and Rashid's continued status with the Firm.

Paul, Weiss, Rifkind, Wharton & Garrison LLP      FOIA CONFIDENTIAL TREATMENT REQUESTED BY APOLLO GLOBAL MANAGEMENT20

A CONFIDENTIAL TREATMENT REQUESTED BY APOLLO                                              APOLLO 00001