**Page 1**

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     _____
 3                            )
     UNITED STATES SECURITIES AND    )
 4   EXCHANGE COMMISSION,            )
              Plaintiff,      ) Case No.
 5   vs.                      ) 17-cv-8223(PKC)
                              )
 6                            )
     MOHAMMED ALI RASHID,     )
 7                            )
              Defendant.      )
 8   _____)
 9
10
11          DEPOSITION OF GLEN MCGORTY, ESQ.
12          (Volume 1, pages 1 - 238 inclusive)
13            Tuesday, October 30, 2018
14                  10:23 a.m.
15                 Taken at:
16       Securities and Exchange Commission
17              200 Vesey Street
18              New York, New York
19
20
21
22
23
24   Reported by:
     MONIQUE CABRERA,
25   JOB No. 181030PXL
```

**Page 2**

```
 1   APPEARANCES OF COUNSEL:
 2   FOR THE PLAINTIFF, UNITED STATES SECURITIES AND
 3   EXCHANGE COMMISSION:
 4   UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 5   BY:    DUANE K. THOMPSON, ESQUIRE
 6        DONNA NORMAN, ESQUIRE
 7        Division of Enforcement
 8        100 F Street, N.E.
 9        Washington, DC 20549
10        Telephone:  202.551.7159
11        E-mail: Thompsond@sec.gov
12
13
14   FOR THE DEFENDANT, MOHAMMED ALI RASHID:
15        GREENBERG TRAURIG, LLP
16        BY:  GREGORY W. KEHOE, ESQUIRE
17            DANIEL FRIEDMAN, ESQUIRE
18        200 Park Avenue
19        New York, New York 10166
20        Telephone:  212.801.9200
21        E-mail:  Kehoeg@gtlaw.com
22        Telephone:  212.801.6788
23        E-mail:  Friedmand@gtlaw.com
24
25
```

**Page 3**

```
 1   APPEARANCES OF COUNSEL:  (CONTINUED)
 2   FOR THE WITNESS, GLEN MCGORTY:
 3        CROWELL MORING
 4        BY:  THOMAS A. HANUSIK, ESQUIRE
 5            DANIELLE GIFFUNI, ESQUIRE
 6        1001 Pennsylvania Avenue NW
 7        Washington, DC  20004
 8        Telephone:  202.624.2530
 9        E-mail:  Thanusik@crowell.com
10
11        590 Madison Avenue - 20th Floor
12        New York, New York 10022
13        Telephone:  212.895.4239
14        E-mail:  Dgiffuni@crowell.com
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                   INDEX
 2   TUESDAY, OCTOBER 30, 2018
 3   GLEN MCGORTY
 4                            Page
 5   Examination by    MR. THOMPSON    8
 6                   MR. KEHOE     210
 7
 8
 9               -o0o-
10
11   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
12           (NONE)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Glen McGorty
10/30/2018

EXHIBITS

GLEN MCGORTY

| Number | Page | Description |
|---|---|---|
| Exhibit 1B | 18 | Witness CV (retained by counsel) |
| Exhibit 1A | 20 | Subpoena |
| Exhibit 2 | 27 | A43628-30 E-mail string |
| Exhibit 3 | 32 | AR37-38 E-mail string |
| Exhibit 4 | 74 | 659-74 Apollo Travel and Expense |
| Exhibit 5 | 57 | E-mail from Susan Maisel |
| Exhibit 6 | 79 | 42137-39 E-mail string |
| Exhibit 7 | 83 | A109063-69 E-mail string |
| Exhibit 8 | 87 | E1376-78 Letter dated Nov. 18, 2016 |
| Exhibit 8A | 90 | Declaration of Roberto Finzi |
| Exhibit 9 | 96 | A109059-109062 Spreadsheet |
| Exhibit 10 | 107 | A109070-71 American Express statements |
| Exhibit 13 | 117 | A109332-34 Two Spreadsheets |
| Exhibit 14 | 131 | A3994-96 E-mail string |
| Exhibit 15 | 133 | A109-3940 |
| Exhibit 16 | 146 | A3989-91 Spreadsheet |
| Exhibit 17 | 147 | A109342-47 Spreadsheet |
| Exhibit 18 | 151 | A109355-57 |
| Exhibit 20 | 153 | A109358-63 E-mail string |
| Exhibit 21 | 154 | A109364-71 E-mail string |

5

EXHIBITS(Continued)

| Number | Page | Description |
|---|---|---|
| Exhibit 22 | 156 | A42426-27 E-mail string |
| Exhibit 23 | 168 | A43573-80 McGorty's E-mail |
| Exhibit 24 | 170 | A109379-80 and 109381 |
| Exhibit 25 | 185 | A109385-86 |
| Exhibit 26 | 187 | A108719 E-mail [not attached] |
| Exhibit 27 | 190 | Rashid 2499-2507 [not attached] |
| Exhibit 28 | 193 | A41654-673 1/8/2014 [Not attached] |
| Exhibit 29 | 197 | A42345-46 E-mail string [Not attached] |
| Exhibit 30 | 198 | A1298-1317 Apollo Global management review [Not attached] |
| Exhibit 31 | 201 | A43560-61 E-mail string [Not attached] |

*** EXHIBITS BOUND SEPARATELY ***

6

TUESDAY, OCTOBER 30, 2018

A.M. SESSION

MR. THOMPSON:  Good morning, Mr. McGorty.

MR. KEHOE:  Before we begin I just want to put on the record one thing.  We are going to invoke the common-interest privilege for the month of July across the entire timeframe that Mr. McGorty and Crowell and Moring were dealing with either Paul Weiss or anybody involved in this.  All those were subject to Rule 408 negotiations, all of those proceedings, and that includes both July up through August 1st and thereafter.

We preserve all of those objections and, of course, we will be invoking as appropriate our instructions to the witness not to answer two questions that will get into the confidential interests during July -- during July and ending midday August 1st.

MR. THOMPSON:  Mr. Kehoe, we did speak or e-mail before the deposition and it was my understanding that you were not going to assert a blanket common-interest objection, but that we are going to take it question by question.

MR. KEHOE:  That is always appropriate.  In response to that, you had asked me what I was going

7

to object to and not object to, which I thought was premature, as I noted in my e-mail and that we will take it question by question, but as far as a blanket objection, no, there will not be a blanket objection.

MR. THOMPSON:  Okay.  We will go question by question.

EXAMINATION BY

MR. THOMPSON:

Mr. McGorty, I know you are a well-experienced lawyer so I am going to dispense with the usual ground rules for deposition.

I will say that we will be looking at a number of documents today.  We premarked exhibits and we have got 3 exhibit binders.  By and large the documents will reflect conversations or meetings and I am going to be asking about your recollection of those conversations or meetings and also whether you have any records of those events.

Some of the documents will include spreadsheets that list expenses and, as you may know, at issue in this case is over 1,000 expenses. We are not going to go expense by expense, so when I hand you a document that is two inches thick, believe me I will not, with very few exceptions, be

8

1  asking you about any expenses.  I will be asking you
2  about the setup of the documents to the extent you
3  can define certain terms used in the documents, but
4  not individual expenses.
5        This is all by way of saying that it's my
6  hope that you don't need to review 1,000 expenses
7  otherwise we will be here for 3 weeks.
8        You have heard our discussion about
9  objections, so it is my intention to ask the
10 questions that I would otherwise ask and we will see
11 what objections are made and we will see where it
12 goes.
13       So with that, do you have any questions?
14    **A.**  No.
15    **Q.**  Let's get started.
16       Mr. McGorty, what did you do to prepare for
17 the deposition today?
18    **A.**  I have met with counsel, Tom Hanusik, who
19 is sitting to my left and Daniel Giffuni.  I have
20 spoken with and met with counsel representing Mr.
21 Rashid, Mr. Kehoe, to Tom's left, on a couple of
22 occasions and that's pretty much it.
23    **Q.**  Mr. Kehoe is not acting as your counsel in
24 this case?
25    **A.**  He is not.

9

1    **Q.**  When you met or spoke with Mr. Kehoe, was
2  Mr. Hanusik also present?
3    **A.**  For at least one of those meetings.
4    **Q.**  But for one meeting he was not present?
5    **A.**  That's true, I believe.
6    **Q.**  Did you review any documents in preparation
7  for the deposition?
8    **A.**  I have seen a few documents, a handful of
9  documents that I looked at.
10   **Q.**  Did that refresh your recollection about
11 the events discussed therein?
12   **A.**  I don't think I saw anything that refreshed
13 my recollection beyond what I remember.
14   **Q.**  Have you reviewed the SEC's complaint in
15 this case?
16   **A.**  I have not.
17   **Q.**  Have you reviewed any other court filings
18 or discovery in this case?
19   **A.**  I have not.
20   **Q.**  When was the last time that you
21 communicated in any way with Mr. Mohammed Ali
22 Rashid?
23   **A.**  I am going to speculate, I am going to
24 guess it's been at least two years, maybe; year and
25 a half to two years, approximately.

10

1    **Q.**  As you know, we don't want you to
2  speculate, but that's your best recollection?
3    **A.**  I just want to make to make it clear that
4  that's my best guess.
5    **Q.**  What was the subject of that discussion?
6       MR. KEHOE:  Objection.  If it calls for
7  anything in the attorney-client privilege area, we
8  have instructed the witness not to answer.
9    **Q.**  Did the subject involve your prior
10 representation of Mr. Rashid?
11   **A.**  Yes, I mean we have never had a
12 conversation beyond the substance of our working
13 relationship.
14   **Q.**  Was that a phone call or a meeting or what?
15   **A.**  I don't remember.  I don't remember.
16   **Q.**  Did any one else participate?
17   **A.**  I don't remember.
18   **Q.**  What did you discuss with Mr. Kehoe in
19 preparation for your deposition?
20      MR. KEHOE:  I will object to the extent it
21 calls for conversations with a perspective client
22 and I instruct the witness not to answer.
23   **Q.**  Do you intend to follow that instruction?
24   **A.**  I think I have to.
25   **Q.**  Are you acquainted with Paul Weiss partner

11

1  Roberto Finzi?
2    **A.**  Yes.
3    **Q.**  Have you had any communications with Mr.
4  Finzi regarding this case?
5    **A.**  Not for years.
6    **Q.**  Are you aware that Mr. Finzi executed a
7  declaration in this case?
8    **A.**  I think I heard that.
9    **Q.**  But you have not seen the declaration?
10   **A.**  I think that's right.
11   **Q.**  Do you know what Mr. Finzi stated in his
12 declaration?
13   **A.**  I do not specifically, no.
14   **Q.**  Your firm is Crowell & Morning; correct?
15   **A.**  Crowell & Moring.
16      MR. HANUSIK:  Can I clarify one thing for
17 the record, because you asked him if he spoke to Mr.
18 Finzi about this case.  By "this case" do you mean
19 the entire matter beginning with the SEC
20 examination, because obviously they had a lot of
21 communications.
22      MR. THOMPSON:  I am referring to the filed
23 case.
24      MR. HANUSIK:  I just want to make sure.  I
25 think that's how he was answering but sometimes

12

1  things are not clear.
2    **Q.** So Crowell?
3    **A.** You've got it.
4    **Q.** I should know that.  I was a law student
5  many moons ago and I think I interviewed with
6  Crowell and with Tipco, was it?
7    **A.** I never got to meet him.
8    **Q.** Is Crowell being compensated for its time
9  with respect to the SEC case against Mr. Rashid?
10    **A.** Presently?
11    **Q.** Presently.
12    **A.** I don't believe so, no.
13        MR. HANUSIK:  I can answer that
14  affirmatively, no.
15    **Q.** To your knowledge has there been any
16  discussion about compensation?
17    **A.** Not to my knowledge.
18    **Q.** Okay.  Let's go back to Crowell's
19  representation of Mr. Rashid back in 2013.  Did
20  someone refer Mr. Rashid to Crowell?
21    **A.** Yes.
22    **Q.** Who was that?
23    **A.** I believe it was someone at Paul Weiss, I
24  am not certain who it was.
25    **Q.** Do you know to whom the referral was made

13

1  specifically?
2    **A.** I think it was made to my partner Daniel
3  Zelenko, Z E L E N K O.
4    **Q.** Have you spoke with Mr. Zelenko in
5  preparation for your deposition today?
6    **A.** I have spoken to him since I knew I was
7  coming to be deposed, so yes.
8    **Q.** What did you discuss?
9        MR. KEHOE:  If it calls for any discussion
10  about your conversations with Mr. Rashid or
11  involvement with Mr. Rashid during the operative
12  timeframe, I instruct you not to answer.
13        MR. HANUSIK:  I would also add that to the
14  extent that Mr. Zelenko is going to be deposed, we
15  will also be representing him.  So if it calls for
16  any discussion around preparation for the
17  deposition, I would instruct you not to answer.
18        MR. THOMPSON:  It sounds like you can't
19  answer it.
20    **Q.** Have Paul Weiss and Crowell previously
21  represented different parties in internal
22  investigations?
23    **A.** I am not certain.
24    **Q.** You didn't participate in any such
25  representation of different parties in internal

14

1  investigations?
2    **A.** With Paul Weiss?
3    **Q.** Yes.
4    **A.** Not prior to this.
5    **Q.** With other law firms, have you been
6  involved in situations where Crowell was
7  representing one party in an internal investigation
8  and another law firm was representing a different
9  party?
10        MR. HANUSIK:  Can I just clarify?  You said
11  previously, so your question is limited to the
12  timeframe before July of 2013 from when Mr. McGorty
13  joined the firm, which was December of 2012?
14        MR. THOMPSON:  That's correct.
15        MR. HANUSIK:  So just that 7 month period?
16    **A.** I believe so, but I am not certain what
17  specifically, whether I did something in those 6
18  months that would qualify under your definition.
19    **Q.** Leaving aside Rashid and Apollo, were there
20  any instances when you believed the common- interest
21  understanding existed and was not embodied in a
22  written agreement where your firm was representing
23  one party in an internal investigation and another
24  firm was representing another party?
25        MR. KEHOE:  Are we talking about another

15

1  instance, putting aside the --
2        MR. THOMPSON:  Leaving aside Rashid and
3  Apollo?
4    **A.** Before or since?
5    **Q.** Yes.
6    **A.** Yes.
7    **Q.** And the question was whether in such a
8  circumstances you believe a common interest existed
9  despite the absence of a written agreement to that
10  effect?
11    **A.** Yes.
12    **Q.** Can you identify those instances?
13        MR. HANUSIK:  No, you are asking him to
14  identify existing clients or client relationships
15  that are non-public?
16    **Q.** Without identifying clients, can you
17  describe the instances?
18    **A.** I have represented individuals in many
19  cases since entering private practice where there
20  was a non-written, common-interest privilege and
21  understanding with the counsel representing the
22  employer or in some instances former employer of
23  that individual.
24    **Q.** Why would a common-interest understanding
25  be left unwritten?

16

1    A.  I don't know of any reason it would be
2    intentionally unwritten, but I know of instances, I
3    believe, where it was written and instances where it
4    was unwritten without a particular reason for it
5    being written or unwritten.
6        Q.  So no particular reason why it would not be
7    written?
8        A.  That's correct.
9        Q.  Through July, let's take it through the end
10   of 2013, did you have a practice of marking
11   communications with other parties that you deemed to
12   be settlement communications as settlement
13   communications?
14       A.  I don't recall having that practice one way
15   or the other.
16       Q.  So you may have had settlement
17   communications without having a header or a footer
18   saying subject to Rule 408 of the Federal Rules of
19   Evidence?
20       A.  That's likely, that's true, I think.
21       Q.  So I have your bio here from the website.
22   I believe it's the current bio.  I am not going to
23   mark it as an exhibit, but I will hand it to you.
24       MR. KEHOE:  You have to mark it as an
25   exhibit if you are going to hand it to him.

17

1        MR. THOMPSON:  I will mark it as an
2    exhibit.
3        MR. KEHOE:  Please do.
4        MR. THOMPSON:  We will mark this Exhibit
5    1B.
6        (Exhibit No. 1B was so marked for
7            identification, as of this date.)
8        Q.  Mr. McGorty, what I want to refer you to is
9    the instances that you referred to handling matters
10   in the area of what is on page 2?
11       A.  Yes.
12       Q.  The bottom third of the page:  "Executive
13   employment-related investigations."
14       A.  Okay.
15       Q.  And the second bullet point is a former
16   principal and senior partner of an international
17   private equity firm in an SEC examination and
18   investigation.
19       Does that refer to your representation of
20   Mr. Rashid?
21       A.  I think so.
22       Q.  The first bullet point refers to a vice
23   president of an international energy conglomerate in
24   an internal expense-related employment inquiry.
25   Without identifying the parties involved, can you

18

1    tell me what that representation involved?
2        A.  I think that was purely an internal inquiry
3    initiated by I believe the client, of a concern
4    about particular expenses that either were going to
5    be or may have been scrutinized by his employer.  I
6    don't recall if it had come to light that the
7    employer, with the employer, that there had been a
8    concern from the individual that we represented, but
9    I remember that.
10       That was certainly all internal and it may
11   not have even reached the employer's attention that
12   we were asked by the individual to help give him
13   guidance on a expense-related problem.
14       Q.  So the employer was not involved in the
15   investigation, am I understanding you correctly?
16       A.  That's my recollection.  At most it was the
17   employer's knowledge, like the employer had some
18   idea about it, but I don't believe so when we
19   represented that individual.  I am doing my best to
20   recall.  There was definitely no external element as
21   there was with the Rashid case, but that's what I
22   believe it was.
23       Q.  You can set that aside.
24       In 2013, what systems did Crowell have in
25   place to check for conflicts when a representation

19

1    was proposed?
2        A.  We have a conflicts department with whom we
3    communicate over phone and e-mail to raise both
4    identified potential clients, adversarial parties
5    and other related parties, so they can run conflict
6    before we can take on a matter.
7        Q.  Did Crowell run a conflicts check with
8    respect to the proposed representation of Mr. Rashid
9    in 2013?
10       A.  I assume so, only we couldn't have taken
11   the matter if we hadn't, so yes.
12       Q.  You were not involved in that check?
13       A.  I don't remember it.
14       Q.  Let's look at, I am going to hand out some
15   binders now.  I am handing you what has been
16   designated as 1 of 3 of our exhibit binders and I am
17   going to hand them to your counsel.
18       Let's go to what is designated as Exhibit
19   1A.
20       A.  1 is the subpoena and attachment.
21       Q.  I'm sorry.  It's actually marked, should be
22   marked down at the bottom.
23       MR. THOMPSON:  Just for the record, we are
24   providing the Reporter with electronic versions of
25   all of these documents, as well as the hard copy of

20

1 the premarked exhibits.  We may not use all of the
2 premarked exhibits, but they will be identified in
3 the transcript.
4      Let me know when you are ready to respond
5 to questions.
6      A.  Sure.
7      Q.  Is this, in fact, the retainer letter by
8 which Crowell was retained by Mr. Rashid?
9      A.  That's what it looks like.
10     Q.  You have no reason to believe it's not?
11     A.  No.
12     Q.  Are you aware of any other retainer letters
13 between Crowell and Mr. Rashid?
14     A.  I am not.
15     Q.  Would you have seen the retainer letter on
16 or about it's date, July 12, 2013?
17     A.  This one was sent out by Mr. Zelenko so I
18 don't know if I would have necessarily seen this.
19     Q.  Are you aware of any written or unwritten
20 agreement with Mr. Rashid to modify the scope of
21 engagement as stated in the first paragraph of the
22 retainer letter?
23     A.  No.
24     Q.  Was there ever a change in Crowell's scope
25 of engagement?

21

1      A.  It's a distinction we actually did not make
2 and don't often make.
3      Q.  The retainer letter, on the first page, in
4 the last paragraph, refers to an offer by Apollo to
5 pay invoices for Crowell's fees.  Do you see that?
6      A.  Yes.
7      Q.  Did anyone other than Apollo ever pay any
8 of Crowell's fees?
9      A.  Ever?  I believe at some point Mr. Rashid
10 did.
11     Q.  At what point was that?
12     A.  Subsequent to his separation from Apollo.
13 I just don't remember the timeline, but that's my
14 understanding.
15     Q.  And in 2013, did Mr. Rashid personally pay
16 any fees?
17     A.  I don't remember when it began and ended.
18     Q.  Was there a separate agreement between
19 Crowell and Apollo with respect to the payment of
20 legal fees for representation?
21     A.  I am not aware of one.
22     Q.  Did the arrangement for Apollo to pay
23 Crowell's legal fees ever change, perhaps after Mr.
24 Rashid's separation?
25     A.  I believe that's probably right.

23

1      A.  I don't know.
2      Q.  Did Crowell ever advise Mr. Rashid with
3 respect to his income taxes?
4      A.  I don't know.
5      Q.  I take it Mr. Zelenko was the billing
6 partner with respect to this engagement?
7      A.  I think so.
8      Q.  What was the your role?
9      A.  I don't know if I had an official title.  I
10 just helped represent Ali Rashid in the matter for
11 this period of time.
12     Q.  So Mr. Zelenko is the lead partner but you
13 were working -- would it be fair to say you were
14 working on the matter on a day-to-day basis?
15     MR. HANUSIK:  I will object to the
16 characterization "lead."  You used the phrase
17 billing partner, he agreed with that.
18     Q.  Okay, with that amendment.
19     A.  I suppose, not to the exclusion of Dan, but
20 my recollection is during the relevant time period
21 of July through September of 2013, I was probably
22 more engaged on the day to day with Mr. Rashid than
23 Dan was.
24     Q.  Would you regard yourself as having been
25 the lead partner on the matter?

22

1      Q.  Exhibit 1A also includes the billing
2 statements.
3      MR. THOMPSON:  And for the record, Exhibit
4 1A consists of Crowell's production, document
5 production response to the SEC subpoena in this
6 case.  Obviously the bills were not attached to the
7 original retainer letter because they were later in
8 time, but what I would like to do for present
9 purposes, Mr. McGorty, is just to identify the
10 timekeepers listed in the billing statement.
11     If we go to Bates Number CMAR SEC, I am not
12 going to repeat all of the 0's, but it's 5, do you
13 see that page 9, August 2013 statement.
14     A.  Yes.
15     Q.  Under "Professional Services," GM, I take
16 it that's you?
17     A.  Yes.
18     Q.  DLZ, I take it that's Mr. Zelenko?
19     A.  Yes.
20     Q.  If we go to page 7, under the July 10 entry
21 -- I am sorry, July 11th entry, there is an NK?
22     A.  Yes.
23     Q.  Is that a Ms. Namrata Kotwani?
24     A.  Sure.
25     Q.  Do you recall any other timekeepers billing

24

1 time for this project, any other lawyers?
2     MR. HANUSIK:  There is another listing on
3 the next page.
4     Q.  There is a JEK listed?
5     A.  I believe that was James Kellet, K E L L E
6 T, who was another partner in the New York office at
7 the time, who has since retired.
8     Q.  What was Ms. Kotwani's representation with
9 respect to this?
10     A.  She was the associate on the case.
11     Q.  Going back to page 5, Bates Number CMAR
12 65, the July 3, 2013 entry.  You billed .7 hours for
13 what is described as "Conference call with Mr.
14 Rashid, with his spouse and sister regarding
15 matter."
16     His sister, would that have been Erem
17 Rashid, E R E M?
18     A.  Despite having spoken to her several times,
19 I don't remember her name, so I believe so.  It
20 sounds right.
21     Q.  Was she a client of the firm?
22     A.  No.
23     Q.  What did you discuss with her in that
24 conversation?
25     A.  In this particular conversation?

                          25

1     Q.  Yes.
2     A.  I don't remember.
3     Q.  Do you know why you were having a
4 conversation with Mr. Rashid, his wife and his
5 sister?
6     A.  I don't remember what we talked about.
7     Q.  How many times do you believe you spoke
8 with Erem Rashid or Rashid's sister?
9     A.  Sure, sister, yes.
10     Over the course of those months, I am
11 guessing, I am going to say 3 or 4 times maybe.  I
12 am not certain.  Only telephone conversations I
13 don't recall ever meeting.
14     Q.  Was it your custom to take notes during
15 phone conversations with witnesses or other persons?
16     A.  It depends.
17     Q.  Do you believe that you took notes with
18 respect to your phone conversations with Rashid's
19 sister?
20     A.  I don't believe I did.
21     Q.  Is there a reason why you did not?
22     A.  The nature of the conversations, the
23 locations of the conversations would be the reasons.
24     Q.  What do you mean the nature of the
25 conversations?

                          26

1     A.  Well, I don't recall any specific
2 conversations, but I can say generally we spoke
3 about sort of updates directly from me, where we
4 were in the process of the representation and all
5 these requests.  She was very concerned about him.
6     Q.  Please turn to Exhibit 2 in your binder.
7     MR. THOMPSON:  For the record, Exhibit 2 is
8 a document that's Bates numbered Apollo 43 -- I am
9 leaving out the 0's -- 43628 through 30.  While I am
10 at it, I think I neglected to identify the Bates
11 Numbers of Exhibit 1A for the record, so let me do
12 that, or Exhibit 1A, rather.  The Bates Numbers are
13 CMAR SEC 1 through 35.
14     Back to Exhibit 2, this appears to be an
15 e-mail string that ends with the e-mail from Mr.
16 Zelenko, dated July 8th, 2:02 p.m., to Mr. Finzi; do
17 you see that.
18     A.  Yes.
19     Q.  The subject is "Contact information,"
20 correct?
21     A.  That's correct, that's what it says, yes.
22     Q.  Let's look on the second page, page 4369,
23 it starts on the prior page, but it's from Mr.
24 Zelenko.  It's a July 3, 2013, 5:40 p.m., e-mail
25 from Mr. Finzi; do you see that?

                          27

1     A.  Yes.
2     Q.  It states:  "Roberto, are you available at
3 3:30?  My partner Glen McGorty may also join the
4 call as well, would you mind sending a dial-in?"
5     Do you recall whether you, in fact,
6 participated in a phone call with Mr. Finzi on or
7 about July 3, 2013?
8     A.  I do not.
9     Q.  And if you had participated in a call,
10 would you have any record of the call?
11     MR. KEHOE:  Objection, speculation.
12     A.  You can answer.
13     A.  I might have hypothetically, to answer your
14 question.  I might have a record, but I have
15 reviewed and provided to counsel any records I had,
16 which were minimal, of everything related to this
17 case.  So the answer to your question is yes, but
18 the real answer is I don't have any record of that
19 call.
20     Q.  So to the best of your recollection, you
21 don't think you participated in this particular
22 call?
23     MR. KEHOE:  Objection to form.  You can
24 answer.
25     A.  I thought the question was about having

                          28

1  notes of the call.
2       **Q.**  That was the second question.
3       **A.**  The first question?
4       **Q.**  Let me ask you a new question:  Do you
5  think you participated in a July 3, 2013 call?
6       **A.**  I don't know.  I don't remember.
7       **Q.**  But you have no recollection of the call?
8       **A.**  I don't have any recollection of a call, of
9  that specific call.
10      **Q.**  So you're a blank slate with respect to
11  that call?
12      MR. KEHOE:  Objection to the form, you can
13  answer.
14      **A.**  I don't remember if I was on that
15  particular call, so yes.
16      **Q.**  Are you aware of any document that might
17  refresh your recollection if you did participate in
18  that call?
19      **A.**  No.
20      **Q.**  Would you have received a report -- report
21  is probably too formal, but would you have discussed
22  with Mr. Zelenko the call if did you not participate
23  in it?
24      **A.**  Yes.
25      **Q.**  Do you have any recollection of such a

29

1  discussion?
2       MR. KEHOE:  If it involves the discussion
3  with Paul Weiss during the operative timeframe, it's
4  covered by the common-interest privilege and I
5  instruct the witness not to answer.
6       MR. THOMPSON:  For the record, I do
7  disagree with the instructions.  As I understand the
8  Judge's order, we are permitted to ask questions
9  about the existence of a common-interest privilege,
10  in fact that would go to the existence of such a
11  privilege.  To the extent you are preventing any
12  inquiry about discussions with Paul Weiss, I think
13  that frustrates the order and is not consistent with
14  it, so I will state my disagreement with your
15  objection.
16      MR. KEHOE:  My response is real easy.  What
17  you are asking about is a conversation between
18  somebody at Crowell & Moring and somebody at Paul
19  Weiss about representations of Mr. Ali or the
20  subject matter, and it's quite simple then.  Whether
21  or not Mr. McGorty was involved, you asked him a
22  question about:  Did you discuss this with Mr.
23  Zelenko?  That was your question.  To the extent
24  that that impacted the common-interest privilege
25  that existed in July of 2013, I told the witness he

30

1  couldn't answer that question.  If it does not, he
2  can answer the question.  It's as simple as that.
3       MR. THOMPSON:  Again, we disagree.  The
4  Judge's order specifically permits inquiry into
5  discussions that would go into the existence or non-
6  existence of the common-interest privilege, if you
7  are not going to permit examination of any
8  communication --
9       MR. KEHOE:  Oh, no --
10      MR. THOMPSON:  Do not interrupt me, please.
11      If you are not going to permit examination
12  of any discussions with Paul Weiss, I do believe that
13  frustrates the order.
14      MR. KEHOE:  Well, you are mistaken.  It
15  does not frustrate the order and I disagree with
16  you.  Let me be very clear:  In July of 2013 the
17  position of Mr. Rashid was that there was a
18  common-interest privilege, so communications between
19  Mr. McGorty, Mr. Zelenko and Paul Weiss, as it
20  pertains to the Rashid case, to the extent they
21  involve discussions about that case, are protected
22  by the common-interest privilege.
23      Now, whether or not you want to ask other
24  questions that don't impact that or don't involve
25  the discussions about that representation, that's

31

1  fine.  We have no objection to that.  We have not
2  objected to every question in this regard.  So why
3  don't we take it one by one.
4       MR. THOMPSON:  I think we understand one
5  another and disagree.
6       MR. KEHOE:  This, of course, is the problem
7  when you get into deposing someone's prior counsel.
8  You get into the attorney-client privileges so it's
9  not surprising in this regard, is it?
10      MR. THOMPSON:  We have had a briefing on
11  this, I don't think you need to make extended
12  speeches about it.
13      MR. KEHOE:  I think you started off -- just
14  move on to the next question.  Just move on.
15      **Q.**  Let me ask you to turn to Exhibit 3 in your
16  binder.
17      MR. THOMPSON:  Exhibit 3 for the record, is
18  a document Bates numbered AR37 to 38.  It appears to
19  be an e-mail string that ends with a July 3, 2013,
20  10:21 a.m. e-mail from Lisa Bernstein to Ali Rashid
21  at Gmail.com.
22      **Q.**  Let me ask you:  Do you have any
23  recollection of seeing this document previously?
24      **A.**  No.
25      **Q.**  Let me first refer you to Mr. Rashid's

32

1  e-mail of July 1, 2013, where he states:  "Thanks
2  for your help through this process.  It would be
3  helpful if I could get the following for my
4  lawyers."  Then he lists various documents,
5  including employment documents, employment
6  agreement, passport, employee manual code of ethics,
7  expense policy, and personal e-mails.
8       Then, if you go back up to Ms. Bernstein's
9  e-mail of July 3rd, in her first sentence she
10  states:  "Ali, the original request has been
11  approved?"  Do you see that?
12      A.  Yes.
13      Q.  After you were engaged as one of Mr.
14  Rashid's lawyers, did you have access to the type of
15  documents listed in this e-mail of July 1 of 2013?
16      A.  I don't remember seeing them.  It does not
17  mean I didn't have any access to them if we
18  collected some or all of them.
19      Q.  Do you believe you had access?
20      MR. KEHOE:  Objection to the form.
21      You can answer.
22      A.  I just don't recall this.  I am sorry.
23      Q.  Let's go back to Exhibit 2.  You see on the
24  first page there is what appears to be a reference
25  to traveling to the meeting on July 8th, do you see

33

1  that?
2       MR. KEHOE:  I don't know which one you are
3  looking at.
4       MR. THOMPSON:  This is the first page,
5  starting from the top, Mr. Zelenko's e-mail to Mr.
6  Finzi states:  "We will be there in 5."
7       Below that, Mr. Finzi's e-mail says:  "Yes,
8  it stills works."
9       Below that, Mr. Zelenko's e-mail says:
10  "Does 2:00 p.m. Monday still work for you guys?"
11      MR. KEHOE:  Gotcha.
12      Q.  Do you see that, Mr. McGorty?
13      A.  I do.
14      Q.  Did you participate in a meeting with Paul
15  Weiss on July 8, 2013, with respect to Mr. Rashid?
16      A.  I remember going to Paul Weiss for a
17  meeting during that time period about Mr. Rashid's
18  case.  I don't remember if that was the specific
19  meeting I remember in my head.
20      Q.  Do you have a recollection of the first
21  meeting that you went to on that date?
22      A.  I don't understand.
23      Q.  That's a poor question let me withdraw
24  that.
25      I am going to refer you back to Exhibit 1A,

34

1  take a look at that, on page Bates Number CMAR SEC
2  6?
3       A.  Yes.
4       Q.  There is a reference in the middle of the
5  page to a July 8, 2013 entry for a GM meeting at
6  Paul Weiss with Mr. Finzi, Mr. Ricciardi, myself and
7  Mr. Zelenko regarding status of internal
8  investigation, follow-up of Ms. Kotwani; do you see
9  that?
10      A.  Yes.
11      Q.  Based on that, do you believe that you
12  actually participated in a meeting with Paul Weiss
13  on July 8, 2013?
14      A.  Based on that, it seems I did.
15      Q.  So that particular time entry is a combined
16  entry.  It's 1.5, but it also includes follow-up
17  discussions with Ms. Kotwani.  Do you have a
18  recollection of approximately how long the actual
19  meeting with Paul Weiss lasted?
20      A.  I don't.
21      Q.  What do you recall about the discussion at
22  that meeting?
23      MR. KEHOE:  To the extent that this
24  involves the common-interest privilege, I instruct
25  the witness not to answer.

35

1       A.  I don't remember that specific meeting.  I
2  don't know if there were others.  I remember a
3  meeting at Paul Weiss during that time period.  That
4  very well may have been the meeting where we
5  initially met with counsel at Paul Weiss to discuss
6  the circumstances resolving our representations.
7       Q.  You do recall an initial meeting with Paul
8  Weiss?
9       A.  I recall a meeting with Paul Weiss.  I
10  don't know if the one that I recall -- if there was
11  more than one, I don't know.  The one that I recall
12  was the first one, but I am not certain how many
13  there were.  This would be a better guide for that.
14      Q.  So would it be fair to say that you only
15  remember one meeting at Paul Weiss, then?
16      A.  I remember one or two meetings vaguely.  I
17  am not certain on the number.  I remember at least
18  one, but I don't think there were multiple ones.
19  There weren't many, maybe 2 or 3 at the most.
20      Q.  Let's focus on the first meeting that you
21  recall with Paul Weiss.  Do you recall there being
22  any discussion of Rashid and Paul Weiss -- Rashid
23  and Apollo, rather, having a common interest?
24      MR. KEHOE:  At this point, if you are
25  talking about this meeting -- and I will let the

36

1 witness answer -- to the extent we are talking about
2 issues involving the common-interest privilege, I
3 instruct the witness not to answer or to answer
4 accordingly.
5     I am not talking about all answers
6 involving this meeting.
7     **A.** To answer your question, because it was
8 specifically related to an initial meeting, which
9 presumably, based on the date, this one would have
10 been, I don't have a specific recollection of what
11 was discussed at this meeting versus any other
12 meetings I would have had.
13     MR. THOMPSON:  All right.  I am just going
14 to read into the record a portion of the Judge's
15 order which was issued last Thursday, October 25.
16 It states --
17     MR. KEHOE:  For the record, I'm aware of
18 the order.
19     MR. THOMPSON:  That's fine.  I am going to
20 read it into the record:
21     "Rashid concedes that there was no common
22 interest with Apollo through July 1, 2013, that none
23 existed as of August 1, 2013.  It is the interim
24 period where he claims there was a common interest.
25 If Rashid or McGorty choose to assert a privilege or

37

1 protection for any interim period, then plaintiffs
2 are entitled to examine Mr. McGorty on
3 communications with Apollo or its counsel that go to
4 the question of whether a common legal interest
5 existed at the time of the communication for which a
6 privilege or protection is asserted.
7     "If, following the deposition session,
8 plaintiff chooses to challenge the assertion of the
9 privilege or protection, Rashid will have the burden
10 of establishing its existence.  If the Court upholds
11 the assertion, the deposition will be completed.  If
12 the Court does not uphold the assertion, then the
13 witness will need to be produced for further
14 examination."
15     **Q.** Mr. McGorty, do you recall any discussion
16 with Paul Weiss' attorneys at any time with respect
17 to an Upjohn warning to be given?
18     **A.** My recollection is that there were
19 discussions -- well, actually, I can't actually
20 answer that question because I am not sure if I am
21 relying on attorney-client privilege rather than
22 what I have learned from Paul Weiss or other
23 sources.
24     **Q.** When you say attorney-client privilege are
25 you referring to the --

38

1     MR. KEHOE:  Do you mean attorney-client
2 communication?
3     **A.** I'm sorry.  Attorney-client communications
4 between me and Mr. Rashid at the time.  I just can't
5 distinguish in my mind.
6     **Q.** Do you recall any discussion with Paul
7 Weiss concerning what would be the ground rules, so
8 to speak, for Mr. Rashid's cooperation in the
9 expense review that was being conducted?
10     **A.** What do you mean by ground rules?
11     **Q.** Ground rules in terms of whether there
12 would be any confidentiality owed by one party to
13 another, for example?
14     **A.** I recall there was a confidentiality
15 agreement, I believe, before Paul Weiss provided us
16 with the documents needed to undertake the task that
17 we were going to take, which I am sure we will talk
18 about at some point.  If you are asking me whether
19 or not I believe there was a common-interest
20 understanding about the nature of our communications
21 between Paul Weiss on behalf of Mr. Rashid and
22 Crowell & Moring, I believe we did have one
23 certainly in the beginning until whatever the date
24 was.
25     **Q.** What is the basis for your belief that one

39

1 did exist?
2     **A.** I can't point to a specific conversation
3 that I had personally with Paul Weiss, but I can
4 tell you that it is my recollection that that was
5 the understanding between Paul Weiss and Crowell &
6 Moring in connection with why we were being brought
7 into this case to assist with Mr. Rashid's review of
8 these expenses and representation generally.
9     **Q.** So I think you said that you don't recall a
10 specific discussion.  I just want to be clear, do
11 you recall any discussion with Paul Weiss about
12 there being a common interest as between Rashid and
13 Apollo?
14     **A.** I just can't point to a specific
15 conversation.  I am just offering you what my best
16 recollection is, which is that we had an
17 understanding at that time that we were
18 communicating with Paul Weiss.  There was a common
19 interest and the common interest was based
20 ultimately in reviewing these expenses as best we
21 could, assisting Mr. Rashid in reviewing these
22 expenses to assist Apollo in their determination --
23 among other things, in their determination of the
24 nature of their claims or concerns against Mr.
25 Rashid, and from Mr. Rashid's perspective to resolve

40

1 any potential dispute with Apollo with respect to
2 the nature of these expenses.
3     Q. You said a couple of times you don't recall
4 any specific discussion with Paul Weiss, but you
5 nonetheless had an understanding. Is it possible
6 that your understanding was based not on a
7 conversation with Paul Weiss but a conversation with
8 Mr. Zelenko?
9     MR. KEHOE: Objection to form.
10 Speculation.
11     A. I don't think it would be based just on
12 that, candidly.
13     Q. Is it possible that your understanding was
14 just your own assumption?
15     MR. KEHOE: Objection to the form. Calls
16 for speculation.
17     A. I do not believe it was based on just
18 assumption either.
19     Q. What I am trying to get at is what was it
20 based on? If you do not recall a conversation with
21 Paul Weiss about a common interest, what was your
22 understanding based on?
23     A. Well, my understanding at the time -- I am
24 just saying I don't recall specific conversations
25 with Paul Weiss. I am not saying that at the time

41

1 that my belief that we had a common interest was not
2 based on conversations with Paul Weiss. I just
3 can't point to a specific conversation because I
4 don't remember the details, particularly of these
5 early conversations that we had with them.
6     My answer to your question is: I am not
7 saying that it was never discussed. I just don't
8 recall the details of the conversation. I do recall
9 my belief at the time that we did have a common-
10 interest understanding, which is the nature, I
11 believe, of the communications we had in the
12 beginning part of our representation.
13     Q. Would someone from Crowell have taken notes
14 during the July 8th meeting?
15     A. Someone might have. That might be a good
16 place to look.
17     Q. But you have not done that so far, I take
18 it?
19     A. Taken notes?
20     Q. You haven't looked at any notes?
21     A. I have not looked at these at all.
22     Q. If any notes exist, they will refresh your
23 recollection as to what was discussed at the
24 meeting, I take it?
25     A. If I was at that meeting, the 8th meeting

42

1 which I believe I was at, they might.
2     Q. Whether you took notes or someone else took
3 notes -- let me ask this --
4     A. Yes?
5     Q. Whatever meeting you recall with Paul
6 Weiss, do you recall anybody from Crowell taking
7 notes?
8     A. I don't recall. It would be the general
9 practice that someone would take notes. I don't
10 recall.
11     Q. Would that be the most junior person
12 present or it doesn't work that way?
13     A. It depends on the meeting.
14     Q. In the normal course, would there have been
15 a file memo prepared with respect to the July 8th
16 meeting?
17     A. In the normal course -- I just don't
18 remember the nature of that particular meeting, so I
19 can't speak to it. As to the general practice of
20 meetings of that nature, it's quite possible there
21 would have been a file memo created, but I have no
22 idea.
23     Q. So you don't know, but if one did exist it
24 might refresh your recollection?
25     A. If one did, it might refresh my

43

1 recollection if I was present, yes.
2     Q. I am going to ask some questions, see if I
3 can jar your memory a little bit and if it doesn't,
4 sobeit. Do you recall any discussion with Paul
5 Weiss about the purpose of the expense review?
6     A. Generally, yes.
7     Q. What do you recall?
8     A. These are conversations at any point?
9     Q. Well, since you can't remember
10 specifically, I guess at any point.
11     A. Fair enough. I remember conversations with
12 Paul Weiss during the course of our representation
13 where we discussed the nature of this review project
14 and what we were doing, what we were assisting Mr.
15 Rashid to do and what the purpose of that project or
16 that review was.
17     Q. Can you be any more specific about the
18 discussion?
19     A. Sure. I was speaking generally.
20 Specifically, I believe that we represented to Paul
21 Weiss that we were going to and in the process of
22 assisting Mr. Rashid in reviewing the expense
23 reports provided to us by Paul Weiss. Looking at
24 other documents, I recall credit-card statements,
25 maybe travel records, Mr. Rashid's calendar, where

44

1  we were attempting to determine which expenses on
2  the expense report were provided by Paul Weiss were
3  business expenses and to where they were business
4  expenses, how they could be allocated within
5  Apollo's system, and where there was documentation
6  to support that particular expenses were business
7  expenses.
8         With respect to all expenses that we
9  couldn't determine to be business expenses, we put
10 them aside and as was represented to Paul Weiss, it
11 was our goal in assisting Mr. Rashid with his
12 preference and desire to resolve his issues with
13 Apollo, to reimburse Apollo for everything that
14 couldn't be documented as a business expense, even
15 if was not truly a personal expense, and all of that
16 was represented to Paul Weiss, to answer your
17 question.
18        Q. Was there any discussion with Paul Weiss
19 that you recall about the criteria that would be
20 applied to determining whether a particular expense
21 was, in fact, a business expense?
22        MR. KEHOE:  You mean other than as he just
23 testified?
24        Q. If you don't have anything to add, you can
25 say that.

45

1        MR. KEHOE:  He did testify to that.  I want
2  to --
3        A. To answer your question, something I did
4  say was we were looking for documentation that could
5  affirmatively show that a particular business
6  expense was a business expense and where it could be
7  allocated to within the Apollo system, if possible,
8  based on a review of Mr. Rashid's calendar, the
9  credit-card records, and I don't remember the nature
10 of any other records that we may have had access to
11 at the time; but the criteria was basically what
12 could we document as clearly a proper business
13 expense.  If it could not be documented, whether it
14 was a proper business expense or not, we put it in
15 the other bucket.
16        Q. Do you have an understanding whether it was
17 the same standard that applied in Apollo's normal
18 course of business?
19        A. I think it would be a different standard.
20        Q. What do you think would have been the
21 standard?
22        A. I don't know what the standard was.  The
23 reason I framed it that way is because our standard
24 was based on putting forward anything that could be
25 affirmatively documented at this point in time of

46

1  past expenses, based on the documents that we had in
2  front of us and available to us.  I don't know if at
3  the time Apollo's expense policy would permit them
4  to reimburse an employee like Mr. Rashid with less
5  than that standard.  I think it would, but that's
6  speculative, just to be clear.
7         What I am saying is, our standard was the
8  only thing that we put in the business expense
9  bucket were things that we had in front of us that
10 we could, as best I can recall, as it was
11 communicated to Paul Weiss, was a documented
12 business expense.
13        Q. Do you recall any discussion with Paul
14 Weiss about the criteria for reimbursing business
15 expenses set forth in Apollo's time and expense
16 policy?
17        A. I don't recall that.
18        Q. You don't recall any discussion like that
19 at all?
20        A. With Paul Weiss?
21        Q. With Paul Weiss.
22        A. I don't recall any discussion about
23 Apollo's preexisting policies.  That does not mean
24 we didn't have any, I don't recall.
25        Q. You may have mentioned this before, but I

47

1  just want to be clear, do you recall consulting
2  Apollo's time and expense policy in the course of
3  your representation of Mr. Rashid during the expense
4  review?
5         A. I don't recall.  It doesn't mean that we
6  didn't.  I just have difficulty distinguishing my
7  recollection of the policy versus information that
8  would have been attorney-client communications.
9         Q. Do you recall any discussion with Paul
10 Weiss as to why Rashid should agree to cooperate
11 with an expense review?  What was in it for him?
12        A. From Paul Weiss' perspective.
13        Q. No, from Rashid's perspective.  Was there a
14 discussion about why he was doing this?
15        A. Distinguished from conversations I had
16 exclusively with Mr. Rashid, what I remember
17 repeatedly speaking to Paul Weiss about was Mr.
18 Rashid wants to resolve this, he wants to keep his
19 job.  He is going to be as cooperative as he can be,
20 and even if it means reimbursing expenses that
21 aren't ones that he necessarily would have had to
22 have reimbursed, he wanted to pay to reimburse
23 anything that could not be documented, which is what
24 our project was.  Of that I am fairly certain, I
25 said it to Paul Weiss on multiple occasions, but I

48

1  don't remember again whether there were meetings or
2  calls, but that was what we communicated to them.
3      Q.  Rashid was trying to keep his job,
4  basically?
5          MR. KEHOE:  Objection to form.
6          You can answer.
7      A.  I remember, again, what I communicated to
8  Paul Weiss was that Mr. Rashid wanted to keep his
9  job and wanted to cooperate in any way that he could
10 and resolve these concerns that Apollo had with him
11 and, hopefully, one that would allow him to keep his
12 job.
13     Q.  Was there any discussion that you recall
14 with Paul Weiss of whether Apollo's business might
15 be impacted if Rashid's conduct were to be publicly
16 revealed?
17     A.  I don't remember that.
18     Q.  Was there any discussion of Rashid's
19 cooperation expense review being a way of keeping
20 his conduct from being publicly revealed?
21     A.  I don't remember specific conversations.
22 That's the answer, I guess.
23     Q.  Was there any discussion with Paul Weiss of
24 the SEC being in the process of conducting an
25 examination of Apollo at the time?

49

1      A.  Yes, I remember that.
2      Q.  What do you recall about that?
3      A.  Not much more than I remember that the SEC
4  was conducting an investigation at the time.
5          MR. KEHOE:  Objection, it was an
6  examination.
7      A.  I am sorry, examination at the time.  I
8  candidly do not recall whether the SEC was aware of
9  the concern that Apollo had raised with Mr. Rashid
10 at the time, specifically as to Mr. Rashid or
11 generally.  I don't recall that, but I remember
12 being well aware that there was an examination going
13 on and having that conversation with Paul Weiss.
14     Q.  Do you have any understanding as to what
15 part of the SEC was conducting the examination?
16     A.  Obviously not the enforcement part, but I
17 don't know where the examination was being run out
18 of.
19     Q.  So you don't know whether it was the Office
20 of Compliance, Inspections and Examinations?
21     A.  I don't recall if I knew at the time.
22     Q.  Do you recall being aware of a prior review
23 of Rashid's expenses before Crowell was hired in
24 which Rashid agreed to reclassify certain of his
25 expenses as personal rather than business?

50

1      A.  I can't distinguish the source of
2  information about that from what I learned from my
3  attorney-client communication with Mr. Rashid, as
4  opposed to another source.
5      Q.  I believe you testified that you are not
6  certain as to whether you had an understanding as to
7  whether the SEC, during the examination, knew about
8  any expense issues; but do you recall any discussion
9  with Paul Weiss about Rashid's expenses potentially
10 becoming an issue in the SEC examination?
11     A.  I am sure we discussed that.  I don't have
12 a specific recollection of that, but I believe we
13 would have discussed that.
14     Q.  So you have no actual recollection of it
15 though?
16     A.  I don't.
17     Q.  Do you recall any discussion of Apollo
18 potentially reporting Rashid's conduct to the SEC?
19     A.  I cannot source that concern to any
20 conversations with Paul Weiss.
21         MR. KEHOE:  Well, if it's involving
22 conversation with a client, don't answer.
23         THE WITNESS:  That's why I am struggling.
24     A.  Can you ask the question again.
25     Q.  Do you recall any discussion with Paul

51

1  Weiss about Apollo potentially reporting Rashid's
2  conduct to the SEC?
3      A.  I can't recall a specific conversation with
4  Paul Weiss about that concern.
5      Q.  Was there any discussion with Paul Weiss of
6  Rashid and Apollo jointly making a decision as to
7  whether to make some type of disclosure to the SEC
8  with respect to his conduct?
9      A.  There may have been.  I am trying to see if
10 I recall more specifically.  I don't.
11     Q.  Do you believe that there is any writing,
12 contemporaneous writing, that would memorialize such
13 an understanding?
14     A.  Other than e-mail communications that might
15 reflect that, I can't imagine what else it could
16 have been, but I am not aware whether there was any
17 e-mail communication involving me or not involving
18 me on that issue.
19     Q.  Even if it was an internal Crowell memo,
20 this would be a fairly significant understanding,
21 right, that you were jointly going to decide whether
22 to report to the SEC?  That is something that would
23 have been memorialized in some fashion; right?
24         MR. KEHOE:  Objection to form, multiple
25 questions.

52

1  A.  Let me answer it and tell me if I am not
2  answering the question.
3      If any client and his or her employer had
4  agreed to jointly announce something or disclose
5  something to the SEC, that would be an event of
6  sorts and a decision of sorts, and if that had
7  happened, my guess is that there would be some
8  recollection of that as well as writings to reflect
9  that in the ordinary course.
10      I don't believe that happened here, that's
11  not my recollection, but I can't say there would or
12  would not be any writings or conversations about
13  that topic.
14  Q.  Do you recall any discussion with Paul
15  Weiss of the expense for you being a way to avoid
16  having to make a disclosure to the SEC with respect
17  to Rashid's conduct?
18  A.  I am certain I discussed with Paul Weiss --
19  wrapped up, as I said earlier, in our goals of the
20  project, was the best possible resolution of
21  Apollo's concerns with Mr. Rashid, hopefully in the
22  interest of him keeping his job.  To the extent that
23  we discussed -- I mean, I have a vague recollection
24  of discussions with Paul Weiss, where we had hoped
25  that a resolution could be reached in the best

53

1  possible way for Mr. Rashid, which I think would
2  have included not disclosing Mr. Rashid's alleged
3  conduct to the SEC, so I have a vague recollection
4  of that conversation.  That's the best I could do.
5  Q.  Was there any discussion of whether Apollo
6  had regulatory exposure on account of Rashid's
7  conduct?
8  A.  I don't recall that.
9  Q.  Was there any possible discussion about
10  having possible criminal exposure?
11  A.  With Paul Weiss?
12  Q.  Yes.
13  A.  I don't recall that.
14  Q.  Was there any discussion with Paul Weiss as
15  to whether Rashid's conduct would raise regulatory
16  issues for him personally?
17  A.  I can't distinguish conversations I had
18  with Paul Weiss.  The answer is I don't remember.  I
19  can't distinguish between those conversations that
20  may have been with Paul Weiss or attorney-client
21  communications.
22  Q.  Do you recall any discussions with Paul
23  Weiss as to whether at least some of the expense
24  that Rashid had billed as business expenses were
25  passed on to private-equity funds that Apollo

54

1  advised?
2  A.  I recall Paul Weiss had offered some
3  information on the mechanics of how it worked
4  internally at Apollo; so, yes, I think I don't
5  remember anything specifically as to what we were
6  told, but I am fairly certain that at some moment in
7  our conversations with Paul Weiss they discussed
8  that.
9  Q.  Do you have an understanding that Rashid's
10  conduct could potentially constitute a securities'
11  law violation if expenses had not been passed on to
12  private-equity funds?
13  MR. KEHOE:  I am going to object to the
14  extent that the conversation leads to conversations
15  with Mr. Rashid, covered by the attorney-client
16  privilege.
17  MR. THOMPSON:  I am asking about
18  conversations with Paul Weiss.
19  A.  I don't remember that.
20  Q.  If expenses had not been passed on to
21  private-equity funds, it would not be a regulatory
22  matter, it would be an employment issue; correct?
23  MR. KEHOE:  Objection to form.
24  A.  I don't remember having conversations with
25  Paul Weiss about that, I just don't.

55

1  Q.  Was there any, do you recall any discussion
2  with Paul Weiss that the private-equity funds
3  themselves may have potential claims themselves
4  against Rashid?
5  A.  I don't recall.
6  Q.  Was there any discussion that you recall
7  with Paul Weiss or Apollo, at the end of the expense
8  review, repaying private-equity funds for expenses
9  that had been improperly billed to them?
10  A.  I don't remember having that conversation
11  with them.
12  Q.  Do you recall any discussion with Paul
13  Weiss at any time as to whether Rashid's conduct
14  would be material under the federal securities laws?
15  A.  I don't know.
16  MR. HANUSIK:  Related to what though?
17  MR. THOMPSON:  Material to any securities'
18  law violation.
19  A.  I don't recall having that conversation
20  with them.
21  MR. HANUSIK:  Can I just ask, by whom?  The
22  materiality goes to an event not to a law.  It's
23  material to somebody's results or Apollo or private
24  equity.
25  MR. THOMPSON:  Material private-equity

56

1  violation.  Materiality is an element of --
2       MR. HANUSIK:  It's a violation by who?
3       MR. THOMPSON:  I am going to move on
4  because I think it's been addressed.
5       Q.  I am going to ask you to turn to Exhibit 5
6  in your binder.
7       MR. THOMPSON:  For the record, the exhibit
8  is a document that appears to be an e-mail from
9  Susan Maisel, dated July 17, 2013, at 10:43 p.m., to
10  Sipoura Barzideh, S I P O U R A , B A R Z I D E H,
11  and attached case and Bates Numbers are Apollo
12  109047 through 58.
13       Q.  Mr. McGorty, I am not going to quiz you
14  necessarily about the SAAD case, but I do want to
15  ask you a couple of questions.
16       A.  Did you want me to read the case?
17       Q.  I do not want you to read the case.  I want
18  to direct you to -- let's look on the first page of
19  the exhibit, Ms. Maisel's e-mail of July 8, 4:54
20  p.m. to Mr. Zelenko and you.  It states:  "Dan and
21  Glen following up on this afternoons's meeting.
22  Attached is the recent DC Circuit case Walter
23  mentioned, and then the SAAD case is attached.
24       I am not going to ask you questions about
25  the case, but do you want to read the background

57

1  summary about the case and see if that refreshes
2  your recollection?  Let me know when you are done
3  and I will ask you a couple of questions.
4       (Witness reviewing document.)
5       A.  Okay.
6       MR. KEHOE:  I looked this over and this is
7  obviously in the operative timeframe of the
8  common-interest privilege, so to the extent that the
9  question impacts the privilege during that operative
10  time frame of July of 2013, I am going to instruct
11  him not to answer.
12       A.  Okay.
13       Q.  Do you remember any discussion -- I mean
14  there is a reference in Ms. Maisel's memo to the
15  case that Walter mentioned.  Would that be Walter
16  Ricciardi?
17       A.  That is the only Walter I know there, so I
18  assume.
19       Q.  Do you have any recollection of Mr.
20  Ricciardi said about the case?
21       A.  I don't.  None at all.
22       Q.  You can set that aside.  I'm not going to
23  ask you anymore questions about it.
24       At the July 8th meeting with Paul Weiss,
25  was there any discussion --

58

1       A.  I want to see who the Judge's were, I am
2  curious.
3       Q.  At the July 8th meeting with Paul Weiss,
4  was there any discussion that you recall of Apollo
5  potentially asserting a legal claim against Rashid?
6       MR. KEHOE:  Again, I have to caution you,
7  this is during the operative timeframe.  If it
8  impacts the common-interest privilege as you
9  understand it, Mr. McGorty, I instruct you not to
10  answer.
11       A.  There again, the answers that I have given
12  so far about communications with Paul Weiss, are
13  not, to the best of my recollection, during the
14  timeframe of the common-interest privilege as we
15  have defined it.  I don't have a recollection of
16  what was said at that particular meeting anyway, so
17  the answer is I don't remember.  I don't remember.
18       Q.  With respect to the meetings and
19  discussions with Paul Weiss that you do recall, do
20  you recall any discussion of the possibility of
21  Apollo asserting a legal claim against Rashid on
22  account of his expense reporting?
23       MR. KEHOE:  Again, if I could just -- and,
24  Mr. McGorty, you touched on this -- your
25  conversations that you related to with Paul Weiss

59

1  were post-August 1st, 2013 and not during the July
2  of 2013 timeframe.  So to the extent that the answer
3  to counsel's question impacts conversations after
4  August 1, 2013, obviously you can answer, but prior
5  to that, no.
6       A.  That's how I have been trying to answer.  I
7  don't have a recollection of having that
8  conversation we will just say post-August 1st, if
9  that's the general timeframe that we are going with.
10  Not to say that we never had that conversation, but
11  I do not recall having that with Paul Weiss.
12       Q.  For the record, I do want to ask about the
13  period between Crowell's initial engagement and
14  August 1st, the same question.  You may get an
15  instruction on this, but do you recall any
16  discussion with Paul Weiss in that time period, of
17  the possibility that Apollo might assert a legal
18  claim against Rashid?
19       MR. KEHOE:  The same instructions.
20       A.  I don't think I can answer the question.
21       Q.  At any time, do you recall any discussion
22  with Paul Weiss about a settlement privilege
23  potentially applying to information that Mr. Rashid
24  or you, on his behalf, might apply to Paul Weiss?
25       A.  You are asking whether we discussed the

60

1  idea of resolving or settling the claims or whether
2  we discussed the privilege that would be attached to
3  that?
4      Q.  The latter, the privilege.
5      A.  I don't recall any conversations such as
6  that.
7      Q.  At any time?
8      A.  Right.  I don't recall with Paul Weiss.
9      Q.  Now, I am trying to frame the question
10  because you don't recall specific meetings, which is
11  understandable, but do you recall at what point in
12  time, in your mind, there was a common-interest
13  understanding as between Paul Weiss, representing
14  Apollo on the one hand, and Crowell representing
15  Rashid, on the other hand?
16      A.  I am just trying to understand the
17  question.  Will you repeat it again, the last part?
18      Q.  Let me try to rephrase it.
19      A.  I am sorry.
20      Q.  Did you think that there was a
21  common-interest understanding in the very first
22  meeting or the very first phone call between Crowell
23  and Paul Weiss with respect to the expense review or
24  do you think it developed at some later point in
25  time, perhaps as a matter of course of dealing?  I

61

1  am trying to understand what you thought?
2      A.  Yes.  My recollection is from the beginning
3  of the representation, our entire function was
4  derived from a common interest that we had, I
5  believed that we had with Apollo, to undertake this
6  expense review in their interest and, of course,
7  from our perspective, in Mr. Rashid's interest.
8      Q.  You previously testified that you don't
9  recall discussions with Paul Weiss to that effect.
10  Did you think that you had a meeting of the minds
11  with Paul Weiss' attorneys as to the existence of a
12  common-interest understanding?
13      MR. KEHOE:  I object if it calls for him to
14  opine as to what was going on in Paul Weiss' mind.
15  I object to the speculation, but you could answer.
16      Q.  I am asking about in your mind, what you
17  thought.
18      A.  I believed from the beginning that, again,
19  based on our representations as communications being
20  common interests, I believed that that was a mutual
21  understanding.  That's the best I can say.  I can't
22  point to anything more specific than that, but that
23  was my belief.
24      Q.  So, from, if I am understanding you
25  correctly, you are referring to Crowell's practice

62

1  of putting some type of header or footer on
2  documents to the effect that they were joint defense
3  or common- interest material; that's what you are
4  relying on?
5      A.  I would not describe it as a firm practice.
6  I think that is a practice that I think I have
7  employed when I have sent, not necessarily without
8  fail, but when I have sent documents or
9  communications to someone or an entity where I
10  believe we share a common interest.  I would have
11  tried to notate it as such.  It doesn't mean if I
12  didn't that I didn't believe it was.  Unfortunately,
13  I can't say it was a foolproof system, but that
14  generally is what the purpose of that header is.
15      Q.  In this case you did put headers on.
16      A.  If you say that, then that confirms that I
17  believed in that moment, if I did it, then I
18  believed that that communication was subject to a
19  common interest.
20      Q.  Was there any other basis that you had to
21  believe that there was a common-interest
22  understanding?
23      A.  Other than what?
24      Q.  Other than your putting some marker of
25  common interest or joint-defense privilege on

63

1  documents being transmitted to Paul Weiss?
2      A.  I would suggest that the header is not
3  evidence that there was a common interest, but it's
4  certainly evidence that we believed there was.  I
5  think the evidence of there being a common interest
6  was the fact that in retrospect and at the time we
7  had a common interest which was --
8      Q.  Sounds a little circular.
9      A.  You are asking me what I am basing this on,
10  and at least in part I am basing it on the fact that
11  at the time we came on to do this representation, it
12  was my understanding that the nature of the project
13  was something that we both shared an interest in
14  resolving accurately, truthfully and to the best of
15  Mr. Rashid's ability.  That's the way I could say,
16  look back and say that that confirms what I believe
17  was my understanding at the time.
18      Other confirmation, as you suggest, the
19  headers, that I believe at the time we had a common
20  interest in these communications.
21      Q.  In your own words, what was the common
22  interest between Mr. Rashid and Apollo?
23      A.  Well, I believe, I think I believed that
24  the common interest was resolving concerns that
25  Apollo had reflected about Mr. Rashid's expense use

64

1 at Apollo; to assist them in resolving their
2 concerns about Mr. Rashid; to resolve Mr. Rashid's
3 concerns about being employed at Apollo; and to the
4 extent that there was linkage to the SEC
5 examination, to assist Apollo in resolving that.
6         To the extent there was a connection to
7 that examination, I believe it was a variety of
8 issues one of which may have been the Apollo expense
9 policy, that was a common interest.
10        **Q.**   You said to the extent there was linkage to
11 the SEC investigation, but you previously testified
12 you didn't know if there was any linkage; correct?
13        MR. KEHOE:  Objection to form.  He didn't
14 say that.
15        **A.**   I don't think that's what I said.  I said I
16 don't recall if the SEC examiners were specifically
17 aware of Mr. Rashid and his expense issue.  I do
18 believe that part of -- again, Paul Weiss would know
19 better, but I do believe that part of this
20 examination involved Apollo's addressing their
21 expense policy.
22        Again, what I don't know is whether or not
23 the SEC brought it to Apollo's attention or Apollo
24 had to resolve this and bring information to the
25 SEC's attention about this issue, generally or

65

1 specifically.  I never had a sense of the scope of
2 the examination.  I never had a sense of the scope
3 of the expense part of this examination, if that was
4 part of it.
5        **Q.**   Did you think that there needed to be a
6 meeting of the minds with Paul Weiss in order for
7 there to be a common-interest understanding or did
8 you think you could impose one unilaterally by
9 marking documents the way you did?
10        MR. KEHOE:  Objection to the form.
11        You can answer.
12        **A.**   I don't know if I can answer that question.
13        **Q.**   Let's break it down:  Do you think that
14 there needed to be a meeting of the minds with Paul
15 Weiss with respect to the existence of a
16 common-interest understanding?
17        **A.**   You are asking me whether or not you could
18 objectively have a common interest even if one party
19 doesn't realize that?
20        **Q.**   Well, that wasn't the question I asked, but
21 why don't we take that one?
22        **A.**   I don't know the answer to that question
23 actually.  What I do know is that I believe at the
24 time that we had a mutual common interest that both
25 sides recognized.  So I never reached the issue of

66

1 whether one, nor do I now, whether one side can have
2 -- the common interest can be derived from not a
3 lack of meeting of the minds but just the facts of
4 the circumstances or the representations.
5        **Q.**   So you don't recall thinking about whether
6 you needed Apollo's agreement or Paul Weiss' on
7 behalf of Apollo's agreement, that a common-interest
8 understanding existed; that's not something you
9 thought about?
10        MR. KEHOE:  Objection to the form.
11        **A.**   I don't remember thinking we had to address
12 that question at all.  I thought we had -- it was a
13 mutual understanding.
14        MR. HANUSIK:  I think it's a good time for
15 a break.
16        MR. THOMPSON:  Sure, why don't we take ten
17 minutes.
18        We are off the record.
19        (Whereupon, a recess was taken.)
20        MR. THOMPSON:  We are back on the record.
21 BY MR. THOMPSON:
22        **Q.**   Mr. McGorty, you knew that Apollo had given
23 Rashid an Upjohn warning during his meeting with him
24 on July 1, 2013, did you not?
25        MR. KEHOE:  To the extent that that calls

67

1 upon a conversation with the client, I instruct you
2 not to answer.
3        **A.**   I can't distinguish any client
4 communications with anything else that would have
5 been the source of any information about that.
6        **Q.**   You don't recall discussing the Upjohn
7 waring with Paul Weiss?
8        MR. KEHOE:  Objection to form.
9        **Q.**   Or do you recall?
10        MR. KEHOE:  Hold on a second.  If we are
11 talking about this issue, and this goes to
12 conversations on a common interest during July of
13 2013, I am instructing him not to answer.
14        MR. THOMPSON:  The instruction is noted and
15 I would just say that that's clearly what the Judge
16 said we could ask about.  You can take it up with
17 the Judge.
18        MR. KEHOE:  Just explain to me why.
19        MR. THOMPSON:  I am not going to have
20 colloquy on this.  We will deal with it later if
21 that's your instruction.
22        **Q.**   Can you answer the question?
23        **A.**   Can you ask it again?  I am sorry.
24        **Q.**   Do you recall any discussion with Paul
25 Weiss about Paul Weiss having given Mr. Rashid an

68

1  Upjohn warning?
2      **A.** I can't recall whether or not I learned of
3  that from Paul Weiss at any time.
4      **Q.** Part of an Upjohn warning is that any
5  privilege belongs to the company and could be waived
6  at the company's sole discretion; correct?
7      MR. KEHOE:  Objection to form.
8      **A.** I do know what an Upjohn warning is, and
9  that's what it's supposed to do.
10     **Q.** Did you think that the Upjohn warning was
11 applicable to your communications with Apollo's
12 representatives on Rashid's behalf?
13     **A.** Absolutely not.
14     **Q.** Why not?
15     **A.** I never had a representation where
16 communications with counsel for an entity carried
17 over what I imagine would have been a previously
18 administered Upjohn warning to an individual
19 employee that we later represented at a time prior
20 to our representation.
21     **Q.** So, in your mind, did the common interest
22 that you believe existed when Crowell started
23 representing Rashid, did that extinguish the Upjohn
24 warning that had been previously administered to Mr.
25 Rashid?

69

1      **A.** To the extent that Mr. Rashid was given an
2  Upjohn warning in a meeting with his employer prior
3  to our representation, I don't see any connection.
4  That, in my experience, having extinguished
5  when he left that room and that meeting, but that's
6  again, beyond my scope of knowledge in this case.
7      **Q.** If I understand you correctly, you believe
8  the Upjohn warning only pertained to whatever Mr.
9  Rashid disclosed at the July 1, 2013 meeting?
10     MR. HANUSIK:  Objection to the extent
11 you're stating facts not in evidence.
12     **A.** Let me answer that question just generally
13 and you tell me if that is sufficient.
14     My understanding is that when an individual
15 is given an Upjohn warning by his or her employer,
16 it applies to the meeting at or the interview,
17 whatever the case may be, when that Upjohn warning
18 was given.  For example, when I have given Upjohn
19 warnings to individuals when I represented their
20 employer, I have given Upjohn warnings at every
21 meeting I had with that individual, not merely the
22 first one, because it does not, in my experience or
23 it should not apply indefinitely because it was
24 administered once.
25     **Q.** Prior to August 1st, 2013, was there any

70

1  discussion between Crowell and Paul Weiss concerning
2  Crowell's practice of inserting the words "common-
3  interest privileged document" or similar words into
4  the subject line of e-mails?
5      **A.** As I said earlier, I don't consider that a
6  Crowell practice, and I don't recall at any point
7  any discussion with anybody about the fact of us
8  inserting that header or the significance of that.
9      **Q.** Did you regard Paul Weiss' silence as
10 acquiescence to your assertion of a common-interest
11 privilege?
12     **A.** Did you say did I rely on that?
13     **Q.** Did you regard it?
14     **A.** Did I regard it?  I can't say that at the
15 time I was paying attention to their response or
16 lack thereof to the inclusion of the header to have
17 some meeting that I understand we now are giving it
18 because at the time I didn't think there was a
19 dispute about our common interest.
20     **Q.** So you didn't think about it one way or the
21 other?
22     MR. KEHOE:  Objection to form.
23     **A.** That's not what I said.  I didn't have a
24 view on their silence, because I didn't observe that
25 as an issue, one way or another.

71

1      **Q.** Would you have continued to send materials
2  to Paul Weiss if they had said:  Hold on, we don't
3  agree that there is a common-interest privilege?
4      MR. HANUSIK:  Objection, calls for
5  speculation.
6      **A.** I have no idea what I would have done.
7      **Q.** Is there any contemporaneous memo or other
8  writing that memorializes Crowell's understanding
9  that a common-interest privilege existed in
10 protected communications with Paul Weiss regarding
11 Rashid's expenses.
12     MR. HANUSIK:  Just so I am clear on the
13 question, the question is any memo or other writing?
14     MR. THOMPSON:  Correct.
15     **A.** I don't know.
16     **Q.** You are not aware of one?
17     **A.** I am not aware of one.
18     **Q.** Looking back on it, do you have a view as
19 to whether Apollo and Paul Weiss on Apollo's behalf
20 acted in good faith in dealing with Rashid?
21     MR. KEHOE:  Objection to the form.
22     **A.** I am sorry, what do you mean by --
23     **Q.** In the context of the expense review, do
24 you have a view as to whether -- let's take Apollo
25 first -- whether they were dealing with Mr. Rashid

72

1  in good faith in trying to resolve the issues?
2      A. We were trying to resolve the issues, and I
3  don't have any recollection of a belief at any time
4  that anyone was acting in bad faith.
5      Q. Looking back on it, would you have done
6  anything differently in representing Mr. Rashid?
7      MR. KEHOE: Objection, calls for
8  speculation.
9      A. I don't know.
10     Q. Would you have asked for a written
11 common-interest agreement?
12     MR. KEHOE: Objection. Calls for
13 speculation.
14     A. No.
15     Q. No?
16     A. I don't think I would have. I mean, I
17 don't think I would have, candidly. I don't think
18 we would have done anything differently, but I am
19 not sure.
20     Q. After the July 8, 2013 meeting with Paul
21 Weiss, did you or anyone else from Crowell give
22 Rashid advice regarding the existence of a common-
23 interest privilege with respect to your
24 communications with Paul Weiss?
25     MR. KEHOE: Objection. Obviously that's

73

1  attorney-client privilege.
2      MR. THOMPSON: And you are instructing him
3  not to answer the question.
4      MR. KEHOE: Of course.
5      Q. Let's look at Exhibit 4 in your binder.
6      MR. THOMPSON: For the record, Exhibit 4 is
7  a document Bates numbered Rashid, leaving out the
8  0's, 659 through 74. It appears to be a document
9  entitled: "Apollo Global Management Travel and
10 Expense Reimbursement Policies and Procedures."
11     Q. Mr. McGorty, I am going to direct your
12 attention to a specific portion of the document and
13 only that portion. Specifically, the discussion of
14 expense submission that appears at Rashid 662 and
15 goes over to 64. I will direct your attention to
16 particular language, but if you would like to take a
17 look at it and let me know when you are ready to
18 respond to questions, I would appreciate it.
19     (Witness reviewing document.)
20     A. Sure. Up to 2.3?
21     Q. I am going to briefly direct your attention
22 to one line under "Payments" on the next page.
23     A. Okay.
24     MR. KEHOE: What page was it?
25     MR. THOMPSON: 662 to 64.

74

1      MR. KEHOE: You said something about one
2  item?
3      MR. THOMPSON: Yes, on 243, first sentence
4  of the second paragraph. I may ask him a question
5  about that.
6      A. Okay.
7      Q. Do you recall ever seeing this document
8  before?
9      A. It looks familiar to me, I am sure I saw
10 it.
11     Q. During the expense report?
12     A. Yes.
13     Q. Do you recall any discussion with Paul
14 Weiss regarding this document?
15     A. No.
16     Q. Let me see if I can probe a little bit.
17 Directing your attention to page 662, under section
18 2, "Expense Submission." The second paragraph
19 states in part: "Employees may delegate expense
20 report preparation to another individual (EG
21 assistant) however, the employee is ultimately
22 responsible for timely and accurate submission of
23 his/her expenses, regardless of who prepares the
24 expense report."
25     Do you recall any discussion with Paul

75

1  Weiss of that requirement?
2      MR. KEHOE: To the extent it happened in
3  July of 2013, I instruct you not to answer. If
4  there is testimony you can give after August 1 of
5  2013, if you like, you can answer.
6      THE WITNESS: That has governed all of my
7  answers so far.
8      A. I would say that I recall later in the
9  process, in other words after August 1st, having
10 conversations with Paul Weiss about some of the more
11 technical elements of the submission of expenses. I
12 don't remember specifically what they were, I think
13 they would be covered by what you just read for how
14 the expenses were submitted or not submitted, so I
15 think the answer is yes, with all of those caveats.
16     Q. The next paragraph begins: "Each employer
17 will be required to certify accuracy of his/her
18 expense report prior to submission." Was that
19 consistent with your understanding in how you
20 assisted Rashid during the expense review.
21     MR. KEHOE: The same objection, post-
22 August 1st or after.
23     A. I don't think the question called for a
24 communication with Paul Weiss, in any event. Could
25 you resay --

76

1    **Q.** Based on your understanding, whether that
2 is consistent with your understanding, in
3 representing Mr. Rashid during his expense review?
4    **A.** That he had the responsibility to serve via
5 his --
6    **Q.** Yes, sir.
7    **A.** I don't recall the details, but I think I
8 could say I have a recollection that he was required
9 to submit and certify his reports.
10    MR. HANUSIK:  You are asking about his
11 previous expense reports?
12    MR. THOMPSON:  Yes.
13    **Q.** Now I am confused.  I was asking about the
14 expense reports covered by the review.
15    **A.** I don't recall anything different from what
16 you just read.
17    **Q.** Thank you.
18    Going to the next page, Rashid 663, under
19 Section 2.2, "Substantiation of Travel and Business
20 Expenses."  There is a statement that the IRS
21 requires that any tax deductible
22 travel/entertainment cost include documentation of,
23 and it gives a list of things.  After the bullet
24 points it contains:  "Any expense reports that do
25 not adequately address the who, what, when, where

77

1 and why of these expenses will be rejected by Apollo
2 shared services and the employee's Amex will not be
3 paid until such time adequate documentation is
4 received."
5    Is that consistent with your understanding
6 of Apollo's requirements at the time you were
7 representing Mr. Rashid in connection with the
8 expense review?
9    **A.** Just to clarify, you are asking if it was
10 my understanding that that was Apollo's practice or
11 policy?
12    **Q.** Yes.
13    **A.** I know of no other policy than what is
14 written here.
15    **Q.** And conducting the expense review, did you
16 adhere to the standard?
17    **A.** Well, the travel and entertainment costs
18 that this applies to was a subset of the expenses
19 that we looked at.  I can't say I remember the
20 criteria one way or another for how we looked at
21 travel and entertainment expenses as described here.
22 I am fairly certain that each one had an amount, and
23 a date and place it occurred.  I think we knew what
24 the expenses were.
25    I am reading down the list.  I think we

78

1 tried to fill in the names and titles of those who
2 attended, if it was not already included in the
3 materials we got from Paul Weiss, and the purpose of
4 the meeting was one of the things that we
5 determined.  So I don't have a recollection of
6 applying this as you described, but looking at it, I
7 think this is criteria we tried to apply.
8    If we couldn't meet any of this criteria,
9 we would put it in the other bucket, even if we
10 couldn't find documentation to support each of these
11 criteria, we would put it in the other bucket.
12    **Q.** Do you recall having discussion with Paul
13 Weiss regarding the who, what, when, where, and why
14 requirements set forth in the document?
15    **A.** No.
16    MR. KEHOE:  The subject is the same post
17 and prior to August 1st.
18    **Q.** Let me ask you to turn to Exhibit 6 in the
19 binder.
20    MR. THOMPSON:  Exhibit 6 bears Bates
21 numbers Apollo 42137 through 39.  It appears to be
22 an e-mail string, the last of which is from Susan
23 Maisel, dated July 17, 2013, to Sippoura Barzideh
24 and, also, for the record, in the upper left-hand
25 corner of the first page, there is a designation

79

1 "Laufer," L A U F E R, "Gregory."  It's my
2 understanding that that appears because Apollo --
3 these documents were produced on Apollo's behalf and
4 apparently Mr. Laufer was the last one that printed
5 it out, but that did not appear in the original
6 e-mail string.
7    MR. HANUSIK:  Can I ask a question?
8    MR. THOMPSON:  Sure.
9    MR. HANUSIK:  The document reflects, as you
10 noted, sort of the last series of e-mails appear to
11 be communications between Paul Weiss' people
12 themselves or Paul Weiss' people generally.  So one
13 from a Paul Weiss person to themselves; then one
14 from a Paul Weiss person to another Paul Weiss
15 person; and then, I guess, Mr. Laufer as well, but
16 the last reference to a document, e-mail to Mr.
17 McGorty, reflects there is an attachment, but I
18 don't see an attachment to this.  Is there an
19 attachment?
20    MR. THOMPSON:  I believe we will be looking
21 at a version that has the attachment in a few
22 moments.
23    MR. HANUSIK:  You are not asking about the
24 attachment?
25    MR. THOMPSON:  Not at this point.

80

1    Q.   Let me refer you to page Apollo 42138.  At
2  the bottom of that page, Mr. McGorty, appears to be
3  an e-mail that you sent to Susan Maisel and Mr.
4  Zelenko on July 8th, 2013, at 9:57 p.m.  And in the
5  third paragraph you state: "We have Mr. Rashid
6  coming in tomorrow morning to try to help us go
7  through some of the expenses, so at a minimum, a
8  copy of the spreadsheet would be really useful
9  between now and tomorrow."
10       First of all, was it a truthful statement
11  when you said that Mr. Rashid was coming in tomorrow
12  morning?
13       MR. KEHOE:  Objection.  Common-interest
14  privilege.  Instruct the witness not to answer.
15       MR. HANUSIK:  Was it a truthful statement
16  that he expected him to come in to mark this?
17       MR. THOMPSON:  I will accept that
18  amendment.
19       MR. KEHOE:  This is a discussion in July of
20  2013, so I instruct you not to answer.
21    A.   Okay.
22       MR. THOMPSON:  All right.  So the witness
23  has been instructed not to answer.
24    Q.   When you requested a copy of the
25  spreadsheet, what were you referring to?

81

1  recall a confidentiality agreement.
2    Q.   I believe you previously testified there
3  was already a common-interest understanding, why
4  would a confidentiality agreement be necessary?
5    A.   Well, you've got to ask Paul Weiss that,
6  but my understanding is that the confidentiality
7  agreement would govern our disclosure of the
8  physical materials that would be, I am guessing,
9  proprietary, all Apollo business-related documents,
10  the expense reports.  I am thinking that is what it
11  would have been, the nature of the materials they
12  disclosed to us.  That's common.
13    Q.   Let me ask you to turn to Exhibit 7 and
14  this e-mail attaches to what appears to be an
15  agreement.
16       MR. KEHOE:  For the record, it's Bates
17  Number Apollo 109063 through 69.  It appears to be
18  an e-mail string that ends with the July 17, 2013,
19  10:46 p.m. e-mail from Ms. Maisel to Mr. Barzedeh,
20  re: Finzi letter PDF.
21       Then there appears to be a letter agreement
22  in the last two pages.  I have a couple of questions
23  for you about the letter agreement, Mr. McGorty, if
24  you can take a moment to look it over and let me
25  know whether you have seen it previously.

83

1       MR. KEHOE:  The same objection.
2       MR. THOMPSON:  You are instructing him not
3  to answer?
4       MR. KEHOE:  The same objection and the same
5  instructions.
6    Q.   The next e-mail up, from Mr. Finzi, states:
7  "Glen, we're okay with sending you the sheet on the
8  understanding that it will be subject to the terms
9  of the confidentiality letter/agreement we expect to
10  agree on shortly.  Let us know if that works for
11  you."
12       Then your response is:  "Absolutely fine if
13  it's subject to future confidentiality agreement."
14       What confidentiality agreement does that
15  reference, Mr. McGorty?
16       MR. KEHOE:  To the extent that the
17  confidentiality agreement lived after August 1,
18  2013, you can answer.
19    A.   In my recollection, at some point after
20  that, I think there was some confidentiality
21  agreement between Paul Weiss and Crowell which
22  governed their disclosure to us of the material that
23  we worked on in connection with the review, and that
24  extended well after August 1st.  In the limited time
25  after August 1st, that happened in this case.  So I

82

1       (Witness reviewing document.)
2    A.   I believe I have, okay.
3    Q.   And is this packet, in fact, a
4  confidentiality agreement as executed between Paul
5  Weiss and Crowell?
6    A.   I believe so.
7    Q.   Are you aware of any other agreement being
8  entered into between those parties before September
9  of 2013?
10    A.   Any other written agreement?
11    Q.   Start with written agreement.
12    A.   Yes -- no.  I mean, I don't recall any
13  other written agreement.
14    Q.   Are you aware of any other unwritten
15  agreement?
16    A.   To the extent there was a common-interest
17  understanding between the parties, I think that was
18  an agreement that would have predated September, I
19  think you said before September, but as far as
20  agreement in writing, this was it.
21    Q.   Have you had a chance to read the letter?
22    A.   I did just now.
23    Q.   Does it accurately reflect, to the best of
24  your recollection, what had been discussed as
25  between Crowell and Paul Weiss about

84

1  confidentiality?
2      **A.** I can't answer that.  I don't recall the
3  substance of discussions regarding what is in this
4  letter.
5      **Q.** You don't recall any discussions?  You were
6  not involved in --
7      **A.** I didn't say that.  I said I don't recall
8  whether I was or I wasn't.
9      **Q.** This is a not a joint-defense agreement; is
10  it?
11      **A.** No.
12      **Q.** It's not a confidentiality agreement
13  either, is it?
14      **A.** I think that's what it is.  That's what you
15  described it as.
16      **Q.** I am sorry.  It's not a common-interest
17  agreement?
18      **A.** I think that's right.  I would not describe
19  it as a common-interest agreement.  It's something
20  more specific than that.
21      **Q.** Did you understand that this agreement gave
22  Mr. Rashid any rights with respect to information
23  that he might provide in cooperation with Apollo's
24  expense review?
25      **A.** Let me just look at it again.  No, I don't

85

1  think it did at all.
2      **Q.** Did you or Mr. Zelenko ask Paul Weiss to
3  execute a confidentiality agreement to protect the
4  confidentiality of materials that you would be
5  sending to them in connection with the expense
6  review?
7      **A.** You mean the spreadsheets that we sent
8  back?
9      **Q.** Yes.
10      **A.** No.
11      **Q.** Why not?
12      **A.** I think I viewed these confidentiality
13  agreements as providing, in this case, from an
14  employer, business documents that they're disclosing
15  to a third party that otherwise would be private and
16  confidential.  That's why this is included.  We have
17  a common-interest understanding, form my perspective
18  at the time, so we did not need an additional
19  agreement to disclose back to Paul Weiss their
20  documents with our work product of working through
21  these expenses with Mr. Rashid, which was what our
22  task was.
23      **Q.** You can set that aside.  Let me ask you to
24  turn to Exhibit 8 in your binder.
25      **A.** I would be happy to say that I don't have

86

1  an Exhibit 8, but I can look on with him.
2      **Q.** You do not have an Exhibit 8?
3      **A.** No.
4      **Q.** I apologize.
5      **A.** That's okay.
6      **Q.** I will give you a moment to read through
7  the document.  Let me know when you are ready.
8          (Witness reviewing document.)
9      **A.** Okay.
10          MR. THOMPSON:  For the record, Exhibit 8 is
11  Bates Number SEC correspond-E1376 to 78.  There is a
12  letter dated November 18, 2016, from Dan Zelenko to
13  Donna Norman.
14          Mr. McGorty, have you seen this letter
15  previously?
16      **A.** I have a vague recollection of seeing it
17  around the time it was sent, but not since, I don't
18  believe.
19      **Q.** You're aware that Crowell did represent Mr.
20  Rashid in connection with the SEC's investigation
21  that led to the filing of the case that we are here
22  for today; right?
23      **A.** Yes.
24      **Q.** Were you involved in that representation?
25      **A.** I was aware of it, but I really was not

87

1  involved.
2      **Q.** Were you consulted with respect to the
3  preparation of this letter?
4      **A.** I don't recall being consulted about it.  I
5  may have seen it before it went out to verify my
6  understanding or to offer some perspective on it,
7  but I don't recall being involved in drafting the
8  letter.
9      **Q.** Let me refer to the third sentence in the
10  second paragraph on page 1.
11      **A.** The one that begins, "First Mr. Rashid was
12  paid"?
13      **Q.** Yes.
14      **A.** Okay.
15      **Q.** It states, "First, Mr. Rashid was paid his
16  full base salary and benefits beginning on July 1,
17  2013 to the early part of October 2013."  Then the
18  last sentence of the same paragraph states,
19  "Moreover, Mr. Rashid was advised by Apollo for
20  accounts on multiple occasion between July and
21  September of 2013, that no determinations have been
22  made about his employment status while review was
23  ongoing."
24          MR. HANUSIK:  I am sorry, that's the last
25  sentence of the next paragraph.

88

1    MR. THOMPSON:  Thank you for that
2  clarification.
3    **A.**  Okay.
4    **Q.**  Is that account of what Apollo told Rashid
5  about his employment status between July and
6  September of 2013 consistent with your recollection?
7    MR. KEHOE:  To the extent it calls upon
8  conversations with you and Mr. Rashid, it's covered
9  by attorney-client privilege.  To the extent it's
10  dealing with conversations prior to August the 1st,
11  that's a common-interest privilege and it goes to
12  the attorney-client privilege.
13    **A.**  With those caveats, I would say that I
14  believe that was the state, at least in the latter
15  part of our involvement and through representations
16  of counsel, not Mr. Rashid.
17    **Q.**  Do you know when Apollo told Rashid that
18  his employment would be terminated?
19    **A.**  I am going to place it in September or
20  October of 2013.  I don't remember the specific
21  date, but it was definitely in that timeframe.
22    **Q.**  Let me refer you to page 2 of the letter,
23  the second paragraph, last sentence, states: "To
24  the contrary, had Mr. Rashid believed that his
25  interests were adverse to Apollo at the time, he may

89

1  have determined that it was not in his interest to
2  provide extensive cooperation to the firm through
3  its outside counsel and forensic auditor."
4    Do you have any reason to disagree with
5  what Mr. Zelenko told the SEC in that sentence?
6    **A.**  No.
7    **Q.**  I ask you to turn to Exhibit 8A?
8    MR. THOMPSON:  For the record, Exhibit 8A
9  is a declaration of Roberto Finzi.
10    **Q.**  Have you seen this previously, Mr. McGorty?
11    **A.**  I have seen it, but I have not read it.  I
12  think I saw -- I remember seeing that Roberto filed
13  an affidavit, but I have not read it.  I can, if you
14  would like.
15    **Q.**  I would direct your attention to portions
16  of it.
17    Just preliminarily, are you personal
18  friends with Mr. Finzi?
19    **A.**  Yes.
20    **Q.**  So you are good friends?
21    **A.**  I would consider us good friends.
22    **Q.**  Let me direct your attention to, you're
23  welcome to read the entire thing if you would like.
24  As a matter of fact, why don't you take some time to
25  do that.

90

1    **A.**  Okay.
2    **Q.**  I direct your attention to paragraph 4 on
3  the first page, which states:  "On or about July 3,
4  2013, Mr. Rashid sent an e-mail advising me and
5  others that he had retained Dan Zelenko of Crowell &
6  Moring, LLP."
7    Paragraph 5 states: "In the ensuing months
8  I participated in and am otherwise aware of written
9  and verbal communications between Crowell & Moring
10  and Paul Weiss.  I viewed those communications as
11  being between two separately represented parties and
12  did not view them as privileged.  I do not recall
13  thinking of or approaching those discussions as
14  settlement discussions."
15    Do you have any reason to believe that Mr.
16  Finzi, in his declaration, was not truthful in
17  stating that he did not regard those communications
18  as being privileged?
19    MR. KEHOE:  Objection to the form.  It's
20  speculation.
21    **Q.**  You can answer.
22    **A.**  I mean, we have a similar formulation.  I,
23  too -- it is my recollection and my belief at the
24  time that we had an understanding; it was Mr.
25  Finzi's that he did not believe at the time that we

91

1  had that understanding.  I am certain that he is
2  being truthful in his representation that that was
3  his belief at the time, just as I am certainly
4  truthful that I am representing what I believed at
5  the time.
6    **Q.**  Mr. Finzi specifically referenced -- let me
7  read again the last sentence of paragraph 5.  "I do
8  not recall thinking of or approaching those
9  discussions as settlement discussions."
10    Do you have any reason to believe that he
11  is not truthful in relating what his belief was at
12  the time?
13    MR. KEHOE:  The same objection to form.
14    **A.**  If he said he doesn't recall thinking of it
15  that way, then I believe he is speaking the truth.
16  He doesn't recall thinking of it that way.
17    If you are asking me whether I do recall
18  thinking of it that way, or if you are asking
19  whether or not I think it objectively was that,
20  based on the task in front of us, I would say yes,
21  but I certainly do not think in Mr. Finzi is not
22  being truthful.
23    **Q.**  Let's talk about your belief.  I thought
24  you indicated previously that you did not recall any
25  discussion with Paul Weiss to the effect that the

92

1  discussions were subject to a settlement privilege?
2      A.  No.  You asked whether or not I discussed
3  with Paul Weiss whether or not our communications
4  were subject to a settlement privilege.
5      Q.  Right.  That's what I just asked.
6      A.  I'm sorry.  I thought you asked whether I
7  believed at the time we were trying to resolve Mr.
8  Rashid's claims that Apollo had with him.
9          No, you are right.  We never talked about,
10  we never labeled, if you will, his communications as
11  being a settlement privilege.
12      Q.  Right.  Did you think at the time that they
13  were subject to a settlement privilege, Rule 408
14  specifically?
15      A.  I think we were working to resolve the
16  case.  I don't recall ever being asked at the time
17  whether or not I thought whether or not those
18  communications would eventually be subject to the
19  evidentiary rule or whether they would be
20  applicable.  But if you are asking if at the time I
21  thought we were trying to settle Apollo's dispute
22  with Mr. Rashid, I did.  That's how it started.
23  That's how we got involved in the case, and
24  relatedly, to assist Apollo in settling these
25  concerns that the SEC apparently had with them,

93

1  based on your examination.
2      Q.  Do you recall discussion or do you recall
3  thinking at the time in 2013 that your
4  communications with Paul Weiss on Mr. Rashid's
5  behalf were subject to the protection of Rule 408?
6      A.  I don't recall.  I don't recall thinking
7  that.
8      Q.  You just didn't think about it one way or
9  the other?
10      A.  Yes.  I think I didn't think of it in those
11  terms at the time, one way or the other.  No, I
12  didn't at the time, but I did think of the project
13  as I have described it at the time.
14          Just to clarify, you had asked about Mr.
15  Finzi's sentence, which is about his thinking about
16  the nature of the discussions, the process?
17      Q.  Yes.
18      A.  Not labeling it as such, the
19  communications.  So I am trying to answer the
20  question the same way that Mr. Finzi said in his
21  response.
22      Q.  And let me direct you to paragraph 9 of Mr.
23  Finzi's declaration where he states in the first
24  sentence: "I do not recall any common interest or
25  joint-defense agreement between Crowell & Moring and

94

1  Mr. Rashid, on the one hand, and Paul Weiss and
2  Apollo on the other hand."
3          Do you have any reason to believe that Mr.
4  Finzi is not accurately stating his recollection?
5      A.  No.  I am sure he is stating his
6  recollection as he described it.
7      Q.  Do you think Mr. Finzi's statement that I
8  just read into the record is reasonable, based on
9  the course of dealing with Paul Weiss, as you recall
10  it?
11          MR. KEHOE:  Objection to the form.
12          MR. HANUSIK:  Objection.
13      A.  He is stating his recollection.  If you are
14  asking me whether or not I think, independent of his
15  statement about his recollection, I think it's
16  reasonable for somebody to perceive our
17  communications as being pursuant to a common
18  interest, I do.
19      Q.  No.  I am asking whether you think it's
20  reasonable for Mr. Finzi to perceive that there was
21  no common-interest agreement as between Crowell and
22  Paul Weiss?
23          MR. KEHOE:  Objection to the form.
24      A.  I don't know how to answer that question.
25  From my perspective, I believe we had a

95

1  common-interest understanding.  Mr. Finzi is
2  suggesting his recollection is different than mine.
3  Is it unreasonable for him to have the recollection
4  he has?  I can't say.
5      Q.  Do you think it's unreasonable for him to
6  reach the conclusion that there is no common
7  interest?
8          MR. KEHOE:  Object to the form.  It's
9  complete speculation.
10          MR. HANUSIK:  Objection.  It's been asked
11  and answered.
12      A.  I don't have some knowledge of what he is
13  basing his recollection on.  So I can't really
14  answer whether it's reasonable from his perspective.
15      Q.  Do you think it's an honest difference of
16  opinion?
17          MR. KEHOE:  Objection to form.
18      A.  If there is a different of opinion,
19  certainly it's not dishonest.  I am sure everyone is
20  approaching this in good faith.
21      Q.  You can set that aside for a moment.  Let's
22  go on to Exhibit 9.  Exhibit 9 is Bates Number
23  Apollo 109059 through 109062, and the spreadsheet
24  that is attached does not have separate Bates
25  Numbers on it.

96

1    MR. THOMPSON:  For the record, the last
2 e-mail in the series is a July 17, 2013, e-mail from
3 Susan Maisel to Sippoura Barzedeh.  Those are two
4 lawyers at Paul Weiss.  It's my understanding that
5 one was forwarding a previous mail string to the
6 other.  So what I want to focus on, Mr. McGorty, is
7 just the prior e-mail string.
8    Q.  In the page Bates numbered 109059, middle
9 of the page, there is an e-mail from Ms. Maisel to
10 you, Mr. McGorty, dated July 8, 2013, at 7:38 p.m.
11 Subject:  Ali Rashid, and it appears to attach a
12 document.  Have you had a chance to not review the
13 attachment, but look at it to identify what it is?
14    A.  I believe I know what it is.
15    Q.  What is the attachment?
16    A.  This appears to be the original spreadsheet
17 provided to Crowell from Paul Weiss, that I believe
18 originated from Apollo's accounting department,
19 related to Mr. Rashid's expenses.
20    Q.  And your belief that it originated from
21 Apollo's accounting department is based on what?
22    A.  Looking at the document and seeing the
23 information contained in there.
24    Q.  Do you remember having any discussion with
25 Ms. Maisel or others at Paul Weiss about the

97

1 spreadsheet that is being transmitted to you?
2    MR. KEHOE:  To the extent it's in July of
3 2013, it's subject to the privilege.  I instruct you
4 not to answer.  If it's post-August 1, 2013, you can
5 answer.
6    A.  I don't remember any conversation one way
7 or another about it.  There were definitely
8 conversations with Paul Weiss after August 1st about
9 the spreadsheet or at least in the version of the
10 spreadsheet that existed at that time, which was our
11 work product, working off of this original
12 spreadsheet, to identify and allocate expenses.
13    Q.  Looking at the spreadsheet, let's just look
14 at the first page of it, it begins with entries in
15 January of 2011, and there are different headings to
16 the columns.  Is it your understanding that this is
17 information that was taken from Apollo's accounting
18 system or time and expenses?
19    A.  That was my understanding of where this
20 came from.
21    Q.  What is your understanding of where the
22 information set forth in the long description or as
23 it's stated here, long abbreviation DSCR, what is
24 your understanding of where that information came
25 from?

98

1    A.  I think the whole document came from the
2 accounting department.
3    Q.  Specifically, do you have an understanding
4 of whether the information in the long description
5 field bore some relation to expense reports that Mr.
6 Rashid had submitted?
7    MR. KEHOE:  Objection to the form.
8    A.  I don't know the author was of the
9 descriptions in the long description category.  I
10 think that's what you are asking me.
11    Q.  Well, I am asking whether you have an
12 understanding that it related to Mr. Rashid's
13 submitted expense reports, whether they were
14 originally authored by an assistant or Mr. Rashid
15 himself.
16    MR. KEHOE:  To the extent you received any
17 of that information from conversations with counsel,
18 that's governed by attorney-client, with your
19 client.
20    A.  Without relating any information that I got
21 from Mr. Rashid or information that I subsequently
22 had in exchange with Paul Weiss, I don't remember
23 having any specific direction as to the ultimate
24 origin of where the words in that column came from.
25    Q.  Leaving aside any discussions you may have

99

1 had with Mr. Rashid --
2    A.  Right.
3    Q.  Did you have any understanding based on
4 communications with Paul Weiss as to where the
5 information in the long description field came from?
6    A.  Subject to the date at issue, I don't
7 recall.  I don't recall Paul Weiss telling me
8 exactly where that came from.
9    Q.  Did you ever have any reason to doubt the
10 accuracy of the information set forth in the long
11 description field?
12    MR. KEHOE:  Objection to form.
13    A.  Just to clarify.
14    Q.  I will ask a different question:  Did you
15 ever come to have any reason to doubt that the
16 information set forth in the long description field
17 accurately reflected what was in Apollo's accounting
18 system for time and expenses?
19    A.  No.
20    Q.  Next column over is labeled "personal,"
21 with a question mark.  The field appears to be
22 populated entirely with N's.  Do you have an
23 understanding that the N is intended to connote
24 "no"?
25    A.  Not based on any information other than my

100

1 perception of the document as it looks. I am sure
2 that's what that meant.
3    Q. Did you have an understanding of where the
4 information set forth in that column came from?
5    A. I don't, other than the accounting
6 department where the whole document, I think, came
7 from.
8    Q. Right. Let me ask this: Was it your
9 understanding that all of the expenses listed in
10 this spreadsheet were expenses that Rashid had
11 originally billed as business expenses?
12    A. Well, there's some that are -- at least
13 there are some that are not business expenses. They
14 have Y's, like on page 24, for example.
15    Q. Yes. You're correct, there are some Y's.
16    A. Again, I am assuming that the personal
17 column is the distinction in the accounting
18 department.
19    Q. I apologize. I didn't recognize there were
20 some Y's in that column.
21       Under "Payment" it appears that there's
22 binary choice between OOP or AMX, is it your
23 understanding that OOP refers to out of pocket?
24    A. Yes. I mean, not based on recollection of
25 this, but I would be surprised if the abbreviation

101

1 covered something other than that.
2    Q. AMX referred to an Amex card?
3    A. I would assume so.
4    Q. Do you have an understanding of the source
5 of the information set forth in the "comments"
6 field?
7    A. I don't, other than coming from the
8 accounting department. Originally, I don't know
9 where that came from. What gives me pause is that
10 it's the kind of thing we were trying to add to it,
11 so I don't know the source of it in this version, if
12 this is the first version that we got.
13    Q. Right. When you had -- Paul Weiss and
14 Crowell had at least one meeting, if not more by
15 then, so you are not certain whether this was based
16 on information provided by Mr. Rashid or some other
17 source?
18       MR. KEHOE: Objection to the form.
19 Anything from Mr. Rashid, I would instruct you not
20 to answer.
21       THE WITNESS: Right, of course.
22       MR. HANUSIK: Are you suggesting that the
23 information might have come from Crowell, the record
24 you have presented.
25       MR. THOMPSON: I am asking.

102

1       MR. HANUSIK: This is the first time that
2 Crowell gets this.
3       MR. THOMPSON: That doesn't mean,
4 necessarily mean that information hadn't been
5 inputted into a spreadsheet based on information
6 provided by Mr. Rashid.
7    A. I understand. I don't recall whether this
8 -- this is the first spreadsheet received. I don't
9 recall whether it had already included information,
10 which may or may not have been provided. Based on
11 the dates, I would say that would have been under
12 the common-interest understanding, so I can't speak
13 to it anyway, but I don't have a recollection of
14 that.
15    Q. You can set that aside. I am going to flip
16 you around in the binder a little bit and ask you to
17 go back to Exhibit 1 A?
18    A. The time sheets?
19    Q. Yes.
20       On CMAR SEC 7, the second entry down is a
21 July 10, 2013 entry by you for teleconference with
22 Mr. Finzi and Mr. Zelenko, regarding status, follow-
23 up discussion regarding next steps.
24       MR. KEHOE: What date, I am sorry?
25       MR. THOMPSON: July 10th. The second entry

103

1 from the top.
2    Q. Any chance you have a recollection of that
3 discussion?
4    A. If I did, I don't think I could answer it
5 anyway, but I happen not to have a recollection of
6 that.
7    Q. Do you know whether you had taken notes
8 during this conversation?
9    A. I don't know if I did take notes in that
10 conversation, but if I did, I would have already
11 provided them.
12    Q. To your counsel?
13    A. Yes.
14       MR. THOMPSON: For the record, no such
15 notes have been provided to us. I assume that that
16 would be a work-product privilege asserted, nor did
17 we request them.
18    Q. Do you know whether a file memo was
19 prepared?
20    A. I don't.
21    Q. I take it your answers would be the same if
22 I asked about the July 11, 2013 entry regarding
23 another teleconference with Paul Weiss. Do you see
24 that?
25    A. July 11th, that's also -- yes, I see that.

104

1  Yes, I don't remember that particular conversation
2  either.
3      Q.  That also refers to a meeting with BDO;
4  what is that a reference to?
5      A.  I have a recollection that BDO was the
6  audit company that was assisting Paul Weiss and Mr.
7  Rashid in their effort to recreate the expense
8  reports.
9      Q.  Do you have a recollection of having a
10 meeting where both Paul Weiss personnel and BDO
11 personnel were present?
12     A.  Not specifically, only to the extent that I
13 recall a meeting with Paul Weiss at some point and
14 if BDO was present at that meeting, then I have a
15 recollection of that meeting, but not specifically
16 of BDO's presence.
17     Q.  I am not going to ask you about all of your
18 entries and references to teleconferences, but would
19 it be fair to say that if I asked you whether you
20 had a recollection of those specific
21 teleconferences, you would not have a specific
22 recollection at a particular point in time?
23     A.  Let me look through them in case something
24 sticks out.
25        (Witness reviewing documents.)

105

1      How far do you want me to go?  I went up to
2  August, but I can keep going.  None of the time
3  entries reflecting teleconferences or meetings
4  helped me remember what meetings there were and what
5  we talked about, beyond sort of the general
6  descriptions in here.
7      Q.  That would include the reference on page 9
8  to the July 17th meeting, for which you billed 6-
9  and-a-half hours, just to close the loop on that.
10     A.  I do remember going to Paul Weiss' offices
11 for a meeting.  That could be the one in my head.
12 There's one that was there, so that could be it.
13     MR. HANUSIK:  Was Mr. Rashid present for
14 the one that you recall?
15     THE WITNESS:  I remember him being present.
16 I don't remember the auditors being present, but
17 that makes sense, as I said, that they were.
18     Q.  You have testified previously about
19 communications with Paul Weiss subject to various
20 instructions that you have been given, but does this
21 assist you at all in remembering any additional
22 details about those communications?
23     A.  It doesn't.
24     Q.  It does not.
25        Let me refer you to -- I would ask you to

106

1  turn to Exhibit 10 in your binder.
2      Exhibit 10, for the record, is a document,
3  Bates Number Apollo 109070 through 71.  It attaches
4  approximately 2 inches of additional materials,
5  which are mostly unBates numbered but some of the
6  materials do have Bates Numbers on them.  The
7  material formatted as spreadsheets do not, but
8  beginning with page Apollo 109072 are what appear to
9  be copies of American Express corporate card
10 statements that go from 10072 to 109322.
11     Then, there is another spreadsheet attached
12 behind a Bates Numbered document 109323, which
13 indicates that the document is available in native
14 format.  So I am not going to be asking questions
15 about the Amex bills.
16     Again, we go back to the first page of the
17 document, there is a transmittal from Ms. Maisel to
18 Ms. Barzedeh.  It was an internal Paul Weiss
19 transmittal of an earlier e-mail string.  The one I
20 would like to focus on, Mr. McGorty, is Ms. Maisel,
21 July 10, 5:36 p.m. e-mail to you and Mr. Zelenko,
22 where she states:  "Dan, Glen, pursuant to our
23 confidentiality agreement, attached please find
24 various documents related to Ali Rashid.  Thanks,
25 Susan."

107

1      First, do you have an understanding of what
2  is being referenced by the confidentiality
3  agreement?
4      MR. KEHOE:  Can I ask one question before
5  we talk about this?
6      MR. THOMPSON:  Sure.
7      MR. KEHOE:  The matter that is blocked on
8  top here, was that blocked by the SEC?
9      MR. THOMPSON:  It was not blocked by the
10 SEC.
11     MR. KEHOE:  When Apollo and/or Paul Weiss
12 delivered this to the SEC, this e-mail from Ms.
13 Maisel to Ms. Barzedeh, they blocked off this
14 information?
15     MR. THOMPSON:  As we sit here, Greg, I
16 don't know whether that is something that is
17 deliberately blocked off or what, but that's how we
18 received it.
19     MR. KEHOE:  That was not the SEC, it was
20 either Apollo or Paul Weiss?
21     MR. THOMPSON:  It was not us.
22     Q.  So I think the question was whether you --
23     MR. KEHOE:  I'm sorry.
24     MR. THOMPSON:  It's okay.
25     Q.  -- whether you have an understanding of

108

1  Ms. Maisel's reference to our confidentiality
2  agreement?
3      A.  Only that I assume it's the one we saw
4  before.
5      Q.  So you are referring to the confidentiality
6  agreement marked as Plaintiff's Exhibit 8, right?
7  That's the one I don't have, so I just want to be
8  accurate.
9      A.  Yes.  It's the attachment to the e-mail
10  chain on 7.
11      MR. KEHOE:  Just for the record, the reason
12  I didn't object to that question is because the
13  confidentiality agreement extends past August 1st.
14      THE WITNESS:  That's why I answered it.
15      MR. THOMPSON:  Right.
16      Q.  So I stand corrected.  The confidentially
17  agreement was part of Exhibit 7.  That is the
18  agreement that you understand Ms. Maisel was
19  referring to in Exhibit 10?
20      A.  Yes.
21      Q.  You have no reason to believe that you did
22  not receive the e-mail; correct?
23      A.  Correct.
24      Q.  Do you recall any discussions with Paul
25  Weiss personnel regarding the attachments to the

109

1  e-mail?
2      MR. KEHOE:  Any discussions post-August
3  1st, no objection; prior to that objection.
4      THE WITNESS:  For sure.
5      A.  Subsequent to that day, I certainly
6  remember discussing how we were using the credit-
7  card statements in connection with our review, that
8  we were using these documents to assist in the
9  project, to help Mr. Rashid and Apollo go through
10  the expenses.
11      Q.  In addition to the credit-card statement,
12  there is another spreadsheet which appears to start
13  in January of 2010.  Do you see that?
14      MR. KEHOE:  Are you looking at the first
15  spreadsheet?  I'm sorry.
16      MR. THOMPSON:  I'm sorry.  Yes, I am.  This
17  is the spreadsheet that is right behind the page
18  that says this document is available in native
19  format, Bates Number 109071?
20      A.  Yes.
21      Q.  So is it your recollection that Apollo and
22  Paul Weiss were now providing expenses back to
23  January of 2010 or, as I believe, the first
24  spreadsheet started in 2011; correct?
25      A.  I believe I remember at some point the

110

1  project expanded to include more dates.  I don't
2  remember the dates.
3      MR. KEHOE:  Without waiving any objection
4  to that this could have been processed -- obviously
5  at the appropriate time I am going to object to the
6  statute of limitations for matters going back that
7  far, but we would just preserve that.
8      A.  It does not look like it has.
9      Q.  I am sorry?
10      MR. HANUSIK:  There is no question.
11      A.  I just want to be complete.  You had asked
12  me whether or not this is what the spreadsheet was.
13  It looks like it stops, but it says last page 48 of
14  77, and then there is nothing after that, so unless
15  I am misreading it, I would describe it as a partial
16  spreadsheet, but there are other documents.
17      For your benefit, I just want to point that
18  out.  I don't know if there is something else that
19  is supposed to be there.  It sort of ends.
20      The next pages don't have that, so I just
21  point it out in case it's helpful.
22      Q.  It looks like the expenses go to through
23  April 3rd of 2013 and there had been a meeting with
24  Mr. Rashid on April 1st of 2013; correct?
25      A.  Okay.

111

1      Q.  I know you have testified about your
2  general recollection before.  I just want to ask
3  specifically about the July 17th meeting, just so
4  the record is absolutely clear.
5      Do you recall any discussion at that
6  meeting about confidentiality?
7      MR. HANUSIK:  Are you talking about a
8  meeting with his client and Paul Weiss.
9      MR. THOMPSON:  No, I am referring to --
10  well, I am referring to the meeting that was
11  referenced in Exhibit 1A, the time sheet, the entry
12  that we looked at previously, July 17th entry, which
13  reflects the 6.5 hour time?
14      A.  I remember the entry.  I don't remember
15  what was discussed at the meeting.
16      Q.  You don't remember anything about the
17  specifics of the meeting?
18      A.  It's also within the timeframe.  I don't
19  know if I can answer if I do recall.  As I said
20  earlier, I don't have a recollection of all the
21  topics that were discussed at the meeting, including
22  the one you mentioned.
23      Q.  I just want to be clear.  I think you can
24  answer this even subject to the instruction; do you
25  have any recollection of a July 17, 2013 meeting

112

1 specifically, as opposed to a general recollection
2 of conversations in the period?
3     **A.** I recall a meeting with Mr. Rashid at Paul
4 Weiss.  Unless there were multiple ones, that would
5 be the one that I have in my head.  I don't recall
6 the specific topics that were discussed.
7     **Q.** Do you recall there being any discussion of
8 confidentiality?
9     **A.** That would include that.  My lack of
10 recollection of the topics discussed would include
11 that I don't recall.
12     **Q.** Do you recall there being any discussion of
13 common interest?
14     MR. KEHOE:  To the extent we are talking
15 about within the time, I instruct you not to answer.
16 However, he said he did not recall what the topics
17 were.  I don't know what the question is.
18         If you don't recall you don't recall.
19     MR. THOMPSON:  I am trying to be specific
20 so the record is clear.  I think he can answer
21 whether or not he recalls without violating your
22 instruction, that I don't agree with.
23     MR. KEHOE:  I think it's easier to say
24 without getting into the details, do you recall what
25 was discussed, the topics of discussion.  You answer

113

1 "yes" or "no."  If it's "no," we can move on.  If
2 it's "yes," there is something else.
3     **A.** I think I said, other than a general idea
4 of why we were there, which I remember, I don't
5 recall a discussion of any topic, including the
6 common interest.
7     MR. THOMPSON:  I appreciate your comment,
8 Greg, you want to be specific for the record.
9     **Q.** Do you recall there being any discussion
10 about the applicability or non-applicability of Rule
11 408?
12     **A.** I don't.
13     **Q.** Do you have any recollection, one way or
14 the other, of the possibility that Rashid might be
15 terminated?
16     **A.** At that meeting, I don't recall.
17     **Q.** As to that meeting, do you have a
18 recollection of whether or not there was a
19 discussion of negotiation of a separation agreement?
20     MR. KEHOE:  We are getting into -- now you
21 are getting into the actual terms of what it is and
22 saying because he doesn't recall it didn't happen.
23         If we are going down that road, I am going
24 to object and instruct you not to answer because I
25 am not going to deal with that.  The Judge -- merely

114

1 because he doesn't answer, he doesn't recall the
2 topic.  If you are going turn that into, oh, it did
3 not happen, then I am going to object.
4         So it's just easier to object to the
5 question and say it's within the common-interest
6 timeframe, because I see where this is going.
7     MR. THOMPSON:  Are you instructing him not
8 to answer?
9     MR. KEHOE:  I am right now.  I thought it
10 might be easier to say that he doesn't recall what
11 the topics are, but now that I see what you are
12 trying to develop, I am just going to cut it off.
13     **Q.** Are you declining to answer the pending
14 question?
15     **A.** I have no choice.
16     **Q.** Do you have a recollection of whether there
17 was any discussion at the July 17th meeting
18 regarding possible SEC interest in Mr. Rashid's
19 expense submissions?
20     MR. KEHOE:  The same objection.
21     **A.** I can't answer it.
22     MR. HANUSIK:  Can I ask for a
23 clarification?
24     MR. THOMPSON:  You can ask.
25     MR. HANUSIK:  The question seemed to

115

1 presume that the meeting was with Paul Weiss.
2     MR. THOMPSON:  I think that's what the time
3 entry said.
4     MR. HANUSIK:  The time entry says it was at
5 Paul Weiss.  I just want to make sure that you are
6 not misrepresenting what the time entry says.
7     **Q.** Let me ask that:  Do you believe there was
8 a meeting at Paul Weiss on July 17, 2013, where no
9 Paul Weiss attorneys were present?
10     **A.** My recollection of that meeting is while
11 Paul Weiss attorneys were present for a portion of
12 the meeting, it was much more of a working session.
13     **Q.** With BDO?
14     **A.** Or the documents.  I don't recall.  As I
15 said earlier, I don't recall BDO being present
16 there, but they may have been.  But I recall it was
17 one of those sort of working in their office space.
18 It doesn't mean that there weren't some Paul Weiss
19 attorneys there at some point, but it was not a six-
20 hour meeting with Paul Weiss going, for as much as I
21 would enjoy their company, for that long, that's a
22 long time.
23     **Q.** Did someone at Crowell prepare a file memo
24 or summary regarding that July 17, 2013 session?
25     **A.** I have not reviewed one.  Not that I

116

1  recall, but it's possible.
2       Q.  Did Crowell prepare a written report to
3  Rashid about the meeting?
4       A.  I don't think I can answer that because if
5  we did, we would have been attorney-client.
6       Q.  I am not asking what the report said, I am
7  asking --
8       A.  Oh.  I don't recall if he was present at
9  the meeting.
10      Q.  Other than any file memo, e-mail or report,
11  is there any document that you can think of that
12  would refresh your recollection of the July 17, 2013
13  session that you have been testifying about?
14      A.  I can't think of any.
15      MR. THOMPSON:  Let's go off the record.
16      (Whereupon, a luncheon recess was taken.)
17      MR. THOMPSON:  Back on the record.
18  BY MR. THOMPSON:
19      Q.  You have been handed another exhibit
20  binder.  I am going to ask you to turn to Exhibit
21  13?
22      MR. THOMPSON:  For the record, it's Bates
23  Number Apollo 109332 to 34, and it attaches an
24  unBates numbered spreadsheet or two spreadsheets.
25      Q.  I will be asking you some questions not

117

1  about individual expenses, but about the format of
2  the spreadsheet themselves.  Take a moment and let
3  me know when you are ready to respond to questions.
4       A.  Okay.
5       MR. HUNUSKI:  You just want him to focus on
6  the spreadsheet or on that form.
7       MR. THOMPSON:  On the form, not the
8  particular expense.
9       MR. HANUSIK:  Because I just noticed
10  there's I don't know how many pages, but 2500 some
11  odd spreadsheets.
12      Q.  Mr. McGorty, the e-mail includes your
13  e-mail to Susan Maisel on July 19, 2013 at 10:04
14  p.m., and you indicated, "Susan, pursuant to our
15  common interest, attached is a draft spreadsheet
16  reflecting updates that we made during and following
17  our meeting on Wednesday.  Hopefully, we can speak
18  more soon about any additional assistance our client
19  can provide."
20      So I will represent to you that July 19 was
21  a Friday.  Do you believe that your reference to the
22  meeting last Wednesday was the meeting that you
23  would have had with or at Paul Weiss on July 17th?
24      MR. KEHOE:  I am going to object to this.
25  This is all common-interest communications, so I am

118

1  instructing you not to answer.
2       MR. THOMPSON:  Right now I am just asking
3  whether he believes it's a reference to a prior
4  meeting.
5       MR. KEHOE:  It's the same thing.  We are
6  talking about an e-mail.  We are talking about a
7  common interest and we are asking questions about
8  this, so it's covered by the privilege.  So I am to
9  going to object and instruct him not to answer?
10      Q.  Do you intend to follow that instructions?
11      A.  I think I have to.  Yes.
12      Q.  Let's look at the first spreadsheet.  I
13  guess there is actually only one spreadsheet
14  attached to the exhibit.  Let's look at the
15  spreadsheet.
16      So this spreadsheet has different columns
17  to it.  Is it the case that the information set
18  forth in all of the columns, except for the
19  expense-classification column, was taken from the
20  earlier spreadsheet that Paul Weiss had provided to
21  you?
22      MR. KEHOE:  If you are going to ask him
23  questions about things he transmitted pursuant to
24  the common-interest privilege, I am going to
25  instruct him not to answer any and all questions

119

1  pursuant to that.
2       MR. THOMPSON:  Okay.  So that's clear on
3  the record, I did read the Judge's order into the
4  record previously, where he expressly said to ask
5  questions about common interest during this time
6  period.
7       MR. KEHOE:  That's not a question about the
8  common interest.  It's a question about the document
9  and the context of the document that he either got
10  and sent or received.  So it's not about the common
11  interest, it's about the document.  That's what your
12  question was.
13      MR. THOMPSON:  Well, your earlier
14  instruction was to prevent him from answering
15  questions about whether the e-mail followed up on a
16  meeting two days earlier?
17      MR. KEHOE:  The e-mail is quite clear.  In
18  the e-mail he is talking about communications
19  pursuant to the common-interest privilege.  That's
20  what he is doing, but you are asking him questions
21  about the e-mail not about this document, which all
22  goes to the common-interest privilege.
23      MR. THOMPSON:  As the Judge's order
24  indicated, if there are instructions not to answer
25  questions, we can address that with the Judge.

120

1      For the record, I will ask the questions
2  and you can object if you would like to.  We don't
3  need to have an extended colloquy each time.
4      MR. KEHOE:  You don't need to ask the
5  questions.  Well, you can ask the question.  Go
6  ahead.
7      Q.  Did Crowell and Mr. Rashid provide the
8  information that is set forth in the expense
9  classification column of this spreadsheet?
10     MR. KEHOE:  The same objection.
11     A.  I can't answer about the spreadsheet.
12     Q.  And information in that column was not
13  provided by Paul Weiss or Apollo, was it?
14     MR. KEHOE:  The same objection.
15     A.  I can't answer the question.
16     Q.  What does the designation "personal" in the
17  expense classification column of the spreadsheet
18  denote?
19     MR. KEHOE:  The same objection.
20     A.  The same answer.
21     Q.  What does the designation "business" in
22  that expense classification column denote?
23     A.  The same answer.
24     MR. KEHOE:  The same objection.
25     Q.  There is another classification "taxi/

121

1  cab," what does that denote in the expense
2  classification column?
3      MR. KEHOE:  The same objection.
4      A.  The same answer.
5      Q.  There is a designation of "personal
6  (Prev.)paid back."  What does that denote?
7      MR. KEHOE:  The same objection.
8      A.  The same answer.
9      Q.  If you go to the second page of the
10  spreadsheet.  There is an entry in yellow above, two-
11  thirds of the way down the page.  In the "expense"
12  classification column there is a reference to "check
13  e-mail."  What does that denote?
14     MR. KEHOE:  The same objection.
15     A.  The same answer.
16     Q.  Back to your e-mail.  The subject line says
17  "common interest, privileged document."  Is it
18  correct, that you did not believe that this was a
19  settlement of the document?
20     MR. KEHOE:  The same objection.
21     A.  The same answer.
22     Q.  Or refusal to answer, correct?
23     MR. KEHOE:  Yes, when I say "same
24  objection," I mean, the same objection to the
25  implication of common-interest privilege, at this

122

1  point, during the end of July timeframe.
2      MR. HANUSIK:  Are you instructing him not
3  to answer?
4      MR. KEHOE:  Therefore, I am going to
5  instruct you not to answer.
6      Q.  Do you believe that your transmission of
7  that spreadsheet was subject to the protections of
8  Rule 408 of the Federal Rules of Civil Procedure.
9      MR. KEHOE:  Just thinking out the
10  objection.  Putting aside the document, but with
11  regard to your prior question about common interest,
12  we withdraw that objection and you can answer that
13  question.
14     MR. THOMPSON:  I am sorry, now I am
15  confused.
16     MR. KEHOE:  I was rethinking my objection
17  to the prior question, when he transmitted this, did
18  he believe this was pursuant to the common interest.
19  That, I think I withdraw that objection and allow
20  him to answer.
21     MR. THOMPSON:  I am not sure that was the
22  last prior question, so maybe we need to have the
23  record read back.
24     (Record read by the Reporter.)
25     MR. KEHOE:  If you are asking what his

123

1  belief was, you can ask him what his belief is, I
2  will withdraw that objection.
3      MR. THOMPSON:  I am asking what I asked
4  him.  I am not asking him those questions.
5      MR. KEHOE:  That's fine.  The objection
6  stands.
7      MR. THOMPSON:  Now, I can't remember
8  whether I got an answer or an instruction to -- I am
9  sure I got an instruction, but I don't remember the
10  witness actually said that he was following it.
11     With respect to question about Rule 408,
12  can you read that back into the record.
13     (Record read by the Reporter as follows:
14  Question:  Do you believe that your transmission of
15  that spreadsheet was subject to the protections of
16  Rule 408 of the Federal Rules of Civil Procedure?)
17     Q.  Are you following the instruction not to
18  answer that question, Mr. McGorty?
19     MR. KEHOE:  I withdraw the objection on
20  that.  You can answer the question.
21     THE WITNESS:  Can you read that again?
22     MR. THOMPSON:  Are you also withdrawing the
23  instruction with respect to the prior question?
24     MR. KEHOE:  No, this question.
25     (Question read by the Reporter.)

124

1    **A.** Yes, I do believe that.
2    **Q.** Why didn't you mark -- you did mark the
3  communication as common-interest privileged in the
4  actual spreadsheet. There are a number of markings:
5  "Draft attorney work product," "joint defense
6  privilege" and "confidential." Why didn't you
7  include Rule 408?
8    MR. KEHOE: You are pointing to the bottom
9  of the page in a spreadsheet that is part of Exhibit
10  13 that says: "Draft attorney work product," "joint
11  defense privilege," "confidential," is that what you
12  are referring to?
13    MR. THOMPSON: Yes.
14    **Q.** So you put all of these markings on the
15  document and on your cover e-mail. If you believe
16  your transmission was subject to Rule 408, why
17  didn't you reference Rule 408 as well?
18    **A.** I think this entire -- I don't want to
19  overstep the question, but the entire project was in
20  furtherance of resolving issues settling any
21  concerns that Apollo had against Mr. Rashid in
22  helping them to settle their concerns that they had
23  with the SEC or the basis he had with them, I should
24  say. So I can tell you that I think all of this was
25  in furtherance of that settlement effort, but every

125

1  communication and every telephone conversation was
2  not labeled as such.
3    Why I didn't put those words in furtherance
4  of this? Some of these words, I don't think are
5  necessary either. This is just a standard header I
6  put, and I put a footer on the bottom that I thought
7  covered the protection of the communication. So
8  there are other bases for it as well, I believe.
9    **Q.** Which words on the footer do you believe
10  were not necessary?
11    **A.** Well, I mean it is attorney work product.
12  It is a joint defense privilege. They said it's a
13  common-interest privilege. I don't know if the word
14  "confidential" also has been required. It could be.
15  It depends on the perspective. I think the word
16  confidential adds something to it that may not be
17  necessary, the same way the confidentiality
18  agreement from Paul Weiss to me did not really add
19  any protection, but if they wanted it, they could
20  have it.
21    **Q.** So you put 3 different designations of some
22  type of privilege --
23    MR. HANUSIK: Can we just clarify, I think
24  you will allow him to answer this question: Did you
25  put these footers on this document?

126

1    THE WITNESS: I didn't, no.
2    MR. HANUSIK: Because you keep representing
3  that he did.
4    MR. THOMPSON: Let me ask that question.
5    MR. HANUSIK: Somebody must have. I don't
6  think we have established that.
7    **Q.** Who put the footer on the spreadsheet?
8    **A.** I am not certain. I would imagine it was
9  Ms. Kotwani that put it on, K O T W A N I.
10    **Q.** She was working under your supervision?
11    **A.** Correct.
12    **Q.** So this was Crowell designating this
13  document as "attorney work product," "joint defense
14  privilege" and "confidential," correct?
15    **A.** I think that's fair.
16    **Q.** So with 3 different assertions of some type
17  of privilege, why didn't you just subject to Rule
18  408, if that's what you believed at the time?
19    **A.** You asked me this earlier. I didn't think
20  of it exclusively as a settlement negotiation. I
21  think it is -- I thought that was what we were
22  doing, but I didn't feel it was necessary to add
23  that language here to get that protection. I still
24  don't.
25    **Q.** In your subject line on your e-mail you put

127

1  "common-interest privileged document." Why didn't
2  you also put subject to Rule 408?
3    **A.** For no particular reason.
4    **Q.** You never discussed Rule 408 with Paul
5  Weiss in connection with this expense review; is
6  that correct?
7    MR. KEHOE: If we are talking about
8  conversations prior to August the 1st, objection.
9  If it's after that, you can answer.
10    **A.** I don't know.
11    **Q.** I think you previously indicated that you
12  did not. Now you are saying that you don't know.
13    MR. KEHOE: It's asked and answered.
14    **A.** I don't know with respect to the time
15  clarification. I don't know.
16    **Q.** Okay. Well, asked and answered is not a
17  basis to instruct the witness not answer, so you can
18  answer it again.
19    MR. KEHOE: Just not my objection.
20    **Q.** Do you not know or do you believe that you
21  did not have discussions with Paul Weiss about Rule
22  408. I am asking whether you have no recollection
23  or whether you know that you had no discussions.
24    MR. KEHOE: You just asked him two
25  questions. I am going to object to the compound

128

1  question.  You can ask one question at a time.
2    **Q.** I am trying to understand your testimony.
3    **A.** Okay.
4        MR. KEHOE:  Object to the preface.  Just
5  ask questions, please.
6        MR. THOMPSON:  Greg, please don't keep
7  speechified, Greg.  I am going to cut it off pretty
8  soon.
9        MR. KEHOE:  That's fine, you can do
10  anything you want, but do not give a speech prior to
11  asking the witness a question to lay your argument.
12        MR. THOMPSON:  It's not a speech, and I
13  appreciate it if you would be quiet and stop
14  interjecting.
15        MR. KEHOE:  It is.  I will not stop
16  interjecting if you continue to ask him improper
17  questions.
18        MR. THOMPSON:  That is not an improper
19  question, and you know it.
20        MR. KEHOE:  Don't interrupt me.
21        MR. THOMPSON:  Let's go on.  Let's ask new
22  questions.
23        MR. KEHOE:  Good.
24    **Q.** Did you or did you not have discussions
25  with Paul Weiss about the extent to which Rule 408

129

1  applied to communications that you were having with
2  Paul Weiss during the expense review?
3        MR. KEHOE:  My objection is the time frame.
4  Anything post-August 1st he can answer.  Prior to
5  that, it's a privileged objection; common- interest
6  objection.
7    **A.** And I believe with the time limitation
8  placed by counsel, the answer I gave earlier, which
9  is I don't believe I had those conversations with
10  Paul Weiss under the time clarification proposed by
11  counsel.  I don't have a recollection of ever having
12  a conversation with Paul Weiss during that time
13  frame.
14    **Q.** Just so the record is absolutely clear, are
15  you declining to answer whether you have a
16  recollection of such conversations prior to August 1
17  of 2013?
18    **A.** I think I have to.
19        MR. HANUSIK:  At the direction of counsel.
20    **A.** I think I have to, so yes.
21    **Q.** So is it your testimony that Exhibit 13 and
22  specifically your e-mail on the attached
23  spreadsheet, was protected by common-interest
24  privilege, joint defense privilege and Rule 408 of
25  the Federal Rules of Evidence?

130

1    **A.** Asking me as I sit here today, yes, I think
2  it was.
3    **Q.** I am going to ask you to turn to Exhibit 14
4  in your binder.  Exhibit 14 is an e-mail string
5  bearing Bates Numbers Apollo 43994 to 98.  The last
6  e-mail and string on the first page is a July 25,
7  2013, 5:45 e-mail, from Susan Maisel to Dan Zelenko,
8  copied to you, Mr. McGorty.
9        Mr. Zelenko's July 23rd e-mail at 4:55 to
10  Ms. Maisel is on page 97.  It says he wanted to find
11  the time this week for Ali Rashid to come over to
12  review his calendar and e-mails at Paul Weiss.
13        Had Paul Weiss offered to make Mr. Rashid's
14  calendars and e-mails available to him for review in
15  connection with the expense review?
16        MR. KEHOE:  Objection.  This is the July
17  13, 2013 time frame covered by the common-interest
18  privilege.
19    **A.** I can't answer it then.
20    **Q.** Ms. Maisel's July 25th e-mail, on the top
21  of page 95, asks:  "Can we get a revamped copy of
22  your chart that groups expenses by trip?"
23        Do you see that?
24    **A.** I see that.
25    **Q.** Do you understand what that is in reference

131

1  to?
2        MR. KEHOE:  The same objection.  I instruct
3  the witness not no answer.
4    **A.** Therefore, I can't answer it.
5    **Q.** Have there been any discussions of
6  developing a revised chart that grouped expenses by
7  trip?
8        MR. KEHOE:  The same objection.  The same
9  admonition.
10    **A.** The same answer.
11    **Q.** Mr. Zelenko's e-mail of July 25th at 5:36
12  p.m. says:  "Susan, Monday works for us.  Can we say
13  10 a.m.?  We are working on the chart and should
14  have something for you by tomorrow morning."
15        Now, you are not shown as copied on this
16  particular e-mail, but do you have an understanding
17  of what the reference to the chart --
18        MR. HANUSIK:  Mr. McGorty is copied on the
19  e-mail.
20        MR. THOMPSON:  He is?
21        MR. HANUSIK:  Yes.
22    **A.** I am in there.
23        MR HANUSIK:  He is CC's, the last entry.
24    **Q.** So you are copied on the e-mail.  Do you
25  have an understanding of the reference to the chart?

132

1      MR. KEHOE:  The objection.  The same
2  instruction not to answer.
3      **A.**  The same answer.
4      **Q.**  Is that the spreadsheet that you had been
5  working on?
6      MR. KEHOE:  The same objection.  The same
7  instructions.  The same admonition.
8      **Q.**  Was there a meeting between Crowell
9  personnel and -- Crowell personnel and Paul Weiss on
10  Monday, July 29, 2013?
11      **A.**  I don't remember if there was one that day.
12      **Q.**  Do you recall being present at such a
13  meeting in that time period?
14      **A.**  Meaning the last week in July?  Not
15  specifically.
16      **Q.**  Turn to Exhibit 15.  Exhibit 15 bears Bates
17  Numbers Apollo 109 through 3940.  And attaches what
18  appear to be two spreadsheets, and as with the prior
19  spreadsheet, Mr. McGorty, I don't plan to ask you
20  about --
21      MR. KEHOE:  I don't mean to interrupt, but
22  are there two spreadsheets or just one?
23      MR. THOMPSON:  I believe there is just one,
24  it's formatted just straight chronologically and
25  another that is formatted by trip.  Is that not

133

1  correct?
2      MR. KEHOE:  No, no, I didn't catch the
3  distinction about the format.
4      My apologies.
5      MR. THOMPSON:  No problem.
6      **Q.**  So as with the prior spreadsheets, I would
7  ask questions with respect to the source of the
8  information provided in the various columns of the
9  spreadsheets.  I take it that there would be an
10  instruction not to answer those questions.
11      MR. KEHOE:  Yes.
12      **Q.**  Can we stipulate that the questions would
13  have been asked and that there is an instruction
14  that has been given and that you will follow the
15  instruction?
16      **A.**  Yes, sir.
17      MR. KEHOE:  We can stipulate that the
18  questions similar to what you asked on the
19  spreadsheet will be asked here and I would instruct
20  the witness not to answer, in a similar fashion.
21      MR. THOMPSON:  Likewise, if I ask the
22  purpose of the trip spreadsheet, the one that
23  appears to be trips by -- or expenses by trip, I
24  take it there would be an instruction?
25      MR. KEHOE:  Yes, similar instructions.

134

1      MR. THOMPSON:  And the witness would follow
2  that instruction.
3      MR. KEHOE:  I would hope he would.
4      **A.**  Yes.
5      MR. THOMPSON:  There do appear to be some
6  changes in the version of the spreadsheet that is
7  organized chronologically in the last version that
8  was sent.  I would ask questions about those
9  changes.  I mean, I take it that there would be an
10  instruction not answer those questions as well?
11      MR. KEHOE:  You are correct.
12      **Q.**  And you would follow that instruction?
13      **A.**  Yes, sir.
14      MR. THOMPSON:  Likewise, I take it if I
15  asked about discussions with Paul Weiss about the
16  spreadsheets attached to the e-mail that is Exhibit
17  15, there would be an instruction not to answer
18  those questions?
19      MR. KEHOE:  There would.
20      **Q.**  And you would follow that instruction, Mr.
21  McGorty?
22      **A.**  Yes.
23      **Q.**  I believe you did not recall specifically
24  going to a meeting at Paul Weiss on July 29th, but
25  did generally recall some type of meeting in that

135

1  timeframe, am I correct?
2      **A.**  I didn't recall during that time period.
3  As I said earlier, I remember going to Paul Weiss at
4  some point.  That may have been the earlier meeting
5  we talked about this morning.  I can't pin it down,
6  but it was certainly in the early part of the case.
7  Which I would say was July.  I am just not certain
8  which one I am remembering in my head.  It may have
9  been the earlier one that month.
10      **Q.**  Okay.  Do you recall any discussion at a
11  meeting with Paul Weiss, at any time prior to August
12  1st of 2013, regarding subject of common interest?
13      **A.**  That was covered by the common interest or
14  the topic of whether the conversations were
15  protected by common interest?
16      **Q.**  The latter.
17      **A.**  I don't recall having a conversation like
18  that, no.
19      **Q.**  Do you recall at any time prior to August
20  1st of 2013, having any discussion with anyone at
21  Paul Weiss about the extent to which communications
22  were subject to a joint defense privilege?
23      **A.**  I take your question to mean conversations
24  about that subject matter, as opposed to
25  communications that are protected by it or marked as

136

such.

Q. That's correct.

A. I would say no.

Q. So the record is clear. You don't recall any discussion about the subject matter of whether communications were protected by joint defense privilege?

A. That's correct.

Q. Prior to August 1, 2013, do you recall any discussions with Paul Weiss at any time as to whether communications were protected or were subject to Rule 408 of the Federal Rules of Evidence?

A. No, not specifically, no. I don't recall I should say.

Q. Again, prior to August 1st of 2013, do you recall any discussions at any time with anyone at Paul Weiss, about possible legal claims that Apollo might assert against Mr. Rashid?

A. I am going to answer that question yes, but in very general terms. The concern that Paul Weiss itself had, in my view, gave rise to potential claims. So the conversations I recall would have included discussions of claims that they could have against Mr. Rashid, in a general sense.

137

Q. When you say would have in a general sense, I need to probe that.

A. Sure.

Q. Do you actually recall any discussion, as opposed so thinking something in your mind?

A. I recall conversations with Paul Weiss.

Q. Yes, but do you recall discussions with Paul Weiss about potential claims that Apollo could assert against Mr. Rashid?

A. My confusion is how you want me to define "potential claims."

Q. Potentially legal claims. Do you recall a discussion of Apollo saying we could sue you embezzlement or something else like that?

A. I think the subject matter was discussed in a general sense, not with specificity as to what potential claims could be against him, like what the nature of a potential lawsuit would be about, just their concerns about his conduct that could inherently give rise to potential legal claims.

Q. Again, we need to drill down on this.

A. Okay.

Q. Was there a discussion about the conduct and if that was the end of it, or was there also a discussion about potential legal claims that Apollo

138

could assert against Mr. Rashid?

A. I am having trouble distinguishing the timeframe as well. I am fairly certain that at some point in time there was a conversation about the seriousness of the allegations of the conduct in the form of a discussion of a potential legal action that Apollo could take against Mr. Rashid. I do not believe it was specific to, we could sue Mr. Rashid for X or Y, but it was clearly Apollo, at some point during our conversations with Paul Weiss, Apollo via Paul Weiss, asserting the fact that they could take legal action against Mr. Rashid for what they perceived to be the conduct.

I just don't think it was specific as to embezzlement or something labeled like that.

Q. Is this a specific conversation that you are recalling?

A. Meaning time and who was present? No.

Q. Meaning timeframe.

A. If you would accept the timeframe being from the time we began the representation through September, October then, yes, in that timeframe we would have had those conversations, but I don't remember.

Q. You don't recall whether that was before or

139

after?

A. Before or after August 1, for example?

Q. Right.

A. I am sure that in some form those conversations extended past August 1st, but I don't know for sure beyond that.

Q. And who are the participants in this conversation?

A. Again, not having a recollection of the specific conversation, it is hard to say. I would imagine I would have been present, obviously, someone from Paul Weiss, possibly Mr. Finzi or Mr. Ricciardi or Mr. -- I am forgetting the name of the other person who was the other side with Paul Weiss, Ehrlich, maybe. I apologize. I don't remember. And on our side, Mr. Zelenko may be part of those calls or conversation, I don't remember as well. I just can't pin it to a specific date.

Q. So you don't know basically who would have been party to those conversations?

MR. KEHOE: Objection to the form.

A. Some combination of those people would have. I just can't tell you who specifically was part of the conversations where -- conversation or conversations where I remember this general

140

1 conversation about Mr. Rashid's potential civil
2 exposure vis-a-vis Apollo.
3     Q.  So you can't say who at Paul Weiss
4 participated in this general conversation that you
5 recall?
6         MR. KEHOE:  Objection to form.  Asked and
7 answered.  You can answer.
8     A.  Or who from our side, other than me because
9 I would have been there, if I remember the
10 conversation.
11    Q.  Is there some file memo or other writing
12 that memorializes Paul Weiss generally saying
13 something to the effect that Apollo could assert
14 claims against Mr. Rashid?
15    A.  I don't know.
16    Q.  You have not seen one?
17    A.  No, I have not seen one.  I have not seen
18 one certainly recently in anticipation of this.
19 Maybe back in the day if there was one I would have
20 seen it, but I don't recall.
21    Q.  So after this conversation that you can't
22 recall specifically, did you start marking
23 communications with Paul Weiss as subject to Rule
24 408 of the Federal Rules of Evidence?
25    A.  Let me be clear, I don't think that

141

1 potential designation arose from that conversation.
2 I think from day one we were working to settle
3 Apollo's claims against Mr. Rashid.
4     I remember -- if you are talking about the
5 specific legal claims as opposed to the claims they
6 have in the context of his employment, that
7 conversation happened at some point.  I don't
8 remember when it happened, but my belief that we
9 were trying to settle the concern Apollo had with
10 him was from the day one when I got on this case.
11    Q.  I appreciate the explanation, but the
12 question was much simpler.  It was simply after this
13 conversation that you generally recall, did you
14 start marking your communications with Paul Weiss as
15 subject to Rule 408 of the Federal Rules of
16 Evidence?
17    A.  No.
18    Q.  That's because you didn't think it was
19 necessary or what?
20        MR. KEHOE:  Objection to form.
21    A.  The answer to that question is the answer I
22 just gave you, which is I didn't think that my
23 belief that was to settle these claims arose from a
24 conversation with Paul Weiss about the specific
25 legal action that they could take against Mr.

142

1 Rashid.
2     Q.  So recognizing that you only have a general
3 recollection, but do you have any recollection of
4 what the claims were that Apollo could have asserted
5 against Rashid?
6     A.  I don't.  I don't.  I would add that,
7 again -- I will answer you question.  I don't recall
8 the specific claims that they could have asserted
9 against Mr. Rashid.
10    Q.  And are you certain that there was some
11 discussion of legal claims as opposed to discussion
12 of Rashid's conduct being a basis for his
13 termination from the firm?
14    A.  I believe so.  I am glad you asked that
15 question because, again, from the beginning, the
16 focal point was for Mr. Rashid to keep his job.  I
17 believe there was a separate notion of there being a
18 concern about potential legal action as well, I
19 believe that.
20    Q.  You say notion.  You believe this notion
21 was verbalized in some sense and your recollection
22 is a very general one.  You don't recall who.  You
23 don't recall when.  You don't recall what claims
24 would have been asserted?
25        MR. KEHOE:  Objection to the form.

143

1     Q.  Is that correct?
2     A.  I believe being concerned during this time
3 period that --
4     Q.  I am not asking about your concern.
5         MR. KEHOE:  Excuse me?
6     Q.  I am sorry, I did interrupt you.  Go ahead.
7     A.  I believe that during this time period I
8 had concerns about legal action that Apollo could
9 take against Mr. Rashid along side employment
10 concerns that we had on his behalf.  I do believe
11 that at some point there was some conversation
12 between our side and Apollo, meaning someone from
13 Crowell and Apollo, that discussed that in some
14 general terms.  I just don't remember when it was or
15 the details of it, but I think that was not
16 something that just existed in my mind, I believe,
17 that was an actual concern.
18    Q.  What claims did you think Apollo could
19 assert against Mr. Rashid?
20    A.  I don't know if I had specific concerns --
21 a specific statutory action in mind.  I knew what
22 the conduct was believed to be from Apollo's
23 perspective, as shared with me by Paul Weiss and not
24 protected client communications.
25    Q.  Was there ever any discussion with Paul

144

1    Weiss that you can recall of potential claims that
2    Mr. Rashid might assert against Apollo?
3       **A.** I don't recall that.
4       **Q.** You don't believe there were such
5    discussions?
6       **A.** I just don't recall either way.
7       **Q.** Have you now testified to everything you
8    can recall about any discussion with Paul Weiss
9    about potential claims, legal claims, that Apollo
10   potentially could assert against Mr. Rashid?
11      MR. KEHOE: Object to the form of that.
12      **A.** To the best of my ability.
13      **Q.** Is there anything that you can think of,
14   any document or anything else that you can think of
15   that would refresh your recollection?
16      MR. KEHOE: Objection to the form.
17      **A.** None that I can think of.
18      **Q.** I apologize if I asked this previously. I
19   honestly can't remember if I asked it previously.
20   You can object to it. I apologize. With respect to
21   looking at Exhibit 15, for example, in the
22   spreadsheets in the footer, "draft attorney
23   product," "joint defense privilege" "confidential,"
24   do you recall ever having discussions with anyone at
25   Paul Weiss about that footer?

145

1       **A.** Other than the fact that it was included in
2    what we sent them, no.
3       **Q.** I am asking about discussions. I am not
4    asking about the fact that it appeared on a
5    document.
6       **A.** There were no discussions about it. They
7    never -- there was who discussion about it.
8       **Q.** Prior to August 1 of 2013, did Paul Weiss
9    ever indicate that it disagreed with the privilege
10   notations you saw in Exhibit 15 in the footer?
11      **A.** No, not that I recall.
12      **Q.** Did Paul Weiss ever indicate that it agreed
13   with that notation?
14      **A.** No, not that I recall.
15      **Q.** Okay. Please turn to Exhibit 16 in your
16   binder.
17      MR. THOMPSON: For the record, Exhibit 16
18   is Bates numbered Apollo 43989 to 91. It attaches
19   what appears to be a spreadsheet?
20      **A.** Okay.
21      **Q.** And the last e-mail in this string is from
22   Sipoura Barzedeh at Paul Weiss to Namirata Kotwani
23   at Crowell, dated July 29, 2013, at 5:35 p.m. Ms.
24   Kotwani's e-mail of July 29th at 5:16 requests a
25   copy of the spreadsheet with the additional expenses

146

1    on it. Do you see that at the bottom of the first
2    page, Mr. McGorty?
3       **A.** I do see that.
4       **Q.** Do you know what that refers to?
5       **A.** I do not.
6       **Q.** Mr. Barzedeh's 5:35 p.m. e-mail attaches a
7    file titled "Missing Expense Items," and it goes on.
8    Do you have an understanding of what that
9    represents?
10      **A.** I do not.
11      **Q.** You can set this aside. Let's go to
12   Exhibit 17.
13      MR. THOMPSON: Exhibit 17 is Bates numbered
14   Apollo 109342 to 47. It also has an attachment
15   which appears to be a spreadsheet or some excerpt
16   from a spreadsheet. There is another Bates number
17   Apollo 109848 that attaches what appears to be
18   another spreadsheet.
19      **Q.** If you look at it, working backwards in the
20   e-mail string, July 30th 2013, at 10:34 p.m., you
21   wrote to Ms. Barzedeh, referring to your
22   availability for a call the following morning. The
23   ensuing e-mails appear to be setting up such a call.
24      Would you agree that that is an accurate
25   characterization of that document?

147

1       **A.** That's seems correct.
2       **Q.** If you go back to your entries in Exhibit
3    1A on the billing records, you have two entries for
4    two calls with Mr. Ricciardi and Ms. Barzedeh on
5    July 31st. Do you see those entries?
6       **A.** Yes.
7       **Q.** Do you have any recollection of such calls?
8       **A.** I do not.
9       **Q.** So you have no recollection of what was
10   discussed?
11      **A.** Correct.
12      **Q.** If I asked if you had any recollection of
13   any common-interest understanding being discussed, I
14   take it you would have no such recollections?
15      **A.** No, I don't have a recollection of anything
16   that was discussed.
17      **Q.** Do you know whether someone at Crowell
18   prepared a memo regarding the calls on that date?
19      **A.** I do not.
20      **Q.** Are you aware of any document that might
21   refresh your recollection as to a discussion of
22   those calls?
23      **A.** No.
24      **Q.** Okay. So the print is very small. I have
25   been struggling with it. Let's look at the

148

1  spreadsheet that is Exhibit 17 that I attached to
2  the document Bates Number Apollo 109348. I believe,
3  that's the next spreadsheet?
4     MR. HUNUSKI: The non-folder spreadsheet?
5     MR. THOMPSON: Yes, sir.
6     A. The non-folder.
7     Q. In the far right hand side of the page
8  there is a column designated, "Added by BDO." What
9  does that mean?
10    MR. KEHOE: Objection, common-interest
11  privilege.
12    MR. HANUSIK: Can I ask a question?
13    MR. THOMPSON: Yes.
14    MR. HANUSIK: Is this a good printout? It
15  appears to be cut off.
16    MR. THOMPSON: I should say that some of
17  the exhibits -- not all of the -- I am sorry, some
18  of these spreadsheets when we copied them, some of
19  the text was cut off. I should be having delivered
20  here sometime this afternoon versions that are not
21  cut off and I will distribute those for
22  substitution.
23    MR. HANUSIK: Okay.
24    Q. Looking in that same column, added by BDO,
25  Mr. McGorty, some of the entries say "not included

149

1  in Ali Rashid," although that's a portion that your
2  counsel has pointed at that was cut off. Do you
3  have an understanding of what that denotes?
4     MR. KEHOE: The same objection.
5     A. Based on the direction, I can't answer.
6     MR. HANUSIK: I would add it's impossible
7  to answer with the text cut off. You can represent
8  what the rest of it says.
9     Is it your direction not to answer?
10    MR. KEHOE: Correct.
11    Q. Do you believe that these were expenses
12  that had not been previously included in the
13  spreadsheet that Ms. Kotwani had transmitted to Paul
14  Weiss on July 26th?
15    MR. THOMPSON: If your answer is it involves
16  matters implicated as a common-interest privilege, I
17  instruct you not to answer.
18    A. Based on that direction, I won't answer.
19    Q. Let me just ask generally, do you have a
20  recollection at some point in time that there had
21  been some expenses identified as expenses that were
22  not covered in the earlier spreadsheets that had
23  been transmitted prior to July 26 of 2013?
24    A. I think I said earlier that I remember
25  there was an expansion of dates. So I remember we

150

1  received another wave of previously not included
2  expenses. I don't remember anything beyond that.
3  That could be what that is, it may not be. I don't
4  know.
5     Q. We are going to go to binder number 3.
6     A. Yes, sir. The first one is 18.
7     Q. Actually look at Exhibit 19 first.
8     A. Okay.
9     Q. So we are on Exhibit 19 now.
10    MR. THOMPSON: For the record, it is Bates
11  numbered Apollo 109355 through 57, and it attaches
12  what appears to be a spreadsheet, and this is also
13  one of the spreadsheets where the copying job
14  partially cut off some of the numbering on the far
15  left-hand side of the spreadsheet. As previously
16  indicated, we do have better copies coming and will
17  be made available to counsel for substitution in
18  their binders.
19    Q. Mr. McGorty, let's look at your e-mail from
20  August 1, 2013 at 11:33 a.m. to Ms. Barzedeh. You
21  indicate: "Sipoura, attached is the draft
22  spreadsheet showing the modifications and edits
23  based on our session last Monday in your office when
24  Mr. Rashid was able to review the calendar and
25  e-mail."

151

1     Was it accurate that Mr. Rashid was able to
2  review the calendar and e-mail at that prior Monday?
3     MR. KEHOE: Objection, common-interest
4  privilege. I instruct the witness not to answer.
5     A. Based on that instructions I can't answer.
6     Q. What calendars did Mr. Rashid review?
7     MR. KEHOE: The same objection.
8     A. The same answer then.
9     Q. What e-mails did he review?
10    MR. KEHOE: The same objection.
11    A. The same answer.
12    Q. Just to expedite things, it appears to me
13  that there were some changes in the expense
14  classifications between this spreadsheet that is
15  attached here to Exhibit 19 and the spreadsheets
16  that have been earlier transmitted. I would ask
17  questions about those changes. I assume there would
18  be an instruction not to answer?
19    MR. KEHOE: There would.
20    Q. I assume, Mr. McGorty, that you would
21  follow that instructions?
22    A. Yes.
23    MR. HANUSIK: Can we go off the record for
24  a second.
25    (Off the record.)

152

1    MR. THOMPSON:  Back on the record.
2    And likewise I take it, Mr. Kehoe, if I ask
3  questions about the meaning of the column headings
4  and the spreadsheet and the entries in the
5  spreadsheet there would be an instruction not to
6  answer?
7    MR. KEHOE:  That's correct.
8  BY MR. THOMPSON:
9    Q.  And you would follow that instruction?
10    A.  Yes, sir.
11    Q.  Let's turn to Exhibit 20.
12    MR. THOMPSON:  For the record, Exhibit 20
13  bears Bates Number Apollo 109358 through 63.  It is
14  an e-mail string.  It appears to end with Mr.
15  McGorty's August 1, 2013, 7:28 p.m. to Ms. Barzedeh,
16  a copy to Mr. Ricciardi, the subject is:  "Request
17  for more information."
18    Q.  Do you have that orientation, Mr. McGorty?
19    A.  Yes, I do.
20    Q.  You wrote:  Hi Sipoura, I have answers to a
21  number of the questions which I can send to you
22  tonight.  We are presently in a conference room
23  working on trip descriptions, which is time
24  consuming."
25    When you wrote that we are presently in a

153

1  conference room, who was working on the trip
2  descriptions?
3    MR. KEHOE:  For the record, there is not a
4  common-interest privilege because prior, earlier
5  that day, is when the e-mail came through at 1:31
6  instructing you that they were not abiding by any
7  such privilege.  So to that question, we are not
8  invoking that.
9    A.  I don't have an independent recollection of
10  who was present.  Contextually, it was probably a
11  combination of Mr. Rashid and Ms. Kotwani.
12    Q.  Turning to Exhibit 21, this bears Bates
13  Number Apollo 109364 to 71.  It is another e-mail
14  string appearing to end with, Mr. McGorty, your
15  e-mail of August 1st, 8:25 p.m., to Ms. Barzedeh on
16  the subject of request for more information.  You
17  say, "Here are the answers we have thus far."
18    Can you tell me what the questions were and
19  what these were answers to?
20    A.  Well, there is really only one question for
21  all of these, which is can we document it to be a
22  business expense?  So I believe at the time we were
23  going through the process of reviewing the items and
24  looking at the calendar and reviewing other
25  documents.  I don't remember the extent of all the

154

1  documents, but certainly, at a minimum, his calendar
2  and trying to figure out what we could definitively
3  document as a particular business expense, and if it
4  was a business expense, where it could be allocated
5  in the Apollo system, like I said earlier.
6    So I don't have a recollection as to why we
7  only had answers at this point for these particular
8  line items, but that's what these answers are.
9    Q.  So the line items that are referenced in
10  your e-mail, that refers to the expense
11  spreadsheets?
12    A.  Yes, yes.  That's the categorization in the
13  spreadsheets.
14    Q.  And where you indicate that various items
15  should be business or personal, that was a
16  determination that Crowell and Mr. Rashid were
17  making; correct?
18    MR. KEHOE:  Objection to the form.  If it
19  involves conversations with Mr. Rashid, I instruct
20  you not to answer.
21    A.  What we -- what I shared with Paul Weiss
22  via this e-mail and potentially subsequent documents
23  was our determination, our representation of what we
24  found on documentation to support saying it was a
25  business expense, and if not, everything else was

155

1  put in the other bucket.
2    Q.  Subsequent to this e-mail, do you know
3  whether anyone from Crowell ever transmitted
4  additional changes to the spreadsheets that have
5  been previously transmitted?
6    A.  I don't remember.  I thought this process
7  continued past this date in my mind, but I don't
8  remember.
9    Q.  Now, let's turn to Exhibit 22.  Exhibit 22
10  is Bates number Apollo 42426 to 27.  It appears to
11  be an e-mail string that ends with an August 1st,
12  2013, 1:31 p.m., e-mail from Ms. Barzedeh to Mr.
13  McGorty, with copies to others.
14    Was this one of the documents that you
15  reviewed in preparation for your deposition?
16    A.  This one I definitely saw recently.
17    Q.  Did this refresh your recollection about
18  the events?
19    A.  To some extent.
20    Q.  And did you see this e-mail on August 1,
21  2013?
22    A.  I assume I did, based on the e-mail header.
23    Q.  Did the e-mail come as a surprise to you?
24    A.  I don't recall my reaction to the e-mail.
25    Q.  Well, given that you thought there was a

156

1  common interest, wouldn't it have come as a surprise
2  to you?
3        MR. KEHOE:  Objection to the form.
4     **Q.**  I don't mean to be argumentative.
5     **A.**  I understand.  I don't mean to be elusive.
6  I don't remember what my reaction was.  I think
7  that's a reasonable statement that you just made,
8  but I don't remember receiving or reacting to it.
9     **Q.**  Ms. Barzedeh writes, "Glen, Namirata, thank
10 you for the spreadsheets you had provided.  We would
11 like to remind you that we are not in a position to
12 enter into a joint defense agreement with your
13 client.  We are willing to accept the information
14 you provided on the same basis as the interview we
15 conducted with Ali.  The information is considered
16 privileged, however, the privilege belongs to
17 Apollo.  Apollo may choose to waive this privilege
18 without Ali's consent and Ali will not have a say in
19 the disclosure of this information if the company
20 chooses to waive the privilege.  Thank you,
21 Sipoura."
22       So my first question is whether you recall
23 anything having changed from July 31 to August 1st
24 to prompt such an e-mail from Paul Weiss?  Was there
25 any change?

157

1     **A.**  I don't recall anything changing.
2     **Q.**  So you don't recall any big discussion or
3  Apollo on July 31st saying we are going to sue your
4  client?
5     **A.**  Which part of the question do you want me
6  to answer?  I don't recall any of that on July 31st.
7     **Q.**  That's fine.
8        You don't believe that Apollo had told
9  Rashid by this point that he would be terminated;
10 correct?
11       MR. KEHOE:  Objection to the form.
12    **Q.**  Or do you?
13       MR. KEHOE:  Object to the form.
14    **A.**  Again, excluding anything I learned from my
15 client, I don't have a specific recollection of
16 hearing from Paul Weiss that that determination has
17 been made.
18    **Q.**  Do you recall hearing it from anyone else?
19    **A.**  Or anyone other than my client, which is
20 excluding potential client communications at that
21 time.  As I said earlier, I think it was much later
22 than that.
23    **Q.**  A little while ago you testified about a
24 general recollection of a discussion with Paul Weiss
25 where there was some reference made to the

158

1  possibility of a claim being asserted by Apollo
2  against Rashid.  Can you say whether that
3  conversation, as you recall, happened before or
4  after you received Ms. Barzedeh's e-mail?
5     **A.**  I can't.
6     **Q.**  Had Paul Weiss personnel previously told
7  you that Apollo was not in a position to enter into
8  a joint defense agreement with Mr. Rashid?
9     **A.**  Prior to this?
10    **Q.**  Yes.
11    **A.**  I don't recall ever being told that by
12 anyone at Paul Weiss.
13    **Q.**  Do you recall anyone else ever being told
14 that?
15    **A.**  No.
16    **Q.**  Ms. Kotwani was the associate on the case;
17 right?
18    **A.**  Yes.
19    **Q.**  Did she regularly report to you on her
20 conversations with Paul Weiss' attorneys?
21    **A.**  I assume so.  I believe so, during this
22 time period.
23    **Q.**  Do you believe that she would have informed
24 you had Paul Weiss, prior to this e-mail that we are
25 looking at, indicated that Apollo was not in a

159

1  position to enter into a joint defense arrangement
2  with your client?
3     **A.**  I think so.
4     **Q.**  After receiving this e-mail, did you ask
5  her?
6     **A.**  I don't recall.
7        MR. HANUSIK:  Objection.
8     **Q.**  To the extent you can answer without
9  getting into attorney work product, can you indicate
10 whether there was any investigation conducted after
11 receipt of this e-mail with respect to prior
12 disclaimers by Paul Weiss of a common interest?
13    **A.**  I cannot.
14    **Q.**  You cannot answer?
15    **A.**  Based on that caveat, no.
16    **Q.**  I am not asking the content, but does any
17 internal memo or other document exist at Crowell
18 with respect to any investigation that may have been
19 prompted by the receipt of this e-mail?
20       MR. HANUSIK:  Objection?
21    **Q.**  Again I am not asking the content.
22       MR. HANUSIK:  Do you know.
23    **A.**  I do not know.
24    **Q.**  You have not seen such a --
25    **A.**  Correct.

160

1   **Q.** What is your understanding, going back to
2   the e-mail of Ms. Barzedeh's reference to the
3   interview we conducted with Ali?
4       **A.** What is my understanding?
5       **Q.** Yes.
6       **A.** I believe the only interview that was ever
7   conducted of Ali was the one that predated our
8   retention, so I assume that is what you mean.
9       **Q.** So to the extent that there was --
10  subsequent to Rashid -- subsequent to your retention
11  there were interactions between Mr. Rashid and
12  Crowell, on the one hand, and Apollo's
13  representatives on the other hand, did Mr. Rashid
14  sometimes provide verbal information in response to
15  questions?
16          MR. KEHOE:  I am going to object to that
17  and instruct the witness not to answer.
18      **A.** I can't answer that question.
19      **Q.** Did you write back to Ms. Barzedeh or
20  anyone else at Paul Weiss to dispute what you said
21  in your e-mail?
22      **A.** I don't remember.
23      **Q.** Did you pick up the phone to ask about the
24  e-mail?
25      **A.** I don't remember.

161

1           MR. HANUSIK:  He said that he didn't
2   remember.
3       **A.** I didn't say I didn't, that's my point.  I
4   honestly don't remember how I addressed this e-mail
5   externally with Paul Weiss.  I can't say I didn't
6   have those conversations, I just don't remember.
7       **Q.** If any pushback occurred, you don't recall
8   any?
9       **A.** If any conversations, regardless of the
10  tenor occurred, I just don't remember.
11      **Q.** After reading Ms. Barzedeh's e-mail, did
12  you believe that a common legal interest still
13  existed between Rashid and Apollo?
14      **A.** At the time?
15      **Q.** Yes.
16      **A.** I don't recall what I thought about the
17  state of play after this e-mail, to be honest with
18  you.  I just don't.
19      **Q.** What do you think about the state of play
20  now?
21      **A.** Based on the instructions from my former
22  client's attorney, my understanding is that there is
23  no dispute that as of this date there wasn't a
24  common legal interest, so I don't disagree with
25  that.

163

1       **Q.** Did you contact Mr. Finzi to ask what is
2   going on here?
3       **A.** The same answer.  I don't remember.
4       **Q.** You don't remember one way or the other?
5       **A.** I just don't remember.
6       **Q.** Do you know whether Mr. Zelenko or anyone
7   else at Crowell called anyone at Paul Weiss about
8   Ms. Barzedeh's e-mail?
9       **A.** In the sense that was I informed by someone
10  internally at Crowell about a conversation that I
11  was not a part of?
12      **Q.** Yes.
13          THE WITNESS:  Can I answer that question?
14          MR. HANUSIK:  No.
15      **A.** I don't think I can answer that?
16      **Q.** Did you push back in any way in Ms.
17  Barzedeh's e-mail?
18      **A.** You mean with respect to Paul Weiss?
19      **Q.** Yes.
20      **A.** I don't remember subsequent conversations
21  with Paul Weiss about this issue.  I don't remember.
22      **Q.** Why not?
23      **A.** Why don't I remember?
24      **Q.** No, why didn't you have subsequent
25  conversations, if you didn't?

162

1       **Q.** Why do you disagree with that?
2       **A.** I am not disagreeing with that.
3       **Q.** You don't disagree with that?
4       **A.** No.
5       **Q.** We will look at some documents, but
6   nonetheless, you continued to write "common-interest
7   privilege" on transmissions after
8   receiving Mr. Barzedeh' e-mail; right?
9       **A.** I don't recall it.  If it says that, then I
10  did.
11      **Q.** Why would you have done that?
12      **A.** Well, I am not certain that -- well,
13  again --
14      **Q.** I will represent to you that you did.
15      **A.** I don't recall how we addressed this issue
16  with Paul Weiss after receiving this e-mail, so I
17  don't know if we addressed it in such a way that we
18  continued to believe there was a common-interest
19  privilege and then marked the documents accordingly
20  or not.  I just don't remember the distinction post-
21  August 1st.
22      **Q.** Did you think, after receiving Ms.
23  Barzedeh e-mail, that some other privilege would
24  apply to ensuing communications between Crowell and
25  Paul Weiss with respect to the expense review?

164

1      A.  You mean a new, different privilege?
2      Q.  Yes.
3      A.  I don't believe so.  I don't think this
4  gave rise to a new theory of privilege.
5      Q.  Before August 1st of 2013, did you ever ask
6  Paul Weiss to mark documents and spreadsheets that
7  they sent to you as joint defense privilege or a
8  common-interest privilege?
9      A.  Can I answer that question?
10         MR. KEHOE:  Yes, you can.
11     A.  I don't recall if we ever made a request
12  like that to Paul Weiss.  I don't.
13     Q.  Is there a reason why you would not have
14  made such a request?
15     A.  No.
16     Q.  Did you think after receiving Ms.
17  Barzedeh's e-mail reflected on Exhibit 22 that
18  Apollo and Rashid were not adverse to one another?
19     A.  No, no, I think that's a fair question.  It
20  depends on how you want to define adversity.
21        I don't think this e-mail changed the level
22  of adversity or common interest that proceeded or
23  followed this e-mail.  What I mean by that is, I
24  think from the beginning there was obviously an
25  inherent adversity with respect to the concerns that

165

1  Paul Weiss had with Mr. Rashid or Apollo had with
2  Mr. Rashid via Paul Weiss, concerns that the SEC had
3  to some extent through their examination process
4  with Paul Weiss that reflected upon their actions
5  with Mr. Rashid and, at the same time as that
6  adversity, an interest for both of us, meaning
7  Apollo and Mr. Rashid, to resolve this concern about
8  Mr. Rashid's alleged conduct, to help Apollo resolve
9  the potential concerns they had with the SEC, and
10  all of that and the interest of Mr. Rashid to keep
11  his job.  All of that, I would assert, was equally
12  true on July 31st as it was on August 2nd.
13     Q.  So, your view basically is that Ms.
14  Barzedeh's e-mail did not change anything?
15        MR. KEHOE:  Object to the form.
16     A.  I don't think that it didn't change
17  anything, it didn't change the things I just
18  described to you.
19     Q.  I believe in the answer that you gave
20  before the last question, you referred to concerns
21  that the SEC may have had being a source of
22  adversity between Apollo and Rashid; is that
23  correct?
24     A.  Maybe it's the adversity between the SEC.
25  I don't know if you want to call the examination

166

1  process an adversity.  It's probably not the right
2  word.  I just used that word because you had used
3  it, but clearly the SEC's examination had prompted
4  or in part related to Apollo's concerns with Mr.
5  Rashid.  So we endeavored in this entire process, in
6  part, to help Apollo resolve -- maybe adversity is
7  not the word right -- the concerns the SEC may have
8  had through their examination process, with respect
9  to at least in part the expense issue.
10        Whether that's general or specific as to
11  Mr. Rashid, as I said before, I don't know.
12     Q.  So you are not saying that any concerns the
13  SEC may have had was a source of adversity between
14  Apollo and Rashid?
15        MR. KEHOE:  Objection to the form.
16     A.  I think that's right.  I think, that's
17  probably right.  Maybe that's where I maybe had
18  misused the word adversity.
19     Q.  So the source of adversity was the fact
20  that Rashid was a partner or employee and Apollo was
21  his employer and he didn't want to be terminated; is
22  that what you are getting at?
23     A.  Let me try and answer your question.
24  Again, I am thinking maybe adversity is not the word
25  right for that piece of this.

167

1      Q.  What is the right word?
2      A.  So I would say there obviously developed
3  some concern and issue that Apollo had about Mr.
4  Rashid's expense conduct, we will call it that.  I
5  don't know, I still don't know until this day.
6        The extent of the SEC's examination of
7  Apollo predated the concerns that Apollo raised with
8  Mr. Rashid.  I don't know that relationship, but I
9  certainly know that when we were retained, our
10  responsibility in representing Mr. Rashid was to
11  assist him in helping Apollo resolve this issue, and
12  we will call it adversity, with the SEC's
13  examination; resolve Apollo's issues with respect to
14  Mr. Rashid and the expense policy and from Mr.
15  Rashid's perspective, doing all of that in the
16  interest of hopefully resolving these concerns and
17  keeping his job.  I think, that's maybe a clearer
18  way of what I was trying to say before.  I apologize
19  if it was confusing.
20     Q.  Thank you.
21        How much time do you need for your 3:00
22  call?
23        MR. KEHOE:  Give me 5 minutes and that
24  would be good.
25     Q.  Let's turn to Exhibit 23 in the binder.

168

1    MR. THOMPSON:  Exhibit 23 is Bates number
2  Apollo 43573 to 80, and the last e-mail appears to
3  be Mr. McGorty's e-mail, dated August 1, 7:38 p.m.
4  to Ms. Barzedeh.  The subject is:  "Request for
5  information."
6        So, Mr. McGorty, your e-mail was sent,
7  what, 6 hours after Mr. Barzedeh sent her e-mail
8  with respect to not being in a position to enter
9  into a defense joint arrangement; correct?
10      A.  Say that again.
11      Q.  Your e-mail is dated about 6 hours or timed
12  about 6 hours after Mr. Barzedeh's e-mail reflected
13  in Exhibit 22; correct?
14      A.  Yes, I am sorry.  I didn't understand, yes,
15  that seems right.
16      Q.  You had had some time to cogitate on Ms.
17  Barzedeh's e-mail and perhaps discuss it with your
18  colleagues if you chose to do so; correct?
19      MR. KEHOE:  Objection to form.
20      A.  I don't remember when I saw that e-mail, so
21  I don't know how much timed I had.
22      Q.  Is there a reason why in your e-mail you
23  don't say anything about her e-mail?
24      A.  Nope.  Not at all.
25      Q.  This particular e-mail is not designated as

169

1  common-interest privilege, is it?
2      A.  I don't think we were sending anything,
3  were we?  No, I don't think so.  I think this is
4  just a continuing chain that goes back.
5      Q.  I think, this is part of the e-mail we
6  looked at earlier?
7      A.  Yes, that's right.
8      MR. THOMPSON:  Let's go ahead and take a
9  break.  You need until about 3:15.
10      (Whereupon, a recess was taken.)
11      MR. THOMPSON:  We are back on the record.
12      During the break, replacements copies of a
13  couple of the exhibits came.  I had indicated that
14  on some of the exhibits, some of the text was cut
15  off on some of the spreadsheets.  I don't know if
16  this is replacements for all of the ones that were
17  cut off, but we do have replacements for Exhibits 19
18  and 24, which we actually haven't gotten to so far.
19  We are about to get to Exhibit 24.
20      Exhibit 24 includes a spreadsheet which has
21  some of item numbers cut off.  Just take it out and
22  just substitute in these versions of Exhibit 24.
23      MR. HANUSIK:  Keep the e-mail?
24      MR. THOMPSON:  Right.
25      So let's go to Exhibit 24.  Exhibit 24

170

1  consists of e-mail Bates Numbers Apollo 109379 to 80
2  and an attachment, Bates Number 109381, that
3  indicates this document is available in native
4  format.  It attaches a spreadsheet.
5  BY MR. THOMPSON:
6      Q.  Let's look at your e-mail, dated August 2,
7  2013, 3:45 p.m., to Ms. Barzedeh, with copies to Mr.
8  Ricciardi, Mr. Zelenko and Ms. Kotwani.  It
9  indicates, "Sipoura, please find both the master
10  spreadsheet, which includes expenses post-April 5,
11  2013, and a revised trip spreadsheet which has a
12  header featuring the information you requested for
13  each trip.  In addition please find below the
14  remaining answers to the line items on which you
15  requested clarification."
16      Did I read that correctly?
17      A.  Yes.
18      Q.  Now, you sent this e-mail and its
19  attachments after you had received Ms. Barzedeh's
20  August 1 e-mail that was marked as Exhibit 22;
21  correct?
22      A.  Based on the dates, yes.
23      Q.  And would it be fair to say that you knew
24  Paul Weiss' position at that point was that no joint
25  defense or common-interest privilege applies to your

171

1  communications with him.
2      A.  I presumably would have seen the August 1st
3  e-mail by then.  The one you are referring to from
4  Sipoura.
5      Q.  Did you think that your transmission was
6  protected by Rule 408 of the Federal rules of
7  evidence?
8      A.  As I said earlier, I don't remember what I
9  believed with respect to what could have covered all
10  of the different ways our communications post-August
11  1st could have been protected or privileged.  So in
12  that sense, I don't remember, as I said earlier,
13  what, if any, conversations happened with Paul Weiss
14  subsequent to August 1st -- subsequent to that
15  e-mail on August 1st.  So I am not certain what
16  protections exist for these communications.  I don't
17  remember what I was thinking.  You are asking me
18  what I was thinking at the time?
19      Q.  Yes.
20      A.  I just don't remember.
21      Q.  Was a master spreadsheet still a draft at
22  the point that you were sending this version of it?
23      A.  The only distinction that I recall between
24  -- and its more contextual from this e-mail --
25  between a master spreadsheet and a trip spreadsheet

172

1  was the fact that the trip spreadsheet categorized
2  expenses by trip, as opposed to, I guess,
3  chronologically, which I think the quote/unquote
4  master spreadsheet, if that's what you want to call
5  this.
6      Q.  Well, that's what you called it, right?
7      A.  I am assuming that's what this refers to.
8  Again, I don't have any reason to believe that's not
9  what this refers to.
10      So to answer your question about drafts, I
11  think that it was all a draft.  It was all a draft.
12  I mean, in the sense that there were multiple
13  drafts.  I don't think they ever had a final work
14  product, if you want to call it the last draft if
15  someone wants to categorize it as that.
16      Q.  Are you aware of any draft of the master
17  spreadsheet that is later in time than this
18  attachment to Exhibit 24?
19      A.  I am only aware of this one, because you
20  are showing it to me.  So there may have been
21  others, there may not have been.  I don't remember.
22      Q.  You don't know one way or the other?
23      A.  I don't know.
24      Q.  Do you know what if any additional work was
25  contemplated on the master spreadsheet at the time

173

1  you transmitted it?
2      A.  I do not.
3      Q.  Keep Exhibit 24 in front of you.
4      Can you get Exhibit 10 and look back at
5  that?  Are you looking at Exhibit 10?
6      A.  Yes, sir.
7      Q.  Please look at what's attached to the
8  exhibit, the spreadsheet that's attached.  I have a
9  couple of questions.  I am still trying to
10  understand the source of information that's set
11  forth in the spreadsheets now.
12      Is it correct that the information set
13  forth in Exhibit 24, the master spreadsheet for
14  "date," "merchant," "long description," "transaction
15  amount" -- I am sorry, "transaction amount,"
16  "personal payment type," and "project name," would
17  that all have been taken from the spreadsheet that
18  is included in Exhibit 10?
19      MR. KEHOE:  Object and instruct the witness
20  not to answer the question on Exhibit 10.  This is
21  dated the 17th of July.
22      A.  Based on that instruction, I can't answer.
23      Q.  Well, for the record, I disagree with the
24  instructions since we are talking about the source
25  of information for the master spreadsheet, which was

174

1  transmitted on August 2, 2013.
2      MR. KEHOE:  Just to be clear, you were
3  referring back to an Exhibit 10 where we had a large
4  number of objections on Exhibit 10.  So that's the
5  problem.
6      MR. THOMPSON:  I understand that, but okay,
7  we disagree on that one.
8      Q.  If I were referring to Exhibit 10, since
9  there's been an instructions with respect to it,
10  what was the source of the information set forth in
11  the columns of Exhibit 24 that I read into the
12  record a moment ago?
13      A.  My recollection is that most of the
14  information on this spreadsheet were accounting
15  records from Apollo.
16      Q.  When you say most of the information, would
17  that have been the information in the "date,"
18  "merchants," "long description," "transaction
19  amount," "personal payment type" and "project name"
20  columns?
21      A.  I believe so.
22      Q.  With respect to the expense classification
23  column, was that a column that your firm added on
24  Ms. Rashid's behalf?
25      A.  Answering that in the context of what we

175

1  communicated to Paul Weiss on the spreadsheet, I
2  believe that that, as was expressed to Paul Weiss,
3  that that was with the category or the column where
4  we were trying to figure out what was business or
5  not or other.  So that's a designation, yes.
6      Q.  So is it correct then all of the
7  information, all of the designations in each of the
8  entries were designations that your firm made on Mr.
9  Rashid's behalf?
10      A.  I don't know if they all are, in the sense
11  that it's conceivable that there could have been
12  information that was provided by Paul Weiss, that
13  they had or I guess for that matter BDO, that they
14  had come to some -- they had found documentation to
15  reflect how to categorize this stuff.
16      I guess my answer is, yes, the column was
17  created as part of this project, but I don't know if
18  it was exclusively populated by us.  It may have
19  been.
20      Q.  It may have been?
21      A.  It may have been or I should say it may
22  have been populated in, again, particular line
23  items, I don't remember, by information we received
24  maybe from Paul Weiss.  It's possible.
25      Q.  If I am understanding you correctly, the

176

1  designations may have been informed by information
2  you received by Paul Weiss, but the entity that
3  actually made the determination, that would have
4  been your firm on behalf of Mr. Rashid?
5        MR. KEHOE: Objection to the form.
6        A. I think that's right, I think that's fair.
7        Q. What did the designation "personal" denote?
8        A. "Personal" was a designation for anything
9  that, to the best of my recollection, we actually
10  communicated to Paul Weiss; anything that we
11  couldn't determine how to document it as a business
12  purpose, and that was based on a review of calendar
13  entries, other documents. So I don't remember what
14  else we had accessed to at the time. I do remember
15  calendar entries. The American Express credit-card
16  bills, to the extent that that provided some
17  context, that's where that came from, that's where
18  the designation came from.
19        Q. Okay. And what did the designation
20  "business" denote?
21        A. I think that's the designation where we
22  could actually document something being a business
23  expense and the dichotomy, the distinction was
24  simply, at the point when we were doing this project
25  as communicated to Paul Weiss, we were trying to

177

1  allocate to business whatever we could unequivocally
2  say was documented business, and everything else we
3  categorized not as business, with the goal of Mr.
4  Rashid's intending, as I expressed to Paul Weiss, to
5  write a check for anything that could not be
6  substantiated to reimburse Apollo for, what we
7  couldn't clearly say was business expenses.
8        Q. With respect to expenses designated as
9  business, was there any further inquiry made to
10  determine whether the expense had been passed on to
11  private-equity funds or was borne by Apollo itself?
12        A. Not by our team. I do recall, as I said
13  earlier, to the extent where we could attribute the
14  business expense to what I believe Apollo referred
15  to as "project name," we tried to verify that so the
16  designation was proper. Theoretically, if a
17  business expense was something that was mislabeled,
18  it actually was a different project name, we would
19  try and identify that if we did go into the document
20  to determine that.
21        So part of our project was to determine if
22  the -- part of our project was to determine how it
23  was properly designated if we could. So I don't
24  know if there were changes in the project name
25  column, there may have been, but I think your

178

1  question is slightly different. I didn't play a
2  role in that.
3        Q. Just to be clear, do you recall any
4  discussion with Paul Weiss about the extent to which
5  expenses designated as "personal" that had been
6  previously billed as business expenses would be
7  reimbursed to private-equity funds if they bore the
8  expense?
9        MR. KEHOE: Objection to form.
10        Q. Do you understand the question?
11        A. I do. To the extent that the answer to the
12  question is we had conversations where we explicitly
13  explained to Paul Weiss our methodology, that
14  personal expenses were not necessarily personal. We
15  just couldn't document them as being business, and
16  it was Mr. Rashid's intentions to write a check to
17  cover that amount in the interest of keeping his
18  job. However, I don't recall having conversations
19  with Paul Weiss about the next piece, about the
20  funds that they were associated with, if there were
21  any.
22        Q. What does the designation "taxi/cab"
23  denote?
24        A. I think we tried to separate that because
25  we could. Unclear, I mean it really doesn't fit

179

1  into -- I guess, it's a business expense, it's
2  theoretically a business expense. I don't remember
3  candidly if that taxicab, those expenses, fell into
4  the bucket of the other that were paying, like the
5  personal. Those were designated on the spreadsheet
6  or if they were open ended and we only -- because
7  they were taxi and/or cab expenses, we left them in
8  the potential business expense because we couldn't
9  determine that, I assume that we designated it this
10  way for a reason, but I don't remember what it was.
11        Q. Then there is a designation of "personal
12  (Prev paid back.)" What does that denote?
13        A. Based on my conversations with Paul Weiss,
14  my understanding is that those expenses fell into a
15  category of expenses that had been subject to an
16  earlier inquiry or conversations, however you want
17  to describe it, that Apollo had with Mr. Rashid,
18  that resulted him, at that point in time,
19  reimbursing those expenses, that had previously not
20  been personal or previously not been paid by Mr.
21  Rashid. That's my best recollection.
22        Q. Go to entry number 212. Two pages into the
23  spreadsheet, American Airline expense. Flight from
24  Miami to LA, trip from Metals USA. And in the
25  expense classification column, there appears a

180

1  designation of "partial business expense."  What
2  does that denote?
3      A.  I think that I remember, as we described to
4  Paul Weiss, there were challenges with respect to
5  trips because sometimes trips weren't purely
6  business or some aspect of a trip expense could be
7  carved out to be not a business expense.  So my best
8  recollection is that that's the designation we put
9  if something that was a business trip, but at some
10  point there may have been a component of it that he
11  wanted to include in the other bucket of saying I
12  should write a check back.
13     Q.  Was there some allocation made with respect
14  to partial business expenses?
15     A.  The question, take the line item 212, I
16  don't know or recall how that was calculated into
17  that final -- here's is what we can't document
18  clearly as business expenses, so we are going to put
19  it in the "personal" or other that will result in
20  the check.  I don't remember how to allocate it.
21         My guess, again it's a guess, is that we
22  put it in the other.  My guess is that we put
23  everything in this other bucket that was not
24  business expenses.  It just says business, I think,
25  that rings a bell to me.

181

1      Q.  I am sorry, you are referring to the other
2  bucket, is that something that --
3      A.  Everything that is not business, because I
4  think it got a business designation here if we could
5  document, based on the review of all those
6  documents, that it was clearly a business expense
7  that in this case it belongs to Metals U.S.A., or is
8  associated with that project name, using their
9  designation.
10        I am pretty sure and someone else could do
11  the math, I am pretty sure that whatever the amount
12  that Ali paid to resolve this concern, was a sum
13  total of everything else.
14     Q.  Everything other than business?
15     A.  Everything other than business.  I am not
16  sure if I am right about taxicabs.  I am not sure
17  how we handled partial business expenses, but it's
18  possible they all ended up in the other bucket which
19  was called "personal."
20     Q.  In determining whether an expense could be
21  classified as business, is it the case that you did
22  make an attempt to determine the who, what, where,
23  when and why of the expense?
24     A.  I don't know if I would put it in those
25  terms, but I think back to what I mean when I say

182

1  something being documented, and I think that means
2  some documentation that reflects what this expense
3  was and, obviously, if it's travel or a meal or
4  something, where it was, who it was, obviously the
5  dollar amount came with the expense, so what the
6  expense was, but that's my recollection.
7      Q.  Did you have any concern with the
8  completeness of Apollo's records that were made
9  available to you with respect to the proper
10  classification of an expense?  For example, do you
11  have any concern that you did not have all of the
12  Amex bills or all of the calendar entries?
13     A.  Sure.  I mean, I think that's a very -- I
14  think that was a point that I remember thinking of
15  at the time, which is, there may be documentation
16  that could exist or that theoretically would exist
17  in some form that we don't have access to, that
18  would move things that we couldn't designate into
19  business expenses, but absent those documents, we
20  put everything in sort of the other, non-business
21  bucket, because, for example, pick a meal; we
22  couldn't determine exactly who was present, what was
23  the business purpose of that meal, we put it in
24  personal.  If it was a coffee or something, it could
25  have been a coffee with a colleague that would have

183

1  been a proper business expense, depending on
2  Apollo's views towards such an expense, but if we
3  couldn't show that it was about a particular deal or
4  project or whatever, we put it in personal meals,
5  the same thing.
6      Q.  Were there any documents that you requested
7  of Apollo that were not provided, to your
8  recollection?
9      A.  I don't think so.  I don't think so.  I
10  think we requested and they provided whatever they
11  had to help us.  I don't think they withheld
12  anything.  We just did the best we could with what
13  we had to categorize this stuff.
14     Q.  Was there any forensic accounting firm that
15  was engaged to assist you in this process?
16     A.  Well, if I recall, Apollo, working with
17  Paul Weiss, hired BDO.  I feel like we were
18  assisting them, more so than they were assisting us.
19  We were attempting to fill in the blanks with these
20  documents, wherever we could.
21     Q.  But Crowell did not engage a separate
22  forensic accounting firm, other than BDO?
23     A.  We didn't engage BDO.
24     Q.  That's a bad question.
25     A.  No, no, because there was -- the record was

184

1 the record, and the best we could do was try and
2 work with what we had at their request, meaning
3 Apollo or Paul Weiss.
4      Q.  What, again, was the purpose of the trips
5 spreadsheet?
6      A.  My recollection is that we took out, as
7 best we could, expenses that were related to
8 particular trips from the chronology, which we will
9 call the master spreadsheet, which is the term we
10 used, and categorized them by trip.  We were able,
11 as best we could, to actually lay out the details to
12 who, what, where, and when, that we could, based on
13 what we received.
14      Again, I am looking at the spreadsheets and
15 that's what I am seeing.
16      Q.  Do you recall any discussion with Paul
17 Weiss or BDO about the master spreadsheet after you
18 transmitted it on August 2, 2013?
19      A.  No.  It doesn't mean we didn't, but I don't
20 recall.
21      Q.  Do you know whether Paul Weiss accepted all
22 of your designations or was additional work done?
23      A.  I don't remember.
24      Q.  Let's take a look at Exhibit 25.  Exhibit
25 25 is Bates Number Apollo 109385 to 86, with an

185

1 attachment, and the first page is an e-mail from Ms.
2 Kotwani to Ms. Barzedeh, dated August 23, 2013, and
3 it states:  "Good evening, Sippoura.  Attached
4 please find draft classifications pertaining to
5 pending T's and E's for Mr. Rashid that have not
6 been submitted for reimbursement."
7      The attachment, if you look at it, all the
8 dates -- they appear to go from mid May 2013 to
9 August of 2013.  So am I correct in understanding
10 that this pertains to expenses that were incurred by
11 Mr. Rashid but had not been previously submitted for
12 reimbursement?
13      A.  That's what she said and that's what it
14 looks like to me.
15      Q.  So these are not expenses that Apollo would
16 have paid or any private equity firm would have
17 paid; is that correct?
18      A.  Right.  Right.  Presumably, I don't know;
19 some of these are business expenses, so I don't know
20 how they were subsequently handled once we submitted
21 it.  I don't remember why we submitted it, but I do
22 think it is what it is, as you described.
23      Q.  Other than Exhibit 25, are you aware of any
24 subsequent transmission of a spreadsheet or any
25 additions or changes to the master spreadsheet from

186

1 your firm to Paul Weiss?
2      A.  I don't recall.
3      Q.  Please turn to Exhibit 26.
4      This is a one-page document, Bates Number
5 Apollo 108719.  It appears to be an e-mail from
6 Roberto Finzi to Mr. Zelenko, Mr. McGorty and Mr.
7 Little, dated October 15, 2013.  Subject Ali Rashid.
8 I will give you a moment to read it, Mr. McGorty?
9      A.  Okay, thank you.
10      (Witness reviewing document.)
11      A.  Okay.
12      Q.  Do you have any knowledge of Mr. Rashid,
13 prior to this e-mail, having met with members of
14 Apollo's executive committee concerning his
15 continuation as a partner at Apollo?
16      A.  It's not based on any communication with my
17 former client.  I will say that Mr. Little's
18 involvement in the representation definitely post-
19 dated; however it was communicated to Mr. Rashid, I
20 don't remember, but their desire to separate from
21 him.  Mr. Little was definitely involved after that
22 to resolve a severance issue.
23      Q.  Mr. Little was engaged to resolve the
24 severance piece?
25      A.  He was an employment lawyer.  He is, I

187

1 believe, an employment lawyer, so, yes.
2      Q.  Did Crowell act as co-counsel in that
3 engagement or were you involved in the negotiation
4 of the separation?
5      A.  I don't remember how much we were involved.
6 We certainly were not taking the lead on that.  I do
7 remember attending, I think it was just me from
8 Crowell, attending a meeting with Mr. Little.  It
9 may have been in Mr. Little's firm, Paul Weiss.  I
10 think counsel for Apollo and general counsel for
11 Apollo was present.  General counsel was present for
12 that meeting where they negotiated a resolution and
13 to say we were there as co-counsel would be an
14 overstatement.  I was there more for moral support
15 in case an issue came up that related back to our
16 efforts to resolve the matter.
17      Q.  Would that meeting that you are recalling
18 have occurred sometime in October 2013 or after?
19      A.  That would be my best recollection.
20      Q.  Would it be fair to say that prior to
21 October 2013, your firm had not been representing
22 Mr. Rashid in connection with negotiations of a
23 separation agreement?
24      MR. KEHOE:  Objection to the form.
25      A.  Well, no, because I do think, to some

188

1  extent, all of this was leading up to that.  We had
2  hoped not, but if you want to draw the
3  representation of Ali Rashid to resolving his
4  employment at Apollo, I would say that started from
5  day one.  I think the turn it took that made a
6  difference at the end was when Apollo had decided to
7  separate from Mr. Rashid, which happened at some
8  point, as I think I said, at some point in September
9  or October, and we brought in outside employment
10 counsel that could directly interface with Apollo.
11 I believe there were lawyers at Paul Weiss that were
12 helping as well to work through the actual terms of
13 a severance.
14     Q.  Did you regard Apollo and Rashid as being
15 adverse to one another from the time that Mr. Rashid
16 was told that he would not be allowed to remain at
17 the firm?
18     A.  I mean, I guess it's hard to say that there
19 was not some level of adversity when you're trying
20 to sparse out terms of a settlement.  I don't know
21 if I would describe it as amicable, it probably
22 wasn't, but I do think that's fair.
23     I think the dynamics changed at that point.
24 Our efforts to settle it with respect to keeping his
25 job was no longer an option, so that changed.

189

1     Q.  Up until the point Mr. Rashid was told he
2  had to leave, his hopes were dashed, up until that
3  point, the objective was keeping his job, basically?
4     MR. KEHOE:  Objection to the form.
5     A.  Part of it, for sure.
6     Q.  Please turn to Exhibit 27.
7     MR. THOMPSON:  Exhibit 27 is a document
8  bearing Bates Numbers Rashid 2499 to 2507.  It's
9  titled "Separation Agreement Term Sheet."  It's
10 dated October 28, 2013.
11     Q.  Have you ever seen this document before,
12 Mr. McGorty?
13     A.  I am sure at the time I saw a copy of the
14 draft settle agreement, so, yes, I am sure I saw it
15 at some point.
16     Q.  Did you have any role in preparing this
17 term sheet?
18     A.  I am sure there was an opportunity to offer
19 any factual corrections if we had any.  I don't
20 remember if I had any at the time or I don't
21 remember if this is the draft that I saw.  It was
22 not and is not my area of expertise.
23     Q.  Is the header on this document,
24 "Confidential Settlement Communication Pursuant to
25 FRE408."  Do you see that?

190

1     A.  Yes.
2     Q.  Did you ever affix similar headers to
3  documents that you were sending to opposing counsel
4  in the context of settlement discussions?
5     A.  No, not that said that.
6     Q.  That said something similar?
7     A.  That reflected confidential.  I would
8  describe common-interest documents, whatever the
9  designation was on those footers, I would say, but
10 we didn't have a designation that referenced Rule
11 408, if that's what you mean.
12     Q.  So, in the course of your practice up until
13 October of 2013, you had never sent a document to
14 opposing counsel labeled as a settlement
15 communication?
16     A.  Beyond this case?
17     Q.  In any case?
18     A.  I mean, I left the government in December
19 of that prior year.  I don't recall, I don't recall
20 having that designation on anything I sent before
21 this time, and I would be hard pressed to think if I
22 ever used that designation since.  I could have.
23     Q.  Have you been engaged in settlement
24 discussions?
25     A.  Sure.  I mean, I can argue in many cases I

191

1  have been involved with settlement discussions, it
2  depends on how you want to define them.
3     Q.  But you don't have a practice of labeling
4  settlement communications as settlement
5  communications?
6     A.  I don't know if I used that designation.  I
7  don't go off the cover for other designations as
8  well.  So I am not sure if I would have relied
9  truthfully on that.  I just can't say that I never
10 used it.  I don't want to overcommit, I may have.
11 Clearly, Mr. Little did here.
12     Q.  After October 14, 2013, did Crowell
13 continue to have communications with Paul Weiss
14 concerning the expense review?
15     A.  After October?
16     Q.  October 14, 2013?
17     A.  There was a point in time where I believe
18 there were communications between our firm and Paul
19 Weiss.  I don't remember if, call it this project,
20 continued past that date.  I do remember later when
21 the SEC got involved, that there were conversations
22 with Mr. Zelenko and subsequent counsel for Mr.
23 Rashid, but I don't remember anything specific.
24     Q.  After October 14, 2013, did Crowell label
25 any written communication with Paul Weiss pertaining

192

1 to the expense review as being subject to Rule 408
2 or settlement material or some similar designation?
3     A.  I don't remember what communications we had
4 with them, so I can't say how we labeled it.
5     Q.  Let's turn to Exhibit 28.
6         MR. THOMPSON:  Exhibit 28 bears Bates
7 Numbers Apollo 41654 through 673, and it appears to
8 be a January 8, 2014 document addressed to Mr.
9 Rashid.  Have you seen this previously, Mr. McGorty?
10     A.  I may have.  I don't remember.  I remember
11 that the format of that earlier version you showed
12 me, I am sure I saw this, but I am not certain.
13     Q.  Did you have any role in the negotiation of
14 this agreement?
15     A.  No.
16     Q.  Did anyone else form Crowell have any role
17 in the negotiation of this agreement?
18     A.  I don't believe so.  It was more Mr.
19 Little.
20     Q.  So I don't know if you will know, but let
21 me just direct your attention to one portion of the
22 document.  On page 2 of the agreement, under
23 "incentive awards," there is a discussion of a
24 payout for incentive awards.  If you go to the very
25 end of that section, on the next page there is a

193

1 discussion of a deduction from that payout.
2         So if you could take -- this is fairly
3 technical and it's late in the day, my question is
4 actually, I think, fairly simple, but I do want you
5 to have the context -- well, it may not be fairly
6 simple.
7     A.  You can ask the question.  I think I've got
8 it so far.  I am following.
9     Q.  So on page 3 of the document Apollo 41656,
10 the last sentence of the carryover paragraph states:
11 "In addition to the distribution equivalence
12 otherwise payable to you after taking into account
13 the one million dollar reduction described in the
14 preceding sentence, it shall be further reduced by
15 an amount that after withholding all applicable
16 federal state and local taxes thereon, equals
17 $325,000."
18         The question is, do you know how that
19 amount was determined?
20     A.  The $325,000?
21     Q.  Yes, sir?
22     A.  To the best of my recollection, that is the
23 -- it's clearly rounded off upward, I would imagine,
24 based on my recollection of what we couldn't
25 determine in our spreadsheet project to be clearly a

194

1 documented business expense, as we described to Paul
2 Weiss.
3         So I don't know what the total was of the
4 math of the non-documented business expense, where
5 it ends up.  My guess is, it ends up somewhere south
6 of 325,000, and it was rounded up to that, keeping
7 in mind again, intentionally so, what is the
8 direction of our client and, more importantly, as I
9 specifically told Paul Weiss, which I believe they
10 understood to be as well, that was paid to them in
11 this case via reduction, as opposed to Mr. Rashid
12 writing a check, and was intended by him to be paid
13 to resolve the concerns that were initially raised
14 to him about his expense-account issue and it was
15 calculated in our effort to be both cooperative with
16 them, but also in the hopes that he would keep his
17 job, which he didn't.
18     Q.  Earlier in the day there were some
19 questions and answers about your knowledge of the
20 SEC examination that was occurring with respect to
21 Apollo in 2013.  At some point, you did learn that
22 there was such an examination in process; correct?
23     A.  Yes.
24     Q.  Do you recall any agreement or
25 understanding with Paul Weiss that Paul Weiss would

195

1 keep your firm apprised of the status of that
2 investigation?
3     A.  I am fairly certain, though I can't point
4 to a time, repeatedly asked, extending I am certain
5 past August 1st, for the purposes of my answer,
6 repeatedly asked about the status of that
7 investigation, because we were concerned about how
8 that could impact Mr. Rashid.
9     Q.  Do you recall whether Paul Weiss agreed to
10 keep you informed?
11     A.  I believe they did, and I believe they kept
12 us informed.
13     Q.  Was there any understanding that your firm
14 or Mr. Rashid would have any role in responding to
15 questions asked by the SEC during the examination?
16     A.  To a large part, I think it was our main
17 role from day one.  I think part of this, to the
18 extent that there was an SEC examination or concern
19 from the SEC via an examination into this expense
20 account issue, I think our responsibilities were to
21 represent Mr. Rashid's interest, to aid Apollo in
22 addressing these concerns, and if they could be
23 addressed generally with respect to a resolution of
24 this issue internally, without specificity to Mr.
25 Rashid being identified to the SEC, all the better.

196

1   But that was part of our job from day one.
2       Q.  Was there any understanding with Paul Weiss
3   that you would have a say in how Apollo responded to
4   inquiries from the SEC during the examination?
5       A.  Well, I think we had a very cooperative
6   relationship with Paul Weiss during this whole time.
7   I can't point to a conversation where Paul Weiss
8   said that we actually would have a controlling say
9   in what happened, but I never felt that we didn't
10  have a voice in the process, on behalf of Mr.
11  Rashid, to help guide Apollo through its response to
12  the SEC.
13      Q.  Let's look at Exhibit 29.  So Exhibit 29 is
14  Bates Number Apollo 42345 to 46.  This e-mail string
15  ends with an e-mail from Mr. Zelenko, dated
16  September 3, 2013, to Ms. Barzedeh.  You are copied
17  on the e-mail, Mr. McGorty.
18      A.  Yes.
19      Q.  And Mr. Zelenko states:  "Sipoura, have you
20  heard anything else from the SEC and is there a date
21  you are scheduled to report on this issue?"
22          Do you know whether Mr. Zelenko ever
23  received an update or response to that query?
24      A.  I don't recall.  I assume he did.  I would
25  be surprised if he did not receive a response, but I

197

1   don't have a recollection.
2       Q.  Turn to Exhibit 30.
3       MR. THOMPSON:  Exhibit 30 is a document
4   that bears Bates Numbers Apollo 1298 through 1317.
5   It appears to be on Paul Weiss paper.  It's
6   entitled, "Apollo Global Management Expense Review
7   Preliminary Results," and it's dated September 16,
8   2013.  Have you ever seen this document previously,
9   Mr. McGorty.
10      A.  I have not, to the best of my recollection.
11      Q.  I will represent to you that this was part
12  of a representation made to the Office of Compliance
13  Inspection and Examinations at the SEC on September
14  16, 2013.  Did you know that Paul Weiss was going to
15  make such presentation?
16      A.  I didn't know what form it was going to
17  take, but I assumed that there was an issue, that
18  Paul Weiss would be representing Apollo to resolve
19  it.
20      Q.  Were you given any opportunity, you or
21  anyone else, to your knowledge at your firm, given
22  an opportunity to comment on this presentation
23  beforehand?
24      A.  Well, I am assuming -- unless I am
25  mistaken, I am assuming the substance of it was, at

198

1   least in part, our work product, but as far as the
2   final form, I have never seen it before, as far as I
3   can tell.
4       Q.  Well, were you given an opportunity to
5   comment on any draft of this document?
6       A.  I don't think so.  I don't recall, nor do I
7   expect we would have.
8       Q.  Let me direct your attention to the page
9   Bates numbered 1303, titled "Mohammed Ali Rashid
10  Prior Reimbursements."  The second arrow point there
11  refers to 2012 reimbursement.  It states:  "In
12  December of 2011, Rashid sought and received
13  permission from the compliance department to
14  purchase $100 holiday gifts for executives of
15  certain portfolio companies.  The charges for the
16  gifts appeared on Rashid's February Amex statement.
17  The timing of the charges prompted further inquiry
18  by the expense manager of the yield, that instead of
19  purchasing gifts for executives, Rashid had spent
20  $3,500 on a suit for his father at Zegna, a high-end
21  clothing store."
22          Then it continues on the next page.
23      "When asked to produce receipts for the
24  gifts he claimed were purchased, Rashid asked the
25  salesman to create and forward a false receipt

199

1   reflecting the purchase of 35, quote, 'ties' for
2   gifts."  Then it continues.
3          Was this a subject you ever discussed with
4   Paul Weiss?
5       MR. KEHOE:  If it's during the timeframe
6   prior to August the 1st, I instruct you not to
7   answer.
8       A.  I don't recall having any conversations
9   specifically about this after August 1st.  So I
10  can't answer.
11      Q.  Without telling me the substance of the
12  conversation, do you believe you had a conversation
13  on this subject prior to August 1st?
14      MR. KEHOE:  The same objection.
15      A.  I can't answer that.
16      Q.  Did Paul Weiss inform you or anyone else at
17  Crowell after the fact that it had made this
18  presentation to the SEC?
19      A.  I don't recall.  They might have.  They
20  might have told us in general terms about their
21  report to the SEC, without the details of what looks
22  like with a PowerPoint presentation.  I just don't
23  recall.
24      Q.  Turn to Exhibit 31, which I believe is our
25  final exhibit.

200

1    MR. THOMPSON:  Exhibit 31 is Bates numbered
2  Apollo 43560 to 61.  It's an e-mail string ending
3  with the December 11, 2013 e-mail from Andrew
4  Ehrlich, to Mr. Zelenko, and the subject matter is
5  actually "common-interest privilege."
6    Q.  First of all, did your firm think there was
7  still a common interest with Apollo as of December
8  11, 2013?
9    MR. HANUSIK:  Objection to foundation.  Mr.
10  McGorty did not write the e-mail.
11    Q.  I understand you didn't write the e-mail.
12  I am just wondering what your firm thought, to your
13  recollection?
14    MR. HANUSIK:  I am objecting on the
15  foundation.  Mr. McGorty does not speak on behalf of
16  the entire firm.
17    Q.  You can answer the question, Mr. McGorty.
18    A.  So I can't say that I remember having a
19  specific recollection of my personal view on this
20  date, the December date, but the context of this
21  communication, I believe it's arguably a common-
22  interest communication.  If you want to know why, I
23  can tell you.
24    Q.  So looking at the e-mail string on December
25  6th, Mr. Zelenko sent an e-mail to Mr. Ehrlich

201

1  stating Andrew, or asking "Andrew, any update from
2  the SEC?  Thanks."
3    And then on December 11th, apparently
4  having received no response, it says, "Andrew, just
5  following up to see whether there have been any
6  developments on the SEC front.  Thanks."
7    Then, on December 11th, Mr. Ehrlich writes
8  back:  "Dan, sorry for the delay, I have been
9  traveling.  No development of note."
10    So is it the case that as of December 11,
11  2013, your firm still didn't know about the
12  presentation that had been made to the SEC by Paul
13  Weiss that is reflected in Exhibit 30, the
14  presentation that had been made on September 16,
15  2013?
16    A.  Well, I don't have any recollection at all,
17  but definitely no, based on these e-mails.  I do not
18  believe you could reach that conclusion at all, the
19  conclusion that we were unaware of the September
20  presentation, based on this e-mail.
21    Q.  So you think you may have been aware of the
22  September presentation based on this e-mail?
23    A.  I don't know one way or the other.  As I
24  said earlier, when you asked me about our knowledge
25  of the presentation, we may have been aware that

202

1  there was a presentation, but not the specifics of
2  what it looked like.  This communication could very
3  well have been about any further follow-up from the
4  SEC based on Mr. Rashid, but I am not sure.
5    Q.  I believe your testimony was that, before I
6  showed it to you a few moments ago, you had never
7  seen Exhibit 30; is that right?
8    A.  I don't recognize it, no.  It doesn't mean
9  that I had not heard about the presentation.  I just
10  don't remember.
11    Q.  I believe you previously testified that
12  your firm represented Mr. Rashid in connection with
13  the SEC's investigation of misconduct while at
14  Apollo; correct?
15    A.  Yes.
16    Q.  And that work would have been done in 2016
17  and 2017, was it?
18    A.  I believe so.  I believe so.
19    Q.  Did the representation come to an end on or
20  about October 16, 2017?
21    A.  I don't remember the date.  My
22  understanding is we were no longer representing Mr.
23  Rashid in his case with the SEC at some point late
24  last year.  That sounds right, I just don't have the
25  date.  I wasn't involved with the day to day.

203

1    Q.  I take it that Apollo didn't pay for your
2  firm's bills for work that they did for Rashid in
3  2016 and 2207?
4    MR. KEHOE:  Objection.  What is the
5  relevance of this.
6    Q.  You can answer.
7    A.  Yes.  I wouldn't imagine that they did, no.
8    Q.  Rashid himself was paying those bills?
9    MR. KEHOE:  I am going to object and
10  instruct you not to answer any questions on that.
11    MR. THOMPSON:  What is the basis for that
12  instruction?
13    MR. KEHOE:  To the extent it impacted his
14  relationship, the attorney-client with Rashid during
15  the time, he has already said that Apollo is not
16  paying the bills.  What difference does it make who
17  is paying the bills here?  If he is getting it from
18  a third party, he is getting it from himself, what
19  difference does it make.
20    MR. THOMPSON:  Well, that may be, but a
21  relevance objection is not a basis to instruct the
22  witness not to answer.  Communications about
23  payments or bills are not subject to any privilege,
24  as you well know.
25    A.  It depends who the source of the

204

Glen McGorty
10/30/2018

1  communication would be right.  So I don't know the
2  answer to your question.
3      Q.  You don't know whether Rashid paid all the
4  bills?
5      A.  I do not know the answer to that question.
6      Q.  Did Rashid have any insurance that paid any
7  portion of the bill?
8      A.  I don't know.
9      Q.  Has Rashid ever indicated to your firm,
10  directly or through counsel, that he was considering
11  any type of legal claim against your firm in
12  connection with its prior representation of him?
13      MR. KEHOE:  Objection.  Covered by the
14  privilege and instruct him not to answer.
15      A.  I can't answer.
16      Q.  I don't know what imaginable privilege that
17  could be covered by.
18      MR. KEHOE:  You can imagine it's
19  attorney-client privilege, we will go with that and
20  I instruct him not to answer.
21      MR. THOMPSON:  It certainly would not be
22  attorney-client if they were adverse and considering
23  a legal claim.
24      I would ask Tom, you are the actual counsel
25  here.  I have not heard you instruct him not to

205

1  answer and I don't believe that this event, post-
2  representation would be something that Mr. Kehoe
3  could actually decide.
4      MR. KEHOE:  You didn't narrow the question.
5  You asked whether or not there was ever a question
6  -- a conversation between Mr. McGorty and counsel
7  about bringing legal action -- Mr. Rashid.
8      MR. THOMPSON:  Let me do that.  That's a
9  fair point.  Let me do that.
10      Q.  Subsequent to your firm's termination by
11  Mr. Rashid, are you aware of any communication on
12  behalf of Mr. Rashid to your firm, indicating that
13  Mr. Rashid was considering bringing a malpractice
14  claim?
15      A.  No.
16      Q.  Has Crowell notified its carrier that it
17  could be subject to a malpractice claim?
18      A.  Not to my knowledge.
19      Q.  Does your firm have any governing body that
20  needs to be informed when there is an occurrence
21  that might give rise to such a claim?
22      A.  I don't understand your question.
23      Q.  Is there any part of your firm --
24      A.  I understood that part.  The part I don't
25  understand is "occurrence."

206

1      Q.  I am using insurance speak.  I am sorry.
2      Does your firm have some governing body
3  that deals with potential professional liability
4  claims?
5      A.  Sure.  When there is a professional
6  liability claim, it's raised to our internal general
7  counsel, I would imagine.
8      Q.  Has there been any notification to your
9  general counsel of a potential claim by Mr. Rashid
10  against the firm?
11      A.  Not that I'm aware of.
12      Q.  Okay.  With respect to communications that
13  you had with Mr. Rashid, his wife and his sister, we
14  had looked at that previously, it was in Exhibit 1A,
15  I am not sure you need to get it in front of you
16  again, did you believe that that call was subject to
17  an attorney-client privilege -- those calls?
18      A.  I appreciate how the presence of a third
19  party could make it -- I don't recall doing an
20  analysis on whether that call was privileged or not.
21  I don't remember what was discussed.
22      Q.  You don't remember what was discussed at
23  all?
24      A.  I don't remember.
25      Q.  Let me try to probe you a little bit.

207

1      Do you recall there being any discussion of
2  Rashid's sister being a recipient of gifts from Mr.
3  Rashid?
4      MR. KEHOE:  Objection to the form.
5      A.  I don't recall.
6      Q.  Do you recall any discussion of her being
7  present at dinners that Mr. Rashid had billed as
8  business expenses?
9      MR. KEHOE:  Objection to form.
10      A.  I don't recall.
11      Q.  Do you recall any discussion of her being
12  present on trips that Mr. Rashid had billed as
13  business expenses?
14      MR. KEHOE:  Objection to the form.
15      A.  I don't recall.
16      Q.  You indicated before that Rashid's sister
17  was concerned about the situation.  Can you
18  elaborate on what the concern was?
19      A.  She was concerned about her brother.  I
20  mean, I think the concern that I referenced was the
21  concern that any team member would have for somebody
22  who was going through this kind of circumstances.
23      Q.  If you look back -- I do want you to look
24  back at Exhibit 1A, for one thing.
25      A.  Yes.

208

1      **Q.**  The very last entry on the last bill on
2   page CMAR SEC 33 --
3            MR. HANUSIK:  Second-to-last bill.
4            MR. THOMPSON:  You are right.  The
5   second-to-last bill.
6      **Q.**  There is a reference to a November 27, 2013
7   telephone call that Mr. Zelenko had with client and
8   M. Hilzik, H I L Z I K.  Do you know who M. Hilzik
9   was or is?
10     **A.**  I don't.
11           MR. THOMPSON:  Let's go off the record.
12           (Off the record.)
13           MR. THOMPSON:  Go back on the record.
14   BY MR. THOMPSON:
15     **Q.**  Let me direct you to page CMAR SEC 35.
16   This is a statement of account as of January 15,
17   2014, and there is another entry for Mr. Zelenko on
18   December 4, 2013.  It says:  "Review of Hilzik
19   retention letter and correspondence with client."
20           Do you have an understanding of that
21   reference?
22     **A.**  I don't.
23           MR. THOMPSON:  Let's go off the record.
24           (Whereupon, a recess was taken.)
25           MR. THOMPSON:  Back on the record.

209

1   BY MR. THOMPSON:
2      **Q.**  Mr. McGorty, during the break did you have
3   any discussion with Mr. Kehoe.
4      **A.**  We spoke.
5            MR. KEHOE:  You said you were finished
6   questioning, did you not?
7            MR. THOMPSON:  No, I would said we would
8   take a break.
9      **A.**  We spoke briefly.
10     **Q.**  What did you say?
11     **A.**  The fact that he said it was not going to
12   be much longer before we were done.
13     **Q.**  Anything else?
14     **A.**  No.
15     **Q.**  Mr. McGorty, I don't have anymore questions
16   for you right now.
17   EXAMINATION BY
18   MR. KEHOE:
19     **Q.**  Mr. McGorty, I am going to go back and go
20   through some of the issues that were raised by
21   counsel.  The first thing I would like you to take a
22   look at was Exhibit 24, the spreadsheet that you
23   were talking about this afternoon.
24     **A.**  Okay.
25     **Q.**  Now, just stay on the front page, the

210

1   defense clarification, you know, "personal,"
2   "business," when you say "personal," do you know
3   that every designation that was in this spreadsheet
4   and designated as "personal" was, in fact, a
5   personal expense?
6      **A.**  No.
7      **Q.**  Explain that for us.
8      **A.**  So we decided and conveyed to Paul Weiss
9   collectively, we worked with our client and what was
10   conveyed to Paul Weiss was that anything that we
11   could not show was clearly a documented business
12   expense and therefore we put it in the business
13   category, was placed in this other "personal"
14   category, because it was our belief and our client's
15   intention that to resolve the concern that Apollo
16   had, he would, at least in part to resolve it, he
17   wanted to reimburse them for anything that could not
18   be documented clearly as a specified business
19   expense.  That's what "personal" meant.
20     **Q.**  So when you came up with the number of a
21   payback that counsel raised to you previously, I
22   think it was $325,000; was that right?
23     **A.**  That was the number on the severance
24   agreement.
25     **Q.**  Is it your testimony that that is a

211

1   completely accurate portrayal of how much personal
2   expenses was owed back to Apollo or was it his
3   attempt to resolve this once and for all
4   financially?
5      **A.**  The latter.  If that number was derived by
6   our efforts here and it's the sum total of all the
7   personal things designated "personal" in the
8   spreadsheet, then that number is largely
9   overinflated and part of Mr. Rashid's efforts to
10   resolve it, and based on what we couldn't determine
11   to be clearly a business expense.
12     **Q.**  So if the SEC at trial were to rely on the
13   numbers coming from these spreadsheets as to what
14   the actual personal expenses were, that number would
15   be not only inaccurate but very inadequate?
16           MR. THOMPSON:  Objection as to form.  It
17   calls for a legal conclusion.
18     **Q.**  Right?
19     **A.**  Yes.
20     **Q.**  So the fact is that it would be very
21   adequate; wouldn't it?
22           MR. THOMPSON:  The same objection.
23     **A.**  You can't rely on that for that purpose.
24   You can't rely on what is designated "personal" here
25   for that purpose.

212

1    Q.  Is the reason for that, was it that he was
2  attempting to pay back money in order to keep his
3  job?
4    A.  Yes.
5    Q.  Let me ask you some questions about the
6  Upjohn warning from counsel.  Upjohn warnings had
7  been given to Mr. Rashid, counsel had asked you
8  those questions, and you were -- and the firm, when
9  I say the firm, Crowell, you were retained
10  thereafter?
11    A.  That's right.  We are retained at the time
12  of the interview.
13    Q.  If I can go to the document from SEC 1A and
14  we go to the first bill, that transmission of advice
15  to or discussions with Mr. Ali began on July the
16  2nd, 2013?
17    MR. THOMPSON:  Sorry, what page are you
18  looking at?
19    MR. KEHOE:  First billing page -- excuse
20  me, I will give it to you, it is page 5.
21    A.  So the first entry on the bill reflects a
22  telephone call between -- they were involving me and
23  my partner Dan Zelenko on July 2nd, about Mr.
24  Rashid.
25    Q.  Thereafter, there is a call with Paul Weiss

213

1  on the 3rd?
2    A.  Yes.
3    Q.  And Mr. Zelenko and you and -- there's
4  another conference call between you, Mr. Zelenko and
5  the client on the 3rd?
6    A.  Yes.
7    Q.  It goes on for many, many entries prior to
8  the actual retention letter being signed on July the
9  12th of 2013, does it not?
10    A.  Yes.
11    Q.  Prior to the actual retention letter being
12  signed, was it your understanding that you had an
13  attorney-client relationship with Mr. Rashid going
14  back to July the 2nd?
15    A.  Yes.
16    Q.  Now, starting with July the 2nd and after
17  Mr. Rashid had received Upjohn warnings, was it your
18  understanding that you were supposed to be some
19  conduit of some information that came your way with
20  Paul Weiss?
21    MR. THOMPSON:  Objection as to form.
22    Q.  Was it your understanding, after the Upjohn
23  warnings had been given to Mr. Rashid, prior to your
24  retention I think you testified in response to
25  questions by SEC counsel, was it your understanding

214

1  that the role of Crowell & Moring was just as a
2  conduit of information to Paul Weiss or any other
3  representative for Apollo?
4    A.  No, and the fact of the Upjohn warning had
5  no baring on our representation at all.
6    Q.  What was your understanding as to how you
7  were protecting the interests of your client, Mr.
8  Rashid?
9    A.  Well, we were representing him and his
10  interest exclusively, and to the extent that we were
11  engaging in an effort to help him keep his job, we
12  were engaging in communication with Paul Weiss, we
13  were reviewing documents, ultimately we were working
14  with Mr. Rashid to review documents to provide
15  information to Paul Weiss in connection with their
16  representation of Apollo and in an effort to resolve
17  Apollo's concern with Mr. Rashid.
18    Q.  Now, at the time that you were representing
19  Mr. Rashid, did you become aware at the beginning or
20  shortly thereafter that the SEC enforcement was
21  doing an examination of Apollo?
22    MR. THOMPSON:  Objection.  Assumes facts
23  not in evidence.
24    A.  I don't recall -- I recall being aware of
25  some involvement of the SEC doing an investigation

215

1  on Apollo from the beginning.  I don't recall a time
2  where I didn't have that knowledge in this case.
3    Q.  Counsel just argued that there was a fact
4  not in evidence, so we will just talk about one of
5  the exhibits that he put in evidence?
6    A.  Okay.
7    Q.  If I may, I just have to find it for a
8  second.  It's Mr. Zelenko letter to Mr. Norman.
9    A.  That's the one that I don't have.
10    Q.  If you turn to the second full paragraph,
11  the Bates stamp number is 1376, the letter from Mr.
12  Zelenko to Ms. Norman, dated November 18, 2016.  It
13  notes that:  "To begin with, we take issue with the
14  factual statements in the staff's letter" -- first,
15  Mr. Rashid -- this is the third sentence down -- was
16  paid his full base salary and benefits on the July
17  1st, 2013 to October of 2013.  During this time
18  period Mr. Rashid was asked to cooperate fully with
19  the investigation being conducted by Paul Weiss and
20  its outside forensic accounting firm BDO.  He was
21  placed on leave in part so that he could have time
22  to assist Apollo in its expeditious review of
23  certain expenses for 2011, 2013 period, that were
24  the subject of a related SEC examination at the
25  time.

216

1    Do you see that, sir?
2    **A.** Yes.
3    **Q.** To your recollection, and this was written
4 by Mr. Zelenko, to your recollection is that
5 accurate?
6    **A.** Yes.
7    MR. THOMPSON: For the record, the basis of
8 my objection to the question about 3 questions ago
9 was that you referred to an examination or
10 investigation by the SEC Division of Enforcement.
11 There is no foundation for that, to the contrary.
12    MR. KEHOE: No speeches.
13    MR. THOMPSON: I am entitled to make my
14 objection. You asserted that I made a factual
15 representation that I did not.
16    MR. KEHOE: Of course you did.
17    MR. THOMPSON: The question is still
18 objectionable because you referred to an objection
19 of the Division of Enforcement.
20    **Q.** During the period of time that you were
21 retained, Mr. Rashid is being examined by Apollo for
22 his expenses; is that right?
23    **A.** That's correct.
24    **Q.** And you are representing him in an effort
25 to try to keep his job.

217

1    **A.** That was from his perspective and goal,
2 yes.
3    **Q.** According to Mr. Zelenko's letter, Mr.
4 Rashid was even given time off so he could cooperate
5 with that investigation; right?
6    **A.** That's what he was doing, yes.
7    **Q.** And during this period of time, while he
8 was cooperating, he was cooperating with Apollo
9 because they were subject to an SEC examination?
10    **A.** That's correct.
11    **Q.** So we have this situation where you were
12 representing your client to try to keep his job, not
13 get fired, and also helping Apollo when they are
14 under review during an SEC exam?
15    **A.** That's right.
16    **Q.** This is the substance of what you -- is
17 this the substance what you believe was the common
18 interest that you had with Paul Weiss and Apollo?
19    MR. THOMPSON: Objection as to form.
20    **A.** Yes.
21    **Q.** Now under any of these circumstances,
22 beginning with you being retained, and I think you
23 testified on direct examination you were brought in
24 to resolve this expense issue?
25    **A.** I think that's how I referred to it.

218

1    **Q.** You referred to it some other way?
2    **A.** I think that's right.
3    **Q.** Was your goal to resolve any dispute that
4 Mr. Rashid may have had with Apollo, with the hopes
5 of keeping his job?
6    **A.** Yes.
7    **Q.** Was your goal to try to settle that dispute
8 in order for him to keep his job?
9    **A.** Yes, and more specifically, that was the
10 purpose of our calculation of this dollar amount
11 that he would pay Apollo, partly to settle this, so
12 to keep his job.
13    **Q.** Would it be fair to say that during this
14 entire time frame, both parties were getting
15 something from this relationship, Rashid having the
16 hope of settling this dispute to keep his job by
17 paying back money, and Apollo, getting information
18 to resolve their exam with the SEC?
19    **A.** That's fair. Yes.
20    **Q.** If I am wrong in any of my questions,
21 correct me.
22    **A.** No, I would be the first to correct you.
23 That was great.
24    **Q.** Let's go back to clarify this. You have
25 been in many settlement negotiations during your

219

1 career; have you not?
2    **A.** Settlement of?
3    **Q.** Cases.
4    **A.** Sure.
5    **Q.** I noticed from your resume that it was put
6 in as Exhibit B that this is not your first rodeo?
7    **A.** Correct.
8    **Q.** So during all of those communications,
9 going back and forth with all of the entities that
10 are involved in a settlement, do you always put that
11 this is subject to Rule 408 restrictions?
12    **A.** No.
13    **Q.** Is it often the case that when you are
14 negotiating a settlement it's understood that these
15 are all part of settlement negotiations?
16    **A.** The label does not make it a settlement
17 negotiation.
18    **Q.** What makes it a settlement negotiation?
19    **A.** The purpose of the communication.
20    **Q.** If the purpose of the communication is
21 settlement, is it protected by Rule 408?
22    MR. THOMPSON: Objection as to form. Calls
23 for a legal conclusion.
24    **A.** That's my understanding. That's my belief
25 and practice. For example, if Mr. Little's

220

1  communication with drafting the severance agreement
2  did not include that line, it would be no less of a
3  document in furtherance of a settlement.
4      Q.  You are talking about the exhibit that
5  counsel just put in.  Let's clarify that.
6      A.  It's 27.
7      Q.  27.  Thank you.  I love when the witness
8  tells me my exhibits.
9          So when you are talking about Exhibit 27,
10 so when you are looking at that, is it your
11 testimony that whether or not Mr. Little put
12 "confidential settlement communications pursuant to
13 Federal reference 408" doesn't determine whether or
14 not it's subject to Rule 408?
15         MR. THOMPSON:  Objection to form.  Calls
16 for a conclusion.
17     A.  That is my belief.
18     Q.  Now, let's talk a little bit about this
19 common-interest privilege.  What is the need for
20 that?  Why did you believe that that was the case
21 and why did you think that was necessary in a case
22 like this?
23     A.  Well, when you are engaged in a task that
24 involves or includes relating what would otherwise
25 be a protected communication, vis-a-vis any

221

1  communications with a client, and you are
2  communicating that to a third-party increase for
3  another purpose and that purpose affords you
4  protection, it's in everyone's interest, I think, to
5  avail yourself of that protection for your client or
6  the other side, their client, from disclosure that
7  is beyond the scope of the common-interest agreement
8  or group or it's more than one working parts.
9      Q.  Does it promote candor in situations such
10 as this with Paul Weiss when you are attempting to
11 resolve the dispute for your client and then to get
12 information for the SEC exam?
13     A.  That's the point of that in part, sure.
14     Q.  Why is that?
15     A.  Because you have some protection built into
16 this understanding, common-interest understanding,
17 that you can represent and present information that
18 would otherwise be protected, exclusively if it
19 remained with your client, if that's the main source
20 of communication to a third party.
21     Q.  Was it ever your belief after these Upjohn
22 warnings have been given to Mr. Rashid, that every
23 conversation that you may have had on Mr. Rashid's
24 behalf or Mr. Rashid might have had at any of these
25 meetings with Paul Weiss was subject to that Upjohn

222

1  warning that they had prior to your retention?
2      A.  I had no basis, based on my experience, to
3  believe that the Upjohn waring that Mr. Rashid, I
4  assume was given at that interview, applied beyond
5  that interview.
6      Q.  Let me ask you, in your entire career,
7  absent a specific allocution to that regard, have
8  you ever practiced law, such as an Upjohn warning
9  given at one meeting carried through to every other
10 contact with that person?
11     A.  No.
12     Q.  As we move forward, you have this situation
13 where you're promoting candor for what you think is
14 the common interest, and you were putting it on your
15 documents and prior to this e-mail, at 1:31 p.m., on
16 August 1st, 2013, had Paul Weiss ever objected to
17 the designation of common interest?
18     A.  No.
19     Q.  I told you I am going faster than what you
20 thought.
21     A.  I appreciate it.
22     Q.  Counsel asked you questions about whether
23 or not there was a discussion with Paul Weiss as to
24 what potential claims Apollo could have against Mr.
25 Rashid; do you recall that?

223

1      A.  Yes.
2      Q.  Was there a discussion with them at some
3  regard, post-August 1st of 2013, to your
4  recollection?
5      A.  The best that I can say about that, the
6  best of my recollection is that there were some
7  conversations or conversations where there was
8  discussion involving Paul Weiss that related to the
9  seriousness of the conduct from their perspective,
10 and the notion that it could give rise to legal
11 action, but I don't have any recollection of
12 specifics.
13     Q.  Well, in your mind as a seasoned litigator,
14 did that raise some concern on your behalf to
15 attempt to settle this with as good terms as
16 possible for your client?
17     A.  Yes, but as I said earlier, that concern,
18 based on my experience, did not derive from
19 conversations I had with Paul Weiss, whenever they
20 may have been, it derived from day one of the
21 representation, the understanding and concern about
22 the ramifications of what the allegations were that
23 had been made to Mr. Rashid in the interview before
24 we were retained.  So the very core of the conduct
25 at issue here was what informed my concern about

224

1  potential claims, not merely a subsequent
2  conversation with Paul Weiss about it.
3      Q.  Independent of any conversation with Paul
4  Weiss, you would have had those concerns?
5      A.  I did have those concerns.
6      Q.  You did have those concerns?
7      A.  Yes.
8      Q.  So just going back to the actual sheet
9  itself, the actual sheet itself, and you came to put
10  together what is now Exhibit 24, and you put those
11  things into all of the various categories of
12  "personal," "business," "taxicabs," were all of
13  those efforts done to attempt to settle any claim
14  that Apollo or anyone else might have against Mr.
15  Rashid?
16      A.  Yes, in parts.
17      Q.  What else, what is the other part?
18      A.  To assist Apollo in whatever concerns the
19  SEC had with them in their investigation -- their
20  examination.
21      Q.  So in your way of thinking, as a lawyer,
22  you were settling a case, attempting to keep his
23  job, and you were giving information to Apollo, in
24  order for them to resolve their matter with the SEC?
25      A.  Although they are really not two distinct

225

1  things.  We were hoping to provide information to
2  Apollo for their purposes, which included addressing
3  the SEC concern, all with the goal of resolving
4  their claim against Mr. Rashid and helping him to
5  keep his job, hopefully keep his job, which did not
6  work out, obviously.
7      Q.  Turn to document 30.  I want you to address
8  a portion of the document that counsel for the SEC
9  did not point out to you, and what I am looking at,
10  this is a Paul Weiss Apollo/Global Management
11  expense review.  Do you see that?
12      A.  Yes.
13      Q.  I think you noted, of course, that you had
14  not seen this?
15      A.  I have not seen this, to my best
16  recollection, I didn't see it before today.
17      Q.  I want you to turn to 1316.
18          Do you see that, sir, it's number 2,
19  Rashid's cooperation with Apollo's investigation?
20      A.  Let me just read it.
21      Q.  Please take your time to read it.
22          (Witness reviewing document.)
23      A.  Yes, this is -- I don't think I have seen
24  this before.
25      Q.  This is the first time you are reading

226

1  this?
2      A.  Yes.
3      Q.  Let's just go through it.  "Rashid has
4  cooperated fully with Apollo, Paul Weiss and BDO at
5  all stages of the process; is that true?"
6      A.  Yes.
7      Q.  Was that part of your settlement efforts
8  when you were working on his behalf?
9      A.  Absolutely.
10      Q.  Next bullet point:  "He has spent
11  considerable time reviewing his expenses to
12  reclassify charges as personal in the first instance
13  and to group travel-related expenses so that they're
14  associated truth."
15          Is that true?  Did you spend considerable
16  time doing that?
17      A.  A lot of time.
18      Q.  Did you do that at the request of Apollo?
19      A.  Yes.
20      Q.  This one:  "He has endorsed an
21  overinclusive approach to the effect that we believe
22  maybe substantially overstate the amounts being
23  properly charged as a business expense."
24          MR. THOMPSON:  I think you misquoted the
25  statement.

227

1          MR. KEHOE:  I'm sorry.  Let me read that
2  again.  My apologies to the Court Reporter.
3      Q.  "He has endorsed an overly inclusive
4  approach to the effort that we believe may
5  substantially overstate the amounts improperly
6  charged as business expenses."
7          Now, the words "overly inclusive," that's
8  Paul Weiss' comment here; right?
9      A.  Yes.
10      Q.  And is that what you did?  Did you put an
11  overly inclusive approach to the effort that may
12  have substantially overstated the amounts improperly
13  charged?
14      A.  Yes.
15      Q.  Was that consistent, Mr. McGorty, with your
16  prior testimony that the last spreadsheet that we
17  were looking at in Exhibit 24 is inaccurate?
18      A.  Inaccurate, in the sense that, as I
19  described here, yes, I agree.
20      Q.  Inaccurate in what sense?
21      A.  It is inaccurate to the extent that it
22  calculates personal expenses that are personal
23  expenses.  It is created consistent with what Paul
24  Weiss apparently represented to the SEC, which is
25  that we undertook an overly inclusive approach, as I

228

1  said earlier, everything that we couldn't clearly
2  document as a business expense in an effort to
3  resolve the concern that they had with Ali Rashid,
4  in the hopes that he could keep his job, which by
5  definition overstated the amount that should have
6  been properly characterized as "personal."
7       This is the first I have ever seen this.  I
8  am glad that he passed along that clear instruction
9  and directive that we gave them as far as what we
10 were doing.
11      Q.  So, if we go back to Exhibit 24, this
12 spreadsheet presented by counsel, if the SEC at
13 trial presented this spreadsheet as an accurate
14 assessment of what Mr. Rashid owed or did not owe,
15 would that document be accurate and truthful?
16      MR. THOMPSON:  Objection as to form.  Calls
17 for a legal conclusion and an evidentiary
18 conclusion.
19      Q.  You can answer it.
20      A.  That spreadsheet and any spreadsheet we
21 provided to Paul Weiss would include an
22 overstatement of what was actually a personal
23 expense.  That's true.
24      MR. KEHOE:  Let me take a five-minute break
25 to talk to my co-counsel here.

229

1       (Whereupon, a recess was taken.)
2       MR. THOMPSON:  Back on the record.
3       MR. KEHOE:  I am true to my word.  That's
4  all the questions that I have for you.
5       MR. THOMPSON:  Mr. Hanusik, are you going
6  to have any cross?
7       MR. HANUSIK:  No.
8       MR. THOMPSON:  I have got a very brief
9  redirect.
10      BY MR. THOMPSON:
11      Q.  Mr. McGorty, with respect to the master
12 spreadsheet that is Exhibit 24 overstating the
13 amount of personal expenses, do you have any
14 estimate of how much of an overstatement it was,
15 what percentage may have been truly personal
16 expenses and which may have been expenses that were
17 labeled as personal erring on the side of over
18 inconclusiveness?
19      MR. KEHOE:  You are asking him to
20 speculate.  I am going to object to speculation.
21      MR. HANUSIK:  I am asking him the question
22 I asked.
23      MR. KEHOE:  That's speculation.  I object.
24      A.  I don't know.  I have no way of knowing
25 what the accurate number is.

230

1       Q.  None whatsoever?
2       A.  I really don't.
3       Q.  So You don't know if the overstatement is 2
4  percent or 20 percent?
5       MR. KEHOE:  Objection to the form.
6       A.  Or more.
7       Q.  Or less?
8       A.  Or less.
9       Q.  When you say you think that Exhibit 24, the
10 master spreadsheet, reflects an overstatement of
11 expenses labeled as "personal," are you aware of any
12 actual expense entries that you would say reflect an
13 overstatement?
14      A.  I think to answer that question in either
15 direction, overstatement or understatement, if I had
16 that knowledge it would be based on attorney-client
17 communications and I don't reveal it.
18      Q.  So it's possible there were some
19 understatements as well?
20      A.  You mean there are things that were
21 determined to be business that should have been
22 personal.
23      Q.  Yes.
24      A.  No, I don't think so, because it only made
25 it into business if we really had some documents

231

1  that reflected it was a business expense.  So I
2  would say, again, with the goal of only putting
3  things into business that we had some objective
4  evidence of, I would say it's unlikely that there
5  are things that are counted as business that should
6  not be.
7       Q.  Would it surprise you if it turned out that
8  BDO's review identified expenses that your review
9  had classified as business that were, in fact,
10 personal expenses?
11      MR. KEHOE:  Objection to the form.
12      A.  I don't know what they were looking at.  I
13 just know what we were looking at, so I don't know
14 the scope of their review, so I can't say I would be
15 surprised.  I would be surprised if, for example,
16 you told me that a dinner for which there was a
17 counter entry that reflected attendees from a
18 business relationship, something that you and I
19 would agree was a business expense, if it turned out
20 that they determined that was not a business
21 expense, I wouldn't know what criteria they were
22 using, so I can't tell you I would be surprised, it
23 would depend.
24      Q.  Let's take your example, if it turned out
25 there was a calendar entry or an expense report

232

1 reflecting a business dinner, but there were e-mails
2 that same day with personal friends of Rashid's,
3 reflecting plans to have dinner at the same
4 restaurant for which the expense was billed as a
5 business expense, would you deem that as information
6 that would have caused you to label Ali's expense as
7 personal, had you not known it?
8       MR. KEHOE:  Objection, speculation.
9       A.  If we had seen e-mails that reflected the
10 dinner was with friends, it would have ended up in
11 the business category.  So we would have only put it
12 in the business category, to the best of my
13 recollection, if there was objective evidence to
14 suggest that it was a business dinner and if there
15 were e-mails that said exactly there were friends,
16 that wouldn't qualify.  If we saw e-mails that
17 suggested that it was really a dinner with friends
18 and just a dinner with friends, we would not have
19 put it in the business category.
20      Q.  So, in your view, contemporaneous e-mails
21 reflecting that an expense billed as business was
22 actually for dinner or some other event with
23 friends, that would be objective evidence that the
24 expense should be classified as personal?
25      A.  It depends.  Again, if you are suggesting a

233

1 particular dinner that was billed as a business
2 expense was in reality not a business expense --
3      Q.  Yes, sir.
4      A.  Because it was dinner with friends for
5 which there is no business explanation, then yes, of
6 course.  But what I am saying is, using the criteria
7 you raised, I don't know who the friends were.  I
8 don't know if there was somebody at that dinner that
9 was a business relationship, that under Apollo's
10 policy justified it being a business expense; so it
11 depends, a little bit drilled down on that.
12      My recollection is, if we had reason to
13 doubt whether it was a business expense, we would
14 not have put it in the business category.  That is
15 my belief.
16      Q.  Did you ever have any reason to doubt BDO's
17 competence in conducting an expense review?
18      A.  No.
19      Q.  Did you ever have any reason to doubt BDO's
20 motives in trying to reach an accurate result?
21      MR. KEHOE:  Objection, relevance.
22      A.  Not at all.  I just don't know what they
23 looked at.
24      MR. THOMPSON:  Mr. McGorty, I don't have
25 any more questions for you.  Thank you very much.

234

1       You are going to read and sign?
2       THE WITNESS:  Yes.
3       (At 5:15 P.M., the deposition proceedings
4 concluded.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

235

1
2
3
4
5
6       I, GLEN MCGORTY, do hereby declare
7 under penalty of perjury that I have read the
8 foregoing transcript of my deposition; that I have
9 made the such corrections as noted herein, in ink,
10 initialed by me, or attached hereto; that my
11 testimony as contained herein, as corrected, is true
12 and correct.
13
14 _____ I have made changes to my deposition.
15 _____ I have NOT made any changes to my deposition.
16
17      EXECUTED this _____ day of _____,
18 _____, at _____, _____.
        (City)             (State)
19
20      _____
        GLEN MCGORTY
21
22
23
24
25

236

```
 1            ERRATA SHEET
 2   Deposition of:  GLEN MCGORTY
     Date taken:  October 30, 2018
 3   Case: SEC vs. Ali Rashid, et al.
     PAGE LINE
 4   ____ ____ CHANGE: _____
               REASON: _____
 5
               CHANGE: _____
 6   ____ ____ REASON: _____
 7   ____ ____ CHANGE: _____
               REASON: _____
 8
               CHANGE: _____
 9   ____ ____ REASON: _____
10   ____ ____ CHANGE: _____
               REASON: _____
11
               CHANGE: _____
12   ____ ____ REASON: _____
13   ____ ____ CHANGE: _____
               REASON: _____
14
               CHANGE: _____
15   ____ ____ REASON: _____
16   ____ ____ CHANGE: _____
               REASON: _____
17
               CHANGE: _____
18   ____ ____ REASON: _____
19   ____ ____ CHANGE: _____
               REASON: _____
20
               CHANGE: _____
21   ____ ____ REASON: _____
22   ____ ____ CHANGE: _____
               REASON: _____
23
24
     Signed _____
25   Dated  _____
```

237

```
 1   STATE OF NEW YORK    )
 2                        ) SS
 3   COUNTY OF SUFFOLK    )
 4
 5         I, hereby certify that the witness in the
 6   foregoing deposition GLEN MCGORTY, ESQ., was by me
 7   duly sworn to testify to the truth, the whole truth
 8   and nothing but the truth, in the within-entitled
 9   cause; that said deposition was taken at the time
10   and place herein named; and that the deposition is a
11   true record of the witness's testimony as reported
12   by me, a duly certified shorthand reporter and a
13   disinterested person, and was thereafter transcribed
14   into typewriting by computer.
15         I further certify that I am not interested
16   in the outcome of the said action, nor connected
17   with nor related to any of the parties in said
18   action, nor to their respective counsel.
19         IN WITNESS WHEREOF, I have hereunto set my
20   hand this 2nd day of November, 2018.
21   Reading and Signing was:
22   xx requested __ waived __ not requested
23   _____
         MONIQUE CABRERA
24
25
```

238

**A**

**a.m** 1:14 7:2 32:20 132:13
151:20
**A108719** 6:7
**A109-3940** 5:20
**A109059-109062** 5:15
**A109063-69** 5:11
**A109070-71** 5:16
**A109332-34** 5:18
**A109342-47** 5:22
**A109355-57** 5:23
**A109358-63** 5:24
**A109364-71** 5:25
**A109379-80** 6:5
**A109385-86** 6:6
**A1298-1317** 6:13
**A3989-91** 5:21
**A3994-96** 5:19
**A41654-673** 6:9
**A42345-46** 6:11
**A42426-27** 6:3
**A43560-61** 6:16
**A43573-80** 6:4
**A43628-30** 5:6
**abbreviation** 98:23 101:25
**abiding** 154:6
**ability** 64:15 145:12
**able** 151:24 152:1 185:10
**absence** 16:9
**absent** 183:19 223:7
**absolutely** 69:13 82:12
112:4 130:14 227:9
**accept** 81:17 139:20 157:13
**accepted** 185:21
**access** 33:14,17,19 46:10
183:17
**accessed** 177:14
**account** 54:6 59:22 89:4
194:12 196:20 209:16
**accounting** 97:18,21 98:17
99:2 100:17 101:5,17
102:8 175:14 184:14,22
216:20
**accounts** 88:20
**accuracy** 76:17 100:10
**accurate** 75:22 109:8
147:24 152:1 212:1 217:5
229:13,15 230:25 234:20
**accurately** 64:14 84:23 95:4
100:17
**acquainted** 11:25
**acquiescence** 71:10
**act** 188:2
**acted** 72:20
**acting** 9:23 73:4
**action** 139:6,12 142:25

143:18 144:8,21 206:7
224:11 238:16,18
**actions** 166:4
**actual** 35:18 51:14 114:21
125:4 144:17 189:12
205:24 212:14 214:8,11
225:8,9 231:12
**add** 14:13 45:24 102:10
126:18 127:22 143:6 150:6
**added** 149:8,24 175:23
**addition** 110:11 171:13
194:11
**additional** 86:18 106:21
107:4 118:18 146:25 156:4
173:24 185:22
**additions** 186:25
**address** 67:11 77:25 120:25
226:7
**addressed** 57:4 163:4
164:15,17 193:8 196:23
**addressing** 65:20 196:22
226:2
**adds** 126:16
**adequate** 78:3 212:21
**adequately** 77:25
**adhere** 78:16
**administered** 69:18,24
70:24
**admonition** 132:9 133:7
**adversarial** 20:4
**adverse** 89:25 165:18
189:15 205:22
**adversity** 165:20,22,25
166:6,22,24 167:1,6,13,18
167:19,24 168:12 189:19
**advice** 73:22 213:14
**advise** 22:2
**advised** 55:1 88:19
**advising** 91:4
**affidavit** 90:13
**affirmatively** 13:14 46:5,25
**affix** 191:2
**affords** 223:3
**afternoon** 149:20 210:23
**afternoons's** 57:21
**ago** 13:5 158:23 175:12
203:6 217:8
**agree** 48:10 72:3 82:10
113:22 147:24 228:19
232:19
**agreed** 22:17 50:24 53:4
146:12 196:9
**agreement** 15:22 16:9 21:20
23:18 33:6 39:15 67:6,7
73:11 82:13,14,17,21 83:1
83:4,7,15,21,23 84:4,7,10

84:11,13,15,18,20 85:9,12
85:17,19,21 86:3,19 94:25
95:21 107:23 108:3 109:2
109:6,13,17,18 114:19
126:18 157:12 159:8
188:23 190:9,14 193:14,17
193:22 195:24 211:24
221:1 222:7
**agreements** 86:13
**ahead** 121:6 144:6 170:8
**aid** 196:21
**Airline** 180:23
**al** 237:3
**Ali** 1:6 2:14 10:21 22:10
30:19 32:20 33:10 97:11
107:24 131:11 150:1
157:15,18 161:3,7 182:12
187:7 189:3 199:9 213:15
229:3 237:3
**Ali's** 157:18 233:6
**allegations** 139:5 224:22
**alleged** 54:2 166:8
**allocate** 98:12 178:1 181:20
**allocated** 45:4 46:7 155:4
**allocation** 181:13
**allocution** 223:7
**allow** 49:11 123:19 126:24
**allowed** 189:16
**amendment** 22:18 81:18
**American** 5:16 107:9 177:15
180:23
**Amex** 78:2 102:2 107:15
183:12 199:16
**amicable** 189:21
**amount** 78:22 174:15,15
175:19 179:17 182:11
183:5 194:15,19 219:10
229:5 230:13
**amounts** 227:22 228:5,12
**AMX** 101:22 102:2
**analysis** 207:20
**and-a-half** 106:9
**and/or** 108:11 180:7
**Andrew** 201:3 202:1,1,4
**announce** 53:4
**answer** 4:11 7:15 11:8,22
13:13 14:12,17,19 28:12
28:13,17,18,24 29:13 30:5
31:1,2 33:21 35:25 37:1,3
37:3,7 38:20 42:6 45:16
46:3 49:6,22 51:22 53:1
54:18 58:11 59:10,17 60:2
60:4,6,20 62:15 66:11,12
66:22 68:2,13,22 70:12
74:3 76:3,5,15 81:14,20,23
82:3,18 85:2 91:21 94:19

95:24 96:14 98:4,5 102:20
104:4 112:19,24 113:15,20
113:25 114:24 115:1,8,13
115:21 117:4 119:1,9,25
120:24 121:11,15,20,23
122:4,8,15,21,22 123:3,5
123:12,20 124:8,18,20
126:24 128:9,17,18 130:4
130:8,15 131:19 132:3,4
132:10 133:2,3 134:10,20
135:10,17 137:20 141:7
142:21,21 143:7 150:5,7,9
150:15,17,18 152:4,5,8,11
152:18 153:6 155:20 158:6
160:8,14 161:17,18 162:3
162:13,15 165:9 166:19
167:23 173:10 174:20,22
176:16 179:11 196:5 200:7
200:10,15 201:17 204:6,10
204:22 205:2,5,14,15,20
206:1 229:19 231:14
**answered** 96:11 109:14
128:13,16 141:7
**answering** 12:25 53:2
120:14 175:25
**answers** 37:5 59:11 76:7
104:21 153:20 154:17,19
155:7,8 171:14 195:19
**anticipation** 141:18
**anybody** 7:9 43:6 71:7
**anymore** 58:23 210:15
**anyway** 59:16 103:13 104:5
**Apollo** 5:8 6:13 15:19 16:3
23:4,7,12,19,22 27:8 36:23
37:22 38:3 40:13,22 41:1
45:13,13 46:7 49:10,25
50:9 51:17 52:1,6 54:5,25
55:4 56:7,23 57:11 59:4,21
60:17 61:14 62:5 64:22,25
65:1,3,5,8,23 67:22 72:19
72:24 74:9 78:1 79:21 80:2
81:1 83:9,17 88:19 89:4,17
89:25 93:8,24 95:2 96:23
107:3,8 108:11,20 110:9
110:21 117:23 121:13
125:21 131:5 133:17
137:18 138:8,13,25 139:7
139:9,10 141:2,13 142:9
143:4 144:8,12,13,18
145:2,9 146:18 147:14,17
149:2 151:11 153:13
154:13 155:5 156:10
157:17,17 158:3,8 159:1,7
159:25 163:13 165:18
166:1,7,8,22 167:6,14,20
168:3,7,7,11 169:2 171:1

175:15 178:6,11,14 180:17
184:7,16 185:3,25 186:15
187:5,15 188:10,11 189:4
189:6,10,14 193:7 194:9
195:21 196:21 197:3,11,14
198:4,6,18 201:2,7 203:14
204:1,15 211:15 212:2
215:3,16,21 216:1,22
217:21 218:8,13,18 219:4
219:11,17 223:24 225:14
225:18,23 226:2 227:4,18
**Apollo's** 45:5 46:17 47:3,15
47:23 48:2 49:14 53:21
65:20,23 67:6,7 69:11
72:19 78:6,10 80:3 85:23
93:21 97:18,21 98:17
100:17 142:3 144:22
161:12 167:4 168:13 183:8
184:2 187:14 215:17
226:19 234:9
**Apollo/Global** 226:10
**apologies** 134:4 228:2
**apologize** 87:4 101:19
140:15 145:18,20 168:18
**apparently** 80:4 93:25 202:3
228:24
**appear** 80:5,10 107:8
133:18 135:5 147:23 186:8
**APPEARANCES** 2:1 3:1
**appeared** 146:4 199:16
**appearing** 154:14
**appears** 27:14 32:18 33:24
57:8 74:8,14 79:21 80:2
81:2 83:14,17,21 97:11,16
100:21 101:21 110:12
134:23 146:19 147:15,17
149:15 151:12 152:12
153:14 156:10 169:2
180:25 187:5 193:7 198:5
**applicability** 114:10
**applicable** 69:11 93:20
194:15
**applied** 45:20 46:17 130:1
223:4
**applies** 70:16 78:18 171:25
**apply** 60:24 70:23 79:7
164:24
**applying** 60:23 79:6
**appreciate** 74:18 114:7
129:13 142:11 207:18
223:21
**apprised** 196:1
**approach** 227:21 228:4,11
228:25
**approaching** 91:13 92:8
96:20

**appropriate** 7:14,24 111:5
**approved** 33:11
**approximately** 10:25 35:18
107:4
**April** 111:23,24
**AR37** 32:18
**AR37-38** 5:7
**area** 11:7 18:10 190:22
**arguably** 201:21
**argue** 191:25
**argued** 216:3
**argument** 129:11
**argumentative** 157:4
**arose** 142:1,23
**arrangement** 23:22 160:1
169:9
**arrow** 199:10
**aside** 15:19 16:1,2 19:23
45:10 58:22 86:23 96:21
99:25 103:15 123:10
147:11
**asked** 7:25 12:17 19:12
30:21 66:20 73:10 93:2,5,6
93:16 94:14 96:10 104:22
105:19 111:11 124:3
127:19 128:13,16,24
134:13,18,19 135:15 141:6
143:14 145:18,19 148:12
196:4,6,15 199:23,24
202:24 206:5 213:7 216:18
223:22 230:22
**asking** 8:17 9:1,1 16:13
30:17 39:18 55:17 60:25
62:16 64:9 66:17 77:10,13
78:9 80:23 92:17,18 93:20
95:14,19 99:10,11 102:25
107:14 117:6,7,25 119:2,7
120:20 123:25 124:3,4
128:22 129:11 131:1 144:4
146:3,4 160:16,21 172:17
202:1 230:19,21
**asks** 131:21
**aspect** 181:6
**assert** 7:21 37:25 60:17
137:19 138:9 139:1 141:13
144:19 145:2,10 166:11
**asserted** 38:6 104:16 143:4
143:8,24 159:1 217:14
**asserting** 59:5,21 139:11
**assertion** 38:8,11,12 71:10
**assertions** 127:16
**assessment** 229:14
**assist** 40:7,22 65:1,5 93:24
106:21 110:8 168:11
184:15 216:22 225:18
**assistance** 118:18

**assistant** 75:21 99:14
**assisted** 76:20
**assisting** 40:21 44:14,22
45:11 105:6 184:18,18
**associate** 25:10 159:16
**associated** 179:20 182:8
227:14
**assume** 20:10 58:18 102:3
104:15 109:3 152:17,20
156:22 159:21 161:8 180:9
197:24 223:4
**assumed** 198:17
**Assumes** 215:22
**assuming** 101:16 173:7
198:24,25
**assumption** 41:14,18
**attach** 97:11
**attached** 6:7,8,10,12,15,17
24:6 57:11,22,23 61:2
96:24 107:11,23 118:15
119:14 130:22 135:16
149:1 151:21 152:15 174:7
174:8 186:3 236:10
**attaches** 83:14 107:3 117:23
133:17 146:18 147:6,17
151:11 171:4
**attachment** 20:20 80:17,18
80:19,21,24 97:13,15
109:9 147:14 171:2 173:18
186:1,7
**attachments** 109:25 171:19
**attempt** 182:22 212:3
224:15 225:13
**attempting** 45:1 184:19
213:2 222:10 225:22
**attended** 79:2
**attendees** 232:17
**attending** 188:7,8
**attention** 19:11 65:23,25
71:15 74:12,15,21 75:17
90:15,22 91:2 193:21
199:8
**attorney** 125:5,10 126:11
127:13 145:22 160:9
163:22
**attorney-client** 11:7 32:8
38:21,24 39:1,3 48:8 51:3
54:20 55:15 74:1 89:9,12
99:18 117:5 204:14 205:19
205:22 207:17 214:13
231:16
**attorneys** 38:16 62:11 116:9
116:11,19 159:20
**attribute** 178:13
**audit** 105:6
**auditor** 90:3

**auditors** 106:16
**August** 7:12,18 24:13 37:23
60:4,14 70:25 76:4,9,22
79:17 82:17,24,25 89:10
98:8 106:2 109:13 128:8
130:16 136:11,19 137:9,16
140:2,5 146:8 151:20
153:15 154:15 156:11,20
157:23 164:21 165:5
166:12 169:3 171:6,20
172:2,14,15 175:1 185:18
186:2,9 196:5 200:6,9,13
223:16
**author** 99:8
**authored** 99:14
**avail** 222:5
**availability** 147:22
**available** 28:2 47:2 107:13
110:18 131:14 151:17
171:3 183:9
**Avenue** 2:18 3:6,11
**avoid** 53:15
**awards** 193:23,24
**aware** 12:6 21:12,19 23:21
29:16 37:17 50:8,12,22
52:16 65:17 72:16,17 84:7
84:14 87:19,25 91:8
148:20 173:16,19 186:23
202:21,25 206:11 207:11
215:19,24 231:11

---

**B**

**B** 57:10 220:6
**back** 13:18,19 25:11 27:14
33:8,23 34:25 64:16 67:20
72:18 73:5 86:8,19 103:17
107:16 110:22 111:6
117:17 122:6,16 123:23
124:12 141:19 148:2 153:1
161:1,19 162:16 170:4,11
174:4 175:3 180:12 181:12
182:25 188:15 202:8
208:23,24 209:13,25
210:19 212:2 213:2 214:14
219:17,24 220:9 225:8
229:11 230:2
**background** 57:25
**backwards** 147:19
**bad** 73:4 184:24
**baring** 215:5
**Barzedeh** 83:19 97:3 107:18
108:13 146:22 147:21
148:4 151:20 153:15
154:15 156:12 157:9
161:19 164:23 169:4,7
171:7 186:2 197:16

Barzedeh' 164:8
Barzedeh's 147:6 159:4
161:2 162:8,17 163:11
165:17 166:14 169:12,17
171:19
Barzideh 57:10 79:23
base 88:16 216:16
based 35:11,14 37:9 40:19
41:6,11,17,20,22 42:2 46:8
46:24 47:1 62:19 77:1
92:20 94:1 95:8 97:21
100:3,25 101:24 102:15
103:5,10 150:5,18 151:23
152:5 156:22 160:15
163:21 171:22 174:22
177:12 180:13 182:5
185:12 187:16 194:24
202:17,20,22 203:4 212:10
223:2 224:18 231:16
bases 126:8
basically 46:11 49:4 140:19
166:13 190:3
basing 64:9,10 96:13
basis 22:14 39:25 63:20
125:23 128:17 143:12
157:14 204:11,21 217:7
223:2
Bates 24:11 25:11 27:8,10
27:12 32:18 35:1 57:11
74:7 79:20 83:16 87:11
96:22,24 97:8 107:3,6,12
110:19 117:22 131:5
133:16 146:18 147:13,16
149:2 151:10 153:13
154:12 156:10 169:1 171:1
171:2 185:25 187:4 190:8
193:6 197:14 198:4 199:9
201:1 216:11
BDO 105:3,5,10,14 116:13
116:15 149:8,24 176:13
184:17,22,23 185:17
216:20 227:4
BDO's 105:16 232:8 234:16
234:19
bearing 131:5 190:8
bears 79:20 133:16 153:13
154:12 193:6 198:4
becoming 51:10
began 23:17 139:21 213:15
beginning 12:19 39:23
42:12 62:2,18 88:16 107:8
143:15 165:24 215:19
216:1 218:22
begins 76:16 88:11 98:14
behalf 39:21 60:24 67:7
69:12 72:19 80:3 94:5

144:10 175:24 176:9 177:4
197:10 201:15 206:12
222:24 224:14 227:8
belief 39:25 42:1,9 62:23
73:3 91:23 92:3,11,23
97:20 124:1,1 142:8,23
211:14 220:24 221:17
222:21 234:15
believe 8:25 10:5 13:12,23
15:16 16:8 17:3,22 19:3,18
19:22 21:10 23:9,25 25:5
25:19 26:7,17,20 31:12
33:19 35:11 39:15,19,22
41:17 42:11 43:1 44:20
51:5,12 52:11 53:10 63:10
63:12,21 64:16,19,23 65:7
65:18,19 66:23 69:22 70:7
80:20 83:2 84:2,6 87:18
89:14 91:15,25 92:10,15
95:3,25 97:14,17 109:21
110:23,25 116:7 118:21
122:18 123:6,18 124:14
125:1,15 126:8,9 128:20
130:7,9 133:23 135:23
139:8 143:14,17,19,20
144:2,7,10,16 145:4 149:2
150:11 154:22 158:8
159:21,23 161:6 163:12
164:18 165:3 166:19 173:8
175:21 176:2 178:14 188:1
189:11 192:17 193:18
195:9 196:11,11 200:12,24
201:21 202:18 203:5,11,18
203:18 206:1 207:16
218:17 221:20 223:3
227:21 228:4
believed 15:20 62:5,18,20
63:17,18 64:4,23 89:24
92:4 93:7 127:18 144:22
172:9
believes 119:3
bell 181:25
belongs 69:5 157:16 182:7
benefit 111:17
benefits 88:16 216:16
Bernstein 32:20
Bernstein's 33:8
best 11:2,4 19:19 28:20
40:15,20 47:10 53:20,25
54:4 59:13 62:21 64:14
84:23 145:12 177:9 180:21
181:7 184:12 185:1,7,11
188:19 194:22 198:10
224:5,6 226:15 233:12
better 36:13 65:19 151:16
196:25

beyond 10:13 11:12 70:6
106:5 140:6 151:2 191:16
222:7 223:4
big 158:2
bill 205:7 209:1,3,5 213:14
213:21
billed 25:12 54:24 56:9
101:11 106:8 179:6 208:7
208:12 233:4,21 234:1
billing 22:5,17 24:1,10,25
148:3 213:19
bills 24:6 107:15 177:16
183:12 204:2,8,16,17,23
205:4
binary 101:22
binder 27:6 32:16 57:6 74:5
79:19 86:24 103:16 107:1
117:20 131:4 146:16 151:5
168:25
binders 8:15 20:15,16
151:18
bio 17:21,22
bit 44:3 75:16 103:16 207:25
221:18 234:11
blank 29:10
blanket 7:22 8:4,4
blanks 184:19
blocked 108:7,8,9,13,17
body 206:19 207:2
bore 99:5 179:7
borne 178:11
bottom 18:12 20:22 81:2
125:8 126:6 147:1
BOUND 6:21
break 66:13 67:15 170:9,12
210:2,8 229:24
brief 230:8
briefing 32:10
briefly 74:21 210:9
bring 65:24
bringing 206:7,13
brother 208:19
brought 40:6 65:23 189:9
218:23
bucket 46:15 47:9 79:9,11
156:1 180:4 181:11,23
182:2,18 183:21
built 222:15
bullet 18:15,22 77:23 227:10
burden 38:9
business 45:3,3,6,9,14,21
46:5,6,12,14,18 47:8,12,14
49:14 50:25 54:24 77:19
86:14 101:11,13 121:21
154:22 155:3,4,15,25
176:4 177:11,20,22 178:1

178:2,3,7,9,14,17 179:6,15
180:1,2,8 181:1,6,7,9,14
181:18,24,24 182:3,4,6,14
182:15,17,21 183:19,23
184:1 186:19 195:1,4
208:8,13 211:2,11,12,18
212:11 225:12 227:23
228:6 229:2 231:21,25
232:1,3,5,9,18,19,20 233:1
233:5,11,12,14,19,21
234:1,2,5,9,10,13,14
business-related 83:9

C

cab 122:1 180:7
CABRERA 1:24 238:23
calculated 181:16 195:15
calculates 228:22
calculation 219:10
calendar 44:25 46:8 131:12
151:24 152:2 154:24 155:1
177:12,15 183:12 232:25
calendars 131:14 152:6
call 11:14 25:13 28:4,6,9,10
28:19,22 29:1,5,7,8,9,11
29:15,18,22 61:22 147:22
147:23 166:25 168:4,12,22
173:4,14 185:9 192:19
207:16,20 209:7 213:22,25
214:4
called 76:23 162:7 173:6
182:19
calls 11:6,21 14:9,15 41:15
49:2 62:13 67:25 72:4 73:7
73:12 89:7 140:17 148:4,7
148:18,22 207:17 212:17
220:22 221:15 229:16
candidly 41:12 50:8 73:17
180:3
candor 222:9 223:13
card 102:2 107:9 110:7
career 220:1 223:6
carried 69:16 223:9
carrier 206:16
carryover 194:10
carved 181:7
case 1:4 8:22 9:24 10:15,18
12:4,7,18,18,23 13:9 19:21
24:6 25:10 28:17 31:20,21
34:18 40:7 57:11,14,16,17
57:22,23,25 58:1,15,20
63:15 70:6,17 82:25 86:13
87:21 93:16,23 105:23
111:21 119:17 136:6
142:10 159:16 182:7,21
188:15 191:16,17 195:11

202:10 203:23 216:2
220:13 221:20,21 225:22
237:3
**cases** 16:19 191:25 220:3
**catch** 134:2
**categories** 225:11
**categorization** 155:12
**categorize** 173:15 176:15
184:13
**categorized** 173:1 178:3
185:10
**category** 99:9 176:3 180:15
211:13,14 233:11,12,19
234:14
**cause** 238:9
**caused** 233:6
**caution** 59:6
**caveat** 160:15
**caveats** 76:15 89:13
**CC's** 132:23
**certain** 9:3 13:24 14:23
15:16 26:12 36:12,17
48:24 50:24 51:6 53:18
55:6 78:22 92:1 102:15
127:8 136:7 139:3 143:10
164:12 172:15 193:12
196:3,4 199:15 216:23
**certainly** 19:10 39:23 64:4
92:3,21 96:19 110:5 136:6
141:18 155:1 168:9 188:6
205:21
**certified** 238:12
**certify** 76:17 77:9 238:5,15
**chain** 109:10 170:4
**challenge** 38:8
**challenges** 181:4
**chance** 84:21 97:12 104:2
**change** 21:24 23:23 157:25
166:14,16,17 237:4,5,7,8
237:10,11,13,14,16,17,19
237:20,22
**changed** 157:23 165:21
189:23,25
**changes** 135:6,9 152:13,17
156:4 178:24 186:25
236:14,15
**changing** 158:1
**characterization** 22:16
147:25
**characterized** 229:6
**charged** 227:23 228:6,13
**charges** 199:15,17 227:12
**chart** 131:22 132:6,13,17,25
**check** 19:25 20:7,12 122:12
178:5 179:16 181:12,20
195:12

**choice** 101:22 115:15
**choose** 37:25 157:17
**chooses** 38:8 157:20
**chose** 169:18
**chronologically** 133:24
135:7 173:3
**chronology** 185:8
**Circuit** 57:22
**circular** 64:8
**circumstances** 16:8 36:6
67:4 208:22 218:21
**City** 236:18
**civil** 123:8 124:16 141:1
**claim** 59:5,21 60:18 159:1
205:11,23 206:14,17,21
207:6,9 225:13 226:4
**claimed** 199:24
**claims** 37:24 40:24 56:3
61:1 93:8 137:18,23,24
138:8,11,12,17,20,25
141:14 142:3,5,5,23 143:4
143:8,11,23 144:18 145:1
145:9,9 207:4 223:24
225:1
**clarification** 89:2 115:23
128:15 130:10 171:15
211:1
**clarify** 12:16 15:10 78:9
94:14 100:13 126:23
219:24 221:5
**classification** 121:9,17,22
121:25 122:2,12 175:22
180:25 183:10
**classifications** 152:14
186:4
**classified** 182:21 232:9
233:24
**clear** 11:3 13:1 31:16 40:10
47:6 48:1 72:12 112:4,23
113:20 120:2,17 130:14
137:4 141:25 175:2 179:3
229:8
**clearer** 168:17
**clearly** 46:12 68:15 139:9
167:3 178:7 181:18 182:6
192:11 194:23,25 211:11
211:18 212:11 229:1
**client** 11:21 16:14 19:3
25:21 51:22 53:3 68:1,3
99:19 112:8 118:18 144:24
157:13 158:4,15,19,20
160:2 187:17 195:8 209:7
209:19 211:9 214:5 215:7
218:12 222:1,5,6,11,19
224:16
**client's** 163:22 211:14

**clients** 16:14,16 20:4
**close** 106:9
**clothing** 199:21
**CMAR** 24:11 25:11 27:13
35:1 103:20 209:2,15
**co-counsel** 188:2,13 229:25
**code** 33:6
**coffee** 183:24,25
**cogitate** 169:16
**colleague** 183:25
**colleagues** 169:18
**collected** 33:18
**collectively** 211:9
**colloquy** 68:20 121:3
**column** 99:24 100:20 101:4
101:17,20 119:19 121:9,12
121:17,22 122:2,12 149:8
149:24 153:3 175:23,23
176:3,16 178:25 180:25
**columns** 98:16 119:16,18
134:8 175:11,20
**combination** 140:22 154:11
**combined** 35:15
**come** 19:6 81:16 100:15
102:23 131:11 156:23
157:1 176:14 203:19
**coming** 14:7 81:6,11 102:7
151:16 212:13
**comment** 114:7 198:22
199:5 228:8
**comments** 102:5
**Commission** 1:4,16 2:3,4
**committee** 187:14
**common** 16:8 36:23 37:21
37:24 38:4 40:12,18,19
41:21 42:1 62:4,20 63:10
63:19,25 64:3,5,7,19,21,24
65:9 66:18,24 67:2 68:12
69:21 71:19 83:12 94:24
95:17 96:6 113:13 114:6
118:15 119:7 120:5,8,10
122:17 123:11,18 136:12
136:13,15 157:1 160:12
163:12,24 165:22 201:7
218:17 223:14,17
**common-** 15:20 42:9 63:3
71:2 73:22 130:5 201:21
**common-interest** 7:6,22
16:20,24 30:4,9,24 31:6,18
31:22 35:24 37:2 39:19
58:8 59:8,14 61:12,21
62:12 63:21 66:7,16 67:7
71:10 72:3,9 73:11 81:13
83:3 84:16 85:16,19 86:17
89:11 95:21 96:1 103:12
115:5 118:25 119:24

**clients** 120:19,22 122:25 125:3
126:13 128:1 130:23
131:17 148:13 149:10
150:16 152:3 154:4 164:6
164:18 165:8 170:1 171:25
191:8 201:5 221:19 222:7
222:16
**communicate** 20:3
**communicated** 10:21 47:11
49:2,7 176:1 177:10,25
187:19
**communicating** 40:18 222:2
**communication** 31:8 38:5
39:2 51:3 52:17 63:18
76:24 125:3 126:1,7
187:16 190:24 191:15
192:25 201:21,22 203:2
205:1 206:11 215:12
220:19,20 221:1,25 222:20
**communications** 12:3,21
17:11,12,13,17 31:18 38:3
39:3,20 42:11 48:8 52:14
54:21 59:12 62:19 63:9
64:20 68:4 69:11,16 72:10
73:24 80:11 91:9,10,17
93:3,10,18 94:4,19 95:17
100:4 106:19,22 118:25
120:18 130:1 136:21,25
137:6,11 141:23 142:14
144:24 158:20 164:24
172:1,10,16 192:4,5,13,18
193:3 204:22 207:12 220:8
221:12 222:1 231:17
**companies** 199:15
**company** 69:5 105:6 116:21
157:19
**company's** 69:6
**compensated** 13:8
**compensation** 13:16
**competence** 234:17
**complaint** 10:14
**complete** 96:9 111:11
**completed** 38:11
**completely** 212:1
**completeness** 183:8
**compliance** 50:20 198:12
199:13
**component** 181:10
**compound** 128:25
**computer** 238:14
**concedes** 37:21
**conceivable** 176:11
**concern** 19:3,8 50:9 51:19
52:4 137:21 142:9 143:18
144:4,17 166:7 168:3
182:12 183:7,11 196:18

208:18,20,21 211:15
215:17 224:14,17,21,25
226:3 229:3
**concerned** 27:5 144:2 196:7
208:17,19
**concerning** 39:7 71:1
187:14 192:14
**concerns** 40:24 49:10 53:21
64:24 65:2,3 93:25 125:21
125:22 138:19 144:8,10,20
165:25 166:2,9,20 167:4,7
167:12 168:7,16 195:13
196:22 225:4,5,6,18
**concluded** 235:4
**conclusion** 96:6 202:18,19
212:17 220:23 221:16
229:17,18
**conduct** 49:15,20 51:18
52:2,8 53:17 54:3,7,15
55:10 56:13 138:19,23
139:5,13 143:12 144:22
166:8 168:4 224:9,24
**conducted** 39:9 157:15
160:10 161:3,7 216:19
**conducting** 49:24 50:4,15
78:15 234:17
**conduit** 214:19 215:2
**conference** 25:13 153:22
154:1 214:4
**confidential** 7:16 86:16
125:6,11 126:14,16 127:14
145:23 190:24 191:7
221:12
**confidentiality** 39:12,14
82:9,13,14,17,20 83:1,4,6
84:4 85:1,12 86:3,4,12
107:23 108:2 109:1,5,13
112:6 113:8 126:17
**confidentially** 109:16
**confirmation** 64:18
**confirms** 63:16 64:16
**conflict** 20:5
**conflicts** 19:25 20:2,7
**confused** 77:13 123:15
**confusing** 168:19
**confusion** 138:10
**conglomerate** 18:23
**connected** 238:16
**connection** 40:6 65:6 70:3
78:7 82:23 86:5 87:20
110:7 128:5 131:15 188:22
203:12 205:12 215:15
**connote** 100:23
**consent** 157:18
**consider** 71:5 90:21
**considerable** 227:11,15

**considered** 157:15
**considering** 205:10,22
206:13
**consistent** 30:13 76:19 77:2
78:5 89:6 228:15,23
**consists** 24:4 171:1
**constitute** 55:10
**consulted** 88:2,4
**consulting** 48:1
**consuming** 153:24
**contact** 27:19 162:1 223:10
**contained** 97:23 236:11
**contains** 77:24
**contemplated** 173:25
**contemporaneous** 52:12
72:7 233:20
**content** 160:16,21
**context** 72:23 120:9 142:6
175:25 177:17 191:4 194:5
201:20
**contextual** 172:24
**Contextually** 154:10
**continuation** 187:15
**continue** 129:16 192:13
**continued** 3:1 72:1 156:7
164:6,18 192:20
**continues** 199:22 200:2
**continuing** 170:4
**contrary** 89:24 217:11
**controlling** 198:8
**conversation** 11:12 25:24
25:25 26:4 30:17 40:2,15
41:7,7,20 42:3,8 50:13
51:22 52:3 54:4 55:14
56:10,19 60:8,10 68:1 98:6
104:8,10 105:1 126:1
130:12 136:17 139:4,16
140:8,10,17,24 141:1,4,10
141:21 142:1,7,13,24
144:11 159:3 162:10 197:7
200:12,12 206:6 222:23
225:2,3
**conversations** 8:16,18
11:21 14:10 26:12,15,18
26:22,23,25 27:2 41:24
42:2,5 44:8,11 48:15 49:21
51:20 53:12 54:17,19 55:7
55:14,18,24 59:25 60:3
61:5 68:12 76:10 89:8,10
98:8 99:17 113:2 128:8
130:9,16 136:14,23 137:23
138:6 139:10,23 140:5,20
140:24,25 155:19 159:20
162:20,25 163:6,9 172:13
179:12,18 180:13,16
192:21 200:8 224:7,7,19

**conveyed** 211:8,10
**cooperate** 48:10 49:9
216:18 218:4
**cooperated** 227:4
**cooperating** 218:8,8
**cooperation** 39:8 49:19
85:23 90:2 226:19
**cooperative** 48:19 195:15
197:5
**copied** 131:8 132:15,18,24
149:18 197:16
**copies** 107:9 151:16 156:13
170:12 171:7
**copy** 20:25 81:8,24 131:21
146:25 153:16 190:13
**copying** 151:13
**core** 224:24
**corner** 79:25
**corporate** 107:9
**correct** 12:14 15:14 17:8
27:20,21 55:22 65:12 69:6
72:14 101:15 109:22,23
110:24 111:24 122:18,22
127:11,14 128:6 134:1
135:11 136:1 137:2,8
144:1 148:1,11 150:10
153:7 155:17 158:10
160:25 166:23 169:9,13,18
171:21 174:12 176:6 186:9
186:17 195:22 203:14
217:23 218:10 219:21,22
220:7 236:12
**corrected** 109:16 236:11
**corrections** 190:19 236:9
**correctly** 19:15 62:25 70:7
171:16 176:25
**correspond-E1376** 87:11
**correspondence** 209:19
**cost** 77:22
**costs** 78:17
**counsel** 2:1 3:1 5:4 9:18,20
9:23 16:21 20:17 28:15
32:7 36:5 38:3 69:16 89:16
90:3 99:17 104:12 130:8
130:11,19 150:2 151:17
188:10,10,11 189:10 191:3
191:14 192:22 205:10,24
206:6 207:7,9 210:21
211:21 213:6,7 214:25
216:3 221:5 223:22 226:8
229:12 238:18
**counsel's** 60:3
**counted** 232:5
**counter** 232:17
**COUNTY** 238:3
**couple** 9:21 41:3 57:15 58:3

83:22 170:13 174:9
**course** 7:14 26:10 32:6
43:14,17 44:12 46:18 48:2
53:9 61:25 62:6 74:4 95:9
102:21 191:12 217:16
226:13 234:6
**court** 1:1 10:17 38:10,12
228:2
**cover** 125:15 179:17 192:7
**covered** 30:4 55:15 76:13
77:14 89:8 102:1 119:8
126:7 131:17 136:13
150:22 172:9 205:13,17
**create** 199:25
**created** 43:21 176:17
228:23
**credit-** 110:6
**credit-card** 44:24 46:9
110:11 177:15
**criminal** 54:10
**criteria** 45:19 46:11 47:14
78:20 79:7,8,11 232:21
234:6
**cross** 230:6
**Crowell** 3:3 7:8 12:14,15
13:2,6,8,20 14:20 15:6
19:24 20:7 21:8,13 22:2
23:19 30:18 39:22 40:5
42:13 43:6 50:23 52:19
61:14,22 69:22 71:1,6
73:21 82:21 84:5,25 87:19
91:5,9 94:25 95:21 97:17
102:14,23 103:2 116:23
117:2 121:7 127:12 133:8
133:9 144:13 146:23
148:17 155:16 156:3
160:17 161:12 162:7,10
164:24 184:21 188:2,8
192:12,24 193:16 200:17
206:16 213:9 215:1
**Crowell's** 13:18 21:24 23:5
23:8,23 24:4 60:13 62:25
71:2 72:8
**curious** 59:2
**current** 17:22
**custom** 26:14
**cut** 115:12 129:7 149:15,19
149:21 150:2,7 151:14
170:14,17,21
**CV** 5:4

---

**D**

**D** 57:10
**Dan** 22:19,23 57:20 87:12
91:5 107:22 131:7 202:8
213:23

**Daniel** 2:17 9:19 14:2
**DANIELLE** 3:5
**dashed** 190:2
**date** 18:7 21:16 34:21 37:9
    39:23 78:23 89:21 100:6
    103:24 140:18 148:18
    156:7 163:23 174:14
    175:17 192:20 197:20
    201:20,20 203:21,25 237:2
**dated** 5:12 27:16 57:9 79:23
    87:12 97:10 146:23 169:3
    169:11 171:6 174:21 186:2
    187:7,19 190:10 197:15
    198:7 216:12 237:25
**dates** 103:11 111:1,2 150:25
    171:22 186:8
**day** 22:22,22 110:5 133:11
    141:19 142:2,10 154:5
    168:5 189:5 194:3 195:18
    196:17 197:1 203:25,25
    224:20 233:2 236:17
    238:20
**day-to-day** 22:14
**days** 120:16
**DC** 2:9 3:7 57:22
**deal** 68:20 114:25 184:3
**dealing** 7:8 61:25 72:20,25
    89:10 95:9
**deals** 207:3
**December** 15:13 191:18
    199:12 201:3,7,20,24
    202:3,7,10 209:18
**decide** 52:21 206:3
**decided** 189:6 211:8
**decision** 52:6 53:6
**declaration** 5:14 12:7,9,12
    90:9 91:16 94:23
**declare** 236:6
**declining** 115:13 130:15
**deductible** 77:21
**deduction** 194:1
**deem** 233:5
**deemed** 17:11
**Defendant** 1:7 2:14
**defense** 63:2 125:5,11
    126:12 127:13 130:24
    136:22 137:6 145:23
    157:12 159:8 160:1 165:7
    169:9 171:25 211:1
**define** 9:3 138:10 165:20
    192:2
**defined** 59:15
**definitely** 19:20 89:21 98:7
    156:16 187:18,21 202:17
**definition** 15:18 229:5
**definitively** 155:2

**delay** 202:8
**delegate** 75:19
**deliberately** 108:17
**delivered** 108:12 149:19
**denote** 121:18,22 122:1,6
    122:13 177:7,20 179:23
    180:12 181:2
**denotes** 150:3
**department** 20:2 97:18,21
    99:2 101:6,18 102:8
    199:13
**depend** 232:23
**depending** 184:1
**depends** 26:16 43:13
    126:15 165:20 192:2
    204:25 233:25 234:11
**deposed** 14:7,14
**deposing** 32:7
**deposition** 1:11 7:20 8:12
    9:17 10:7 11:19 14:5,17
    38:7,11 156:15 235:3
    236:8,14,15 237:2 238:6,9
    238:10
**derive** 224:18
**derived** 62:4 67:2 212:5
    224:20
**describe** 16:17 63:5 85:18
    111:15 180:17 189:21
    191:8
**described** 25:13 78:21 79:6
    85:15 94:13 95:6 166:18
    181:3 186:22 194:13 195:1
    228:19
**description** 5:3 6:2 98:22
    99:4,9 100:5,11,16 174:14
    175:18
**descriptions** 99:9 106:6
    153:23 154:2
**designate** 183:18
**designated** 20:16,18 149:8
    169:25 178:8,23 179:5
    180:5,9 211:4 212:7,24
**designating** 127:12
**designation** 79:25 121:16
    121:21 122:5 142:1 176:5
    177:7,8,18,19,21 178:16
    179:22 180:11 181:1,8
    182:4,9 191:9,10,20,22
    192:6 193:2 211:3 223:17
**designations** 126:21 176:7
    176:8 177:1 185:22 192:7
**desire** 45:12 187:20
**despite** 16:9 25:18
**details** 42:4,8 77:7 106:22
    113:24 144:15 185:11
    200:21

**determination** 40:22,23
    155:16,23 158:16 177:3
**determinations** 88:21
**determine** 45:1,9 177:11
    178:10,20,21,22 180:9
    182:22 183:22 194:25
    212:10 221:13
**determined** 79:5 90:1
    194:19 231:21 232:20
**determining** 45:20 182:20
**develop** 115:12
**developed** 61:24 168:2
**developing** 132:6
**development** 202:9
**developments** 202:6
**Dgiffuni@crowell.com** 3:14
**dial-in** 28:4
**dichotomy** 177:23
**difference** 96:15 189:6
    204:16,19
**different** 14:21,25 15:8
    46:19 77:15 96:2,18 98:15
    100:14 119:16 126:21
    127:16 165:1 172:10
    178:18 179:1
**differently** 73:6,18
**difficulty** 48:6
**dinner** 232:16 233:1,3,10,14
    233:17,18,22 234:1,4,8
**dinners** 208:7
**direct** 57:18 74:11,15,21
    90:15,22 91:2 94:22
    193:21 199:8 209:15
    218:23
**Directing** 75:17
**direction** 99:23 130:19
    150:5,9,18 195:8 231:15
**directive** 229:9
**directly** 27:3 189:10 205:10
**disagree** 30:7 31:3,15 32:5
    90:4 163:24 164:1,3
    174:23 175:7
**disagreed** 146:9
**disagreeing** 164:2
**disagreement** 30:14
**disclaimers** 160:12
**disclose** 53:4 86:19
**disclosed** 70:9 83:12
**disclosing** 54:2 86:14
**disclosure** 52:7 53:16 82:22
    83:7 157:19 222:6
**discovery** 10:18
**discretion** 69:6
**discuss** 11:18 14:8 25:23
    30:22 36:5 169:17
**discussed** 10:11 29:21

**discussing** 68:6 110:6
**discussion** 9:8 11:5 13:16
    14:9,16 30:1,2 35:21 36:22
    38:15 39:6 40:10,11 41:4
    44:4,18 45:18 47:13,18,22
    48:9,14 49:13,18,23 51:8
    51:17,25 52:5 53:14 54:5,9
    54:14 56:1,6,12 58:13,25
    59:4,20 60:16,21 68:24
    71:1,7 74:13 75:13,25
    79:12 81:19 92:25 94:2
    97:24 103:23 104:3 112:5
    113:7,12,25 114:5,9,19
    115:17 136:10,20 137:5
    138:4,13,23,25 139:6
    143:11,11 144:25 145:8
    146:7 148:21 158:2,24
    179:4 185:16 193:23 194:1
    208:1,6,11 210:3 223:23
    224:2,8
**discussions** 30:12 31:5,12
    31:21,25 35:17 38:19
    53:24 54:22 59:19 62:9
    85:3,5 91:13,14 92:9,9
    93:1 94:16 99:25 109:24
    110:2 128:21,23 129:24
    132:5 135:15 137:10,17,24
    138:7 145:5,24 146:3,6
    191:4,24 192:1 213:15
**dishonest** 96:19
**disinterested** 238:13
**dispense** 8:11
**dispute** 41:1 71:19 93:21
    161:20 163:23 219:3,7,16
    222:11
**distinct** 225:25
**distinction** 23:1 101:17
    134:3 164:20 172:23
    177:23
**distinguish** 39:5 51:1 54:17
    54:19 68:3
**Distinguished** 48:15
**distinguishing** 48:6 139:2
**distribute** 149:21
**distribution** 194:11
**DISTRICT** 1:1,1
**Division** 2:7 217:10,19
**DLZ** 24:8
**document** 8:24 24:4 27:8
    29:16 32:18,23 46:12 57:8

58:4 71:3 74:7,8,12,19
75:7,14 79:14 80:9,16 84:1
87:7,8 97:12,22 99:1 101:1
101:6 107:2,12,13,17
110:18 117:11 120:8,9,11
120:21 122:17,19 123:10
125:15 126:25 127:13
128:1 145:14 146:5 147:25
148:20 149:2 154:21 155:3
160:17 171:3 177:11,22
178:19 179:15 181:17
182:5 187:4,10 190:7,11
190:23 191:13 193:8,22
194:9 198:3,8 199:5
213:13 221:3 226:7,8,22
229:2,15
**documentation** 45:5 46:4
77:22 78:3 79:10 155:24
176:14 183:2,15
**documented** 45:14 46:13,25
47:11 48:23 178:2 183:1
195:1 211:11,18
**documents** 8:14,16,20 9:2,3
10:6,8,9 20:25 33:4,5,15
39:16 44:24 47:1 63:2,8
64:1 66:9 80:3 83:9 86:14
86:20 105:25 107:24 110:8
111:16 116:14 154:25
155:1,22 156:14 164:5,19
165:6 177:13 182:6 183:19
184:6,20 191:3,8 215:13
215:14 223:15 231:25
**doing** 19:19 44:14 48:14
120:20 127:22 168:15
177:24 207:19 215:21,25
218:6 227:16 229:10
**dollar** 183:5 194:13 219:10
**Donna** 2:6 87:13
**doubt** 100:9,15 234:13,16
234:19
**draft** 118:15 125:5,10
145:22 151:21 172:21
173:11,11,14,16 186:4
190:14,21 199:5
**drafting** 88:7 221:1
**drafts** 173:10,13
**draw** 189:2
**drill** 138:21
**drilled** 234:11
**DSCR** 98:23
**DUANE** 2:5
**duly** 238:7,12
**dynamics** 189:23

———————————
E
———————————
**E** 14:3,3 25:5,5,17,17 57:10

80:1
**E's** 186:5
**e-mail** 2:11,21,23 3:9,14 5:6
5:7,9,10,11,19,24,25 6:3,4
6:7,11,16 7:20 8:2 20:3
27:15,15,24 32:19,20 33:1
33:9,15 34:5,7,9 52:14,17
57:8,19 79:22 80:6,16 81:3
82:6 83:14,18,19 91:4 97:2
97:2,7,9 107:19,21 108:12
109:9,22 110:1 117:10
118:12,13 119:16 120:15,17
120:18,21 122:13,16
125:15 127:25 130:22
131:4,6,7,9,20 132:11,16
132:19,24 135:16 146:21
146:24 147:6,20 151:19,25
152:2 153:14 154:5,13,15
155:10,22 156:2,11,12,20
156:22,23,24 157:24 159:4
159:24 160:4,11,19 161:2
161:21,24 162:8,17 163:4
163:11,17 164:8,16,23
165:17,21,23 166:14 169:2
169:3,6,7,11,12,17,20,22
169:23,25 170:5,23 171:1
171:6,18,20 172:3,15,24
186:1 187:5,13 197:14,15
197:17 201:2,3,10,11,24
201:25 202:20,22 223:15
**e-mails** 33:7 71:4 80:10
131:12,14 147:23 152:9
202:17 233:1,9,15,16,20
**E1376-78** 5:12
**earlier** 53:19 71:5 107:19
112:20 116:15 119:20
120:13,16 127:19 130:8
136:3,4,9 150:22,24
152:16 154:4 155:5 158:21
170:6 172:8,12 178:13
180:16 193:11 195:18
202:24 224:17 229:1
**early** 42:5 88:17 136:6
**easier** 113:23 115:4,10
**easy** 30:16
**edits** 151:22
**effect** 16:10 62:9 63:2 92:25
141:13 227:21
**effort** 105:7 125:25 195:15
215:11,16 217:24 228:4,11
229:2
**efforts** 188:16 189:24 212:6
212:9 225:13 227:7
**Ehrlich** 140:15 201:4,25
202:7
**either** 7:8 19:4 41:18 85:13

105:2 108:20 120:9 126:5
145:6 231:14
**elaborate** 208:18
**electronic** 20:24
**element** 19:20 57:1
**elements** 76:11
**elusive** 157:5
**embezzlement** 138:14
139:15
**embodied** 15:21
**employed** 63:7 65:3
**employee** 33:6 47:4 69:19
75:21 167:20
**employee's** 78:2
**Employees** 75:19
**employer** 16:22,22 19:5,7,7
19:14,17 53:3 70:2,15,20
76:16 86:14 167:21
**employer's** 19:11,17
**employment** 18:24 33:5,5
55:22 88:22 89:5,18 142:6
144:9 187:25 188:1 189:4
189:9
**employment-related** 18:13
**endeavored** 167:5
**ended** 23:17 180:6 182:18
233:10
**endorsed** 227:20 228:3
**ends** 27:15 32:19 83:18
111:19 156:11 195:5,5
197:15
**energy** 18:23
**enforcement** 2:7 50:16
215:20 217:10,19
**engage** 184:21,23
**engaged** 22:22 33:13
184:15 187:23 191:23
221:23
**engagement** 21:21,25 22:6
60:13 188:3
**engaging** 215:11,12
**enjoy** 116:21
**ensuing** 91:7 147:23 164:24
**enter** 157:12 159:7 160:1
169:8
**entered** 84:8
**entering** 16:19
**entertainment** 78:17,21
**entire** 7:7 12:19 62:3 90:23
125:18,19 167:5 201:16
219:14 223:6
**entirely** 100:22
**entities** 220:9
**entitled** 38:2 74:9 198:6
217:13
**entity** 63:9 69:16 177:2

**entries** 98:14 105:18 106:3
148:2,3,5 149:25 153:4
176:8 177:13,15 183:12
214:7 231:12
**entry** 24:20,21 25:12 35:5,15
35:16 103:20,21,25 104:22
112:11,12,14 116:3,4,6
122:10 132:23 180:22
209:1,17 213:21 232:17,25
**equally** 166:11
**equals** 194:16
**equity** 18:17 56:24 186:16
**equivalence** 194:11
**Erem** 25:16 26:8
**ERRATA** 237:1
**erring** 230:17
**ESQ** 1:11 238:6
**ESQUIRE** 2:5,6,16,17 3:4,5
**established** 127:6
**establishing** 38:10
**estimate** 230:14
**et** 237:3
**ethics** 33:6
**evening** 186:3
**event** 53:5 56:22 76:24
206:1 233:22
**events** 8:19 10:11 156:18
**eventually** 93:18
**everyone's** 222:4
**evidence** 17:19 64:3,4,5
70:11 130:25 137:13
141:24 142:16 172:7
215:23 216:4,5 232:4
233:13,23
**evidentiary** 93:19 229:17
**exactly** 100:8 183:22 233:15
**exam** 218:14 219:18 222:12
**examination** 4:5 8:8 12:20
18:17 31:7,11 38:14 49:25
50:6,7,12,15,17 51:7,10
65:5,7,20 66:2,3 94:1
166:3,25 167:3,8 168:6,13
195:20,22 196:15,18,19
197:4 210:17 215:21
216:24 217:9 218:9,23
225:20
**Examinations** 50:20 198:13
**examine** 38:2
**examined** 217:21
**examiners** 65:16
**example** 99:13 70:18 101:14
140:2 145:21 183:10,21
220:25 232:15,24
**exceptions** 8:25
**excerpt** 147:15
**exchange** 1:4,16 2:3,4 99:22

excluding 158:14,20
exclusion 22:19
exclusively 48:16 127:20
    176:18 215:10 222:18
excuse 144:5 213:19
execute 86:3
executed 12:6 84:4 236:17
executive 18:12 187:14
executives 199:14,19
exhibit 5:4,5,6,7,8,9,10,11
    5:12,14,15,16,18,19,20,21
    5:22,23,24,25 6:3,4,5,6,7,8
    6:9,11,13,16 8:15 17:23,25
    18:2,4,6 20:16,18 24:1,3
    27:6,7,11,12,14 32:15,17
    33:23 34:25 57:5,7,19 74:5
    74:6 79:18,20 83:13 86:24
    87:1,2,10 90:7,8 96:22,22
    103:17 107:1,2 109:6,17
    109:19 112:11 117:19,20
    119:14 125:9 130:21 131:3
    131:4 133:16,16 135:16
    145:21 146:10,15,17
    147:12,13 148:2 149:1
    151:7,9 152:15 153:11,12
    154:12 156:9,9 165:17
    168:25 169:1,13 170:19,20
    170:22,25,25 171:20
    173:18 174:3,4,5,8,13,18
    174:20 175:3,4,8,11
    185:24,24 186:23 187:3
    190:6,7 193:5,6 197:13,13
    198:2,3 200:24,25 201:1
    202:13 203:7 207:14
    208:24 210:22 220:6 221:4
    221:9 225:10 228:17
    229:11 230:12 231:9
exhibits 5:1 6:21 8:14 21:1,2
    149:17 170:13,14,17 216:5
    221:8
EXHIBITS(Continued) 6:1
exist 40:1 42:22 43:23
    160:17 172:16 183:16,16
existed 15:21 16:8 30:25
    37:23 38:5 67:8 69:22 72:9
    98:10 144:16 163:13
existence 30:9,10 31:5,6
    38:10 62:11 66:15 73:22
existing 16:14
expanded 111:1
expansion 150:25
expect 82:9 199:7
expected 81:16
expedite 152:12
expeditious 216:22
expense 5:8 8:23,23 33:7

39:9 44:5,22 45:2,14,15,20
    45:21 46:6,6,13,14 47:3,8
    47:12,15 48:2,3,11 49:19
    51:8 53:15 54:23 56:7
    59:22 61:23 62:6 64:25
    65:8,17,21 66:3 72:23
    74:10,14 75:11,18,19,24
    76:18,20 77:3,11,14,24
    78:8,15 83:10 85:24 86:5
    99:5,13 105:7 115:19
    118:8 121:8,17,22 122:1
    122:11 128:5 130:2 131:15
    147:7 152:13 154:22 155:3
    155:4,10,25 164:25 167:9
    168:4,14 175:22 177:23
    178:10,14,17 179:8 180:1
    180:2,8,23,25 181:1,6,7
    182:6,20,23 183:2,5,6,10
    184:1,2 192:14 193:1
    195:1,4 196:19 198:6
    199:18 211:5,12,19 212:11
    218:24 226:11 227:23
    229:2,23 231:12 232:1,19
    232:21,25 233:4,5,6,21,24
    234:2,2,10,13,17
expense-account 195:14
expense-classification
    119:19
expense-related 18:24
    19:13
expenses 8:21,22 9:1,4,6
    19:4 40:8,20,22 41:2 45:1
    45:3,4,6,7,8,9 47:1,15
    48:20 50:23,25 51:9 54:24
    55:11,20 56:8 72:11 75:23
    76:11,14 77:20 78:1,18,21
    78:24 81:7 86:21 97:19
    98:12,18 100:18 101:9,10
    101:11,13 110:10,22
    111:22 118:1 131:22 132:6
    134:23 146:25 150:11,21
    150:21 151:2 171:10 173:2
    178:7,8 179:5,6,14 180:3,7
    180:14,15,19 181:14,18,24
    182:17 183:19 185:7
    186:10,15,19 208:8,13
    212:2,14 216:23 217:22
    227:11,13 228:6,22,23
    230:13,16,16 231:11 232:8
    232:10
experience 70:4,22 223:2
    224:18
experienced 8:11
expertise 190:22
explain 68:18 211:7
explained 179:13

explanation 142:11 234:5
explicitly 179:12
exposure 54:6,10 141:2
Express 5:16 107:9 177:15
expressed 176:2 178:4
expressly 120:4
extended 32:11 82:24 121:3
    140:5
extending 196:4
extends 109:13
extensive 90:2
extent 9:2 11:20 14:14 30:11
    30:23 31:20 35:23 37:1
    53:22 55:14 58:8 60:2 65:4
    65:6,10 67:25 70:1,10 76:2
    82:16 84:16 89:7,9 98:2
    99:16 105:12 113:14
    129:25 136:21 154:25
    156:19 160:8 161:9 166:3
    168:6 177:16 178:13 179:4
    179:11 189:1 196:18
    204:13 215:10 228:21
external 19:20
externally 163:5
extinguish 69:23
extinguished 70:4

---

**F**

F 2:8 80:1
fact 21:7 28:5 30:10 45:21
    64:6,10 71:7 84:3 90:24
    139:11 146:1,4 167:19
    173:1 200:17 210:11 211:4
    212:20 215:4 216:3 232:9
facts 67:3 70:11 215:22
factual 190:19 216:14
    217:14
fail 63:8
fair 22:13 36:14 44:11
    105:19 127:15 165:19
    171:23 177:6 188:20
    189:22 206:9 219:13,19
fairly 48:24 52:20 55:6 78:22
    139:3 194:2,4,5 196:3
faith 72:20 73:1,4 96:20
false 199:25
familiar 75:9
far 8:3 42:17 59:12 76:7
    84:19 106:1 111:7 149:7
    151:14 154:17 170:18
    194:8 199:1,2 229:9
fashion 52:23 134:20
faster 223:19
father 199:20
featuring 171:12
February 199:16

federal 17:18 56:14 123:8
    124:16 130:25 137:12
    141:24 142:15 172:6
    194:16 221:13
feel 127:22 184:17
fees 23:5,8,16,20,23
fell 180:3,14
felt 197:9
field 99:5 100:5,11,16,21
    102:6
figure 155:2 176:4
file 43:15,21 104:18 116:23
    117:10 141:11 147:7
filed 12:22 90:12
filing 87:21
filings 10:17
fill 79:1 184:19
final 173:13 181:17 199:2
    200:25
financially 212:4
find 79:10 107:23 131:10
    171:9,13 186:4 216:7
fine 32:1 37:19 82:12 124:5
    129:9 158:7
finished 210:5
Finzi 5:14 12:1,4,6,11,18
    27:16,25 28:6 34:6 35:6
    82:6 83:20 90:9,18 91:16
    92:6,21 94:20 95:4,20 96:1
    103:22 140:12 162:1 187:6
Finzi's 34:7 91:25 94:15,23
    95:7
fired 218:13
firm 12:14 15:8,13,22,24
    18:17 25:21 63:5 90:2
    143:13 175:23 176:8 177:4
    184:14,22 186:16 187:1
    188:9,21 189:17 192:18
    196:1,13 198:21 201:6,12
    201:16 202:11 203:12
    205:9,11 206:12,19,23
    207:2,10 213:8,9 216:20
firm's 204:2 206:10
firms 15:5
first 18:22 21:21 23:3 29:3
    32:25 33:9,24 34:4,20
    36:12,20 57:18 61:21,22
    70:22 72:25 75:3 79:25
    81:10 88:11,15 91:3 94:23
    98:14 102:12 103:1,8
    107:16 108:1 110:14,23
    119:12 131:6 147:1 151:6
    151:7 157:22 186:1 201:6
    210:21 213:14,19,21
    216:14 219:22 220:6
    226:25 227:12 229:7

fit 179:25
five-minute 229:24
**Flight** 180:23
flip 103:15
**Floor** 3:11
focal 143:16
focus 36:20 97:6 107:20
118:5
**follow** 11:23 119:10 134:14
135:1,12,20 152:21 153:9
follow- 103:22
follow-up 35:8,16 203:3
followed 120:15 165:23
**following** 33:3 38:7 57:21
118:16 124:10,17 147:22
194:8 202:5
**follows** 124:13
**foolproof** 63:13
**footer** 17:17 63:1 126:6,9
127:7 145:22,25 146:10
**footers** 126:25 191:9
**foregoing** 236:8 238:6
**forensic** 90:3 184:14,22
216:20
**forgetting** 140:13
**form** 28:23 29:12 33:20 41:9
41:15 49:5 52:24 55:23
65:13 66:10 67:10 68:8
69:7 71:22 72:21 86:17
91:19 92:13 95:11,23 96:8
96:17 99:7 100:12 102:18
118:6,7 139:6 140:4,21
141:6 142:20 143:25
145:11,16 155:18 157:3
158:11,13 166:15 167:15
169:19 177:5 179:9 183:17
188:24 190:4 193:16
198:16 199:2 208:4,9,14
212:16 214:21 218:19
220:22 221:15 229:16
231:5 232:11
**formal** 29:21
**format** 107:14 110:19 118:1
134:3 171:4 193:11
**formatted** 107:7 133:24,25
**former** 16:22 18:15 163:21
187:17
**formulation** 91:22
**forth** 47:15 79:14 98:22
100:10,16 101:4 102:5
119:18 121:8 174:11,13
175:10 220:9
**forward** 46:24 199:25
223:12
**forwarding** 97:5
**found** 155:24 176:14

**foundation** 201:9,15 217:11
**frame** 58:10 61:9 130:3,13
131:17 219:14
**framed** 46:23
**FRE408** 190:25
**Friday** 118:21
**FRIEDMAN** 2:17
Friedmand@gtlaw.com
2:23
**friends** 90:18,20,21 233:2
233:10,15,17,18,23 234:4
234:7
**front** 47:2,9 92:20 174:3
202:6 207:15 210:25
**frustrate** 31:15
**frustrates** 30:13 31:13
**full** 88:16 216:10,16
**fully** 216:18 227:4
**function** 62:3
**funds** 54:25 55:12,21 56:2,8
178:11 179:7,20
**further** 38:13 178:9 194:14
199:17 203:3 238:15
**furtherance** 125:20,25
126:3 221:3
**future** 82:13

---

### G

**general** 43:8,19 60:9 106:5
112:2 113:1 114:3 137:21
137:25 138:1,16 140:25
141:4 143:2,22 144:14
158:24 167:10 188:10,11
200:20 207:6,9
**generally** 27:2 40:8 44:6,19
50:11 63:14 65:25 70:12
80:12 135:25 141:12
142:13 150:19 196:23
**getting** 113:24 114:20,21
160:9 167:22 204:17,18
219:14,17
**Giffuni** 3:5 9:19
**gifts** 199:14,16,19,24 200:2
208:2
**give** 19:12 73:21 76:4 87:6
129:10 138:20 168:23
187:8 206:21 213:20
224:10
**given** 38:17 59:11 67:22
68:25 70:1,15,18,18,20
106:20 134:14 156:25
198:20,21 199:4 213:7
214:23 218:4 222:22 223:4
223:9
**gives** 77:23 102:9
**giving** 71:17 225:23

**glad** 143:14 229:8
**Glen** 1:11 3:2 4:3 5:2 28:3
57:21 82:7 107:22 157:9
236:6,20 237:2 238:6
**Global** 6:13 74:9 198:6
**GM** 24:15 35:5
**Gmail.com** 32:21
**go** 8:6,23 13:18 20:18 24:11
24:20 30:10 31:5 33:8,23
38:3 81:6 96:22 103:17
106:1 107:10,16 110:9
111:22 117:15 121:5 122:9
129:21 144:6 147:11 148:2
151:5 152:23 170:8,25
178:19 180:22 186:8 192:7
193:24 205:19 209:11,13
209:23 210:19,19 213:13
213:14 219:24 227:3
229:11
**goal** 45:11 178:3 218:1
219:3,7 226:3 232:2
**goals** 53:19
**goes** 9:12 56:22 68:11 74:15
89:11 120:22 147:7 170:4
214:7
**going** 7:5,21,23,25 8:11,17
8:23 10:23,23 14:14 17:22
17:25 19:4 20:14,17 24:12
25:11 26:11 31:7,11 34:16
34:25 37:13,19 39:17 44:2
44:21 48:19 50:12 52:21
55:13 57:3,5,13,24 58:10
58:22 60:9 62:14 68:19
74:11,21 77:18 89:19
103:15 105:17 106:2,10
107:14 111:5,6 114:23,23
114:25 115:2,3,6,12
116:20 117:20 118:24
119:9,22,24 123:4 128:25
129:7 131:3 135:24 136:3
137:20 151:5 154:23 158:3
161:1,16 162:2 181:18
198:14,16 204:9 208:22
210:11,19 214:13 220:9
223:19 225:8 230:5,20
235:1
**good** 7:3 42:15 67:14 72:20
73:1 90:20,21 96:20
129:23 149:14 168:24
186:3 224:15
**Gotcha** 34:11
**gotten** 170:18
**govern** 83:7
**governed** 76:6 82:22 99:18
**governing** 206:19 207:2
**government** 191:18

**great** 219:23
**GREENBERG** 2:15
**Greg** 108:15 114:8 129:6,7
**Gregory** 2:16 80:1
**ground** 8:12 39:7,10,11
**group** 222:8 227:13
**grouped** 132:6
**groups** 131:22
**guess** 10:24 11:4 44:10
49:22 53:7 80:15 119:13
173:2 176:13,16 180:1
181:21,21,22 189:18 195:5
**guessing** 26:11 83:8
**guidance** 19:13
**guide** 36:13 197:11
**guys** 34:10

---

### H

**H** 57:10 209:8
**half** 10:25
**hand** 8:24 17:23,25 20:14,17
61:14,15 95:1,2 149:7
161:12,13 238:20
**handed** 117:19
**handful** 10:8
**handing** 20:15
**handled** 182:17 186:20
**handling** 18:9
**Hanusik** 3:4 9:18 10:2 12:16
12:24 13:13 14:13 15:10
15:15 16:13 22:15 25:2
56:16,21 57:2 67:14 70:10
72:4,12 77:10 80:7,9,23
81:15 88:24 95:12 96:10
102:22 103:1 106:13
111:10 112:7 115:22,25
116:4 118:9 123:2 126:23
127:2,5 130:19 132:18,21
132:23 149:12,14,23 150:6
152:23 160:7,20,22 162:14
163:1 170:23 201:9,14
209:3 230:5,7,21
**happen** 104:5 114:22 115:3
**happened** 53:7,10 76:2
82:25 142:7,8 159:3
172:13 189:7 197:9
**happy** 86:25
**hard** 20:25 140:10 189:18
191:21
**head** 34:19 106:11 113:5
136:8
**header** 17:17 63:1,14 64:2
71:8,16 126:5 156:22
171:12 190:23
**headers** 63:15 64:19 191:2
**headings** 98:15 153:3

**heard** 9:8 12:8 197:20 203:9 205:25
**hearing** 158:16,18
**help** 19:12 33:2 81:6 110:9 166:8 167:6 184:11 197:11 215:11
**helped** 22:10 106:4
**helpful** 33:3 111:21
**helping** 125:22 168:11 189:12 218:13 226:4
**hereto** 236:10
**hereunto** 238:19
**Hi** 153:20
**high-end** 199:20
**Hilzik** 209:8,8,18
**hired** 50:23 184:17
**his/her** 75:23 76:17
**Hold** 68:10 72:2
**holiday** 199:14
**honest** 96:15 163:17
**honestly** 145:19 163:4
**hope** 9:6 135:3 219:16
**hoped** 53:24 189:2
**hopefully** 49:11 53:21 118:17 168:16 226:5
**hopes** 190:2 195:16 219:4 229:4
**hoping** 226:1
**hour** 112:13 116:20
**hours** 25:12 106:9 169:7,11 169:12
**HUNUSKI** 118:5 149:4
**hypothetically** 28:13

**I**

**idea** 19:18 43:22 61:1 72:6 114:3
**identification** 18:7
**identified** 20:4 21:2 150:21 196:25 232:8
**identify** 16:12,14 24:9 27:10 97:13 98:12 178:19
**identifying** 16:16 18:25
**imaginable** 205:16
**imagine** 52:15 69:17 127:8 140:11 194:23 204:7 205:18 207:7
**impact** 31:24 196:8
**impacted** 30:24 49:15 204:13
**impacts** 58:9 59:8 60:3
**implicated** 150:16
**implication** 122:25
**importantly** 195:8
**impose** 66:8
**impossible** 150:6

**improper** 129:16,18
**improperly** 56:9 228:5,12
**inaccurate** 212:15 228:17 228:18,20,21
**inadequate** 212:15
**incentive** 193:23,24
**inches** 8:24 107:4
**include** 8:20 77:22 106:7 111:1 113:9,10 125:7 181:11 221:2 229:21
**included** 54:2 79:2 86:16 103:9 137:24 146:1 149:25 150:12 151:1 174:18 226:2
**includes** 7:11 24:1 35:16 118:12 170:20 171:10 221:24
**including** 33:5 112:21 114:5
**inclusion** 71:16
**inclusive** 1:12 228:3,7,11,25
**income** 22:3
**inconclusiveness** 230:18
**increase** 222:2
**incurred** 186:10
**indefinitely** 70:23
**independent** 95:14 154:9 225:3
**INDEX** 4:1
**indicate** 146:9,12 151:21 155:14 160:9
**indicated** 92:24 118:14 120:24 128:11 151:16 159:25 170:13 205:9 208:16
**indicates** 107:13 171:3,9
**indicating** 206:12
**individual** 4:14 16:23 19:8,12 19:19 69:18 70:14,21 75:20 118:1
**individuals** 16:18 70:19
**inform** 200:16
**information** 27:19 48:7 51:2 55:3 60:23 65:24 68:5 85:22 97:23 98:17,22,24 99:4,17,20,21 100:5,10,16 100:25 101:4 102:5,16,23 103:4,5,9 108:14 119:17 121:8,12 134:8 153:17 154:16 157:13,15,19 161:14 169:5 171:12 174:10,12,25 175:10,14,16 175:17 176:7,12,23 177:1 214:19 215:2,15 219:17 222:12,17 225:23 226:1 233:5
**informed** 159:23 162:9 177:1 196:10,12 206:20

224:25
**inherent** 165:25
**inherently** 138:20
**initial** 36:7 37:8 60:13
**initialed** 236:10
**initially** 36:5 195:13
**initiated** 19:3
**ink** 236:9
**inputted** 103:5
**inquiries** 197:4
**inquiry** 18:24 19:2 30:12 31:4 178:9 180:16 199:17
**inserting** 71:2,8
**Inspection** 198:13
**Inspections** 50:20
**instance** 16:1 227:12
**instances** 15:20 16:12,17,22 17:2,3 18:9
**instruct** 11:22 14:12,17 30:5 35:24 37:3 58:10 59:9 68:1 76:3 81:14,20 98:3 102:19 113:15 114:24 119:9,25 123:5 128:17 132:2 134:19 150:17 152:4 155:19 161:17 174:19 200:6 204:10,21 205:14,20,25
**instructed** 4:11 11:8 81:23
**instructing** 68:13 74:2 82:2 115:7 119:1 123:2 154:6
**instruction** 11:23 60:15 68:14,21 112:24 113:22 120:14 124:8,9,17,23 133:2 134:10,13,15,24 135:2,10,12,17,20 152:18 153:5,9 174:22 204:12 229:8
**instructions** 7:15 30:7 60:19 82:5 106:20 119:10 120:24 133:7 134:25 152:5,21 163:21 174:24 175:9
**insurance** 205:6 207:1
**intend** 11:23 119:10
**intended** 100:23 195:12
**intending** 178:4
**intention** 9:9 211:15
**intentionally** 17:2 195:7
**intentions** 179:16
**interactions** 161:11
**interest** 15:20 16:8 36:23 37:22,24 38:4 40:12,19,19 41:21 42:1,10 53:22 62:4,6 62:7 63:3,10,19,25 64:3,5 64:7,13,20,22,24 65:9 66:18,24 67:2 68:12 69:21 71:3,19 73:23 90:1 94:24 95:18 96:7 113:13 114:6

115:18 118:15 119:7 120:5 120:8,11 122:17 123:11,18 130:5 136:12,13,15 157:1 160:12 163:12,24 165:22 166:6,10 168:16 179:17 196:21 201:7,22 215:10 218:18 222:4 223:14,17
**interested** 238:15
**interests** 7:17 62:20 89:25 215:7
**interface** 189:10
**interim** 37:23 38:1
**interjecting** 129:14,16
**internal** 14:21,25 15:7,23 18:24 19:2,10 35:7 52:19 107:18 160:17 207:6
**internally** 55:4 162:10 196:24
**international** 18:16,23
**interrupt** 31:10 129:20 133:21 144:6
**interview** 70:16 157:14 161:3,6 213:12 223:4,5 224:23
**interviewed** 13:5
**investigation** 15:7,23 18:18 19:15 35:8 50:4 65:11 87:20 160:10,18 196:2,7 203:13 215:25 216:19 217:10 218:5 225:19 226:19
**investigations** 14:22 15:1 18:13
**invoices** 23:5
**invoke** 7:5
**invoking** 7:14 154:8
**involve** 11:9 31:21,24
**involved** 7:9 15:6 18:25 19:1 19:14 20:12 30:21 65:20 85:6 87:24 88:1,7 93:23 187:21 188:3,5 192:1,21 203:25 220:10
**involvement** 14:11 89:15 187:18 215:25
**involves** 30:2 35:24 150:15 155:19 221:24
**involving** 37:2,6 51:21 52:17,17 213:22 224:8
**IRS** 77:20
**issue** 8:22 51:10 52:18 55:22 65:17,25 66:25 68:11 71:25 100:6 162:21 164:15 167:9 168:3,11 187:22 188:15 195:14 196:20,24 197:21 198:17 216:13 218:24 224:25

**issued** 37:15
**issues** 37:2 45:12 51:8
54:16 65:8 73:1,2 125:20
168:13 210:20
**item** 75:2 170:21 181:15
**items** 147:7 154:23 155:8,9
155:14 171:14 176:23

**J**

**James** 25:5
**January** 98:15 110:13,23
193:8 209:16
**jar** 44:3
**JEK** 25:4
**job** 1:25 48:19 49:3,9,12
53:22 143:16 151:13
166:11 168:17 179:18
189:25 190:3 195:17 197:1
213:3 215:11 217:25
218:12 219:5,8,12,16
225:23 226:5,5 229:4
**join** 28:3
**joined** 15:13
**joint** 63:2 125:5,10 126:12
127:13 130:24 136:22
137:6 145:23 157:12 159:8
160:1 165:7 169:9 171:24
**joint-defense** 63:25 85:9
94:25
**jointly** 52:6,21 53:4
**Judge** 68:15,17 114:25
120:25
**Judge's** 30:8 31:4 37:14
59:1 120:3,23
**July** 7:6,11,17,17 15:12 17:9
21:16 22:21 24:20,21
25:12 27:16,24 28:7 29:5
30:25 31:16 32:19 33:1,9
33:15,25 34:15 35:5,13
37:22 42:14 43:15 57:9,19
58:10,24 59:3 60:1 67:24
68:12 70:9 73:20 76:3
79:23 81:4,19 83:18 88:16
88:20 89:5 91:3 97:2,10
98:2 103:21,25 104:22,25
106:8 107:21 112:3,12,25
115:17 116:8,24 117:12
118:13,20,23 123:1 131:6
131:9,16,20 132:11 133:10
133:14 135:24 136:7
146:23,24 147:20 148:5
150:14,23 157:23 158:3,6
166:12 174:21 213:15,23
214:8,14,16 216:16
**junior** 43:11
**justified** 234:10

**K**

**K** 2:5 14:3 25:5 127:9 209:8
**keep** 48:18 49:3,8,11 106:2
127:2 129:6 143:16 166:10
170:23 174:3 195:16 196:1
196:10 213:2 215:11
217:25 218:12 219:8,12,16
225:22 226:5,5 229:4
**keeping** 49:19 53:22 168:17
179:17 189:24 190:3 195:6
219:5
**Kehoe** 2:16 4:6 7:4,19,24
9:21,23 10:1 11:6,18,20
14:9 15:25 17:24 18:3
28:11,23 29:12 30:2,16
31:9,14 32:6,13 33:20 34:2
34:11 35:23 36:24 37:17
39:1 41:9,15 45:22 46:1
49:5 50:5 51:21 52:24
55:13,23 58:6 59:6,23
60:19 62:13 65:13 66:10
67:10,25 68:8,10,18 69:7
71:22 72:21 73:7,12,25
74:4,24 75:1 76:2,21 79:16
81:13,19 82:1,4,16 83:16
89:7 91:19 92:13 95:11,23
96:8,17 98:2 99:7,16
100:12 102:18 103:24
108:4,7,11,19,23 109:11
110:2,14 111:3 113:14,23
114:20 115:9,20 118:24
119:5,22 120:7,17 121:4
121:10,14,19,24 122:3,7
122:14,20,23 123:4,9,16
123:25 124:5,19,24 125:8
128:7,13,19,24 129:4,9,15
129:20,23 130:3 131:16
132:2,8 133:1,6,21 134:2
134:11,17,25 135:3,11,19
140:21 141:6 142:20
143:25 144:5 145:11,16
149:10 150:4,10,15 152:3
152:7,10,19 153:2,7 154:3
155:18 157:3 158:11,13
161:16 165:10 166:15
167:15 168:23 169:19
174:19 175:2 177:5 179:9
188:24 190:4 200:5,14
204:4,9,13 205:13,18
206:2,4 208:4,9,14 210:3,5
210:18 213:19 217:12,16
228:1 229:24 230:3,19,23
231:5 232:11 233:8 234:21
**Kehoeg@gtlaw.com** 2:21
**Kellet** 25:5
**kept** 196:11

**kind** 102:10 208:22
**knew** 14:6 50:21 51:7 67:22
78:23 144:21 171:23
**know** 8:10,22 11:1 12:11
13:4,25 17:1,2 21:4,18
22:1,4,9 26:3 29:6 34:2
36:2,10,11 43:23 46:22
47:2 50:17,19 56:15 58:2
58:17 65:12,18,22 66:12
66:22,23 69:8 72:15 73:9
74:17 78:13 82:10 83:25
87:7 89:17 95:24 97:14
99:8 102:8,11 104:7,9,18
108:16 111:18 112:1,19
113:17 118:3,10 126:13
128:10,12,14,15,20,23
129:19 140:6,19 141:15
144:20 147:4 148:17 151:4
156:2 160:22,23 162:6
164:17 166:25 167:11
168:5,5,8,9 169:21 170:15
173:22,23,24 176:10,17
178:24 181:16 182:24
185:21 186:18,19 189:20
192:6 193:20,20 194:18
195:3 197:22 198:14,16
201:22 202:11,23 204:24
205:1,3,5,8,16 209:8 211:1
211:2 230:24 231:3 232:12
232:13,13,21 234:7,8,22
**knowing** 230:24
**knowledge** 13:15,17 19:17
70:6 96:12 187:12 195:19
198:21 202:24 206:18
216:2 231:16
**known** 233:7
**Kotwani** 24:23 35:8,17
127:9 146:22 150:13
154:11 159:16 171:8 186:2
**Kotwani's** 25:8 146:24

**L**

**L** 14:3 25:5,5 80:1 209:8
**LA** 180:24
**label** 192:24 220:16 233:6
**labeled** 93:10 100:20 126:2
139:15 191:14 193:4
230:17 231:11
**labeling** 94:18 192:3
**lack** 67:3 71:16 113:9
**language** 74:16 127:23
**large** 8:15 175:3 196:16
**largely** 212:8
**lasted** 35:19
**late** 194:3 203:23
**Laufer** 80:1,4,15

**law** 13:4 15:5,8 55:11 56:18
56:22 223:8
**laws** 56:14
**lawsuit** 138:18
**lawyer** 8:11 187:25 188:1
225:21
**lawyers** 25:1 33:4,14 97:4
189:11
**lay** 129:11 185:11
**lead** 22:12,16,25 188:6
**leading** 189:1
**leads** 55:14
**learn** 195:21
**learned** 38:22 51:2 69:2
158:14
**leave** 190:2 216:21
**leaving** 15:19 16:2 27:9 74:7
99:25
**led** 87:21
**left** 9:19,21 16:25 70:5 180:7
191:18
**left-hand** 79:24 151:15
**legal** 23:20,23 38:4 59:5,21
60:17 137:18 138:12,20,25
139:6,12 142:5,25 143:11
143:18 144:8 145:9 163:12
163:24 205:11,23 206:7
212:17 220:23 224:10
229:17
**let's** 9:15 13:18 17:9 20:14
20:18 27:22 33:23 36:20
57:18 66:13 72:24 74:5
92:23 96:21 98:13 117:15
119:12,14 129:21,21
147:11 148:25 151:19
153:11 156:9 168:25 170:8
170:25 171:6 185:24 193:5
197:13 209:11,23 219:24
221:5,18 227:3 232:24
**letter** 5:12 21:7,15,22 23:3
24:7 83:20,21,23 84:21
85:4 87:12,14 88:3,8 89:22
209:19 214:8,11 216:8,11
216:14 218:3
**letter/agreement** 82:9
**letters** 21:12
**level** 165:21 189:19
**liability** 207:3,6
**light** 19:6
**likewise** 134:21 135:14
153:2
**limitation** 130:7
**limitations** 111:6
**limited** 15:11 82:24
**line** 71:4 74:22 122:16
127:25 155:8,9 171:14

176:22 181:15 221:2 237:3
**linkage** 65:4,10,12
**Lisa** 32:20
**list** 8:21 77:23 78:25
**listed** 24:10 25:4 33:15
101:9
**listing** 25:2
**lists** 33:4
**litigator** 224:13
**little** 44:3 64:8 75:16 103:16
158:23 187:7,21,23 188:8
192:11 193:19 207:25
221:11,18 234:11
**Little's** 187:17 188:9 220:25
**lived** 82:17
**LLP** 2:15 91:6
**local** 194:16
**locations** 26:23
**long** 35:18 98:22,23 99:4,9
100:5,10,16 116:21,22
174:14 175:18
**longer** 189:25 203:22
210:12
**look** 20:14 27:22 35:1 42:16
57:18 64:16 74:5,17 83:24
85:25 87:1 97:13 98:13
105:23 111:8 119:12,14
147:19 148:25 151:7,19
164:5 171:6 174:4,7
185:24 186:7 197:13
208:23,23 210:22
**looked** 10:9 42:20,21 58:6
78:19,20 112:12 170:6
203:2 207:14 234:23
**looking** 8:13 34:3 44:23
46:4 72:18 73:5 79:6 80:20
97:22 98:13 110:14 145:21
149:24 154:24 159:25
174:5 185:14 201:24
213:18 221:10 226:9
228:17 232:12,13
**looks** 21:9 75:9 101:1
111:13,22 186:14 200:21
**loop** 106:9
**lot** 12:20 227:17
**love** 221:7
**luncheon** 117:16

**M**

**M** 25:17 209:8,8
**Madison** 3:11
**mail** 97:5
**main** 196:16 222:19
**Maisel** 5:9 57:9 79:23 81:3
83:19 97:3,9,25 107:17,20
108:13 109:18 118:13

131:7,10
**Maisel's** 57:19 58:14 109:1
131:20
**making** 52:6 155:17
**malpractice** 206:13,17
**management** 6:14 74:9
198:6 226:10
**manager** 199:18
**manual** 33:6
**mark** 17:23,24 18:1,4 81:16
100:21 125:2,2 165:6
**marked** 18:6 20:21,22 109:6
136:25 164:19 171:20
**marker** 63:24
**marking** 17:10 66:9 141:22
142:14
**markings** 125:4,14
**master** 171:9 172:21,25
173:4,16,25 174:13,25
185:9,17 186:25 230:11
231:10
**material** 56:14,17,23,25
63:3 82:22 107:7 193:2
**materiality** 56:22 57:1
**materials** 72:1 79:3 83:8,11
86:4 107:4,6
**math** 182:11 195:4
**matter** 12:19 20:6,11 22:10
22:14,25 25:15 30:20
55:22 61:25 90:24 108:7
136:24 137:5 138:15
176:13 188:16 201:4
225:24
**matters** 18:9 111:6 150:16
**McGorty** 1:11 3:2 4:3 5:2 7:3
7:7 8:10 9:16 15:12 18:8
24:9 28:3 30:21 31:19
34:12 37:25 38:2,15 57:13
59:9,24 67:22 74:11 80:17
81:2 82:15 83:23 87:14
90:10 97:6,10 107:20
118:12 124:18 131:8
132:18 133:19 135:21
147:2 149:25 151:19
152:20 153:18 154:14
156:13 169:6 187:6,8
190:12 193:9 197:17 198:9
201:10,15,17 206:6 210:2
210:15,19 228:15 230:11
234:24 236:6,20 237:2
238:6
**McGorty's** 6:4 153:15 169:3
**meal** 183:3,21,23
**meals** 184:4
**mean** 11:11 12:18 26:24
33:17 39:1,10 45:22 47:23

48:5 53:23 58:13 63:11
72:22 73:16 84:12 86:7
91:22 101:24 103:3,4
116:18 122:24 126:11
133:21 135:9 136:23 149:9
157:4,5 161:8 162:18
165:1,23 173:12 179:25
182:25 183:13 185:19
189:18 191:11,18,25 203:8
208:20 231:20
**meaning** 133:14 139:18,19
144:12 153:3 166:6 185:2
**means** 48:20 183:1
**meant** 101:2 211:19
**mechanics** 55:3
**meet** 13:7 79:8
**meeting** 10:4 11:14 26:13
33:25 34:14,17,19,21 35:5
35:12,19,22 36:1,3,4,7,9
36:15,20,25 37:6,8,11
42:14,24,25,25 43:5,13,16
43:18 57:21 58:24 59:3,16
61:22 62:10 66:6,14 67:3
67:23 70:2,5,9,16,21 71:17
73:20 79:4 102:14 105:3
105:10,13,14,15 106:8,11
111:23 112:3,6,8,10,15,17
112:21,25 113:3 114:16,17
115:17 116:1,8,10,12,20
117:3,9 118:17,22,22
119:4 120:16 133:8,13
135:24,25 136:4,11 188:8
188:12,17 223:9
**meetings** 8:16,18 10:3
36:16 37:12 43:20 49:1
59:18 61:10 106:3,4
222:25
**member** 208:21
**members** 187:13
**memo** 43:15,21 52:19 58:14
72:7,13 104:18 116:23
117:10 141:11 148:18
160:17
**memorialize** 52:12
**memorialized** 52:23
**memorializes** 72:8 141:12
**memory** 44:3
**mentioned** 47:25 57:23
58:15 112:22
**merchant** 174:14
**merchants** 175:18
**merely** 70:21 114:25 225:1
**met** 9:18,20 10:1 36:5
187:13
**Metals** 180:24 182:7
**methodology** 179:13

**Miami** 180:24
**mid** 186:8
**midday** 7:18
**middle** 35:4 97:8
**million** 194:13
**mind** 28:4 39:5 61:12 62:14
62:16 69:21 138:5 144:16
144:21 156:7 195:7 224:13
**minds** 62:10 66:6,14 67:3
**mine** 96:2
**minimal** 28:16
**minimum** 81:7 155:1
**minutes** 67:17 168:23
**misconduct** 203:13
**mislabeled** 178:17
**misquoted** 227:24
**misreading** 111:15
**misrepresenting** 116:6
**Missing** 147:7
**mistaken** 31:14 198:25
**misused** 167:18
**modifications** 151:22
**modify** 21:20
**Mohammed** 1:6 2:14 10:21
199:9
**moment** 55:6 63:17 83:24
87:6 96:21 118:2 175:12
187:8
**moments** 80:22 203:6
**Monday** 34:10 132:12
133:10 151:23 152:2
**money** 213:2 219:17
**MONIQUE** 1:24 238:23
**month** 7:6 15:15 136:9
**months** 15:18 26:10 91:7
**moons** 13:5
**moral** 188:14
**Moring** 3:3 7:8 12:15 30:18
39:22 40:6 91:6,9 94:25
215:1
**morning** 7:3 12:14 81:6,12
132:14 136:5 147:22
**motives** 234:20
**move** 32:14,14 57:3 114:1
183:18 223:12
**multiple** 36:18 48:25 52:24
88:20 113:4 173:12
**mutual** 62:20 66:24 67:13

**N**

**N** 14:3 100:23 127:9
**N's** 100:22
**N.E** 2:8
**name** 25:19 140:13 174:16
175:19 178:15,18,24 182:8
**named** 238:10

names 79:1
Namirata 146:22 157:9
Namrata 24:23
narrow 206:4
native 107:13 110:18 171:3
nature 26:22,24 39:20 40:24
41:2 42:10 43:18,20 44:13
46:9 64:12 83:11 94:16
138:18
necessarily 21:18 48:21
57:14 63:7 103:4 179:14
necessary 83:4 126:5,10,17
127:22 142:19 221:21
need 9:6 32:11 38:13 86:18
121:3,4 123:22 138:2,21
168:21 170:9 207:15
221:19
needed 39:16 66:5,14 67:6
needs 206:20
neglected 27:10
negotiated 188:12
negotiating 220:14
negotiation 114:19 127:20
188:3 193:13,17 220:17,18
negotiations 7:10 188:22
219:25 220:15
never 11:11 13:7 42:7 60:10
66:1,2,25 69:15 93:9,10
128:4 146:7 191:13 192:9
197:9 199:2 203:6
new 1:1,18,18 2:19,19 3:12
3:12 25:6 29:4 129:21
165:1,4 238:1
NK 24:21
non- 31:5
non-applicability 114:10
non-business 183:20
non-documented 195:4
non-folder 149:4,6
non-public 16:15
non-written 16:20
Nope 169:24
normal 43:14,17 46:17
Norman 2:6 87:13 216:8,12
notate 63:11
notation 146:13
notations 146:10
note 202:9
noted 8:2 68:14 80:10
226:13 236:9
notes 26:14,17 29:1 42:13
42:19,20,22 43:2,3,7,9
104:7,9,15 216:13
noticed 118:9 220:5
notification 207:8
notified 206:16

notion 143:17,20,20 224:10
Nov 5:12
November 87:12 209:6
216:12 238:20
number 5:3 6:2 8:14 24:11
25:11 35:1 36:17 83:17
87:11 96:22 107:3 110:19
117:23 125:4 147:16 149:2
151:5 153:13,21 154:13
156:10 169:1 171:2 175:4
180:22 185:25 187:4
197:14 211:20,23 212:5,8
212:14 216:11 226:18
230:25
numbered 27:8 32:18 74:7
97:8 107:5,12 117:24
146:18 147:13 151:11
199:9 201:1
numbering 151:14
numbers 27:11,12 57:11
79:21 96:25 107:6 131:5
133:17 170:21 171:1 190:8
193:7 198:4 212:13
NW 3:6

─────────────

O

O 14:3 57:10 127:9
o0o- 4:9
object 8:1,1 11:20 22:15
55:13 62:13,15 96:8
109:12 111:5 114:24 115:3
115:4 118:24 119:9 121:2
128:25 129:4 145:11,20
158:13 161:16 166:15
174:19 204:9 230:20,23
objected 32:2 223:16
objecting 201:14
objection 7:22 8:4,5 11:6
28:11,23 29:12 30:15 32:1
33:20 41:9,15 49:5 50:5
52:24 55:23 65:13 66:10
67:10 68:8 69:7 70:10
71:22 72:4,21 73:7,12,25
76:21 81:13 82:1,4 91:19
92:13 95:11,12,23 96:10
96:17 99:7 100:12 102:18
110:3,3 111:3 115:20
121:10,14,19,24 122:3,7
122:14,20,24,24 123:10,12
123:16,19 124:2,5,19
128:8,19 130:3,5,6 131:16
132:2,8 133:1,6 140:21
141:6 142:20 143:25
145:16 149:10 150:4 152:3
152:7,10 155:18 157:3
158:11 160:7,20 167:15

169:19 177:5 179:9 188:24
190:4 200:14 201:9 204:4
204:21 205:13 208:4,9,14
212:16,22 214:21 215:22
217:8,14,18 218:19 220:22
221:15 229:16 231:5
232:11 233:8 234:21
objectionable 217:18
objections 7:13 9:9,11
175:4
objective 190:3 232:3
233:13,23
objectively 66:18 92:19
observe 71:24
obviously 12:20 24:6 50:16
58:7 60:4 73:25 111:4
140:11 165:24 168:2 183:3
183:4 226:6
occasion 88:20
occasions 9:22 48:25
occurred 78:23 163:7,10
188:18
occurrence 206:20,25
occurring 195:20
October 1:13 4:2 7:1 37:15
88:17 89:20 139:22 187:7
188:18,21 189:9 190:10
191:13 192:12,15,16,24
203:20 216:17 237:2
odd 118:11
offer 23:4 88:6 190:18
offered 55:2 131:13
offering 40:15
office 25:6 50:19 116:17
151:23 198:12
offices 106:10
official 22:9
oh 31:9 115:2 117:8
okay 8:6 13:18 18:14 22:18
58:5,12 74:23 75:6 81:21
82:7 84:2 87:5,9 88:14
89:3 91:1 108:24 111:25
118:4 120:2 128:16 129:3
136:10 138:22 146:15,20
148:24 149:23 151:8 175:6
177:19 187:9,11 207:12
210:24 216:6
once 70:24 186:20 212:3
one-page 187:4
ones 36:18 48:21 113:4
170:16
ongoing 88:23
OOP 101:22,23
open 180:6
operative 14:11 30:3 58:7,9
59:7

opine 62:14
opinion 96:16,18
opportunity 190:18 198:20
198:22 199:4
opposed 51:4 113:1 136:24
138:5 142:5 143:11 173:2
195:11
opposing 191:3,14
option 189:25
order 30:8,13 31:4,13,15
37:15,18 66:6 120:3,23
213:2 219:8 225:24
ordinary 53:9
organized 135:7
orientation 153:18
origin 99:24
original 24:7 33:10 80:5
97:16 98:11
originally 99:14 101:11
102:8
originated 97:18,20
outcome 238:16
outside 90:3 189:9 216:20
overcommit 192:10
overinclusive 227:21
overinflated 212:9
overly 228:3,7,11,25
overstate 227:22 228:5
overstated 228:12 229:5
overstatement 188:14
229:22 230:14 231:3,10,13
231:15
overstating 230:12
overstep 125:19
owe 229:14
owed 39:12 212:2 229:14

─────────────

P

P 57:10
p.m 27:16,24 34:10 57:9,20
81:4 83:19 97:10 107:21
118:14 132:12 146:23
147:6,20 153:15 154:15
156:12 169:3 171:7 223:15
235:3
packet 84:3
page 4:4 5:3 6:2 18:10,12
23:3 24:13,20 25:3,11
27:22,22,23 33:24 34:4
35:1,5 57:18 74:22,24
75:17 77:18 79:25 81:1,2
88:10 89:22 91:3 97:8,9
98:14 101:14 106:7 107:8
107:16 110:17 111:13
122:9,11 125:9 131:6,10
131:21 147:2 149:7 186:1

193:22,25 194:9 199:8,22
209:2,15 210:25 213:17,19
213:20 237:3
**pages** 1:12 83:22 111:20
118:10 180:22
**paid** 78:3 88:12,15 122:6
180:12,20 182:12 186:16
186:17 195:10,12 205:3,6
216:16
**paper** 198:5
**paragraph** 21:21 23:4 75:4
75:18 76:16 81:5 88:10,18
88:25 89:23 91:2,7 92:7
94:22 194:10 216:10
**Park** 2:18
**part** 42:12 50:15,16 61:17
64:10 65:18,19 66:3,4 69:4
75:19 88:17 89:15 109:17
125:9 136:6 140:16,24
158:5 162:11 167:4,6,9
170:5 176:17 178:21,22
190:5 196:16,17 197:1
198:11 199:1 206:23,24,24
211:16 212:9 216:21
220:15 222:13 225:17
227:7
**partial** 111:15 181:1,14
182:17
**partially** 151:14
**participants** 140:7
**participate** 11:16 14:24
29:17,22 34:14
**participated** 28:6,9,21 29:5
35:12 91:8 141:4
**particular** 17:4,6 19:4 25:25
28:21 29:15 35:15 43:18
45:6,20 46:5 59:16 74:16
105:1,22 118:8 128:3
132:16 155:3,7 169:25
176:22 184:3 185:8 234:1
**particularly** 42:4
**parties** 14:21,25 17:11
18:25 20:4,5 84:8,17 91:11
219:14 238:17
**partly** 219:11
**partner** 11:16 14:2 18:16
22:6,12,17,25 25:6 28:3
167:20 187:15 213:23
**parts** 222:8 225:16
**party** 15:7,9,23,24 39:12
66:18 86:15 140:20 204:18
207:19 222:20
**passed** 54:25 55:11,20
178:10 229:8
**passport** 33:6
**Paul** 7:8 11:25 13:23 14:20

15:2 30:3,12,18 31:12,19
34:14,16 35:6,12,19 36:3,5
36:7,9,15,21,22 38:16,22
39:6,15,21 40:3,5,11,18
41:4,7,21,25 42:2 43:5
44:4,12,20,23 45:2,10,16
45:18 47:11,13,20,21 48:9
48:12,17,25 49:8,14,23
50:13 51:9,20,25 52:4,5
53:14,18,24 54:11,14,18
54:20,22 55:2,7,18,25 56:2
56:7,12 58:24 59:3,12,19
59:25 60:11,16,22,24 61:8
61:13,23 62:9,11,14 64:1
65:18 66:6,14 67:6 68:7,24
68:25 69:3 71:1,9 72:2,10
72:19 73:20,24 75:13,25
76:10,24 79:3,12 80:11,12
80:13,14,14 82:21 83:5
84:4,25 86:2,19 91:10
92:25 93:3 94:4 95:1,9,22
97:4,17,25 98:8 99:22
100:4,7 102:13 104:23
105:6,10,13 106:10,19
107:18 108:11,20 109:24
110:22 112:8 113:3 116:1
116:5,8,9,11,18,20 118:23
119:20 121:13 126:18
128:4,21 129:25 130:2,10
130:12 131:12,13 133:9
135:15,24 136:3,11,21
137:10,18,21 138:6,8
139:10,11 140:12,14 141:3
141:12,23 142:14,24
144:23,25 145:8,25 146:8
146:12,22 150:13 155:21
157:24 158:16,24 159:6,12
159:20,24 160:12 161:20
162:7,18,21 163:5 164:7
164:16,25 165:6,12 166:1
166:2,4 171:24 172:13
176:1,2,12,24 177:2,10,25
178:4 179:4,13,19 180:13
181:4 184:17 185:3,16,21
187:1 188:9 189:11 192:13
192:18,25 195:1,9,25,25
196:9 197:2,6,7 198:5,14
198:18 200:4,16 202:12
211:8,10 213:25 214:20
215:2,12,15 216:19 218:18
222:10,25 223:16,23 224:8
224:19 225:2,3 226:10
227:4 228:8,23 229:21
**pause** 102:9
**pay** 23:5,7,15,22 48:22
204:1 213:2 219:11

**payable** 194:12
**payback** 211:21
**paying** 71:15 180:4 204:8,16
204:17 219:17
**payment** 23:19 101:21
174:16 175:19
**payments** 74:22 204:23
**payout** 193:24 194:1
**PDF** 83:20
**penalty** 236:7
**pending** 115:13 186:5
**Pennsylvania** 3:6
**people** 80:11,12 140:22
**perceive** 95:16,20
**perceived** 139:13
**percent** 231:4,4
**percentage** 230:15
**perception** 101:1
**period** 15:15 22:11,20 34:17
36:3 37:24 38:1 60:13,16
113:2 120:6 133:13 136:2
144:3,7 159:22 216:18,23
217:20 218:7
**perjury** 236:7
**permission** 199:13
**permit** 31:7,11 47:3
**permits** 31:4
**permitted** 30:8
**person** 43:11 80:13,14,15
140:14 223:10 238:13
**personal** 33:7 45:15 50:25
90:17 100:20 101:16
121:16 122:5 155:15
174:16 175:19 177:7,8
179:5,14,14 180:5,11,20
181:19 182:19 183:24
184:4 201:19 211:1,2,4,5
211:13,19 212:1,7,7,14,24
225:12 227:12 228:22,22
229:6,22 230:13,15,17
231:11,22 232:10 233:2,7
233:24
**personally** 23:15 40:3 54:16
**personnel** 105:10,11 109:25
133:9,9 159:6
**persons** 26:15
**perspective** 11:21 40:25
48:12,13 62:7 86:17 88:6
95:25 96:14 126:15 144:23
168:15 218:1 224:9
**pertained** 70:8
**pertaining** 186:4 192:25
**pertains** 31:20 186:10
**phone** 11:14 20:3 26:15,18
28:6 61:22 161:23
**phrase** 22:16

**physical** 83:8
**pick** 161:23 183:21
**piece** 167:25 179:19 187:24
**pin** 136:5 140:18
**place** 19:25 42:16 78:23
89:19 238:10
**placed** 130:8 211:13 216:21
**plaintiff** 1:4 2:2 38:8
**Plaintiff's** 109:6
**plaintiffs** 38:1
**plan** 133:19
**plans** 233:3
**play** 163:17,19 179:1
**please** 18:3 27:6 31:10
107:23 129:5,6 146:15
171:9,13 174:7 186:4
187:3 190:6 226:21
**pocket** 101:23
**point** 18:15,22 23:9,11
36:24 39:18 40:2,14 42:3
44:8,10 46:25 61:11,24
62:22 71:6 80:25 82:19
105:13,22 110:25 111:17
111:21 116:19 123:1 136:4
139:4,9 142:7 143:16
144:11 150:20 155:7 158:9
163:3 171:24 172:22
177:24 180:18 181:10
183:14 189:8,8,23 190:1,3
190:15 192:17 195:21
196:3 197:7 199:10 203:23
206:9 222:13 226:9 227:10
**pointed** 150:2
**pointing** 125:8
**points** 77:24
**policies** 47:23 74:10
**policy** 33:7 47:3,16 48:2,7
65:9,21 78:11,13 168:14
234:10
**poor** 34:23
**populated** 100:22 176:18,22
**portfolio** 199:15
**portion** 37:14 74:12,13
116:11 150:1 193:21 205:7
226:8
**portions** 90:15
**portrayal** 212:1
**position** 31:17 157:11 159:7
160:1 169:8 171:24
**possibility** 59:20 60:17
114:14 159:1
**possible** 41:5,13 43:20 46:7
53:20 54:1,9,10 115:18
117:1 137:18 176:24
182:18 224:16 231:18
**possibly** 140:12

post 79:16
post- 76:21 164:20 187:18
    206:1
post-April 171:10
post-August 60:1,8 98:4
    110:2 130:4 172:10 224:3
potential 20:4 41:1 56:3
    137:22 138:8,11,17,18,20
    138:25 139:6 141:1 142:1
    143:18 145:1,9 158:20
    166:9 180:8 207:3,9
    223:24 225:1
potentially 51:9,18 52:1
    55:10 59:5 60:23 138:12
    145:10 155:22
PowerPoint 200:22
practice 16:19 17:10,14
    43:9,19 62:25 63:5,6 71:2
    71:6 78:10 191:12 192:3
    220:25
practiced 223:8
preceding 194:14
predated 84:18 161:7 168:7
preexisting 47:23
preface 129:4
preference 45:12
preliminarily 90:17
Preliminary 198:7
premarked 8:14 21:1,2
premature 8:2
preparation 10:6 11:19 14:5
    14:16 75:20 88:3 156:15
prepare 9:16 116:23 117:2
prepared 43:15 104:19
    148:18
prepares 75:23
preparing 190:16
presence 105:16 207:18
present 10:2,4 24:8 43:12
    44:1 105:11,14 106:13,15
    106:16 116:9,11,15 117:8
    133:12 139:18 140:11
    154:10 183:22 188:11,11
    208:7,12 222:17
presentation 198:15,22
    200:18,22 202:12,14,20,22
    202:25 203:1,9
presented 102:24 229:12,13
presently 13:10,11 153:22
    153:25
preserve 7:13 111:7
president 18:23
pressed 191:21
presumably 37:9 172:2
    186:18
presume 116:1

pretty 9:22 129:7 182:10,11
Prev 122:6 180:12
prevent 120:14
preventing 30:11
previous 77:11 97:5
previously 14:20 15:11
    32:23 62:8 65:11 69:17,24
    83:2,25 87:15 90:10 92:24
    106:18 112:12 120:4
    128:11 145:18,19 150:12
    151:1,15 156:5 159:6
    179:6 180:19,20 186:11
    193:9 198:8 203:11 207:14
    211:21
principal 18:16
print 148:24
printed 80:4
printout 149:14
prior 11:9 15:4 27:23 32:7
    50:22 60:4 69:19 70:2,25
    76:18 79:17 89:10 97:7
    110:3 119:3 123:11,17,22
    124:23 128:8 129:10 130:4
    130:16 133:18 134:6
    136:11,19 137:9,16 146:8
    150:23 152:2 154:4 159:9
    159:24 160:11 187:13
    188:20 191:19 199:10
    200:6,13 205:12 214:7,11
    214:23 223:1,15 228:16
private 16:19 18:17 56:23
    86:15 186:16
private-equity 54:25 55:12
    55:21 56:2,8,25 178:11
    179:7
privilege 7:6 11:7 16:20
    30:4,9,11,24 31:6,18,22
    35:24 37:2,25 38:6,9,21,24
    55:16 58:8,9 59:8,14 60:22
    61:2,4 63:25 69:5 71:11
    72:3,9 73:23 74:1 81:14
    89:9,11,12 93:1,4,11,13
    98:3 104:16 119:8,24
    120:19,22 122:25 125:6,11
    126:12,13,22 127:14,17
    130:24,24 131:18 136:22
    137:7 145:23 146:9 149:11
    150:16 152:4 154:4,7
    157:16,17,20 164:7,19,23
    165:1,4,7,8 170:1 171:25
    201:5 204:23 205:14,16,19
    207:17 221:19
privileged 71:3 91:12,18
    122:17 125:3 128:1 130:5
    157:16 172:11 207:20
privileges 32:8

probably 22:21 23:25 29:21
    154:10 167:1,17 189:21
probe 75:16 138:2 207:25
problem 19:13 32:6 134:5
    175:5
Procedure 123:8 124:16
Procedures 74:10
proceeded 165:22
proceedings 7:11 235:3
process 27:4 33:2 44:21
    49:24 76:9 94:16 154:23
    156:6 166:3 167:1,5,8
    184:15 195:22 197:10
    227:5
processed 111:4
produce 199:23
produced 38:13 80:3
product 86:20 98:11 125:5
    125:10 126:11 127:13
    145:23 160:9 173:14 199:1
production 24:4,5
professional 24:15 207:3,5
project 25:1 44:13,15 48:24
    53:20 64:12 94:12 110:9
    111:1 125:19 174:16
    175:19 176:17 177:24
    178:15,18,21,22,24 182:8
    184:4 192:19 194:25
promote 222:9
promoting 223:13
prompt 157:24
prompted 160:19 167:3
    199:17
proper 46:12,14 178:16
    183:9 184:1
properly 178:23 227:23
    229:6
proposed 20:1,8 130:10
proprietary 83:9
protect 86:3
protected 31:21 72:10
    130:23 136:15,25 137:6,11
    144:24 172:6,11 220:21
    221:25 222:18
protecting 215:7
protection 38:1,6,9 94:5
    126:7,19 127:23 222:4,5
    222:15
protections 123:7 124:15
    172:16
provide 85:23 90:2 118:19
    121:7 161:14 215:14 226:1
provided 28:15 39:15 44:23
    45:2 97:17 102:16 103:6
    103:10 104:11,15 119:20
    121:13 134:8 157:10,14

176:12 177:16 184:7,10
    229:21
providing 20:24 86:13
    110:22
publicly 49:15,20
purchase 199:14 200:1
purchased 199:24
purchasing 199:19
purely 19:2 181:5
purpose 44:5,15 63:14 79:3
    134:22 177:12 183:23
    185:4 212:23,25 219:10
    220:19,20 222:3,3
purposes 24:9 196:5 226:2
pursuant 95:17 107:22
    118:14 119:23 120:1,19
    123:18 190:24 221:12
push 162:16
pushback 163:7
put 7:5 45:9 46:14 47:8
    63:15 79:9,11 125:14
    126:3,6,6,21,25 127:7,9,17
    127:25 128:2 156:1 181:8
    181:18,22,22 182:24
    183:20,23 184:4 211:12
    216:5 220:5,10 221:5,11
    225:9,10 228:10 233:11,19
    234:14
putting 16:1 46:24 63:1,24
    123:10 223:14 232:2

Q

qualify 15:18 233:16
query 197:23
question 7:23,23 8:3,3,6,7
    15:11 16:7 28:14,17,25
    29:2,3,4 30:22,23 31:1,2
    32:2,14 34:23 37:7 38:4,20
    42:6 45:17 46:3 51:24 53:2
    58:9 60:3,14,20 61:9,17
    66:12,20,22 67:12 68:22
    70:12 72:13,13 74:3 75:4
    76:23 80:7 94:20 95:24
    100:14,21 108:4,22 109:12
    111:10 113:17 115:5,14,25
    120:7,8,12 121:5,15
    123:11,13,17,22 124:11,14
    124:18,20,23,24,25 125:19
    126:24 127:4 129:1,1,11
    129:19 136:23 137:20
    142:12,21 143:7,15 149:12
    154:7,20 157:22 158:5
    161:18 162:13 165:9,19
    166:20 167:23 173:10
    174:20 179:1,10,12 181:15
    184:24 194:3,7,18 201:17

205:2,5 206:4,5,22 217:8
217:17 230:21 231:14
**questioning** 210:6
**questions** 4:11 7:16 9:10,13
21:5 30:8 31:24 44:2 52:25
57:15,24 58:3,23 74:18
83:22 107:14 117:25 118:3
119:7,23,25 120:5,15,20
120:25 121:1,5 124:4
128:25 129:5,17,22 134:7
134:10,12,18 135:8,10,18
152:17 153:3,21 154:18
161:15 174:9 195:19
196:15 204:10 210:15
213:5,8 214:25 217:8
219:20 223:22 230:4
234:25
**quiet** 129:13
**quite** 30:20 43:20 120:17
**quiz** 57:13
**quote** 200:1
**quote/unquote** 173:3

---

**R**

**R** 25:17 57:10,10 80:1
**raise** 20:3 54:15 224:14
**raised** 50:9 168:7 195:13
207:6 210:20 211:21 234:7
**ramifications** 224:22
**Rashid** 1:6 2:14 6:8 9:21
10:22 11:10 13:9,19,20
14:10,11 15:19 16:2 18:20
19:21 20:8 21:8,13,20 22:2
22:10,22 23:9,15 25:14,17
26:4,8 31:17,20 32:20
34:15 36:22,22 37:21,25
38:9 39:4,21 40:12,21,25
44:15,22 45:11 47:4 48:3
48:10,16,18 49:3,8 50:9,10
50:24 51:3 52:6 53:21 54:1
54:24 55:15 56:4 59:5,21
60:18,23 61:15 64:22 65:2
65:17 67:23 68:25 69:23
69:25 70:1,9 72:20,25 73:6
73:22 74:7,14 76:20 77:3
77:18 78:7 81:5,11 85:22
86:21 87:20 88:11,15,19
89:4,8,16,17,24 91:4 93:22
95:1 97:11 99:6,14,21
100:1 101:10 102:16,19
103:6 105:7 106:13 107:24
110:9 111:24 113:3 114:14
117:3 121:7 125:21 131:11
137:19,25 138:9 139:1,7,8
139:12 141:14 142:3 143:1
143:5,9,16 144:9,19 145:2

145:10 150:1 151:24 152:1
152:6 154:11 155:16,19
158:9 159:2,8 161:10,11
161:13 163:13 165:18
166:1,2,5,7,10,22 167:5,11
167:14,20 168:8,10,14
177:4 180:17,21 186:5,11
187:7,12,19 188:22 189:3
189:7,14,15 190:1,8
192:23 193:9 195:11 196:8
196:14,25 197:11 199:9,12
199:19,24 203:4,12,23
204:2,8,14 205:3,6,9 206:7
206:11,12,13 207:9,13
208:3,7,12 213:7,24
214:13,17,23 215:8,14,17
218:4 219:4,15 222:22,24
223:3,25 224:23 225:15
226:4 227:3 229:3,14
237:3
**Rashid's** 23:24 26:8,18
32:25 33:14 34:17 39:8
40:7,25 44:25 46:8 48:13
49:15,18 50:23 51:9,18
52:1 53:17 54:2,6,15 55:9
56:13 62:7 64:15,25 65:2
69:12 72:11 93:8 94:4
97:19 99:12 115:18 131:13
141:1 143:12 166:8 168:4
168:15 175:24 176:9 178:4
179:16 196:21 199:16
208:2,16 212:9 222:23
226:19 233:2
**reach** 96:6 202:18 234:20
**reached** 19:11 53:25 66:25
**reacting** 157:8
**reaction** 156:24 157:6
**read** 37:14,20 57:16,17,25
76:13 77:16 84:21 87:6
90:11,13,23 92:7 95:8
120:3 123:23,24 124:12,13
124:21,25 171:16 175:11
187:8 226:20,21 228:1
235:1 236:7
**reading** 78:25 163:11
226:25 238:21
**ready** 21:4 74:17 87:7 118:3
**real** 28:18 30:16
**reality** 234:2
**realize** 66:19
**really** 81:8 87:25 96:13
126:18 154:20 179:25
225:25 231:2,25 233:17
**reason** 17:1,4,6 21:10 26:21
46:23 90:4 91:15 92:10

95:3 100:9,15 109:11,21
128:3 165:13 169:22 173:8
180:10 213:1 234:12,16,19
237:4,6,7,9,10,12,13,15,16
237:18,19,21,22
**reasonable** 95:8,16,20
96:14 157:7
**reasons** 26:23
**recall** 17:14 19:6,20 24:25
26:13 27:1 28:5 33:22
35:21 36:7,9,10,11,21,21
38:15 39:6,14 40:9,11 41:3
41:20,24 42:8,8 43:5,6,8
43:10 44:4,7,24 45:19
47:10,13,17,18,22,24 48:1
48:5,9 49:13 50:2,8,11,21
50:22 51:8,17,25 52:3,10
53:14 54:8,13,22 55:2 56:1
56:5,6,12,19 59:4,19,20
60:11,15,21 61:5,8,10,11
62:9 65:16 67:5 68:6,9,24
69:2 71:6 75:7,13,25 76:8
77:7,15 79:12 83:1 84:12
85:2,5,7 88:4,7 91:12 92:8
92:14,16,17,24 93:16 94:2
94:2,6,6,24 95:9 100:7,7
103:7,9 105:13 106:14
109:24 112:5,19 113:3,5,7
113:11,12,16,18,24
114:5,9,16,22 115:1,10
116:14,15,16 117:1,8
133:12 135:23,25 136:2,10
136:17,19 137:4,9,14,17
137:23 138:4,6,7,12
139:25 141:5,20,22 142:13
143:7,22,23,23 145:1,3,6,8
145:24 146:11,14 156:24
157:22 158:1,2,6,18 159:3
159:11,13 160:6 163:7,16
164:9,15 165:11 172:23
178:12 179:3,18 181:16
184:16 185:16,20 187:2
191:19,19 195:24 196:9
197:24 199:6 200:8,19,23
207:19 208:1,5,6,10,11,15
215:24,24 216:1 223:25
**recalling** 139:17 188:17
**recalls** 113:21
**receipt** 160:11,19 199:25
**receipts** 199:23
**receive** 109:22 197:25
**received** 29:20 78:4 99:16
103:8 108:18 120:10 151:1
159:4 171:19 176:23 177:2
185:13 197:23 199:12
202:4 214:17

**receiving** 157:8 160:4 164:8
164:16,22 165:16
**recess** 67:19 117:16 170:10
209:24 230:1
**recipient** 208:2
**reclassify** 50:24 227:12
**recognize** 101:19 203:8
**recognized** 66:25
**recognizing** 143:2
**recollection** 8:17 10:10,13
11:2 19:16 22:20 28:20
29:7,8,17,25 32:23 34:20
35:18 37:10 38:18 40:4,16
42:23 43:24 44:1 48:7
51:12,14 53:8,11,23 54:3
58:2,19 59:13,15 60:7 62:2
73:3 77:8 79:5 82:19 84:24
87:16 89:6 91:23 95:4,6,13
95:15 96:2,3,13 101:24
103:13 104:2,5 105:5,9,15
105:20,22 110:21 112:2,20
112:25 113:1,10 114:13,18
115:16 116:10 117:12
128:22 130:11,16 140:9
143:3,3,21 145:15 148:7,9
148:12,15,21 150:20 154:9
155:6 156:17 158:15,24
175:13 177:9 180:21 181:8
183:6 184:8 185:6 188:19
194:22,24 198:1,10 201:13
201:19 202:16 217:3,4
224:4,6,11 226:16 233:13
234:12
**recollections** 148:14
**record** 7:5 12:17 20:23 24:3
27:7,11 28:10,14,18 30:6
32:17 37:14,17,20 57:7
60:12 67:18,20 74:6 79:24
83:16 87:10 90:8 95:8 97:1
102:23 104:14 107:2
109:11 112:4 113:20 114:8
117:15,17,22 120:3,4
121:1 123:23,24 124:12,13
130:14 137:4 146:17
151:10 152:23,25 153:1,12
154:3 170:11 174:23
175:12 184:25 185:1
209:11,12,13,23,25 217:7
230:2 238:11
**records** 8:19 28:15 44:25
46:9,10 148:3 175:15
183:8
**recreate** 105:7
**redirect** 230:9
**reduced** 194:14
**reduction** 194:13 195:11

refer 13:20 18:8,19 32:25
34:25 81:1 88:9 89:22
106:25
reference 33:24 35:4 58:14
80:16 82:15 105:4 106:7
109:1 118:21 119:3 122:12
125:17 131:25 132:17,25
158:25 161:2 209:6,21
221:13
referenced 92:6 108:2
112:11 155:9 191:10
208:20
references 105:18
referral 13:25
referred 18:9 102:2 166:20
178:14 217:9,18 218:25
219:1
referring 12:22 38:25 62:25
81:25 109:5,19 112:9,10
125:12 147:21 172:3 175:3
175:8 182:1
refers 18:22 23:4 101:23
105:3 147:4 155:10 173:7
173:9 199:11
reflect 8:16 52:15 53:8
84:23 176:15 231:12
reflected 64:25 100:17
165:17 166:4 169:12 191:7
202:13 232:1,17 233:9
reflecting 106:3 118:16
200:1 233:1,3,21
reflects 80:9,17 112:13
183:2 213:21 231:10
refresh 10:10 29:17 42:22
43:24,25 117:12 145:15
148:21 156:17
refreshed 10:12
refreshes 58:1
refusal 122:22
regard 22:24 32:2,9 71:9,13
71:14 91:17 123:11 189:14
223:7 224:3
regarding 12:4 25:14 35:7
72:10 73:22 75:14 79:13
85:3 103:22,23 104:22
109:25 115:18 116:24
136:12 148:18
regardless 75:23 163:9
regularly 159:19
regulatory 54:6,15 55:21
reimburse 45:13 47:4 48:22
178:6 211:17
reimbursed 48:22 179:7
reimbursement 74:10 186:6
186:12 199:11
Reimbursements 199:10

reimbursing 47:14 48:20
180:19
rejected 78:1
related 20:5 28:16 37:8
56:16 59:25 97:19 99:12
107:24 167:4 185:7 188:15
216:24 224:8 238:17
relatedly 93:24
relating 92:11 99:20 221:24
relation 99:5
relationship 11:13 168:8
197:6 204:14 214:13
219:15 232:18 234:9
relationships 16:14
relevance 204:5,21 234:21
relevant 22:20
relied 192:8
rely 71:12 212:12,23,24
relying 38:21 63:4
remain 189:16
remained 222:19
remaining 171:14
remember 10:13 11:15,15
11:17 19:9 20:13 23:13,17
25:19 26:2,6 29:6,14 33:16
34:16,18,19 36:1,2,15,16
36:17 42:4 43:18 44:9,11
46:9 48:16 49:1,7,17,21
50:1,3,11 54:18 55:5,19,24
56:10 58:13 59:17,17
67:11 76:12 78:19 89:20
90:12 97:24 98:6 99:22
105:1 106:4,10,15,16
110:6,25 111:2 112:14,14
112:16 114:4 124:7,9
133:11 136:3 139:24
140:15,17,25 141:9 142:4
142:8 144:14 145:19
150:24,25 151:2 154:25
156:6,8 157:6,8 161:22,25
162:3,4,5,20,21,23 163:2,4
163:6,10 164:20 169:20
172:8,12,17,20 173:21
176:23 177:13,14 180:2,10
181:3,20 183:14 185:23
186:21 187:20 188:5,7
190:20,21 192:19,20,23
193:3,10,10 201:18 203:10
203:21 207:21,22,24
remembering 106:21 136:8
remind 157:11
repaying 56:8
repeat 24:12 61:17
repeatedly 48:17 196:4,6
rephrase 61:18
replacements 170:12,16,17

report 29:20,20 45:2 52:22
75:11,20,24 76:18 117:2,6
117:10 159:19 197:21
200:21 232:25
reported 1:24 238:11
reporter 20:24 123:24
124:13,25 228:2 238:12
reporting 51:18 52:1 59:22
reports 44:23 77:9,11,14,24
83:10 99:5,13 105:8
represent 22:10 87:19
118:20 150:7 164:14
196:21 198:11 222:17
representation 11:10 13:19
14:25 18:19 19:1,25 20:8
23:20 25:8 27:4 31:25 40:8
42:12 44:12 48:3 62:3
64:11 69:15,20 70:3 87:24
92:2 139:21 155:23 187:18
189:3 198:12 203:19
205:12 206:2 215:5,16
217:15 224:21
representations 30:19 36:6
62:19 67:4 89:15
representative 215:3
representatives 69:12
161:13
represented 14:21 16:18
19:8,19 44:20 45:10,16
69:19 70:19 91:11 203:12
228:24
representing 9:20 14:15
15:7,8,22,24 16:21 61:13
61:14 69:23 73:6 77:3 78:7
92:4 127:2 168:10 188:21
198:18 203:22 215:9,18
217:24 218:12
represents 147:9
request 33:10 104:17
153:16 154:16 165:11,14
169:4 185:2 227:18
requested 81:24 171:12,15
184:6,10 238:22,22
requests 27:5 146:24
required 76:17 77:8 126:14
requirement 76:1
requirements 78:6 79:14
requires 77:21
resay 76:25
resolution 53:20,25 188:12
196:23
resolve 40:25 45:12 48:18
49:10 65:2,24 73:1,2 93:7
93:15 166:7,8 167:6
168:11,13 182:12 187:22
187:23 188:16 195:13

198:18 211:15,16 212:3,10
215:16 218:24 219:3,18
222:11 225:24 229:3
resolving 36:6 61:1 64:14
64:24 65:1,5 125:20
168:16 189:3 226:3
respect 13:9 20:8 22:3,6
23:19 25:9 26:18 29:10
34:15 38:16 41:1 43:15
45:8 52:8 53:16 59:18
61:23 66:15 73:23 85:22
88:2 124:11,23 128:14
134:7 145:20 160:11,18
162:18 164:25 165:25
167:8 168:13 169:8 172:9
175:9,22 178:8 181:4,13
183:9 189:24 195:20
196:23 207:12 230:11
respective 238:18
respond 21:4 74:18 118:3
responded 197:3
responding 196:14
response 7:25 24:5 30:16
71:15 82:12 94:21 161:14
197:11,23,25 202:4 214:24
responsibilities 196:20
responsibility 77:4 168:10
responsible 75:22
rest 150:8
restaurant 233:4
restrictions 220:11
result 181:19 234:20
resulted 180:18
results 56:23 198:7
resume 220:5
retained 5:4 21:8 91:5 168:9
213:9,11 217:21 218:22
224:24
retainer 21:7,12,15,22 23:3
24:7
retention 161:8,10 209:19
214:8,11,24 223:1
rethinking 123:16
retired 25:7
retrospect 64:6
revamped 131:21
reveal 231:17
revealed 49:16,20
review 6:14 9:6 10:6 39:9
40:7 44:5,13,16 46:8 48:4
48:11 49:19 50:22 56:8
61:23 62:6 72:23 76:20
77:3,14 78:8,15 82:23
85:24 86:6 88:22 97:12
110:7 128:5 130:2 131:12
131:14,15 151:24 152:2,6

152:9 164:25 177:12 182:5
192:14 193:1 198:6 209:18
215:14 216:22 218:14
226:11 232:8,8,14 234:17
**reviewed** 10:14,17 28:15
116:25 156:15
**reviewing** 40:20,21 44:22
58:4 74:19 84:1 87:8
105:25 154:23,24 187:10
215:13 226:22 227:11
**revised** 132:6 171:11
**Ricciardi** 35:6 58:16,20
140:13 148:4 153:16 171:8
**right** 12:10 23:25 25:20
37:13 52:21,23 61:8 81:22
85:18 87:22 93:5,9,12
100:2 101:8 102:13,21
109:6,15 110:17 115:9
119:2 140:3 149:7 159:17
164:8 167:1,7,16,17,25
168:1 169:15 170:7,24
173:6 177:6 182:16 186:18
186:18 203:7,24 205:1
209:4 210:16 211:22
212:18 213:11 217:22
218:5,15 219:2 228:8
**rights** 85:22
**rings** 181:25
**rise** 137:22 138:20 165:4
206:21 224:10
**road** 114:23
**Roberto** 5:14 12:1 28:2 90:9
90:12 187:6
**rodeo** 220:6
**role** 22:8 179:2 190:16
193:13,16 196:14,17 215:1
**room** 70:5 153:22 154:1
**rounded** 194:23 195:6
**rule** 7:10 17:18 93:13,19
94:5 114:10 123:8 124:11
124:16 125:7,16,17 127:17
128:2,4,21 129:25 130:24
137:12 141:23 142:15
172:6 191:10 193:1 220:11
220:21 221:14
**rules** 8:12 17:18 39:7,10,11
123:8 124:16 130:25
137:12 141:24 142:15
172:6
**run** 20:5,7 50:17

**S**

**S** 57:10
**SAAD** 57:14,23
**salary** 88:16 216:16
**salesman** 199:25

**saw** 10:12 75:9 90:12 109:3
146:10 156:16 169:20
190:13,14,21 193:12
233:16
**saying** 9:5 17:18 41:24,25
42:7 47:7 114:22 128:12
138:13 141:12 155:24
158:3 167:12 181:11 234:6
**says** 27:21 34:7,9 110:18
111:13 116:4,6 122:16
125:10 131:10 132:12
150:8 164:9 181:24 202:4
209:18
**scheduled** 197:21
**scope** 21:20,24 66:1,2 70:6
222:7 232:14
**scrutinized** 19:5
**seasoned** 224:13
**SEC** 12:19 13:9 18:17 24:5
24:11 27:13 35:1 49:24
50:3,8,15 51:7,10,18 52:2
52:7,22 53:5,16 54:3 65:4
65:11,16,23 87:11 90:5
93:25 103:20 108:8,10,12
108:19 115:18 125:23
166:2,9,21,24 167:7,13
192:21 195:20 196:15,18
196:19,25 197:4,12,20
198:13 200:18,21 202:2,6
202:12 203:4,23 209:2,15
212:12 213:13 214:25
215:20,25 216:24 217:10
218:9,14 219:18 222:12
225:19,24 226:3,8 228:24
229:12 237:3
**SEC's** 10:14 65:25 87:20
167:3 168:6,12 203:13
**second** 18:15 27:22 29:2
68:10 75:4,18 88:10 89:23
103:20,25 122:9 152:24
199:10 216:8,10
**second-to-last** 209:3,5
**section** 75:17 77:19 193:25
**securities** 1:3,16 2:2,4
56:14
**securities'** 55:10 56:17
**see** 9:10,11 23:5 24:13
27:17,25 33:11,23,25
34:12 35:8 44:2 52:9 58:1
59:1 70:3 75:16 80:18
104:23,25 110:13 115:6,11
131:23,24 147:1,3 148:5
156:20 190:25 202:5 217:1
226:11,16,18
**seeing** 32:23 33:16 75:7
87:16 90:12 97:22 185:15

**seen** 10:8 12:9 21:15,18
83:25 87:14 88:5 90:10,11
141:16,17,17,20 160:24
172:2 190:11 193:9 198:8
199:2 203:7 226:14,15,23
229:7 233:9
**send** 72:1 153:21
**sending** 28:4 82:7 86:5
170:2 172:22 191:3
**senior** 18:16
**sense** 66:1,2 106:17 137:25
138:1,16 143:21 162:9
172:12 173:12 176:10
228:18,20
**sent** 21:17 63:7,8 81:3 86:7
87:17 91:4 120:10 135:8
146:2 165:7 169:6,7
171:18 191:13,20 201:25
**sentence** 33:9 75:3 88:9,18
88:25 89:23 90:5 92:7
94:15,24 194:10,14 216:15
**separate** 23:18 96:24
143:17 179:24 184:21
187:20 189:7
**separately** 6:21 91:11
**separation** 23:12,24 114:19
188:4,23 190:9
**September** 22:21 84:8,18,19
88:21 89:6,19 139:22
189:8 197:16 198:7,13
202:14,19,22
**series** 80:10 97:2
**seriousness** 139:5 224:9
**serve** 77:4
**services** 24:15 78:2
**session** 7:2 38:7 116:12,24
117:13 151:23
**set** 19:23 47:15 58:22 79:14
86:23 96:21 98:22 100:10
100:16 101:4 102:5 103:15
119:17 121:8 147:11
174:10,12 175:10 238:19
**setting** 147:23
**settle** 93:21 125:22 142:2,9
142:23 189:24 190:14
219:7,11 224:15 225:13
**settlement** 17:12,12,16
60:22 91:14 92:9 93:1,4,11
93:13 122:19 125:25
127:20 189:20 190:24
191:4,14,23 192:1,4,4
193:2 219:25 220:2,10,14
220:15,16,18,21 221:3,12
227:7
**settling** 61:1 93:24 125:20
219:16 225:22

**setup** 9:2
**severance** 187:22,24 189:13
211:23 221:1
**share** 63:10
**shared** 64:13 78:2 144:23
155:21
**sheet** 82:7 112:11 190:9,17
225:8,9 237:1
**sheets** 103:18
**shorthand** 238:12
**shortly** 82:10 215:20
**show** 46:5 184:3 211:11
**showed** 193:11 203:6
**showing** 151:22 173:20
**shown** 132:15
**side** 67:1 140:14,16 141:8
144:9,12 149:7 151:15
222:6 230:17
**sides** 66:25
**sign** 235:1
**signed** 214:8,12 237:24
**significance** 71:8
**significant** 52:20
**Signing** 238:21
**silence** 71:9,24
**similar** 71:3 91:22 134:18,20
134:25 191:2,6 193:2
**simple** 30:20 31:2 194:4,6
**simpler** 142:12
**simply** 142:12 177:24
**Sipoura** 57:10 146:22
151:21 153:20 157:21
171:9 172:4 197:19
**Sippoura** 79:23 97:3 186:3
**sir** 77:6 134:16 135:13 149:5
151:6 153:10 174:6 194:21
217:1 226:18 234:3
**sister** 25:14,16 26:5,8,9,19
207:13 208:2,16
**sit** 108:15 131:1
**sitting** 9:19
**situation** 208:17 218:11
223:12
**situations** 15:6 222:9
**six-** 116:19
**slate** 29:10
**slightly** 179:1
**small** 148:24
**sobeit** 44:4
**sole** 69:6
**somebody** 30:18,18 95:16
127:5 208:21 234:8
**somebody's** 56:23
**someone's** 32:7
**soon** 118:18 129:8
**sorry** 20:21 24:21 33:22

39:3 50:7 61:19 68:23
72:22 85:16 88:24 93:6
103:24 108:23 110:15,16
111:9 123:14 144:6 149:17
169:14 174:15 182:1 202:8
207:1 213:17 228:1
**sort** 27:3 80:10 106:5
111:19 116:17 183:20
**sorts** 53:6,6
**sought** 199:12
**sounds** 14:18 25:20 64:8
203:24
**source** 51:1,4,19 68:5 102:4
102:11,17 134:7 166:21
167:13,19 174:10,24
175:10 204:25 222:19
**sources** 38:23
**south** 195:5
**SOUTHERN** 1:1
**space** 116:17
**sparse** 189:20
**speak** 7:19 39:8 43:19
103:12 118:17 201:15
207:1
**speaking** 44:19 48:17 92:15
**specific** 27:1 29:9 34:18
36:1 37:10 40:2,10,14 41:4
41:24 42:3 44:17 49:21
51:12 52:3 61:10 62:22
74:12 85:20 89:20 99:23
105:20,21 113:6,19 114:8
139:8,14,16 140:10,18
142:5,24 143:8 144:20,21
158:15 167:10 192:23
201:19 223:7
**specifically** 12:13 14:1
15:17 31:4 37:8 44:10,20
50:10 52:10 55:5 65:16
66:1 74:13 76:12 92:6
93:14 99:3 105:12,15
112:3 113:1 130:22 133:15
135:23 137:14 140:23
141:22 195:9 200:9 219:9
**specificity** 138:16 196:24
**specifics** 112:17 203:1
224:12
**specified** 211:18
**speculate** 10:23 11:2 230:20
**speculation** 28:11 41:10,16
62:15 72:5 73:8,13 91:20
96:9 230:20,23 233:8
**speculative** 47:6
**speech** 129:10,12
**speeches** 32:12 217:12
**speechified** 129:7
**spend** 227:15

**spent** 199:19 227:10
**spoke** 10:1 12:17 14:4 26:7
27:2 210:4,9
**spoken** 9:20 14:6 25:18
**spouse** 25:14
**spreadsheet** 5:15,21,22
81:8,25 96:23 97:16 98:1,9
98:10,12,13 101:10 103:5
103:8 107:11 110:12,15,17
110:24 111:12,16 117:24
118:2,6,15 119:12,13,15
119:16,20 121:9,11,17
122:10 123:7 124:15 125:4
125:9 127:7 130:23 133:4
133:19 134:19,22 135:6
146:19,25 147:15,16,18
149:1,3,4 150:13 151:12
151:15,22 152:14 153:4,5
170:20 171:4,10,11 172:21
172:25,25 173:1,4,17,25
174:8,13,17,25 175:14
176:1 180:5,23 185:5,9,17
186:24,25 194:25 210:22
211:3 212:8 228:16 229:12
229:13,20,20 230:12
231:10
**spreadsheets** 5:18 8:21
86:7 107:7 117:24 118:11
133:18,22 134:6,9 135:16
145:22 149:18 150:22
151:13 152:15 155:11,13
156:4 157:10 165:6 170:15
174:11 185:14 212:13
**SS** 238:2
**staff's** 216:14
**stages** 227:5
**stamp** 216:11
**stand** 109:16
**standard** 46:17,19,21,22,23
47:5,7 78:16 126:5
**stands** 124:6
**start** 84:11 110:12 141:22
142:14
**started** 9:15 32:13 69:22
93:22 110:24 189:4
**starting** 34:5 214:16
**starts** 27:23
**state** 30:14 81:5 89:14
163:17,19 194:16 236:18
238:1
**stated** 12:11 21:21 98:23
**statement** 24:10,13 77:20
81:10,15 95:7,15 110:11
157:7 199:16 209:16
227:25
**statements** 5:17 24:2 44:24

107:10 110:7 216:14
**states** 1:1,3 2:2,4 28:2 33:1
33:10 34:6 37:16 57:20
75:19 82:6 88:15,18 89:23
91:3,7 94:23 107:22 186:3
194:10 197:19 199:11
**stating** 70:11 91:17 95:4,5
95:13 202:1
**status** 35:7 88:22 89:5
103:22 196:1,6
**statute** 111:6
**statutory** 144:21
**stay** 210:25
**steps** 103:23
**sticks** 105:24
**stills** 34:8
**stipulate** 134:12,17
**stop** 129:13,15
**stops** 111:13
**store** 199:21
**straight** 133:24
**Street** 1:17 2:8
**string** 5:6,7,10,11,19,24,25
6:3,11,16 27:15 32:19
79:22 80:6 83:18 97:5,7
107:19 131:4,6 146:21
147:20 153:14 154:14
156:11 197:14 201:2,24
**struggling** 51:23 148:25
**student** 13:4
**stuff** 176:15 184:13
**subject** 7:10 11:5,9 17:18
27:19 30:20 63:18 71:4
79:16 82:8,13 93:1,4,13,18
94:5 97:11 98:3 100:6
106:19 112:24 122:16
123:7 124:15 125:16
127:17,25 128:12 136:12,22
136:24 137:5,12 138:15
141:23 142:15 153:16
154:16 169:4 180:15 187:7
193:1 200:3,13 201:4
204:23 206:17 207:16
216:24 218:9 220:11
221:14 222:25
**submission** 74:14 75:18,22
76:11,18
**submissions** 115:19
**submit** 77:9
**submitted** 76:14,14 99:6,13
186:6,11,20,21
**subpoena** 5:5 20:20 24:5
**subsequent** 23:12 110:5
155:22 156:2 161:10,10
162:20,24 172:14,14
186:24 192:22 206:10

225:1
**subsequently** 99:21 186:20
**subset** 78:18
**substance** 11:12 85:3
198:25 200:11 218:16,17
**substantially** 227:22 228:5
228:12
**substantiated** 178:6
**Substantiation** 77:19
**substitute** 170:22
**substitution** 149:22 151:17
**sue** 138:13 139:18 158:3
**sufficient** 70:13
**SUFFOLK** 238:3
**suggest** 64:2,18 233:14
**suggested** 233:17
**suggesting** 96:2 102:22
233:25
**suit** 199:20
**sum** 182:12 212:6
**summary** 58:1 116:24
**supervision** 127:10
**support** 45:6 79:10 155:24
188:14
**suppose** 22:19
**supposed** 69:9 111:19
214:18
**sure** 12:24 21:6 24:24 26:9
38:20 39:17 44:19 51:11
67:16 73:19 74:20 75:9
80:8 95:5 96:19 101:1
108:6 110:4 116:5 123:21
124:9 138:3 140:4,6
182:10,11,16,16 183:13
190:5,13,14,18 191:25
192:8 193:12 203:4 207:5
207:15 220:4 222:13
**surprise** 156:23 157:1 232:7
**surprised** 101:25 197:25
232:15,15,22
**surprising** 32:9
**Susan** 5:9 57:9 79:22 81:3
97:3 107:25 118:13,14
131:7 132:12
**sworn** 238:7
**system** 45:5 46:7 63:13
98:18 100:18 155:5
**systems** 19:24

**T**

**T** 25:6 127:9
**T's** 186:5
**take** 7:23 8:3 17:9 20:6 22:5
24:15,18 26:14 32:3 35:1
39:17 42:17,24 43:9 66:21
67:16 68:16 72:24 74:16

83:24 90:24 104:9,21
118:2 134:9,24 135:9,14
136:23 139:7,11 142:25
144:9 148:14 153:2 170:8
170:21 181:15 185:24
194:2 198:17 204:1 210:8
210:21 216:13 226:21
229:24 232:24
**taken** 1:15 20:10 42:13,19
67:19 98:17 104:7 117:16
119:19 170:10 174:17
209:24 230:1 237:2 238:9
**talk** 39:17 92:23 108:5 216:4
221:18 229:25
**talked** 26:6 93:9 106:5 136:5
**talking** 15:25 36:25 37:1,5
68:11 112:7 113:14 119:6
119:6 120:18 128:7 142:4
174:24 210:23 221:4,9
**task** 39:16 86:22 92:20
221:23
**tax** 77:21
**taxes** 22:3 194:16
**taxi** 180:7
**taxi/** 121:25
**taxi/cab** 179:22
**taxicab** 180:3
**taxicabs** 182:16 225:12
**team** 178:12 208:21
**technical** 76:11 194:3
**teleconference** 103:21
104:23
**teleconferences** 105:18,21
106:3
**telephone** 2:10,20,22 3:8,13
26:12 126:1 209:7 213:22
**tell** 19:1 40:4 53:1 70:13
125:24 140:23 154:18
199:3 201:23 232:22
**telling** 100:7 200:11
**tells** 221:8
**ten** 67:16
**tenor** 163:10
**term** 185:9 190:9,17
**terminated** 89:18 114:15
158:9 167:21
**termination** 143:13 206:10
**terms** 9:3 39:11 82:8 94:11
114:21 137:21 144:14
182:25 189:12,20 200:20
224:15
**testified** 45:23 51:5 62:8
65:11 83:2 106:18 112:1
145:7 158:23 203:11
214:24 218:23
**testify** 46:1 238:7

**testifying** 117:13
**testimony** 76:4 129:2
130:21 203:5 211:25
221:11 228:16 236:11
238:11
**text** 149:19 150:7 170:14
**thank** 77:17 89:1 157:9,20
168:20 187:9 221:7 234:25
**Thanks** 33:1 107:24 202:2,6
**Thanusik@crowell.com** 3:9
**theoretically** 178:16 180:2
183:16
**theory** 165:4
**thereof** 71:16
**thereon** 194:16
**thick** 8:24
**thing** 7:5 12:16 47:8 90:23
102:10 119:5 184:5 208:24
210:21
**things** 13:1 40:23 47:9
77:23 79:4 119:23 152:12
166:17 183:18 212:7
225:11 226:1 231:20 232:3
232:5
**think** 10:12 11:24 12:8,10,25
13:5 14:2 17:20 18:21 19:2
22:7 27:10 28:21 29:5
30:12 32:4,11,13 36:18
40:9 41:11 46:19,20 47:5
54:1 55:4 57:4 60:20 61:20
61:24 62:10 63:6,6 64:5,23
65:15 66:5,8,13 67:14
69:10 71:18,20 73:16,17
73:17 76:12,15,23 77:7
78:23,25 79:7 82:20 84:17
84:19 85:14,18 86:1,12
90:12 92:19,21 93:12,15
94:8,10,10,12 95:7,14,15
95:19 96:5,15 99:1,10
101:6 104:4 108:22 112:23
113:20,23 114:3 116:2
117:4,11,14 119:11 123:19
125:18,24 126:4,15,23
127:6,15,19,21 128:11
130:18,20 131:1 138:15
139:14 141:25 142:2,18,22
144:15,18 145:13,14,17
150:24 157:6 158:21 160:3
162:15 163:19 164:22
165:3,16,19,21,24 166:16
167:16,16 168:17 170:2,3
170:3,5 172:5 173:3,11,13
177:6,6,21 178:25 179:24
181:3,24 182:4,25 183:1
183:13,14 184:9,9,10,11
186:22 188:7,10,25 189:5

189:8,22,23 191:21 194:4
194:7 196:16,17,20 197:5
199:6 201:6 202:21 208:20
211:22 214:24 218:22,25
219:2 221:21 222:4 223:13
226:13,23 227:24 231:9,14
231:24
**thinking** 67:5,11 83:10
91:13 92:8,14,16,18 94:3,6
94:15 123:9 138:5 167:24
172:17,18 183:14 225:21
**third** 18:12 81:5 86:15 88:9
204:18 207:18 216:15
222:20
**third-party** 222:2
**thirds** 122:11
**THOMAS** 3:4
**THOMPSON** 2:5 4:5 7:3,19
8:6,9 12:22 14:18 15:14
16:2 18:1,4 20:23 24:3
27:7 30:6 31:3,10 32:4,10
32:17 34:4 37:13,19 55:17
56:17,25 57:3,7 67:16,20
67:21 68:14,19 72:14 74:2
74:6,25 75:3 77:12 79:20
80:8,20,25 81:17,22 82:2
87:10 89:1 90:8 97:1
102:25 103:3,25 104:14
108:6,9,15,21,24 109:15
110:16 112:9 113:19 114:7
115:7,24 116:2 117:15,17
117:18,22 118:7 119:2
120:2,13,23 123:14,21
124:3,7,22 125:13 127:4
129:6,12,18,21 132:20
133:23 134:5,21 135:1,5
135:14 146:17 147:13
149:5,13,16 151:10 153:1
153:8,12 169:1 170:8,11
170:24 171:5 175:6 190:7
193:6 198:3 201:1 204:11
204:20 205:21 206:8 209:4
209:11,13,14,23,25 210:1
210:7 212:16,22 213:17
214:21 215:22 217:7,13,17
218:19 220:22 221:15
227:24 229:16 230:2,5,8
230:10 234:24
**Thompson@sec.gov** 2:11
**thought** 8:1 28:25 62:1,17
67:9,12 92:23 93:6,17,21
115:9 126:6 127:21 156:6
156:25 163:16 201:12
223:20
**Thursday** 37:15
**ties'** 200:1

**time** 10:20 13:8 22:11,20
24:8 25:1,7 34:17 35:15
36:3 38:5,16 39:4 40:17
41:23,25 42:9 46:11,25
47:3,15 48:2 49:25 50:4,7
50:10,21 56:13 58:10
60:16,21 61:7,12,25 64:6
64:11,17,19 66:24 67:14
69:3,19 71:15,18 73:3 78:3
78:6 82:24 86:18 87:17
89:25 90:24 91:24,25 92:3
92:5,12 93:7,12,16,20 94:3
94:11,12,13 98:10,18
100:18 103:1,18 105:22
106:2 111:5 112:11,13
113:15 116:2,4,6,22 120:5
121:3 127:18 128:14 129:1
130:3,7,10,12 131:11,17
133:13 136:2,11,19 137:10
137:17 139:4,18,21 144:2
144:7 150:20 153:23
154:22 158:21 159:22
163:14 166:5 168:21
169:16 172:18 173:17,25
177:14 180:18 183:15
189:15 190:13,20 191:21
192:17 196:4 197:6 204:15
213:11 215:18 216:1,17,21
216:25 217:20 218:4,7
219:14 226:21,25 227:11
227:16,17 238:9
**timed** 169:11,21
**timeframe** 7:7 14:12 15:12
30:3 58:7 59:7,14 60:2,9
89:21 112:18 115:6 123:1
136:1 139:3,19,20,22
200:5
**timekeepers** 24:10,25
**timeline** 23:13
**timely** 75:22
**times** 25:18 26:7,11 41:3
**timing** 199:17
**Tipco** 13:6
**title** 22:9
**titled** 147:7 190:9 199:9
**titles** 79:1
**today** 8:14 9:17 14:5 87:22
131:1 226:16
**told** 30:25 55:6 89:4,17 90:5
158:8 159:6,11,13 189:16
190:1 195:9 200:20 223:19
232:16
**Tom** 9:18 205:24
**Tom's** 9:21
**tomorrow** 81:6,9,11 132:14
**tonight** 153:22

top 34:5 104:1 108:8 131:20
topic 53:13 114:5 115:2
  136:14
topics 112:21 113:6,10,16
  113:25 115:11
total 182:13 195:3 212:6
touched 59:24
transaction 174:14,15
  175:18
transcribed 238:13
transcript 21:3 236:8
transmission 123:6 124:14
  125:16 172:5 186:24
  213:14
transmissions 164:7
transmittal 107:17,19
transmitted 64:1 98:1
  119:23 123:17 150:13,23
  152:16 156:3,5 174:1
  175:1 185:18
TRAURIG 2:15
travel 5:8 44:25 74:9 77:19
  78:17,21 183:3
travel-related 227:13
travel/entertainment 77:22
traveling 33:25 202:9
trial 212:12 229:13
tried 63:11 79:1,7 178:15
  179:24
trip 131:22 132:7 133:25
  134:22,23 153:23 154:1
  171:11,13 172:25 173:1,2
  180:24 181:6,9 185:10
trips 134:23 181:5,5 185:4,8
  208:12
trouble 139:2
true 10:5 17:20 166:12
  227:5,15 229:23 230:3
  236:11 238:11
truly 45:15 230:15
truth 92:15 227:14 238:7,7,8
  92:4,11,22 229:15
truthful 81:10,15 91:16 92:2
truthfully 64:14 192:9
try 61:18 81:6 167:23 178:19
  185:1 207:25 217:25
  218:12 219:7
trying 41:19 49:3 52:9 60:6
  61:9,16 62:1 73:1,2 93:7
  93:21 94:19 102:10 113:19
  115:12 129:2 142:9 155:2
  168:18 174:9 176:4 177:25
  189:19 234:20
Tuesday 1:13 4:2 7:1
turn 27:6 32:15 57:5 79:18
  83:13 86:24 90:7 107:1

115:2 117:20 131:3 133:16
  146:15 153:11 156:9
  168:25 187:3 189:5 190:6
  193:5 198:2 200:24 216:10
  226:7,17
turned 232:7,19,24
Turning 154:12
two 5:18 7:15 8:24 10:24,25
  36:16 83:22 91:11 97:3
  117:24 120:16 128:24
  133:18,22 148:3,4 180:22
  225:25
two- 122:10
type 33:14 52:7 63:1 126:22
  127:16 135:25 174:16
  175:19 205:11
typewriting 238:14

---

**U**

U 57:10 80:1
U.S.A 182:7
ultimate 99:23
ultimately 40:20 75:21
  215:13
unaware 202:19
unBates 107:5 117:24
Unclear 179:25
understand 30:7 32:4 34:22
  59:9 61:16 62:1 70:7 71:17
  85:21 103:7 109:18 129:2
  131:25 157:5 169:14
  174:10 175:6 179:10
  201:11 206:22,25
understandable 61:11
understanding 7:21 15:21
  16:21,24 19:15 23:14
  39:20 40:5,17 41:5,6,13,22
  41:23 42:10 46:16 50:14
  51:6 52:13,20 55:9 61:13
  61:21 62:12,21,24 63:22
  64:12,17 66:7,16 67:8,13
  70:14 72:8 76:19 77:1,2
  78:5,10 80:2 82:8 83:3,6
  84:17 86:17 88:6 91:24
  92:1 96:1 97:4 98:16,19,21
  98:24 99:3,12 100:3,23
  101:3,9,23 102:4 103:12
  108:1,25 132:16,25 147:8
  148:13 150:3 161:1,4
  163:22 176:25 180:14
  186:9 195:25 196:13 197:2
  203:22 209:20 214:12,18
  214:22,25 215:6 220:24
  222:16,16 224:21
understatement 231:15
understatements 231:19

understood 195:10 206:24
  220:14
undertake 39:16 62:5
undertook 228:25
unequivocally 178:1
Unfortunately 63:12
unilaterally 66:8
UNITED 1:1,3 2:2,4
unreasonable 96:3,5
unwritten 16:25 17:2,4,5
  21:19 84:14
update 197:23 202:1
updates 27:3 118:16
uphold 38:12
upholds 38:10
Upjohn 38:17 67:23 68:6
  69:1,4,8,10,18,23 70:2,8
  70:15,17,18,20 213:6,6
  214:17,22 215:4 222:21,25
  223:3,8
upper 79:24
upward 194:23
USA 180:24
use 21:1 64:25
useful 81:8
usual 8:12

---

**V**

vague 53:23 54:3 87:16
vaguely 36:16
variety 65:7
various 43:4 106:19 107:24
  134:8 155:14 225:11
verbal 91:9 161:14
verbalized 143:21
verify 88:5 178:15
version 80:21 98:9 102:11
  102:12 135:6,7 172:22
  193:11
versions 20:24 149:20
  170:22
versus 37:11 48:7
Vesey 1:17
vice 18:22
view 71:24 72:18,24 91:12
  137:22 166:13 201:19
  233:20
viewed 86:12 91:10
views 184:2
violating 113:21
violation 55:11 56:18 57:1,2
vis-a-vis 141:2 221:25
voice 197:10
Volume 1:12
vs 1:5 237:3

**W**

W 2:16 127:9
waive 157:17,20
waived 69:5 238:22
waiving 111:3
Walter 57:22 58:15,15,17
want 7:4 11:1,3 12:24 18:8
  31:23 40:10 46:1 48:1
  57:14,16,17,17,25 59:1
  60:12 97:6 106:1 109:7
  111:11,17 112:2,23 114:8
  116:5 118:5 125:18 129:10
  138:10 158:5 165:20
  166:25 167:21 173:4,14
  180:16 189:2 192:2,10
  194:4 201:22 208:23 226:7
  226:17
wanted 48:22 49:8,9 126:19
  131:10 181:11 211:17
wants 48:18,18 173:15
waring 69:7 223:3
warning 38:17 67:23 69:1,4
  69:8,10,18,24 70:2,4,8,15
  70:17 213:6 215:4 223:1,8
warnings 70:19,20 213:6
  214:17,23 222:22
Washington 2:9 3:7
wasn't 66:20 85:8 163:23
  189:22 203:25
wave 151:1
way 9:5 10:21 17:14 43:12
  46:23 49:9,19 53:15 54:1
  64:15 66:9 71:20,25 78:20
  92:15,16,18 94:8,11,20
  98:6 114:13 122:11 126:17
  145:6 162:4,16 164:17
  168:18 173:22 180:10
  202:23 214:19 219:1
  225:21 230:24
ways 172:10
we're 82:7
website 17:21
Wednesday 118:17,22
week 131:11 133:14
weeks 9:7
Weiss 7:9 11:25 13:23 14:20
  15:2 30:3,12,19 31:12,19
  34:15,16 35:6,12,19 36:3,5
  36:8,9,15,21,22 38:22 39:7
  39:15,21 40:3,5,11,18 41:4
  41:7,21,25 42:2 43:6 44:5
  44:12,21,23 45:2,10,16,18
  47:11,14,20,21 48:10,17
  48:25 49:8,14,23 50:13
  51:9,20 52:1,4,5 53:15,18
  53:24 54:11,14,18,20,23

---

55:2,7,18,25 56:2,7,13
58:24 59:3,12,19,25 60:11
60:16,22,24 61:8,13,23
62:9 64:1 65:18 66:6,15
68:7,25,25 69:3 71:1 72:2
72:10,19 73:21,24 75:14
76:1,10,24 79:3,13 80:13
80:14,14 82:21 83:5 84:5
84:25 86:2,19 91:10 92:25
93:3 94:4 95:1,9,22 97:4
97:17,25 98:8 99:22 100:4
100:7 102:13 104:23 105:6
105:10,13 106:19 107:18
108:11,20 109:25 110:22
112:8 113:4 116:1,5,8,9,11
116:18,20 118:23 119:20
121:13 126:18 128:5,21
129:25 130:2,10,12 131:12
131:13 133:9 135:15,24
136:3,11,21 137:10,18,21
138:6,8 139:10,11 140:12
140:14 141:3,12,23 142:14
142:24 144:23 145:1,8,25
146:8,12,22 150:14 155:21
157:24 158:16,24 159:6,12
159:24 160:12 161:20
162:7,18,21 163:5 164:7
164:16,25 165:6,12 166:1
166:2,4 172:13 176:1,2,12
176:24 177:2,10,25 178:4
179:4,13,19 180:13 181:4
184:17 185:3,17,21 187:1
188:9 189:11 192:13,19,25
195:2,9,25,25 196:9 197:2
197:6,7 198:5,14,18 200:4
200:16 202:13 211:8,10
213:25 214:20 215:2,12,15
216:19 218:18 222:10,25
223:16,23 224:8,19 225:2
225:4 226:10 227:4 228:24
229:21
**Weiss'** 38:16 48:12 62:11,14
67:6 71:9 80:11,12 106:10
159:20 171:24 228:8
**welcome** 90:23
**well-** 8:10
**went** 34:21 88:5 106:1
**weren't** 36:19 116:18 181:5
**whatsoever** 231:1
**WHEREOF** 238:19
**wife** 26:4 207:13
**willing** 157:13
**withdraw** 34:23 123:12,19
124:2,19
**withdrawing** 124:22
**withheld** 184:11

**withholding** 194:15
**within-entitled** 238:8
**witness** 3:2 4:11 5:4 7:15
11:8,22 30:5,25 35:25 37:1
37:3 38:13 51:23 58:4
74:19 76:6 81:14,22 84:1
87:8 102:21 105:25 106:15
109:14 110:4 124:10,21
127:1 128:17 129:11 132:3
134:20 135:1 152:4 161:17
162:13 174:19 187:10
204:22 221:7 226:22 235:2
238:5,19
**witness's** 238:11
**witnesses** 26:15
**wondering** 201:12
**word** 126:13,15 167:2,2,7,18
167:24 168:1 230:3
**words** 64:21 71:2,3 76:9
99:24 126:3,4,9 228:7
**work** 34:10 43:12 86:20
98:11 125:5,10 126:11
127:13 160:9 173:13,24
185:2,22 189:12 199:1
203:16 204:2 226:6
**work-product** 104:16
**worked** 55:3 82:23 211:9
**working** 11:12 22:13,14
86:20 93:15 98:11 116:12
116:17 127:10 132:13
133:5 142:2 147:19 153:23
154:1 184:16 215:13 222:8
227:8
**works** 34:8 82:10 132:12
**wouldn't** 157:1 204:7
212:21 232:21 233:16
**wrapped** 53:19
**write** 161:19 164:6 178:5
179:16 181:12 201:10,11
**writes** 157:9 202:7
**writing** 52:11,12 72:8,13
84:20 141:11 195:12
**writings** 53:8,12
**written** 15:22 16:9 17:3,5,7
21:19 73:10 78:14 84:10
84:11,13 91:8 117:2
192:25 217:3
**wrong** 219:20
**wrote** 147:21 153:20,25

**X**

**X** 139:9
**xx** 238:22

**Y**

**Y** 139:9

**Y's** 101:14,15,20
**year** 10:24 191:19 203:24
**years** 10:24,25 12:5
**yellow** 122:10
**yield** 199:18
**York** 1:1,18,18 2:19,19 3:12
3:12 25:6 238:1

**Z**

**Z** 14:3 57:10 209:8
**Zegna** 199:20
**Zelenko** 14:3,4,14 21:17
22:5,12 24:18 27:16,24
29:22 30:23 31:19 35:7
41:8 57:20 81:4 86:2 87:12
90:5 91:5 103:22 107:21
131:7 140:16 162:6 171:8
187:6 192:22 197:15,19,22
201:4,25 209:7,17 213:23
214:3,4 216:8,12 217:4
**Zelenko's** 34:5,9 131:9
132:11 218:3

**0**

**0's** 24:12 27:9 74:8

**1**

**1** 1:12,12 20:16,20 27:13
33:1,15 37:22,23 60:4
67:24 70:9 76:4 82:17
88:10,16 98:4 103:17
130:16 137:9 140:2 146:8
151:20 153:15 156:20
169:3 171:20
**1,000** 8:22 9:6
**1.5** 35:16
**1/8/2014** 6:9
**1:31** 154:5 156:12 223:15
**10** 5:16 24:20 103:21 107:1
107:2,21 109:19 132:13
174:4,5,18,20 175:3,4,8
**10:04** 118:13
**10:21** 32:20
**10:23** 1:14
**10:34** 147:20
**10:43** 57:9
**10:46** 83:19
**100** 2:8 199:14
**1001** 3:6
**10022** 3:12
**10072** 107:10
**10166** 2:19
**107** 5:16
**108719** 187:5
**109** 133:17
**109047** 57:12

**109059** 96:23 97:8
**109062** 96:23
**109063** 83:17
**109070** 107:3
**109071** 110:19
**109072** 107:8
**109322** 107:10
**109323** 107:12
**109332** 117:23
**109342** 147:14
**109348** 149:2
**109355** 151:11
**109358** 153:13
**109364** 154:13
**109379** 171:1
**109381** 6:5 171:2
**109385** 185:25
**109848** 147:17
**10th** 103:25
**11** 104:22 201:3,8 202:10
**11:33** 151:20
**117** 5:18
**11th** 24:21 104:25 202:3,7
**12** 21:16
**1298** 198:4
**12th** 214:9
**13** 5:18 117:21 125:10
130:21 131:17
**1303** 199:9
**131** 5:19
**1316** 226:17
**1317** 198:4
**133** 5:20
**1376** 216:11
**14** 5:19 131:3,4 192:12,16
192:24
**146** 5:21
**147** 5:22
**15** 5:20 133:16,16 135:17
145:21 146:10 187:7
209:16
**151** 5:23
**153** 5:24
**154** 5:25
**156** 6:3
**16** 5:21 146:15,17 198:7,14
202:14 203:20
**168** 6:4
**17** 5:22 57:9 79:23 83:18
97:2 112:25 116:8,24
117:12 147:12,13 149:1
**17-cv-8223(PKC)** 1:5
**170** 6:5
**17th** 106:8 112:3,12 115:17
118:23 174:21
**18** 5:4,12 87:12 151:6

216:12
**181030PXL** 1:25
**185** 6:6
**187** 6:7
**19** 5:23 118:13,20 151:7,9
    152:15 170:17
**190** 6:8
**193** 6:9
**197** 6:11
**198** 6:13
**1A** 5:5 20:19 24:1,4 27:11,12
    34:25 112:11 148:3 207:14
    208:24 213:13
**1B** 5:4 18:5,6
**1st** 7:12,18 60:1,8,14 70:25
    76:9,22 79:17 82:24,25
    89:10 98:8 109:13 110:3
    111:24 128:8 130:4 136:12
    136:20 137:16 140:5
    154:15 156:11 157:23
    164:21 165:5 172:2,11,14
    172:15 196:5 200:6,9,13
    216:17 223:16 224:3

**2**

**2** 5:6 18:10 27:6,7,14 33:23
    36:19 75:18 89:22 107:4
    171:6 175:1 185:18 193:22
    226:18 231:3
**2.2** 77:19
**2.3** 74:20
**2:00** 34:10
**2:02** 27:16
**20** 5:5,24 153:11,12 231:4
**200** 1:17 2:18
**20004** 3:7
**201** 6:16
**2010** 110:13,23
**2011** 98:15 110:24 199:12
    216:23
**2012** 15:13 199:11
**2013** 13:19 15:12 17:10
    19:24 20:9 21:16 22:21
    23:15 24:13 25:12 27:24
    28:7 29:5 30:25 31:16
    32:19 33:1,15 34:15 35:5
    35:13 37:22,23 57:9 58:10
    60:1,2,4 67:24 68:13 70:9
    70:25 73:20 76:3,5 79:23
    81:4,20 82:18 83:18 84:9
    88:17,17,21 89:6,20 91:4
    94:3 97:2,10 98:3,4 103:21
    104:22 111:23,24 112:25
    116:8,24 117:12 118:13
    130:17 131:7,17 133:10
    136:12,20 137:9,16 146:8

146:23 147:20 150:23
151:20 153:15 156:12,21
165:5 171:7,11 175:1
185:18 186:2,8,9 187:7
188:18,21 190:10 191:13
192:12,16,24 195:21
197:16 198:8,14 201:3,8
202:11,15 209:6,18 213:16
214:9 216:17,17,23 223:16
224:3
**2014** 193:8 209:17
**2016** 5:13 87:12 203:16
    204:3 216:12
**2017** 203:17,20
**2018** 1:13 4:2 7:1 237:2
    238:20
**202.551.7159** 2:10
**202.624.2530** 3:8
**20549** 2:9
**20th** 3:11
**21** 5:25 154:12
**210** 4:6
**212** 180:22 181:15
**212.801.6788** 2:22
**212.801.9200** 2:20
**212.895.4239** 3:13
**22** 6:3 156:9,9 165:17
    169:13 171:20
**2207** 204:3
**23** 6:4 168:25 169:1 186:2
**238** 1:12
**23rd** 131:9
**24** 6:5 101:14 170:18,19,20
    170:22,25,25 173:18 174:3
    174:13 175:11 210:22
    225:10 228:17 229:11
    230:12 231:9
**243** 75:3
**2499** 190:8
**2499-2507** 6:8
**25** 6:6 37:15 131:6 185:24
    185:25 186:23
**2500** 118:10
**2507** 190:8
**25th** 131:20 132:11
**26** 6:7 150:23 187:3
**26th** 150:14
**27** 5:6 6:8 156:10 190:6,7
    209:6 221:6,7,9
**28** 6:9 190:10 193:5,6
**29** 6:11 133:10 146:23
    197:13,13
**29th** 135:24 146:24
**2nd** 166:12 213:16,23
    214:14,16 238:20

**3**

**3** 5:7 8:15 9:7 20:16 25:12
    26:11 27:24 28:7 29:5
    32:15,17,19 36:19 91:3
    126:21 127:16 151:5 194:9
    197:16 217:8
**3,500** 199:20
**3:00** 168:21
**3:15** 170:9
**3:30** 28:3
**3:45** 171:7
**30** 1:13 4:2 6:13 7:1 27:9
    198:2,3 202:13 203:7
    226:7 237:2
**30th** 147:20
**31** 6:16 157:23 200:24 201:1
**31st** 148:5 158:3,6 166:12
**32** 5:7
**325,000** 194:17,20 195:6
    211:22
**33** 209:2
**34** 117:23
**35** 27:13 200:1 209:15
**38** 32:18
**39** 79:21
**3940** 133:17
**3rd** 33:9 111:23 214:1,5

**4**

**4** 5:8 26:11 74:5,6 91:2
    209:18
**4:54** 57:19
**4:55** 131:9
**408** 7:10 17:18 93:13 94:5
    114:11 123:8 124:11,16
    125:7,16,17 127:18 128:2
    128:4,22 129:25 130:24
    137:12 141:24 142:15
    172:6 191:11 193:1 220:11
    220:21 221:13,14
**41654** 193:7
**41656** 194:9
**42137** 79:21
**42137-39** 5:10
**42138** 81:1
**42345** 197:14
**42426** 156:10
**43** 27:8
**43560** 201:2
**43573** 169:2
**43628** 27:9
**4369** 27:22
**43989** 146:18
**43994** 131:5
**46** 197:14
**47** 147:14

**48** 111:13

**5**

**5** 5:9 24:12 25:11 34:6 57:5
    91:7 92:7 168:23 171:10
    213:20
**5:15** 235:3
**5:16** 146:24
**5:35** 146:23 147:6
**5:36** 107:21 132:11
**5:40** 27:24
**5:45** 131:7
**57** 5:9 151:11
**58** 57:12
**590** 3:11

**6**

**6** 5:10 15:17 35:2 79:18,20
    169:7,11,12
**6-** 106:8
**6.5** 112:13
**61** 201:2
**63** 153:13
**64** 74:15,25
**65** 25:12
**659** 74:8
**659-74** 5:8
**662** 74:14,25 75:17
**663** 77:18
**673** 193:7
**69** 83:17
**6th** 201:25

**7**

**7** 5:11 15:15 24:20 25:12
    83:13 103:20 109:10,17
**7:28** 153:15
**7:38** 97:10 169:3
**71** 107:3 154:13
**74** 5:8 74:8
**77** 111:14
**78** 87:11
**79** 5:10

**8**

**8** 4:5 5:12 34:15 35:5,13
    57:19 73:20 86:24 87:1,2
    87:10 97:10 109:6 193:8
**8:25** 154:15
**80** 169:2 171:1
**83** 5:11
**86** 185:25
**87** 5:12
**8A** 5:14 90:7,8
**8th** 27:16 33:25 42:14,25
    43:15 58:24 59:3 81:4

| 9 |
| --- |
| **9** 5:15 24:13 94:22 96:22,22 |
| 106:7 |
| **9:57** 81:4 |
| **90** 5:14 |
| **91** 146:18 |
| **95** 131:21 |
| **96** 5:15 |
| **97** 131:10 |
| **98** 131:5 |