**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| **SECURITIES AND EXCHANGE COMMISSION,** |
| **Plaintiff,** |
| **v.** |
| **MOHAMMED ALI RASHID,** |
| **Defendant.** |

No. 17-cv-8223 (PKC)

## DECLARATION OF MATTHEW T. HOFFMAN

I, Matthew T. Hoffman, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over 18 years of age and reside in New Canaan, Connecticut. I have been retained by the Securities and Exchange Commission (the "SEC," or the "Plaintiff") to provide my expert opinions on certain issues in this case. I am making this declaration with the understanding that SEC counsel intends to submit it as my direct testimony in this case. I intend to appear at trial to reaffirm that my declaration is true and correct, and to answer questions on cross examination and re-direct examination. I intend to testify consistently with my expert report dated April 15, 2019 ("Hoffman Report" or "my report"), a copy of which is attached hereto.

**THE SCOPE OF MY OPINIONS**

2.       I understand that January 2010 to June 2013 has been identified as the "Relevant Period" in this case. As pertains to the Relevant Period, I was asked to opine on the following questions:

   A.  Whether Rashid's submission of personal expenses to Apollo for reimbursement, allegedly as legitimate business expenses, conformed to applicable standards of conduct for investment adviser professionals;

   B.  Whether a professional, such as Rashid, who was working for a major private equity management firm should have known that personal expenses he incurred while allegedly doing business with companies in which Apollo-advised private equity funds (the "Relevant Funds") had made investments ("portfolio companies"), would be submitted as legitimate, reimbursable expenses to the Relevant Funds and/or the portfolio companies; and

   C.  Whether private equity funds like the Relevant Funds would have wanted to know about Rashid's conduct.

## EXPERT QUALIFICATIONS

  3.  My employment and education are summarized in my current *curriculum vitae,* a copy of which is appended as Exhibit A to my report. I obtained an MBA in finance from the University of Chicago in 1982, and started my career as a derivatives trader at JPMorgan Chase & Co. After seven years, I moved to Merrill Lynch where I continued to do much of the same. I transitioned into investment management in 1994 while working at UBS, AG (pka Swiss Bank Corporation, AG). There, my team and I constructed investment portfolios for the bank's proprietary capital and for external client funding. These portfolios mainly consisted of hedge fund-style or private equity fund-style investments. I started work at Credit Suisse Group AG in 2000 and while there, constructed new investment portfolios, and managed legacy products within the asset management group. I was responsible for investing capital and managing in excess of $6 billion. I created and managed more than 40 separately managed investment

accounts ("SMAs"). SMAs were accounts where the assets were legally owned directly by the client-investor, but were managed by me as the portfolio manager under a service agreement and power of attorney. I was instrumental in drafting and implementing the due diligence procedures for selecting and managing the assets, and the investment process for managing the assets, including the process for defining relevant expenses, and allocating those expenses to the portfolios.

4.      I started an asset management company in 2003, and following its merger in 2006, I was Chief Investment Officer at Weston Capital, a private wealth management firm, where I was responsible for investing and managing investor funds in excess of $2 billion, across multiple asset classes. There were six hedge fund products, and two private equity fund products. While there, I drafted the investment process and procedures manuals, implemented checks and balances, and documented risk policies and procedures around the investment products.

5.      I am currently a Partner at RoundTable Financial Group, consulting to asset managers and investment clients. I maintain my securities licenses with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority ("FINRA").

6.      In the capacities described above, I have held strategic management positions at large, global, financial institutions where I created and implemented investment strategies, guidelines, processes, and procedures, often in tandem with management, legal counsel, the compliance officer, and risk manager. We developed such procedures to ensure proper checks and balances and to safeguard clients' investments. I am familiar with the duties and responsibilities of an investment manager to act as a fiduciary and to adhere to compliance

policies, governing documentation, investment management agreements, service level agreements, and securities regulations.

7.      As an experienced investment manager, I accepted investment capital from U.S. and international investors, and then invested that same capital in more than four hundred private companies, private credit funds, private equity funds, or hedge funds.

8.      Throughout the fund management process, various expenses were incurred by my portfolio management team and me. Such expenses related to research and due diligence work completed when analyzing the prospective investments. Examples of these expenses included securities databases, certain data technologies, travel costs (including transportation, accommodation, and meals), and to some extent entertainment. Expense policies were defined by the firm. Since I was responsible for establishing many of the policies and procedures, I wrote, edited, and approved many of them.

9.      My roles at Credit Suisse, UBS, and Weston Capital were similar to the management and fiduciary roles held by Rashid at Apollo. I have been an investment manager and have managed multiple private investments. I was responsible for investment priorities, due diligence, research, and related investment work. I worked closely with our cash managers, our chief financial officer, and treasurer in relation to all cash functions. In these roles, I have had experience budgeting both revenues and expenses, allocating investor money, managing investments, liquidating investments, and returning investor capital.

**ASSUMPTIONS AND MATERIALS REVIEWED**

10.      I was asked to assume that the facts alleged in the SEC's Complaint in this case are true. My opinions might change if those facts are shown to be untrue. I have also been provided with record material which supports the conclusion that a reasonable employee, like

someone in Rashid's position, knew or should have known that Apollo would ultimately pass his expenses on to the Relevant Funds. These documents were identified previously during the discovery phase and were marked with Bates numbers.

11.     A complete list of documents I reviewed and considered in preparing this report is set forth in Exhibit B to my report. If I receive additional documents or information, I will modify or supplement my report as necessary to reflect such additional data.

12.     Rashid was employed as an investment adviser by Apollo. Apollo established a clear set of policies to educate its employees about their fiduciary responsibilities. Apollo's policies were consistent with industry standards. I reviewed the following standard process and procedures from respected firms in the investment advisory industry:

13.     The Institutional Limited Partners Association ("ILPA") promulgated standards called the Private Equity Principles embodied in:

> …a document that contains best practices concepts and that speaks to the issues relating to the alignment of interest between general partners and limited partners [investors], fund governance, and transparency and reporting. It is intended to serve as a common framework …with the goal of improving the private equity industry…. Endorsement of these Principles is an indication of general support for the ILPA.[1]

14.     Apollo was a member of the ILPA, and officially endorsed its Principles throughout Rashid's employment. The ILPA supports and recommends expense recognition

---

[1] ILPA Private Equity Principles Endorsements, December 9, 2011; November 21, 2012; September 12, 2013, Complete list of organizations that have endorsed the ILPA Private Equity Principles.

guidelines developed by both the Internal Revenue Services ("IRS") and the Association of International Certified Public Accountants ("AICPA"). The IRS regularly defines what types of reimbursable expenses are acceptable from the tax perspective. Following IRS guidelines, the AICPA outlines a simple recommendation for employee expense reimbursement. There are generally five steps to follow:

1.    Form a policy for the expense reimbursement process,

2.    Determine what expenses employees can claim,

3.    Create a system for collecting expense claims,

4.    Verify the legitimacy of the expenses, and

5.    Make reimbursement payments within a specified timeframe.

Apollo's T&E process mimicked these steps – there was a clear policy for expense reimbursement, the types of permissible business expenses were defined, there was an expense claims process which was verified, and when signed off, reimbursements were made.

15.    Apollo is also a member of another business organization called AIMA, the Alternative Investment Management Association Limited. Its Guides to Sound Practices are "aligned with policy makers, legislators, and regulatory authorities around the world.[2]" Their Guide's commentary on expense reimbursement and allocation is consistent with that of the ILPA.

16.    The Standards Board for Alternative Investments ("SBAI") is a global organization which sets out guidance for investment managers, including private equity fund managers. It brings managers and investors together to establish responsible standards of practice

---

[2] AIMA's Objectives and Principles, www.aima.org, Advocate, Guides to Sound Practices.

that meet investor requirements. It defines best standard practices in its document, The Alternative Investment Standards. The Standards and Guidance [2] clause[3] discusses the commercial terms applicable to fees and expenses, and stresses that the details and nature of any expenses should be effectively monitored and accurately disclosed.

17.     In a letter endorsed by more than 400 ILPA members, and sent to the United States Secretary of the Treasury[4], the ILPA's Managing Director, Jennifer Choi wrote about issues where the United States financial system needed support. In the letter, she described how "there may be impropriety and insufficient disclosure of fee and expense allocations" in private equity funds, and that investors' ability "to discern questionable practices [is] limited." She quotes a statement made by Andrew Ceresney, Director, U.S. Securities and Exchange Commission, Division of Enforcement, saying "even experienced investors can be defrauded if they lack transparency into the various fees, expenses and practices[5]" in the private equity fund industry. ILPA members like Apollo, support transparency and controls over fees and clarity in the allocation process so that investors can be properly protected and informed.

18.     Apollo's policies are consistent with other industry oversight agencies, accounting and audit firms, and specialists in expense management. Apollo is consistent in their views of expense reimbursement and allocation procedures. Apollo employs many Chartered Financial Analysts. Their industry overseer, the CFA Institute of Chartered Financial Analysts, maintains a

---

[3] Standards Board for Alternative Investments, The Alternative Investment Standards, Section 2.1, p. 5, Commercial terms disclosure, https://www.sbai.org/standards/summary-of-standards/, November, 2015.
[4] Letter from Jennifer Choi, Managing Director, ILPA to The Honorable Steven Mnuchin, July 28, 2017.
[5] Andrew Ceresney, Director, Division of Enforcement, U.S. Securities and Exchange Commission, "*Private Equity Enforcement*," Securities Enforcement Forum West 2016, San Francisco, May 12, 2016.

code of ethics which states that its members will "[p]lace the integrity of the investment profession and the interests of clients above [one's] own personal interests.[6]"

19.    The CFA Institute adheres to its Global Investment Performance Standards ("GIPS"), voluntary standards used by investment managers in the asset management world. GIPS recordkeeping guidelines and information maintenance is an important part of sustaining the integrity of the asset valuation methodology. GIPS standards state that there need to be sufficient procedures in place to ensure there is adequate supporting documentation to accurately reflect expenses, the methods used to record those expenses, including management fees, and that expenses are appropriately treated when calculating performance returns. Those procedures state that expenses are to be allocated and recorded to the proper fund, in the correct amounts, and on a timely basis.[7]

20.    Certified public accounting firms like Deloitte & Touche LLP (Apollo's accounting firm), follow procedures and guidelines consistent with those upheld by all certified public accountants ("CPAs"). CPAs are trusted financial advisers who maintain the highest standards of knowledge and ethics when operating in financial capacities. They follow Internal Revenue Service ("IRS") and Department of Labor ("DOL") guidelines. Accounting firms look to see whether the expense reimbursement process compliant with IRS and DOL guidelines, and is structured as an accountable plan[8] which exists when the following conditions are met:

    1.    There is a business reason for the expense and the expense is in connection with the performance of services as an employee.

---

[6] CFA Institute of Chartered Financial Analysts, https://www.cfainstitute.org, Code of Ethics.
[7] 2012 CFA Institute, GIPS Guidance Statement of Performance, 16 March 2012, p. 6.
[8] Prange, Margaret, CPA, C-Bulletin Issue 03 02-15, Calibre CPA Group, PLLC, Is Your Expense Reimbursement Policy Compliant with IRS and DOL Guidelines?

2.      The expense is substantiated or deemed substantiated. There must be receipts and invoices that document the nature and amount of the expenditure.

21.     The private equity industry often uses expense management specialists to create the process and format for expense reimbursement, and travel and entertainment policies. Firms like Abacus Labs, Inc., provide expense reporting applications. Chrome River Technologies, Inc. offers expense management software. SAP Concur delivers global expense reporting solutions, like that which the Gates Foundation uses for its expense reimbursement policies. Each of these firms follows a similar, compliant format, consistent with the accountability-plan format described above.

22.     The fund management industry and Apollo describe the standards of care they presume investment advisers to realize. Maintaining proper standards of care is not a complicated or difficult task. Most of Apollo's investment advisers have earned advanced degrees in education, and have excelled in business and finance. To become a partner, and even a senior partner within a firm like Apollo, it is incumbent upon that adviser to act as a role model, act professionally, and be a trusted fiduciary when managing investor money, consistent with all professional firms in the private equity industry.

23.     As discussed in my report, I also reviewed a number of documents which indicated to me that Apollo's policies and procedures were consistent with the industry standards noted above. The documents that I reviewed included Apollo's Code of Ethics, Employee Handbook, and Travel & Expense Policies during the Relevant Period, as well as offering materials, organizational documents and management agreements related to the private equity funds that I understand Rashid advised.

**EXPERT OPINIONS**

24.     Based upon my review of the Complaint and a significant volume of discovery materials as identified in my report, my opinions in this case can be summarized as follows:

A.     During the Relevant Period, Rashid's submission of numerous personal expenses to Apollo for reimbursement, allegedly as legitimate business expenses, contravened the norms and best business practices that were well-accepted by financial firms and those in the investment advisory industry. Such customs and practices applied to all principals and employees. Investment advisers (and certain employees of investment advisers) are fiduciaries that must place their clients' interests above their own interests. Apollo is an investment adviser; Rashid was employed by Apollo and was required to adhere to investment adviser guidelines. As fiduciaries, investment advisers also owe their clients a duty of honesty. These bedrock customs and practices are derived not only from established legal standards but also from recognition in best practices, codes of ethics, and company policies and procedures in the financial industry. Rashid violated these customs and practices by misrepresenting a significant amount of personal expenses as legitimate business expenses, when a reasonable employee should have known that some of those personal expenses ultimately would be allocated either to portfolio companies that he helped manage, or to private equity funds that he helped to advise.

B.     A reasonable employee in Rashid's position should have known that expenses which he placed on his business credit card and represented to have been incurred on behalf of private equity funds and/or portfolio companies in which such funds had an investment interest ultimately would be submitted to the Relevant Funds as

10

reimbursable management expenses. Rashid had worked for another financial firm previously, Goldman Sachs. Rashid had experience with the business expense reimbursement process, as Goldman Sachs had strict expense policies and procedures. Rashid was also a senior Apollo partner who was a direct owner of the funds as a limited partner. He had access to the funds' legal documents and should have, or could have known that the funds, on whose behalf he claimed to have incurred various expenses, ultimately would bear the costs. During the Relevant Period, it was standard practice for private equity fund managers to be reimbursed for expenses that their partners and employees incurred on a fund's behalf. Apollo had management agreements in place with each of the funds it advised and those management agreements followed that standard practice. Rashid certainly should have known this basic fact as an investment professional and as an Apollo senior partner. For all these reasons, Rashid should have known that the funds, on whose behalf he claimed to have incurred various expenses, ultimately would bear those costs.

C.     The private equity funds that Rashid advised would want to know about Rashid's conduct. Indeed, any fund or fund investor would deem it important to know if an employee of the fund manager was misappropriating money directly or indirectly, regardless of the amount in relation to assets under management. Any misappropriation of funds would be a red flag. Misappropriations could also raise serious questions about the manager's integrity and trustworthiness in general. Moreover, institutional investors like pension funds, that invest in private equity funds, owe fiduciary duties to their own investors. Such investors would also deem the misappropriation of assets by a fund manager to be important. Apollo, which organized, managed, and controlled the Relevant

Funds, deemed Rashid's misconduct to be significant and harmful, as exemplified by its decision to terminate his employment, notwithstanding his past performance, or his potential to make money for the firm in the future.

Pursuant to 28 U.S.C. § 1746, I, Matthew T. Hoffman, declare under penalty of perjury that the foregoing is true and correct.

Executed on July 17, 2019

New Canaan, Connecticut

_____
          Matthew T. Hoffman

**In the Matter of**


**SECURITIES AND EXCHANGE COMMISSION**
Plaintiff

**v.**

**MOHAMMED ALI RASHID**
Defendant


**EXPERT REPORT OF MATTHEW T. HOFFMAN**

April 15, 2019

# TABLE OF CONTENTS

PAGE

I.      SCOPE OF ENGAGEMENT ............................................................ 3

II.     EXPERT QUALIFICATIONS ......................................................... 3

III.    ASSUMPTIONS AND MATERIALS REVIEWED ...................................... 5

IV.     INDUSTRY STANDARDS ............................................................ 6

V.      FACTUAL BACKGROUND AND BASES FOR OPINIONS .................................... 11

        A.  APOLLO'S CODE OF ETHICS ................................................. 11

        B.  APOLLO'S EMPLOYEE HANDBOOK AND T&E POLICIES ............................ 14

        C.  APOLLO'S MANAGEMENT AGREEMENTS AND FUND OFFERING
            MATERIALS ............................................................. 16

        D.  RASHID'S SUBMISSION OF PERSONAL EXPENSES AS BUSINESS
            EXPENSES…………………………………………………………………....... 19

VI.     EXPERT OPINIONS ............................................................... 24


EXHIBIT A: C.V. OF MATTHEW HOFFMAN ....................................................... 27

EXHIBIT B: DOCUMENTS REVIEWED AND CONSIDERED ........................................... 29

EXHIBIT C: TABLE OF DECLARATIONS OF PORTFOLIO COMPANY
           EXECUTIVES .................................................................. 35

## I.     SCOPE OF ENGAGEMENT

1.      I have been retained by the Securities and Exchange Commission (the "SEC," or the "Plaintiff") to provide my expert opinions on certain issues in the case before the United States District Court, Southern District of New York between the Plaintiff, and Mohammed Ali Rashid ("Rashid," or the "Defendant"). Rashid was employed by Apollo Global Management, LLC, and its subsidiary and affiliate entities ("Apollo," or the "Company") during the period in question, from January 2010 to June 2013 ("the "Relevant Period"). Specifically, I have been asked to opine on:

A.      Whether Rashid's submission of personal expenses to Apollo for reimbursement, allegedly as legitimate business expenses, conformed to applicable standards of conduct for investment adviser professionals;

B.      Whether a professional, such as Rashid, who was working for a major private equity management firm should have known that personal expenses he incurred while allegedly doing business with companies in which Apollo-advised private equity funds (the "Relevant Funds") had made investments ("portfolio companies"), would be submitted as legitimate, reimbursable expenses to the Relevant Funds and/or the portfolio companies; and

C.      Whether private equity funds like the Relevant Funds would have wanted to know about Rashid's conduct.

2.      My fee for services is $600 per hour. My compensation is not, in any way, dependent on the outcome of this case, or on the substance of my opinions.

## II.    EXPERT QUALIFICATIONS

3.      My employment and education are summarized in my current *curriculum vitae,* a copy of which is appended to the end of this report as **Exhibit A**. I obtained an MBA in finance from the University of Chicago in 1982, and started my career as a derivatives trader at JPMorgan Chase & Co. After seven years, I moved to Merrill Lynch where I continued to do much of the same. I transitioned into investment management in 1994 while working at UBS, AG (pka Swiss Bank

3

Corporation, AG). There, my team and I constructed investment portfolios for the bank's proprietary capital and for external client funding. These portfolios mainly consisted of hedge fund-style or private equity fund-style investments. I started work at Credit Suisse Group AG in 2000 and while there, constructed new investment portfolios, and managed legacy products within the asset management group. I was responsible for investing capital and managing in excess of $6 billion. I created and managed more than 40 separately managed investment accounts ("SMAs"). SMAs were accounts where the assets were legally owned directly by the client-investor, but were managed by me as the portfolio manager under a service agreement and power of attorney. I was instrumental in drafting and implementing the due diligence procedures for selecting and managing the assets, and the investment process for managing the assets, including the process for defining relevant expenses, and allocating those expenses to the portfolios.

4.  I started an asset management company in 2003, and following its merger in 2006, I was Chief Investment Officer at Weston Capital, a private wealth management firm, where I was responsible for investing and managing investor funds in excess of $2 billion, across multiple asset classes. There were six hedge fund products, and two private equity fund products. While there, I drafted the investment process and procedures manuals, implemented checks and balances, and documented risk policies and procedures around the investment products.

5.  I am currently a Partner at RoundTable Financial Group, consulting to asset managers and investment clients. I maintain my securities licenses with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority ("FINRA").

6.  In the capacities described above, I have held strategic management positions at large, global, financial institutions where I created and implemented investment strategies, guidelines, processes, and procedures, often in tandem with management, legal counsel, the compliance officer, and risk manager. We developed such procedures to ensure proper checks and balances and to safeguard clients' investments. I am familiar with the duties and responsibilities of an

4

investment manager to act as a fiduciary and to adhere to compliance policies, governing documentation, investment management agreements, service level agreements, and securities regulations.

7.      As an experienced investment manager, I accepted investment capital from U.S. and international investors, and then invested that same capital in more than four hundred private companies, private credit funds, private equity funds, or hedge funds.

8.      Throughout the fund management process, various expenses were incurred by my portfolio management team and me. Such expenses related to research and due diligence work completed when analyzing the prospective investments. Examples of these expenses included securities databases, certain data technologies, travel costs (including transportation, accommodation, and meals), and to some extent entertainment. Expense policies were defined by the firm. Since I was responsible for establishing many of the policies and procedures, I wrote, edited, and approved many of them.

9.      My roles at Credit Suisse, UBS, and Weston Capital were similar to the management and fiduciary roles held by Rashid at Apollo. I have been an investment manager and have managed multiple private investments. I was responsible for investment priorities, due diligence, research, and related investment work. I worked closely with our cash managers, our chief financial officer, and treasurer in relation to all cash functions. In these roles, I have had experience budgeting both revenues and expenses, allocating investor money, managing investments, liquidating investments, and returning investor capital.

## III.   ASSUMPTIONS AND MATERIALS REVIEWED

10.     I have been asked to assume that the facts alleged in the SEC's Complaint in this case are true. My opinions might change if those facts are shown to be untrue. I have also been provided with record material which supports the conclusion that a reasonable employee, like someone in Rashid's position, knew or should have known that Apollo would ultimately pass his expenses on to the Relevant Funds. These documents were identified previously during the discovery phase and were

marked with Bates numbers. I have also reviewed examples of standard process and procedures from respected firms in the investment advisory industry.

11.     A complete list of documents I reviewed and considered in preparing this report is attached as **Exhibit B**. If I receive additional documents or information, I will modify or supplement my report as necessary to reflect such additional data.

## IV.   INDUSTRY STANDARDS

12.     Rashid was employed as an investment adviser by Apollo. Apollo established a clear set of policies to educate its employees about their fiduciary responsibilities. Apollo's policies were consistent with industry standards. As an employee of Apollo, itself a fiduciary, Rashid was entrusted with the appropriate financial care of the firm's assets and was therefore obligated to act in the firm's best interests, in the best interests of its investors, maintain a high standard of care, and never put his own interests ahead of those of Apollo or its clients.

13.     Section 206 of the Advisers Act of 1940 states those prohibited transactions by investment advisers. As an investment adviser, and as a partner at Apollo, Rashid was therefore subject to Section 206 which made it "unlawful for any investment adviser … (1) to employ any device, scheme, or artifice to defraud any client," or "(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client.[1]"

14.     Fiduciaries are defined as those persons entrusted with the financial care of another person's money. They have obligations to always: (a) act in the best interests of their clients, and uphold the highest standards of care; (b) maintain a duty of loyalty to the client, such that the fiduciary's personal and business interests are never put ahead of those of his clients, and (c) always act in good faith.

---

[1] Investment Advisers Act of 1940, Statute Section 206 – Prohibited Transactions by Investment Advisers, https://40act.com/laws-rules/investment-advisers-act-of-1940-statute/section-206-prohibited-transactions-by-investment-advisers/.

15.     Firms like Apollo manage large amounts of money for some of the largest U.S. firms and pension funds. Pension funds, in particular, are sensitive to, and very concerned about expenses, since their clients are older, tend to be on fixed incomes, and are generally concerned about financial controls, and expense allocations. Pension funds put their investment money with larger firms like Apollo in the belief that they will have sufficient financial and expense controls in place, adhere to best practices in the industry, and maintain high fiduciary standards.

16.     Apollo belongs to, and participates in various organizations from which it gathers information about industry standards. These are industry standards applicable to the private equity markets, the area in which Rashid worked, and many of Apollo's advisers are employed.

17.     For example, Apollo has been a long-standing member of the industry's international organization for private equity managers called the Institutional Limited Partners Association ("ILPA").[2] By way of its ILPA membership, Apollo endorses its policies.

18.     The ILPA has written the Private Equity Principles:

> …a document that contains best practices concepts and that speaks to the issues relating to the alignment of interest between general partners and limited partners [investors], fund governance, and transparency and reporting. It is intended to serve as a common framework …with the goal of improving the private equity industry…. Endorsement of these Principles is an indication of general support for the ILPA.[3]

19.     The ILPA supports and recommends expense recognition guidelines developed by both the Internal Revenue Services ("IRS") and the Association of International Certified Public Accountants ("AICPA"). The IRS regularly defines what types of reimbursable expenses are acceptable from the tax perspective. Following IRS

---

[2] ILPA Private Equity Principles Endorsements, December 9, 2011; November 21, 2012; September 12, 2013, Complete list of organizations that have endorsed the ILPA Private Equity Principles.
[3] Ibid.

guidelines, the AICPA outlines a simple recommendation for employee expense reimbursement. There are generally five steps to follow:

    a.  Form a policy for the expense reimbursement process,
    b.  Determine what expenses employees can claim,
    c.  Create a system for collecting expense claims,
    d.  Verify the legitimacy of the expenses, and
    e.  Make reimbursement payments within a specified timeframe.

Apollo's T&E process mimicked these steps – there was a clear policy for expense reimbursement, the types of permissible business expenses were defined, there was an expense claims process which was verified, and when signed off, reimbursements were made.

20.    Apollo is a member of another business organization called AIMA, the Alternative Investment Management Association Limited. Its Guides to Sound Practices are "aligned with policy makers, legislators, and regulatory authorities around the world.[4]" Their Guide's commentary on expense reimbursement and allocation is consistent with that of the ILPA.

21.    The Standards Board for Alternative Investments ("SBAI") is a global organization which sets out guidance for investment managers, including private equity fund managers. It brings managers and investors together to establish responsible standards of practice that meet investor requirements. It defines best standard practices in its document, The Alternative Investment Standards. The Standards and Guidance [2] clause[5] discusses the commercial terms applicable to fees and expenses, and stresses that the details and nature of any expenses should be effectively monitored and accurately disclosed.

22.    In a letter endorsed by more than 400 ILPA members, and sent to the United States Secretary of the Treasury[6], the ILPA's Managing Director, Jennifer Choi wrote about issues where the United States financial system needed support. In the letter, she described how "there may be impropriety and insufficient

---

[4] AIMA's Objectives and Principles, www.aima.org, Advocate, Guides to Sound Practices.
[5] Standards Board for Alternative Investments, The Alternative Investment Standards, Section 2.1, p. 5, Commercial terms disclosure, https://www.sbai.org/standards/summary-of-standards/, November, 2015.
[6] Letter from Jennifer Choi, Managing Director, ILPA to The Honorable Steven Mnuchin, July 28, 2017.

disclosure of fee and expense allocations" in private equity funds, and that investors' ability "to discern questionable practices [is] limited." She quotes a statement made by Andrew Ceresney, Director, U.S. Securities and Exchange Commission, Division of Enforcement, saying "even experienced investors can be defrauded if they lack transparency into the various fees, expenses and practices[7]" in the private equity fund industry. ILPA members like Apollo, support transparency and controls over fees and clarity in the allocation process so that investors can be properly protected and informed.

23.    Apollo's policies are consistent with other industry oversight agencies, accounting and audit firms, and specialists in expense management. Apollo is consistent in their views of expense reimbursement and allocation procedures. Apollo employs many Chartered Financial Analysts. Their industry overseer, the CFA Institute of Chartered Financial Analysts, maintains a code of ethics which states that its members will "[p]lace the integrity of the investment profession and the interests of clients above [one's] own personal interests.[8]"

24.    The CFA Institute adheres to its Global Investment Performance Standards ("GIPS"), voluntary standards used by investment managers in the asset management world. GIPS recordkeeping guidelines and information maintenance is an important part of sustaining the integrity of the asset valuation methodology. GIPS standards state that there need to be sufficient procedures in place to ensure there is adequate supporting documentation to accurately reflect expenses, the methods used to record those expenses, including management fees, and that expenses are appropriately treated when calculating performance returns. Those procedures state that expenses are to be allocated and recorded to the proper fund, in the correct amounts, and on a timely basis.[9]

25.    Certified public accounting firms like Deloitte & Touche LLP (Apollo's accounting firm), follow procedures and guidelines consistent with those upheld

---

[7] Andrew Ceresney, Director, Division of Enforcement, U.S. Securities and Exchange Commission, "*Private Equity Enforcement*," Securities Enforcement Forum West 2016, San Francisco, May 12, 2016.
[8] CFA Institute of Chartered Financial Analysts, https://www.cfainstitute.org, Code of Ethics.
[9] 2012 CFA Institute, GIPS Guidance Statement of Performance, 16 March 2012, p. 6.

by all certified public accountants ("CPAs"). CPAs are trusted financial advisers who maintain the highest standards of knowledge and ethics when operating in financial capacities. They follow Internal Revenue Service ("IRS") and Department of Labor ("DOL") guidelines. Accounting firms look to see whether the expense reimbursement process compliant with IRS and DOL guidelines, and is structured as an accountable plan[10] which exists when the following conditions are met:

    a.  There is a business reason for the expense and the expense is in connection with the performance of services as an employee.

    b.  The expense is substantiated or deemed substantiated. There must be receipts and invoices that document the nature and amount of the expenditure.

26.    The private equity industry often uses expense management specialists to create the process and format for expense reimbursement, and travel and entertainment policies. Firms like Abacus Labs, Inc., provides expense reporting applications. Chrome River Technologies, Inc., offers expense management software. SAP Concur delivers global expense reporting solutions, like that which the Gates Foundation uses for its expense reimbursement policies. Each of these entities follows a similar, compliant format, consistent with the accountable plan format described above.

27.    The fund management industry and Apollo describe the standards of care they presume investment advisers to realize. Maintaining proper standards of care is not a complicated or difficult task. Most of Apollo's investment advisers have earned advanced degrees in education, and have excelled in business and finance. To become a partner, and even a senior partner within a firm like Apollo, it is incumbent upon that adviser to act as a role model, act professionally, and be a trusted fiduciary when managing investor money, consistent with all professional firms in the private equity industry.

---

[10] Prange, Margaret, CPA, C-Bulletin Issue 03 02-15, Calibre CPA Group, PLLC, Is Your Expense Reimbursement Policy Compliant with IRS and DOL Guidelines?

28.     Apollo asks its advisers to follow its Employee Handbook, adhere to their Code of
        Ethics, and observe the rules specified in the Travel & Expense Policy. Each of
        these documents contains the employee's signature.

29.     The industry gives firms like Apollo guidance in the form of communal
        information. Apollo is a member of the Institutional Limited Partners Association
        and the Alternative Investment Management Association Limited. These are
        national and somewhat global organizations which set market standards and
        disseminate best practices and policies. Other entities, like the IRS, the Standards
        Board for Alternative Investments, and the Association of International Certified
        Public Accountants provide guidance at the most fundamental levels. Their
        standards cut across many investment industries, but have direct applications to
        the area of expense reimbursement and allocations

## V.      FACTUAL BACKGROUND AND BASES FOR OPINIONS

### A.      APOLLO'S CODE OF ETHICS

30.     Apollo established its Code of Ethics[11] in order to make clear, and educate its
        investment advisers about integrity, morality, principles of good conduct, and the
        difference between right and wrong when dealing with its clients' money.

31.     Apollo's employees officially acknowledged reading and understanding this code
        by signature. The code was provided and updated on a regular basis, sometimes
        more frequently than once per calendar year. Apollo's Employee Handbook,
        which each employee receives, acknowledges, and annually signs, refers directly
        to the code. "Employees must read and be familiar with the Code of Ethics.[12]"

32.     Apollo's Code of Ethics existed throughout Rashid's employment. He "admits
        that he was aware of general internal ethical provisions being formalized" in the

---

[11] Apollo Code of Ethics, February 2010, APOLLO 00001762, and April 2011, APOLLO 00001861, and November 2011, APOLLO 00001962, and December 2012, APOLLO 00002059.
[12] Apollo Employee Handbook, May 7, 2011, January 1, 2012, and 2013, Compliance with Laws and Regulations, p. 38, APOLLO 00002732.

guise of Apollo's Code of Ethics, and further "admits that he was aware of general ethical principles.[13]"

33. Standards of business and personal conduct are described therein. Apollo expected its employees to be mindful of the firm's fiduciary responsibilities. It expected its employees to adhere to the highest standards of legal and ethical behavior in their personal conduct and in their dealings inside and outside the firm.[14]

34. Apollo's Code of Ethics acknowledged that its investment advisers "act as fiduciaries and thus owe a series of duties to [the] funds and their investors, including a general duty to act at all times in their best interest.[15]"

35. Likewise, Apollo is registered with the SEC as an investment adviser, and as such, it requires that its employees "must comply with the requirements set forth in the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and the rules and regulations promulgated thereunder." Apollo's Code of Ethics was adopted in compliance with Rule 204A-1 under the Advisers Act and was designed to "set forth the relevant requirements" to be followed "as fiduciaries and registered investment advisers.[16]"

36. For compliance purposes, Apollo's Code of Ethics was presented to all investment managers and was signed off by each employee. Rashid was employed as an investment manager during the period of time when the 2010, 2011, 2012, and 2013 Codes of Ethics were published.

37. Rashid regularly signed the Code of Ethics Compliance Survey,[17] which contained personal, detailed statements, such as:

    a. "I have at all times complied with the Code of Ethics.[18]"

---

[13] Defendant Mohammed Ali Rashid's Responses and Objections to Plaintiff Securities and Exchange Commission's First Set of Requests for Admission, Section A. Employment with Apollo, para 66 and 67, p. 16.
[14] Apollo Code of Ethics, February 2010, Standard of Business and Personal Conduct, p. 5, APOLLO 00001772.
[15] Apollo Code of Ethics, February 2010, Section 2, Administration of the Code of Ethics, p. 2, APOLLO 00001769.
[16] Ibid.
[17] Acknowledgment to the Annual Compliance Survey and Holdings Report, p. 12, APOLLO 00041635, and p. 3, APOLLO 00041617.

b. "I have used firm assets only for the conduct of the firm's business, except for incidental personal use authorized by the Code of Ethics or other applicable policies.[19]"

c. "At all times, I followed the firm's internal controls, record retention, and reporting requirements, set forth in the Code of Ethics.[20]"

Rashid's signature, against these personal statements, implies that he understood and agreed to the various requirements, and that he would adhere to them during his employment.

38. Apollo's Code of Ethics warned against breach of procedures throughout the document. The section on Internal Controls, Record Retention, and Reporting stated the following:

> The falsification of any book, record, or account relating to the business of Apollo, [or] its clients …(including without limitation, the submission of any false personal expense statement, claim for reimbursement of a non-business expense, or a false record or claim under the employee benefit plan) is prohibited.[21]

Rashid signed off on this statement on a regular basis. In his deposition, Rashid spoke of this clause, saying, "I understood it in general terms.[22]"

39. If it was not already intuitive, Apollo's Code of Ethics made evident that it specifically "prohibits the submission of false or misleading records (e.g. misstating the number of guests at a business dinner in an employee expense report, or attaching a fictitious receipt to support an expense report).[23]" It goes on to warn that "[any] employee who creates or causes the creation of a false or misleading record or accounting entry …will be subject to disciplinary action.[24]"

---

[18] Compliance Survey, p. 1, APOLLO 00041624, and p. 2, APOLLO 00041637, and p. 1, APOLLO 00041615.
[19] Compliance Survey, p. 2, APOLLO 00041625, and p. 3, APOLLO 00041638, and APOLLO 00041615.
[20] Compliance Survey, p. 2, APOLLO 00041625, and Compliance Survey, p. 3, APOLLO 00041638, and Compliance Survey, APOLLO 00041615.
[21] Apollo Code of Ethics 2010, p. 33, Internal Controls, Record Retention, and Reporting, Section 7.3, APOLLO 00001814.
[22] Volume I Videotaped Deposition of Mohammed Ali Rashid, March 19, 2019, p. 134, line 2.
[23] Apollo Code of Ethics 2010, p. 47, Accounting Provisions, Section 12.1.2, APOLLO 00001814.
[24] Apollo Code of Ethics 2010, p. 47, Accurate Records, Section 12.1.2.1, APOLLO 00001814.

### B.   APOLLO'S EMPLOYEE HANDBOOK AND T&E POLICIES

40.   Rashid had previously been employed by Goldman Sachs, a leader in the financial
industry. While there, he was educated and made aware of market standards,
policies and procedures, and best practices. He states in his deposition, "I had
come from Goldman Sachs where they had very strict [expense] policies and
procedures that I adhered to and abided by and never had any issues with.[25]"

41.   Rashid was thus fully aware of industry standards regarding travel and expense
policies. If, however, a professional, corporate, business employee was
completely unaware of customary travel and expense reimbursement policies,
then such employee had those policies spelled out clearly in Apollo's Employee
Handbook and its Travel & Expense Reimbursement Policies and Procedures.
While Rashid was employed by Apollo, he was subject to these policies.

42.   Rashid admits he knew of the Employee Handbook, and "admits he had general
knowledge of the substance and content of Apollo's Employee Handbook.[26]"
Furthermore, Rashid "admits that he was aware that Apollo had general T&E
Reimbursement policies" and that he had "general knowledge of the substance
and content of Apollo's T&E policies.[27]" He admits he was ultimately
"responsible for any mistakes[28]" as well as the accuracy of the expense reports
submitted, saying during his deposition, "Ultimately, the employee was
responsible for the accuracy of what was described for the expense.[29]"

43.   The Employee Handbook states that the Company "requires honest and accurate
recording and reporting of information.[30]" T&E policies were effective
throughout his employment, and certainly during the periods from January 2009,
to November 1, 2011, through 2013, these being the dates of the policies

---

[25] Volume I Videotaped Deposition of Mohammed Ali Rashid, March 19, 2019, p. 320, line 12.
[26] Defendant Mohammed Ali Rashid's Responses and Objections to Plaintiff Securities and Exchange
Commission's First Set of Requests for Admission, Section A. Employment with Apollo, para 64 and 65, p. 16.
[27] Ibid. para 53 and para 55, p. 13.
[28] Ibid, para 57, p. 14.
[29] Volume I Videotaped Deposition of Mohammed Ali Rashid, March 19, 2019, p. 376, line 24.
[30] Apollo Employee Handbook, May 7, 2011, January 1, 2012, and 2013, Accounting and Record Keeping, p. 39,
APOLLO 00002733.

themselves. Although the policies were slightly amended over time, their basic intentions remained the same.

44.    In one section of the Code of Ethics, entitled "Restrictions on Reimbursements and Use of Cash," Apollo states it will only reimburse for "goods, services, or other expenditures that are fully and properly supported by third-party invoices or receipts in accordance with Apollo's Travel & Expense Policy.[31]"

45.    The January 2009 T&E guideline is succinct. The first sentence of the General Policy reads, "Apollo will reimburse all Employees for necessary and reasonable business and travel expenses incurred in the performance of their duties.[32]" The Expense Reporting Guidance section states, "All Employees are required to document and substantiate the following information on their respective employee expense report:

- Amount of the expense
- Date and place incurred
- Names and titles of others attending…
- Business purpose of the expense"[33]

The amount of the expense, the date, and place where the expense occurred might be somewhat easily identified from details provided on the credit card statement. However, the names and titles of those attending the business event, and the detailed business purpose for the expense is more likely to have been provided by the person incurring the expense. It is difficult to believe that a third party, even an assistant, would automatically know how to provide such details without the credit card user supplying the relevant expense information directly.

46.    Exhibit C of the January 2009 T&E Guideline, and Clause 9 of the November 2011 T&E Guideline describe T&E items which specifically are <u>not reimbursable</u>. Those non-reimbursable items include barbers, spa charges, excessive or lavish

---

[31] Apollo Code of Ethics 2010, p. 48, Restrictions on Reimbursements and Use of Cash, Section 12.1.2.2, APOLLO 00001815.
[32] Apollo Global Management LLC, Travel & Expense Reimbursement Policy, January 2009, Introduction, p. 2, APOLLO 00004578.
[33] Ibid, p. 4.

entertainment, clothing, personal items, non-business travel and entertainment expenses, standard commuting costs including taxis/private cars to/from the office, and unexplained expenses.[34] The exclusion list is not limited to these items however.

47.    Qualifying employees were provided with Apollo-sponsored American Express ("AmEx") credit cards, which the employees used for business expenses. Expense reports were to be submitted in a timely manner, after the employee received the credit card statement. It was made clear that "the employee is ultimately responsible for timely and accurate submission of his/her expenses regardless who prepares the expense report.[35]"

48.    After expenses are incurred, and after the monthly billing receipt arrives from American Express, an expense allocation process begins. Charges are uploaded into the "PeopleSoft expense module" where charges are allocated to specific expense categories. "The process is completed by the employee or a representative authorized to fill out the expense report for the Apollo employee.[36]" The employee, not the authorized representative, is responsible for the expense details and the accuracy of the expense information upon submission.[37]

## C.    APOLLO'S MANAGEMENT AGREEMENTS AND FUND OFFERING MATERIALS

49.    Rashid held a high-ranking position as a senior partner at Apollo. Rashid and others were responsible for investments in, and the management of five Apollo funds including Apollo Investment Fund III, L.P., Apollo Investment Fund V, L.P., Apollo Investment Fund VI, L.P., Apollo Investment Fund VII, L.P., and

---

[34] Ibid, p 15, and Apollo Global Management Travel & Expense Reimbursement Policies and Procedures, November 1, 2011, p. 10, APOLLO 00004709.
[35] Apollo Global Management Travel & Expense Reimbursement Policies and Procedures, November 1, 2011, p. 3, APOLLO 00004702.
[36] Apollo Global Management LLC, Travel & Expense Reimbursement Policy, January 2009, Corporate Credit Card Procedures, p. 17, APOLLO 00004594.
[37] Apollo Global Management Travel & Expense Reimbursement Policies and Procedures, November 1, 2011, p. 3, APOLLO 00004702

Apollo Natural Resources Partners, L.P. Each of these funds was managed by a management company ("Management Company"). The Management Company's responsibilities were defined in a management agreement. Each Management Company "is an affiliate of Apollo Management, L.P., an investment adviser that is registered under the Advisers Act.[38]" The Apollo Natural Resources Partners, L.P., however, was managed by its affiliate, Apollo Commodities Management, L.P.

50.     Management agreements were in place with each of the funds Apollo advised. These agreements allowed Apollo to charge fees and expenses to the funds according to pre-defined and documented guidelines. The management agreements dictated which fees were paid to Apollo for its services and which expenses Apollo was entitled to recoup from the funds. Apollo was not entitled to be reimbursed for its fund managers' personal expenses.

51.     Five funds are referenced above. The first four of these funds' legal documents (private placement memoranda) generally followed the same fee payment and expense allocation criteria. Their management agreements also were similar. The Management Company is responsible for managing all affairs and activities of the fund, and "all of the investment advisory activities of the Management Company are subject to the Advisers Act and the rules thereunder.[39]" The fifth fund, Apollo Natural Resources Partners, L.P., was slightly different in that its Management Company was a different legal entity because of the types of investments it made.

52.     Rashid had personal investments as a limited partner in four of these funds. This was an indication that management had aligned its interests with the other investors in the funds, and show that "the people that were managing the investments or recommending the investments [had] skin in the game.[40]" Those funds included Apollo Investment Fund V, L.P., Apollo Investment Fund VI, L.P., Apollo Investment Fund VII, L.P., and Apollo Natural Resources Partners,

---

[38] Apollo Investment Fund VII, L.P., Annex A, Section 6., p. A-2.
[39] Ibid.
[40] Volume II Videotaped Deposition of Mohammed Ali Rashid, March 20, 2019, p. 347, line 3.

L.P. It would have been market convention for any investor, including an Apollo employee, to complete a Subscription Agreement, sign it, and by doing so, acknowledge understanding of the contents of such documentation.

53.     Like any investor and limited partner, Rashid had access to the legal documents relating to each fund in which he had an investment. In the private placement memoranda, there is a description of the way in which expenses were allocated to the funds by Apollo, the Management Company.

54.     The management agreements state that the Management Company shall bear the costs and expenses of "developing, negotiating and structuring" the fund's portfolio, "including without limitation any travel, staff, overhead, and legal and accounting expenses in connection therewith,[41]" including administrative expenses like office space, supplies, and the facilities. The Management Company was not responsible for its fund managers' personal expenses.

55.     The funds were responsible for organizational and operating expenses such as those "pertaining to the offering and sale of limited partner interests," as well as "legal payments and travel expenses.[42]" The Apollo Natural Resources Partners, L.P. fund was additionally responsible for costs and expenses incurred for "operations, and the acquisition, ownership and maintenance of investments,[43]" including the costs for purchasing the companies for the fund. The funds and the funds' investors were not responsible for general administration, staff, and portfolio management costs and expenses. The funds were not responsible for its fund managers' personal expenses.

56.     In exchange for their services, each Management Company was paid a management fee. Depending on the fund, these fees were based on the capital amounts committed by the investors, and the assets under management. The fees

---

[41] Ibid, Article VII, Expenses and Management Fee, Section 7.1, Administrative Expenses, p. 71.
[42] Apollo Investment Fund VII, L.P., Article VII, Expenses and Management Fee, Section 7.2, Organizational and Operating Expenses, p. 71.
[43] Apollo Natural Resources Partners, L.P., Summary of Fund Terms, Section Operating Expenses, p. 79, APOLLO 00049750.

ranged from 1.5% to 0.65% depending on the amount of capital that had been spent, the length of time the capital was invested, and the total value of the assets.

57.     The funds' offering materials and management agreements were clear about the expenses that either the Management Companies or the funds would bear. As an investor, and a senior partner of Apollo, Rashid had access to this information. The Management Companies were being paid a management fee for managing the assets as an investment adviser under the Advisers Act, and expected its fund managers to abide by the Act's guidelines. Nowhere in the offering materials or in the management agreements was a fund manager permitted to allocate personal expenses to a fund.

## D.      RASHID'S SUBMISSION OF PERSONAL EXPENSES AS LEGITIMATE BUSINESS EXPENSES

58.     During the Relevant Period, Rashid was engaged in the business of advising private equity funds managed by Apollo affiliates. The SEC alleges that Rashid defrauded his investment clients and breached his fiduciary duties to the Relevant Funds by effectively using their funds to cover his personal expenses.

59.     According to the SEC's Complaint, Rashid charged personal entertainment, meals, hotels, transportation, clothing, and other personal items to his Apollo credit card. Expenses on the Apollo credit card were presumed to be one hundred percent business-related. Personal expenses were not generally permitted. If personal expenses were charged, and were not properly identified as such, those expenses could be deemed to represent legitimate business expenses incurred in managing portfolio companies or in conducting other activity on behalf of Apollo itself. Each business expense description was ultimately the credit card holder's responsibility.

60.     In November 2010, Rashid was accused of characterizing many of his personal expenses as business related expenses, and ultimately gave Apollo a personal

check for $7,828.86 as reimbursement.[44] Again, in 2012, Rashid was accused of the same, inappropriate characterization of personal expenses as business related expenses, and a personal check for $7,072.36 was paid to Apollo as reimbursement.[45]

61.     Rashid's expense reports were prepared by his personal assistants under his direction. Rashid has asserted that he did not provide descriptions of the expenses and never reviewed his expense reports before they were submitted into Apollo's computerized travel and entertainment ("T&E") system known as "PeopleSoft." Although I am not in a position to make any assessment as to the reliability of Rashid's assertions, based on my experience in the industry, it would seem unlikely that Rashid's assistants would know how to accurately attribute hundreds of expense items without guidance from Rashid.

62.     Rashid has admitted that he was ultimately responsible for the accuracy of the expense reports, and for the descriptions of the expenses. Many of the expense descriptions provided specific supposed business-related activities and/or identified specific portfolio company executives Rashid claimed were involved in the expense-related activity. Depending on the description and classification of a particular expense, Apollo would allocate it to one of the Relevant Funds, or to an Apollo-related management company, or to some other cost center.

63.     Before being placed on leave in July 2013, Rashid breached Apollo policies and procedures. Hundreds of Rashid's personal expense items were submitted for reimbursement and then allocated to the Relevant Funds as legitimate business-related expenses. Rashid was responsible for what was submitted on his expense reports, even though he had relegated the process for completing those forms to his assistants. His expense reports named people with whom he supposedly ate,

---

[44] Defendant Mohammed Ali Rashid's Responses and Objections to Plaintiff Securities and Exchange Commission's First Set of Requests for Admission, Section J. Repayment for Charges of Personal Expense Items, para 475 to 477, p. 133 and Volume I Videotaped Deposition of Mohammed Ali Rashid, March 19, 2019, p. 118, line 23.
[45] Defendant Mohammed Ali Rashid's Responses and Objections to Plaintiff Securities and Exchange Commission's First Set of Requests for Admission, Section J. Repayment for Charges of Personal Expense Items, para 478, p. 135 and Volume III Videotaped Deposition of Mohammed Ali Rashid, March 21, 2019, p. 681, line 19.

the recipients of gifts he purportedly gave, and the attendees at dinners he allegedly hosted.[46] The names of these persons included their companies of employment (e.g. Realogy, QDI, or Metals), and occasionally the reasons for the event. The expenses from these events were then allocated by Apollo through its PeopleSoft expense allocation process to each relevant fund as if those expenses were legitimate, fund-related, business expenses. The funds ultimately bore those costs until later reimbursed by Apollo after it had uncovered Rashid's misconduct.

64.     Rashid used his corporate credit card for personal expenses, saying, "There were times, yes, sure." "Pretty infrequently, I think.[47]" However, hundreds of personal expenses were incurred over the years. Whenever business expenses were incurred, a company name, a person's name, and a reason for the expense had to be supplied. Rashid, either directly, or with his assistant allocated expenses to multiple persons and companies to cover up meals, entertainment, items of clothing, and transportation for what possibly seemed to be legitimate reasons. The reasons, times, dates, names of people, and places were often a smoke screen to hide his scheme.

65.     Many of the persons, places, and reasons for the purported business expenses were investigated. Sworn declarations by the supposed participants have been provided. These people are industry leaders of publicly traded companies, and large private businesses. They are Chairmen of the Board, Chief Executive Officers, Presidents, Chief Financial Officers, Chief Operating Officers, Corporate Controllers, Chief Counsel, Head of Human Resources, and Executive Advisors.

66.     The names of these senior officers were included on Rashid's expense reports as part of his scheme to cover up personal expenses as business related items. Below

---

[46] Expense Report Accounting Distributions, files APOLLO00004388, APOLLO00040732, APOLLO00040763, APOLLO00040784, APOLLO00040799, APOLLO00040833, APOLLO00040845, APOLLO00040850, **specifically pages APOLLO00040855 to APOLLO00040856**, APOLLO00040857, APOLLO00041241, **specifically pages APOLLO00041243 to APOLLO00041244, and APOLLO00041254 to APOLLO00041254, and APOLLO00041285 to APOLLO00041286, and APOLLO00041493 to APOLLO00041494, and APOLLO00041514 to APOLLO00041515, and APOLLO00041540 to APOLLO00041541**.
[47] Volume I Videotaped Deposition of Mohammed Ali Rashid, March 19, 2019, p. 110, lines 14 and 17.

are excerpts from summaries of sworn responses given by some of those senior officers who were listed in Rashid's expense reports. Exhibit C contains a more thorough summary of their responses and the responses of many others.

| Last Name | First Name | Dated | Sworn Declarations | Bates Number |
|---|---|---|---|---|
| | | | **Numbered Sections from Summary Declarations** | |
| Koci | Keith | July 11, 2018 | 4. I did not have dinner with Rashid on February 27, 2011 at Sky Bar in Miami, Florida. 5. I did not have dinner with Rashid on March 12, 2011 at …Mr. Chow Enterprises. I do not recall having been to a restaurant named Mr. Chow. 6. **I did not have dinner with Rashid on March 12, 2011 at ...Lucky 13 Associates. ...I was not in New York City in March 2012**. 7. ...I did not have dinner with Rashid on April 28, 2012 at ...Superior Restaurant NYC. ...I was not in New York City in April 2012. 8. ...I did not have dinner with Rashid on November 22, 2012 at the Bal Harbour Hotel. 9. ...I did not have dinner with Rashid on May 15, 2011 at The Griffin. ...I was not in New York City in May 2011. 10. ...I did not attend a meal with Rashid on January 22, 2012 at Louis Bar and Lounge. 11. ...**I did not receive a Zegna tie from Rashid in April 2012.** | SEC-SEC-E-0000129 |
| Enzor | Gary | June 26, 2018 | 8. **On February 3, 2013, Rashid brought a woman to the event; but in my view, this … would not have justified Rashid treating his airfare, lodging, or other travel expenses that weekend as … business expenses**. 10. From 2010 through 2013 ...I never had dinner alone with Rashid. 13. I do not recall Rashid ever paying for a dinner that I attended.14. I did not have dinner with Rashid at Brother Jimmy's ...on Saturday, April 3, 2010. 15. I did not have dinner at the Cooper Square Hotel with Rashid ...on Friday April 9, 2010. I do not believe I have ever been [there]. 16. I did not have dinner with Rashid at Peter Luger ...on July 28, 2010. I do not believe I have ever been [there]. 17. I did not have dinner with Rashid in New York City on Saturday, August 14, 2010. I was in Bartow, Florida. 18. I did not have dinner with Rashid and other members of the QDI management team ...on October 20, 2010. ...I took a flight from Phoenix, Arizona to Tampa, Florida that day. 19. I did not have drinks with Rashid ...on October 22, 2010. ...I was in Clearwater, Florida. | SEC-SEC-E-0000146 |
| Troy | Joseph | June 22, 2018 | 9. **I do no recall Rashid ever paying for a meal that I attended**. 10. …I did not have dinner with Rashid at Sushi You in New York City on October 20, 2010. 11. …I did not have dinner or drinks with Rashid …on Friday, October 22, 2010. 12. … **I did not have dinner with Rashid ...on Saturday, February 26, 2011**. I had a business meeting in Tampa, Florida on ... February 26, 2011. 13. ....I did not have dinner with Rashid in New York City on June 21, 2011. ...I traveled from Tampa, Florida to Maine on June 21, 2011, on a personal trip. 14. ...I did not have dinner with Rashid ...on September 1, 2011. ...I was [not] in New York that day. ...I had a postoperative doctor's appointment in Tampa, Florida on September 1, 2011. 15. ...**I did not have dinner with Rashid ...on Saturday, April 21, 2012**. ...I was in Tampa. 16. ...**I did not have dinner with Rashid, John Wilson, and Jonathan Gold ...on Sunday, October 28, 2012**. Moreover, Jonathan Gold ...left QDI in or about July 2012. 17. ...I did not have dinner with Rashid, Thomas Finkbiner, Bo Leslie, Jonathan Gold, and other QDI members at The Lion on February 14, 2013. Moreover, **Thomas Finkbiner, Bo Leslie, and Jonathan Gold were not employees of QDI in February 2013.** 18. I do not recall receiving ties, shirts, electronics, gift cards, or any other gifts from Rashid. | SEC-SEC-E-0000018 |

| Swift | Alicia | May 24, 2018 | 4. …I did not have dinner with Rashid …in New York City at a Portuguese restaurant called Aldea on March 2, 2011. I have never been to Aldea in New York City. 5. **I have never received items of clothing, electronics, Bliss spa gift cards, or any other gifts from Rashid. 6. I have never received a baby gift of any kind from Rashid.** | SEC-SEC-E-0000042 |

67. It's surprising that many of Rashid's expenses were incurred either on weekends, or on actual holidays, or while he was in a vacation spot. Though possible, the multiple expenses that were incurred seem unlikely to have all been for business related activities since Saturdays, Sundays, and holidays tend to not be work days for most. The hypothetical attendees who participated on these days were sometimes people who didn't work at the firms (or hadn't worked there for a long time). Meetings were supposedly held with people the other attendees actually never met. Business dinners were theoretically held at restaurants the alleged attendees had never heard of, on days when they were in completely different cities, and at times that conflicted with their other clear commitments. People, who were supposedly given gifts, never received them.

68. Throughout this process, Rashid breached many of the policies defined in Apollo's Employee Handbook, Code of Ethics, and T&E Guidelines.

69. Following a forensic accounting review by the audit and accounting firm BDO USA, LLP, ("BDO") in the summer of 2013, BDO concluded "$315,320.99 [of Rashid's expenses during the period in question] were reclassified as personal. Of those adjustments, more than [$] 220,000 were initially identified by Rashid himself.[48]" According to the SEC's Complaint, "Rashid admitted that over $220,000 in business expenses he charged …were, in fact, his personal expenses." "The $220,000 in personal charges was in addition to the … [$7,828.86 and $7,072.36] personal expenses that Rashid had charged to the Relevant Funds and paid back to Apollo in 2010 and 2012.[49]"

---

[48] Volume III Videotaped Deposition of Mohammed Ali Rashid, March 21, 2019, p. 781, line 24.
[49] No. 17-cv-8223 Complaint, Securities and Exchange Commission v. Mohammed Ali Rashid, October 25, 2017, p. 20, para 81.

70.     In 2013, Rashid repaid approximately $290,000 for personal expenses that he had charged on his Apollo American Express card.[50] Presumably, this was the total amount of personal expenses that he had designated as business expenses, plus additional charges. Many of those presumed business expenses already had been allocated to the Relevant Funds as if they were legitimate business expenses. Approximately $220,000 of those expenses had been independently and unambiguously identified by Rashid.

71.     All told, Rashid reimbursed Apollo three times for personal expenses he had submitted as if they were legitimate business expenses. Rashid's total repayment amounts to Apollo equaled a very large sum of money, an amount in excess of $300,000.

## VI.    EXPERT OPINIONS

72.     In summary, my opinions are as follows:

A.      During the Relevant Period, Rashid's submission of numerous personal expenses to Apollo for reimbursement, allegedly as legitimate business expenses, contravened the norms and best business practices that were well-accepted by financial firms and those in the investment advisory industry. Such customs and practices applied to all principals and employees. Investment advisers (and certain employees of investment advisers) are fiduciaries that must place their clients' interests above their own interests. Apollo is an investment adviser; Rashid was employed by Apollo and was required to adhere to investment adviser guidelines. As fiduciaries, investment advisers also owe their clients a duty of honesty. These bedrock customs and practices are derived not only from established legal standards but also from recognition in best practices, codes of ethics, and company policies and procedures in the financial industry. Rashid violated these customs and practices by misrepresenting a significant amount of personal expenses as legitimate business expenses, when a reasonable employee should have known that some of those personal expenses ultimately would be allocated

---

[50]. No. 17-cv-8223 Complaint, Securities and Exchange Commission v. Mohammed Ali Rashid, October 25, 2017, p. 20, para 83.

either to portfolio companies that he helped manage, or to private equity funds that he helped to advise.

B.      A reasonable employee in Rashid's position should have known that expenses which he placed on his business credit card and represented to have been incurred on behalf of private equity funds and/or portfolio companies in which such funds had an investment interest ultimately would be submitted to the Relevant Funds as reimbursable management expenses. Rashid had worked for another financial firm previously, Goldman Sachs. Rashid had experience with the business expense reimbursement process, as Goldman Sachs had strict expense policies and procedures. Rashid was also a senior Apollo partner who was a direct owner of the funds as a limited partner. He had access to the funds' legal documents and should have, or could have known that the funds, on whose behalf he claimed to have incurred various expenses, ultimately would bear the costs. During the Relevant Period, it was standard practice for private equity fund managers to be reimbursed for expenses that their partners and employees incurred on a fund's behalf. Apollo had management agreements in place with each of the funds it advised and those management agreements followed that standard practice. Rashid certainly should have known this basic fact as an investment professional and as an Apollo senior partner. For all these reasons, Rashid should have known that the funds, on whose behalf he claimed to have incurred various expenses, ultimately would bear those costs.

C.      The private equity funds that Rashid advised would want to know about Rashid's conduct. Indeed, any fund or fund investor would deem it important to know if an employee of the fund manager was misappropriating money directly or indirectly, regardless of the amount in relation to assets under management. Any misappropriation of funds would be a red flag. Misappropriations could also raise serious questions about the manager's integrity and trustworthiness in general. Moreover, institutional investors like pension funds, that invest in private equity funds, owe fiduciary duties to their own investors. Such investors would also deem the misappropriation of assets by a fund manager to be important. Apollo, which organized, managed, and controlled the Relevant Funds, deemed Rashid's

misconduct to be significant and harmful, as exemplified by its decision to terminate his employment, notwithstanding his past performance, or his potential to make money for the firm in the future.


Matthew T. Hoffman

_____

Signature

Date: April 15, 2019

# EXHIBIT A

# MATTHEW T. HOFFMAN

**EXPERIENCE**

## 02/09 – Present:  ROUNDTABLE FINANCIAL GROUP, LLC

**Partner, Financial Consultant and Investment Advisor.** Manage a team of six professionals performing investment advisory, financial negotiations, compliance, due diligence, investment banking, private placements, and consulting services in corporate sales and acquisitions; specialist in hedge funds, private equity, real estate, and other alternative investment products. Expert witness in 8 legal cases.

## 10/03 – 01/09:   WESTON CAPITAL MANAGEMENT, LLC (via acquisition – pka Mayer & Hoffman Capital Advisors, LLC)

**CIO, Head of Portfolio Investments.** Fiduciary with direct responsibility for $2.2bn in fund assets at peak, 80 fund investments across 5 portfolios. Chairman of Investment Committee, member of Investment Oversight Committee and New Product Committee, Director of private equity and seeding entities, Partners Funds I and II, investment vehicles for hedge fund incubation.

Due diligence and research responsibilities on all equity, fixed income, foreign exchange and alternative investments. Specialized in niche, non-correlating strategies and trading portfolios. Built 7-man research, risk management and investment team across all hedge fund strategies including secured lending, distressed debt, equity long short, emerging markets, event driven, fixed income arbitrage, global macro, managed futures, and volatility arbitrage.

Strategically designed hedge fund investment portfolios for private buyers (minimum $100mm). Established and monitored process and procedures, wrote working manuals and guidelines for future investments. Managed multiple audits successfully.

Constructed portfolio with 12 separately managed accounts with $300mm in AUM for one client. Launched portfolio of new and emerging managers. Enabled specialized risk management via full transparency into traditional hedge fund investment portfolios. Sold ownership stake to partner.

## 07/00 – 10/03: CREDIT SUISSE (pka CS Financial Products, Ltd., Credit Suisse Asset Management)

**Group Manager, Fund Investment Group.** Investment Committee Member. Created and managed hedge fund portfolios and related products for institutional customers and proprietary positions. Performed due diligence and monitored process and procedures. $8.0bn in hedge fund exposure with 200+ hedge fund managers, of which $2.5bn was under direct control. 8 direct reports plus 2 additional support staff.

Identified new hedge fund managers, interviewed decision makers, allocated money, established managed accounts, negotiated side letters, created new investment vehicles, monitored operations process, employed derivative techniques for capital protection. Executed both call option and total return swap trades on hedge funds.

Selected managers with appropriate risk criteria across multiple strategies including event driven, distressed, fixed income arbitrage, global macro, managed futures, and convertible bond arbitrage.  Lesser focus on equity long/short and market neutral.

Chairman of Commodity Pool Operator (CPO) for use in managing US-based fund of funds business. Oversaw all CFTC and NFA filings. Responsible for administration and audit of onshore products.

27

**04/91 - 07/00: UBS LLC (via acquisitions - pka O'Connor Partners, Swiss Bank Corporation AG,)**

**Executive Director, Trading Management, Stamford, CT (01/98 – 07/00).** Senior trader, built stable platform upon which business could expand profitably. Assisted in merger processes, both Dillon Read and Union Bank of Switzerland. Supported growth of Prime Brokerage business and Alternative Asset Management businesses.

**Executive Director, Hedge Fund and Structured Product Trading Europe, Equity Derivatives, London (04/91 - 12/97)** Hedge fund trading and business development, PERLES product innovator, sales-trading manager: Expanded derivatives trading and sales operation, warrants product developer, successful multi-product launches, developed new electronic pricing methods, created new structured products, implemented changes to policies and procedures. Managed the finances, designed client reports, headed up technology projects and internet business initiatives.

**06/89 - 04/91: MERRILL LYNCH INTERNATIONAL**

**Director, London.** Capital Markets Group. Derivatives trader within Interest Rate / Currency Risk Management Group. Priced, structured, originated and marketed interest rate and currency hedging products. Worked with portfolio managers to construct risk averse, or more risk tolerant positions. Promoted interest rate, currency and equity swaps.

**09/82 - 06/89: JPMORGAN CHASE & CO.**

**Director, Hong Kong (01/85-06/89).** Head of Interest Rate and Currency Derivatives and Risk Management Group. Asia-wide responsibility for risk management products, sales and trading, including futures, swaps, options, caps, floors and FRAs.

**Director, Tokyo (02/84-01/85).** Swaps Group. Started trading operation for interest rate and currency derivatives and risk management products. Hired traders and marketers and set up shop. Associate (9/82-2/84), NY, Capital Markets Group. Worked on Puerto Rican and Mexican FX related businesses and on private placement proposals and transactions.

**EDUCATION**
University of Chicago, MBA Finance, 1982.
Denison University, BA Mathematics / Economics, Biology, 1978.

**CITIZENSHIP**
American and English, dual citizenship with valid, permanent EEC residency and working status.

**OTHER**
Registered broker, member FINRA, SIPC, Series 7, 63, and 79 valid.

Expert witness for alternative investment projects. Reports, depositions, and testimony expertise.

Board memberships:
- Private equity, early-stage investment fund ($300mm under management) 2006-2009, Head of fund investment committee.
- Hedge fund ($550mm under management) 1995-2000, Chairman of board for Dublin, Ireland-based, off-shore investment vehicles.
- Swiss bank pension fund ($1.4bn under management) 1992-1997, Chairman of pension fund Investment Committee 1995-1997.

Frequent lecturer on asset management, hedge fund seeding and incubation, financial advisory, product development. MS Office, Excel, Word, PowerPoint.

## EXHIBIT B

## Complete Document List for Matthew T. Hoffman

| TITLE | DATE | BATES |
|---|---|---|
| Apollo Investment Fund V, L.P., Fifth Amended and Restated Agreement of Limited Partnership, Dated as of April 19, 2002 | 4/19/2002 | APOLLO 00000032 |
| Apollo Code of Ethics, February 2010 | 2/1/2010 | APOLLO 00001762 |
| Apollo Code of Ethics, April 2011 | 4/1/2011 | APOLLO 00001861 |
| Apollo Code of Ethics, November 2011 | 11/1/2011 | APOLLO 00001962 |
| Apollo Code of Ethics, December 2012 | 12/1/2012 | APOLLO 00002059 |
| Employee Expense Receipt Form, PeopleSoft Express, MRashid | 10/15/2010 | APOLLO 00004388 |
| Apollo Global Management LLC, Travel & Expense Reimbursement Policies and Procedures, January 2009 | 1/1/2009 | APOLLO 00004578 |
| Apollo Global Management, Travel & Expense Reimbursement Policies and Procedures, Revised 12/05/14 | 12/5/2014 | APOLLO 00004617 |
| Apollo Global Management, Travel & Expense Reimbursement Policies and Procedures, Revised 12/12/14 | 12/24/2014 | APOLLO 00004637 |
| Apollo Global Management, Travel & Expense Reimbursement Policies and Procedures, Effective November 11, 2011 | 11/1/2011 | APOLLO 00004699 |
| Apollo Global Management, Travel & Expense Reimbursement Policies and Procedures | NA | APOLLO 00004711 |
| Employee Expense Receipt Form, PeopleSoft Express, MRashid | 11/3/2010 | APOLLO 00040732 |
| Employee Expense Receipt Form, PeopleSoft Express, MRashid | 10/15/2010 | APOLLO 00040763 |
| Employee Expense Receipt Form, PeopleSoft Express, MRashid | 9/22/2010 | APOLLO 00040784 |
| Employee Expense Receipt Form, PeopleSoft Express, MRashid | 7/23/2010 | APOLLO 00040799 |
| Employee Expense Receipt Form, PeopleSoft Express, MRashid | 6/3/2010 | APOLLO 00040833 |
| Employee Expense Receipt Form, PeopleSoft Express, MRashid, and Expense Report Approval Email April 1, 2010 | 3/17/2010 | APOLLO 00040845 |
| Employee Expense Receipt Form, PeopleSoft Express, MRashid, and Expense Report Approval Email April 20, 2010 | 4/13/2010 | APOLLO 00040850 |
| Employee Expense Receipt Form, PeopleSoft Express, MRashid, and Expense Report Approval Email March 17, 2010 | 2/24/2010 | APOLLO 00040857 |

| | | |
|---|---|---|
| Employee Expense Receipt Form, PeopleSoft Express, MRashid | 1/6/2010 | APOLLO 00041241 |
| Apollo Code of Ethics Administration, Part I. Compliance Survey – Electronic Signature / Approval | 6/11/2014 | APOLLO 00041609 |
| Apollo Code of Ethics Administration, Annual Compliance Survey – Electronic Signature / Approval | 5/15/2011 | APOLLO 00041615 |
| Apollo Code of Ethics, Annual Compliance Survey and Holdings Report for the year ended December 31, 2010 - Signed | 6/9/2011 | APOLLO 00041624 |
| Compliance Science – Personal Trading Control Center, Accounts Certified – Electronic Signature / Approval | 3/13/2012 | APOLLO 00041636 |
| Apollo – Caesars Annual Certification for year-end 2011, updated April 18, 2012 | 4/19/2012 | APOLLO 00041640 |
| Compliance Science – Personal Trading Control Center, Accounts Certified – Electronic Signature / Approval | 1/31/2013 | APOLLO 00041643 |
| Memo from Ali Rashid, to Apollo Human Resources, Subject: Yes: 2013 Apollo Employee Handbook – Action Required | 1/8/2013 | APOLLO 00041872 |
| Apollo Natural Resources Partners, L.P., Private Placement Memorandum, | NA | APOLLO 00049668 |
| Apollo Employee Handbook, Apollo 2011 | 5/7/2011 | BDO-APOLLO 00001130 |
| Apollo Employee Handbook, Apollo 2012 | 1/1/2012 | BDO-APOLLO 00002644 |
| Apollo Employee Handbook, Apollo 2013 | 1/1/2013 | BDO-APOLLO 00002695 |
| AICPA American Institute of Certified Public Accountants, Due Diligence in Tax Services | 5/1/2015 | NA |
| Alternative Investment Management Association Limited, AIMA, Guides to Sound Practices, Objectives and Principles | 6/1/2012 | NA |
| Alternative Investment Management Association Limited, AIMA's Review of the Year 2011 | 2/1/2012 | NA |
| Alternative Investment Management Association Limited, AIMA's Review of the Year 2012 | 2/1/2013 | NA |
| Alternative Investment Management Association Limited, AIMA's Review of the Year 2013 | 2/1/2014 | NA |
| Apollo Investment Fund IV, L.P., Amended and Restated Agreement of Limited Partnership, Dated as of April 21, 1998 | 4/21/1998 | NA |
| Apollo Investment Fund VI, L.P., Amended and Restated Agreement of Limited Partnership, Dated as of August 26, 2005 | 8/26/2005 | NA |
| Apollo Investment Fund VII, L.P., Amended and Restated Agreement of Limited Partnership, Dated as of August 30, 2007 | 8/30/2007 | NA |

| | | |
|---|---|---|
| Bill & Melinda Gates Foundation, 2011 Employee Travel and Expense Policy and Procedures: US-Based Employees | 7/19/2011 | NA |
| Calibre CPA Group, C-Bulletin Issue 03 02-15, Is Your Expense Reimbursement Policy Compliant with IRS and DOL Guidelines? Mary Margaret Prange, CPA | 2/1/2015 | NA |
| CFA Institute, 2012 GIPS Guidance Statement of Performance | 1/1/2012 | NA |
| Chartered Financial Accountants, CFA, Code of Ethics | NA | NA |
| ChromeRiver, 10 Expense Management Best Practices | 1/1/2016 | NA |
| ChromeRiver, Benefits of Rules-Based Expense Reporting | 6/1/2012 | NA |
| ChromeRiver, Best Practices in Expense Management for Professional Services Firms | NA | NA |
| ChromeRiver, The Vital Importance of Business Rules for Effective Expense Management | NA | NA |
| Complaint, Securities and Exchange Commission, Plaintiff, v. Mohammed Ali Rashid, Defendant, No. 17-cv-8223 | 10/25/2017 | NA |
| Concur, 11 Tips for Creating an Expense Policy | 10/1/2015 | NA |
| Concur, 8 Tips for a Best-Practice Expense Process | 1/1/2013 | NA |
| Defendant Mohammed Ali Rashid's Answer and Affirmative Defenses, No. 17-cv-8223 | 8/13/2018 | NA |
| Defendant Mohammed Ali Rashid's Responses and Objections to Plaintiff Securities and Exchange Commission's First Set of Requests for Admission | 8/22/2018 | NA |
| Global Investment Performance Standards, GIPS, Factsheet | 7/1/2012 | NA |
| Global Investment Performance Standards, GIPS, Guidance Statement on Alternative Investment Strategies and Structures | 10/1/2012 | NA |
| Global Investment Performance Standards, GIPS, Guidance Statement on Performance Examinations | 7/1/2012 | NA |
| Global Investment Performance Standards, GIPS, Guidance Statement on Performance Record Portability | 1/1/2011 | NA |
| Global Investment Performance Standards, GIPS, Guidance Statement on Recordkeeping Requirements | 1/1/2011 | NA |
| Global Investment Performance Standards, GIPS, Guidance Statement on the Application of the GIPS Standards to Asset Owners | 1/1/2015 | NA |
| Grant Thornton, Private Equity Valuations: Best Practices and Pitfalls | 1/1/2015 | NA |
| ILPA Expense Definitions – Reporting Version 1.1 with Guidance | 10/1/2011 | NA |
| ILPA Institutional Limited Partners Association, Letter to The Honorable Steven Mnuchin, Secretary of the Treasury from Jennifer Choi, Managing Director | 7/28/2017 | NA |
| ILPA Institutional Limited Partners Association, Quarterly Reporting Standards, Best Practices, Version 1.0, Released October 2011 | 10/1/2011 | NA |
| ILPA Private Equity Principles Endorsements, Updated | 12/9/2011 | NA |
| ILPA Private Equity Principles Endorsements, Updated | 11/21/2012 | NA |
| ILPA Private Equity Principles Endorsements, Updated | 9/12/2013 | NA |
| ILPA Private Equity Principles Endorsements, Updated | 4/1/2017 | NA |

| | | |
|---|---|---|
| ILPA Private Equity Principles Endorsements, Updated | 7/1/2018 | NA |
| ILPA, Institutional Limited Partners Association, Private Equity Principles, Version 2.0 | 1/1/2011 | NA |
| ILPA, Institutional Limited Partners Association, Quarterly Reporting Standards, Best Practices, Version 1.0 | 10/1/2011 | NA |
| ILPA, Institutional Limited Partners Association, Reporting Template Guidance, Version 1.0 | 1/1/2016 | NA |
| In the Matter of Apollo Management V, L.P., Apollo Management V, L.P., Apollo Management VI, L.P., Apollo Management VII, L.P., and Apollo Commodities Management, L.P., Respondents, Release No. 4493 / August 23. 2016, Administrative Proceeding, File No. 3-17409 | 8/23/2016 | NA |
| Institute of Chartered Financial Analysts, CFA, https://www.cfainstitute.org, Code of Ethics | NA | NA |
| Institutional Limited Partners Association, Private Equity Principles, Version 2.0 ("ILPA") | 1/1/2011 | NA |
| Investment Advisers Act of 1940, Release No. 4993 / August 23. 2016. Administrative Proceeding, File No. 3-17409, In the Matter of Apollo Management V, L.P., Apollo Management VI, L.P., Apollo Management VII, L.P. and Apollo Commodities Management, L.P. | 8/23/2016 | NA |
| Investment Advisers Act of 1940, Statute Section 206 – Prohibited Transactions by Investment Advisers, https://40act.com/laws-rules/investment-advisers-act-of-1940-statute/section-206-prohibited-transactions-by-investment-advisers/ | NA | NA |
| Standards Board for Alternative Investments, The Alternative Investment Standards, https://www.sbai.org/standards/summary-of-standards/ | 11/1/2015 | NA |
| Videotaped Deposition of Mohammed Ali Rashid, March 19, 2019, Volume I | 3/19/2019 | NA |
| Videotaped Deposition of Mohammed Ali Rashid, March 20, 2019, Volume II | 3/20/2019 | NA |
| Videotaped Deposition of Mohammed Ali Rashid, March 21, 2019, Volume III | 3/21/2019 | NA |
| Wells Submission on Behalf of Ali Rashid, In the Matter of: Certain Apollo Investment Management, LP, Fee Practices, No. HO-12597 | 2/6/2017 | NA |
| Weston-Atlas Fund LLC, Travel and Expense Policy, 2006 | 9/1/2006 | NA |
| Declaration of Lorenco Goncalves | 5/11/2018 | SEC-SEC-E 0000001 |
| Declaration of Anthony Hull | 5/15/2018 | SEC-SEC-E 0000005 |
| Declaration of Donald Casey | 5/14/2018 | SEC-SEC-E 0000011 |
| Declaration of Alexander Perriello | 5/11/2018 | SEC-SEC-E 0000013 |
| Declaration of Joseph Troy | 6/22/2018 | SEC-SEC-E 0000014 |

| | | |
|---|---|---|
| Declaration of Marilyn Wasser | 5/14/2018 | SEC-SEC-E 0000028 |
| Declaration of Richard Smith | 5/14/2018 | SEC-SEC-E 0000030 |
| Declaration of Randall Strutz | 6/22/2018 | SEC-SEC-E 0000033 |
| Declaration of Robert McPherson | 8/21/2018 | SEC-SEC-E 0000035 |
| Declaration of Melissa Ernst | 6/22/2018 | SEC-SEC-E 0000037 |
| Declaration of William Smith | 7/3/2018 | SEC-SEC-E 0000039 |
| Declaration of Alicia Swift | 5/24/2018 | SEC-SEC-E 0000041 |
| Declaration of Robert Krohn | 7/19/2018 | SEC-SEC-E 0000043 |
| Declaration of Robert Weinrich | 7/12/2018 | SEC-SEC-E 0000044 |
| Declaration of John Wilson | 6/22/2018 | SEC-SEC-E 0000046 |
| Declaration of Bruce Zipf | 5/10/2018 | SEC-SEC-E 0000116 |
| Declaration of Hugh Gray | 7/23/2018 | SEC-SEC-E 0000118 |
| Declaration of Joseph Stewart | 7/28/2018 | SEC-SEC-E 0000119 |
| Declaration of Michael Cooney | 7/23/2018 | SEC-SEC-E 0000120 |
| Declaration of Kevin Kelleher | 5/15/2018 | SEC-SEC-E 0000121 |
| Declaration of Seth Truwit | 5/22/2018 | SEC-SEC-E 0000122 |
| Declaration of Peter Lent | 7/24/2018 | SEC-SEC-E 0000125 |
| Declaration of M. Ryan Gorman | 6/22/2018 | SEC-SEC-E 0000126 |
| Declaration of Robin Cohan | 6/22/2018 | SEC-SEC-E 0000126 |
| Declaration of Keith Koci | 7/11/2018 | SEC-SEC-E 0000128 |
| Declaration of Mark Bitting | 6/8/2018 | SEC-SEC-E 0000130 |

| | | |
|---|---|---|
| Declaration of Clinton Lynch | 8/8/2018 | SEC-SEC-E 0000132 |
| Declaration of James Urban | 7/23/2018 | SEC-SEC-E 0000133 |
| Declaration of Lorrel Margelowsky | 6/22/2018 | SEC-SEC-E 0000134 |
| Declaration of Mickey Marshall | 7/18/2018 | SEC-SEC-E 0000136 |
| Declaration of David Martens | 7/17/2018 | SEC-SEC-E 0000137 |
| Declaration of Gary Enzor | 6/26/2018 | SEC-SEC-E 0000138 |

## EXHIBIT C

## Table of Declarations from Portfolio Company Executives

| Last, First Name | Dated | Numbered Sections from Summary Declarations | Bates Number |
|---|---|---|---|
| Bitting, Mark | June 8, 2018 | 4. I have never received ties, shirts, electronics, gift cards, or any other gifts from Rashid. | SEC-SEC-E-0000130 |
| Casey, Donald | May 14, 2018 | 5. I did not have dinner in New York City with Rashid and Seth Truwit on Saturday April 7, 2012. 8. I have never received ties, shirts, electronics, gift cards, expensive wine, or any other gifts from Rashid. | SEC-SEC-E-0000012 |
| Cohan, Robin | June 22, 2018 | 4. I have never received electronics, clothing, gift cards, or any other gifts from Rashid. | SEC-SEC-E-0000126 |
| Cooney, Michael | July 23, 2018 | 4. I did not receive a gift from Ali Rashid in September 2010 or December 2010. | SEC-SEC-E-0000120 |
| Enzor, Gary | June 26, 2018 | 8. On February 3, 2013, Rashid brought a woman to the event; but in my view, this … would not have justified Rashid treating his airfare, lodging, or other travel expenses that weekend as … business expenses. 10. From 2010 through 2013 …I never had dinner alone with Rashid. 13. I do not recall Rashid ever paying for a dinner that I attended.14. I did not have dinner with Rashid at Brother Jimmy's …on Saturday, April 3, 2010. 15. I did not have dinner at the Cooper Square Hotel with Rashid …on Friday April 9, 2010. I do not believe I have ever been [there]. 16. I did not have dinner with Rashid at Peter Luger …on July 28, 2010. I do not believe I have ever been [there]. 17. I did not have dinner with Rashid in New York City on Saturday, August 14, 2010. I was in Bartow, Florida. 18. I did not have dinner with Rashid and other members of the QDI management team …on October 20, 2010. …I took a flight from Phoenix, Arizona to Tampa, Florida that day. 19. I did not have drinks with Rashid …on October 22, 2010. …I was in Clearwater, Florida. | SEC-SEC-E-0000146 |
| Ernst, Melissa | June 22, 2018 | 4. I have never received electronics, clothing, gift cards, or any other gifts from Rashid. | SEC-SEC-E-0000038 |
| Goncalves, Lourenco | May 11, 2018 | 11. If we went to lunch or dinner, whether for business or purely social reasons, I paid. I paid if I invited Rashid. I paid if Rashid invited me. 12. I do not recall Rashid ever paying a dinner bill, whether it was for business or pleasure. 15. December 2011 …Rashid and Farah Khan, who I believed was his girlfriend, came to my home in Brazil. …stayed at least one night in my home. …was purely social. Rashid had no business purpose for this trip to Brazil. …we did not conduct business together in Brazil. 19. I did not have dinner with Rashid …in Bal Harbour. …I have never been to Bal Harbour. 21. I have never received ties, shirts, electronics, gift cards, or any other gifts from Rashid. 22. There was no business reason for Rashid to be in Las Vegas on behalf of or to benefit Metals USA in 2012. 23. There was no business reason for Rashid to be in Cancun, Mexico on behalf of, or to benefit Metals USA. | SEC-SEC-E-0000004 |
| Gorman. M. Ryan | May 15, 2018 | 5. I did not have dinner with Rashid and David Weaving in New York City at Koi on October 9, 2012. 6. I was at Mohawk Mountain House Resort on a corporate retreat. 7. I have never received ties, shirts, electronics, gift cards, expensive wine, or any other gifts from Rashid. | SEC-SEC-E-0000115 |
| Gray | July 23, 2018 | 4. I did not receive a gift from Ali Rashid in September 2010. | SEC-SEC-E-0000118 |

| Hull, Anthony | May 15, 2018 | 9. I did not socialize with Rashid. 12. …there was not a lot of slack in the budget. [We] did not spend much money on …executive meals. 21. I have never met Rashid at or near the New Jersey Shore. 22. I did not have dinner on Sunday August 1, 2010 with Rashid at a restaurant on the New Jersey Shore called Shalimar Sweets. I have never been to Shalimar Sweets. 23. There was not a Realogy business-related reason …for Rashid to rent a car and drive to the New Jersey shore and stay at Ocean House Bed & Breakfast over the weekend of July 30-August 1, 2010. 24. I did not have a working lunch with Rashid at Nobu …on April 7, 2010 and I have never been to Nobu. 25. November 3, 2010. I have never been to Madam Geneva's Hidden Gin Bar. 26. I did not have dinner with Rashid …on November 3, 2010. 27. I did not have drinks with Rashid …on November 5, 2010. I have never been to Avenue Spoon in New York. 28. …there is no indication that I had lunch with Rashid on Sunday, December 5, 2010. 29. …no indication that I had dinner or drinks with Rashid on Saturday, February 12, 2011 at D Wine Corporation. I have never been to D Wine Corporation. 30. I did not have dinner with Rashid …at a Portuguese restaurant called Aldea on Wednesday, March 2, 2011. I have never been to Aldea. 31. …there is no indication I had dinner with Rashid …on March 8, 2011. 32. I did not have dinner on Saturday, May 28, 2011 with Rashid at a restaurant on the New Jersey Shore call Shalimar Sweets. 33. …I [did not have] dinner with Rashid …at the West Village Oasis on July 14, 2011. 34. .I [did not have] dinner with Rashid …at When It's Chile It's Hot on April 9, 2012. 35. I have never received ties, shirts, electronics, gift cards, or any other gifts from Rashid. | SEC-SEC-E-0000010 |
| Kelleher, Kevin | May 15, 2018 | 4. I have never received electronics, clothing, gift cards, expensive wine, or any other gifts from Rashid. | SEC-SEC-E-0000121 |
| Koci, Keith | July 11, 2018 | 4. I did not have dinner with Rashid on February 27, 2011 at Sky Bar in Miami, Florida. 5. I did not have dinner with Rashid on March 12, 2011 at …Mr. Chow Enterprises. I do not recall having been to a restaurant named Mr. Chow. 6. I did not have dinner with Rashid on March 12, 2011 at …Lucky 13 Associates. …I was not in New York City in March 2012. 7. …I did not have dinner with Rashid on April 28, 2012 at …Superior Restaurant NYC. …I was not in New York City in April 2012. 8. …I did not have dinner with Rashid on November 22, 2012 at the Bal Harbour Hotel. 9. …I did not have dinner with Rashid on May 15, 2011 at The Griffin. …I was not in New York City in May 2011. 10. …I did not attend a meal with Rashid on January 22, 2012 at Louis Bar and Lounge. 11. …I did not receive a Zegna tie from Rashid in April 2012. | SEC-SEC-E-0000129 |
| Krohn, Robert | July 19, 2018 | 5. To the best of my recollection, I did not receive a Zegna tie from Rashid in April 2012. | SEC-SEC-E-0000043 |
| Lent, Peter | July 24, 2018 | 4. To the best of my recollection, I did not receive a gift from Rashid in September 2010 or December 2010. | SEC-SEC-E-0000125 |
| Lynch, Clinton | August 8, 2018 | 4. To the best of my recollection, I did not receive a gift from Rashid in September 2010. | SEC-SEC-E-0000132 |
| Margelowsky, Lorrel | August 8, 2018 | 4. I have never received electronics, clothing, gift cards, or any other gifts from Rashid. | SEC-SEC-E-0000134 |
| Marshall, Mickey | July 18, 2018 | 4. To the best of my recollection, I did not receive a gift from Rashid in September 2010. | SEC-SEC-E-0000136 |
| Martens, David | July 17, 2018 | 4. …I did not receive a gift from Rashid in September 2010. 5. …I did not receive a Zegna tie from Rashid in April 2012. | SEC-SEC-E-0000137 |
| McPherson, Robert | August 22, 2018 | 4. I did not have dinner with Rashid on August 21, 2010 at Restaurante Caballito de Mar. 5. …I did not attend a meal with Rashid on January 22, 2011 at Louis Bar and Lounge. 6. …I did not have dinner with Rashid on November 22, 2012 at the Bal Harbour Hotel. 7. …I did not receive a gift from Rashid in September 2010 or December 2010. 8. …I did not receive a Zegna tie from Rashid in April 2012. | SEC-SEC-E-0000036 |
| Perriello, Alexander | May 11, 2018 | 5. …I did not have dinner or drinks with Rashid …on November 3, 2010. 6. I do not recall ever having dinner or drinks with Rashid. 7. I have never received ties, shirts, electronics, gift cards, expensive wine, or any other gifts from Rashid. | SEC-SEC-E-0000013 |

| Smith, Richard | May 14, 2018 | 10. I do not recall having dinner alone with Rashid. 12. I have never received ties, shirts, electronics, gift cards, expensive wine or any other gifts from Rashid. | SEC-SEC-E-0000032 |
|---|---|---|---|
| Smith, William | July 3, 2018 | 4. …I did not have a meal with Rashid on January 22, 2011 at Louis Bar and Lounge. 5. …I did not have dinner with Rashid on March 12, 2011 at …Mr. Chow Enterprises. 6. …I did not have lunch with Rashid on December 13, 2012 at RBC Bar Inc. 7. …I did not have lunch with Rashid on February 15, 2013 at Nobu 57. …I have not met John Hagerman or William Bennet, two of the participants listed as attending this lunch. 8. ...I did not have dinner with Rashid on July 11, 2011 at Barolo Ltd. 9. ...I did not receive a gift from Rashid in September 2010. | SEC-SEC-E-0000040 |
| Stewart, Joseph | July 28, 2018 | 4. To the best of my recollection, I did not receive a Zegna tie from Rashid in April 2012. | SEC-SEC-E-0000119 |
| Strutz, Randall | June 22, 2018 | 4. I have never received ties, shirts, electronics, gift cards, or any other gifts from Rashid. | SEC-SEC-E-0000033 |
| Swift, Alicia | May 24, 2018 | 4. …I did not have dinner with Rashid …in New York City at a Portuguese restaurant called Aldea on March 2, 2011. I have never been to Aldea in New York City. 5. I have never received items of clothing, electronics, Bliss spa gift cards, or any other gifts from Rashid. 6. I have never received a baby gift of any kind from Rashid. | SEC-SEC-E-0000042 |
| Troy, Joseph | June 22, 2018 | 9. I do no recall Rashid ever paying for a meal that I attended. 10. …I did not have dinner with Rashid at Sushi You in New York City on October 20, 2010. 11. …I did not have dinner or drinks with Rashid …on Friday, October 22, 2010. 12. … I did not have dinner with Rashid ...on Saturday, February 26, 2011. I had a business meeting in Tampa, Florida on ... February 26, 2011. 13. ...I did not have dinner with Rashid in New York City on June 21, 2011. ...I traveled from Tampa, Florida, to Maine on June 21, 2011, on a personal trip. 14. ...I did not have dinner with Rashid ...on September 1, 2011. ...I was [not] in New York that day. ...I had a postoperative doctor's appointment in Tampa, Florida on September 1, 2011. 15. ...I did not have dinner with Rashid ...on Saturday, April 21, 2012. ...I was in Tampa. 16. ...I did not have dinner with Rashid, John Wilson, and Jonathan Gold ...on Sunday, October 28, 2012. Moreover, Jonathan Gold ...left QDI in or about July 2012. 17. ...I did not have dinner with Rashid, Thomas Finkbiner, Bo Leslie, Jonathan Gold, and other QDI members at The Lion on February 14, 2013. Moreover, Thomas Finkbiner, Bo Leslie, and Jonathan Gold were not employees of QDI in February 2013. 18. I do not recall receiving ties, shirts, electronics, gift cards, or any other gifts from Rashid. | SEC-SEC-E-0000018 |
| Truwit, Seth | May 22, 2018 | 11. …I did not have dinner in New York City with Rashid and Don Casey on Friday January 28, 2011. 12. …I did not have dinner in New York City at Lucy's Restaurant with Rashid on Saturday, March 19, 2011. 13. …I did not have dinner in New York City with Rashid and Don Casey on Saturday, April 7, 2012. 14. I have never received ties, shirts, electronics, expensive wine, or any other gifts from Rashid. | SEC-SEC-E-0000124 |
| Urban, James | July 23, 2018 | 4. To the best of my recollection, I did not receive a gift from Rashid in September 2010. | SEC-SEC-E-0000133 |
| Wasser, Marilyn | May 14, 2018 | 6. I have never received clothing items, electronics, spa certificates, gift cards, expensive wine, or any other gifts from Rashid. | SEC-SEC-E-0000029 |
| Weinrich, Robert | July 12, 2018 | 4. …I did not have lunch with Rashid on January 4, 2011 at The Burger Joint. I do not recall attending any meals with Rashid. 5. …I did not have dinner with Rashid on November 22, 2012 at the Bal Harbour Hotel. 6. …I did not have dinner with Rashid on May 15, 2011 at The Griffin. 7. ...I did not receive shirts or ties from Ermenegildo Zegna BEV HLS from Rashid in July 2010. 8. ...I did not receive a gift from Rashid in December 2010. | SEC-SEC-E-0000045 |

| Wilson, John | June 22, 2018 | 7. QDI board members were required to …sign a declaration attesting to the truth thereof, an annual Directors' and Officers' Questionnaire. 8. Each year from 2010 through 2012, Rashid completed and signed a QDI D&O Questionnaire. …Rashid declared that he did not receive any "personal benefits [from QDI] not integrally and directly related to job performance …[including] personal travel and entertainment expenses.  10. ...I did not have dinner with Rashid ...in New York City on Sunday, October 28, 2012. ...I was on a cruise ship on October 28, 2012. 11. ...I did not have dinner with Rashid ...in New York City on February 14, 2013. ...I was in Tampa, Florida on February 14, 2013. | SEC-SEC-E-0000048 |
| Zipf, Bruce | May 10, 2018 | 5. On December 23, 2010, I did not have a business dinner or drinks in New York City with Rashid. 6. I did not receive ties, shirts, electronics, gift cards, expensive wine, or any other gifts from Rashid. | SEC-SEC-E-0000117 |