UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------- X
SECURITIES AND EXCHANGE                     :
COMMISSION,                                 :
                                            :
                        Plaintiff,          :        No. 17-cv-8223 (PKC)
                                            :
                                            :
           -v-                              :
                                            :
                                            :
MOHAMMED ALI RASHID,                        :
                                            :
                        Defendant.          :
-------------------------------------------------------------- X
```

### DEFENDANT MOHAMMED ALI RASHID'S TRIAL BRIEF

Gregory W. Kehoe
GREENBERG TRAURIG, LLP
Theresa Van Vliet
GENOVESE JOBLOVE & BATTISTA, P.A.

*Attorneys for Defendant Mohammed Ali Rashid*

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.    BACKGROUND ............................................................................................. 2

    A.    Mohammed Ali Rashid ........................................................................ 2
        1.    Work history ................................................................................ 2
        2.    Responsibilities at Apollo .......................................................... 3

    B.    Expense Practices at Apollo ................................................................ 4
        1.    Apollo's T&E Policies ................................................................ 4
        2.    Mr. Rashid's Personal Expense Practices .................................. 6

    C.    Mr. Rashid's Individual Expenses ...................................................... 8
        1.    Travel Expenses ......................................................................... 8
        2.    The $3,500 Charge at Zegna ...................................................... 9

    D.    Apollo's Investigation of Mr. Rashid's Expenses ............................ 11
        1.    The 2010 and 2012 Meetings with Mr. Donnelly ................... 11
        2.    Apollo and Paul Weiss's Review of Mr. Rashid's Expenses ................. 12

    E.    The SEC's Lack of Investigation ...................................................... 15
    F.    Expert Testimony .............................................................................. 15
        1.    The SEC's Experts ................................................................... 15
        2.    Mr. Rashid's Experts ............................................................... 16

III.    THE SEC'S CLAIMS AGAINST MR. RASHID ...................................... 17

    A.    Mr. Rashid Was Not an "Investment Adviser" under the Advisers Act............. 17
    B.    Mr. Rashid Did Not Act with the Requisite Scienter......................... 18
    C.    Mr. Rashid's Actions Were Not Material. ........................................ 19
    D.    Mr. Rashid Did Not Aid or Abet Apollo's Unproved Violations of the Act....... 22

IV.    RELIEF SOUGHT BY THE SEC .............................................................. 22

    A.    The SEC's Requested Injunctive Relief ........................................... 22
    B.    The SEC's Requested Fine ................................................................ 23
        1.    The Third Tier of Penalties is Inapplicable............................... 24
        2.    The Court Should Only Assess One Penalty. ........................... 24
        3.    Mr. Rashid's Conduct Does Not Warrant the Maximum Available Penalty........... 25

V.    CONCLUSION............................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abrahamson v. Fleschner*,
    568 F.2d 862 (2d Cir. 1977)..................................................................................18

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..................................................................................20

*Johnson v. S.E.C.*,
    87 F.3d 484 (D.C. Cir. 1996)...............................................................................23

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)..................................................................................20

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
    135 F. Supp. 3d 145 (S.D.N.Y. 2015)..................................................................20

*S.E.C. v. Garfield Taylor, Inc.*,
    134 F. Supp. 3d 107 (D.D.C. 2015).....................................................................24

*S.E.C. v. Landberg*,
    836 F. Supp. 2d 148 (S.D.N.Y. 2011)..................................................................22

*S.E.C. v. Rabinovich & Assocs., LP*,
    No. 07-cv-10547, 2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008)..........................24

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012)..................................................................................22

*SEC v. Coates*,
    137 F. Supp. 2d 413 (S.D.N.Y. 2001)..................................................................24

*SEC v. Forest Resources Mgmt. Corp.*,
    No. 09-cv-0903, 2010 WL 2077202 (S.D.N.Y. May 18, 2010)...........................25

*SEC v. Kenton Capital*,
    69 F. Supp. 2d 1 (D.D.C. 1998)...........................................................................24

*SEC v. Madsen*,
    No. 17-cv-8300, 2018 WL 5023945 (S.D.N.Y. Oct. 17, 2018)............................24

*SEC v. Moran*,
    922 F. Supp. 867 (S.D.N.Y. 1996) .......................................................................19

*SEC v. Pattison*,
    2011 WL 723600 (N.D. Cal. Feb. 23, 2011) .......................................................24

*SEC v. Yorkville Advisors*,
    LLC, 305 F. Supp. 3d 486 (S.D.N.Y. 2018) ........................................................18

*Shenk v. Karmazin*,
    868 F. Supp. 2d 299 (S.D.N.Y. 2012)..................................................................18

*Steadman v. SEC,*
  603 F.2d 1126 (5th Cir. 1979) ......................................................................19

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976) ...............................................................................20, 21

**Statutes**

15 U.S.C. § 80b-2(a)(11) .................................................................................18

15 U.S.C. § 80b-6(1) ...............................................................17, 18, 19, 22

15 U.S.C. § 80b-6(2) ...........................................................................17, 22

18 U.S.C. § 80b-9(e)(2) ...................................................................................23

18 U.S.C. § 80b-9(e)(3) ...................................................................................24

**Other Authorities**

FASB *Statement of Accounting Concepts No. 9* ................................................20, 21

Fed R. Evid. 408 ...............................................................................................1

SEC Staff Accounting Bulletin No. 99 ...........................................................20

Pursuant to the Court's Order dated May 17, 2019, Defendant Mohammed Ali Rashid respectfully submits this trial brief in support of his opposition to claims brought by the Plaintiff Securities and Exchange Commission that Mr. Rashid violated the Investment Advisers Act.

## I.     **PRELIMINARY STATEMENT**

This action represents the SEC's efforts to piggyback on the investigation of Mr. Rashid's former employer, Apollo Global Management, L.P. ("Apollo"), its counsel, Paul Weiss, and its accounting firm, BDO, into Mr. Rashid's expenses.   Apollo did not prove any intentional wrongdoing by Mr. Rashid; rather it was investigating an at-will employee and could apply whatever standard – even an "over-inclusive" one – to its review. The SEC is not Apollo. Despite bearing the burden of proof in this action, the SEC submits remarkably little independently developed evidence, instead attempting to flip the presumption and argue that Mr. Rashid must demonstrate a business purpose for his expenses or it will deem them personal.

The SEC relies on three "bulk" categories of evidence to support its contention that Mr. Rashid fraudulently misappropriated funds from Apollo's clients through his expense submissions. Each is, at best, problematic and, at worst, wholly inadmissible:

- First, the SEC claims that Mr. Rashid, through his counsel, admitted to $220,000 in improper expenses.  That "admission" was actually an inadmissible settlement offer subject to Rule 408 made to Apollo to avoid litigation – which he successfully did.[1]

- Second, the SEC points to the "BDO Report" for an additional $61,000 in improper expenses.  That report – which is inadmissible hearsay[2] – is rife with methodological errors and shortcuts.  It presumes that expenses were personal in the absence of narrow and specific documentary proof that they had a business purpose – a requirement not found in Apollo's relevant travel and entertainment policies.

- Third, the SEC submits an expert report which actually demonstrates that a quarter of the expenses Mr. Rashid's counsel "admitted" to, were reimbursable.  That expert took a "BDO lite" approach; while BDO at least searched all of Mr. Rashid's emails, the SEC's

---

[1] Mr. Rashid incorporates by reference his accompanying motion *in limine* to exclude evidence and testimony regarding the purported "admissions."
[2] Mr. Rashid incorporates by reference is accompanying motion *in limine* to exclude the "BDO Report."

expert only searched an unrepresentative subset of emails curated by the SEC to not reveal business purposes for expenses.[3]

In addition to the evidentiary gaps, the SEC cannot overcome legal shortcomings. Mr. Rashid was not an investment adviser, and therefore not subject to the Advisers Act, because he did not exercise control over client funds. Nor does the SEC submit proof that Mr. Rashid acted with fraudulent intent. Indeed, Mr. Rashid took a hands-off approach to his expenses. That approach, which was admittedly negligent, does not rise to the level of fraud alleged by the SEC. Finally, because the SEC cannot demonstrate materiality, it advances a new standard of "materiality" that effectively reads materiality out of the statute. For any number of reasons, the SEC's case falls short.

## II.  **BACKGROUND**

### A.  **Mohammed Ali Rashid**

#### 1.  **Work history**

Mr. Rashid joined Apollo in 2000, took leave to obtain his MBA from the Stanford Graduate School of Business, and returned to Apollo in 2004. Mr. Rashid rose quickly through the ranks, being promoted to partner in or around 2009.[4]  In recognition of his substantial contributions to the firm, Mr. Rashid was further promoted to senior partner in late 2012, becoming the youngest senior partner at Apollo and the first Muslim senior partner. Rashid Decl. ¶ 2.[5] Mr. Rashid was asked to head Apollo's London and Los Angeles offices, agreeing to lead the Los Angeles office prior to his departure from the firm.

---

[3] Mr. Rashid incorporates by reference his accompanying *Daubert* motion to exclude the opinions of Kevin Pierce.
[4] Although Mr. Rashid received the title of partner, he, like all Apollo partners apart from the Founders, did not receive an equity stake in Apollo.  Rashid Decl. ¶ 5.
[5] As further evidence of the regard in which Mr. Rashid was held at Apollo and the private equity community and his work ethic, Mr. Rashid submits the declarations of Jason A. Haim, Gregory D. Prata, Thomas Christopoul and Pamela Liebman.

2.      **Responsibilities at Apollo**

Apollo had an informal reporting structure.  Mr. Rashid ultimately reported to the three co-founders of Apollo, Leon Black, Marc Rowan, and Josh Harris (the "Founders").  Mr. Rashid also reported to Scott Kleinman, the head of private equity, and, on discrete matters, to other individuals.  Rashid Decl. ¶ 4.

Mr. Rashid's primary responsibility was to source deal opportunities to recommend to the Founders, who would ultimately decide whether to invest and which fund would invest in the opportunity; manage the investment after the fund had invested; and make a recommendation to the fund's management as to when to exit the investment. *Id*. Sourcing deal opportunities often involved meeting with colleagues in the finance industry to keep apprised of developments, such as what opportunities competitors were considering. *Id*. Mr. Rashid frequently met with such colleagues without a specific business purpose in mind.[6]  Although, over the course of his career at Apollo, Mr. Rashid explored investments in a number of fields, he was primarily responsible for investments in the mining and metals area. Rashid Decl. ¶ 12. Mr. Rashid worked around the clock, including weekends and holidays, and traveled frequently. *Id*. Despite Mr. Rashid's documented, demanding work-related travel, he was encouraged by his superiors to travel even more than he already did.  *See, e.g.*, Def.'s Ex. 1.

Mr. Rashid did not serve on any committees while at Apollo.  He was not a member of an investment committee, management committee, or executive committee. Rashid Decl. ¶ 4. He had no decision-making authority regarding when to invest or divest, and no control whatsoever over client funds. *Id*.  *See also* Doc. No. 100 ("SEC Br.") at 24 n. 15 ("Apollo's Executive Committee

---

[6] Although Mr. Rashid did not consider this at the time because he did not have knowledge of or visibility into the expense allocation process, he believes that such business development meetings should have been allocated to the Apollo management company.

was the final authority that made investment decisions."). Mr. Rashid's sole responsibility was to recommend courses of action to the Founders, where decision-making authority lied.

## B.     Expense Practices at Apollo

As the SEC's own expert, Matthew Hoffman, conceded, the propriety of Mr. Rashid's expenses was determined by – and only by – the T&E Policy in effect at the time Mr. Rashid incurred the expense; fiduciary duties do not alter what is permissibly expensed pursuant to the relevant policy (assuming the policy itself, as here, is not facially violative of such duties).  Def.'s Ex. 2 (Hoffman) at 111:7-115:9.

### 1.     Apollo's T&E Policies

From 2009 through 2013 (the relevant time period set forth in the complaint), Apollo had three different T&E Policies: (1) a 2009 policy ("2009 Policy") (Pl.'s Ex. 102); (2) a policy with an effective date of November 1, 2011 ("2011 Policy") (Pl.'s Ex. 103); and (3) a policy which appears to be dated June 2013, but for which it is unclear when exactly it became effective ("2013 Policy").  Pl.'s Ex. 4.  Because Mr. Hoffman reasonably concedes that Mr. Rashid's expenses are only subject to the T&E Policy in effect at the time, and, per the SEC's own allegations, only *three* of Mr. Rashid's thousands of expenses at issue occurred in June 2013 or later (and at that, none later than June 5, 2013) (*see* Pl.'s Ex. 111), the SEC must demonstrate that the 2013 T&E Policy was in effect no later than June 5, 2013, for it to have even the most minimal relevance to Mr. Rashid's expenses.  By contrast, 1,450 expenses were incurred under the 2009 Policy (only 290 of which were incurred within the statute of limitations)[7], and 1,377 were incurred pursuant to the 2011 Policy.

---

[7] Mr. Rashid incorporates by reference his accompanying opposition to the SEC's motion *in limine* to introduce evidence from outside the statute of limitations period.

The 2009 Policy "encouraged" employees to extend business trips over the weekend to secure a lower airfare "whenever possible." Pl.'s Ex. 102 at pg. 6. Apollo would reimburse the employee for the cost of the weekend hotel if the hotel and weekend airfare was less than the weekday airfare. The 2009 Policy specifically permitted entertainment expenses: "Business entertainment such as golf, tennis, spa, etc., where fees are incurred is acceptable." *Id*. at 9. It also permitted reimbursement for employee meals during non-business hours. Notably, the 2009 Policy did not require employees to allocate expenses to any fund or to Apollo Management.

The 2011 Policy, under which more than 80 percent of Mr. Rashid's contested expenses during the statute of limitations period were billed, liberalized Apollo's expense practices. While the 2009 Policy required explicit compliance with IRS expense guidelines, the 2011 Policy did not. Pl.'s Ex. 103 at 4. The 2011 Policy eliminated maximum room rates, only requiring that lodging be reasonable (and Apollo did not find any of Mr. Rashid's hotels to be unreasonable – until after the BDO review)[8]. *Id*. at 7. Finally, it permitted an employee to expense car services home if the employee worked past 8:00 pm. *Id*. at 6.

The 2013 Policy represented a change of direction for Apollo's T&E Policies. The 2013 Policy, and its differences from the prior two policies, is significant for a number of reasons. First, the SEC places great weight on the 2013 Policy's requirement that employees "'use best efforts to appropriately allocate the expense,' including using project codes to identify amounts that should be billed to Apollo's funds, portfolio companies, investment funds, or other special projects." Doc. No. 100 ("SEC Br.") at 11. However, the requirement for employees to allocate expenses did not

---

[8] Notably, there is no indication what criteria BDO used to determine whether a given expenditure under the 2009 Policy was reasonable. For example, there was no comparison of the expense at issue to those submitted by other similarly situated employees or against any empirical data of industry standards. Indeed, it appears that the standard was based solely on the subjective judgment of the BDO partner conducting the review.

exist in either of the prior policies.[9]  It was only at the time of Mr. Rashid's suspension that Apollo began requiring employees to allocate expenses to funds, portfolio companies, and/or the management company.

That 2013 Policy, whenever implemented, was done so to appease the SEC's Office of Compliance, Investigations and Examinations, which, at the time, was conducting an examination of Apollo. Ehrlich Decl. ¶ 4. In a presentation to the SEC titled "Expense Review – Interim Report" dated August 19, 2013, Apollo highlighted the "enhancements" in its new T&E Policy:

- "T&E Policy: Apollo has instituted a new T&E policy, which we will provide to the OCIE staff. It contains additional specificity and limitations on numerous issues."

- "Controls: Apollo has instituted enhanced systems and controls around T&E. Under the enhanced system, employees must certify draft T&E reports, and there is an immediate review to ensure the report includes required backup documentation and complies with the T&E policy. Apollo is also in the process of instituting a system of managerial review of T&E spending."

- "Training: Apollo created new training materials relating to expense policies, that will be used with all Apollo employees, and which we will provide to the OCIE staff, and expects to create new training materials for other processes."

Pl.'s Ex. 114 at slide 22.  Apollo appears to have become more rigorous in expense policies only after the SEC started asking questions.  The applicable 2009 Policy and 2011 Policy were not subject to the same rigor.

### 2.     Mr. Rashid's Personal Expense Practices

Mr. Rashid had "little to no" involvement in the submission of his expense reports.  Pl.'s Ex. 162 at 76:14-17. He recalls infrequent questions from his assistants about the reason for an expense, but there was no orderly process by which Mr. Rashid reviewed his expense submissions. Otherwise, he generally did not know the process his assistants used to draft descriptions of

---

[9] In this regard, the sworn declaration of Apollo's current CFO, Martin Kelly, is patently false, in that he testifies that, at the time he joined Apollo in 2012, Apollo had in place T&E Policies that "required employees to 'use best efforts to appropriately allocate the expense.'" Kelly Decl. ¶ 14.

expenses.  His assistants told him that they regarded expense reporting as "menial" and "didn't want to disturb" him with questions.  Def.'s Ex. 3.  Mr. Rashid did not regularly review his expense reports before they were submitted to the Apollo back office for processing, but, in reviewing his expense reports that were produced in the litigation, he noticed that some entries do not even make sense.  As an example, Entry No. 2575 on the BDO Report describes a dinner as a "meeting with Quality Distribution team: Ali Rashid, Steve Atwood, John Wilson, Gary Enzor, Denny Copeland, Thomas Finkbiner, Johnathan Gold, Troy Joseph, Bo Leslie, Timothy Page."  Pl.'s Ex. 111 at row 2575.  However, Finkbiner, Leslie, Page, Copeland and Gold had left the company years earlier.  According to the description, they were dining with their replacements.  Mr. Rashid would have immediately recognized a description such as this one as erroneous.

Mr. Rashid acknowledges that he bears ultimate responsibility for the accuracy of his expense submissions, and, when he was presented with instances where his inattention led to an error, he did not hesitate to reimburse Apollo.  One example of such an error was the entity that appeared as "La Contessa."  Mr. Rashid had never heard of such an establishment, but, according to Ms. Feehan's declaration, was presented with an Apollo printout indicating the expense type was "Meals – Clients." Feehan Decl. ¶ 21; Pl.'s Ex. 87. When Mr. Rashid was told that "La Contessa" was actually a d/b/a for Garren, a salon that Mr. Rashid frequented, he repaid Apollo for the charges.  Notably, the expenses at issue were for a telescoped time period, and thus, not expenses which would have alerted Mr. Rashid to the error.  Another such example were the charges that were identified as "Research Services" relating to Citi Habitats and Triple Crown Mafucci.  When Mr. Rashid was later told that these charges were actually for a real estate broker and a moving company, and not "Research Services," he repaid Apollo.  Pl.'s Ex. 162 at 122:15-123:16.

Mr. Rashid does not believe that he provided the written descriptions in the SEC exhibits identified in Ms. Feehan's and Ms. La Mons' declarations.  But, even assuming Ms. Feehan's and Ms. La Mons' affidavits are generally true, and Mr. Rashid provided the written descriptions identified in those exhibits, they do not show what the SEC believes they do.  Mr. Rashid's practice would appear to be that he generally did not identify meal companions by name, instead referring to, for example, a management team.  *See, e.g.*, Pl.'s Ex. 87 at Apollo 41281-41286.  Of all the printouts identified in Ms. Feehan's and Ms. La Mons' affidavits, only one contains a handwritten entry identifying an individual, and that individual – Paul Brunner – conspicuously did not submit an affidavit.

## C.      Mr. Rashid's Individual Expenses

For the most part, the SEC (and, as discussed below, Apollo) does not raise issues with individual expenses of Mr. Rashid.  Instead, it identifies a handful of purportedly inappropriate expenses centered around travel and a Zegna suit as paradigms for certain behavior and extrapolates from there.   Upon closer examination, none of stand up to scrutiny.

### 1.      Travel Expenses

The SEC highlights a handful of purportedly inappropriately expensed trips:

- **Hawaii**: The SEC is aware, because Mr. Rashid testified at his deposition, that the Hawaii trip was a make-up trip for a vacation Mr. Rashid was asked to cancel by Founder Josh Harris. Pl.s Ex. 162 at 265:3-266:18. Harris told Mr. Rashid that he could then bill a make-up trip the company.  Rashid confirmed this with Gerard Cruse, Apollo's CEO. *Id*. The SEC conspicuously does not submit declarations from Harris or Cruse denying these events.

- **Colombia**: Mr. Rashid was told by his superiors to explore metals and mining opportunities in Colombia and was actively encouraged to visit the country. Def.'s Ex. 1. He scheduled a trip to Bogota to meet with people in the industry, but some of those meetings were cancelled.  While in Bogota, Rashid did work for Apollo.  From Bogota, Rashid and his wife went to Cartagena.  The flights to Cartagena and hotels in Cartagena were not billed to Apollo.  Were it not for work, Mr. Rashid had no reason to be in Bogota. Rashid Decl. ¶ 12.

- **Miami**: Although the SEC does not offer details as to what this trip was or why it was not a business trip, it appears to refer to a trip Mr. Rashid took to Miami in November 2012 to visit the CEO of a portfolio company, Lourenco Goncalves. While Mr. Rashid acknowledges that one meal was improperly billed to Apollo because it was included on an otherwise-valid hotel receipt, Mr. Rashid's work purposes for this trip were confirmed by BDO and the proxy statement filed in connection with the sale of that company.  Rashid Decl. ¶¶ 14-15.

- **Cancun**: Mr. Rashid visited Cancun on a trip back from Los Angeles to New York.  As a senior partner, Mr. Rashid was permitted to buy a first-class ticket.  Instead, he chose to buy a ticket in a cheaper class that went through Cancun, saving Apollo (or whomever Apollo ultimately decided to bill for the expense) money in the process.[10]  Rashid Decl. ¶ 11. The T&E Policies confirm Mr. Rashid's understanding that such "in lieu of" travel was permissible.  Pl.'s Ex. 102.

- **New Orleans**: Mr. Rashid attended the Super Bowl as the guest of a 49ers executive in 2013.  He did not bill his hotels or game tickets to Apollo.  However, he did have a number of work meetings, including one with the executive of a portfolio company and several others with the outside counsel.  He also viewed the Super Bowl, and its gathering of executives from many different fields, as a business development opportunity and met with a number of potential business partners.  Pl.'s Ex. 162 at 245-53. As a result, he billed his flight only to Apollo.  If Mr. Rashid had discretion in the matter, he would have recommended that his flight be billed to the management company. Rashid Decl. ¶ 13.

It is impossible for Mr. Rashid to recall, let alone rebut, each expense individually in this brief – a fact the SEC appears to rely on.  However, because Mr. Rashid *can* demonstrate that the examples singled out by the SEC are actually legitimate expenses, there is no reason to explore the rest of the purportedly improper expenses.

## 2.    The $3,500 Charge at Zegna

Perhaps the SEC's "smoking gun" is a $3,500 charge at Zegna, a clothing store.  The SEC dedicated eight paragraphs in its Complaint to this one charge,[11] (Doc. No. 1 ("Compl.") at ¶¶ 66-73), and an entire section of its trial brief, (SEC Br. at 12-14), to its claim that Mr. Rashid used

---

[10] As an example of this, the BDO spreadsheet demonstrates that Mr. Rashid flew home through Cancun around New Year's 2011.  He booked separate tickets from Los Angeles to Cancun and from Cancun to New York, totaling $1,664.  Pl.'s Ex. 111 at Rows 758, 760.  A direct ticket from Los Angeles to New York purchased the following month, which the SEC acknowledges was a business expense, cost $2,660.  Pl.'s Ex. 111 at 853.  In other words, the SEC's position is that Mr. Rashid defrauded the fund by saving it almost $1,000.

[11] They do so, despite the fact that it concedes the funds were never billed for the charge.  Compl. at ¶ 73 ("The Relevant Funds were never charged with Rashid's $3,500 Zegna charge…")

that money to buy his father a suit instead of putting the money on reserve to buy ties as gifts for portfolio company executives when Zegna next had a sale.  Despite the weight placed on this incident by the SEC, the SEC never contacted a Zegna employee prior to filing the Complaint, nor did it receive a single document from Zegna during its investigation.[12]

Nonetheless, Mr. Rashid did investigate the allegation over the course of this litigation. Mr. Rashid subpoenaed Joel Lehnhoff, the Zegna employee who wrote the handwritten receipt and the full collection of receipts. Haroon Rashid, Mr. Rashid's father, and a Zegna corporate representative also sat for a deposition.  All either confirmed that Mr. Rashid did not spend $3,500 on a suit for his father or that the relevant records Mr. Rashid obtained did not establish the SEC's contention of a fraudulent personal purchase.

At his deposition, Mr. Lehnhoff, testified that he and Mr. Rashid previously discussed purchasing 35 ties as business gifts, which was in line with the relevant T&E Policy. Def.'s Ex. 4 at 34:3-8. Owing to the expense of Zegna neckties, Mr. Lehnhoff agreed to put $3,500 on Mr. Rashid's account so that when ties were on sale (typically at $100 each) he would reserve 35 ties. *Id*. at 81:7-11. The Zegna corporate representative confirmed that this practice was not unusual. Def.'s Ex. 5 at 29:21-30:9. Mr. Lehnhoff continued that he had combined the Rashid family account under Mr. Rashid's father's name, noting that doing so was his own idea. Def.'s Ex. 4 at 26:15-23. Notably, Mr. Lehnhoff was not the Zegna salesperson who initially answered the phone the day Mr. Rashid's then-assistant called to inquire about the charge.  When Mr. Lehnhoff learned of the Apollo inquiry, he volunteered to make a temporary written receipt noting that the charge had been an advance payment for the ties and that it would be replaced when the ties were actually purchased. *Id*. at 41:24-42:7. He forwarded the handwritten receipt to Mr. Rashid, who in turn

---

[12] The SEC's lack of an investigation will be discussed in more detail below.

forwarded the receipt to Apollo without opening the email or reading the receipt. Haroon Rashid confirmed that neither of his children have ever purchased a suit or any other extravagant gift for him. Def.'s Ex. 6 at 28:9-16. Mr. Rashid's sister similarly testified that her father simply would not accept such a gift. Def.'s Ex. 7 at 66:1.4 The SEC presents nothing more than the uncorroborated hearsay statement of Ms. Gatsik (relayed through Mr. Dunayer) regarding the hearsay statement of an unidentified Zegna employee. Dunayer Decl. ¶ 24.[13]

### D.     Apollo's Investigation of Mr. Rashid's Expenses

Apollo did not investigate, and does not claim to have investigated, whether Mr. Rashid violated the Investment Advisors Act. Instead, Apollo, in the midst of an SEC examination, investigated whether it had made any errors in its own expenses practices. Mr. Rashid's career was collateral damage.

### 1.     The 2010 and 2012 Meetings with Mr. Donnelly

After it was discovered that some of Mr. Rashid's personal expenses were erroneously billed to the firm in 2010, Mr. Donnelly told Mr. Rashid that it was "unacceptable" to bill personal expenses to the funds. Donnelly Decl. ¶ 9. Mr. Rashid agreed. He did not understand how his personal expenses were billed to Apollo, but immediately agreed to repay Apollo. Pl.'s Ex. 162 at 117:25-118:3. In 2012, Mr. Donnelly again claims to have told Mr. Rashid that his expense practices were "completely unacceptable," (Donnelly Decl. ¶ 13), but not worth reporting to the Executive Committee, despite, according to the SEC's version of events, Mr. Rashid supposedly submitting a forged receipt to substantiate a $3,500 purchase.[14]

---

[13] In point of fact, the "statement" is actually burdened by 3 levels of hearsay, each of which is offered by the SEC for the truth of the matter asserted. First, that of the unidentified Zegna employee who answered Ms. Gatsik's call. Second, Ms. Gatsik's account of the conversation. Third, Mr. Dunayer's account of Ms. Gatsik's account of what the unidentified Zegna employee said. Yet the SEC offers no theory of admissibility for any of these statements.

[14] Notably, Mr. Donnelly does not claim to have described this meeting as a "come to Jesus" moment for Mr. Rashid. Only Mr. Dunayer claims that Mr. Donnelly told him that; Mr. Donnelly's declaration contains no such description.

### 2. Apollo and Paul Weiss's Review of Mr. Rashid's Expenses

Having apparently already determined that Mr. Rashid had committed a "theft" from Apollo, (Def.'s Ex. 8 (Ehrlich) at 50:5-9; 53:2-5; 87:8-12), Apollo called Mr. Rashid into a meeting with Paul Weiss, Apollo General Counsel John Suydam, and Apollo Chief Compliance Officer Cindy Michel on July 1, 2013.  Paul Weiss partner Roberto Finzi gave Mr. Rashid an *Upjohn* warning, meaning that the contents of the meeting were privileged, but that Apollo held the privilege. Finzi Decl. ¶¶ 7-8.  Despite waiving the privilege by submitting accounts of the meeting from Mr. Finzi and Ms. Michel, Apollo continues to withhold as privileged contemporaneous written accounts of the meeting that can corroborate – or disprove – Mr. Finzi and Ms. Michel's accounts. Def.'s Ex. 9. Moreover, Paul Weiss' account seems to have evolved over the years. While, in 2013 and again in 2015, Paul Weiss told the SEC that, at the meeting, "Rashid ultimately acknowledged that many of his expenses *could fairly be characterized as personal*," Pl.'s Ex. 30 (emphasis added), Def.'s Ex. 10 ("Mr. Rashid stated that a number of expenses charged to the Firm could fairly be characterized as personal"), Paul Weiss, six years after the fact, now contends that Mr. Rashid admitted to improper expenses.  Finzi Decl. ¶ 21.

In fact, Paul Weiss' contemporaneous account is consistent with Mr. Rashid's testimony today and reflective of his state of mind.  At the meeting, Mr. Rashid was rightfully fearful of Apollo pursuing him for what it described as theft.  While Mr. Rashid did not admit that any of the discussed expenses were not reimbursable expenses, he nevertheless offered to repay the relatively trivial amount, in comparison to his compensation, so that he could return to work.  As Mr. Rashid testified at his deposition, concerned that "Apollo is a pretty -- had been and continues to be a pretty litigious firm," he stated at the meeting that he "wanted to settle the matter and obviously go back to work."  Pl.'s Ex. 162 at 227:1-7; 231:4-12.  That night, four different senior

Apollo executives encouraged Mr. Rashid to cooperate in the expense review so that he would be able to come back to work. Rashid Decl. ¶ 20.[15]

Mr. Rashid did cooperate. He hired Crowell & Moring, initially at Apollo's expense, and in particular, Glen McGorty, to assist him in the expense review. Mr. McGorty, at his deposition, confirmed that "the entire project was in furtherance of resolving issues settling any concerns that Apollo had against Mr. Rashid in helping them to settle their concerns that they had with the SEC or the basis he had with them, I should say. So I can tell you that I think all of this was in furtherance of that settlement effort." Pl's Ex. 168 at 125:14-25.[16] To that end, Mr. McGorty continued, "we had conversations where we explicitly explained to Paul Weiss our methodology, that personal expenses were not necessarily personal. We just couldn't document them as being business, and it was Mr. Rashid's intentions to write a check to cover that amount in the interest of keeping his job." *Id*. at 179:12-18.

Paul Weiss, in a presentation to the SEC on September 16, 2013, confirmed Mr. Rashid's cooperation and his intention to cover any amounts needed to keep his job. According to that presentation, Mr. Rashid "cooperated fully with Apollo, Paul Weiss, and BDO at all stages of the Process;" "spent considerable time reviewing his expenses to reclassify charges as personal in the first instance, and to group travel-related expenses with their associated trips;" and "endorsed an over-inclusive approach to the effort that, we believe, *may substantially overstate the amounts*

---

[15] Of the four executives, identified by Mr. Rashid at his deposition, only Marc Becker submitted a declaration. Mr. Becker's declaration is silent on any discussion he had with Mr. Rashid subsequent to the July 1 meeting.

[16] While Crowell did work cooperatively with Paul Weiss, Mr. McGorty added that "I think from the beginning there was obviously an inherent adversity with respect to the concerns that Paul Weiss had with Mr. Rashid or Apollo had with Mr. Rashid via Paul Weiss, concerns that the SEC had to some extent through their examination process with Paul Weiss that reflected upon their actions with Mr. Rashid and, at the same time as that adversity, an interest for both of us, meaning Apollo and Mr. Rashid, to resolve this concern about Mr. Rashid's alleged conduct, to help Apollo resolve the potential concerns they had with the SEC, and all of that and the interest of Mr. Rashid to keep his job." *Id*. at 165:23-166:11.

*improperly charged* as business expenses." Pl.'s Ex. 30 at slide 19 (emphasis added).[17]  In Apollo's own words, Mr. Rashid did not admit to any improper expenses, but only "identified those expenses that he was willing to have re-classified as personal." *Id.* at slide 10. Despite Apollo's words of warning, the SEC adopted Paul Weiss' investigation wholesale, continues to stand by the results of Apollo's review (with one notable exception discussed below), and still has not conducted its own independent investigation into Mr. Rashid's expenses.

In addition to $220,000 worth of expenses supposedly self-identified by Mr. Rashid, in order to claim that "over $250,000" in improper expenses, the SEC must also rely on the work of BDO, Apollo's accounting firm, for "an additional approximately $61,000 in expenses." SEC Br. at 18.  It is not clear how exactly the SEC intends to do this – the BDO Report[18] is inadmissible hearsay – since it does not submit a declaration from anyone at BDO involved with the preparation of the spreadsheet.  Perhaps it is not that surprising that the SEC would like to hide BDO's work from the court, since it is saddled with inexplicable errors.  As a few examples, BDO simply decided to charge Mr. Rashid with all taxi receipts, since it would not be cost-effective to determine which were business expenses and which were not. Def.'s Ex. 10 at 3 ("Given the difficulty of identifying the purpose of car service charges going back in time, BDO allocated all such charges as personal."). BDO also applied the 2013 T&E Policy limits retroactively to determine amounts supposedly in excess of the 2011 T&E Policy, which contained no such limits.  *See, e.g.*, Pl.'s Ex. 111 at row 2624.  Finally, BDO presumed *all* expenses were personal, unless it could substantiate a business purpose through documentation.  Pl.'s Ex. 30 at slide 10 ("Expenses without specific

---

[17] The SEC submitted a declaration from Mr. Finzi, in which Mr. Finzi states that he "do[es] not know the extent to which Mr. Rashid's identification of personal expenses actually may have been overstated."  Finzi Decl. at ¶ 31.  Apparently, the SEC regards this as a point in its favor.

[18] While referred to as a "report," in reality, it is just a spreadsheet.  It does not include any statements on BDO's methodology or qualifications on its use.

supporting documentation were assumed to be personal."). When Apollo made its presentation to the SEC on September 16, 2013, the SEC asked no questions. Def.'s Ex. 8 at 40:15-41:24.

**E.      The SEC's Lack of Investigation**

The SEC adopted Paul Weiss' investigation without meaningful further independent investigation. On September 16, 2013, Paul Weiss told the SEC that Mr. Rashid had improperly billed over $290,000 in expenses. Pl.'s Ex. 30 at slide 17 (Total Due Apollo). On October 25, 2017, the SEC repeated that claim in its Complaint. Compl. at ¶ 1 (Mr. Rashid "intentionally misappropriated approximately $290,000 from private equity funds").[19] The SEC made no effort to investigate Apollo's claims, until this litigation started.

**F.      Expert Testimony**

**1.      The SEC's Experts**

Perhaps realizing that Mr. Rashid's supposed admissions are inadmissible as settlement communications, the SEC retained Kevin Pierce to analyze the expenses to which Mr. Rashid purportedly admitted. Mr. Pierce applied what could be characterized as a BDO-lite approach. While BDO presumed all of Mr. Rashid's expenses to be personal and only characterized an expense as a reimbursable expense if it could find documentary proof of its business purpose, it at least purported to look at all of Mr. Rashid's emails to do so. Mr. Pierce makes no such claim. Instead, Mr. Pierce only had available to him the emails that the SEC requested Apollo produce in discovery – a small subset of Mr. Rashid's total emails, and, because that population was the product of the SEC's desired search terms, a population skewed against Mr. Rashid. Pierce Decl. ¶ 12; Pierce Report ¶ 43, Ex. A. Despite a methodology stacked against Mr. Rashid, even Mr. Pierce was forced to concede that more than a quarter of the supposedly admitted-to personal

---

[19] Mr. Rashid incorporates by reference his motion *in limine* to exclude evidence of expenses not reimbursed by funds.

expenses were not personal. SEC Br. at 19 (quoting Pierce Decl. ¶ 15.).  Incredibly, Mr. Pierce's report was the first time the SEC departed from Apollo's review in any significant manner.

### 2.     Mr. Rashid's Experts

Mr. Rashid has submitted the expert reports of Ron Quintero and Denis O'Connor.

Mr. Quintero has over 40 years of experience as a Certified Public Accountant, with specific expertise in forensic accounting; holds ten professional certifications, including being a Certified Fraud Examiner (CFE) and AICPA-Certified in Financial Forensics (CFF); and has been retained to conduct financial investigation and analysis for, among many others, Apollo and the Department of Justice.  Mr. Quintero has opined that:

- As a certified fraud examiner, he does not regard the materials he reviewed as supporting a conclusion that Mr. Rashid intentionally billed personal expenses to the funds;

- the standards applied by Paul Weiss to identify the misappropriated funds alleged by the SEC were, by their own admission, intended to be "over inclusive," and had the effect of magnifying the number and dollar value of the items cited in the spreadsheet that was used by the SEC to litigate this case;

- Mr. Rashid is being held to a higher standard of proof to substantiate the expenditures listed in the BDO spreadsheet than would be required if he were being investigated by the U.S. Internal Revenue Service for income tax fraud;

- the vast majority of the expenses designated on the BDO Spreadsheet as "Personal Amounts" (the "Personal Amounts") are justified and/or irrelevant to allegations of intentional misappropriation or fraud, and a limited analysis was performed to designate expenses as Personal Amounts;

- the causes of the vast majority of the Personal Amounts seems to have been: (i) the failure of Mr. Rashid to retain and submit full documentation of reimbursable expenses; (ii) technical violation of Apollo expense reimbursement policies through documentation deficiencies or policy violations that do not rise to the level of intentional misappropriation of funds or fraud; and (iii) as Mr. Rashid has conceded, his failure to properly supervise approximately eight assistants who submitted expense reimbursement forms on his behalf;

- the collective impact of any Personal Amounts lacking suitable explanations that may be of a personal nature to Mr. Rashid would not matter to the investors in the funds cited in the SEC's Complaint on both a quantitative and qualitative basis; and

16

- to the extent that Apollo may have received payments from the Funds for any Potential Personal Amounts, such payments would have been returned to the investors in the Funds via the distribution waterfall from liquidity events of portfolio companies, with an additional compounded annual return of approximately 8% on expense reimbursements, thereby mitigating the adverse impact to the Investors from funding any Personal Expenses.

*See* Quintero Decl. ¶ 7. Mr. O'Connor, a managing director at Alix Partners who also has 40 years of experience as an accountant, auditor and consultant in the areas of forensic accounting, dispute analysis, corporate recovery and interim management, has opined that:

- the objectives of T&E Policies include: how to report expenses, what to include, and how employees are reimbursed. Further, T&E policies should provide guidance consistent with a corporation's culture, while providing the flexibility to allow for business dynamics;

- T&E reporting, as well as the review of T&E reporting, should be done using the T&E policies in effect at the time the expenses were incurred; and

- not all deviations from T&E policies are the result of wrongdoing or fraud. Errors occur. Furthermore, the application of business judgment may be warranted when faced with certain business needs or to do what is in the best interests of relevant stakeholders. O'Connor Decl. ¶ 2.

## III.   THE SEC'S CLAIMS AGAINST MR. RASHID

The SEC has charged Mr. Rashid with violations of Sections 206(1) and 206(2) of the Advisors Act or aiding and abetting Apollo's violations of the Act.  Those sections, codified at 15 U.S.C. § 80b-6 (1) and (2), state that "It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly (1) to employ any device, scheme, or artifice to defraud any client or prospective client; [or] (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

### A.   Mr. Rashid Was Not an "Investment Adviser" under the Advisers Act.

Mr. Rashid was not registered as an investment advisor under the Advisers Act.  If the SEC believed that Mr. Rashid was an investment adviser, logically, they would have pursued him for

17

failure to register.  The only fair reading of the SEC's inaction is that it recognized that Mr. Rashid did not need to register because he was not an investment adviser, as that term is statutorily defined.

Apollo, however, was an investment advisor registered under the Advisers Act. That is because, as cited in the SEC's brief, an investment adviser advises its "customers by exercising control over what purchases and sales are made with its clients' funds." SEC Br. at 20 (quoting *Abrahamson v. Fleschner*, 568 F.2d 862, 871 (2d Cir. 1977)).  The record is indisputably clear that Mr. Rashid had no control over the investments made by Apollo's funds and never sat on a management committee or investment committee.  Rashid Decl. ¶¶ 2-5. Investment decisions were the sole province of the Founders.  As the SEC fatally concedes, "Apollo's Executive Committee was the final authority that made investment decisions." SEC Br. at 24 n. 15.

The SEC's citations to Mr. Rashid's Answer do not help it because, the one time the SEC directly alleged that Mr. Rashid was acting as an investment adviser under the Advisers Act, Mr. Rashid denied that he was an investment adviser.  Paragraph 91 of the Complaint alleges that Mr. Rashid "was acting as an investment adviser to the Relevant Funds within the meaning of Section 202 (a) (11) of the Advisers Act, 15 U.S.C. § 80b-2 (a) (11).  Compl. ¶ 91.  Mr. Rashid answered that claim: "Paragraph 91 states a legal conclusion and as such no response is required. To the extent a response is deemed warranted, denied."  Doc. No. 47 at ¶ 91.

**B.      Mr. Rashid Did Not Act with the Requisite Scienter.**

The SEC bears the full burden of establishing scienter, as intent to defraud under Section 206(1) may not be presumed. *See, e.g.*, *SEC v. Yorkville Advisors*, LLC, 305 F. Supp. 3d 486, 511-13 (S.D.N.Y. 2018) (quoting *Shenk v. Karmazin*, 868 F. Supp. 2d 299, 305 (S.D.N.Y. 2012)) ("the SEC 'must produce evidence (1) showing that the defendants had motive and opportunity to commit fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or

recklessness'"); *SEC v. Moran*, 922 F. Supp. 867, 896-97 (S.D.N.Y. 1996) (quoting *Steadman v. SEC*, 603 F.2d 1126, 641 (5th Cir. 1979)) ("in order to successfully litigate a claim under Section 206(1), the SEC must prove that the [defendants] acted with an 'intent to deceive, manipulate, or defraud'"). In this matter, the SEC must prove that any improper expenses submitted by Mr. Rashid was done with intent to defraud, and not merely in error.

The SEC points to only two pieces of evidence to establish scienter.  First, it highlights the $3,500 Zegna charge, which has been thoroughly debunked and which is likely inadmissible hearsay on several levels. *See*, *supra*, Section II(C)(2).  Second, it asserts that Mr. Rashid provided inaccurate expense descriptions to his assistants.  The descriptions cited by the assistants as coming from Mr. Rashid noticeably do not name individuals.  Yet, in another leap from its evidence to its desired theory, the SEC seems to accuse Mr. Rashid of providing the names of individuals.  In fact, Mr. Rashid's supposedly handwritten descriptions do not even match what was submitted in his expense reports.  *Compare* Pl.'s Ex. 111 row 2151 *with* Pl.'s Ex. 141 (entry for Lindsey Buffet Restaurant).  Finally, the SEC preemptively declares any denial of an obligation to allocate expenses to funds as "illogical and strain the bounds of credulity". SEC Br. at 22.  In making that broad dismissal, the SEC does not discuss the fact that Apollo's own T&E Policies did not mention, let alone require, allocation of expenses until *after* Mr. Rashid was placed on leave.  Thus, the SEC seeks to retroactively impose an allocation requirement on Mr. Rashid that simply did not exist in the relevant policies by which he was governed at the time the expenses were incurred.

### C.    Mr. Rashid's Actions Were Not Material.

To violate the Investment Advisors Act, Mr. Rashid's alleged misstatements regarding his business expenses must be material.  To be quantitatively material, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available.'" *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). In gauging whether an alleged misstatement is qualitatively material, courts look to SEC Staff Accounting Bulletin No. 99 ("SAB No. 99") for guidance. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (using SAB No. 99 as guidance for whether a statement was material); *see also In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015) ("[T]he Second Circuit has endorsed the use of [SAB No. 99], as 'relevant guidance for the assessment of materiality.'"). Accordingly, courts consider "both quantitative and qualitative factors in assessing an item's materiality and that consideration should be undertaken in an integrative manner." *Litwin*, 634 F.3d 706, 717 (2d Cir. 2011) (internal citations omitted) (citing SAB No. 99).

Here, the alleged improper business expenses are immaterial when compared to the size of the Apollo Funds, the fees charged by Apollo, and the likely earnings of the Funds. The annual amount of the alleged personal expenses is approximately equivalent to the following:

a.   0.00008% of unrealized value or assets under management;

b.   0.00076% of pro forma annual management fees, excluding incentive fees, which normally greatly exceed management fees; and

c.   0.00004% of pro forma annual investor return.

*See* Quintero Report Table 4. The amounts are an order of magnitude below what would even require an adjusting journal entry in a financial audit, as they would be deemed to be quantitatively immaterial.

As for qualitative materiality, SAB 99 suggests that "a matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." SAB 99, § 1. FASB *Statement of Accounting Concepts No. 9:  Qualitative Characteristics of Accounting Information*

("CON 2") indicates that "[t]he omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."[20]  The issue is whether there is "a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[21]

An investor's normal objective is to maximize the returns from liquidity events involving portfolio investments.  Periodic financial statements are of limited significance, other than the fair value marks of unrealized portfolio investments.  Here, management fees in Apollo's private equity funds were less than 1% of assets under management, Quintero Report ¶ 43, and any reimbursable expenses charged to the funds were generally low in relation to management fees.  Moreover, reimbursable expenses are typically returned through the distribution waterfall.  Quinter Report ¶ 45-47.  Members of the Apollo team have objectives that are in alignment with those of the investors—to maximize returns on portfolio investments via liquidity events. Rashid Decl. ¶ 5. There can be no suggestion that any improper business expenses would be viewed as material to investors.

Perhaps most telling in this regard, however, is the contemporaneous treatment of the alleged fraudulent misappropriations by both Apollo and the SEC.  Until public disclosure of its settlement with the SEC in 2016, Apollo did not even disclose publicly or to the investors anything pertaining to Mr. Rashid's expenses, which would have been required if they deemed them to be material.  Nor did the SEC require, urge, counsel or independently advise the investors of what it

---

[20]  CON 2, (Norwalk, CT:  Financial Accounting Standards Board, May 1980), ¶ 132.

[21]  TSC Industries v. Northway, Inc., 426 U.S. 438, 449 (1976), as quoted in SAB 99, § 1.

now characterizes as a fraud perpetrated upon them, despite having actual knowledge of the alleged "fraud" as early as September 16, 2013. *See* Pl.'s Ex 30. In short, from a financial perspective, any misstatements in Mr. Rashid's expenses are immaterial to investors.

**D.      Mr. Rashid Did Not Aid or Abet Apollo's Unproved Violations of the Act.**

The SEC asks this Court to consider its claims against Mr. Rashid for aiding and abetting violations of the Advisors Act only in the event that the Court finds Mr. Rashid did not violate the Advisors Act himself. SEC Br. at 25 n. 16. However, because a primary violation is an element of an aiding and abetting theory of liability, (*see SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012)), if Mr. Rashid did not violate the act, then there was no violation. Therefore, Mr. Rashid could not have aided and abetted any violation of the Act. If Mr. Rashid is not liable on the two primary counts, he is necessarily not liable on the aiding and abetting counts.

**IV.     <u>RELIEF SOUGHT BY THE SEC</u>**

The SEC seeks (1) an order permanently enjoining Mr. Rashid from violations of Sections 206(1) and 206(2) of the Advisers Act or aiding and abetting such violations; and (2) an order requiring Mr. Rashid to pay a maximum third tier civil penalty of $750,000.

**A.      The SEC's Requested Injunctive Relief**

To issue an injunction permanently enjoining further violations, this Court must find a "likelihood or propensity to engage in future violations." *S.E.C. v. Landberg*, 836 F. Supp. 2d 148, 158 (S.D.N.Y. 2011) (internal quotations omitted). To do so, the Court looks at "(1) the egregiousness of the past violations; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; (4) whether defendant has accepted blame for his conduct; and (5) whether the nature of defendant's occupation makes it likely he will have opportunities to commit future violations." *Id*. at 158.

Here, the relevant factors cut decisively against a permanent injunction. First, the conduct Mr. Rashid is accused of is far from egregious. Assuming the SEC succeeds in proving every expense was fraudulent, the claim would still amount to $250,000 in improper expenses (about half outside of the statute of limitations period) from funds containing billions of dollars. Second, Mr. Rashid has acknowledged that he did not adequately supervise his assistants and was not as careful as he needed to be in submitting his expenses for reimbursement. But he did not intentionally engage in conduct that could cost him his lucrative job for – at best – $250,000 over 3½ years when his salary was many times more than that. Third, Mr. Rashid has repaid Apollo (who presumably repaid the funds) more than the SEC even accuses him of misappropriating, and he did so in 2014, three years before the SEC filed this action. Finally, the last alleged improper expenses were more than six years ago. If the SEC truly believed that Mr. Rashid would offend again, it would not have waited more than four years to file suit against him. *See Johnson v. S.E.C.*, 87 F.3d 484, 490 (D.C. Cir. 1996) (emphasis in original) (if the SEC really viewed Johnson as a clear and present danger to the public, it is inexplicable why it waited *more than five years* to begin the proceedings to suspend her"). The SEC does not claim that Mr. Rashid, "as an individual still active within the financial industry," (SEC Br. at 27), committed subsequent violations since that last expense in June 2013, and there is no reason to think he will again.

### B.    The SEC's Requested Fine

Section 209(e) of the Advisers Act imposes three tiers of fines for violations. The first tier applies to all violations and caps penalties at $5,000. The second tier caps penalties at $50,000 and applies only to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 18 U.S.C. 80b-9(e)(2). The third-tier caps penalties at $150,000 and requires, in addition to the requirements of the second tier, that the "violation directly

or indirectly resulted in substantial losses or created a significant risk of substantial losses." *Id*. at (e)(3).

### 1.    The Third Tier of Penalties is Inapplicable.

By arguing only that there is a risk of substantial losses, the SEC implicitly concedes that the alleged actual loss was not substantial.  Nor does the SEC even argue that there was a "significant" risk of substantial losses.  The statute is clear, however, that the risk need be significant.  Because the SEC does not argue that it was, let alone present evidence beyond its unsubstantiated conjecture, the third-tier civil penalty is inapplicable.  *See SEC v. Madsen*, No. 17-cv-8300, 2018 WL 5023945, at *4 (S.D.N.Y. Oct. 17, 2018) ("a third-tier penalty is warranted only where the Commission proves that that requirement [of a substantial loss or significant risk of substantial loss] is met"). The second tier, therefore, presents the maximum possible penalty.

### 2.    The Court Should Only Assess One Penalty.

The SEC requests that the Court impose five penalties "based on five separate ... violations of the Act."  SEC Br. at 30.  However, even if Mr. Rashid "engaged in repeated violations of the securities laws, they all arose from a single scheme or plan."  *S.E.C. v. Rabinovich & Assocs., LP*, No. 07-cv-10547, 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) (imposing a single penalty despite multiple violations, because all violations arose from a single plan).  *See also S.E.C. v. Garfield Taylor, Inc.*, 134 F. Supp. 3d 107, 110 (D.D.C. 2015) ("Because the violations here similarly arose out of a single scheme or plan, for purposes of this case the Court will apply a single monetary penalty...").[22]

---

[22] In *SEC v. Coates*, 137 F. Supp. 2d 413 (S.D.N.Y. 2001), and *SEC v. Pattison*, 2011 WL 723600 (N.D. Cal. Feb. 23, 2011), while the courts mentioned that they were considering multiple violations in assessing the amount of the penalty, neither actually exceeded the cap of a single $50,000 penalty.  Only the court in *SEC v. Kenton Capital*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998) did so, presenting an outlier.

According to the SEC, Mr. Rashid engaged in a single "fraud [that] persisted for several years."  SEC Br. at 29.  Therefore, by the SEC's own theory, Mr. Rashid only engaged in a single scheme or plan, requiring a single penalty.  The maximum penalty is thus limited to $50,000.

### 3.    Mr. Rashid's Conduct Does Not Warrant the Maximum Available Penalty.

As the SEC notes, the Court, in assessing what penalty up to the maximum is appropriate, should look at factors similar to those the Court considers in determining whether to issue a permanent injunction.  *See* SEC Br. at 28 (quoting *SEC v. Forest Resources Mgmt. Corp.*, No. 09-cv-0903, 2010 WL 2077202 (S.D.N.Y. May 18, 2010)).  For the same reasons Mr. Rashid's conduct does not warrant a permanent injunction, it does not warrant the maximum available penalty.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, and based on the foregoing evidence, Mr. Rashid respectfully requests that the Court, after trial, enter an order finding him not liable on any of the SEC's causes of action.  In the event the Court does find him liable, Mr. Rashid respectfully requests that the SEC's relief be limited to an appropriate penalty.

Dated: New York, New York
       August 23, 2019

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

By:    /s/ Gregory W. Kehoe            

Gregory W. Kehoe
200 Park Ave.
New York, New York 10166
(212) 801-9200
(212) 801-6400 (facsimile)
KehoeG@gtlaw.com

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Theresa M.B. Van Vliet, Esq.
200 E. Broward Blvd. Suite 1110
Ft. Lauderdale, Florida 33301
(954) 453-8000
(954) 331-2912 (facsimile)
tvanvliet@gjb-law.com

*Attorneys for Defendant Mohammed Ali Rashid*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel Friedman, hereby certify that a true and correct copy of Defendant's Trial Brief

was served upon the following attorneys of record by ECF on August 23, 2019:

Duane K. Thompson
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
ThompsonD@SEC.gov

James M. Carlson
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
CarlsonJa@SEC.gov

*Attorneys for Plaintiff, Securities and Exchange Commission*

*/s/ Daniel Friedman*
Daniel Friedman