# Exhibit 2

MATTHEW T. HOFFMAN
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID

May 24, 2019
1–4

**Page 1**

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2
3    SECURITIES AND            :
     EXCHANGE COMMISSION,   :
4                             :
          Plaintiff,          :
5                             :
     v.            : No. 17-cv-8223
6                             :
     MOHAMMED ALI RASHID,  :
7                             :
          Defendant.     :
8
9
10
11       DEPOSITION OF MATTHEW T. HOFFMAN
12
13            Friday, May 24, 2019
14                 9:25 a.m.
15
16             Greenberg Traurig
               2101 L Street, N.W.
17             Washington, D.C.
18
19
20    Terry L. Bradley, Court Reporter
21
22

**Page 2**

1         APPEARANCES OF COUNSEL
2
3    For the Plaintiff:
4     SECURITIES AND EXCHANGE COMMISSION
      DUANE K. THOMPSON, ESQ.
5     JAMES CARLSON, ESQ.
      DONNA K. NORMAN, ESQ.
6     100 F Street, N.E.
      Washington, DC 20549
7     E-thompsond@sec.gov
8
      For the Defendant:
9
      GREENBERG TRAURIG, LLP
10    DANIEL FRIEDMAN, ESQ.
      MetLife Building
11    200 Park Avenue
      New York, NY 10166
12    T-212.801.6788
      E-friedmand@gtlaw.com
13
14
15
16
17
18
19
20
21
22

**Page 3**

1         INDEX OF EXAMINATION
2
3    EXAMINATION                PAGE
4    By Mr. Friedman. . . . . . . . . .    5
5              ~~~~~
6
7         INDEX OF EXHIBITS
8    Exhibit 1              15
     Expert Report - Matthew Hoffman
9    (4/15/19)
     Exhibit 2              45
10   Complaint
     Exhibit 3              57
11   Declaration of Lourenco Goncalves
     Exhibit 4              59
12   FedEx Shipping Receipt
     Exhibit 5              62
13   Expense Spreadsheet (Excerpt)
     Exhibit 6**             90
14   T&E Reimbursement Policy -
     Apollo Global Management
15   (Apollo 00004578 - 4596)
     Exhibit 7**             90
16   T&E Reimbursement Policies &
     Procedures.  Policy # A.1 -
17   Apollo Global Management
     (BDO-Apollo- 00000999 - 1010)
18   Exhibit 8**             90
     T&E Reimbursement Policies &
19   Procedures -
     Apollo Global Management
20   (Rashid 00000659 - 674)
21
22

**Page 4**

1    EXHIBITS (Cont.)
2    Exhibit 9**            107
     Expense Review Interim Report -
3    Apollo Global Management
     (Apollo00114148 - 169)
4    Exhibit 10             127
     Cease-and-Desist Order
5    Exhibit 11             131
     ILPA letter to Steven. Mnuchin
6    (7/28/17)
     Exhibit 12             139
7    Rebuttal Report - Matthew Hoffman
     (5/13/19)
8    Exhibit 13             142
     Rebuttal Report - Matthew Hoffman
9    (5/20/19)
10   **CONFIDENTIAL EXHIBITS
11
12   (Original Exhibits retained by Court Reporter.)
13            ~~~~~
14
15
16
17
18
19
20
21
22

Page 5

1          P R O C E E D I N G S
2
3          MATTHEW T. HOFFMAN
4  having been first duly sworn, testified as
5  follows:
6
7          MR. FRIEDMAN:  I think we'll start
8  by introducing ourselves.  I'm Daniel Friedman,
9  Greenberg Traurig, representing the defendant,
10  Mr. Rashid.
11          MR. THOMPSON:  Duane Thompson,
12  representing the plaintiff, Securities and
13  Exchange Commission.
14          MR. CARLSON:  Jim Carlson, on behalf
15  of the Securities and Exchange Commission as
16  well.
17          THE WITNESS:  Matthew Hoffman,
18  expert witness.
19
20          EXAMINATION
21  BY MR. FRIEDMAN:
22    Q.    So just to begin by giving you a few

Page 6

1  ground rules for the deposition.  I'll try not
2  to interrupt you, and ask you try not to
3  interrupt me.  I understand it's hard to do
4  sometimes.  The other thing is, for the Court
5  Reporter's sake, please give "yes" or "no" or
6  verbal answers instead of nodding your head.
7  Mr. Thompson will object to questions from time
8  to time.  Unless he tells you not to answer,
9  you can answer after his objection.
10    A.    Got it.
11    Q.    Have you been deposed before?
12    A.    Yes, I have.
13    Q.    How many times?
14    A.    Five or six times maybe.
15    Q.    All those times as an expert
16  witness?
17    A.    Yes.
18    Q.    Have you ever given trial testimony
19  before?
20    A.    I have been through arbitration with
21  three judges.
22    Q.    And when you were deposed as an

Page 7

1  expert witness who was the client in those five
2  or six times?
3    A.    Do you mean plaintiff or defendant?
4    Q.    The party.
5    A.    The parties.  I wish I had my list.
6  I've been an expert witness on probably
7  11 cases now, and I have supported both the
8  plaintiff and defendant.
9          Just a minute.  I'm going to check
10  my notes because I do have the list.  Some of
11  the list.
12          MR. THOMPSON:  Mr. Hoffman, just let
13  Dan ask the questions --
14          THE WITNESS:  Okay.
15          MR. THOMPSON:  -- and he'll direct
16  you to documents if he wants you to look at
17  any.
18          THE WITNESS:  Okay.
19          MR. THOMPSON:  Just answer as best
20  you can.
21          MR. FRIEDMAN:  If you can remember.
22          MR. THOMPSON:  If you can't recall,

Page 8

1  you can't recall.
2          THE WITNESS:  All right.  The most
3  recent one was the Highland Creditors Committee
4  versus Highland Management Capital or Capital
5  Management, and that's the one that went to
6  trial.
7  BY MR. FRIEDMAN:
8    Q.    Have you ever been an expert witness
9  for the SEC before?
10    A.    No.
11    Q.    Have you ever been an expert witness
12  for any branch of the government before?
13    A.    No.
14    Q.    Have you ever been an expert witness
15  concerning travel and expense, which I'll refer
16  to as T&E --
17    A.    No.
18    Q.    -- policies?
19          And it's okay if we use the term
20  "T&E policies" --
21    A.    Yes.
22    Q.    -- when we're referring to it?

Page 9

1       What did you do to prepare for this
2   deposition?
3       A.   This morning?  Or just in general?
4       Q.   In general.
5       A.   Okay.  So I reviewed the materials
6   that were supplied to me by the SEC.  I
7   identified additional documents which I've
8   supplied to counsel on my own.  So I did
9   research on my own by speaking with various
10  companies that focus on travel and expense --
11       -- travel and entertainment expense
12  processes.  I reviewed T&E policies that I had
13  developed myself when working for other firms.
14  I reviewed my notes and depositions --
15       Excuse me.
16       -- my notes and reports for this
17  deposition prior to coming here.
18       Q.   Now, any of those additional
19  documents that you mentioned, are those the
20  documents listed in Exhibit B?
21       A.   Yes.  They're all listed.
22       Q.   They're all listed.

Page 10

1       A.   They're all listed.
2       Q.   How did you first come in contact
3   with the SEC regarding this matter?
4       A.   Boy.  It was so long ago.  I have a
5   friend who was my Risk Manager at Credit
6   Suisse, named Dan Pines, and he works for the
7   SEC in New York.  And he gave me the name of
8   somebody that was looking for an Asset Manager
9   within the SEC.  She's no longer working at the
10  SEC, but I believe Wayne got my name through
11  her.
12       Q.   Was Mr. Thompson the first person
13  you spoke to at the SEC about this litigation?
14       A.   Yes.
15       Q.   About how many times have you
16  discussed your --
17       -- the subject of your testimony,
18  your expert report with the SEC?
19       A.   How many times?
20       Q.   Yeah.
21       (Ms. Norman entered the room.)
22       A.   Maybe --

Page 11

1       I'm trying to think of the number of
2   phone calls that we've had.
3       A.   A dozen.  Maybe a dozen times.
4   Possibly more.
5       Q.   About how much total time were those
6   dozen conversations, if you can estimate?
7       A.   Oh.  We met in New York once, and
8   over the phone possibly a total of two hours,
9   maybe.  2 or 3 hours.
10       Q.   How did you select --
11       And I'm going to use the term
12  "record material" regarding your Exhibit B to
13  differentiates those documents that are
14  specific to this litigation.  Those documents
15  that have Bates numbers on them as opposed to
16  the other materials that you identified
17  yourself.
18       A.   Okay.  Yes.
19       Q.   So, how do you select what record
20  material you would review in preparing your
21  report?
22       A.   Well, I knew the topic was going to

Page 12

1   be on travel and entertainment process, so I
2   pulled the documents from my own files that I
3   already had on T&E, because I had developed
4   these processes in the past.  Then I went to
5   the firms that I knew supplied the applications
6   for T&E procedures.  They were companies that
7   developed the forms, they develop the online
8   applications themselves.  I then went to all
9   the various -- I'm going to call them
10  quasi-regulatory entities -- that would monitor
11  private equity funds to see how they would have
12  looked at T&E policies.  So that's when I
13  started connecting the process to the
14  institutional LP association.  I found that
15  they had identified T&E policies procedures in
16  their documentation.  From there I was able to
17  figure out other regulatory bodies that would
18  have had T&E types of documentation.  Let's
19  just put it that way.
20       So just through the research process
21  on my own I identified the various regulatory
22  bodies that would have commented on travel and

MATTHEW T. HOFFMAN
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID

May 24, 2019
13–16

Page 13

1  entertainment.

2      Q.    So specifically, the documents that

3  you needed to get from the SEC because they

4  were part of this litigation, how did you

5  select those materials to review?

6      A.    From the SEC?

7      Q.    Yes.

8          MR. THOMPSON:  He's asking about

9  documents with Bates numbers on them that were

10  generated in the course of this litigation.

11         THE WITNESS:  Right.  Either I asked

12  Duane for them myself because I knew there were

13  certain clauses within certain documents that

14  would have referenced T&E policies, or he

15  simply supplied me with a batch.  Some of the

16  documents I didn't have to review other than

17  cursory glances because they weren't relevant,

18  per se.

19         But either he supplied them to me

20  because they were pertinent to the case, or I

21  asked him to identify those documents and then

22  send them to me.

Page 14

1  BY MR. FRIEDMAN:

2      Q.    And those documents you said after a

3  cursory glance you determined they weren't

4  relevant, are those also included?

5      A.    Yes, they would have been included.

6      Q.    Was there anything from the record

7  that you asked for from the SEC that you didn't

8  receive?

9      A.    That I don't remember.  I'm pretty

10  sure I would have gotten almost everything that

11  I thought was needed.

12      Q.    And you submitted three expert

13  reports in this matter.  Is that right?

14      A.    Correct.

15      Q.    Is there anything in those reports

16  that you would like to change?

17      A.    Not necessarily.  No.

18      Q.    Okay.  Have you reviewed the expert

19  report of Mr. Pearce?

20      A.    No.

21      Q.    You have not seen it at all?

22      A.    No.

Page 15

1      Q.    So I'm going to give you a copy of

2  your report.  We can mark this as Hoffman 1.

3          (Exhibit 1 marked for

4  identification.)

5          We'll be referring to it throughout

6  the deposition.

7      A.    Okay.  Thank you.

8      Q.    I'd like you to turn to Exhibit A,

9  which is your resume.

10      A.    Uh-huh.

11      Q.    What professional licenses do you

12  hold?

13      A.    I have the Series 7, 63, 79, the

14  SIE, um, I believe the 3.  I'm not sure.

15      Q.    Okay.  You said the SIE?

16      A.    SIE.  Yeah.  It's a new designation,

17  so I qualified for it, I believe January this

18  year, simply based on the fact that I'm

19  grandfathered in.

20         Or possibly because of continuing

21  education.  I'm not really sure.

22      Q.    And do you know what SIE stands for.

Page 16

1      A.    No.  No, I don't.  Sorry.

2      Q.    And it isn't a memory test, but the

3  second page of your resume says you are a

4  registered broker, a member of FINRA --

5          SIPC?

6      A.    SIPC.  Yes.

7      Q.    -- Series 7, 63 and 79 valid.

8      A.    Correct.

9      Q.    So are you subject to FINRA

10  regulation?

11      A.    I am.

12      Q.    I'd like to go through the jobs

13  you've had starting from the beginning.  Just

14  you let me know what training you received at

15  each job regarding T&E policies, compliance

16  with the policies --

17      A.    Okay.

18      Q.    -- starting with J.P. Morgan.

19      A.    Sure.  So, I was a derivatives

20  trader, and we were trading interest rate

21  currency swaps and options, and that kind of

22  came out of my background in mathematics and

MATTHEW T. HOFFMAN
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID

May 24, 2019
17–20

Page 17

1    securities.  So as far as T&E policies, we were
2    educated early on how to be --
3          -- how to get reimbursement for
4    expenses.  I was sent overseas fairly quickly
5    after being hired, and my first assignment was
6    to Puerto Rico.  So within the first 9 months
7    of employment I was working in and out of the
8    San Juan, Puerto Rico office.  So as the
9    expenses started to come up, I had to figure
10   out how to get reimbursement for those.  There
11   was a policy, there was a procedure, you
12   followed, that were reimbursed.
13        Q.    Now, you said that you were educated
14   about the policies.
15        A.    Uh-huh.
16        Q.    What did that education look like?
17   Was it a formal class?  Videos?
18        A.    Oh, Dan, this is going back, like,
19   30 years.
20        Q.    Would you like to start with the
21   most recent and we can work backwards?
22        A.    It wasn't videos, I'll tell you

Page 18

1    that, because I don't think those existed.
2    Probably would have been simply my boss or my
3    secretary showing me what the reports were and
4    how you filled them out.  Bring in your
5    receipts, describe the reason for the expense,
6    who you met with, why you met with them, fill
7    out the form, get your boss to sign it, submit
8    it, you'll get a check back.  And that's
9    essentially what it was.  It was a very manual
10   process back then.
11        Q.    So moving on to Merrill Lynch, what
12   kind of education or instruction were you given
13   on T&E policies?
14        A.    It would have been very minimal
15   because at that stage I had already been a
16   senior trader and had traveled the world with
17   J.P. Morgan.  I had lived in Tokyo by that
18   point.  I had lived in Hong Kong by that point.
19   I had been all over Asia and Europe on behalf
20   of the firm.  So there were probably hundreds
21   of expense reports that I had already completed
22   that stage.  And when Merrill Lynch hired me,

Page 19

1    they knew that I had that process more or less
2    well understood, so they didn't have to give me
3    much education.  There was very little
4    difference in the process.  Keep your receipts,
5    designate who you met with, why you met with
6    them, the amounts were already indicated,
7    location you would supply, fill out the form --
8    again still manual at that stage -- your boss
9    signed off on it, and then you were reimbursed.
10        Q.    And at UBS was it similar in that it
11   was minimal instruction at that point?
12        A.    Yes.
13        Q.    By UBS was it an electronic process?
14   Or not there yet?
15        A.    I was well into my 30s by the time I
16   was working for them, so it was an expected
17   knowledge that you should have had prior to
18   employment.  And again, it would have been:
19   Here's the expense form.  Fill it out.
20         I don't remember it being online at
21   that point still.
22        Q.    Okay.  Moving on to Credit Suisse.

Page 20

1    What kind of instruction or training did Credit
2    Suisse give you on expense policies?
3        A.    Again similarly, I was probably in
4    my 40s at that stage.  There was no need for
5    additional education on how to expense, other
6    than the fact that their procedure was slightly
7    different.  As you were employed you were given
8    a corporate credit card in your name.  The
9    bills came through Credit Suisse to you, and
10   they expected you to pay for those expenses
11   first and then submit your reimbursement
12   expense form.
13        Q.    Okay.
14        A.    And then --
15        Q.    Sorry.
16        A.    That's all right.
17         But while I was at Credit Suisse we
18   were creating portfolios of products at that
19   stage.  I was in asset management.  I was no
20   longer a trader.  And we were creating what
21   they called SMAs, Separately Managed Accounts.
22   And the Separately Managed Accounts were owned

MATTHEW T. HOFFMAN
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID

May 24, 2019
21–24

Page 21

1   by either companies, limit liability companies,
2   or individuals.  And these SMAs were separate
3   investment vehicles against which we could
4   allocate expenses.  So we didn't have an
5   expense policy that was designated specifically
6   for the SMA products, so I developed the T&E
7   policy for those of us who were working on the
8   SMA products.  So that's when I began drafting
9   and writing the T&E policies for relevant
10  expenses that could have been allocated to
11  these privately held managed accounts.
12      Q.    How long did the SMAs exist before
13  you drafted the T&E policies for them?
14      A.    They would have been created and the
15  policies would have been created
16  simultaneously.
17      Q.    So moving on to Weston Capital
18  Management.
19      A.    Yes.
20      Q.    Did you receive any training on T&E
21  policies when you got there?
22      A.    They already had an existing process

Page 22

1   which I followed.  And that had to do with
2   hedge fund types of investments and the
3   allocation of expenses to those portfolios.
4   However, when I was there we created private
5   equity fund products.  And because I knew that
6   the private equity funds had to have separate
7   policies, I created the T&E policies for those
8   vehicles and drafted those, wrote those,
9   implemented those.  So I trained my staff.  At
10  that point I was Chief Investment Officer, so I
11  had to train my guys as to how they had to
12  allocate their expenses to certain portfolio
13  companies by providing the receipts, the dates,
14  locations, reasons.
15      Q.    And fair to say that you didn't
16  receive any training yourself, you were
17  training others at that point?
18      A.    Correct.
19      Q.    And then just Round Table Financial.
20  Did you receive any training?
21      A.    No.  Everybody at Round Table is in
22  their 50s or 60s.  And at this point we're all

Page 23

1   very aware of what the appropriate policies are
2   for T&E.  When we speak to our clients in all
3   of our contracts we talk about expense
4   allocation with our mandated clients.  And if
5   there is an expense in excess of $500, if we
6   anticipate that the client will pay for that,
7   we get their prior approval.  Anything under
8   $500 we simply supply them with the receipts
9   and then they pay us.  They reimburse us.
10      Q.    Would you say your experience that
11  you primarily received training at your first
12  employer and that carried over to your
13  subsequent employers, is typical in the
14  financial industry?
15      A.    I'd say currently if you were
16  starting out as a new employee you would follow
17  certain new procedure.  I understand that there
18  are not just videos, but there are required
19  parts of your education prior to coming into
20  asset management which go through codes of
21  ethics, things that you should and should not
22  do with regard to T&E specifically.  They'll

Page 24

1   probably have a YouTube or a video of some sort
2   which says:  This is your corporate policy with
3   regard to T&E process, and this is how you
4   implement the request process for
5   reimbursement.
6          That would be currently.
7      Q.    Would you say that any of the T&E
8   policies at any of your employers substantially
9   differed from one another?  Or were they all
10  pretty much the same?
11      A.    Other than the process itself, the
12  concepts were all very similar.  You incur an
13  expense, a business expense, and you designate
14  which project you were working on, who you met
15  with, where you met them, purpose of the
16  meeting, and then you left it up to the
17  internal process to allocate or attribute that
18  expense to that project.
19      Q.    And was compliance with the policies
20  pretty much the same at all of your employers?
21      A.    The compliance policy?
22      Q.    The actual compliance of the

MATTHEW T. HOFFMAN
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID

May 24, 2019
25–28

Page 25

1  employees with the policy.
2      A.   Yes.  Otherwise they would not get
3  reimbursed.  Most everybody knew that you were
4  not permitted to charge personal expenses to
5  the company.
6      Q.   Have you ever worked for a private
7  equity company?
8          MR. THOMPSON:  As an employee?
9          THE WITNESS:  As an employee?
10         MR. FRIEDMAN:  Let's start with
11  that.
12         THE WITNESS:  No.
13         So I managed private equity
14  portfolios as a Chief Investment Officer and as
15  an Asset Manager, but I was never employed by a
16  private equity company.
17  BY MR. FRIEDMAN:
18     Q.   You mentioned you managed investment
19  portfolios.  Did you ever directly manage a
20  portfolio company?
21     A.   No.
22     Q.   Did you ever sit on the Board of a

Page 26

1  portfolio company?
2      A.   No.  But I have been on a Board, but
3  it was not a portfolio company.
4      Q.   What Board were you on?
5      A.   I was actually on the bank's pension
6  fund Board for its investments.  I've also been
7  on the Board of the bank's fund management
8  team -- I suppose you could call it -- and I
9  was the Chairman of that Board.  For the
10  pension fund I was the Chairman of the
11  investment Committee.
12     Q.   Which bank are you referring to?
13     A.   This is Swiss Bank, which was
14  actually morphed into UBS.
15     Q.   So this was when?
16     A.   This would have been 1995 to 1997.
17  And the hedge fund Board that I was on with the
18  550 million under management, that was also the
19  Dublin, Ireland-based offshore investment
20  vehicle that we set up at Swiss Bank/UBS.  The
21  one that I'm referring to here about the
22  private equity early stage investment fund is

Page 27

1  the two funds that I managed at Weston Capital
2  where they were portfolios of private equity
3  investments.
4      Q.   So you served on an investment
5  committee?
6      A.   Correct.  Yes.
7      Q.   Have you ever served on a management
8  committee?
9      A.   Yes.
10     Q.   Do you have decisionmaking authority
11  in your current job?
12     A.   Yes.  Very much so.
13     Q.   How many other jobs would you say
14  you had decisionmaking authority in?
15         MR. THOMPSON:  Objection as to form.
16  I don't know what you mean.  Decisionmaking
17  authority as pertains to what?
18         MR. FRIEDMAN:  Anything.
19         THE WITNESS:  Other than at Round
20  Table currently?
21         MR. FRIEDMAN:  Yes.  I mean, if it
22  helps, we can start with decisions on what to

Page 28

1  invest in.
2          THE WITNESS:  Oh, sure.  Well, I'm
3  the designated Chief Investment Officer at
4  Round Table.  For example, when we collectively
5  decide to work on a project, oftentimes we're
6  asked if we want to invest in the company as
7  well.  Sometimes we will take our fees in the
8  form of equity in a company in lieu of cash.
9  We make that decision collectively, but I
10  ultimately have the authority to do this
11  because I'm the managing member of Round Table.
12         That's pretty much it on the
13  investment side.
14  BY MR. FRIEDMAN:
15     Q.   So prior to Round Table you did not
16  have the authority to make decisions on where
17  to invest?
18     A.   Oh, no.  I was Chief Investment
19  Officer.  So at Weston Capital I was
20  100 percent responsible for all investments
21  that the firm made in every respect.
22     Q.   And prior to Weston, Credit Suisse

Page 29

1   or UBS --
2       A.   Credit Suisse.
3            MR. THOMPSON:  Let him finish the
4   question before you answer.
5   BY MR. FRIEDMAN:
6       Q.   Did you have any decisionmaking
7   authority regarding what Credit Suisse and UBS
8   invested in?
9       A.   There was an investment committee at
10  Credit Suisse, there was an investment
11  committee at Weston Capital too, but ultimately
12  I was responsible for the final decision.  My
13  signature was at the bottom.  At Credit Suisse
14  we had an investment committee which I
15  established.  The process was collectively we
16  talk about, discuss each of the investment
17  products that we had evaluated and researched,
18  collectively we decide whether they're
19  appropriate for the portfolio.  Ultimately I
20  had to sign off on every investment, but my
21  boss at that stage also signed off.
22           So did I have investment authority?

Page 30

1   I don't know.  How would you evaluate that?  I
2   was in charge of the investment committee, but
3   my boss ultimately signed off.
4       Q.   Okay.  What professional licenses
5   did Mr. Rashid hold?
6       A.   I would have to review his
7   background.
8       Q.   What document would you want to
9   review?
10      A.   His resume.
11      Q.   Do you know if Mr. Rashid is subject
12  to FINRA regulation?
13      A.   He is definitely as an investment
14  advisor.  That's my --
15      Q.   Is he a member of FINRA?
16      A.   He is a member of FINRA if he is
17  regulated, yes.  He should be regulated under
18  the SEC and FINRA.
19      Q.   He should be.  But do you know if he
20  is?
21      A.   Well, I can't confirm that without
22  seeing his resume, which I presume would show

Page 31

1   his designation.  There's also a very simple
2   way of checking by going through something
3   called BrokerCheck.  And he would have had that
4   at the point when he was employed by Goldman
5   certainly, and very likely when he was at
6   Apollo.
7       Q.   And Mr. Rashid worked for a private
8   equity company.  Is that correct?
9       A.   Apollo Management Capital?  Or was
10  it Global Management?  Is that the name of the
11  company that he worked for?
12           MR. THOMPSON:  Mr. Hoffman, answer
13  the questions as best you can.  If you need
14  something clarified, you can ask that, but
15  you're not generally supposed to be asking
16  questions yourself.
17           Why don't we read back the question.
18           (Court Reporter read back.)
19           THE WITNESS:  I don't know the
20  correct answer to that from a legal standpoint.
21  Everybody is employed by somebody.  How they're
22  defined, I'm not really sure.

Page 32

1   BY MR. FRIEDMAN:
2       Q.   Would you agree that Mr. Rashid had
3   no decisionmaking authority regarding what
4   Apollo invested in?  Apollo --
5           Sorry.  I should clarify.
6           Apollo or any of the funds at issue
7   in this litigation invested in?
8           MR. THOMPSON:  Objection as to form.
9           THE WITNESS:  I believe he was part
10  of the investment committee.  So somebody would
11  have signed off on every portfolio company in
12  which they made an investment.  So he was a
13  participating member.
14  BY MR. FRIEDMAN:
15      Q.   You reviewed Mr. Rashid's deposition
16  transcript in this matter?
17      A.   Yes.  Once.
18      Q.   Are you aware in that deposition he
19  testified that he was not a member of the
20  investment committee?
21           MR. THOMPSON:  Objection as to form.
22  If you want to show him the deposition

Page 33

1  transcript, that's fine.
2      THE WITNESS:  No.
3  BY MR. FRIEDMAN:
4      Q.    Let's go to Paragraph 49 of your
5  report.  You mention that the funds were
6  managed --
7      Sorry.  I'll give you a chance to
8  get there.
9      A.    Page 49?
10     Q.    Paragraph 49.
11     A.    Okay.
12     Q.    I'm going to give you paragraph
13  numbers.
14     A.    Okay.
15     Q.    So you say that the funds were
16  managed by a management company, except for the
17  natural resources fund which had a little
18  different structure.  Is that correct?
19     A.    Correct.
20     Q.    Was Mr. Rashid a member of the
21  management company for any of the four funds?
22     A.    I don't know.

Page 34

1      Q.    Did Mr. Rashid ever serve on any
2  Apollo committees?
3      A.    I don't know.
4      Q.    So earlier in Paragraph 49 you
5  say -- I'm reading the second sentence --
6  "Rashid and others were responsible for
7  investments in and the management of five
8  Apollo funds."
9      What is that statement based on?
10     A.    My collective reading of the
11  information provided.
12     Q.    Anything specific you can point to?
13     A.    Not necessarily.
14     Q.    Would it change your view if you
15  knew that Mr. Rashid was not a member of the
16  Apollo management committee or the Apollo
17  investment committee?
18     A.    No, it would not change my view.
19     Q.    Why is that?
20     A.    Because --
21     MR. THOMPSON:  Object as to form.
22  View as to what?

Page 35

1      MR. FRIEDMAN:  That sentence that I
2  just read:  "Rashid and others were responsible
3  for investments in and the management of five
4  Apollo funds."
5      MR. THOMPSON:  So if he knew that
6  Rashid --
7      You're asserting that Rashid was not
8  a member of those committees, and if he knew
9  that to be a fact would it change what he wrote
10  in the first sentence of Paragraph 49?
11     MR. FRIEDMAN:  The second sentence,
12  but yes.
13     MR. THOMPSON:  The second sentence.
14  Management company's responsibilities.
15     THE WITNESS:  No.  Rashid and others
16  were responsible for investments.
17     What I knew was that Rashid was
18  responsible for doing research and due
19  diligence on portfolio companies.  And I
20  believe in his deposition he described how he
21  would influence the decision at the management
22  committee or investment committee level as to

Page 36

1  whether they should or should not invest in a
2  company.  Generally if he had done the research
3  he was going to be supporting the investment.
4  So he would have been responsible for the
5  investments.  And ultimately when they were in
6  the portfolio he was responsible for
7  maintaining or managing part of that
8  investment.  Certainly the relationship.
9  BY MR. FRIEDMAN:
10     Q.    So your opinion is that he would be
11  responsible for the investment even though he
12  didn't have the authority to make the
13  investment?
14     MR. THOMPSON:  Objection as to form.
15     THE WITNESS:  He would have
16  influenced the decisionmaking process, whether
17  he had the authority to do that or not.
18  BY MR. FRIEDMAN:
19     Q.    So in your report you say that you
20  are assuming that everything in the complaint
21  is true.  Is that correct?
22     A.    Yes.  That's my only assumption I

MATTHEW T. HOFFMAN                                          May 24, 2019
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID                  37–40

Page 37

1  believe.

2       Q.    And if anything in the complaint is

3  not true, you reserve the right to change your

4  opinions.

5       A.    Correct.

6       Q.    In fact, if the complaint was not

7  true, that would impact your opinions.  Is that

8  correct?

9            MR. THOMPSON:  True or not true in

10  what respect?  I mean, true in its totality or

11  some particular paragraph or averment?  It's a

12  very broad question.

13           MR. FRIEDMAN:  Start with the

14  broadest.  And if you need specificity, we can

15  specify.

16           MR. THOMPSON:  The broadest being if

17  the complaint were totally inaccurate, would

18  that change his view?

19           MR. FRIEDMAN:  If the complaint were

20  not totally true.

21           MR. THOMPSON:  If anything in the

22  complaint were inaccurate.  So the question is

Page 38

1  not whether the complaint --

2            MR. FRIEDMAN:  Well, Mr. Hoffman, do

3  you understand the question?

4            MR. THOMPSON:  -- is totally

5  inaccurate.

6            Let me finish.  Don't interrupt,

7  Dan.

8            Your question is whether any

9  averment in the complaint -- which I believe is

10  over 20 pages long -- if any averment were

11  inaccurate, would that change his opinion on

12  something which you haven't identified?

13           MR. FRIEDMAN:  Let's start there.

14           THE WITNESS:  Probably not.  Based

15  on what I've read and researched on my own, my

16  feeling is still consistent with my report.

17  BY MR. FRIEDMAN:

18       Q.   If it turned out that it was not

19  true as the complaint alleges that Mr. Rashid

20  improperly billed personal expenses, would that

21  change your opinions?

22       A.   Can you repeat that, please.

Page 39

1       Q.   If it turns out that it is not true,

2  as the complaint alleges, that Mr. Rashid

3  improperly billed personal expenses, would that

4  change your opinions?

5            MR. THOMPSON:  I'm going to object

6  because you're not referring to any particular

7  paragraph of the complaint.  You're basically

8  asking if the SEC's position in this case were

9  not correct, would that change Mr. Hoffman's

10  opinion.  So I'm going to object to the breadth

11  of that question.  It's not really a

12  comprehensible question.

13           THE WITNESS:  I'm not sure I

14  understand how to answer that.  I would have to

15  see the evidence that would help prove or prove

16  that he did not submit personal expenses and

17  have them allocated as business expenses and

18  then subsequently attributed to the funds.  And

19  that doesn't follow what I've seen thus far.

20  BY MR. FRIEDMAN:

21       Q.   What have you seen that doesn't

22  follow?

Page 40

1       A.   I've seen all of the documents that

2  have been presented to me.

3       Q.   But you're not assuming any of that

4  evidence is true.  Is that correct?

5       A.   The evidence that I've been

6  presented with is what I've looked at.

7       Q.   Right.

8       A.   Period.

9       Q.   But the only thing you're assuming

10  is true is the complaint?

11       A.   Correct.

12       Q.   Does the dollar amount of Mr.

13  Rashid's alleged misappropriations matter to

14  your opinions at all?

15       A.   The quantity?

16       Q.   Yes.

17       A.   The quantity of the amount?

18           No, not necessarily.

19       Q.   So if Mr. Rashid --

20           It's ultimately determined that Mr.

21  Rashid improperly billed $3,000 of expenses

22  instead of $300,000 of expenses, your opinions

Page 41

1   would be exactly the same?
2       A.    My opinion would be the same if it
3   was $1.  As an investor and as a fiduciary, if
4   I'm going to do something wrong and my
5   investors ultimately wind up paying for it,
6   that is not something that I would approve of.
7       Q.    I'd like you to look at Paragraph 71
8   of your report.  The last sentence states:
9   "Rashid's total repayment amounts to Apollo
10  equaled a very large sum of money, an amount in
11  excess of $300,000."
12      A.    Yes.
13      Q.    When you wrote "a very large sum of
14  money", what were you thinking it in comparison
15  to?
16      A.    In comparison to what you would use
17  to buy a car, what you would use to put a down
18  payment on for a house.  $300,000 is a
19  significant amount of money to anybody, unless
20  you're an uber billionaire.
21      Q.    Well, is it a large --
22            -- a very large sum of money

Page 42

1   relative to Apollo's assets under management?
2       A.    I am not in a position to make a
3   quantitative assessment in that regard.
4       Q.    So I'm trying to get what
5   quantitative assessment you were making when
6   you determined it was a very large sum of
7   money.
8             MR. THOMPSON:  Objection as to form.
9   The sentence on its face doesn't compare
10  $300,000 to anything, so you're assuming that
11  there was such comparison and that there was
12  some assessment made.
13            MR. FRIEDMAN:  Mr. Thompson, you can
14  object to form.
15            MR. THOMPSON:  And I'm doing that.
16            MR. FRIEDMAN:  Yeah.  The speaking
17  objections are not allowed.
18            MR. THOMPSON:  Look, I will make the
19  objections that I deem appropriate.  If you
20  want to ask clearer questions, that's fine.
21  But if you're going to assume facts in your
22  questions, I'm entitled to make an objection on

Page 43

1   that basis, and that's what I'm doing.
2   BY MR. FRIEDMAN:
3       Q.    Mr. Hoffman, would you agree that
4   something cannot be large in isolation?
5       A.    Something cannot be large in
6   isolation?
7             MR. THOMPSON:  Objection as to form.
8             THE WITNESS:  I'm not sure I
9   understand what you mean.
10  BY MR. FRIEDMAN:
11      Q.    In order for something to be large,
12  there must be something else to compare it to.
13  Is that correct?
14      A.    Oh, I see what you're saying.
15            Yes, I can understand that theory.
16  Yes.
17      Q.    So when you compare the amount of
18  Rashid's total repayments to the amounts of
19  Apollo's assets under management, would you
20  still consider it a very large sum of money?
21      A.    Absolutely.
22      Q.    Why is that?

Page 44

1       A.    Because as an investor, if I'm a
2   pensioner for example, and I'm counting my
3   pennies, and my pension fund invests in Apollo,
4   and I find out that Apollo's senior partners --
5   or partner -- is processing personal expenses
6   equal to or greater than $300,000 against the
7   investment that I've made, $300,000 to a
8   pensioner is a lot of money.  So it is a large
9   number.
10      Q.    Is it a large number relative to
11  Apollo's assets under management?
12            MR. THOMPSON:  Asked and answered.
13            THE WITNESS:  No, it is large.  It
14  is still large.
15  BY MR. FRIEDMAN:
16      Q.    Is it a large number relative to the
17  fees Apollo received from its funds?
18      A.    It is still a large number.
19      Q.    Is it a large number relative to the
20  fees Apollo received from its funds?
21      A.    Yes, it is.  It's still a large
22  number.

Page 45

1       Q.   Is it a large number relative to the
2   fees Apollo received from its funds?
3           MR. THOMPSON:  Objection.  Asked and
4   answered.
5           THE WITNESS:  Yes.
6   BY MR. FRIEDMAN:
7       Q.   Why is that?
8       A.   Because $300,000 or more is still a
9   significant number.
10      Q.   I'd like to show you the complaint.
11  We'll mark this as Hoffman 2.
12          (Exhibit 2 marked for
13  identification.)
14          Now I'm going to start by referring
15  to Paragraphs 66 to 70 of this complaint.
16          MR. THOMPSON:  Sorry.  You said 66
17  to 70?
18          MR. FRIEDMAN:  Yes.
19          MR. THOMPSON:  So you want him to
20  read Paragraphs 66 through 70.
21          (Witness reviewed document.)
22          THE WITNESS:  Okay.

Page 46

1   BY MR. FRIEDMAN:
2       Q.   And for your report did you assume
3   everything in those paragraphs was true?
4       A.   Yes.  But I believe I don't
5   reference that specific segment of this report.
6       Q.   Did you know that the SEC never
7   tried to interview any of the Zegna personnel
8   as part of its investigation?
9       A.   What I know is that the list of
10  recipients for these gifts was interviewed, and
11  they never received the gifts.
12      Q.   Did you know that the SEC never
13  tried to interview any of the Zegna personnel
14  as part of its investigation?
15      A.   No.
16      Q.   Did you know that because the SEC
17  didn't interview any of the Zegna personnel,
18  the SEC did not know how to properly frame its
19  request for documents from Zegna?
20          MR. THOMPSON:  Objection as to form.
21  Assumes facts not in evidence and is incorrect.
22  BY MR. FRIEDMAN:

Page 47

1       Q.   Did you know that?
2       A.   No, I did not know that.
3           But it doesn't really --
4           It doesn't go to the meat of the --
5           MR. THOMPSON:  You've answered the
6   question.
7   BY MR. FRIEDMAN:
8       Q.   Did you know that the SEC never got
9   copies of the Zegna receipts as part of its
10  investigation?
11      A.   No, I did not.
12      Q.   Did you know that the SEC in
13  drafting the complaint substantially relied on
14  the work of Paul Weiss?
15          MR. THOMPSON:  Objection as to form.
16          THE WITNESS:  I have no idea what
17  they relied on.  The SEC.
18  BY MR. FRIEDMAN:
19      Q.   Are you familiar with Paul Weiss'
20  role in this litigation and investigation?
21      A.   To some extent, yes, but I did not
22  have to review any of their materials, per se.

Page 48

1       Q.   Did you know that Mr. Rashid's
2   father, Haroon Rashid, testified in this matter
3   that his son never bought him a suit?
4       A.   No, I did not know that.
5       Q.   Did you know that Mr. Rashid's
6   sister, Erem Rashid, testified to the same
7   thing?
8       A.   That she did not get clothing?
9       Q.   That Mr. Rashid never bought his
10  father a suit?
11      A.   No, I didn't know that.
12      Q.   You do know that Mr. Rashid denies
13  ever having bought his father a suit from
14  Zegna.  Is that correct?
15      A.   I don't recall that specifically.
16      Q.   Would any of that change your
17  opinion on the veracity of the complaint?
18      A.   No.
19      Q.   Why not?
20      A.   I wasn't asked to look at any of
21  those specific details.  I was asked to look at
22  whether the standard of care that he

Page 49

1    implemented was consistent with market
2    standards.  And I don't believe that I was
3    asked to review specific expenses, generally
4    speaking.
5        Q.    Well, I'm not suggesting that you
6    were asked to review specific expenses.  I'm
7    asking you when you say that if the complaint
8    was not true, that you would reserve the right
9    to change your opinion.
10       A.    Yes.  But this part of it I would
11   not have been asked to opine on.
12       Q.    So did you know that the Zegna
13   employee that Mr. Rashid dealt with, Joel
14   Lehnhoff, testified that Mr. Rashid put money
15   on his account to purchase ties?
16       A.    I did not know that.
17       Q.    Did you know that the Zegna
18   corporate representative in this matter
19   testified that it was a common practice among
20   Zegna customers?
21            MR. THOMPSON:  Objection as to form.
22            THE WITNESS:  No.

Page 50

1    BY MR. FRIEDMAN:
2        Q.    Did you know that Mr. Lehnhoff's
3    testimony does not support the SEC's allegation
4    that Mr. Rashid asked him to create a fake
5    receipt?
6            MR. THOMPSON:  Objection as to form.
7            THE WITNESS:  No.
8    BY MR. FRIEDMAN:
9        Q.    Would any of those facts from
10   independent witnesses change your opinions?
11       A.    No.
12       Q.    Let's go to Paragraph 64 of the
13   complaint.  And it lists a number of what it
14   calls "vacations", but I'm going to be
15   referring to No. 4, a trip to the St. Regis Bal
16   Harbour Resort in Florida over Thanksgiving
17   2012.
18       A.    Okay.
19       Q.    Now you read Mr. Rashid's deposition
20   in this matter.  Is that correct?
21       A.    Once.
22       Q.    Do you know in that deposition he

Page 51

1    asserted that he went to Florida to spend time
2    with the CEO of a portfolio company that was
3    about to be sold?
4        A.    I probably skimmed that area.
5        Q.    Do you recognize the name Lourenco
6    Goncalves?
7        A.    Yes, I do.
8        Q.    And he was the CEO of the portfolio
9    company?
10       A.    Of a portfolio company.  That's
11   correct.
12       Q.    Did you know that the proxy
13   statement filed with the SEC regarding the sale
14   of that portfolio company details the meetings
15   between Mr. Rashid and Mr. Goncalves?
16       A.    No, I did not know that.
17       Q.    Would that matter to your view of
18   the complaint?
19       A.    I would like to see what it says.
20       Q.    Did you know that --
21            So I mentioned Paul Weiss before.
22   What is your understanding of Paul Weiss' role

Page 52

1    in this investigation?
2        A.    They --
3        Q.    The SEC's investigation.
4            MR. THOMPSON:  Objection as to form.
5            THE WITNESS:  Let me think.
6            Paul Weiss was responsible for
7    pulling together --
8            I believe they were responsible for
9    pulling together the list of questionable
10   expenses, possibly, that would be relevant to
11   this case, and summarizing that in a way that
12   would make it comprehensible for someone to
13   then do some kind of audit on.  That's
14   basically my understanding.  I didn't review
15   that document.
16   BY MR. FRIEDMAN:
17       Q.    Do you know who that someone was who
18   did that audit that you referenced?
19       A.    BDO?  You're talking about BDO?
20       Q.    Yes.
21       A.    Yes.  Okay.  I'm familiar with BDO.
22   I'm not familiar with Paul Weiss.

MATTHEW T. HOFFMAN                                          May 24, 2019
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID              53–56

Page 53

1    Q.   Oh, okay.  So sticking with BDO, do
2    you know that BDO designated some of Mr.
3    Rashid's expenses relating to this Thanksgiving
4    trip to Florida as partial business expenses?
5    A.   No, I did not know that.
6    Q.   Would that change your opinion of
7    the complaint?
8    A.   No.
9    Q.   Now in Exhibit B to your report you
10   reference a lot of declarations.
11   A.   Correct.
12   Q.   And is it all right if I
13   collectively refer to them as "the
14   declarations"?
15   A.   Absolutely.
16   Q.   Did you assume that the declarations
17   were true?
18   A.   Yes.
19   Q.   You did assume that they were true?
20   A.   I believe that they're sworn
21   statements.  So if they are sworn statements,
22   they should be true.

Page 54

1    Q.   And Mr. Rashid's deposition was
2    under oath as well.  Is that correct?
3    A.   I believe so.
4    Q.   Did you assume Mr. Rashid's
5    deposition was true?
6    A.   No.
7    Q.   What distinction are you making
8    between the declarations and the deposition?
9    A.   Based on the evidence, I --
10   One of them is false.  And based on
11   the evidence that I've seen, it seems that one
12   of them is false and it's not those 30
13   individuals who have sworn that their
14   statements are true.
15   Q.   So would it be fair to say that you
16   weren't assuming the declarations weren't true,
17   but after your review of the evidence you
18   determined they were true?
19   A.   When you find two positions, each of
20   which is assumed to be true, but you know one
21   is false, you have to make a judgment call.
22   And based on my experience as an investment

Page 55

1    professional, my judgment call is that the 30
2    individuals who have sworn collectively, the
3    validity of their statements is true, and the
4    sworn statement that Rashid has made is false.
5    That's my belief.
6    Q.   Would it matter to your opinions if
7    the declarations were not true?
8         MR. THOMPSON:  In their totality?
9         MR. FRIEDMAN:  In any respect.
10        THE WITNESS:  I find it very
11   difficult to believe that of the hundreds of
12   comments that were made and sworn to by these
13   30 individuals, that they are false.  I find it
14   very difficult to believe that that's the case.
15   It's highly improbable.
16   BY MR. FRIEDMAN:
17   Q.   Understanding that you believe it's
18   highly improbable, would it matter to you if
19   they were false?
20        MR. THOMPSON:  Again, false in any
21   particular respect?  If any statement in any
22   declaration were false?  If any one

Page 56

1    statement --
2         You're not --
3         You're saying that that is what
4    you're asking, right.
5    BY MR. FRIEDMAN:
6    Q.   Do you understand the question as it
7    is?
8    A.   Not really.  Why don't you rephrase
9    it.
10   Q.   Understanding you believe it's
11   unlikely that the declarations are not true,
12   would it matter to you if in any respect the
13   declarations were not true?
14   A.   There would have to be a lot of
15   collusion going on for all of them to be
16   untrue, and I find that, again, to be highly
17   unlikely.  Highly improbable.
18   Q.   So after Mr. Thompson's
19   clarification, I'm trying to stay away from
20   whether they are all untrue.  Would it matter
21   to you if any of them were not true?
22   A.   It depends on how material the

MATTHEW T. HOFFMAN                                May 24, 2019
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID        57–60

Page 57

1  misstatement might have been.  If it was an
2  error of some sort it would not have any impact
3  on my decision.
4      Q.    So it's significant to you whether a
5  declaration was not true because of an error or
6  because someone was lying.  Is that correct?
7      A.    If 30 people have colluded and
8  declared statements that you can prove are
9  untrue, then I will amend my document.
10  However, I find it highly unlikely -- and
11  doesn't make sense -- that 30 individuals would
12  swear that their statements are inconsistent
13  with the evidence that I've seen.
14      Q.    So I'm going to show you one of the
15  declarations.  This is the declaration of Mr.
16  Goncalves?
17      A.    Uh-huh.
18          (Exhibit 3 marked for
19  identification.)
20      Q.    And you can refer either to the
21  declaration or to Exhibit C of your report
22  where you excerpt some of the declarations.

Page 58

1          Paragraph 21 of his declaration.
2          MR. THOMPSON:  Do you have another
3  copy?
4          THE WITNESS:  Oh, here.  Sorry.
5          His Paragraph 21?
6          MR. FRIEDMAN:  Correct.
7          THE WITNESS:  Uh-huh.  Yes.
8  BY MR. FRIEDMAN:
9      Q.    "I have never received ties, shirts,
10  electronics, gift cards, or any other gifts
11  from Rashid."
12      A.    Okay.
13      Q.    Would it matter to you if that
14  statement was not true?
15      A.    Not necessarily.
16      Q.    And why not?
17      A.    In total, given all of the
18  statements, I can't ignore the fact that there
19  are 30 sworn statements, with multiple
20  statements in each, saying that they did not
21  receive, did not meet with, did not have
22  meetings with, did not have restaurant meals

Page 59

1  with Rashid.  If they're declaring this
2  multiple times over and over, one statement in
3  one sworn --
4          -- one sentence in one sworn
5  statement, if incorrect, would not change my
6  opinion.
7      Q.    Okay.  I'd like to show you what
8  we're going to mark as Hoffman Exhibit 4.
9          (Exhibit 4 marked for
10  identification.)
11          And let me know when you've had a
12  chance to look at the document.
13      A.    I see it.
14      Q.    Okay.  And can you read the note at
15  the bottom of the document.
16      A.    "Lourenco and Rosangela, Thank you
17  so much for your hospitality.  We had a great
18  trip to Brazil and Cabo Frio was definitely one
19  of the highlights.  Feliz Ano Nuevo.  Love
20  Farah and Ali."
21      Q.    All right.  And right above that
22  under Order Items it looks like a 2007

Page 60

1  Alexander valley Cabernet and a Silver Oak Pour
2  Stopper.
3      A.    Yes.
4      Q.    Does this look like Mr. Rashid was
5  buying a gift for Mr. Goncalves?
6      A.    It does since it was shipped to him.
7      Q.    Would you agree with me that the
8  statement that Mr. Goncalves' declaration where
9  he says he never received a gift from Mr.
10  Rashid is false?
11      A.    I do not know if he received this
12  gift.
13      Q.    Why not?
14      A.    Do we have anything stating that he
15  received this gift?
16          I don't know.  I don't see anything
17  that says that he received this.
18      Q.    Well, after looking at this receipt
19  would you assume that Mr. Rashid bought a gift
20  for Mr. Goncalves?
21      A.    It looks that way.
22      Q.    I'll introduce Hoffman Exhibit No.

MATTHEW T. HOFFMAN
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID

May 24, 2019
61–64

Page 61

1   5.
2        Now you mentioned you are familiar
3   with the work that BDO did in this matter.  Is
4   that correct?
5        A.   No, I'm not familiar with it.
6        Q.   The general work that they did.
7        A.   Yes.  I did glance at this, but I --
8        Q.   Let's give the Court Reporter a
9   second.
10        MR. THOMPSON:  Mr. Friedman, this
11   doesn't have a Bates number.  Are you
12   representing it was produced in discovery?
13        MR. FRIEDMAN:  This is a Court
14   filing.
15        MR. THOMPSON:  I'm sorry?
16        MR. FRIEDMAN:  This is a Court
17   filing.  It has an ECS ledger at the top.
18        MR. THOMPSON:  Are you representing
19   it's a complete document?  Or --
20        MR. FRIEDMAN:  No.  But once the
21   Court Reporter is ready, we'll discuss that.
22

Page 62

1        (Exhibit 5 marked for
2   identification.)
3        THE WITNESS:  Thank you.
4        Okay.
5   BY MR. FRIEDMAN:
6        Q.   So Mr. Hoffman, as Mr. Thompson was
7   saying, I am not representing that this is a
8   complete document.  As you can see the page
9   numbers at the top, this is only a selection of
10   pages.  I didn't want to kill trees
11   unnecessarily.  But if you need more
12   information or the rest of the document, we can
13   get that for you.
14        So this is a document that the SEC
15   represented to the Court was the BDO
16   spreadsheet that was the work product they did
17   in their review of Mr. Rashid's expenses.
18        A.   This document?
19        Q.   Yes.
20        A.   Okay.
21        Q.   And I'm giving you Page 1 just so
22   that you can see the column headings.

Page 63

1        A.   Right.
2        Q.   They don't repeat on each page.
3        But what I'd like you to look at is
4   Page 82 of the document.
5        A.   How would I know which page?
6        Q.   It's at the top of the page.
7        A.   Okay.
8        Q.   Okay.  And in the far left column,
9   No. 1490.  Do you see that entry?
10        A.   I do.
11        Q.   And if you go over four columns to
12   the right, it says:  "Gift for Lourenco
13   Goncalves for ascometals."
14        A.   Right.
15        MR. THOMPSON:  Sorry.  What entry
16   are you on, Dan?
17        THE WITNESS:  1490.
18        That's strange.
19        MR. THOMPSON:  Yeah.  I'm not
20   actually seeing a 1490 on my page.
21        THE WITNESS:  There it is right
22   there (indicating).

Page 64

1        MR. FRIEDMAN:  So the numbers in the
2   first column are not in order.  If you want to
3   go by the numbers in the second column, which
4   are in order, it's 1618.
5        MR. THOMPSON:  All right.  Thank
6   you.
7   BY MR. FRIEDMAN:
8        Q.   And a few more columns over to the
9   right you see a column where it says that this
10   was a business expense?
11        A.   Yes, I see that.
12        Q.   So would you agree with me that even
13   BDO considered this to be a business expense?
14        MR. THOMPSON:  Objection as to form.
15        MR. FRIEDMAN:  If you need to refer
16   to the first page for the column headings,
17   please do so.
18        MR. THOMPSON:  Same objection.
19        There's no foundation here that that
20   represents BDO's determination.
21        THE WITNESS:  I have never looked at
22   this, so I have no idea.

MATTHEW T. HOFFMAN

SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID

May 24, 2019

65–68

Page 65

1    BY MR. FRIEDMAN:

2        Q.    Okay.  But you see business in the

3    column to the right on that row.  Is that

4    correct?

5        A.    I do see that word.  Yes.

6        Q.    Okay.  So seeing the FedEx shipping

7    instructions --

8        A.    Uh-huh.

9        Q.    -- and this spreadsheet that the SEC

10   referred to as the BDO spreadsheet, does that

11   make you question the accuracy of Mr.

12   Goncalves' declaration?

13       A.    No.  Absolutely not.

14       Q.    Why is that?

15       A.    In total I don't believe that he's

16   misstating.  Possibly this one gift, possibly.

17   We can't prove that he received it.  He

18   certainly didn't remember it, if that's what

19   he's sworn to.  So I would say it does not

20   change my opinion.

21       Q.    Well, going back to the

22   declaration --

Page 66

1            Give you a second to get there and

2    back to Paragraph 21.

3            -- he doesn't qualify his statement

4    that he doesn't recall receiving gifts.  Is

5    that correct?

6        A.    That's correct.

7        Q.    Did you see that qualification in

8    other declarations that you reviewed?

9        A.    Not that I remember.

10       Q.    Would that matter to you?

11       A.    No, it wouldn't matter.

12       Q.    Why is that?

13       A.    Because in total, all of these

14   statements, hundreds of statements about

15   hundreds of expenses, cannot all be false.  I

16   just can't imagine that Chief Investment

17   Officers, Chief Operating Officers, Presidents,

18   CEOs, Chief Financial Officers are going to

19   perjure themselves or tell lies in sworn

20   statements.  Clearly if this was a gift, if

21   there is any validity to his receipt of this as

22   a gift, and it was documented in two places

Page 67

1    there is a FedEx charge, if he says he did not

2    receive any other gifts, he may be mistaken,

3    but it doesn't change my opinion.

4        Q.    Okay.  Going back to your report,

5    I'd like you to take a look at Paragraph 67.

6    The end of the second sentence in that

7    paragraph says:  "Saturdays, Sundays and

8    holidays tend not to be workdays for most."

9            Is that correct?

10       A.    Correct.

11       Q.    What is that based on?

12       A.    The simple fact that most people,

13   the vast majority of people in the United

14   States do not work on Saturdays, Sundays and

15   holidays.

16       Q.    Is that also true of most employees

17   at Apollo?

18       A.    I don't know of that for a fact.

19       Q.    Would it matter to you if most

20   Apollo employees worked on Saturdays, Sundays

21   and holidays?

22       A.    Would it matter to me in what

Page 68

1    respect?

2        Q.    Your opinions in your report.

3        A.    No.

4        Q.    Why is that?

5        A.    Because the evidence still shows

6    that the allocation of personal expenses as if

7    they were business expenses is --

8            Based on the information that I've

9    gotten, it doesn't matter whether they worked

10   on Saturdays, Sundays or holidays or not.  My

11   opinion is still going to remain the same.

12       Q.    Now if you look at the whole

13   sentence, and I'll read it for the record:

14   "Though possible, the multiple expenses that

15   were incurred seem unlikely to have all been

16   for business-related activities since

17   Saturdays, Sundays and holidays tend to not be

18   workdays for most."

19           Would it matter for your opinion in

20   that sentence that the expenses incurred seem

21   unlikely to have all been for business-related

22   activities?

Page 69

1      MR. THOMPSON:  Objection as to form.
2  I don't understand that.
3      THE WITNESS:  I don't understand
4  that either.
5  BY MR. FRIEDMAN:
6    Q.    Would it matter to you if Apollo
7  employees tended to work on Saturdays, Sundays
8  and holidays for your opinion that the expenses
9  incurred seem unlikely to have all been for
10  business-related activities?
11      MR. THOMPSON:  Objection.  Asked and
12  answered.
13      THE WITNESS:  What I have not done,
14  I have not analyzed which expenses were
15  attributable to which days.  All I can say is
16  that there were a surprising number of expenses
17  on Saturdays, Sundays and holidays that I would
18  not have expected.  That's --
19      I think that's what I'm trying to
20  say.
21  BY MR. FRIEDMAN:
22    Q.    And it was surprising to you because

Page 70

1  you were thinking about the American work force
2  as a whole?
3    A.    Correct.
4    Q.    Not Apollo employees specifically?
5    A.    Correct.
6    Q.    Okay.  So one of the opinions in
7  your report -- and let me know if you disagree
8  with this -- is that someone in Mr. Rashid's
9  position should reasonably expect that his
10  expenses would be billed to funds or portfolio
11  companies.  Is that correct?
12      MR. THOMPSON:  Objection as to form.
13      THE WITNESS:  Would you please
14  repeat that, Dan.
15  BY MR. FRIEDMAN:
16    Q.    One of the opinions in your report
17  is that someone in Mr. Rashid's position should
18  reasonably expect that his expenses would be
19  billed to funds or portfolio companies.  Is
20  that correct?
21    A.    That's correct.  Yes.
22    Q.    Would you expect that someone in Mr.

Page 71

1  Rashid's position would expect that gifts that
2  he buys -- such as ties, gift cards, Apollo
3  prod --
4      Sorry.
5      -- Apple products would also be
6  billed to funds or portfolio companies?
7    A.    Would I expect those to be billed to
8  portfolio companies?
9    Q.    Or funds.
10    A.    Or funds.
11      I wouldn't expect any employee to be
12  buying personal products and expensing them to
13  the funds or portfolio companies.  But what
14  you're implying, I think, is that these
15  products were bought as gifts for the
16  executives of the portfolio companies and
17  presumably given to them, correct?
18    Q.    Yes.
19    A.    And therefore, those should have
20  been attributable as business expenses to the
21  funds or the portfolio companies.
22    Q.    Well, that's my question to you.

Page 72

1    A.    Right.
2    Q.    If Mr. Rashid buys a gift for a
3  portfolio company executive, such as a bottle
4  of wine for Mr. Goncalves --
5    A.    And it's within compliance.
6    Q.    -- would you --
7      -- would someone in Mr. Rashid's
8  position expect that that gift would be billed
9  to the portfolio company or to Apollo?
10    A.    Specifically with regard to gifts, I
11  don't know the answer to that because sometimes
12  the management company will pick up those
13  expenses.  Or depending on how it's documented
14  in the offering memo for each fund, they may be
15  able to take on those expenses.  But I would
16  think it would be born by the management
17  company.  I'm just trying to think logically
18  here, Dan.
19    Q.    And do you know if in practice that
20  happened?
21    A.    No, I don't know.
22    Q.    Going back to the Exhibit 5, the BDO

Page 73

1  spreadsheet, and back to that bottle of wine
2  for Mr. Goncalves that we were discussing.
3      A.   Yes.
4      Q.   Now, do you see the entry in the
5  column all the way to the right for that
6  expense?
7      A.   Yes.
8      Q.   And can you read it, please.
9      A.   "Project was allocated from
10 Ascometal SA to management company."
11     Q.   So it would have been your
12 expectation --
13          Would it have been your expectation
14 that that expense would have been billed to the
15 management company in the first instance?
16     A.   Again, I don't know the policy with
17 regard to gifts.  I'd have to look at the
18 offering memo and what the gift policy was.  So
19 I can't be 100 percent sure, but it appears
20 that that would have been allocated out of the
21 fund to the management company based on this.
22 That's what it looks like, but I can't be sure.

Page 74

1      Q.   Okay.  And you mentioned the
2  offering memo and the policy.  Are you
3  referring to the T&E policy?
4      A.   The T&E policy and the employee
5  manual with regard to whatever the allocation
6  process would be.
7      Q.   Okay.  And in order to determine
8  where the gift should be allocated, whether to
9  the management company or to the portfolio
10 company, would you need to look at the T&E
11 policy?  The offering memo?  Or both?
12     A.   Both.
13     Q.   And you did review both as part of
14 your expert report.  Is that correct?
15     A.   Yes.  But it is very specific to
16 gifts, and this I don't remember.  Because some
17 of those expenses can be allocated to the fund,
18 some of them may not be allocated to the fund.
19 I really don't know how they split it.
20     Q.   Do you recall seeing anything about
21 that in the T&E policy itself?  Setting aside
22 the offering memo for the moment.

Page 75

1      A.   Specifically with regard to gifts, I
2  don't remember that.
3      Q.   So you are aware that Mr. Rashid has
4  asserted that he did not provide descriptions
5  of his expenses and did not routinely review
6  his expense reports before they were submitted.
7  Is that correct?
8      A.   I understand that.  Yes.
9      Q.   Okay.  I'd like you to take a look
10 at Paragraph 61 of your report.
11          MR. THOMPSON:  Dan, it's been about
12 an hour and 20 minutes.  When you get to a
13 convenient stopping point we should probably
14 take a quick break.
15          MR. FRIEDMAN:  Let's do it now.
16          MR. THOMPSON:  Okay.
17          (Recess taken at 10:39 a.m.)
18          (Deposition resumed at 10:53 a.m.)
19 BY MR. FRIEDMAN:
20     Q.   So, Mr. Hoffman, if you can go to
21 Paragraph 61 of your report.
22     A.   Yep.

Page 76

1      Q.   And I'd like you to look at the last
2  clause in the paragraph.  "It would seem
3  unlikely that Rashid's assistants would know
4  how to accurately attribute hundreds of expense
5  items without guidance from Rashid."
6          Did I read that correctly?
7      A.   Yes.
8      Q.   So would you agree with the
9  corollary to that, that it would seem likely
10 that Rashid's assistants would inaccurately
11 attribute hundreds of expense items without
12 guidance from Mr. Rashid?
13          MR. THOMPSON:  Objection as to form.
14 I'm not sure about the characterization of the
15 corollary.
16          But you can answer the question if
17 you understand it.
18          THE WITNESS:  I understand what I
19 wrote.  And the corollary is the absolute
20 opposite of this, correct?
21          MR. FRIEDMAN:  Yes.
22          MR. THOMPSON:  Well, a corollary

Page 77

1   isn't an opposite.  But --
2        MR. FRIEDMAN:  Let's not focus on --
3        MR. THOMPSON:  -- it's semantics
4   now.
5        MR. FRIEDMAN:  -- corollary.
6        MR. THOMPSON:  Maybe you should ask
7   the question again --
8        MR. FRIEDMAN:  Sure.
9        MR. THOMPSON:  -- because I'm
10  confused.
11  BY MR. FRIEDMAN:
12       Q.   If Mr. Rashid was not providing
13  guidance to his assistants, would you think
14  it's likely that Rashid's assistants would not
15  know how to accurately attribute hundreds of
16  expense items?
17       A.   They would not know how to attribute
18  them.  That is correct.  They would seek
19  guidance from Rashid.
20       Q.   And it is Mr. Rashid's position --
21  or he asserted as you state in the beginning of
22  that paragraph, second sentence, if you'd like

Page 78

1   to refer to it -- that he was not providing
2   guidance to his assistants.  Is that correct?
3        A.   It says he did not provide the
4   descriptions of the expenses, and he never
5   reviewed his expense reports.  That's what he
6   said.  Correct.
7        Q.   So if Mr. Rashid's assertion is
8   correct, you would expect there to be a lot of
9   errors in his expense reports?
10       A.   I wouldn't assume that that
11  statement is correct.  That his statement would
12  be correct.  I can't imagine how all of his
13  expenses can be attributed without his
14  assistance.  That I can't comprehend.
15       Q.   Well, you can't imagine how his
16  expenses would be accurately attributed without
17  his assistance.  Is that correct?
18       A.   No.  I can't imagine that the
19  assistants would know exactly what he's doing
20  at all points in time and with whom he's doing
21  those activities and where he's met them.  I
22  can't imagine that the assistants would know

Page 79

1   that.
2        Q.   Right.  So if they did not know
3   that --
4        A.   They wouldn't fill it out
5   incorrectly, they would ask his assistance.
6        Q.   Did you --
7             Is that based on speaking to 20 of
8   the assistants?
9        A.   That's logic.
10       Q.   Have you seen any statements from
11  assistants?
12       A.   No, I have not.
13       Q.   Now, even if one of Mr. Rashid's
14  expenses had a proper business purpose, if Mr.
15  Rashid was not providing guidance to his
16  assistants it might be submitted with an
17  inaccurate description.  Is that correct?
18       A.   It would not be submitted.
19       Q.   So it's your testimony that there is
20  no way Mr. Rashid's expenses were submitted
21  without Mr. Rashid's guidance?
22       A.   Correct.  I can't imagine how that

Page 80

1   would happen without his guidance.
2        Q.   Do you know how many assistants Mr.
3   Rashid had during the relevant period?
4        A.   No, I do not.
5        Q.   Did you ask or investigate that?
6        A.   No, I did not.
7        Q.   Let's go back to Exhibit 5, the BDO
8   spreadsheet, and back to the entry about the
9   bottle of wine.  And if you just want to refer
10  to the first page for the column headings, the
11  fifth column says "Long Descr".  Would you
12  understand that to mean long description?
13       A.   Yes, I would --
14       Q.   Okay.
15       A.   -- presume so.
16       Q.   Going to the entry in that column
17  for the bottle of wine, it says:  Gift for
18  Lourenco Goncalves for Ascometals.  Is that
19  correct?
20       A.   Yes.
21       Q.   Now, Mr. Goncalves did not work for
22  Ascometals.  Is that correct?

Page 81

1    A.   I don't know.
2    Q.   Well, if you'd like to pick up his
3  declaration and take a look at the third
4  paragraph.
5    A.   Yes.
6    Q.   It begins:  "From 2003 until in or
7  about April 2013, I was the President and Chief
8  Executive Officer of Metals USA".
9         Do you know if Metals USA and
10  Ascometals are the same company?
11    A.   I do not.
12    Q.   I guess you don't know if they're
13  different companies either then?
14    A.   Correct.
15    Q.   Would you expect Mr. Rashid, if he
16  was providing guidance, to make a mistake about
17  what company Mr. Goncalves works for?
18    A.   Say that again.
19    Q.   Would you expect Mr. Rashid, if he
20  was providing guidance regarding his expenses,
21  to make a mistake about which company Mr.
22  Goncalves works for?

Page 82

1    A.   That I could not answer.  He may not
2  know the exact name of the company that he was
3  working for.
4    Q.   Do you know if Mr. Rashid served on
5  the Board of Metals USA?
6    A.   I do not know that.
7    Q.   Okay.  Turning to Paragraph 45 in
8  your report.  And starting at the beginning,
9  you refer to the January 2009 T&E guideline.
10  Is that correct?
11    A.   Yes.
12    Q.   And the third sentence of the
13  paragraph states:  "The expense reporting
14  guidance section states all employees are
15  required to document and substantiate the
16  following information on their respective
17  employee expense report:  Amount of the
18  expense, date and place incurred, names and
19  titles of others attending, business purpose of
20  the expense.'"
21         Is that correct?
22    A.   Yes.

Page 83

1    Q.   Was that enforced in practice at
2  Apollo?
3    A.   I don't know the exact answer, but I
4  presume so.
5    Q.   If you take a look back at
6  Exhibit 5, and I'd like you to refer to the
7  long description column for Entry No. 345 on
8  Page 13, and Entry No. 363 on Page 14, then 365
9  and 366 on Page 14.
10    A.   I see them.
11    Q.   Okay.  And just one more.  387 on
12  Page 15.
13         So again, in practice does it look
14  like Mr. Rashid needed to submit the names and
15  titles of others attending when he submitted
16  his expenses?
17    A.   Does it appear that he did so?  Is
18  that what you're asking?
19    Q.   Does it appear that he was required
20  to do so in practice -- not what it says in the
21  policy, but what was actually done at Apollo --
22  when he submitted his expenses?

Page 84

1    A.   This form that you've presented is
2  not what was submitted, correct?
3    Q.   Well, I'll represent to you that the
4  columns on the left portion, if you're looking
5  at the first page --
6    A.   Right.
7    Q.   -- the columns before the first
8  break except for the numbered columns, but
9  everything between Trans Date and Distribution
10  Tran Amount --
11    A.   Yes.
12    Q.   -- those columns were part of the
13  expense report that he or his assistant
14  submitted.
15    A.   Okay.
16    MR. THOMPSON:  Just so I'm clear,
17  the representation is that everything but the
18  Trans Date column and the Distribution Amount
19  column, all those columns in between are based
20  on information contained in the original
21  expense reports?
22    MR. FRIEDMAN:  Yes.

MATTHEW T. HOFFMAN                                          May 24, 2019
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID              85—88

Page 85

1        MR. THOMPSON:  Okay.
2        THE WITNESS:  Verbatim?
3        MR. FRIEDMAN:  Yes.
4        THE WITNESS:  Are you assuming?  Or
5    is that true?
6        MR. FRIEDMAN:  It's a
7    representation.  So I'm asking you to assume
8    that.
9        THE WITNESS:  Well, I don't want to
10   make that assumption, quite honestly.  But --
11       MR. THOMPSON:  He's representing
12   that these are --
13       -- the information is taken verbatim
14   from the expense reports.  For purposes of the
15   questions you can accept that assumption.
16       THE WITNESS:  All right.  So go back
17   to your question then, Dan.
18   BY MR. FRIEDMAN:
19   Q.    So the question again was:
20   Regardless of what the 2009 T&E policy stated,
21   in practice did Mr. Rashid have to submit the
22   names and titles of others attending when he

Page 86

1    submitted his expenses?
2    A.    Oh, I see what you're trying to say.
3    You're simply saying that the T&E policy
4    requires names and titles, whereas --
5        Yeah.  You're saying that the names
6    and titles should be provided, and on the
7    expense reports that you say he submitted he
8    did not provide the names and titles.  Is that
9    what you're saying?
10   Q.    Yes.
11   A.    Okay.  I understand what you're
12   saying.  I don't necessarily agree that he
13   filled out the expense forms properly, but I
14   understand what you're saying.
15   Q.    Well, if he did not fill out the
16   expense forms properly because he was not
17   including names and titles, wouldn't that be
18   something that someone in the Apollo back
19   office would catch immediately?
20   A.    I don't know the process that they
21   had in the back office, so I can't opine on
22   that.

Page 87

1    Q.    In the financial companies that
2    you've worked for would you expect someone in
3    the back office of Credit Suisse or J.P. Morgan
4    to catch expenses submitted without required
5    information?
6    A.    Because the process is so automated
7    right now, I know that if a certain section is
8    left blank it doesn't get processed.  But
9    that's an automated process currently.  This
10   might have been a manual process.  Again, I'm
11   not familiar with the process that they had to
12   follow.
13   Q.    Where were you employed between 2011
14   and --
15       -- or 2010 and 2013?
16   A.    Round Table.
17   Q.    At Round Table would you expect that
18   during that time period if an expense was
19   submitted without required information, it
20   would be rejected?
21   A.    It was probably rejected.  Yes.
22   Q.    So does that make you question

Page 88

1    whether the policies, the T&E policies at
2    Apollo, were actually enforced as stated?
3    A.    In totality I can say that they were
4    probably enforced.  Specifically with regard to
5    certain elements, possibly not.  But in a
6    number of these descriptions you can pull from
7    those the names.  If he mentions, for example,
8    the CFO of a certain company, you can look that
9    up pretty easily.  He may not have provided it,
10   but you can look that up.
11   Q.    Well, specifically, it mentions a
12   CFO candidate.  Is that correct?  I'm looking
13   at 345 if you want to refer to it.
14   A.    Right.
15   Q.    And 365 and 366.
16   A.    Oh, I see.
17       MR. THOMPSON:  CFO candidate.
18   Dinner with CFO candidate for QDI.
19       345 is that you're referring to?
20       MR. FRIEDMAN:  Yes.
21       And you can look at 365 and 366 as
22   well.

Page 89

1      (Witness reviewed document.)
2      THE WITNESS:  Sorry.  But those look
3  like they're allocated against personal.
4  BY MR. FRIEDMAN:
5      Q.   Yes, that's part of the BDO review.
6  I'm focusing on what was submitted at the time.
7      A.   Right.  You know, Dan, I have not
8  seen the actual expense forms that they filled
9  out, so I really don't know if, you know, there
10  might have been other columns or if there were
11  other attributes to a specific meeting or place
12  or person.  I don't know what the actual forms
13  look like.
14      Q.   And as part of your report you
15  didn't do any investigation of whether the
16  Apollo T&E policies were enforced as written.
17  Is that correct?
18      A.   Correct that wasn't what I was
19  written to opine on.
20      Q.   So Paragraph 45 of your report
21  focuses on the 2009 T&E policy.  Do you know if
22  that requirement was also in the 2011 T&E

Page 90

1  policy?
2      A.   You can show me what those policies
3  look like, and I can probably figure out
4  whether they are in there or not.
5      Q.   Okay.  So I will --
6      Let's introduce --
7      I'm going to give you the 2009
8  policy, the 2011 policy, and the 2013 policy.
9      (Exhibit 6 marked for
10  identification.)
11      MR. THOMPSON:  This is 6?  The 2009
12  policy.
13      MR. FRIEDMAN:  I think so.
14      2011 policy will be 7.
15      (Exhibit 7 marked for
16  identification.)
17      The 2013 policy will be 8.
18      (Exhibit 8 marked for
19  identification.)
20      So take as much time as you need to
21  review the policies, but my question is whether
22  the requirement in the 2009 policy is the same

Page 91

1  in the 2011 policy.
2      MR. THOMPSON:  And the requirement
3  is the quoted portion of Paragraph 45 that was
4  read into the record a few questions ago?
5      MR. FRIEDMAN:  Yes.
6      THE WITNESS:  That's Page 4 of 2009.
7      MR. THOMPSON:  Uh-huh.  He's asking
8  you whether that same requirement appears in
9  the subsequent policies.
10      THE WITNESS:  Can I write on these?
11      Can I underline something?
12      MR. THOMPSON:  I'd rather you not.
13  Don't do that.
14      THE WITNESS:  All right.  I'm going
15  to lose track.
16      MR. FRIEDMAN:  If it makes it
17  easier, I'm not talking about the 2013 policy
18  yet.
19      THE WITNESS:  Okay.  All right.  I
20  see it in the 2009 policy, and I see an
21  allusion to it in the 2011 policy.  But it's
22  not exactly the same.

Page 92

1  BY MR. FRIEDMAN:
2      Q.   Why do you think in the 2011 policy
3  it was changed to an allusion?
4      A.   Oh, that I don't know.
5      MR. THOMPSON:  Is this --
6      I mean, is this a memory test?  Or
7  is there a reason you're not directing him to
8  particular portions of the 2011 policy?
9      MR. FRIEDMAN:  I'm sorry.  Are you
10  looking --
11      I'm happy to direct you if you'd
12  like me to.  I'm looking at Page 4 of the 2011
13  policy.  I thought you found it.
14      THE WITNESS:  Sorry.  Sorry.  My
15  mistake.  I didn't see it.  Okay.
16      MR. FRIEDMAN:  At any time you want
17  me to direct you to something, just ask.  It's
18  not supposed to be a memory test.
19      THE WITNESS:  All right.  Got it.  I
20  see it.  All right.  They just moved it into a
21  different section.
22  BY MR. FRIEDMAN:

Page 93

1    Q.    Well, my question actually is they
2    do more than that.  In the 2011 policy it only
3    says that the IRS requires that any tax
4    deductible travel entertainment costs include
5    documentation of.  Is that correct?
6    A.    That's what it says.  Yes.
7    Q.    And that's not the language that's
8    in the 2009 policy.  Is that correct?
9    A.    It doesn't specifically say that
10   anywhere in the 2009 policy that I can see.
11   Q.    In the 2009 policy it's actually
12   written as a requirement for employees to
13   submit this information, correct?
14   A.    Where is that?
15   Q.    The 2009 policy.  The one under your
16   left hand.
17   A.    I see.  Yes.
18   Q.    Why do you think Apollo changed that
19   language between 2009 and 2011?
20   A.    That I cannot answer.  I have no
21   idea.
22   Q.    Are you surprised to see that

Page 94

1    change?
2    A.    No.  It's probably not something
3    that they thought would have been material
4    enough to consider.  The implication is still
5    very similar.  They've added this comment about
6    the IRS for a specific reason, but I wouldn't
7    know what that was.
8    Q.    Well, wouldn't the easiest thing to
9    do be copy information from the old policy into
10   the new policy?
11   A.    Well, they may have done that, and
12   they may have amended it subsequently.
13   Q.    So in that case you would assume
14   that the amendment was intentional, correct?
15   A.    Presumably.
16   Q.    Now, in general, if Mr. Rashid was
17   trying to pass off personal expenses as
18   business expenses, you would expect that he
19   would include as little information as needed
20   in order to submit the expense.  Is that
21   correct?
22   A.    No, I would not agree with that.

Page 95

1    Q.    Why is that?
2    A.    Why would you make that assumption?
3    You might provide more information than
4    necessary to throw somebody off the track.  I
5    mean, I don't know.
6         The requirement in 2011 is that
7    expenses would be documented that are
8    reasonable and appropriately --
9         It just says they have to be
10   appropriately documented.  And --
11   Q.    Can you let me know where you're
12   reading?
13   A.    Yes.  It's --
14        Unfortunately there's no page
15   number.  It's --
16   Q.    You want to refer to the Bates
17   number at the bottom of the page?
18   A.    Yes.  It's Bates BDO Apollo 1001,
19   and it's Paragraph 1.1 under Guidelines.  It
20   says:  Travel expenses --
21        Let's see.
22        "Apollo will reimburse employees for

Page 96

1    business and travel expenses incurred while
2    performing their duties, provided the expenses
3    are necessary, reasonable and appropriately
4    documented."
5         And "appropriately documented", most
6    likely means those types of details that are
7    detailed in Section 2.2 regardless whether it's
8    an IRS requirement or not.
9    Q.    And why do you say most likely?
10   A.    Well, because it just seems very
11   logical that that would be the case.  How else
12   would you know how to allocate an expense if
13   you didn't have such details?
14   Q.    Well, why wouldn't Apollo just say
15   that explicitly like they did in 2009?
16   A.    Because it's such a simple logical
17   thing to do that people would know how to do
18   this implicitly.
19   Q.    Going to Paragraph 12 of your
20   report, the third sentence, beginning of the
21   third line, you write:  "Apollo's policies were
22   consistent with industry standards."

Page 97

1    A.   Yes.
2    Q.   You stand by that opinion?
3    A.   Yes.
4    Q.   Is there a reason you hesitated?
5    A.   I wanted to read the full sentence.
6    Q.   Oh.
7    A.   That's all.
8         Because it says: "Apollo
9    established a clear set of policies to educate
10   its employees about their fiduciary
11   responsibilities."
12        MR. THOMPSON:  Wait for a question,
13   Mr. Hoffman.
14   BY MR. FRIEDMAN:
15   Q.   Now, there were three relevant
16   Apollo T&E policies during what you call the
17   relevant period:  The 2009 policy, the 2011
18   policy, and the 2013 policy.
19        Is that correct?
20   A.   Yes.
21   Q.   And your opinion applies to all
22   three of those policies.  Is that correct?

Page 98

1    A.   In general all the policies say
2    pretty much the same thing, and therefore they
3    apply.
4    Q.   And the 2013 policy only became
5    effective a few weeks before Mr. Rashid's
6    suspension.  Is that correct?
7    A.   When was he suspended?
8    Q.   July 1st.
9         MR. THOMPSON:  2013.
10        MR. FRIEDMAN:  2013.
11        If you're going to look for an
12   effective date, I'll tell you it's not in
13   there.  So it's --
14        THE WITNESS:  Okay.
15   BY MR. FRIEDMAN:
16   Q.   Based on your knowledge, if you know
17   when the 2013 policy became effective?
18   A.   It's probably sometime during that
19   timeframe.  Yes.
20   Q.   Okay.  And you might have answered
21   this already.  But despite any differences in
22   the policies, all three policies were

Page 99

1    consistent with industry standards.  Is that
2    correct?
3    A.   Generally speaking.  Yes.
4    Q.   I'd like you to pick up the
5    complaint, Exhibit 2.
6         Before I get there, "generally
7    speaking" wasn't meant to qualify anything.  Is
8    that correct?  All the policies were consistent
9    within industry standards?
10   A.   They were fairly consistent with
11   industry standards.  Yes.  I can't tell you
12   exactly without evaluating multiple expense
13   policies whether these were consistent with all
14   of the other ones.  But generally speaking,
15   these were consistent with the ones that I was
16   familiar with at least.
17   Q.   Is there any difference between the
18   policies you were familiar with and industry
19   standards?
20   A.   No, not necessarily.
21   Q.   So Paragraph 32 of the complaint.
22   I'll give you a second to get there.  And I'm

Page 100

1    looking at the last sentence:  "It further
2    required employees to 'use best efforts to
3    appropriately allocate the expense' including
4    using project codes to identify amounts that
5    should be billed to Apollo's funds, portfolio
6    companies, investment funds, or other special
7    projects."
8         Do you see that quote?
9    A.   Yes.
10   Q.   Do you believe it is consistent with
11   industry best --
12        -- or industry standards to include
13   that instruction in your expense policies?
14        MR. THOMPSON:  Just so we're clear,
15   we're talking about industry standards for a
16   private equity firm like Apollo.
17        MR. FRIEDMAN:  Yes.
18        THE WITNESS:  I'm actually going to
19   ask you to tell me where this quote is from.
20   BY MR. FRIEDMAN:
21   Q.   Well, before we get there, I should
22   ask you:  When you say in Paragraph 12

Page 101

1  "Apollo's policies were consistent with
2  industry standards."
3      A.   Yes.
4      Q.   -- did you mean private equity firms
5  like Apollo?
6      A.   Yes.
7      Q.   Okay.
8      A.   So where is this quote from?
9      Q.   Well, according to the complaint,
10  it's Apollo's travel and expense reimbursement
11  policies and procedures.
12      A.   But do we know which year it was and
13  where I can find that?  Because I want to read
14  the full sentence.
15      Q.   Well, before we do that, would --
16          Do you need to read the full
17  sentence to know if it's industry standard to
18  include something like that in an expense
19  policy?
20      A.   It may or may not be.  I don't know.
21  It's pulled out of --
22          It's pulled out of the middle of a

Page 102

1  sentence, so I want to read the full sentence.
2      Q.   Okay.  So I'd ask you to pick up the
3  2013 policy?
4      A.   Yes.
5      Q.   And it's the third page of the
6  document, but it's called Page 2 of 16.
7      A.   Yes.
8      Q.   And it's the last paragraph of 1.1.
9      A.   Yes, I understand.
10      Q.   Okay.
11      A.   Okay.  So --
12          MR. THOMPSON:  Sorry.  Where are we?
13          THE WITNESS:  We're right here
14  (indicating).
15          MR. THOMPSON:  Where are we, Dan?
16          MR. FRIEDMAN:  He's pointing to it.
17          MR. THOMPSON:  Okay.  Sorry for the
18  interruption.  What's the question?
19          THE WITNESS:  Yes, what is the
20  question?
21  BY MR. FRIEDMAN:
22      Q.   Would you say it's consistent with

Page 103

1  industry standards to include that statement in
2  an expense policy?  That the employees should
3  use best efforts to appropriately allocate the
4  expense.
5      A.   It may not be exactly the
6  terminology that I would use, but yes, it's
7  appropriate.
8      Q.   What would be the terminology you
9  would use?
10      A.   I probably would not use the word
11  "best efforts".  But other than that, because
12  they're all facts, you should be able to
13  identify everything fairly clearly.
14      Q.   Well, in fact, this language -- and
15  you can take a look -- but anything like it
16  only appears in the 2013 policy.  Is that
17  correct?
18      A.   I don't know.  I didn't compare the
19  documents for that clause.  Do you want me to
20  do it?  Or are you making a statement?
21      Q.   You're welcome to look at the 2009
22  and 2011 policies, but I can tell you I haven't

Page 104

1  found anything that looks similar to that
2  language.
3          So would you say the 2009 and 2011
4  policies fall below industry standards because
5  they do not contain a requirement for employees
6  to use best efforts to appropriately allocate
7  an expense?
8      A.   No.
9      Q.   Why is that?
10      A.   In totality that clause in and of
11  itself is not as significant as other portions
12  of the policy.  The policy has to do with
13  defining the expense so that it can be properly
14  allocated within the organization to another
15  part of a project or a fund or a management
16  company.  It simply has to do with
17  identification of data.  That's what this is
18  implying.
19      Q.   So in your mind, industry standard
20  expense policy is much more narrow and focused
21  than the Apollo policy.  Is that a fair
22  statement?

Page 105

1        MR. THOMPSON:  Objection as to form.
2        THE WITNESS:  No.  I wouldn't say
3   that it has to be narrow and focused.  I think
4   that the actual application of the expense
5   form, the use of the expense form, it will
6   probably have in it all the appropriate things
7   that you need to supply.  This is simply a
8   statement of that process.
9   BY MR. FRIEDMAN:
10       Q.   So if you have an expense form that
11  contains within it all the information we need
12  to supply, why even have a T&E policy?
13       MR. THOMPSON:  Objection.
14  Argumentative.
15       THE WITNESS:  Do I answer that?
16       MR. THOMPSON:  You can answer it if
17  you can.
18       THE WITNESS:  To make it obvious to
19  the person who has never experienced the use of
20  travel and entertainment expenses, and to make
21  it obvious to those people that they should not
22  be applying personal expenses to the business

Page 106

1   expense process.
2   BY MR. FRIEDMAN:
3        Q.   So industry standard is a fairly low
4   threshold.  Is that correct?
5        A.   I wouldn't qualify it as that.  It's
6   simply making an obvious statement that most
7   people would understand.
8        Q.   And you wouldn't equate an obvious
9   statement with below threshold?
10       MR. THOMPSON:  Argumentative.
11       THE WITNESS:  Not necessarily.  It's
12  simply making a factual --
13       Maybe not factual.
14       But it's simply making a
15  well-understood statement as clear as possible
16  to an individual who possibly has never had an
17  expense policy before.
18  BY MR. FRIEDMAN:
19       Q.   And as part of your drafting of the
20  report you reviewed all three expense policies.
21  Is that correct?
22       A.   Yes, I did.

Page 107

1        Q.   Did you notice a lot of information
2   was only added to the 2013 policy?
3        MR. THOMPSON:  Objection as to form.
4        THE WITNESS:  Not necessarily.  I
5   didn't review each one for the relevant
6   changes.  There was an easy way to do that, but
7   I did not do that.
8   BY MR. FRIEDMAN:
9        Q.   I'd like to show you what we're
10  going to mark as Exhibit 9.
11       (Exhibit 9 marked for
12  identification.)
13       And this is a PowerPoint
14  presentation titled Apollo Global Management
15  Expense Review Interim Report, and it's dated
16  August 19, 2013, and it appears to be from Paul
17  Weiss.
18       A.   Yes.
19       Q.   So take whatever time you need to
20  review it, but I'm only going to be asking
21  questions about the last page.
22       A.   I have not seen this report.

Page 108

1        Q.   Okay.
2        (Witness reviewed document.)
3        A.   Dan, it references OCIE staff, and
4   it doesn't define what those are.  Do you know
5   who they are?
6        Q.   I was actually going to ask you
7   that.  Do you know who the OCIE is?
8        A.   No.
9        Q.   Okay.  Well --
10       A.   Do you know who they are?
11       Q.   I believe it's the Office of
12  Compliance, Inspections and Examinations at the
13  SEC.
14       A.   Okay.
15       Q.   Have you ever heard of that office?
16       A.   I have.  Yes.
17       Q.   Okay.  Have you ever had any
18  interaction with that office?
19       A.   No, I have not.
20       Q.   And on the last page of the report,
21  the first arrow says:  "Expense Allocation
22  Policy.  Paul Weiss and PWC are working with

Page 109

1  Apollo to enhance the Apollo Global Management,
2  LLC, Expense Allocation Policy and Procedures."
3      Do you see that?
4  A.   Yes.
5  Q.   And do you know what PWC refers to?
6  A.   I believe Price Waterhouse Cooper.
7  Q.   Now, if Paul Weiss and Price
8  Waterhouse Cooper are working with Apollo to
9  enhance the Apollo Global Management, LLC,
10 Expense Allocation Policy and Procedures, does
11 that make you question whether the prior
12 Expense Allocation Policy and Procedures
13 complied with industry standards?
14 A.   No, it does not.  All it says is
15 that they're going to enhance the existing
16 policy and procedures.  It doesn't imply that
17 they were inconsistent with industry standards,
18 it just means that they're going to enhance it.
19 Q.   Would you expect Apollo to hire Paul
20 Weiss and PWC to enhance the policy and
21 procedures if they did not believe there was an
22 issue with the policies and procedures as they

Page 110

1  were?
2  A.   That I don't know.
3  Q.   Going down to the third bullet or
4  arrow: "T&E Policy.  Apollo has instituted a
5  new T&E policy, which we will provide to the
6  OCIE staff.  It contains additional specificity
7  and limitations on numerous issues."
8      Are you surprised to see that Apollo
9  is adding additional specificity and
10 limitations on numerous issues to their 2013
11 T&E policy?
12 A.   Not necessarily.  No.
13 Q.   Why not?
14 A.   Because things evolve over time and
15 are always being improved upon.  The fact that
16 they're simply making additional enhancements
17 to the existing policy is not surprising at
18 all.  So I wouldn't say that it's --
19     It's a good thing.  It is a good
20 thing, but I wouldn't say that it's anything
21 more than just being an enhancement.
22 Q.   And it doesn't raise any concerns in

Page 111

1  your mind about the 2011 T&E policy.  Is that
2  correct?
3  A.   No, it doesn't.
4  Q.   Why do you think Apollo is providing
5  the policy to the OCIE staff?
6  A.   I don't know.  I have no idea.
7  Q.   Would you agree with me that Mr.
8  Rashid was only subject to the Apollo T&E
9  policy that was in effect at the time?
10     MR. THOMPSON:  At what time?
11     MR. FRIEDMAN:  At the time he
12 incurred the expense.
13     THE WITNESS:  He would have been
14 subject to the T&E policies in effect at the
15 time, but he would also know what he should and
16 should not have done.
17 BY MR. FRIEDMAN:
18 Q.   Is there a difference between what
19 he should and should not have done and the T&E
20 policy in effect at the time?
21 A.   He would know that he should not
22 have used his corporate credit card for

Page 112

1  personal expenses.  He would have known that
2  certainly.  He would have known that he should
3  not have processed personal expenses through
4  the expense reimbursement system, which would
5  have automatically caught --
6      -- assumed that they were business
7  related.
8  Q.   But you would agree with me that
9  those restrictions are in the T&E policy.  Is
10 that correct?
11 A.   I do recall seeing statements about
12 not allocating --
13     -- not using your corporate credit
14 card for personal expenses.  I do remember
15 seeing those statements.  As to which policy it
16 was in, I don't remember specifically.  But
17 there's certain logic behind all of this.  And
18 since he was already --
19     He was already a senior enough
20 employee that he should have known the
21 difference between what was right and wrong; he
22 should not therefore have tried to process

MATTHEW T. HOFFMAN
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID

May 24, 2019
113–116

Page 113

1  personal expenses as if they were business
2  expenses. I mean, there's a certain logical
3  understanding behind that, that any business
4  professional who is a well-educated person
5  would know.
6      Q.    Beyond the Apollo T&E policies, was
7  Mr. Rashid subject to any other restrictions on
8  his expenses?
9      A.    Any restrictions on his expenses? I
10  can't think of anything.
11      Q.    So if an expense is permitted under
12  the policy, he is allowed to submit it for
13  reimbursement. Is that correct?
14      A.    If it's a permissible business
15  expense, yes.
16      Q.    And whether it is a permissible
17  business expense is defined by the T&E policy
18  and nothing else. Is that correct?
19      A.    As a fiduciary you are always going
20  to act in a way that is supposed to benefit
21  your clients and is not going to benefit you at
22  the end of the day. So to the extent that your

Page 114

1  fiduciary responsibility is outside the T&E
2  policy, that comes into effect.
3      Q.    So, is it your opinion that an
4  expense can be permitted under the Apollo T&E
5  policy but still be improper?
6      A.    No. If it's documented in the T&E
7  policy as an appropriate business expense, then
8  it can be allocated accordingly.
9      Q.    So the only thing that determines
10  whether an expense is an appropriate expense,
11  is the Apollo T&E policy. Is that correct?
12      A.    Repeat the question, please.
13      Q.    The only document or standard that
14  determines whether an expense is an appropriate
15  business expense, is the Apollo T&E policy. Is
16  that correct?
17      A.    Certainly the T&E policy is the
18  appropriate guideline to reference for
19  appropriate business expenses.
20      Q.    Is it possible that an expense is
21  appropriate under the T&E policy but is
22  inappropriate for a different reason?

Page 115

1      A.    Can you give me an example?
2      Q.    Not really. I mean, can you think
3  of any?
4      A.    Repeat the question again, Dan.
5      Q.    Is it possible that an expense is
6  appropriate under the Apollo T&E policy but is
7  inappropriate for a different reason?
8      A.    There's nothing that I can think of
9  right now.
10      Q.    Let's go to Paragraph 44 of your
11  report.
12      MR. THOMPSON: Which Paragraph? 44?
13      MR. FRIEDMAN: Yes.
14  BY MR. FRIEDMAN:
15      Q.    I'll just read the whole paragraph
16  for the record. "In one section of the Code of
17  Ethics entitled 'Restrictions on Reimbursements
18  and Use of Cash', Apollo states that it will
19  only reimburse for 'goods, services, or other
20  expenditures that are fully and properly
21  supported by third-party invoices or receipts
22  in accordance with Apollo's travel and expense

Page 116

1  policy'".
2      A.    Yes.
3      Q.    I'd like you to take a look at the
4  2011 policy. And this is Exhibit 7.
5      This is --
6      I'm going to point you to the bottom
7  of the 4th page. There is a paragraph that's
8  all in bold that begins: "In the U.S."
9      Let me know when you get there.
10      MR. THOMPSON: Which page?
11      MR. FRIEDMAN: 4th page.
12      MR. THOMPSON: What's the section?
13      MR. FRIEDMAN: Substantiation of
14  Travel and Business Expenses. It's the
15  paragraph that begins: "In the U.S."
16      THE WITNESS: It's 7.
17      MR. THOMPSON: Okay. Yeah, I've got
18  it. 7.
19  BY MR. FRIEDMAN:
20      Q.    Let me know when you're ready.
21      So under the Apollo T&E policy, an
22  employee did not have to submit a receipt if

MATTHEW T. HOFFMAN                                          May 24, 2019
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID              117–120

Page 117

1   the expense was under $75 or was charged on the
2   corporate Apollo AmEx card.  Is that correct?
3       A.   Yes, that's correct.  That's what it
4   says.
5       Q.   So would you agree that for the vast
6   majority of Mr. Rashid's expenses he didn't
7   need to submit a receipt in order to receive
8   reimbursement?
9           MR. THOMPSON:  Objection.
10  Foundation.
11          THE WITNESS:  That I don't know.  I
12  haven't reviewed all of the expenses.
13  BY MR. FRIEDMAN:
14      Q.   About how many expenses have you
15  reviewed?
16      A.   Specific expenses?  I did not even
17  look at this report, other than glance at it.
18  And I'm referring to Exhibit 5.
19      Q.   Okay.  So comparing this quote from
20  the 2011 policy and the quote in your report in
21  Paragraph 44, do you think those statements are
22  inconsistent?

Page 118

1       A.   No.
2       Q.   Why is that?
3       A.   One is the Code of Ethics is fairly
4   generic, which basically states that the
5   employee will be reimbursed for appropriate
6   expenses.  And the qualifier is in the T&E
7   policy of 2011, and it says that only receipts
8   in excess of $75 need to be submitted.  That's
9   all it says.  I mean, so that's the qualifier.
10  That's just one of the differences.  It doesn't
11  mean that you still shouldn't supply the
12  information.
13      Q.   Why did you choose to quote from the
14  Code of Ethics instead of the policy in your
15  report?
16      A.   This is an overlying statement, and
17  it's in the Code of Ethics, which everybody
18  signs off on annually.  So to the extent that
19  there are inconsistencies between the two,
20  presumably the Code of Ethics would be more
21  generic, and the specificity would be more
22  appropriate in the T&E policy.

Page 119

1       Q.   Would you agree that even if it's
2   not explicitly stated in the Apollo T&E policy,
3   it is best practices for the employee to try to
4   save the company money?
5       A.   Oh, absolutely.
6       Q.   And I don't mean to limit it to the
7   company Apollo.  Try to save the funds' money,
8   try to save the portfolio companies' money.  Is
9   that correct?
10      A.   Sure.  Minimize expenses.
11      Q.   Are you familiar with the concept of
12  in lieu of travel?
13      A.   You can explain it to me.  I don't
14  want to assume I know.
15      Q.   Do you have any understanding of it?
16      A.   I have not heard the term
17  specifically, so maybe you can tell me what you
18  think it means and then I can tell you how I
19  would interpret it.
20      Q.   Are you familiar with the concept of
21  incorporating a weekend stay in order to get a
22  cheaper flight?

Page 120

1       A.   Yes.
2       Q.   And have you ever seen that included
3   in an expense policy permitting that?
4       A.   In the expense policy itself?  The
5   T&E policy?
6           No, I've actually never seen it
7   documented.  There's an implicit understanding,
8   but I've never seen it documented.
9       Q.   So even if it's not documented in
10  the T&E policy, you believe it would be
11  permissible to extend a trip over a weekend if
12  it would ultimately save the company, the fund,
13  the portfolio company money.  Is that correct?
14      A.   With prior approval, yes.  I have
15  actually implemented that myself with prior
16  approval.  Documented prior approval.  Because
17  it oftentimes doesn't make a lot of sense.
18      Q.   What do you mean it doesn't make a
19  lot of sense?
20      A.   The bottom line is you wind up
21  saving money, but there's got to be a reason
22  for it, and you have to explain the reason.

MATTHEW T. HOFFMAN                                    May 24, 2019
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID       121–124

Page 121

1    Q.    Isn't saving money enough of a
2  reason on its own?
3    A.    With the proper approvals, yes.
4    Q.    Now, if the policy doesn't say you
5  need prior approvals, would it be fair to
6  assume that you could extend a trip over a
7  weekend if it saves the company money?
8    A.    You'd have to document it.  You'd
9  have to prove that you were able to save the
10  company money by doing so.  And any time you
11  believe that you can do something outside of
12  the generic policy, you would normally seek
13  proper authority to do so.
14    Q.    And what is that statement based on?
15    A.    Again, logic, practice in the past,
16  market standards.
17    Q.    Do you make any distinction in your
18  mind between a business expense and a
19  reimbursable expense?
20    A.    When it's under an Apollo policy you
21  mean?
22    Q.    Yes.

Page 122

1    A.    Okay.  There are reimbursable
2  expenses that are related to business expenses.
3  So an employee will incur a business expense,
4  and he has the right to request reimbursement
5  for that business expense.
6        Then you said something about an
7  Apollo expense?
8    Q.    A reimbursable expense.  And I'm
9  actually I'm referring to your report.
10  Sometimes you talk about a reimbursable
11  expense, sometimes you talk about a business
12  expense.  And I'm just asking if you are
13  drawing a distinction between the two
14  categories?  Or if you're using them
15  synonymously?
16    A.    Can you point me to the section?
17        Because the implication should be
18  fairly clear.
19    Q.    If we actually go to Paragraph 1
20  where you list what you were asked to offer
21  opinions on:  (A )refers to legitimate business
22  expenses, and (B) refers to legitimate

Page 123

1  reimbursable expenses.
2        Is there any difference between
3  those two terms?
4    A.    Not necessarily.  There are
5  legitimate business expenses that should be
6  reimbursed.
7    Q.    So, is it in your mind every
8  business expense is a reimbursable expense,
9  every reimbursable expense is a business
10  expense?
11    A.    I would say the former rather than
12  the latter.
13    Q.    Why is that?
14    A.    If it's a legitimate business
15  expense, it is reimbursable.
16    Q.    But there can be reimbursable
17  expenses that are not business expenses?
18    A.    Can there be expenses that are
19  reimbursable that are not business expenses?
20        I don't know the answer to that.
21        MR. FRIEDMAN:  This is actually a
22  good time to take a break.  Do you want to keep

Page 124

1  going?
2        MR. THOMPSON:  How are we doing on
3  time?
4        MR. FRIEDMAN:  We probably have an
5  hour left.
6        MR. THOMPSON:  Why don't we go off
7  the record.
8        (Recess taken at 11:50 a.m.)
9        (Deposition resumed at 12:36 p.m.)
10  BY MR. FRIEDMAN:
11    Q.    Back on the record.
12        Mr. Hoffman, have you ever had any
13  professional interactions with Apollo?
14    A.    No.
15    Q.    Have you ever invested in an Apollo
16  fund, either personally or through any of your
17  employers?
18    A.    No, not that I'm aware of.
19    Q.    Okay I'd like you to turn to
20  Paragraph 72(C) of your report.
21        Okay.  And looking at the second
22  sentence, it says:  "Indeed any fund or fund

MATTHEW T. HOFFMAN
SECURITIES AND EXCHANGE vs MOHAMMED ALI RASHID

May 24, 2019
125–128

Page 125

1  investor would deem it important to know if an
2  employee of the fund manager was
3  misappropriating money directly or indirectly,
4  regardless of the amount in relation to assets
5  under management."
6       Is that correct?
7  A.   Yes.
8  Q.   Was Mr. Rashid an employee of the
9  fund manager?
10 A.   He was employed by the Apollo group
11 management, I believe.  And I believe they were
12 employed as the fund manager through a
13 management agreement.
14 Q.   So that broader statement, what is
15 it based on?
16 A.   Well, I've never seen his employment
17 contract.
18 Q.   I'm sorry.  I meant the broader
19 statement:  "Any fund or fund investor would
20 deem it important to know if an employee of the
21 fund manager was misappropriating money
22 directly or indirectly, regardless of the

Page 126

1  amount in relation to assets under management."
2  A.   Right.
3  Q.   What is that statement had on?
4  A.   Based on my experience as a Chief
5  Investment Officer and manager of funds and
6  manager as a fiduciary of other people's money.
7  Q.   So it's based solely on your
8  experience. Is that correct?
9  A.   It's based on my experience and my
10 knowledge of the marketplace.  Yes.
11 Q.   Did you do any studies in connection
12 with this report regarding what fund or fund
13 investors would deem important?
14 A.   No.
15 Q.   Did you do --
16 A.   Not specific research.  No.
17 Q.   Did you do any interviews with fund
18 managers?
19      Or fund investors.  Excuse me.
20 A.   No.
21 Q.   Are you aware that Apollo entered
22 into a consent order with the SEC regarding Mr.

Page 127

1  Rashid's conduct?
2  A.   I'm not familiar with what a consent
3  order is.
4  Q.   Well, let me show you a document
5  then.
6  A.   All right.
7  Q.   I think this is going to be
8  Exhibit 10.
9       (Exhibit 10 marked for
10 identification.)
11 A.   All right.  I'm not familiar with
12 this document.
13 Q.   Have you ever seen it before?
14 A.   I don't believe so.
15      Let me --
16      Can I check one thing in my report?
17 I don't think it's in there.
18 Q.   No, I don't think it is either.
19 A.   Okay.  All right.
20 Q.   So just for the record, this is a
21 document titled:  Order Instituting
22 Administrative and Cease-and-Desist Proceedings

Page 128

1  Pursuant to Sections 203(e) and 203(k) of the
2  Investment Advisers Act of 1940, Making
3  Findings, and Imposing a Cease-and-Desist
4  Order.
5       Do you recall hearing through news
6  reports through your contacts in the investment
7  field about an order against Apollo in 2016?
8  A.   No.  Actually, no, I do not.
9  Q.   I'd like you to turn to Page 10 of
10 the order.  Section IV in particular, and then
11 B(i):  "Respondents shall pay $40,254,552
12 consisting of disgorgement of $37,527,000 and
13 prejudgment interest of $2,727,552
14 (collectively, the Disgorgement Fund) to
15 compensate the funds that invested in private
16 equity transactions that resulted in payment of
17 undisclosed accelerated monitoring fees from
18 December 2011 through May 2015, and to
19 compensate the lending funds for interest
20 improperly allocated to Advisors VI."
21      Do you see that?
22 A.   Yes.

1    Q.    Do you remember hearing anything
2   about this at the time?
3    A.    No.
4    Q.    Do you think an investor in an
5   Apollo fund would consider something like this
6   to be important to them?
7        MR. THOMPSON:  Object.  This is
8   beyond the scope of Mr. Hoffman's report.
9        THE WITNESS:  Repeat the question,
10  please, Dan.
11  BY MR. FRIEDMAN:
12   Q.    Do you think an investor in an
13  Apollo fund would consider a disgorgement of
14  over $37 million to be important to them?
15       MR. THOMPSON:  Same objection.
16       THE WITNESS:  When you say the
17  "investor", which investor are you referring
18  to?
19       MR. FRIEDMAN:  The investor in the
20  Apollo fund.
21       THE WITNESS:  In which Apollo fund?
22       MR. FRIEDMAN:  It can be the funds

1   at issue here or any Apollo fund.
2        MR. THOMPSON:  So I don't keep
3   interrupting, can I just get a continuing
4   objection on the grounds of scope.
5        THE WITNESS:  Would I consider it
6   important that there was a disgorgement of this
7   amount of money?
8        Yes, it would be important to any
9   investor in an Apollo fund if there was
10  something that came out where they had to
11  disgorge this amount of money.
12  BY MR. FRIEDMAN:
13   Q.    And this is a significantly larger
14  amount of money than is at issue in the Rashid
15  investigation.  Is that fair?
16   A.    On a quantitative basis, yes, it is
17  larger.
18   Q.    Do you know if any investors in
19  Apollo pulled their money out of Apollo when
20  this order came out?
21   A.    No, I do not.
22   Q.    Do you know if Apollo fired anyone

1   because of these events?
2    A.    No, I do not.
3    Q.    I'm going to show you another
4   document.  I think this is going to be 11.
5        (Exhibit 11 marked for
6   identification.)
7        For the record, this is a letter
8   from the Institutional Limited Partners
9   Association to the Honorable Steven Mnuchin,
10  Secretary of the Treasury, dated July 28th,
11  2017.
12       Just start by asking if you've seen
13  this document before?
14       MR. THOMPSON:  Give him a chance to
15  read the document.
16       MR. FRIEDMAN:  Sure.
17       If you'd also like to look at
18  Footnote 6 of your report, that helps.
19       THE WITNESS:  That's correct.  Yes,
20  I have seen this.
21  BY MR. FRIEDMAN:
22   Q.    And this is the same document that's

1   in Footnote 6, correct?
2    A.    Presumably, yes.  Not 100 percent
3   sure.
4    Q.    Okay.
5    A.    There may have been multiple letters
6   sent to the same day--
7        -- to the same person by the same
8   person, but I really don't know.
9    Q.    Okay.  I mean, if you would like to
10  match up the content, feel free.
11   A.    Yes.
12       You know, I was trying to be
13  incredibly careful with my footnoting.
14       Okay.
15   Q.    Do you believe it is the same
16  document?
17   A.    Yes, I believe it is.
18   Q.    So I'd like you to turn to Page 3 of
19  this letter to the Secretary of the Treasury,
20  the first full paragraph on the page.  And I'm
21  going to read a bit for the record:  "A 2014
22  speech by Andrew Bowden, then the head of the

Page 133

1    SEC's Office of Compliance Inspections and
2    Examinations (OCIE), highlighted these harmful
3    practices and stated that when the SEC had
4    examined how fees and expenses were handled by
5    private equity fund advisors, they identified
6    'violations of law or material weaknesses in
7    controls over 50 percent of the time,' during
8    their examination of over 150 private equity
9    fund advisors."
10       Do you see that?
11   A.   Yes.
12   Q.   Do you recall that speech by Mr.
13   Bowden?
14   A.   Honestly, no, I don't recall.  But I
15   do reference this letter in my statement in my
16   report.
17   Q.   Well, would you be expecting some
18   reaction to a speech from the head of the SEC's
19   OCIE where he says that over 50 percent of the
20   time they identified violations of law or
21   material weaknesses in how fees and expenses
22   were handled by private equity fund advisors?

Page 134

1        MR. THOMPSON:  Sorry.  The question
2    is:  Would he expect some reaction?
3        MR. FRIEDMAN:  Yes.
4        MR. THOMPSON:  Reaction by whom?
5        MR. FRIEDMAN:  Investors.
6        THE WITNESS:  By investors?
7        No.  But I can tell you where I
8    think the reaction would come from, and that
9    would be from the private equity funds and the
10   fund managers themselves.
11   BY MR. FRIEDMAN:
12   Q.   Why wouldn't you expect investors to
13   react to the head of the SEC's OCIE saying they
14   have found violations of law or material
15   weaknesses over 50 percent of the time?
16   A.   I understand what you're saying.
17   This is a letter from the Institutional LP
18   Association.  The Limited Partners Association.
19   And I don't know if this document would have
20   been made public to non-members of the ILPA.
21   What this is stating is that there are
22   potentially inconsistencies or ways in which

Page 135

1    processes can be improved upon, and they've
2    identified them.  And therefore, these
3    weaknesses will be attended to, either by them
4    or by the fund managers, and they will have
5    pointed them out.  Pointed out some of these
6    weaknesses.  That's my presumption.
7        Would this have gotten out in the
8    marketplace?  If so, it might have been fairly
9    generic.  And I don't think that that specific
10   comment would have been a particular reason why
11   generally the investor population would not
12   invest.
13   Q.   Would they deem it important?
14   A.   Would they deem this important?  The
15   fact that they've identified some weaknesses in
16   certain fund managers?
17   Q.   Well, violations of law or material
18   weaknesses.  Yes?
19   A.   Would they deem it important?  They
20   would.  Yes, they would.  But they haven't
21   identified any individual funds.  And it's a
22   simple statement when you find that there's an

Page 136

1    error or a mistake, they are there to help
2    repair that mistake or error.
3    Q.   So your understanding of Mr.
4    Bowden's speech is that he was talking about
5    mistakes or errors?
6    A.   Or deficiencies.  Yes.
7    Q.   Isn't it the same to an investor
8    whether they're not getting money they should
9    get whether it's due to a mistake, an error, or
10   intentional conduct?
11   A.   Isn't it the same to an investor?
12       You're talking about this statement
13   versus whether they are being shortchanged in
14   their performance?
15   Q.   Well, I'm talking about whether they
16   are shortchanged in their performance -- to use
17   your language -- whether it's due to a mistake
18   or due to intentional conduct?
19   A.   The answer to that would be they
20   would deem it important.  Yes.
21   Q.   So do you recall any reaction --
22   A.   No.

Page 137

1    Q.    -- to Mr. Bowden's speech?
2    A.    No, I don't.
3    Q.    Would you agree that a speech in
4  2014 from the head of the SEC's OCIE reflected
5  what was going on in private equity companies
6  in the relevant period?
7        MR. THOMPSON:  Objection as to form.
8        THE WITNESS:  Well, when you say
9  within private equity companies, they've taken
10  a small segment of that population.  They've
11  identified 150 fund advisors, half of whom are
12  being criticized, presumably criticized, in
13  this letter.  So 75 managers in a population of
14  potentially thousands of fund managers, is an
15  important number, but I wouldn't find it to be
16  headline grabbing.
17        I mean, if you watch MSNBC in the
18  morning or anything that has to do with the
19  markets, I don't think something like this
20  would have even hit the market.
21  BY MR. FRIEDMAN:
22    Q.    You don't think this would be

Page 138

1  important information to fund investors?
2        MR. THOMPSON:  Objection.  Asked and
3  answered.
4        THE WITNESS:  Yes.  I said it would
5  be important, but I don't think it got into the
6  news.  I don't remember any of this hitting the
7  news.
8  BY MR. FRIEDMAN:
9    Q.    How many private equity fund
10  advisors do you estimate there are?
11    A.    Potentially thousands.
12    Q.    Is that based on experience?
13    A.    Based on my knowledge of the market.
14  I mean, it could be multiple thousands.  It's
15  like hedge funds, the number continues to
16  increase.  It started out at, you know, 10
17  years ago it might have been 2000, now it's
18  10,000.  Same thing with private equity funds,
19  it's in the thousands.
20    Q.    Going to turn to your rebuttal
21  report to Mr. Quintero?
22    A.    Yes, Mr. Quintero.

Page 139

1    Q.    This will be Exhibit 12.
2        (Exhibit 12 marked for
3  identification.)
4        And I'll give you a chance to look
5  at it, but I'm not going to ask anything
6  specific about what you wrote.
7        So your disagreement with Mr.
8  Quintero is with his conclusion, not with any
9  of his analysis.  Is that correct?
10    A.    I'd have to look at his report again
11  because his analysis touched on areas that I
12  was not familiar with.  His analysis was
13  very --
14        It was driven by the accounting side
15  and by the financial side, as opposed to the
16  fiduciary or the T&E side, specifically the
17  policies.  That's my takeaway from that report.
18    Q.    Is it fair to say that the
19  accounting side is outside your expertise?
20    A.    That's correct.  Yes.
21    Q.    Back to your report for a minute.
22  Just to be clear, you're not offering any

Page 140

1  opinions as to whether Mr. Rashid intentionally
2  billed personal expenses to Apollo or the funds
3  or the private equity companies.  Is that
4  correct.
5        Sorry.  The portfolio companies.  Is
6  that correct?
7    A.    The physical process of allocating
8  them to those funds or portfolio companies?
9  That was not his responsibility.  He signed off
10  on his expense reports though.
11        MR. THOMPSON:  I think his question
12  was different.
13        You asked whether you're offering an
14  opinion on whether Mr. Rashid intentionally
15  billed personal expenses to funds or clients.
16        MR. FRIEDMAN:  Intentionally as
17  opposed to unintentionally.
18        THE WITNESS:  Right.  What I can't
19  understand is how thousands --
20        Not thousands.
21        -- hundreds of expenses would have
22  been processed without some deliberate action

Page 141

1  on his part or a certain responsibility taken
2  by him.  I really don't know.
3       MR. THOMPSON:  Mr. Hoffman, that may
4  be your view.  I think the question was whether
5  you're offering an actual formal opinion as to
6  whether Mr. Rashid intentionally
7  misappropriated client funds?
8       THE WITNESS:  No.  No.  I'm just
9  saying that he didn't follow market standards
10  and standard process and procedures, the market
11  convention, protocol.  He simply didn't follow
12  market standards.
13  BY MR. FRIEDMAN:
14      Q.   And you refer a couple of times in
15  your report to Mr. Rashid's "scheme".  Is that
16  correct?
17      A.   Yes.
18      Q.   And if someone was reading that and
19  saw "scheme", and thought that implied intent,
20  they would be mistaken.  Is that correct?
21      A.   I believe so.  Yes.
22      Q.   I'm going to give you your rebuttal

Page 142

1  report to Mr. O'Connor.  I think this is
2  Exhibit 13.
3       (Exhibit 13 marked for
4  identification.)
5       And I'd like you to focus on
6  Paragraphs 6 and 7.
7       So looking at Paragraph 7, you
8  write:  "O'Connor agrees with the above
9  statement.  He says 'I agree that a reasonable
10  employee should expect that the (illegitimate)
11  expense would be passed on to and borne by the
12  respective fund or company.'"
13      You see that?
14      A.   Yes.
15      Q.   Now Mr. O'Connor qualified that
16  statement.  Is that correct?
17      A.   What do you mean?
18      Q.   That's not the full statement from
19  Mr. O'Connor's report.  Is that correct?
20      A.   I would have to see his report
21  again.  I don't remember the context in which
22  that was taken.

Page 143

1      Q.   Okay.  Let's go back to your report.
2  Your initial report.  I'd like you to look at
3  Paragraph 72(B).
4       MR. THOMPSON:  72(B)?
5       THE WITNESS:  Which one?
6       MR. FRIEDMAN:  72(B).
7       MR. THOMPSON:  On Page 25.
8       THE WITNESS:  Yes.
9  BY MR. FRIEDMAN:
10      Q.   So looking at the first sentence, to
11  read it for the record:  "A reasonable employee
12  in Rashid's position should have known that
13  expenses which he placed on his business credit
14  card and represented to have been incurred on
15  behalf of private equity funds and/or portfolio
16  companies in which such funds had an investment
17  interest, ultimately would be submitted to the
18  relevant funds as reimbursable management
19  expenses."
20      Do you see that statement?
21      A.   Yes.
22      Q.   And you stand by that statement?

Page 144

1      A.   Yes.
2      Q.   And I know I can read the rest of
3  the paragraph, but just to not put words in
4  your mouth, what is that statement based on?
5      A.   He had been employed previously by a
6  very good firm, Goldman Sachs.  He would have
7  been trained in how to submit T&E expenses for
8  reimbursement.  He moved to another experienced
9  firm, Apollo, and was --
10      -- was an investor in various funds
11  that he was working on.  He would have received
12  information about those funds as an investor
13  and could have read about the T&E policies that
14  would have been applicable to those funds.  He
15  would have attended meetings at Apollo where
16  allocation expenses would have been discussed.
17      Those are the types of things that I
18  would believe he would have been privy to at
19  that point in time.
20      Q.   So starting with the first one, his
21  experience at Goldman Sachs.
22      A.   Yes.

Page 145

1    Q.    You have never seen a Goldman Sachs
2    T&E policy.  Is that correct?
3    A.    I have not.  No.
4    Q.    Okay.  Jumping to the last one.  You
5    mentioned he attended meetings in which
6    allocation of expenses would have been
7    discussed.  Is that correct?
8    A.    Yes.
9    Q.    Do you know for a fact that Apollo
10   had those meetings?  Or do you believe they
11   did?
12   A.    There were at least two times prior
13   to his departure when he was reprimanded for
14   processing personal expenses as if they were
15   business expenses, legitimate business
16   expenses, and he would have been a party to a
17   conversation -- whether in a meeting or not a
18   meeting, but certainly a conversation -- as to
19   why it was inappropriate to allocate personal
20   expenses as if they were business expenses.
21   And as a consequence of those conversations he
22   would then have to reimburse Apollo for those

Page 146

1    amounts that were identified.  So he had at
2    least two conversations or meetings with
3    employees of Apollo along those lines.
4    Q.    And these two conversations where
5    you say he was reprimanded, have you seen any
6    account of those conversations where it says he
7    was told his expenses were allocated to funds
8    or portfolio companies?
9    A.    No, I have not.
10   Q.    Do you know who Mr. Rashid wrote a
11   check to in those two instances?
12   A.    No, I do not.
13   Q.    Would it surprise you to learn he
14   wrote the check to Apollo?
15   A.    It would not be surprising.
16   Q.    Would it surprise you to learn he's
17   never written a reimbursement check regarding
18   his expenses to a fund or a portfolio company?
19   A.    That's not the way it would have
20   worked anyway because Apollo would have charged
21   the fund as opposed to his expenses being
22   allocated to the fund directly.

Page 147

1    Q.    And the second thing you mentioned,
2    I believe, was that Mr. Rashid was an investor
3    in funds --
4    A.    Correct.
5    Q.    -- and he would have had access to
6    information.
7    A.    Correct.
8    Q.    You haven't seen anything in the
9    record where Mr. Rashid reviewed that
10   information.  Is that correct?
11   A.    I have not seen anything other than
12   the fact that I know that he subscribed for the
13   funds and was an investor in those funds, and
14   in the subscription agreement would have had
15   the rights to review the T&E allocation process
16   that those funds had.  I can't say whether he
17   read them or not, but he's a smart person.
18   He's a senior partner.  He would know these
19   things.
20   Q.    You mentioned somewhere in your
21   report that Mr. Rashid invested in these funds
22   because Apollo employees are encouraged to have

Page 148

1    skin in the game?
2    A.    Those were his words.  Yes.
3    Q.    Do you think it's more likely that
4    someone who is investing in a fund to make a
5    statement would do less due diligence than
6    someone who is investing in a fund purely as an
7    investment decision?
8    A.    No, I don't think so.
9    Q.    Why not?
10   A.    Because you're spending money or
11   you're incurring an expense.  You're giving
12   someone else money that is coming out of your
13   pocket, so why would you --
14        Why would you do any less research
15   even if it's somebody internally versus an
16   external investment?  I don't understand why
17   you wouldn't do that.
18   Q.    Do you know if Mr. Rashid was
19   required to invest in the funds?
20   A.    Was required?
21        No.  And I don't think he invested
22   in all the funds.

Page 149

1    Q.    Do you know if Mr. Rashid was
2    required to invest in the funds that he did
3    invest in?
4    A.    Was he required?
5         No, I'm not 100 percent sure.
6    Q.    Do you know if he was encouraged to
7    invest in the funds that he did invest in?
8    A.    Yes, I know that he would have been
9    encouraged to do so.  Yes.
10   Q.    And that encouragement, in your
11   mind, wouldn't impact the level of diligence
12   that Mr. Rashid would do on his investment?
13   A.    I would never have minimized my due
14   diligence if it had been my money.
15   Q.    Go to Paragraph 70 of your report.
16   And the last sentence, read it for the record:
17   "Approximately $220,000 of those expenses had
18   been independently and unambiguously identified
19   by Rashid."
20        You see that statement?
21   A.    Yes.
22   Q.    And "those expenses" refers to the

Page 150

1    top of the paragraph where it says he repaid
2    approximately 290,000.  Is that correct?
3    A.    Correct.
4    Q.    What is your statement that he did
5    so unambiguously based on?
6    A.    Based on the fact that he identified
7    them himself.  He personally identified those
8    expenses himself.
9    Q.    Where did you see that?
10   A.    In one of the documents somewhere.
11   One of the documents that referenced an
12   approximation of $220,000 that he had
13   pre-identified.
14   Q.    Any guess as to what that document
15   was?  Was it the SEC's complaint?
16   A.    Possibly.
17   Q.    Does the SEC's complaint say that
18   Mr. Rashid did so unambiguously?
19   A.    I don't remember.
20        MR. FRIEDMAN:  Thank you.  I have no
21   more questions.
22        THE WITNESS:  Really?

Page 151

1        MR. THOMPSON:  And we have no
2    questions.
3        MR. FRIEDMAN:  Regular.
4        MR. THOMPSON:  We'll read and sign,
5    and I'll be in touch with you about ordering
6    the transcript.
7        (Deposition concluded at 1:09 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 152

1        DEPOSITION ERRATA SHEET
2    Our Assignment No. J4140709
3    Case Caption:
4    Securities & Exchange Commission
5    vs.
6    Mohammed Ali Rashid
7
8        DECLARATION UNDER PENALTY OF PERJURY
9     I declare under penalty of perjury that I
10   have read the entire transcript of my
11   Deposition taken in the captioned matter or the
12   same has been read to me, and the same is true
13   and accurate, save and except for changes
14   and/or corrections, if any, as indicated by me
15   on the DEPOSITION ERRATA SHEET hereof, with the
16   understanding that I offer these changes as if
17   still under oath.
18
19   Signed on the_____day of _____, 2019.
20        _____
21     Matthew T. Hoffman
22

Page 153

1      DEPOSITION ERRATA SHEET

2    Page No._____ Line No._____ Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____ Line No._____ Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____ Line No._____ Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____ Line No._____ Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____ Line No._____ Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____ Line No._____ Change to:_____

18   _____

19   Reason for change:_____

20

21   SIGNATURE_____DATE:_____

22       Matthew T. Hoffman

Page 154

1      DEPOSITION ERRATA SHEET

2    Page No._____ Line No._____ Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____ Line No._____ Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____ Line No._____ Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____ Line No._____ Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____ Line No._____ Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____ Line No._____ Change to:_____

18   _____

19   Reason for change:_____

20

21   SIGNATURE:_____DATE_____

22       Matthew T. Hoffman

Page 155

1      CERTIFICATE OF NOTARY PUBLIC

2        I, Terry L. Bradley, the officer before

3    whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly

6    sworn by me; that the testimony of said witness

7    was taken by me in shorthand and thereafter

8    reduced to computerized transcription under my

9    direction; that said deposition is a true

10   record of the testimony given by said witness;

11   that I am neither counsel for, related to, nor

12   employed by any of the parties to the action in

13   which this deposition was taken; and further,

14   that I am not a relative or employee of any

15   attorney or counsel employed by the parties

16   hereto, nor financially or otherwise interested

17   in the outcome of the action.

18

19       _____

          Notary Public in and for

20        the District of Columbia

21   My Commission expires:  April 30, 2022

22

**Exhibits**

4140709 Mat
thew.T.
 Hoffman.
EXHIBIT1
 3:8 15:3

4140709 Mat
thew.T.
 Hoffman.
EXHIBIT2
 3:9 45:12
 99:5

4140709 Mat
thew.T.
 Hoffman.
EXHIBIT3
 3:10
 57:18

4140709 Mat
thew.T.
 Hoffman.
EXHIBIT4
 3:11
 59:8,9

4140709 Mat
thew.T.
 Hoffman.
EXHIBIT5
 3:12
 60:22
 61:1 62:1
 72:22
 80:7 83:6
 117:18

4140709 Mat
thew.T.
 Hoffman CO
NFIDENTIAL.
EXHIBIT6
 90:9

4140709 Mat
thew.T.
 Hoffman CO
NFIDENTIAL.
EXHIBIT7
 90:15
 116:4

4140709 Mat
thew.T.
 Hoffman CO
NFIDENTIAL.
EXHIBIT8
 90:18

4140709 Mat
thew.T.
 Hoffman CO
NFIDENTIAL.
EXHIBIT9
 107:10,11

4140709 Mat
thew.T.
 Hoffman.
EXHIBIT10
 4:4
 127:8,9

4140709 Mat
thew.T.
 Hoffman.
EXHIBIT11
 4:5 131:5

4140709 Mat
thew.T.
 Hoffman.
EXHIBIT12
 4:6
 139:1,2

4140709 Mat
thew.T.
 Hoffman.
EXHIBIT13
 4:8
 142:2,3

**$**

$1
 41:3

$2,727,552
 128:13

$220,000
 149:17
 150:12

$3,000
 40:21

$300,000
 40:22
 41:11,18
 42:10
 44:6,7
 45:8

$37
 129:14

$37,527,000
 128:12

$40,254,552
 128:11

$500
 23:5,8

$75
 117:1
 118:8

**(**

(B)
 122:22

**1**

1
 15:2,3
 62:21

122:19

**1.1**
 95:19
 102:8

**10**
 127:8,9
 128:9
 138:16

**10,000**
 138:18

**100**
 28:20
 73:19
 132:2
 149:5

**1001**
 95:18

**10:39**
 75:17

**10:53**
 75:18

**11**
 7:7
 131:4,5

**11:50**
 124:8

**12**
 96:19
 100:22
 139:1,2

**12:36**
 124:9

**13**
 83:8
 142:2,3

**14**
 83:8,9

**1490**
 63:9,17,
 20

**15**
 83:12

**150**
 133:8
 137:11

**16**
 102:6

**1618**
 64:4

**19**
 107:16

**1940**
 128:2

**1995**
 26:16

**1997**
 26:16

**1:09**
 151:7

**1st**
 98:8

**2**

2
 11:9
 45:11,12
 99:5
 102:6

**2.2**
 96:7

**20**
 38:10
 75:12
 79:7

**2000**
 138:17

**2003**
 81:6



**2007**
59:22

**2009**
82:9
85:20
89:21
90:7,11,
22 91:6,
20 93:8,
10,11,15,
19 96:15
97:17
103:21
104:3

**2010**
87:15

**2011**
87:13
89:22
90:8,14
91:1,21
92:2,8,12
93:2,19
95:6
97:17
103:22
104:3
111:1
116:4
117:20
118:7
128:18

**2012**
50:17

**2013**
81:7
87:15
90:8,17
91:17
97:18
98:4,9,
10,17
102:3
103:16

107:2,16
110:10

**2014**
132:21
137:4

**2015**
128:18

**2016**
128:7

**2017**
131:11

**203(e)**
128:1

**203(k)**
128:1

**21**
58:1,5
66:2

**25**
143:7

**28th**
131:10

**290,000**
150:2

—————

**3**

3
11:9
15:14
57:18
132:18

30
17:19
54:12
55:1,13
57:7,11
58:19

**30s**
19:15

**32**
99:21

**345**
83:7
88:13,19

**363**
83:8

**365**
83:8
88:15,21

**366**
83:9
88:15,21

**387**
83:11

—————

**4**

4
50:15
59:8,9
91:6
92:12

**40s**
20:4

**44**
115:10,12
117:21

**45**
82:7
89:20
91:3

**49**
33:4,9,10
34:4
35:10

**4th**
116:7,11

—————

**5**

5
61:1 62:1
72:22
80:7 83:6
117:18

**50**
133:7,19
134:15

**50s**
22:22

**550**
26:18

—————

**6**

6
90:9,11
131:18
132:1
142:6

**60s**
22:22

**61**
75:10,21

**63**
15:13
16:7

**64**
50:12

**66**
45:15,16,
20

**67**
67:5

—————

**7**

7

15:13
16:7
90:14,15
116:4,16,
18 142:6,
7

**70**
45:15,17,
20 149:15

**71**
41:7

**72(B)**
143:3,4,6

**72(C)**
124:20

**75**
137:13

**79**
15:13
16:7

—————

**8**

8
90:17,18

**82**
63:4

—————

**9**

9
17:6
107:10,11

—————

**A**

**a.m.**
75:17,18
124:8

**absolute**



76:19

**absolutely**
43:21
53:15
65:13
119:5

**accelerated**
128:17

**accept**
85:15

**access**
147:5

**accordance**
115:22

**account**
49:15
146:6

**accounting**
139:14,19

**accounts**
20:21,22
21:11

**accuracy**
65:11

**accurately**
76:4
77:15
78:16

**act**
113:20
128:2

**action**
140:22

**activities**
68:16,22
69:10
78:21

**actual**
24:22
89:8,12

105:4
141:5

**added**
94:5
107:2

**adding**
110:9

**additional**
9:7,18
20:5
110:6,9,
16

**Administrat
ive**
127:22

**Advisers**
128:2

**advisor**
30:14

**advisors**
128:20
133:5,9,
22 137:11
138:10

**agree**
32:2 43:3
60:7
64:12
76:8
86:12
94:22
111:7
112:8
117:5
119:1
137:3
142:9

**agreement**
125:13
147:14

**agrees**
142:8

**Alexander**
60:1

**Ali**
59:20

**allegation**
50:3

**alleged**
40:13

**alleges**
38:19
39:2

**allocate**
21:4
22:12
24:17
96:12
100:3
103:3
104:6
145:19

**allocated**
21:10
39:17
73:9,20
74:8,17,
18 89:3
104:14
114:8
128:20
146:7,22

**allocating**
112:12
140:7

**allocation**
22:3 23:4
68:6 74:5
108:21
109:2,10,
12 144:16
145:6
147:15

**allowed**
42:17

113:12

**allusion**
91:21
92:3

**amend**
57:9

**amended**
94:12

**amendment**
94:14

**American**
70:1

**Amex**
117:2

**amount**
40:12,17
41:10,19
43:17
82:17
84:10,18
125:4
126:1
130:7,11,
14

**amounts**
19:6 41:9
43:18
100:4
146:1

**analysis**
139:9,11,
12

**analyzed**
69:14

**and/or**
143:15

**Andrew**
132:22

**annually**
118:18

**Ano**
59:19

**answers**
6:6

**anticipate**
23:6

**Apollo**
31:6,9
32:4,6
34:2,8,16
35:4 41:9
44:3,17,
20 45:2
67:17,20
69:6 70:4
71:2 72:9
83:2,21
86:18
88:2
89:16
93:18
95:18,22
96:14
97:8,16
100:16
101:5
104:21
107:14
109:1,8,
9,19
110:4,8
111:4,8
113:6
114:4,11,
15 115:6,
18 116:21
117:2
119:2,7
121:20
122:7
124:13,15
125:10
126:21
128:7
129:5,13,



20,21
130:1,9,
19,22
140:2
144:9,15
145:9,22
146:3,14,
20 147:22

**Apollo's**
42:1
43:19
44:4,11
96:21
100:5
101:1,10
115:22

**appears**
73:19
91:8
103:16
107:16

**Apple**
71:5

**applicable**
144:14

**application**
105:4

**applications**
12:5,8

**applies**
97:21

**apply**
98:3

**applying**
105:22

**appropriately**
95:8,10
96:3,5
100:3
103:3

**104**:6

**approval**
23:7
120:14,16

**approvals**
121:3,5

**approve**
41:6

**approximately**
149:17
150:2

**approximation**
150:12

**April**
81:7

**arbitration**
6:20

**area**
51:4

**areas**
139:11

**Argumentative**
105:14
106:10

**arrow**
108:21
110:4

**Ascometal**
73:10

**ascometals**
63:13
80:18,22
81:10

**Asia**
18:19

**asserted**
51:1 75:4

**77**:21

**asserting**
35:7

**assertion**
78:7

**assessment**
42:3,5,12

**asset**
10:8
20:19
23:20
25:15

**assets**
42:1
43:19
44:11
125:4
126:1

**assignment**
17:5

**assistance**
78:14,17
79:5

**assistant**
84:13

**assistants**
76:3,10
77:13,14
78:2,19,
22 79:8,
11,16
80:2

**association**
12:14
131:9
134:18

**assume**
42:21
46:2
53:16,19
54:4
60:19

**78**:10
85:7
94:13
119:14
121:6

**assumed**
54:20
112:6

**Assumes**
46:21

**assuming**
36:20
40:3,9
42:10
54:16
85:4

**assumption**
36:22
85:10,15
95:2

**attended**
135:3
144:15
145:5

**attending**
82:19
83:15
85:22

**attributable**
69:15
71:20

**attribute**
24:17
76:4,11
77:15,17

**attributed**
39:18
78:13,16

**attributes**
89:11

**audit**
52:13,18

**August**
107:16

**authority**
27:10,14,
17 28:10,
16 29:7,
22 32:3
36:12,17
121:13

**automated**
87:6,9

**automatically**
112:5

**averment**
37:11
38:9,10

**aware**
23:1
32:18
75:3
124:18
126:21

_____

**B**

_____

**B(i)**
128:11

**back**
17:18
18:8,10
31:17,18
65:21
66:2 67:4
72:22
73:1
80:7,8
83:5
85:16
86:18,21
87:3



124:11
139:21
143:1

background
16:22
30:7

backwards
17:21

Bal
50:15

bank
26:12,13

bank's
26:5,7

Bank/ubs
26:20

based
15:18
34:9
38:14
54:9,10,
22 67:11
68:8
73:21
79:7
84:19
98:16
121:14
125:15
126:4,7,9
138:12,13
144:4
150:5,6

basically
39:7
52:14
118:4

basis
43:1
130:16

batch
13:15

Bates
11:15
13:9
61:11
95:16,18

BDO
52:19,21
53:1,2
61:3
62:15
64:13
65:10
72:22
80:7 89:5
95:18

BDO's
64:20

began
21:8

begin
5:22

beginning
16:13
77:21
82:8
96:20

begins
81:6
116:8,15

behalf
18:19
143:15

belief
55:5

benefit
113:20,21

billed
38:20
39:3
40:21
70:10,19
71:6,7

72:8
73:14
100:5
140:2,15

billionaire
41:20

bills
20:9

bit
132:21

blank
87:8

Board
25:22
26:2,4,6,
7,9,17
82:5

bodies
12:17,22

bold
116:8

born
72:16

borne
142:11

boss
18:2,7
19:8
29:21
30:3

bottle
72:3 73:1
80:9,17

bottom
29:13
59:15
95:17
116:6
120:20

bought
48:3,9,13

60:19
71:15

Bowden
132:22
133:13

Bowden's
136:4
137:1

Boy
10:4

branch
8:12

Brazil
59:18

breadth
39:10

break
75:14
84:8
123:22

Bring
18:4

broad
37:12

broader
125:14,18

broadest
37:14,16

broker
16:4

Brokercheck
31:3

bullet
110:3

business
24:13
39:17
53:4
64:10,13
65:2 68:7

71:20
79:14
82:19
94:18
96:1
105:22
112:6
113:1,3,
14,17
114:7,15,
19 116:14
121:18
122:2,3,
5,11,21
123:5,8,
9,14,17,
19 143:13
145:15,20

business-
related
68:16,21
69:10

buy
41:17

buying
60:5
71:12

buys
71:2 72:2

_____

C

Cabernet
60:1

Cabo
59:18

call
12:9 26:8
54:21
55:1
97:16

called
20:21



31:3
102:6

**calls**
11:2
50:14

**candidate**
88:12,17,
18

**Capital**
8:4 21:17
27:1
28:19
29:11
31:9

**car**
41:17

**card**
20:8
111:22
112:14
117:2
143:14

**cards**
58:10
71:2

**care**
48:22

**careful**
132:13

**carried**
23:12

**case**
13:20
39:8
52:11
55:14
94:13
96:11

**cases**
7:7

**cash**

28:8

**Cash'**
115:18

**catch**
86:19
87:4

**categories**
122:14

**caught**
112:5

**Cease-and-desist**
127:22
128:3

**CEO**
51:2,8

**CEOS**
66:18

**CFO**
88:8,12,
17,18

**Chairman**
26:9,10

**chance**
33:7
59:12
131:14
139:4

**change**
14:16
34:14,18
35:9
37:3,18
38:11,21
39:4,9
48:16
49:9
50:10
53:6 59:5
65:20
67:3 94:1

**changed**
92:3
93:18

**characteriz ation**
76:14

**charge**
25:4 30:2
67:1

**charged**
117:1
146:20

**cheaper**
119:22

**check**
7:9 18:8
127:16
146:11,
14,17

**checking**
31:2

**Chief**
22:10
25:14
28:3,18
66:16,17,
18 81:7
126:4

**choose**
118:13

**clarificati on**
56:19

**clarified**
31:14

**clarify**
32:5

**class**
17:17

**clause**
76:2

103:19
104:10

**clauses**
13:13

**clear**
84:16
97:9
100:14
106:15
122:18
139:22

**clearer**
42:20

**client**
7:1 23:6
141:7

**clients**
23:2,4
113:21
140:15

**clothing**
48:8

**Code**
115:16
118:3,14,
17,20

**codes**
23:20
100:4

**collective**
34:10

**collectivel y**
28:4,9
29:15,18
53:13
55:2
128:14

**colluded**
57:7

**collusion**

56:15

**column**
62:22
63:8
64:2,3,9,
16 65:3
73:5
80:10,11,
16 83:7
84:18,19

**columns**
63:11
64:8
84:4,7,8,
12,19
89:10

**comment**
94:5
135:10

**commented**
12:22

**comments**
55:12

**committee**
8:3 26:11
27:5,8
29:9,11,
14 30:2
32:10,20
34:16,17
35:22

**committees**
34:2 35:8

**common**
49:19

**companies**
9:10 12:6
21:1
22:13
35:19
70:11,19
71:6,8,
13,16,21



81:13
87:1
100:6
137:5,9
140:3,5,8
143:16
146:8

**companies'**
119:8

**company**
25:5,7,
16,20
26:1,3
28:6,8
31:8,11
32:11
33:16,21
36:2
51:2,9,
10,14
72:3,9,
12,17
73:10,15,
21 74:9,
10 81:10,
17,21
82:2 88:8
104:16
119:4,7
120:12,13
121:7,10
146:18

**company's**
35:14

**company.'**
142:12

**compare**
42:9
43:12,17
103:18

**comparing**
117:19

**comparison**
41:14,16

42:11

**compensate**
128:15,19

**complaint**
36:20
37:2,6,
17,19,22
38:1,9,19
39:2,7
40:10
45:10,15
47:13
48:17
49:7
50:13
51:18
53:7
99:5,21
101:9
150:15,17

**complete**
61:19
62:8

**completed**
18:21

**compliance**
16:15
24:19,21,
22 72:5
108:12
133:1

**complied**
109:13

**comprehend**
78:14

**comprehensi
ble**
39:12
52:12

**concept**
119:11,20

**concepts**

24:12

**concerns**
110:22

**concluded**
151:7

**conclusion**
139:8

**conduct**
127:1
136:10,18

**confirm**
30:21

**confused**
77:10

**connecting**
12:13

**connection**
126:11

**consent**
126:22
127:2

**consequence**
145:21

**considered**
64:13

**consistent**
38:16
49:1
96:22
99:1,8,
10,13,15
100:10
101:1
102:22

**consisting**
128:12

**contact**
10:2

**contacts**
128:6

**contained**
84:20

**content**
132:10

**context**
142:21

**continues**
138:15

**continuing**
15:20
130:3

**contract**
125:17

**contracts**
23:3

**controls**
133:7

**convenient**
75:13

**convention**
141:11

**conversatio
n**
145:17,18

**conversatio
ns**
11:6
145:21
146:2,4,6

**Cooper**
109:6,8

**copies**
47:9

**copy**
15:1 58:3
94:9

**corollary**
76:9,15,
19,22
77:5

**corporate**
20:8 24:2
49:18
111:22
112:13
117:2

**correct**
14:14
16:8
22:18
27:6
31:8,20
33:18,19
36:21
37:5,8
39:9
40:4,11
43:13
48:14
50:20
51:11
53:11
54:2 57:6
58:6 61:4
65:4
66:5,6
67:9,10
70:3,5,
11,20,21
71:17
74:14
75:7
76:20
77:18
78:2,6,8,
11,12,17
79:17,22
80:19,22
81:14
82:10,21
84:2
88:12
89:17,18
93:5,8,13
94:14,21
97:19,22



98:6
99:2,8
103:17
106:4,21
111:2
112:10
113:13,18
114:11,16
117:2,3
119:9
120:13
125:6
126:8
131:19
132:1
139:9,20
140:4,6
141:16,20
142:16,19
145:2,7
147:4,7,
10 150:2,
3

correctly
76:6

costs
93:4

counsel
9:8

counting
44:2

couple
141:14

court
6:4 31:18
61:8,13,
16,21
62:15

create
50:4

created
21:14,15
22:4,7

creating
20:18,20

credit
10:5
19:22
20:1,8,9,
17 28:22
29:2,7,
10,13
87:3
111:22
112:13
143:13

Creditors
8:3

criticized
137:12

currency
16:21

current
27:11

cursory
13:17
14:3

customers
49:20

————————

———————— D

Dan
7:13 10:6
17:18
38:7
63:16
70:14
72:18
75:11
85:17
89:7
102:15
108:3
115:4
129:10

data
104:17

date
82:18
84:9,18
98:12

dated
107:15
131:10

dates
22:13

day
113:22

day--
132:6

days
69:15

dealt
49:13

December
128:18

decide
28:5
29:18

decision
28:9
29:12
35:21
57:3
148:7

decisionmak
ing
27:10,14,
16 29:6
32:3
36:16

decisions
27:22
28:16

declaration
55:22

57:5,15,
21 58:1
60:8
65:12,22
81:3

declaration
s
53:10,14,
16 54:8,
16 55:7
56:11,13
57:15,22
66:8

declared
57:8

declaring
59:1

deductible
93:4

deem
42:19
125:1,20
126:13
135:13,
14,19
136:20

defendant
7:3,8

deficiencie
s
136:6

define
108:4

defined
31:22
113:17

defining
104:13

deliberate
140:22

denies

48:12

departure
145:13

depending
72:13

depends
56:22

deposed
6:11,22

deposition
6:1 9:2,
17 15:6
32:15,18,
22 35:20
50:19,22
54:1,5,8
75:18
124:9
151:7

depositions
9:14

derivatives
16:19

Descr
80:11

describe
18:5

description
79:17
80:12
83:7

description
s
75:4 78:4
88:6

designate
19:5
24:13

designated
21:5 28:3
53:2



designation
  15:16
  31:1

detailed
  96:7

details
  48:21
  51:14
  96:6,13

determination
  64:20

determine
  74:7

determined
  14:3
  40:20
  42:6
  54:18

determines
  114:9,14

develop
  12:7

developed
  9:13
  12:3,7
  21:6

differed
  24:9

difference
  19:4
  99:17
  111:18
  112:21
  123:2

differences
  98:21
  118:10

differentiates
  11:13

difficult
  55:11,14

diligence
  35:19
  148:5
  149:11,14

Dinner
  88:18

direct
  7:15
  92:11,17

directing
  92:7

directly
  25:19
  125:3,22
  146:22

disagree
  70:7

disagreement
  139:7

discovery
  61:12

discuss
  29:16
  61:21

discussed
  10:16
  144:16
  145:7

discussing
  73:2

disgorge
  130:11

disgorgement
  128:12,14
  129:13
  130:6

distinction
  54:7
  121:17
  122:13

Distribution
  84:9,18

document
  30:8
  45:21
  52:15
  57:9
  59:12,15
  61:19
  62:8,12,
  14,18
  63:4
  82:15
  89:1
  102:6
  108:2
  114:13
  121:8
  127:4,12,
  21 131:4,
  13,15,22
  132:16
  134:19
  150:14

documentation
  12:16,18
  93:5

documented
  66:22
  72:13
  95:7,10
  96:4,5
  114:6
  120:7,8,
  9,16

documents
  7:16 9:7,
  19,20

11:13,14
12:2
13:2,9,
13,16,21
14:2 40:1
46:19
103:19
150:10,11

dollar
  40:12

dozen
  11:3,6

drafted
  21:13
  22:8

drafting
  21:8
  47:13
  106:19

drawing
  122:13

driven
  139:14

Duane
  13:12

Dublin
  26:19

due
  35:18
  136:9,17,
  18 148:5
  149:13

duties
  96:2

───────────
        E
───────────

earlier
  34:4

early
  17:2

26:22

easier
  91:17

easiest
  94:8

easily
  88:9

easy
  107:6

ECS
  61:17

educate
  97:9

educated
  17:2,13

education
  15:21
  17:16
  18:12
  19:3 20:5
  23:19

effect
  111:9,14,
  20 114:2

effective
  98:5,12,
  17

efforts
  100:2
  103:3,11
  104:6

electronic
  19:13

electronics
  58:10

elements
  88:5

employed
  20:7
  25:15



31:4,21
87:13
125:10,12
144:5

employee
23:16
25:8,9
49:13
71:11
74:4
82:17
112:20
116:22
118:5
119:3
122:3
125:2,8,
20 142:10
143:11

employees
25:1
67:16,20
69:7 70:4
82:14
93:12
95:22
97:10
100:2
103:2
104:5
146:3
147:22

employer
23:12

employers
23:13
24:8,20
124:17

employment
17:7
19:18
125:16

encouraged
147:22

149:6,9

encourageme
nt
149:10

end
67:6
113:22

enforced
83:1
88:2,4
89:16

enhance
109:1,9,
15,18,20

enhancement
110:21

enhancement
s
110:16

entered
10:21
126:21

entertainme
nt
9:11 12:1
13:1 93:4
105:20

entities
12:10

entitled
42:22
115:17

entry
63:9,15
73:4
80:8,16
83:7,8

equal
44:6

equaled
41:10

equate
106:8

equity
12:11
22:5,6
25:7,13,
16 26:22
27:2 28:8
31:8
100:16
101:4
128:16
133:5,8,
22 134:9
137:5,9
138:9,18
140:3
143:15

Erem
48:6

error
57:2,5
136:1,2,9

errors
78:9
136:5

essentially
18:9

established
29:15
97:9

estimate
11:6
138:10

ethics
23:21
115:17
118:3,14,
17,20

Europe
18:19

evaluate

30:1

evaluated
29:17

evaluating
99:12

events
131:1

evidence
39:15
40:4,5
46:21
54:9,11,
17 57:13
68:5

evolve
110:14

exact
82:2 83:3

examination
5:20
133:8

Examination
s
108:12
133:2

examined
133:4

excerpt
57:22

excess
23:5
41:11
118:8

Excuse
9:15
126:19

executive
72:3 81:8

executives
71:16

exhibit
9:20
11:12
15:3,8
45:12
53:9
57:18,21
59:8,9
60:22
62:1
72:22
80:7 83:6
90:9,15,
18 99:5
107:10,11
116:4
117:18
127:8,9
131:5
139:1,2
142:2,3

exist
21:12

existed
18:1

existing
21:22
109:15
110:17

expect
70:9,18,
22 71:1,
7,11 72:8
78:8
81:15,19
87:2,17
94:18
109:19
134:2,12
142:10

expectation
73:12,13

expected
19:16



20:10
69:18

**expecting**
133:17

**expenditure
s**
115:20

**expense**
8:15
9:10,11
18:5,21
19:19
20:2,5,12
21:5
23:3,5
24:13,18
64:10,13
73:6,14
75:6
76:4,11
77:16
78:5,9
82:13,17,
18 84:13,
21 85:14
86:7,13,
16 87:18
89:8
94:20
96:12
99:12
100:13
101:10,18
103:2,4
104:7,13,
20 105:4,
5,10
106:1,17,
20 107:15
108:21
109:2,10,
12 111:12
112:4
113:11,
15,17

114:4,7,
10,14,15,
20 115:5,
22 117:1
120:3,4
121:18,19
122:3,5,
7,8,11,12
123:8,9,
10,15
140:10
142:11
148:11

**expense'**
100:3

**expense.'**
82:20

**expenses**
17:4,9
20:10
21:4,10
22:3,12
25:4
38:20
39:3,16,
17 40:21,
22 44:5
49:3,6
52:10
53:3,4
62:17
66:15
68:6,7,
14,20
69:8,14,
16 70:10,
18 71:20
72:13,15
74:17
75:5
78:4,13,
16 79:14,
20 81:20
83:16,22
86:1 87:4

94:17,18
95:7,20
96:1,2
105:20,22
112:1,3,
14 113:1,
2,8,9
114:19
116:14
117:6,12,
14,16
118:6
119:10
122:2,22
123:1,5,
17,18,19
133:4,21
140:2,15,
21
143:13,19
144:7,16
145:6,14,
15,16,20
146:7,18,
21
149:17,22
150:8

**expensing**
71:12

**experience**
23:10
54:22
126:4,8,9
138:12
144:21

**experienced**
105:19
144:8

**expert**
6:15 7:1,
6 8:8,11,
14 10:18
14:12,18
74:14

**expertise**
139:19

**explain**
119:13
120:22

**explicitly**
96:15
119:2

**extend**
120:11
121:6

**extent**
47:21
113:22
118:18

**external**
148:16

---

**F**

---

**face**
42:9

**fact**
15:18
20:6 35:9
37:6
58:18
67:12,18
103:14
110:15
135:15
145:9
147:12
150:6

**facts**
42:21
46:21
50:9
103:12

**factual**
106:12,13

**fair**
22:15
54:15
104:21
121:5
130:15
139:18

**fairly**
17:4
99:10
103:13
106:3
118:3
122:18
135:8

**fake**
50:4

**fall**
104:4

**false**
54:10,12,
21 55:4,
13,19,20,
22 60:10
66:15

**familiar**
47:19
52:21,22
61:2,5
87:11
99:16,18
119:11,20
127:2,11
139:12

**Farah**
59:20

**father**
48:2,10,
13

**Fedex**
65:6 67:1

**feel**
132:10



feeling
  38:16

fees
  28:7
  44:17,20
  45:2
  128:17
  133:4,21

Feliz
  59:19

fiduciary
  41:3
  97:10
  113:19
  114:1
  126:6
  139:16

field
  128:7

figure
  12:17
  17:9 90:3

filed
  51:13

files
  12:2

filing
  61:14,17

fill
  18:6
  19:7,19
  79:4
  86:15

filled
  18:4
  86:13
  89:8

final
  29:12

financial
  22:19

23:14
66:18
87:1
139:15

find
  44:4
  54:19
  55:10,13
  56:16
  57:10
  101:13
  135:22
  137:15

Findings
  128:3

fine
  33:1
  42:20

finish
  29:3 38:6

FINRA
  16:4,9
  30:12,15,
  16,18

fired
  130:22

firm
  18:20
  28:21
  100:16
  144:6,9

firms
  9:13 12:5
  101:4

flight
  119:22

Florida
  50:16
  51:1 53:4

focus
  9:10 77:2
  142:5

focused
  104:20
  105:3

focuses
  89:21

focusing
  89:6

follow
  23:16
  39:19,22
  87:12
  141:9,11

Footnote
  131:18
  132:1

footnoting
  132:13

force
  70:1

form
  18:7
  19:7,19
  20:12
  27:15
  28:8
  32:8,21
  34:21
  36:14
  42:8,14
  43:7
  46:20
  47:15
  49:21
  50:6 52:4
  64:14
  69:1
  70:12
  76:13
  84:1
  105:1,5,
  10 107:3
  137:7

formal

17:17
141:5

forms
  12:7
  86:13,16
  89:8,12

found
  12:14
  92:13
  104:1
  134:14

foundation
  64:19
  117:10

frame
  46:18

free
  132:10

Friedman
  5:21 7:21
  8:7 14:1
  25:10,17
  27:18,21
  28:14
  29:5
  32:1,14
  33:3
  35:1,11
  36:9,18
  37:13,19
  38:2,13,
  17 39:20
  42:13,16
  43:2,10
  44:15
  45:6,18
  46:1,22
  47:7,18
  50:1,8
  52:16
  55:9,16
  56:5
  58:6,8
  61:10,13,

16,20
62:5
64:1,7,15
65:1
69:5,21
70:15
75:15,19
76:21
77:2,5,8,
11 84:22
85:3,6,18
88:20
89:4
90:13
91:5,16
92:1,9,
16,22
97:14
98:10,15
100:17,20
102:16,21
105:9
106:2,18
107:8
111:11,17
115:13,14
116:11,
13,19
117:13
123:21
124:4,10
129:11,
19,22
130:12
131:16,21
134:3,5,
11 137:21
138:8
140:16
141:13
143:6,9
150:20
151:3

friend
  10:5



**Frio**
59:18

**full**
97:5
101:14,16
102:1
132:20
142:18

**fully**
115:20

**fund**
22:2,5
26:6,7,
10,17,22
33:17
44:3
72:14
73:21
74:17,18
104:15
120:12
124:16,22
125:2,9,
12,19,21
126:12,
17,19
128:14
129:5,13,
20,21
130:1,9
133:5,9,
22 134:10
135:4,16
137:11,14
138:1,9
142:12
146:18,
21,22
148:4,6

**funds**
12:11
22:6 27:1
32:6
33:5,15,
21 34:8

35:4
39:18
44:17,20
45:2
70:10,19
71:6,9,
10,13,21
100:5,6
126:5
128:15,19
129:22
134:9
135:21
138:15,18
140:2,8,
15 141:7
143:15,
16,18
144:10,
12,14
146:7
147:3,13,
16,21
148:19,22
149:2,7

**funds'**
119:7

――――――

**G**

――――――

**game**
148:1

**gave**
10:7

**general**
9:3,4
61:6
94:16
98:1

**generally**
31:15
36:2 49:3
99:3,6,14
135:11

**generated**
13:10

**generic**
118:4,21
121:12
135:9

**gift**
58:10
60:5,9,
12,15,19
63:12
65:16
66:20,22
71:2
72:2,8
73:18
74:8
80:17

**gifts**
46:10,11
58:10
66:4 67:2
71:1,15
72:10
73:17
74:16
75:1

**give**
6:5 15:1
19:2 20:2
33:7,12
61:8 66:1
90:7
99:22
115:1
131:14
139:4
141:22

**giving**
5:22
62:21
148:11

**glance**
14:3 61:7

117:17

**glances**
13:17

**Global**
31:10
107:14
109:1,9

**Goldman**
31:4
144:6,21
145:1

**Goncalves**
51:6,15
57:16
60:5,20
63:13
72:4 73:2
80:18,21
81:17,22

**Goncalves'**
60:8
65:12

**good**
110:19
123:22
144:6

**goods**
115:19

**government**
8:12

**grabbing**
137:16

**grandfather
ed**
15:19

**great**
59:17

**greater**
44:6

**ground**
6:1

**grounds**
130:4

**group**
125:10

**guess**
81:12
150:14

**guidance**
76:5,12
77:13,19
78:2
79:15,21
80:1
81:16,20
82:14

**guideline**
82:9
114:18

**Guidelines**
95:19

**guys**
22:11

――――――

**H**

――――――

**half**
137:11

**hand**
93:16

**handled**
133:4,22

**happen**
80:1

**happened**
72:20

**happy**
92:11

**Harbour**
50:16

**hard**



6:3

**harmful**
133:2

**Haroon**
48:2

**he'll**
7:15

**head**
6:6
132:22
133:18
134:13
137:4

**headings**
62:22
64:16
80:10

**headline**
137:16

**heard**
108:15
119:16

**hearing**
128:5
129:1

**hedge**
22:2
26:17
138:15

**held**
21:11

**helps**
27:22
131:18

**hesitated**
97:4

**Highland**
8:3,4

**highlighted**
133:2

**highlights**
59:19

**highly**
55:15,18
56:16,17
57:10

**hire**
109:19

**hired**
17:5
18:22

**hit**
137:20

**hitting**
138:6

**Hoffman**
7:12 15:2
31:12
38:2 43:3
45:11
59:8
60:22
62:6
75:20
97:13
124:12
141:3

**Hoffman's**
39:9
129:8

**hold**
15:12
30:5

**holidays**
67:8,15,
21 68:10,
17 69:8,
17

**honestly**
85:10
133:14

**Hong**
18:18

**Honorable**
131:9

**hospitality**
59:17

**hour**
75:12
124:5

**hours**
11:8,9

**house**
41:18

**hundreds**
18:20
55:11
66:14,15
76:4,11
77:15
140:21

---

---

**I**

**idea**
47:16
64:22
93:21
111:6

**identification**
15:4
45:13
57:19
59:10
62:2
90:10,16,
19 104:17
107:12
127:10
131:6
139:3
142:4

**identified**
9:7 11:16
12:15,21
38:12
133:5,20
135:2,15,
21 137:11
146:1
149:18
150:6,7

**identify**
13:21
100:4
103:13

**ignore**
58:18

**illegitimate**
142:10

**ILPA**
134:20

**imagine**
66:16
78:12,15,
18,22
79:22

**immediately**
86:19

**impact**
37:7 57:2
149:11

**implement**
24:4

**implemented**
22:9 49:1
120:15

**implication**
94:4
122:17

**implicit**
120:7

**implicitly**
96:18

**implied**
141:19

**imply**
109:16

**implying**
71:14
104:18

**important**
125:1,20
126:13
129:6,14
130:6,8
135:13,
14,19
136:20
137:15
138:1,5

**Imposing**
128:3

**improbable**
55:15,18
56:17

**improper**
114:5

**improperly**
38:20
39:3
40:21
128:20

**improved**
110:15
135:1

**inaccurate**
37:17,22
38:5,11
79:17

**inaccurately**
76:10



inappropria
te
    114:22
    115:7
    145:19

include
    93:4
    94:19
    100:12
    101:18
    103:1

included
    14:4,5
    120:2

including
    86:17
    100:3

inconsisten
cies
    118:19
    134:22

inconsisten
t
    57:12
    109:17
    117:22

incorporati
ng
    119:21

incorrect
    46:21
    59:5

incorrectly
    79:5

increase
    138:16

incredibly
    132:13

incur
    24:12
    122:3

incurred
    68:15,20
    69:9
    82:18
    96:1
    111:12
    143:14

incurring
    148:11

independent
    50:10

independent
ly
    149:18

indicating
    63:22
    102:14

indirectly
    125:3,22

individual
    106:16
    135:21

individuals
    21:2
    54:13
    55:2,13
    57:11

industry
    23:14
    96:22
    99:1,9,
    11,18
    100:11,
    12,15
    101:2,17
    103:1
    104:4,19
    106:3
    109:13,17

influence
    35:21

influenced

36:16

information
    34:11
    62:12
    68:8
    82:16
    84:20
    85:13
    87:5,19
    93:13
    94:9,19
    95:3
    105:11
    107:1
    118:12
    138:1
    144:12
    147:6,10

initial
    143:2

Inspections
    108:12
    133:1

instance
    73:15

instances
    146:11

instituted
    110:4

Instituting
    127:21

institution
al
    12:14
    131:8
    134:17

instruction
    18:12
    19:11
    20:1
    100:13

instruction
s
    65:7

intent
    141:19

intentional
    94:14
    136:10,18

intentional
ly
    140:1,14,
    16 141:6

interaction
    108:18

interaction
s
    124:13

interest
    16:20
    128:13,19
    143:17

Interim
    107:15

internal
    24:17

internally
    148:15

interpret
    119:19

interrupt
    6:2,3
    38:6

interrupti
ng
    130:3

interruptio
n
    102:18

interview
    46:7,13,

17

interviewed
    46:10

interviews
    126:17

introduce
    60:22
    90:6

invest
    28:1,6,17
    36:1
    135:12
    148:19
    149:2,3,7

invested
    29:8
    32:4,7
    124:15
    128:15
    147:21
    148:21

investigate
    80:5

investigati
on
    46:8,14
    47:10,20
    52:1,3
    89:15
    130:15

investing
    148:4,6

investment
    21:3
    22:10
    25:14,18
    26:11,19,
    22 27:4
    28:3,13,
    18 29:9,
    10,14,16,
    20,22
    30:2,13



32:10,12,
20 34:17
35:22
36:3,8,
11,13
44:7
54:22
66:16
100:6
126:5
128:2,6
143:16
148:7,16
149:12

investments
22:2 26:6
27:3
28:20
34:7
35:3,16
36:5

investor
41:3 44:1
125:1,19
129:4,12,
17,19
130:9
135:11
136:7,11
144:10,12
147:2,13

investors
41:5
126:13,19
130:18
134:5,6,
12 138:1

invests
44:3

invoices
115:21

Ireland-
based
26:19

IRS
93:3 94:6
96:8

isolation
43:4,6

issue
32:6
109:22
130:1,14

issues
110:7,10

items
59:22
76:5,11
77:16

IV
128:10

_____

J

_____

J.P.
16:18
18:17
87:3

January
15:17
82:9

job
16:15
27:11

jobs
16:12
27:13

Joel
49:13

Juan
17:8

judges
6:21

judgment

54:21
55:1

July
98:8
131:10

Jumping
145:4

_____

K

_____

kill
62:10

kind
16:21
18:12
20:1
52:13

knew
11:22
12:5
13:12
19:1 22:5
25:3
34:15
35:5,8,17

knowledge
19:17
98:16
126:10
138:13

Kong
18:18

_____

L

_____

language
93:7,19
103:14
104:2
136:17

large
41:10,13,

21,22
42:6
43:4,5,
11,20
44:8,10,
13,14,16,
18,19,21
45:1

larger
130:13,17

law
133:6,20
134:14
135:17

learn
146:13,16

ledger
61:17

left
24:16
63:8 84:4
87:8
93:16
124:5

legal
31:20

legitimate
122:21,22
123:5,14
145:15

Lehnhoff
49:14

Lehnhoff's
50:2

lending
128:19

letter
131:7
132:19
133:15
134:17
137:13

letters
132:5

level
35:22
149:11

liability
21:1

licenses
15:11
30:4

lies
66:19

lieu
28:8
119:12

limit
21:1
119:6

limitations
110:7,10

Limited
131:8
134:18

lines
146:3

list
7:5,10,11
46:9 52:9
122:20

listed
9:20,21,
22 10:1

lists
50:13

litigation
10:13
11:14
13:4,10
32:7
47:20



lived
    18:17,18
LLC
    109:2,9
location
    19:7
locations
    22:14
logic
    79:9
    112:17
    121:15
logical
    96:11,16
    113:2
logically
    72:17
long
    10:4
    21:12
    38:10
    80:11,12
    83:7
longer
    10:9
    20:20
looked
    12:12
    40:6
    64:21
lose
    91:15
lot
    44:8
    53:10
    56:14
    78:8
    107:1
    120:17,19
Lourenco
    51:5

59:16
63:12
80:18
Love
    59:19
low
    106:3
LP
    12:14
    134:17
lying
    57:6
Lynch
    18:11,22

───────────

        M

───────────

made
    28:21
    32:12
    42:12
    44:7
    55:4,12
    134:20
maintaining
    36:7
majority
    67:13
    117:6
make
    28:9,16
    36:12
    42:2,18,
    22 52:12
    54:21
    57:11
    65:11
    81:16,21
    85:10
    87:22
    95:2
    105:18,20

109:11
120:17,18
121:17
148:4
makes
    91:16
making
    42:5 54:7
    103:20
    106:6,12,
    14 110:16
    128:2
manage
    25:19
managed
    20:21,22
    21:11
    25:13,18
    27:1
    33:6,16
management
    8:4,5
    20:19
    21:18
    23:20
    26:7,18
    27:7
    31:9,10
    33:16,21
    34:7,16
    35:3,14,
    21 42:1
    43:19
    44:11
    72:12,16
    73:10,15,
    21 74:9
    104:15
    107:14
    109:1,9
    125:5,11,
    13 126:1
    143:18
manager

10:5,8
25:15
125:2,9,
12,21
126:5,6
managers
    126:18
    134:10
    135:4,16
    137:13,14
managing
    28:11
    36:7
mandated
    23:4
manual
    18:9 19:8
    74:5
    87:10
mark
    15:2
    45:11
    59:8
    107:10
marked
    15:3
    45:12
    57:18
    59:9 62:1
    90:9,15,
    18 107:11
    127:9
    131:5
    139:2
    142:3
market
    49:1
    121:16
    137:20
    138:13
    141:9,10,
    12
marketplace

126:10
135:8
markets
    137:19
match
    132:10
material
    11:12,20
    56:22
    94:3
    133:6,21
    134:14
    135:17
materials
    9:5 11:16
    13:5
    47:22
mathematics
    16:22
matter
    10:3
    14:13
    32:16
    40:13
    48:2
    49:18
    50:20
    51:17
    55:6,18
    56:12,20
    58:13
    61:3
    66:10,11
    67:19,22
    68:9,19
    69:6
meals
    58:22
means
    96:6
    109:18
    119:18



meant
  99:7
  125:18

meat
  47:4

meet
  58:21

meeting
  24:16
  89:11
  145:17,18

meetings
  51:14
  58:22
  144:15
  145:5,10
  146:2

member
  16:4
  28:11
  30:15,16
  32:13,19
  33:20
  34:15
  35:8

memo
  72:14
  73:18
  74:2,11,
  22

memory
  16:2
  92:6,18

mention
  33:5

mentioned
  9:19
  25:18
  51:21
  61:2 74:1
  145:5
  147:1,20

mentions
  88:7,11

Merrill
  18:11,22

met
  11:7 18:6
  19:5
  24:14,15
  78:21

Metals
  81:8,9
  82:5

middle
  101:22

million
  26:18
  129:14

mind
  104:19
  111:1
  121:18
  123:7
  149:11

minimal
  18:14
  19:11

Minimize
  119:10

minimized
  149:13

minute
  7:9
  139:21

minutes
  75:12

misappropri
ated
  141:7

misappropri
ating
  125:3,21

misappropri
ations
  40:13

misstatemen
t
  57:1

misstating
  65:16

mistake
  81:16,21
  92:15
  136:1,2,
  9,17

mistaken
  67:2
  141:20

mistakes
  136:5

Mnuchin
  131:9

moment
  74:22

money
  41:10,14,
  19,22
  42:7
  43:20
  44:8
  49:14
  119:4,7,8
  120:13,21
  121:1,7,
  10 125:3,
  21 126:6
  130:7,11,
  14,19
  136:8
  148:10,12
  149:14

monitor
  12:10

monitoring

128:17

months
  17:6

Morgan
  16:18
  18:17
  87:3

morning
  9:3
  137:18

morphed
  26:14

mouth
  144:4

moved
  92:20
  144:8

moving
  18:11
  19:22
  21:17

MSNBC
  137:17

multiple
  58:19
  59:2
  68:14
  99:12
  132:5
  138:14

————————

N

————————

named
  10:6

names
  82:18
  83:14
  85:22
  86:4,5,8,
  17 88:7

narrow
  104:20
  105:3

natural
  33:17

necessarily
  14:17
  34:13
  40:18
  58:15
  86:12
  99:20
  106:11
  107:4
  110:12
  123:4

needed
  13:3
  14:11
  83:14
  94:19

news
  128:5
  138:6,7

nodding
  6:6

non-members
  134:20

Norman
  10:21

note
  59:14

notes
  7:10
  9:14,16

notice
  107:1

Nuevo
  59:19

number
  11:1



44:9,10,
16,18,19,
22 45:1,9
50:13
61:11
69:16
88:6
95:15,17
137:15
138:15

**numbered**
84:8

**numbers**
11:15
13:9
33:13
62:9
64:1,3

**numerous**
110:7,10

---

**O**

---

**O'CONNOR**
142:1,8,
15

**O'Connor's**
142:19

**Oak**
60:1

**oath**
54:2

**object**
6:7 34:21
39:5,10
42:14
129:7

**objection**
6:9 27:15
32:8,21
36:14
42:8,22

43:7 45:3
46:20
47:15
49:21
50:6 52:4
64:14,18
69:1,11
70:12
76:13
105:1,13
107:3
117:9
129:15
130:4
137:7
138:2

**objections**
42:17,19

**obvious**
105:18,21
106:6,8

**OCIE**
108:3,7
110:6
111:5
133:2,19
134:13
137:4

**offer**
122:20

**offering**
72:14
73:18
74:2,11,
22 139:22
140:13
141:5

**office**
17:8
86:19,21
87:3
108:11,
15,18
133:1

**Officer**
22:10
25:14
28:3,19
81:8
126:5

**Officers**
66:17,18

**offshore**
26:19

**oftentimes**
28:5
120:17

**online**
12:7
19:20

**Operating**
66:17

**opine**
49:11
86:21
89:19

**opinion**
36:10
38:11
39:10
41:2
48:17
49:9 53:6
59:6
65:20
67:3
68:11,19
69:8
97:2,21
114:3
140:14
141:5

**opinions**
37:4,7
38:21
39:4
40:14,22

50:10
55:6 68:2
70:6,16
122:21
140:1

**opposed**
11:15
139:15
140:17
146:21

**opposite**
76:20
77:1

**options**
16:21

**order**
43:11
59:22
64:2,4
74:7
94:20
117:7
119:21
126:22
127:3,21
128:4,7,
10 130:20

**ordering**
151:5

**organizatio
n**
104:14

**original**
84:20

**overlying**
118:16

**overseas**
17:4

**owned**
20:22

---

**P**

---

**p.m.**
124:9
151:7

**pages**
38:10
62:10

**paragraph**
33:4,10,
12 34:4
35:10
37:11
39:7 41:7
50:12
58:1,5
66:2
67:5,7
75:10,21
76:2
77:22
81:4
82:7,13
89:20
91:3
95:19
96:19
99:21
100:22
102:8
115:10,
12,15
116:7,15
117:21
122:19
124:20
132:20
142:7
143:3
144:3
149:15
150:1

**paragraphs**
45:15,20



46:3
142:6

part
13:4 32:9
36:7
46:8,14
47:9
49:10
74:13
84:12
89:5,14
104:15
106:19
141:1

partial
53:4

participating
32:13

parties
7:5

partner
44:5
147:18

partners
44:4
131:8
134:18

parts
23:19

party
7:4
145:16

pass
94:17

passed
142:11

past
12:4
121:15

Paul

47:14,19
51:21,22
52:6,22
107:16
108:22
109:7,19

pay
20:10
23:6,9
128:11

paying
41:5

payment
41:18
128:16

Pearce
14:19

pennies
44:3

pension
26:5,10
44:3

pensioner
44:2,8

people
57:7
67:12,13
96:17
105:21
106:7

people's
126:6

percent
28:20
73:19
132:2
133:7,19
134:15
149:5

performance
136:14,16

performing
96:2

period
40:8 80:3
87:18
97:17
137:6

perjure
66:19

permissible
113:14,16
120:11

permitted
25:4
113:11
114:4

permitting
120:3

person
10:12
89:12
105:19
113:4
132:7,8
147:17

personal
25:4
38:20
39:3,16
44:5 68:6
71:12
89:3
94:17
105:22
112:1,3,
14 113:1
140:2,15
145:14,19

personally
124:16
150:7

personnel
46:7,13,

17

pertains
27:17

pertinent
13:20

phone
11:2,8

physical
140:7

pick
72:12
81:2 99:4
102:2

Pines
10:6

place
82:18
89:11

places
66:22

plaintiff
7:3,8

pocket
148:13

point
18:18
19:11,21
22:10,17,
22 31:4
34:12
75:13
116:6
122:16
144:19

pointed
135:5

pointing
102:16

points
78:20

policies
8:18,20
9:12
12:12,15
13:14
16:15,16
17:1,14
18:13
20:2
21:9,13,
15,21
22:7 23:1
24:8,19
88:1
89:16
90:2,21
91:9
96:21
97:9,16,
22 98:1,
22 99:8,
13,18
100:13
101:1,11
103:22
104:4
106:20
109:22
111:14
113:6
139:17
144:13

policy
17:11
21:5,7
24:2,21
25:1
73:16,18
74:2,3,4,
11,21
83:21
85:20
86:3
89:21
90:1,8,
12,14,17,



22 91:1,
17,20,21
92:2,8,13
93:2,8,
10,11,15
94:9,10
97:17,18
98:4,17
101:19
102:3
103:2,16
104:12,
20,21
105:12
106:17
107:2
108:22
109:2,10,
12,16,20
110:4,5,
11,17
111:1,5,
9,20
112:9,15
113:12,17
114:2,5,
7,11,15,
17,21
115:6
116:4,21
117:20
118:7,14,
22 119:2
120:3,4,
5,10
121:4,12,
20 145:2

**policy'**
116:1

**population**
135:11
137:10,13

**portfolio**
22:12
25:20

26:1,3
29:19
32:11
35:19
36:6
51:2,8,
10,14
70:10,19
71:6,8,
13,16,21
72:3,9
74:9
100:5
119:8
120:13
140:5,8
143:15
146:8,18

**portfolios**
20:18
22:3
25:14,19
27:2

**portion**
84:4 91:3

**portions**
92:8
104:11

**position**
39:8 42:2
70:9,17
71:1 72:8
77:20
143:12

**positions**
54:19

**possibly**
11:4,8
15:20
52:10
65:16
88:5
106:16
150:16

**potentially**
134:22
137:14
138:11

**Pour**
60:1

**Powerpoint**
107:13

**practice**
49:19
72:19
83:1,13,
20 85:21
121:15

**practices**
119:3
133:3

**pre-
identified**
150:13

**prejudgment**
128:13

**prepare**
9:1

**preparing**
11:20

**presentatio
n**
107:14

**presented**
40:2,6
84:1

**President**
81:7

**Presidents**
66:17

**presume**
30:22
80:15
83:4

**presumption**
135:6

**pretty**
14:9
24:10,20
28:12
88:9 98:2

**previously**
144:5

**Price**
109:6,7

**primarily**
23:11

**prior**
9:17
19:17
23:7,19
28:15,22
109:11
120:14,
15,16
121:5
145:12

**private**
12:11
22:4,6
25:6,13,
16 26:22
27:2 31:7
100:16
101:4
128:15
133:5,8,
22 134:9
137:5,9
138:9,18
140:3
143:15

**privately**
21:11

**privy**
144:18

**procedure**
17:11
20:6
23:17

**procedures**
12:6,15
101:11
109:2,10,
12,16,21,
22 141:10

**Proceedings**
127:22

**process**
12:1,13,
20 18:10
19:1,4,13
21:22
24:3,4,
11,17
29:15
36:16
74:6
86:20
87:6,9,
10,11
105:8
106:1
112:22
140:7
141:10
147:15

**processed**
87:8
112:3
140:22

**processes**
9:12 12:4
135:1

**processing**
44:5
145:14

**prod**
71:3



produced
    61:12

product
    62:16

products
    20:18
    21:6,8
    22:5
    29:17
    71:5,12,
    15

professiona
l
    15:11
    30:4 55:1
    113:4
    124:13

project
    24:14,18
    28:5 73:9
    100:4
    104:15

projects
    100:7

proper
    79:14
    121:3,13

properly
    46:18
    86:13,16
    104:13
    115:20

protocol
    141:11

prove
    39:15
    57:8
    65:17
    121:9

provide
    75:4 78:3
    86:8 95:3

110:5

provided
    34:11
    86:6 88:9
    96:2

providing
    22:13
    77:12
    78:1
    79:15
    81:16,20
    111:4

proxy
    51:12

public
    134:20

Puerto
    17:6,8

pull
    88:6

pulled
    12:2
    101:21,22
    130:19

pulling
    52:7,9

purchase
    49:15

purely
    148:6

purpose
    24:15
    79:14
    82:19

purposes
    85:14

Pursuant
    128:1

put
    12:19

41:17
49:14
144:3

PWC
    108:22
    109:5,20

———————————

Q

———————————

QDI
    88:18

qualificati
on
    66:7

qualified
    15:17
    142:15

qualifier
    118:6,9

qualify
    66:3 99:7
    106:5

quantitativ
e
    42:3,5
    130:16

quantity
    40:15,17

quasi-
regulatory
    12:10

question
    29:4
    31:17
    37:12,22
    38:3,8
    39:11,12
    47:6 56:6
    65:11
    71:22
    76:16
    77:7

85:17,19
87:22
90:21
93:1
97:12
102:18,20
109:11
114:12
115:4
129:9
134:1
140:11
141:4

questionabl
e
    52:9

questions
    6:7 7:13
    31:13,16
    42:20,22
    85:15
    91:4
    107:21
    150:21
    151:2

quick
    75:14

quickly
    17:4

Quintero
    138:21,22
    139:8

quote
    100:8,19
    101:8
    117:19,20
    118:13

quoted
    91:3

———————————

R

———————————

raise
    598:

110:22

Rashid
    30:5,11
    31:7 32:2
    33:20
    34:1,6,15
    35:2,6,7,
    15,17
    38:19
    39:2
    40:19,21
    48:2,6,9,
    12 49:13,
    14 50:4
    51:15
    55:4
    58:11
    59:1
    60:4,10,
    19 72:2
    75:3
    76:5,12
    77:12,19
    79:15
    80:3
    81:15,19
    82:4
    83:14
    85:21
    94:16
    111:8
    113:7
    125:8
    130:14
    140:1,14
    141:6
    146:10
    147:2,9,
    21 148:18
    149:1,12,
    19 150:18

Rashid's
    32:15
    40:13
    41:9
    43:18



48:1,5
50:19
53:3
54:1,4
62:17
70:8,17
71:1 72:7
76:3,10
77:14,20
78:7
79:13,20,
21 98:5
117:6
127:1
141:15
143:12

**rate**
16:20

**react**
134:13

**reaction**
133:18
134:2,4,8
136:21

**read**
31:17,18
35:2
38:15
45:20
50:19
59:14
68:13
73:8 76:6
91:4 97:5
101:13,16
102:1
115:15
131:15
132:21
143:11
144:2,13
147:17
149:16
151:4

**reading**
34:5,10
95:12
141:18

**ready**
61:21
116:20

**reason**
18:5 92:7
94:6 97:4
114:22
115:7
120:21,22
121:2
135:10

**reasonable**
95:8 96:3
142:9
143:11

**reasons**
22:14

**rebuttal**
138:20
141:22

**recall**
7:22 8:1
48:15
66:4
74:20
112:11
128:5
133:12,14
136:21

**receipt**
50:5
60:18
66:21
116:22
117:7

**receipts**
18:5 19:4
22:13
23:8 47:9

115:21
118:7

**receive**
14:8
21:20
22:16,20
58:21
67:2
117:7

**received**
16:14
23:11
44:17,20
45:2
46:11
58:9
60:9,11,
15,17
65:17
144:11

**receiving**
66:4

**recent**
8:3 17:21

**recess**
75:17
124:8

**recipients**
46:10

**recognize**
51:5

**record**
11:12,19
14:6
68:13
91:4
115:16
124:7,11
127:20
131:7
132:21
143:11
147:9

149:16

**refer**
8:15
53:13
57:20
64:15
78:1 80:9
82:9 83:6
88:13
95:16
141:14

**reference**
46:5
53:10
114:18
133:15

**referenced**
13:14
52:18
150:11

**references**
108:3

**referred**
65:10

**referring**
8:22 15:5
26:12,21
39:6
45:14
50:15
74:3
88:19
117:18
122:9
129:17

**refers**
109:5
122:22
149:22

**reflected**
137:4

**regard**
23:22

24:3 42:3
72:10
73:17
74:5 75:1
88:4

**Regis**
50:15

**registered**
16:4

**Regular**
151:3

**regulated**
30:17

**regulation**
16:10
30:12

**regulatory**
12:17,21

**reimbursabl
e**
121:19
122:1,8,
10 123:1,
8,9,15,
16,19
143:18

**reimburse**
23:9
95:22
115:19
145:22

**reimbursed**
17:12
19:9 25:3
118:5
123:6

**reimburseme
nt**
17:3,10
20:11
24:5
101:10



112:4
113:13
117:8
122:4
144:8
146:17

**Reimbursements**
115:17

**rejected**
87:20,21

**related**
112:7
122:2

**relating**
53:3

**relation**
125:4
126:1

**relationship**
36:8

**relative**
42:1
44:10,16,
19 45:1

**relevant**
13:17
14:4 21:9
52:10
80:3
97:15,17
107:5
137:6
143:18

**relied**
47:13,17

**remain**
68:11

**remember**
7:21 14:9
19:20

65:18
66:9
74:16
75:2
112:14,16
129:1
138:6
142:21
150:19

**repaid**
150:1

**repair**
136:2

**repayment**
41:9

**repayments**
43:18

**repeat**
38:22
63:2
70:14
114:12
115:4
129:9

**rephrase**
56:8

**report**
10:18
11:21
14:19
15:2 33:5
36:19
38:16
41:8
46:2,5
53:9
57:21
67:4 68:2
70:7,16
74:14
75:10,21
82:8,17
84:13
89:14,20

96:20
106:20
107:15,22
108:20
115:11
117:17,20
118:15
122:9
124:20
126:12
127:16
129:8
131:18
133:16
138:21
139:10,
17,21
141:15
142:1,19,
20 143:1,
2 147:21
149:15

**Reporter**
31:18
61:8,21

**Reporter's**
6:5

**reporting**
82:13

**reports**
9:16
14:13,15
18:3,21
75:6
78:5,9
84:21
85:14
86:7
128:6
140:10

**represent**
84:3

**representation**

84:17
85:7

**representative**
49:18

**represented**
62:15
143:14

**representing**
61:12,18
62:7
85:11

**represents**
64:20

**reprimanded**
145:13
146:5

**request**
24:4
46:19
122:4

**required**
23:18
82:15
83:19
87:4,19
100:2
148:19,20
149:2,4

**requirement**
89:22
90:22
91:2,8
93:12
95:6 96:8
104:5

**requires**
86:4 93:3

**research**
9:9 12:20
35:18

36:2
126:16
148:14

**researched**
29:17
38:15

**reserve**
37:3 49:8

**Resort**
50:16

**resources**
33:17

**respect**
28:21
37:10
55:9,21
56:12
68:1

**respective**
82:16
142:12

**Respondents**
128:11

**responsibilities**
35:14
97:11

**responsibility**
114:1
140:9
141:1

**responsible**
28:20
29:12
34:6
35:2,16,
18 36:4,
6,11
52:6,8

**rest**
62:12



144:2

**restaurant**
58:22

**restriction
s**
112:9
113:7,9
115:17

**resulted**
128:16

**resume**
15:9 16:3
30:10,22

**resumed**
75:18
124:9

**review**
11:20
13:5,16
30:6,9
47:22
49:3,6
52:14
54:17
62:17
74:13
75:5 89:5
90:21
107:5,15,
20 147:15

**reviewed**
9:5,12,14
14:18
32:15
45:21
66:8 78:5
89:1
106:20
108:2
117:12,15
147:9

**Rico**
17:6,8

**rights**
147:15

**Risk**
10:5

**role**
47:20
51:22

**room**
10:21

**Rosangela**
59:16

**Round**
22:19,21
27:19
28:4,11,
15 87:16,
17

**routinely**
75:5

**row**
65:3

**rules**
6:1

———————

———————
        S

**SA**
73:10

**Sachs**
144:6,21
145:1

**sake**
6:5

**sale**
51:13

**San**
17:8

**Saturdays**
67:7,14,
20 68:10,

17 69:7,
17

**save**
119:4,7,8
120:12
121:9

**saves**
121:7

**saving**
120:21
121:1

**scheme**
141:15,19

**scope**
129:8
130:4

**SEC**
8:9 9:6
10:3,7,9,
10,13,18
13:3,6
14:7
30:18
46:6,12,
16,18
47:8,12,
17 51:13
62:14
65:9
108:13
126:22
133:3

**SEC's**
39:8 50:3
52:3
133:1,18
134:13
137:4
150:15,17

**secretary**
18:3
131:10
132:19

**section**
82:14
87:7
92:21
96:7
115:16
116:12
122:16
128:10

**Sections**
128:1

**securities**
17:1

**seek**
77:18
121:12

**segment**
46:5
137:10

**select**
11:10,19
13:5

**selection**
62:9

**semantics**
77:3

**send**
13:22

**senior**
18:16
44:4
112:19
147:18

**sense**
57:11
120:17,19

**sentence**
34:5
35:1,10,
11,13
41:8 42:9
59:4 67:6

68:13,20
77:22
82:12
96:20
97:5
100:1
101:14,17
102:1
124:22
143:10
149:16

**separate**
21:2 22:6

**Separately**
20:21,22

**Series**
15:13
16:7

**serve**
34:1

**served**
27:4,7
82:4

**services**
115:19

**set**
26:20
97:9

**Setting**
74:21

**shipped**
60:6

**shipping**
65:6

**shirts**
58:9

**shortchange
d**
136:13,16

**show**
30:22



32:22
45:10
57:14
59:7 90:2
107:9
127:4
131:3

showing
18:3

shows
68:5

side
28:13
139:14,
15,16,19

SIE
15:14,15,
16,22

sign
18:7
29:20
151:4

signature
29:13

signed
19:9
29:21
30:3
32:11
140:9

significant
41:19
45:9 57:4
104:11

significantly
130:13

signs
118:18

Silver
60:1

similar
19:10
24:12
94:5
104:1

similarly
20:3

simple
31:1
67:12
96:16
135:22

simply
13:15
15:18
18:2 23:8
86:3
104:16
105:7
106:6,12,
14 110:16
141:11

simultaneously
21:16

SIPC
16:5,6

sister
48:6

sit
25:22

skimmed
51:4

skin
148:1

slightly
20:6

SMA
21:6,8

small
137:10

smart
147:17

SMAS
20:21
21:2,12

sold
51:3

solely
126:7

son
48:3

sort
24:1 57:2

speak
23:2

speaking
9:9 42:16
49:4 79:7
99:3,7,14

special
100:6

specific
11:14
34:12
46:5
48:21
49:3,6
74:15
89:11
94:6
117:16
126:16
135:9
139:6

specifically
13:2 21:5
23:22
48:15
70:4
72:10
75:1

88:4,11
93:9
112:16
119:17
139:16

specificity
37:14
110:6,9
118:21

speech
132:22
133:12,18
136:4
137:1,3

spend
51:1

spending
148:10

split
74:19

spoke
10:13

spreadsheet
62:16
65:9,10
73:1 80:8

St
50:15

staff
22:9
108:3
110:6
111:5

stage
18:15,22
19:8
20:4,19
26:22
29:21

stand
97:2
143:22

standard
48:22
101:17
104:19
106:3
114:13
141:10

standards
49:2
96:22
99:1,9,
11,19
100:12,15
101:2
103:1
104:4
109:13,17
121:16
141:9,12

standpoint
31:20

stands
15:22

start
17:20
25:10
27:22
37:13
38:13
45:14
131:12

started
12:13
17:9
138:16

starting
16:13,18
23:16
82:8
144:20

state
77:21

stated



85:20
88:2
119:2
133:3

**statement**
34:9
51:13
55:4,21
56:1
58:14
59:2,5
60:8 66:3
78:11
103:1,20
104:22
105:8
106:6,9,
15 118:16
121:14
125:14,19
126:3
133:15
135:22
136:12
142:9,16,
18
143:20,22
144:4
148:5
149:20
150:4

**statements**
53:21
54:14
55:3
57:8,12
58:18,19,
20 66:14,
20 79:10
112:11,15
117:21

**states**
41:8
67:14
82:13,14

115:18
118:4

**stating**
60:14
134:21

**stay**
56:19
119:21

**Steven**
131:9

**sticking**
53:1

**Stopper**
60:2

**stopping**
75:13

**strange**
63:18

**structure**
33:18

**studies**
126:11

**subject**
10:17
16:9
30:11
111:8,14
113:7

**submit**
18:7
20:11
39:16
83:14
85:21
93:13
94:20
113:12
116:22
117:7
144:7

**submitted**

14:12
75:6
79:16,18,
20 83:15,
22 84:2,
14 86:1,7
87:4,19
89:6
118:8
143:17

**subscribed**
147:12

**subscriptio
n**
147:14

**subsequent**
23:13
91:9

**subsequentl
y**
39:18
94:12

**substantial
ly**
24:8
47:13

**substantiat
e**
82:15

**Substantiat
ion**
116:13

**suggesting**
49:5

**Suisse**
10:6
19:22
20:2,9,17
28:22
29:2,7,
10,13
87:3

**suit**
48:3,10,
13

**sum**
41:10,13,
22 42:6
43:20

**summarizing**
52:11

**Sundays**
67:7,14,
20 68:10,
17 69:7,
17

**supplied**
9:6,8
12:5
13:15,19

**supply**
19:7 23:8
105:7,12
118:11

**support**
50:3

**supported**
7:7
115:21

**supporting**
36:3

**suppose**
26:8

**supposed**
31:15
92:18
113:20

**surprise**
146:13,16

**surprised**
93:22
110:8

**surprising**

69:16,22
110:17
146:15

**suspended**
98:7

**suspension**
98:6

**swaps**
16:21

**swear**
57:12

**Swiss**
26:13,20

**sworn**
53:20,21
54:13
55:2,4,12
58:19
59:3,4
65:19
66:19

**synonymousl
y**
122:15

**system**
112:4

_____

T

_____

**T&e**
8:16,20
9:12
12:3,6,
12,15,18
13:14
16:15
17:1
18:13
21:6,9,
13,20
22:7
23:2,22



24:3,7
74:3,4,
10,21
82:9
85:20
86:3 88:1
89:16,21,
22 97:16
105:12
110:4,5,
11 111:1,
8,14,19
112:9
113:6,17
114:1,4,
6,11,15,
17,21
115:6
116:21
118:6,22
119:2
120:5,10
139:16
144:7,13
145:2
147:15

Table
22:19,21
27:20
28:4,11,
15 87:16,
17

takeaway
139:17

talk
23:3
29:16
122:10,11

talking
52:19
91:17
100:15
136:4,12,
15

tax
93:3

team
26:8

tells
6:8

tend
67:8
68:17

tended
69:7

term
8:19
11:11
119:16

terminology
103:6,8

terms
123:3

test
16:2
92:6,18

testified
32:19
48:2,6
49:14,19

testimony
6:18
10:17
50:3
79:19

Thanksgivin
g
50:16
53:3

theory
43:15

thing
6:4 40:9
48:7 94:8
96:17

98:2
110:19,20
114:9
127:16
138:18
147:1

things
23:21
105:6
110:14
144:17
147:19

thinking
41:14
70:1

third-party
115:21

Thompson
6:7 7:12,
15,19,22
10:12
13:8 25:8
27:15
29:3
31:12
32:8,21
34:21
35:5,13
36:14
37:9,16,
21 38:4
39:5
42:8,13,
15,18
43:7
44:12
45:3,16,
19 46:20
47:5,15
49:21
50:6 52:4
55:8,20
58:2
61:10,15,
18 62:6

63:15,19
64:5,14,
18 69:1,
11 70:12
75:11,16
76:13,22
77:3,6,9
84:16
85:1,11
88:17
90:11
91:2,7,12
92:5
97:12
98:9
100:14
102:12,
15,17
105:1,13,
16 106:10
107:3
111:10
115:12
116:10,
12,17
117:9
124:2,6
129:7,15
130:2
131:14
134:1,4
137:7
138:2
140:11
141:3
143:4,7
151:1,4

Thompson's
56:18

thought
14:11
92:13
94:3
141:19

thousands

137:14
138:11,
14,19
140:19,20

threshold
106:4,9

throw
95:4

ties
49:15
58:9 71:2

time
6:7,8
11:5
19:15
51:1
78:20
87:18
89:6
90:20
92:16
107:19
110:14
111:9,10,
11,15,20
121:10
123:22
124:3
129:2
133:20
134:15
144:19

time,'
133:7

timeframe
98:19

times
6:13,14,
15 7:2
10:15,19
11:3 59:2
141:14
145:12



**titled**
   107:14
   127:21

**titles**
   82:19
   83:15
   85:22
   86:4,6,8,
   17

**Tokyo**
   18:17

**told**
   146:7

**top**
   61:17
   62:9 63:6
   150:1

**topic**
   11:22

**total**
   11:5,8
   41:9
   43:18
   58:17
   65:15
   66:13

**totality**
   37:10
   55:8 88:3
   104:10

**totally**
   37:17,20
   38:4

**touch**
   151:5

**touched**
   139:11

**track**
   91:15
   95:4

**trader**

   16:20
   18:16
   20:20

**trading**
   16:20

**train**
   22:11

**trained**
   22:9
   144:7

**training**
   16:14
   20:1
   21:20
   22:16,17,
   20 23:11

**Tran**
   84:10

**Trans**
   84:9,18

**transaction
s**
   128:16

**transcript**
   32:16
   33:1
   151:6

**travel**
   8:15
   9:10,11
   12:1,22
   93:4
   95:20
   96:1
   101:10
   105:20
   115:22
   116:14
   119:12

**traveled**
   18:16

**Treasury**
   131:10
   132:19

**trees**
   62:10

**trial**
   6:18 8:6

**trip**
   50:15
   53:4
   59:18
   120:11
   121:6

**true**
   36:21
   37:3,7,9,
   10,20
   38:19
   39:1
   40:4,10
   46:3 49:8
   53:17,19,
   22 54:5,
   14,16,18,
   20 55:3,7
   56:11,13,
   21 57:5
   58:14
   67:16
   85:5

**turn**
   15:8
   124:19
   128:9
   132:18
   138:20

**turned**
   38:18

**Turning**
   82:7

**turns**
   39:1

**types**
   12:18
   22:2 96:6
   144:17

**typical**
   23:13

_____

**U**

**U.S.**
   116:8,15

**uber**
   41:20

**UBS**
   19:10,13
   26:14
   29:1,7

**Uh-huh**
   15:10
   17:15
   57:17
   58:7 65:8
   91:7

**ultimately**
   28:10
   29:11,19
   30:3 36:5
   40:20
   41:5
   120:12
   143:17

**unambiguous
ly**
   149:18
   150:5,18

**underline**
   91:11

**understand**
   6:3 23:17
   38:3
   39:14
   43:9,15

   56:6
   69:2,3
   75:8
   76:17,18
   80:12
   86:11,14
   102:9
   106:7
   134:16
   140:19
   148:16

**understandi
ng**
   51:22
   52:14
   55:17
   56:10
   113:3
   119:15
   120:7
   136:3

**understood**
   19:2

**undisclosed**
   128:17

**unintention
ally**
   140:17

**United**
   67:13

**unnecessari
ly**
   62:11

**untrue**
   56:16,20
   57:9

**USA**
   81:8,9
   82:5

_____

**V**

**vacations**



50:14

**valid**
16:7

**validity**
55:3
66:21

**valley**
60:1

**vast**
67:13
117:5

**vehicle**
26:20

**vehicles**
21:3 22:8

**veracity**
48:17

**verbal**
6:6

**verbatim**
85:2,13

**versus**
8:4
136:13
148:15

**VI**
128:20

**video**
24:1

**videos**
17:17,22
23:18

**view**
34:14,18,
22 37:18
51:17
141:4

**violations**
133:6,20
134:14

135:17

―――――――

**W**

―――――――

**Wait**
97:12

**wanted**
97:5

**watch**
137:17

**Waterhouse**
109:6,8

**Wayne**
10:10

**ways**
134:22

**weaknesses**
133:6,21
134:15
135:3,6,
15,18

**weekend**
119:21
120:11
121:7

**weeks**
98:5

**Weiss**
47:14
51:21
52:6,22
107:17
108:22
109:7,20

**Weiss'**
47:19
51:22

**well-
educated**
113:4

**well-
understood**
106:15

**Weston**
21:17
27:1
28:19,22
29:11

**wind**
41:5
120:20

**wine**
72:4 73:1
80:9,17

**witnesses**
50:10

**word**
65:5
103:10

**words**
144:3
148:2

**work**
17:21
28:5
47:14
61:3,6
62:16
67:14
69:7 70:1
80:21

**workdays**
67:8
68:18

**worked**
25:6
31:7,11
67:20
68:9 87:2
146:20

**working**
9:13 10:9

17:7
19:16
21:7
24:14
82:3
108:22
109:8
144:11

**works**
10:6
81:17,22

**world**
18:16

**write**
91:10
96:21
142:8

**writing**
21:9

**written**
89:16,19
93:12
146:17

**wrong**
41:4
112:21

**wrote**
22:8 35:9
41:13
76:19
139:6
146:10,14

―――――――

**Y**

―――――――

**year**
15:18
101:12

**years**
17:19
138:17

**York**
10:7 11:7

**Youtube**
24:1

―――――――

**Z**

―――――――

**Zegna**
46:7,13,
17,19
47:9
48:14
49:12,17,
20

