# Exhibit 23

Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  SOUTHERN DISTRICT OF NEW YORK
 3  _____X
 4  SECURITIES AND EXCHANGE
 5  COMMISSION,
 6        Plaintiff,     17-CV-08223(PKC)(SN)
 7        -against-
 8  MOHAMMED ALI RASHID,
 9        Defendant.
10  _____X
11
12        Deposition of Kevin Maurice Pierce
13              Washington, DC
14           Tuesday, June 4, 2019
15                9:42 a.m.
16
17  Job No: J4140714
18  Pages: 1-191
19  Reported by: Kenneth Norris
20
21
```

Page 2

```
 1        Deposition of Kevin Maurice Pierce
 2        Held at the Law Offices of:
 3
 4        GREENBURG TRAURIG
 5        2101 L Street NW
 6        Washington, DC 20037
 7        Telephone: (703)883-0880
 8
 9
10
11        Pursuant to Notice, before Kenneth Norris, a
12  Professional Reporter and Notary Public in and for the
13  District of Columbia.
14
15
16
17
18
19
20
21
```

Page 3

```
 1  APPEARANCES:
 2        ON BEHALF OF THE PLAINTIFF:
 3        JAMES M. CARLSON, ESQUIRE and
 4        DUANE K. THOMPSON, ESQUIRE
 5        United States Securities and Exchange
 6        Commission
 7        Assistant Chief Litigation Counsel
 8        Division of Enforcement
 9        Room 4216
10        100 F Street NE
11        Washington, DC 20549-5020
12        Telephone: (202)551-7159
13        Email:carlsonje@sec.gov
14
15
16
17
18
19
20
21
```

Page 4

```
 1  ON BEHALF OF THE DEFENDANT:
 2  THERESA VAN VLIET, ESQUIRE
 3        Genovese, Joblove & Battista
 4        200 East Broward Boulevard
 5        Suite 1110
 6        Fort Lauderdale, Florida 33301
 7        Telephone: (954)453-8000
 8        E-mail:tvanvliet@gjb-law.com
 9
10
11
12
13
14
15
16
17
18
19
20
21
```

Page 5

1                CONTENTS

2  EXAMINATION OF Kevin Maurice Pierce          Page

3      By Ms. Van Vliet            6

4

5

6

7

8

9  Exhibits                       Page

10  KP-1    Expert Witness report of Kevin M.    15

11          Pierce, CPA

12  KP-2    Rebuttal Expert Witness report of    15

13          Kevin M. Pierce, CPA

14  KP-3    Securities and Exchange detail of    17

15          Relevant expenses

16  KP-5    E-mail from Gregory Laufer to Donna   102

17          K. Norman

18

19

20

21

Page 6

1              P R O C E E D I N G S

2   Whereupon,

3               Kevin Maurice Pierce,

4   a witness of lawful age, after being duly sworn to

5   tell the truth, the whole truth and nothing but the

6   truth, testified as follows:

7               EXAMINATION:

8   BY MS. VAN VLIET:

9       Q.  Good morning, Mr. Pierce.

10      A.  Good morning.

11      Q.  My name -- we've met already.

12      A.  Yes.

13      Q.  But, for the record, my name is Theresa

14  Van Vliet.  I am a lawyer based out of Fort

15  Lauderdale, Florida, and thank you for coming to

16  Washington.

17          Although I would have come to Cleveland.

18          The -- the case that we're here -- again, I

19  represent Mr. Rashid, obviously.

20          I'm here today to ask you some questions

21  about both your initial expert report and your

Page 7

1   supplemental report.

2       But before we do that, I want to just get

3   some ground rules down.

4       Have you ever had your deposition taken

5   before?

6       A.  I have.

7       Q.  I assume the answer to that is yes.

8       So, you're pretty familiar, no doubt, with

9   the kind of ground rules that go on with a deposition.

10      But if at any point in time you want to take

11  a break, as long as there is not a question pending,

12  let me know and we'll take a break.  I don't

13  anticipate that we'll be here all day.  I don't know

14  when your flight is, but my flight is this afternoon.

15  Well, actually, my flight is this evening, and I'm

16  hoping to get home a little earlier, so I'll try to do

17  the same for you, assuming you're flying out.

18      Obviously the court reporter is taking down

19  everything we say.  At some point you and I are going

20  to talk over each other.  It's just going to happen.

21  I will try not to do it, you try not to do it, and

Page 8

1   hopefully we'll make him a happier man at the end of

2   the day.

3       MR. CARLSON:  I never talk over anybody.

4       MS. VAN VLIET:  Of course not, you don't,

5   because you're perfect.  Practically perfect in every

6   way.

7   BY MS. VAN VLIET:

8       Q.  So, obviously, you've spent time with

9   Mr. Carlson and know the rules of the road on

10  depositions, so I'm not going to waste any more time

11  -- of our precious time going through that right now.

12      So let's go through a little bit of -- it's

13  kind of the precursor kind of stuff.

14      What's your background, educationally, from

15  high school forward?

16      A.  I graduated from high school from Leland

17  High School in San Jose, California.

18      I attended West Valley Community College in

19  Saratoga, California, for two years upon which I

20  transferred to UNC-Charlotte.

21      Q.  Okay.

Page 9

1   A.  In Charlotte, North Carolina, from where I
2   graduated with a Bachelor of Science, a major in
3   accounting.
4       Q.  And do you hold any advanced degrees in
5   accounting?
6   A.  I don't.
7       Q.  Or do you hold an advanced degree in
8   anything, I guess I should say?
9   A.  I don't.
10      Q.  Do you have any licenses?
11  A.  I do.
12      Q.  National licenses?
13  A.  I do.
14      Q.  And what are they?
15  A.  I'm a CPA, a certified public accountant, a
16  CFE, certified fraud examiner, and a CFF, which is
17  certified in financial forensics.
18      Q.  And do you practice in those fields of
19  certified fraud examination and forensics?
20  A.  I do.
21      Q.  And how long have you been doing that?

Page 10

1   A.  For approximately 12 and a half years.
2       Q.  And has it all been with -- I believe the
3   name of your company is Stout?
4   A.  Yes.
5       Q.  The entire time?
6   A.  The entire 12 and a half years.
7       Prior to that, I was in public accounting.
8       Q.  Okay.  And those particular details are in
9   your CV, which is attached to your report; correct?
10  A.  That's correct.
11      Q.  Now, during the time period you've been
12  working on certified -- you know, fraud examinations
13  or forensic examinations, how many times have you been
14  called upon to do a forensic exam on travel and
15  entertainment expense policy issues, generically,
16  broadly?
17  A.  I would estimate seven to ten.
18      Q.  Seven to ten times?
19  A.  Yes.
20      Q.  Over the 12 years?
21  A.  Yes.

Page 11

1       Q.  Okay.  And in terms of -- I don't want to
2   get into the gory details, obviously, of who the other
3   clients were or any of that kind of stuff -- but in
4   terms of the scope of those investigations, can you
5   give me an idea of the dollar amounts that you were
6   looking at, the average in those seven to ten
7   entities?  Excuse me, investigations.
8       A.  I'll do my best to recall.
9           Anywhere from a 100,000 to 200,000 up to
10  several million.
11      Q.  Okay.
12          And the -- did you -- were you called upon
13  in those examinations to go in, in the first instance,
14  to the company and determine whether there had been
15  violations of T & E policy or expense reporting
16  policies as opposed to kind of as in this case looking
17  back at several years ago?  Do you understand?
18      A.  Yes, I do.  I'm just trying to remember.  In
19  most instances, I believe it was after the fact.
20  Maybe two or three brought in by the company to
21  perform an investigation.

Page 12

1       Q.  Okay.
2           And in the instances -- well, let me back
3   up.
4           In your work do you strive to have a certain
5   independence when you're reviewing, for example, T & E
6   policies, whether you're testifying as an expert or
7   not?
8       A.  Yes.
9       Q.  Okay.
10          And the purpose of your -- correct me if I'm
11  wrong, but generically the purpose of the fraud
12  examiner or doing a forensic in really any of the kind
13  of areas you do, is to find out the nuts and bolts, to
14  drill down to find out what happened and say, you
15  know, call balls or strikes.  Is it personal?  Is it
16  fraud?  Was there not fraud, period, end of story?
17          MR. CARLSON: I'm going to object to form.
18          But if you can answer that --
19          THE WITNESS:  I think I heard more than one
20  question.
21  BY MS. VAN VLIET:

Page 13

1    Q.  Is the purpose of your work to drill down on

2    a given question that you've been asked to answer and

3    analyze and give an independent call on whether, you

4    know, let's say, it's a business expense?  Is it

5    personal or is it business?  Or is it nonreimbursable,

6    whatever categories you come up with?

7        MR. CARLSON:  Same objection, but you can

8    give an answer.

9        THE WITNESS:  Yes.  It's to give an

10   independent opinion on -- an independent answer based

11   on the documents and information available to me as to

12   what, in my opinion, the appropriate classification of

13   expenses are.

14   BY MS. VAN VLIET:

15   Q.  Okay.  Perfect.

16       Now to do that, am I correct that having all

17   of the evidence available to you is important?

18   A.  I guess I'm -- having all the available

19   evidence to me is important that's relevant to my

20   analysis.

21   Q.  Okay.

Page 14

1        Now, if you were -- well, strike that.

2        Let's talk first about things that you

3    reviewed.

4        By the way, how much time did you spend on

5    this project, exclusive of preparing for the

6    deposition and the deposition today?

7    A.  I honestly don't have an estimate.  It's

8    been a long project.  I don't have a --

9    Q.  10 hours, a hundred hours?

10   A.  More than a hundred.

11   Q.  More than a hundred?

12   A.  Yes.

13   Q.  Okay.  Now, I notice in your exhibits to

14   your report that you went through a variety of

15   depositions and exhibits; is that right?

16   A.  Yes.

17   Q.  Okay.

18       And you did -- you never reviewed Paul

19   Weise's deposition, Mr. Ehrlich; is that correct?

20   A.  I did not.

21   Q.  You never reviewed Susan Clary's deposition

Page 15

1    or the exhibits to that one; correct?

2    A.  I did not.

3    Q.  Video.

4        Now, as I understand it from your report --

5    actually let me --

6        MR. CARLSON:  It was easier that way.

7        MS. VAN VLIET:  We're not actually going to

8    be talking about the report right now, but --

9    BY MS. VAN VLIET:

10   Q.  Mr. Pierce, I'm handing you what I've marked

11   as KP-1, which is your original report; correct?

12       (KP Exhibit No. 1 was marked for

13   identification.)

14       THE WITNESS:  Yes, it appears to be.

15       (KP Exhibit No. 2 was marked for

16   identification.)

17   BY MS. VAN VLIET:

18   Q.  And I'm also handing you KP-2, which as you

19   indicated earlier, you had written a rebuttal report

20   to Mr. -- sorry, written a rebuttal report; is that

21   right?  Is that a copy of your rebuttal report?

Page 16

1    A.  Yes, it appears to be.

2    Q.  Okay.

3        Now, in addition to your original report,

4    you filed a number of exhibits; correct?

5    A.  Yes.

6    Q.  And many of them were, like, details of

7    either expenses or things that you reviewed

8    generically; correct?

9        MR. CARLSON:  Theresa, just to clarify for

10   the record, they weren't -- the exhibits weren't

11   filed.  They were appended.

12       MS. VAN VLIET:  All right.

13       MR. CARLSON:  When they were submitted, just

14   for clarity.

15       MS. VAN VLIET:  I apologize.

16   BY MS. VAN VLIET:

17   Q.  One of the -- can I --

18       MR. CARLSON:  I'm sorry, just to note also,

19   the Exhibit 1 and I think Exhibit 2 have all the

20   exhibits or are they sans exhibits?

21       MS. VAN VLIET:  They are sans exhibits.  I

Case 1:17-cv-08223-PKC   Document 114-23   Filed 08/23/19   Page 6 of 86

Page 17

1  actually have them here, but I didn't want to kill a
2  tree. I'm only going to ask for one, which is what
3  I'm about to say right now.
4        MR. CARLSON: For sure. Again, I just want
5  to make sure the record is clear what we're looking
6  at.
7        MS. VAN VLIET: You're about 30 seconds
8  ahead of me.
9  BY MS. VAN VLIET:
10      Q.  So you filed all of these -- I'm sorry, you
11  appended all of these exhibits to your original
12  report; is that correct? Do you recall appending a
13  number of exhibits?
14      A.  I did attach exhibits to my report, yes.
15      Q.  All right. In order to save a tree, I'm
16  going to hand you just the only one that I'm going to
17  be asking about today, which is -- I've marked it as
18  KP-3, and it's Exhibit D, as in David, to your report.
19        (KP Exhibit No. 3 was marked for
20  identification.)
21  BY MS. VAN VLIET:

Page 18

1      Q.  And I've also -- well, take a look at that
2  first. And then tell me -- sorry, I don't mean to
3  throw the exhibit, but it was a wide, big table.
4        MR. CARLSON: Big table.
5        MS. VAN VLIET: I didn't want Mr. Thompson
6  to think I was tossing anything at him.
7        MR. CARLSON: Not yet.
8  BY MS. VAN VLIET:
9      Q.  With the exception of the highlighting that
10  I have done for ease of -- to direct you to things I'm
11  going to actually be asking you about, does that
12  appear to be a copy of your Exhibit D to your report
13  which was entitled "Detail of Relevant Expenses"?
14      A.  Yes, is appears to be.
15      Q.  Okay.
16        Now, I have a set of the rest of your
17  exhibits here. If you want to look at them, let me
18  know and I'll hand them over, but I just decided to
19  try to be a little bit paper friendly.
20        Okay.
21        So I'm not going to get into the weeds on 1,

Page 19

1  2, and 3 right now, but I do want to ask you just a
2  couple of general questions and then we'll start
3  getting into a little bit more detail on your report.
4        You noted in your report, your initial
5  report, which is KP-1, that you used -- and I'm
6  specifically referring to footnote 5 of your report,
7  page 7.
8      A.  Yes.
9      Q.  That you reviewed Plaintiff's Exhibit 19; is
10  that correct?
11      A.  That's correct.
12      Q.  And am I correct in understanding that you
13  used Plaintiff's Exhibit 19 as kind of a baseline for
14  your analysis eventually resulting in the work product
15  that is Exhibit D to the report as well as obviously
16  the report itself?
17      A.  That's correct.
18      Q.  Now, do you know whether Exhibit 19 was
19  prepared -- well, strike that.
20        Do you know whether Exhibit 19, which I
21  believe you referred to as the Master Spreadsheet; is

Page 20

1  that correct? Look up at the top of the page in 22,
2  paragraph 7.
3      A.  Yes, that's correct.
4      Q.  Is it okay instead of continuing to say
5  "Plaintiff's 19" that I refer to it as "Master
6  Spreadsheet"?
7      A.  Yes.
8      Q.  Do you know whether the master spreadsheet
9  that you looked at included information that had been
10  transmitted to Paul Weise and BDO from Mr. Rashid's
11  lawyers at Pearl and Moore?
12        MR. CARLSON: Objection to form.
13        THE WITNESS: My understanding from reading
14  the depositions was that portions of that spreadsheet
15  were completed by Mr. Rashid and his advisors.
16  BY MS. VAN VLIET:
17      Q.  And when you say his advisors, you're
18  actually talking about his lawyers; correct?
19      A.  Yes.
20      Q.  All right. So what you used as the baseline
21  contained the information that had been exchanged

Page 21

1 between Paul Weise, Apollo's lawyers, correct, and
2 Paul Moore, Mr. Rashid's lawyer. Is that -- was that
3 your understanding? Or is that your understanding?
4        MR. CARLSON: Objection to form.
5        You can answer.
6        THE WITNESS: My understanding was that
7 spreadsheet was provided by Mr. Rashid and his
8 advisors, his attorney, to Apollo.
9 BY MS. VAN VLIET:
10   Q.   You're aware that the communication as in
11 most things where lawyers are involved went from
12 lawyer to lawyer, right?
13        MR. CARLSON: Objection to form.
14        THE WITNESS: Typically.
15 BY MS. VAN VLIET:
16   Q.   Okay.
17        You have no reason to believe that it wasn't
18 anything different here; correct?
19   A.   I have no basis to have an opinion on that.
20   Q.   Okay.
21        And certainly nothing that you've reviewed

Page 22

1 would suggest that Mr. Rashid was e-mailing Paul Weise
2 directly or e-mailing Apollo directly with all this
3 information; correct?
4        MR. CARLSON: Objection to form.
5        You can answer if you know.
6        THE WITNESS: Not that I'm aware of.
7 BY MS. VAN VLIET:
8   Q.   Okay.
9        Now, were you aware that -- first of all,
10 when was Plaintiff's -- excuse me, the master
11 spreadsheet, when was it first generated?
12   A.   My understanding is approximately July 2013.
13   Q.   And it was early July 2013, correct?  Like
14 July 13th, 14th?
15        MR. CARLSON: Objection to form.
16 BY MS. VAN VLIET:
17   Q.   I guess that would have been mid, wouldn't
18 it?  Mid July?
19        MR. CARLSON: Same objection.
20        If you know.
21        THE WITNESS: I'm not sure on the exact

Page 23

1 date, but that sounds reasonable.
2 BY MS. VAN VLIET:
3   Q.   Okay.  And you're aware that -- are you
4 aware that in early July, specifically July 2nd, 2013,
5 Mr. Rashid was called in to Apollo and confronted with
6 allegations of inappropriate T & E expenses?
7   A.   I don't have a specific recollection.  It
8 sounds like something I read in a deposition.  But I
9 don't have a specific recollection of that meeting or
10 reading about that meeting.
11   Q.   Okay.
12        You did read Mr. Rashid's depo; correct?
13   A.   I did.
14   Q.   Do you recall -- and I'll represent to you
15 that the date was July 2nd, 2013.  But do you recall
16 that he was -- in his deposition he testified that he
17 was basically told cooperate with this investigation
18 or you're going to lose your job?
19        MR. CARLSON: Objection to form.  Also, I
20 believe, mischaracterizes the evidence.
21        Just for the point, again, I don't like

Page 24

1 being on the record, but if you're going to show -- if
2 you're going to talk about a specific part of
3 Mr. Rashid's deposition, it might be quicker to show
4 him.
5        MS. VAN VLIET: Well, I don't have it here
6 because I didn't realize he wasn't going to remember
7 things that he put in his report, but the basis for
8 it.
9 BY MS. VAN VLIET:
10   Q.   Do you recall that when you read his
11 deposition, Mr. Rashid's?
12   A.   I don't recall the specifics, but it sounds
13 like something I recall reading, yes.
14   Q.   Okay.  So do you generally recall that there
15 was a meeting where Mr. Rashid was brought in to
16 Apollo and that Paul Weise's lawyers were there?
17   A.   Yes.
18   Q.   Okay.
19        And do you generally recall, based on your
20 review of documents and evidence for preparation of
21 your report, that, as a result of that meeting,

Page 25

1  Mr. Rashid was suspended?

2       A.  I recall he was suspended.  I don't recall

3  whether it was a result of that meeting or not.

4       Q.  And do you recall that when he was

5  suspended, he was shown to the door and not given any

6  further access to anything inside the Apollo system

7  except through Paul Weise?

8            MR. CARLSON:  Objection to form.

9            I believe mischaracterizes the evidence, but

10  you can answer.

11           THE WITNESS:  I don't recall.  I don't

12  recall that.

13           I recall that Mr. McGorty testified that he

14  believed they were provided with everything that they

15  had requested from Paul Weise.

16  BY MS. VAN VLIET:

17       Q.  Okay.  Well, let's talk about what Paul

18  Weise thinks then.

19           What other specific -- since you appear to

20  be able to remember Mr. McGorty's deposition

21  specifically and not Mr. Rashid's, what other

Page 26

1  specifics do you remember from Mr. McGorty's

2  deposition about that event?

3            MR. CARLSON:  Objection to form.

4  BY MS. VAN VLIET:

5       Q.  By the way, he wasn't there at that meeting,

6  was he?  Mr. McGorty?

7       A.  I don't recall.

8       Q.  Do you seem to recall from your recollection

9  of Mr. McGorty's deposition he was in fact hired some

10  days later?

11       A.  I don't recall.

12       Q.  Okay.

13           Let's take a look at Defendant's Exhibit 1

14  previously identified in Mr. Ehrlich's deposition

15  which you didn't review.

16           Have you ever seen this document before?

17       A.  I have.

18       Q.  Okay.

19           And is it among the ones that you reviewed?

20       A.  I did look at it, yes.

21       Q.  Does that mean that you reviewed it or did

Page 27

1  you just flip through the pages and glance at it?  Did

2  you actually read it?

3       A.  I did.

4       Q.  Okay.  Now, is it fair to say that there --

5  in addition to the review of Mr. Rashid's expenses

6  there were also reviews of several other employees at

7  Apollo's expenses?

8       A.  Is there a specific page that you're

9  referring to?  I --

10       Q.  Look at -- you're going to have to refer to

11  the page number on these rather crummy copies that we

12  were provided with because the Bates numbers are cut

13  off, but page 2.

14       A.  Okay.

15       Q.  And page 3, if you'll review those.

16           And let me know when you're done.

17       A.  Okay.

18       Q.  Am I correct that in 2012 Apollo engaged

19  Paul Weise, who in turn engaged in an investigation

20  over broader expenses and procedures along with

21  Pricewaterhouse?  Too many PWs in this case -- at

Page 28

1  Apollo?

2            MR. CARLSON:  Objection to form.

3            But if you can answer.

4  BY MS. VAN VLIET:

5       Q.  Well, read the first bullet.

6       A.  Yes.  Yes, I see that.

7       Q.  And in the second bullet point it talks

8  about Paul Weise hiring Pricewaterhouse, is that

9  right, to assist them?

10       A.  Yes.

11       Q.  Okay.  And if you look to the next page,

12  there are several, specifically six, items of expenses

13  that Pricewaterhouse and Paul Weise were initially

14  hired in 2012 to look at and review; is that right?

15       A.  Yes, that appears to be the case.

16       Q.  And one of them was internal expense

17  reviews.  Excuse me, review of employee travel and

18  expense reports, number 2; is that right?

19       A.  Yes.

20       Q.  But there were a bunch of other kinds of

21  expenses they were looking at; is that correct?

Page 29

1    A.  Yes, that appears to be the case.

2    Q.  Okay.

3        Now, if you turn to pages 7 and 8 -- again,

4   I apologize, the Bates are cut off.

5        Paul Weise's PowerPoint reflects the

6   procedures that they used in this larger general

7   review; is that a fair summary of those two pages?

8        MR. CARLSON:  Objection to lack of

9   foundation that he would know that, other than looking

10  at this document.

11       But if you know, you can answer.

12       THE WITNESS:  Can you repeat the question,

13  please.

14  BY MS. VAN VLIET:

15   Q.  Sure.  Let me clarify something.  For

16  purposes of this question, also analyze whether you

17  have any reason to believe that Paul Weise lied to the

18  SEC when they presented this presentation to them?

19       MR. CARLSON:  Objection.

20  BY MS. VAN VLIET:

21   Q.  Do you understand that the PowerPoint that

Page 30

1   Paul Weise presented to the SEC on August 19th, 2013,

2   at pages 7 and 8, provides an overview of the testing

3   procedures that PwC used?

4        MR. CARLSON:  Objection to form as well as

5   argumentative.  It assumes facts not in evidence for

6   the statement prior to the question.

7        But if you can answer, go ahead.

8   BY MS. VAN VLIET:

9    Q.  Well, it is in Mr. Ehrlich's deposition.

10  Unfortunately you didn't review it, but go ahead.

11   A.  I understand the document is labeled testing

12  procedures and has a list of -- a list of procedures

13  that -- that they assert, that PwC did.

14   Q.  Okay.  And if you look to page 10, it

15  indicates down towards the bottom, the second material

16  one from the bottom, says "Travel, Meals, and

17  Entertainment."  Do you see that?  I grant you it is

18  hard to read.

19   A.  I do.

20       MR. CARLSON:  On the left?  Oh, okay.  My

21  eyesight is going.

Page 31

1        MS. VAN VLIET:  Yeah, on the left.  It's

2   really hard to read.

3        MR. CARLSON:  Travel, meals and

4   entertainment is what you're referring to?

5        MS. VAN VLIET:  Yes.  I'm sorry.  I think I

6   said expenses, yes.

7   BY MS. VAN VLIET:

8    Q.  And up at the top, equally difficult to

9   read, it says -- the second column if you will

10  "Phase 1 Expense Selection."  Do you see that?

11   A.  I do.

12   Q.  And next column is "Phase 2 Expense

13  Selection"?

14   A.  Yes.

15   Q.  And the third column is "Adjustment Back

16  slash Releases."  I think that's -- no reclass.  I

17  think it says reclass.  It's really difficult to read,

18  but I didn't prepare it.

19       It says adjustment something.  Let's put it

20  that way; is that fair?

21       MR. CARLSON:  Fair characterization.

Page 32

1        THE WITNESS:  All right.

2   BY MS. VAN VLIET:

3    Q.  Is that what you see?

4    A.  Yes, that's what I see.

5    Q.  So if we go down to the travel, meal and

6   entertainment category line, in phase 1, they selected

7   -- if I'm understanding this -- they selected 7

8   expense selections; correct?

9        MR. CARLSON:  Objection as to what 7

10  actually means.

11       But if you know, you can answer.

12       THE WITNESS:  They selected 7 something,

13  whether they were individuals' expenses or what that

14  population was, I don't know.

15  BY MS. VAN VLIET:

16   Q.  Okay.

17       The next column it's 10?  Correct?  Phase 2,

18  select 10.

19   A.  The column says 10, yes.

20   Q.  And column 3 regarding adjustments says that

21  there were three out of the --

Page 33

1   A.  Correct.

2   Q.  Now, if you turn to the next page, which is

3   11, it shows what the expenses that were adjusted

4   resulting from the PwC review were.  At least that's

5   what the title of the page said, is that right?

6   A.  May I read the --

7   Q.  Of course.

8   A.  Thank you.

9       Okay.

10  Q.  Do you have any reason to believe that the

11  information contained in Paul Weise's report to the

12  SEC or presentation to the SEC was inaccurate or false

13  and misleading in any regard?

14      MR. CARLSON:  Objection to form and

15  foundation.

16      THE WITNESS:  I have no basis to have an

17  opinion on that either way.

18  BY MS. VAN VLIET:

19  Q.  Okay.

20      So, fair to say that a number -- you know,

21  there are outlined here at least six different

Page 34

1   occasions where things, expenses, had to be readjusted

2   based on them being put in the wrong place initially

3   by Apollo?

4       MR. CARLSON:  Objection to form.

5   Foundation.

6       THE WITNESS:  Yes, that's what this page

7   says.

8   BY MS. VAN VLIET:

9   Q.  Okay.

10      And there were employees other than, or in

11  addition to I guess I should say, Mr. Rashid whose

12  expenses had been misallocated and had to be

13  readjusted; correct?

14      MR. CARLSON:  Objection to form.

15  Foundation.

16  BY MS. VAN VLIET:

17  Q.  Look at the second --

18      MR. CARLSON:  You're asking him just to read

19  and agree whether it says that on the page.

20      MS. VAN VLIET:  I'm asking him whether

21  that's his understanding based on documents he said he

Page 35

1   reviewed.

2       THE WITNESS:  Yes, that appears to be the

3   case.

4   BY MS. VAN VLIET:

5   Q.  Now, turn to page 16 of Exhibit 1.

6       Is it your understanding that page 16 of

7   Exhibit 1, which you've testified that you reviewed in

8   preparation for your report, summarizes what PwC

9   designed their audit to identify in terms of

10  transaction types?

11      MR. CARLSON:  I'm going to also object to

12  form and foundation that he would have any knowledge

13  of this beyond the document itself.

14      But if you can answer that question --

15      THE WITNESS:  Based on the information that

16  says the forensic analysis is designed to identify

17  certain audible transactions and then has a list of

18  types of transactions.

19  BY MS. VAN VLIET:

20  Q.  Okay.

21      And I am right?  You said you reviewed

Page 36

1   these, right?  This document?

2   A.  I did read this document, yes.

3   Q.  Okay, thank you.

4       I'm sorry, let me clarify it even further.

5       You read it actually in preparing your

6   report which -- report -- which are KP-1 and 2 as

7   opposed to just reading it on a Sunday morning?

8       MR. CARLSON:  Objection to form.

9   BY MS. VAN VLIET:

10  Q.  Personally?  Is that right?

11  A.  I would say I read it over the course of

12  reviewing documents.

13  Q.  For this engagement; correct?

14  A.  And for this engagement.  However, in terms

15  of the preparation of my report it is not a document

16  that I relied upon to reach my opinions.

17  Q.  By the way, can you tick off for me exactly

18  what documents it is you relied on in forming your

19  opinion?

20      Tell me exactly which ones.  Because all I

21  know is what you reviewed.  You didn't give me a list

Page 37

1  of specifically which documents you relied on, so tell
2  me which ones you did specifically every one.
3          MR. CARLSON:  Do you want him to go down
4  Exhibit A, his report?
5  BY MS. VAN VLIET:
6      Q.  Well, Exhibit A includes this.  So
7  apparently Exhibit A is not going to be very helpful,
8  so tell me exactly which ones you relied on.
9      A.  The documents that primarily form the basis
10 of my opinions are included in the footnotes in my
11 report.  The footnotes.
12     Q.  Which ones, other than the ones that
13 primarily form -- are there any other documents that
14 form the basis of your report?  If it's not in the
15 footnote, it doesn't constitute the basis for your
16 report; right?
17     A.  The documents that are in the footnotes in
18 addition to independent research that I have that I
19 did not footnote specifically but that I mention in
20 the report.
21     Q.  Okay.  Such as?  Because you only give, you

Page 38

1  know, examples in your KP-1 of --
2          MR. CARLSON:  Theresa, I would also like to
3  note for the record that you're asking about the
4  documents he consulted, which are in Exhibit A of the
5  report, which we're not looking at right now.  We
6  don't have that in front of us.
7  BY MS. VAN VLIET:
8      Q.  There you go.
9          MR. CARLSON:  Counsel has given Mr. Pierce a
10 copy of what appears to be Exhibit A to the initial
11 report, but we're not marking it as an exhibit, I
12 don't think.
13         MS. VAN VLIET:  I'm giving it to the witness
14 to refresh his recollection because you just suggested
15 that he might need it.
16         MR. CARLSON:  I understand.
17         THE WITNESS:  Is there a question pending?
18 BY MS. VAN VLIET:
19     Q.  No.  Your counsel asked me to hand you
20 Exhibit A, so I did?
21         MR. CARLSON:  Well, do you have a question

Page 39

1  to ask?
2  BY MS. VAN VLIET:
3      Q.  I'm -- you said that you primarily relied on
4  documents that are either noted specifically in your
5  footnote for preparing your report, or other things
6  that you reference in the body of your report.  Do I
7  understand your past testimony correctly?
8      A.  I would say that wasn't entirely correct
9  because there are depositions that -- and other
10 documents that I relied on that may have related to
11 the specific analysis of the transactions that aren't
12 footnoted in the report because there's not a specific
13 reference to them.
14     Q.  Understood.
15         So the things that, in fact, you've listed
16 in Exhibit A to your report, which would include
17 exhibits to all of the depositions, are things that
18 you reviewed and relied on in making your report; is
19 that correct?
20         MR. CARLSON:  Objection to form.  Exhibit A
21 specifically lists documents considered, not documents

Page 40

1  that he relied upon specifically.
2          MS. VAN VLIET:  Yeah.  Well, I'm following
3  up on his testimony just then.
4          MR. CARLSON:  You should ask the question.
5          MS. VAN VLIET:  I did.
6          You can answer.
7          THE WITNESS:  Can you repeat the question?
8  BY MS. VAN VLIET:
9      Q.  Sure.
10         You just testified that your previous
11 statement that the things that are footnoted in your
12 report, KP-1 or KP-2, as well as certain references
13 within the text of the report to outside research you
14 did, were those documents that you've relied on
15 primarily in issuing your opinions.  Did I understand
16 your testimony correctly?
17     A.  That is what I said and I --
18     Q.  And then you said, if -- next part of the
19 question -- that you believed that you may want to
20 revisit that answer because there were other
21 depositions and exhibits to depositions that may

Page 41

1  relate to some of the texts and opinions that you
2  formed in the context of your report, KP-1 and 2; is
3  that correct?
4      A.  Correct.
5      Q.  Do I understand your testimony correctly?
6      A.  That's correct.
7      Q.  Okay.  And among the exhibits that you
8  reviewed are the ones that we were just talking about,
9  Exhibit 1; is that correct?
10     A.  It is.
11     Q.  Okay.
12         And this all started on Mr. Carlson's
13 objection that you didn't necessarily rely on this
14 document in reviewing -- in making your opinion.
15         Can you tell me which of the exhibits that
16 you reviewed in the various depositions you used to --
17 you used in formulating your opinions?
18     A.  Not from memory.
19     Q.  Or was it -- did you form your opinion and
20 was your opinion guided to whatever extent by
21 everything that you've reviewed relevant to doing the

Page 42

1  work in this case?
2      A.  I think there is a distinction between --
3  for instance, this document that we're looking at now,
4  had I not reviewed it or not seen it --
5      Q.  You're referring to Plaintiff's 4.
6         MR. CARLSON:  Let him answer the question.
7         MS. VAN VLIET:  All right.
8         THE WITNESS:  Would not influence my
9  opinion.  Would not change my opinion.
10 BY MS. VAN VLIET:
11     Q.  I'm not asking you whether it would change
12 your opinion.  I'm asking you whether in reviewing it,
13 it informs your opinion one way or the other?  Because
14 otherwise I'm going to have to go through every single
15 exhibit.
16         Did it support your opinion, or did it not?
17 I'm just trying to find out whether when you reviewed
18 it, it goes into your calculus, whether informing or
19 agreeing or disagreeing?
20         MR. CARLSON:  Objection to form.
21         THE WITNESS:  It's a document I looked at.

Page 43

1  It's not a document that was pertinent to the opinions
2  I reached in the matter.
3  BY MS. VAN VLIET:
4      Q.  Okay.
5         Now, unfortunately then, I guess we're going
6  to have to go through every one like this.
7         Exhibit 3.  You might want to -- Plaintiff's
8  Exhibit 3.
9         MR. CARLSON:  It's Defendant's Exhibit 3.
10        MS. VAN VLIET:  Sorry.  Defendant's
11 Exhibit 3.
12 BY MS. VAN VLIET:
13     Q.  Do you recall reviewing this exhibit?
14     A.  I recall seeing it.
15     Q.  Okay.
16        And when you saw it, did you actually read
17 it?
18     A.  I don't recall reading it in detail, no.
19     Q.  Are there any other exhibits that are
20 listed -- I guess I'm going to have to mark it -- in
21 your Exhibit A that you saw but did not read?

Page 44

1         MR. CARLSON:  Objection to form.
2         MS. VAN VLIET:  Let me staple it.
3         MR. CARLSON:  And mischaracterizes his prior
4  statement.
5  BY MS. VAN VLIET:
6      Q.  I'm sorry, did you just say that you don't
7  recall reading this, Exhibit 3?
8      A.  I don't recall.
9      Q.  Okay.
10        MR. CARLSON:  Do you want to get copies of
11 that, Theresa?
12        MS. VAN VLIET:  Not particularly right now,
13 but I will get copies after.
14 BY MS. VAN VLIET:
15     Q.  Take a look at Exhibit KP-3.
16        (Exhibit No. KP-3 was thereupon marked for
17 identification.)
18 BY MS. VAN VLIET:
19     Q.  Which is Exhibit A to the report that you
20 filed.
21        Are there any other documents listed in

Page 45

1  Exhibit A to your report that you recall seeing but
2  not reading?
3      A.   There are very large amount of documents
4  that were subject to our search procedures, which I
5  may have seen and not reviewed in detail.
6          I did not review in detail or even
7  potentially look at every single document on
8  Exhibit A.
9      Q.   Okay.
10     A.   However, it was in the population of
11 documents that were subject to the searching
12 procedures that I performed in relation to my
13 analysis.
14     Q.   Okay.
15          Can you tell me where in your report or in
16 the exhibits you've discussed what searching
17 procedures you used?
18     A.   If you go to --
19     Q.   Is this the four days after, before and
20 after part?
21     A.   Yes.

Page 46

1      Q.   Okay.
2          Did you do any -- I can't remember the
3  number of e-mails you said that you had, whatever it
4  is, it is.  Tens of thousands.
5          Did you do any word searches on those
6  e-mails, for example, to narrow them before you did
7  your -- what I'm going to say your nine day search, if
8  we can call it that?
9      A.   I don't know that I would say to narrow the
10 search, but we did targeted word searches as well.
11     Q.   Okay.
12          Where might I find the list of targeted word
13 searches that you did?
14     A.   The list of terms?
15     Q.   Yes.
16     A.   It's not in the report.
17     Q.   Okay.  Well, can you please tell me what it
18 is you -- what terms you used?
19     A.   Well, we looked at 988 transactions.
20     Q.   No, I'm sorry.  Let me clarify my question.
21          You've just said that you used -- you

Page 47

1  utilized in your methodology search terms for the --
2  we were specifically talking about e-mails -- for the
3  e-mails that you reviewed.  Did I understand your
4  testimony correctly?
5      A.   You did.
6      Q.   Okay.
7          So can you please tell me, first of all,
8  whether you applied those same search terms to the
9  calendar entries that you were provided with for a
10 review?
11     A.   The calendar entries primarily focused on
12 dates.
13     Q.   I understand the calendar entries focus on
14 dates.
15          My question is, however, did you apply the
16 same search terms that you say that you applied to the
17 e-mails to calendar entries?
18     A.   No.  We did separate searches in the e-mails
19 for terms.
20     Q.   Okay.  Did you do any word searches of the
21 calendar entries?

Page 48

1      A.   Yes.
2      Q.   Words as opposed to dates?
3      A.   Yes.
4      Q.   Did you say yes?
5      A.   Yes.
6      Q.   Okay.
7          And so were those word search terms that you
8  did in relation to the calendar entries different from
9  the ones that you did in relation to the e-mail?
10     A.   They may have been.
11     Q.   Okay.
12          Can you tell me what -- do you have any
13 recollection of what the word searches you used in
14 your methodology were?
15     A.   Primarily merchant's name, cities,
16 attendees, that kind of information.  I don't have a
17 specific recollection of every search term that we
18 used.
19     Q.   Did you provide that information to the SEC,
20 your search terms?
21     A.   I did not.

Page 49

1 Q. Let's go back to something general.
2 Were you aware that the -- that Paul Weise
3 retained a law firm -- excuse me, not a law firm -- an
4 accounting firm, BDO, to do a specific review of
5 Mr. Rashid's expenses?
6 A. Yes.
7 Q. Did you ever review BDO's final report as
8 attached by the SEC to a pleading in April of 2018?
9 Let me make it broader first.
10 Did you ever review a BDO report?
11 A. I recall seeing a BDO report. I don't
12 recall reviewing it in detail.
13 Q. I'm going to hand you what's been marked as
14 Defendant's Exhibit 111.
15 I did not make copies of this.
16 MR. CARLSON: I understand.
17 BY MS. VAN VLIET:
18 Q. And forgive me, I had it put on letter paper
19 so that we could minimize the death of trees.
20 So it may be a little more difficult to read
21 is my point. Sorry.

Page 50

1 Do you recall reviewing Exhibit 111 in the
2 context of your preparation for -- and, candidly, I'll
3 be honest with you. This was introduced in
4 Mr. Rashid's examination. You can tell by the date
5 that's on it?
6 MR. CARLSON: Your reference -- just to
7 clarify, we're referencing this is as the BDO
8 spreadsheet.
9 MS. VAN VLIET: I believe that's what we
10 referred to it as.
11 Right now I'm just saying 111, because I
12 don't know the information on that.
13 THE WITNESS: I'm sorry, is there a
14 question?
15 BY MS. VAN VLIET:
16 Q. Yeah. Did you review it? I'm sorry, we
17 were kind of talking over your review while you were
18 -- did you review it in connection for preparation of
19 your deposition today?
20 A. Did I review this spreadsheet in preparation
21 for my deposition?

Page 51

1 Q. I'm so sorry.
2 In preparation for your report?
3 A. I recall seeing it. I did not review it in
4 detail.
5 Q. Okay.
6 So you did not -- am I correct that you
7 didn't use any of BDO's final work product as
8 reflected in Exhibit 111 in reaching your conclusions;
9 is that right?
10 A. That's correct.
11 Q. When I say your conclusions, I'm talking
12 about that which is in your report and ultimately the
13 specific summary that's in Exhibit D to your report;
14 correct?
15 A. That's correct.
16 Q. And I am correct that Exhibit D or
17 Exhibit KP-3 is the final breakdown of what your calls
18 on the allocations of expenses, personal business,
19 partial business is; correct? I think you did some
20 refunds or credit, too.
21 But am I correct that this is the final call

Page 52

1 for you?
2 A. This represents the results of my analysis,
3 yes.
4 Q. Okay. Now, you are aware, are you not, that
5 the review that was done by PwC and BDO was admittedly
6 overinclusive?
7 MR. CARLSON: Objection to form.
8 Foundation.
9 THE WITNESS: I recall that from the
10 depositions there was discussions of it being overly
11 inclusive.
12 BY MS. VAN VLIET:
13 Q. Well, do you -- let me -- do you recall
14 reviewing Defendant's 5 -- sorry -- and specifically
15 I'll turn your attention to page -- this one you can
16 actually read the Bates stamps. They are there, but
17 they're pretty small. They're on the right and I'm
18 going to refer you to Bates stamp ending in 4239.
19 A. Okay.
20 Q. Was it your understanding that the PW --
21 Paul Weise -- and BDO review of Mr. Rashid's expenses

Page 53

1  was admittedly one that might significantly overstate
2  the actual amount of Rashid's improperly expensed
3  costs because of the overinclusive approach adopted by
4  Apollo, which is caret marked number 2?
5          MR. CARLSON: Objection.
6          MS. VAN VLIET: Take a look at that.
7          MR. CARLSON: Objection to form and
8  foundation.
9          THE WITNESS: That's what the second caret
10  says, yes.
11  BY MS. VAN VLIET:
12      Q.  When you reviewed all of these documents and
13  spent the hundreds of hours working on this case prior
14  to -- prior to your testimony in your preparation -- I
15  mean did you come to gain an understanding of things?
16  Or what was the purpose of your reviewing documents
17  then?
18          MR. CARLSON: Objection to form and
19  foundation.
20          Are you asking him what the scope of the
21  engagement was?

Page 54

1          MS. VAN VLIET: No. I'm asking what the
2  purpose of his review of documents was, if not to gain
3  an understanding of what the document said.
4          MR. CARLSON: Same objection.
5          THE WITNESS: I'm not sure I understand the
6  question.
7  BY MS. VAN VLIET:
8      Q.  Well, Mr. Carlson is objecting because he's
9  saying that you have no basis to answer the question
10  because -- I really don't know why. But I'm curious
11  because you said that you reviewed all of these
12  exhibits in the context of preparing your report. Do
13  I understand that correctly?
14          MR. CARLSON: I'm objecting to the form of
15  the question. And whether or not you have a
16  foundation, you should lay it.
17          If you understand what she's asking you,
18  then go ahead and answer it. I'm not sure I do.
19          THE WITNESS: I don't.
20  BY MS. VAN VLIET:
21      Q.  Okay. Well, I'll ask it one more time.

Page 55

1          Did you review this exhibit in preparation
2  for issuing your report?
3      A.  I looked at it in the course of my review of
4  documents, yes.
5      Q.  Okay.
6          When you looked at this and all of the other
7  exhibits that you looked at in preparation for your
8  report, that would be the foundation for asking you
9  this question, did you come to gain an understanding
10  of the things, words, that were written in the report
11  that you reviewed?
12          MR. CARLSON: Objection to form.
13          THE WITNESS: I'm sorry, I'm not sure I
14  understand the question.
15  BY MS. VAN VLIET:
16      Q.  Okay. Do you understand what the word --
17  what the term "gain an understanding" means?
18          MR. CARLSON: I think the problem is
19  "things."
20  BY MS. VAN VLIET:
21      Q.  The words in the report, which is what I

Page 56

1  said.
2          MR. CARLSON: Things.
3          MS. VAN VLIET: I'm trying to be as broad as
4  possible. It's not a difficult question.
5          THE WITNESS: I believe I testified I
6  recalled looking at it. I don't recall reading it in
7  detail.
8  BY MS. VAN VLIET:
9      Q.  Well, actually, you didn't as to Exhibit 3.
10  That was when you were talking about Exhibit 1, and I
11  tried to ask you which documents you read, but didn't
12  -- I mean looked at but didn't read in detail, but you
13  weren't able to tell me.
14          So let's go back.
15          MR. CARLSON: I think for the record he said
16  the same thing about this exhibit, but if just have a
17  question --
18          MS. VAN VLIET: Actually, no, he didn't.
19  But the transcript will speak for itself.
20  BY MS. VAN VLIET:
21      Q.  Let's go back to Exhibit 5, because we'll

Page 57

1   have to go through every single one.
2       Do you recall seeing this in preparation for
3   preparing your report and reaching your conclusions?
4       A.  I recall seeing it over the course of my
5   engagement.
6       Q.  Did you read it?
7       A.  I don't recall reading it in detail.
8       Q.  Okay.
9       Exhibit 3,. Did you see it?
10      A.  I recall seeing it.
11      Q.  Did you read it?
12      A.  I don't recall reading it in detail.
13      Q.  Okay.
14      Look at Exhibit A to your report, which
15  we've marked, I think, in front of you.
16      A.  I'm sorry.
17      Q.  I believe it's under -- I believe you have
18  it right there.  There you go.
19      A.  All right.
20      Q.  Can you tell me what, if anything, else on
21  the list of documents that you considered you saw but

Page 58

1   did not read?
2       A.  I said there's within the Bates-ranged
3   documents there are -- I don't know how many pages.
4   Hundreds, thousand-plus pages, I did not read all of
5   them in detail.
6       Q.  I understand.
7       How about the exhibits to all of the other
8   depositions that you say that you reviewed?  I think
9   that might be on the page before in Exhibit A.  Can
10  you tell me what of the various exhibits to the
11  various depositions you list on your Exhibit A to your
12  report you saw but didn't read?
13      A.  I don't recall specifically all the exhibits
14  to all the depositions.
15      I don't recall which ones -- typically, I
16  would read the portion of the exhibit or at least
17  reference the portion of the exhibit in which the
18  deposition was specifically referring to and not
19  necessarily the entire document.
20      Q.  Okay.
21      So if, for example -- did you review

Page 59

1   Ms. Michelle's deposition, assuming Michelle?
2       A.  What was that name?  I'm sorry.
3       Q.  Michelle.  Maybe it's spelled Michael, I
4   don't know.  No?
5       A.  I don't believe so.
6       Q.  Okay.
7       So do I understand it correctly that it's
8   your recollection that if you read -- when, rather,
9   you were reading any of the depositions that you say
10  that you read in Exhibit A -- that if that testimony
11  referred to an exhibit and a specific page or
12  reference, if it was a line item, for example, that
13  you would have then gone to that exhibit and reviewed
14  that specific page or reference that was being
15  testified about?  Do I understand your testimony
16  correctly?
17      A.  That's my recollection.
18      Q.  Okay.
19      A.  I just don't recall what I read fully and
20  what -- I just don't recall it.
21      Q.  Did you take any notes or keep any notes of

Page 60

1   what you read or actually reviewed as opposed to just
2   saw?
3       A.  I don't recall all of them.
4       Q.  Okay.
5       Do you remember reading any travel and
6   expense policies from Apollo?
7       A.  I do.
8       Q.  Okay.  Let's start with the -- did you
9   review the -- if I don't crosshatch this right I'm
10  going to get totally confused.
11      What's previously been marked as CM-1, which
12  I'll represent -- well, look on the front of the page.
13  It says, "Apollo Global Management LLC Travel Expense
14  Reimbursement Policy, January 2009."  Do you see that?
15      A.  I do.
16      Q.  Is this a document that you not only saw but
17  read in preparation for your report?
18      A.  I did read this document.
19      Q.  Okay.
20      Now, this policy was in effect -- was it
21  your understanding that this policy was replaced by

Page 61

1 another policy that came into effect in November of

2 2011?

3    A.   That's my understanding.

4    Q.   Okay.

5         Let me show you CM-2 previously marked.

6         Is CM-2 a copy of the Apollo policy that

7 came into effect on November 1st, 2011?

8    A.   It appears to be.

9    Q.   Okay.

10        And is CM-2 among the exhibits -- let me

11 clarify.

12        This one is marked CM-2.  I'm not

13 necessarily saying that the exhibit that you read was,

14 in fact, marked CM-2 because there are several other

15 copies of this.  I'm just saying CM-2 because that

16 happens to be the copy I brought with me.

17        MR. CARLSON:  For example, CM-2 has a

18 BDO-Apollo production number, right?

19        MS. VAN VLIET:  Yes.

20 BY MS. VAN VLIET:

21    Q.   And I recognize that there are -- there may

Page 62

1 be others.  So please don't -- I recognize that you

2 may not -- you certainly probably won't remember it

3 marked this way.  What I'm after is did you -- you

4 said that you recall reading the 2011 Apollo review

5 policy.  Did I understand your testimony correctly?

6 Which is this one.

7    A.   I read this document, yes.

8    Q.   Okay.  And when you say "this document,"

9 you're referring to the 2011 policy; is that correct?

10   A.   I am.

11   Q.   And is it your understanding that the 2011

12 policy was then replaced by another policy that went

13 into effect in June of 2013?

14   A.   That's my understanding from the deposition

15 transcript.  I don't know that I ever saw a dated copy

16 of that.

17   Q.   Okay.

18        Did you review the Apollo corporate

19 representatives' testimony where Apollo stipulates

20 that it came into being on June 13th, 2013?

21        MR. CARLSON:  Can you give him a name,

Page 63

1 Theresa?

2         MS. VAN VLIET:  Cindy Michelle.

3         THE WITNESS:  I did.

4         MR. CARLSON:  The deposition of Cindy

5 Michelle is not listed on Exhibit A to his report.

6         MS. VAN VLIET:  Okay.

7 BY MS. VAN VLIET:

8    Q.   Did -- well, in fact, there was that

9 stipulation, and I'll put that in the record and I'll

10 ask you to accept my representation that that, in

11 fact, stipulation did occur at her deposition.

12        By the way, did you ask for all the

13 depositions?

14        MR. CARLSON:  Objection as to what's being

15 stipulated to.

16        If you have a specific thing that you want

17 to point him to in Michelle's deposition, you're

18 welcome to do so.  But that being said, you can ask

19 your question.

20 BY MS. VAN VLIET:

21    Q.   As I said, I'm representing to you that that

Page 64

1 is in fact what the Apollo corporate rep testified and

2 through counsel stipulated to that this policy, CM-3,

3 became effective June 1st, 2013.

4         Did you review this policy?

5    A.   I did.

6    Q.   Okay.  Now, before I get any further, did

7 you ask -- how did you come to select which

8 depositions you were going to review as reflected in

9 your Exhibit A to your report?  I'll get back to the

10 policies in a second.

11   A.   I didn't select them.

12   Q.   You didn't?

13   A.   I did not.

14   Q.   Were they selected for you by the SEC?

15   A.   They were provided to me.

16   Q.   By whom?

17   A.   By the SEC.

18   Q.   Okay.

19        So the SEC gave you what it wanted you to

20 review but didn't -- did you ask for all of the

21 depositions?

Page 65

1    A.   I did not.

2    Q.   Okay.

3         Did you review their complaint in this case?

4    A.   I did.

5    Q.   Okay.

6         And did you accept the facts as represented

7    in the allegations as represented in that complaint to

8    be true?

9    A.   I didn't accept the facts one way or the

10   other.

11   Q.   Okay.

12        And that's important, right?  If you're an

13   expert, you're supposed to try to be independent,

14   right?

15        You're nodding your head yes.  One of the

16   deposition rules is you can't do that because he can't

17   take down that nod.

18   A.   Yes.

19   Q.   Okay.

20        Now, were you aware -- let me back up.

21        These three T & E policies, the 2009 to

Page 66

1    October 31st, 2011, policy, which would be CM-1, the

2    November 1st, 2011, to May 31st, 2013, policy which

3    would be CM-2 -- excuse me -- the June 13th --

4    June 1st, 2013, policy -- and I don't know when it's

5    no longer effective, which would be CM-3.

6         As I understand it, you've testified that

7    you in fact read each of these policies; correct?

8    A.   I did.

9    Q.   Now, you know that Mr. Rashid was suspended

10   in or about early July 2013; is that correct?

11   A.   I don't have a specific recollection of

12   that, but that sounds correct.

13   Q.   Okay.

14        Now, you're aware, are you not, that the

15   2011 policy that was effective up until May 31st,

16   2013, didn't require receipts to be provided; is that

17   right?

18        MR. CARLSON:  Objection to form.

19   BY MS. VAN VLIET:

20   Q.   I'm asking you if you recall that.

21   A.   What is the 2011 policy?

Page 67

1    Q.   Specifically look at BDO -- look at Section

2    2.2.

3    A.   Yes.

4    Q.   And, yes, to answer your the question, the

5    2011 policy.

6         I'm specifically going to ask you about the

7    first bold faced type paragraph under 2.2, but please

8    feel free to reread.

9    A.   Okay.

10   Q.   Let me know -- are you ready?

11   A.   I'm ready.

12   Q.   So, is that your understanding that receipts

13   didn't have to be provided if charged on the Apollo

14   corporate -- let me just read it.

15        "In the US employees and partners must

16   attach all receipts for expenses over $75 unless they

17   are charged on the corporate Apollo credit card."

18        Is that your understanding?

19   A.   Yes, that's what the policy says.

20   Q.   And was it also your understanding that no

21   receipts are required for charges incurred on the

Page 68

1    Apollo corporate AMX card?  Is that your understanding

2    of what the 2011 policy called for?

3    A.   Yes.

4    Q.   Okay.

5         So based on your reading of these words and

6    the document that you read, you came to have an

7    understanding that no receipts were required for

8    charges that had been placed on the corporate AMX

9    card; correct?

10        MR. CARLSON:  Objection to form.

11        THE WITNESS:  Yes, that's correct.

12   BY MS. VAN VLIET:

13   Q.   Now, and, indeed in your review, your

14   hundreds of hours of work on this engagement, you

15   didn't see a lot of receipts for things that were on

16   the corporate AMX card particularly -- of Mr. Rashid's

17   particularly during this period; correct?  The 2011

18   time period.

19   A.   In general, I don't recall a lot of

20   receipts.  I don't recall specifically more or less in

21   a specific time period.

Page 69

1    Q.  Okay.

2        Well, let me just clarify one thing.

3        You at the end of the day in your report

4    conclude that there are some -- I'll refer you to your

5    initial report, which will be 1.

6        You conclude that some are -- some expenses

7    that you reviewed were outside the statute of

8    limitations; is that correct?  And specifically I'll

9    refer you to paragraph 57 of your report, but

10   obviously feel free to review any other -- do I

11   understand that correctly?

12   A.  That's correct.

13   Q.  Okay.

14       So, I'm a little bit confused.

15       Did you review only expenses within -- back

16   up.  Strike that.

17       In paragraph 57, you refer to a date range

18   of June 13, 2011, to June 2013 as being within the

19   applicable 5-year limitation period.  Is that correct?

20   Do I understand that correctly?

21   A.  That's correct.

Page 70

1    Q.  Okay.

2        Did you review only expenses within that

3    June 13, 2011, to June 2013 time period?

4    A.  In the course of preparing my report?

5    Q.  Yes, sir.

6    A.  No.  I reviewed expenses outside of that

7    time period.

8    Q.  Okay.

9        And your time period of review started at

10   least as early as January 2nd, 2010; right?

11       Because if you look at your Exhibit D to

12   your report --

13   A.  Yes.

14   Q.  -- I think, even though it's teeny tiny

15   little print, that that first date is January 2, 2010,

16   right?

17   A.  That's correct.

18   Q.  Okay.

19       So that would have been the first date you

20   reviewed because you testified earlier that this was

21   the sum of the things that you reviewed; correct?

Page 71

1        Do I understand that correctly?

2    A.  That would have been the first date I

3    reviewed, yes.

4    Q.  Okay.  And the last date you reviewed would

5    have been June 4th, 2013?

6    A.  That's correct.

7    Q.  All right.

8        Now, your first report.  You talk about at

9    paragraph 18 that Mr. Rashid quote, end quote,

10   admitted --

11   A.  I'm sorry, page 18?

12       MR. CARLSON:  She means paragraph.

13   BY MS. VAN VLIET:

14   Q.  I'm sorry, paragraph 18.  It would be

15   difficult to read page 18.

16       Paragraph 18.  And it goes from the bottom

17   of page 5 up into page 6, which is where you use the

18   admission language.

19       Let me know when you've reviewed that.

20   A.  Okay.

21   Q.  Okay.  Up at the top of page 6, which is the

Page 72

1    concluding language in that paragraph, you note that

2    he -- you're referring to Mr. Rashid there; correct?

3    When you say "he"?

4    A.  Yes.

5    Q.  That "he admittedly charged to his" --

6    Mr. Rashid's -- "and Apollo's client."

7        Do you see that?

8    A.  Yes, I do.

9    Q.  And where is it that you source the

10   statement that Mr. Rashid admittedly charged personal

11   expenses to Apollo's client?

12   A.  This entire section is cited to the

13   complaint.

14   Q.  Okay.

15       So for purposes of that, is there anything

16   other than the allegations in the complaint that you

17   are sourcing that to?

18   A.  No.

19   Q.  Okay.

20       Now, in connection with -- well, actually

21   back up.  Let me talk about footnote 2 because that's

Page 73

1  referenced in that paragraph 18. Do you see that?
2     A.  I do.
3     Q.  Mr. Rashid self-identified 220,000 worth --
4  it says "or expenses."  I'm assuming it may be
5  "of" -- "as personal in 2013".  Do you see that?
6     A.  I do.
7     Q.  Okay.
8         And where do you source your statement that
9  Mr. Rashid self-identified the amount that you
10 indicate?  Is that also from the complaint?
11    A.  I don't recall if that number came out of
12 the complaint or not.  I don't recall.
13    Q.  Oh, I'm not asking you about the number.
14 Where did you get the DM, the precursor to the number
15 that Mr. Rashid self-identified, whatever number?
16 Where are you sourcing that to?
17    A.  I don't recall specifically where that 220
18 was sourced to.  I believe it was just the breakdown
19 of the 290 that's cited in the complaint.
20    Q.  Yeah, again I'm not getting after the
21 number.  I'm getting after the -- I want to know where

Page 74

1  you sourced the phrase "Mr. Rashid self-identified"
2  whatever the number is?
3     A.  I don't recall if it's not in the complaint.
4     Q.  I'm sorry, you don't recall if --
5     A.  I don't recall.
6     Q.  So -- you don't know where you make a
7  statement that Mr. Rashid self-identified something?
8     A.  I believe it's in the context of the
9  complaint.
10    Q.  Okay.
11        MR. CARLSON:  Theresa, we've been going --
12 can we grab a quick break?
13        MS. VAN VLIET:  Okay.
14        (Whereupon, a recess ensued.)
15        MS. VAN VLIET:  Back on the record.
16 BY MS. VAN VLIET:
17    A.  So the discussion we were having before the
18 break.
19    Q.  The question I had asked you?
20    A.  With reference to self-identified in
21 footnote 2.  The 290,000 -- and I know you're not

Page 75

1  focused on the amount -- was from the complaint.
2     Q.  That's 220?
3     A.  I'm sorry.  The 290 that's at the beginning
4  of the footnote, I'm sorry.  And then the 220, the 10
5  and the 61 are breakdown.
6         The self-identified was from the depositions
7  of McGorty and I'm blanking on the other gentleman's
8  name, I'm sorry, from -- Zelenko.  I'm sorry.
9     Q.  Okay.
10    A.  And Zelenko.
11    Q.  So you specifically remember in Mr. Zelenko
12 and -- actually, during the 10-minute break, by the
13 way, did you have a conference with the counsel for
14 the SEC?
15    A.  I did.
16    Q.  And did you discuss your testimony?
17    A.  We discussed that point.
18    Q.  And did they remind you of anything they
19 wanted you to say in clarification of your previous
20 testimony on footnote 2?
21        MR. CARLSON:  Objection to form.

Page 76

1         THE WITNESS:  They didn't remind me of
2  anything they wanted me to say.
3  BY MS. VAN VLIET:
4     Q.  Did they just tell you what the new answer
5  was?
6         MR. CARLSON:  Objection to form.
7         THE WITNESS:  They did not.
8  BY MS. VAN VLIET:
9     Q.  So you independently remember that
10 Mr. McGorty and Mr. Zelenko said that Mr. Rashid
11 self-identified that stuff?
12    A.  They refreshed my memory as to where that
13 information might have come from.
14    Q.  And did you verify that?  That their
15 recollection, counsel's recollection, was correct?
16    A.  The --
17    Q.  In other words, did you look at
18 Mr. McGorty's deposition?
19        MR. CARLSON:  Please let him finish his
20 answer.
21        THE WITNESS:  The recollection or the

Page 77

1  portions are cited elsewhere in my report.
2  BY MS. VAN VLIET:
3      Q.  Okay.  Where?  Is it in your first report?
4      A.  It is in the first report.
5      Q.  Okay.  Great.  Show me where it is that
6  McGorty and Zelenko were cited to for the source for
7  the comment about Mr. Rashid self-identified it.
8      A.  It would be footnote 4 on page 7.
9      Q.  Okay.  And it's your recollection that pages
10  38 and 39 --
11      MS. VAN VLIET:  Those belong to those two
12  gentlemen.  Thank you so much.  I appreciate it.  Very
13  kind of you.
14      MR. CARLSON:  Was there a question?
15      MS. VAN VLIET:  I'm going to wait.
16      MR. CARLSON:  Okay.
17      MS. VAN VLIET:  Trying to wait until the
18  witness gets his coffee.
19      THE WITNESS:  The witness appreciates that.
20  BY MS. VAN VLIET:
21      Q.  You're welcome.

Page 78

1      We'll finish up with that after Mr. Thompson
2  -- after the next break, because I'm having trouble
3  logging in to pull up those two pages to see if that
4  is in fact what they say in terms of the
5  self-identification language.
6      So let's put that on hold for a second.
7      And any other things in your testimony that
8  you want to amend or change after the break we just
9  had?
10      A.  No.
11      Q.  Okay.  Turn to, if you will, page -- excuse
12  me, Defendant's Number 3, which was the Apollo Global
13  Management Review Preliminary Results, September 13th,
14  that you -- I believe you said you saw but didn't
15  read.
16      And if you would, turn to page 1306.  Since
17  your recollection was refreshed by things that
18  happened during the break --
19      MR. THOMPSON.  3?
20      MS. VAN VLIET:  Yes, sir.
21  BY MS. VAN VLIET:

Page 79

1      Q.  Got it?  I'm sorry, Defendant's Number 3,
2  not CM-3.
3      A.  This one?
4      Q.  It's the one dated September 16, 2013.  It
5  would be at the bottom of the pile, of course, right?
6      Specifically if you could turn to Bates page
7  1306.  And the Bates numbers are right down in the
8  bottom right-hand corner.
9      The title of the page -- although, candidly,
10  there is more than one page numbered 2, Mohammed Ali
11  Rashid, but this one says, "Current examination of
12  Rashid's expenses."
13      Let me know when you're there?
14      A.  I am.
15      Q.  I'm sorry?
16      A.  I'm there.
17      Q.  Okay.
18      Now, you know since we had some recollection
19  refreshing, take a look at the first caret.  That's
20  what I call these things.  I believe they're called
21  carets.  The first bullet.

Page 80

1      Which says "On July 1st, 2013, Paul Weise
2  interviewed Rashid."
3      Does that refresh your recollection that
4  Mr. Rashid was called in for that interview in early
5  July 2013?
6      A.  That's what this document says.  So it
7  appears that he was there on July 1st, 2013.
8      Q.  Okay.
9      So, now, does the next bullet or caret,
10  whatever we're going to call it, which says, "Although
11  he initially defended his expenditures as appropriate
12  business expenses and noted his assistant handled his
13  expense report, Rashid ultimately acknowledged that
14  many of his expenses could fairly be characterized as
15  personal."
16      Does reading that refresh your recollection
17  of your understanding of what transpired in the
18  July 1st, 2013, interview?
19      A.  I don't have any recollection of what
20  transpired at the July 1st, 2013, interview.
21      Q.  Okay.  All right.

Page 81

1  If you don't have a recollection, then it
2  isn't going to get refreshed.
3        Turn to the next page if you will.
4        Was it your understanding based upon your
5  review of documents and the hundreds of hours of work
6  leading up to your report that Mr. Rashid was willing
7  to have certain expenses reclassified as personal?
8        MR. CARLSON:  Objection to form.
9        Are you asking if he knew what is listed in
10 caret 1?
11       MS. VAN VLIET:  I believe I asked him
12 whether it was his understanding based on the
13 documents he reviewed in the over hundred hours he
14 worked in preparing for his report, whether it was his
15 understanding that Mr. Rashid was willing to have
16 certain expenses reclassified as personal.
17       I believe that it's almost verbatim of the
18 first question.
19       THE WITNESS:  I think that's what it says
20 here on the page.  I don't have a specific
21 recollection.

Page 82

1  BY MS. VAN VLIET:
2      Q.  Okay.
3          Do you know that there is a difference
4  between the terms recollection and having an
5  understanding of something?  Do you get that those are
6  two different concepts?
7      A.  I apologize.  I thought you asked if I had a
8  recollection.
9      Q.  No.  Was it your understanding based on
10 everything that you reviewed in the more than
11 100 hours of work that you did in preparation for your
12 report that Mr. Rashid was willing to have certain
13 expenses reclassified as personal?
14       MR. CARLSON:  Objection to form.
15       THE WITNESS:  It was my understanding that
16 Mr. Rashid and his advisors identified certain
17 expenses as personal.
18 BY MS. VAN VLIET:
19      Q.  So you have -- am I correct you have no
20 understanding as to why Mr. Rashid's lawyers -- who
21 you call as his advisors I believe -- working with

Page 83

1  Mr. Rashid -- and obviously I'm not suggesting that
2  you know what discussions went on between the two of
3  them or those two entities -- but you have no idea
4  based upon what you reviewed why Mr. Rashid did that?
5        MR. CARLSON:  Objection to form.
6        THE WITNESS:  I have an understanding based
7  on reviewing the depositions as to why they assert
8  that that was the case.
9  BY MS. VAN VLIET:
10     Q.  Is it your understanding based on reviewing
11 Mr. Rashid's deposition that he did so because he was
12 afraid he was going to be fired and/or face legal
13 consequences from his now former employer Apollo?
14       MR. CARLSON:  Objection to form.
15 BY MS. VAN VLIET:
16     Q.  Do you remember reading that?
17     A.  I recall -- I don't recall that exact
18 specifically, but I recall something along those
19 lines, yes.
20     Q.  Okay.
21         Now, let's talk a little bit about what you

Page 84

1  had access to -- other than the depositions that the
2  SEC gave to you -- in terms of your review for your --
3  leading up to your ultimate report.  Okay?
4         Tell me what it is apart from the
5  depositions that you were given, what else did you
6  have generically?  You don't have to give me Bates
7  stamp numbers.
8        MR. CARLSON:  Can he refer to --
9        THE WITNESS:  Can I refer to --
10 BY MS. VAN VLIET:
11     Q.  You can refer to whatever you want.
12     A.  Well, Exhibit A lists the documents I had
13 access to.
14     Q.  Okay.  And then I believe you had testified
15 that were some other independent research that you did
16 that you referenced in your report.  I believe you
17 testified to that earlier today.  Do I recall that
18 correctly?
19     A.  That's correct.
20     Q.  Is that -- are the details of that other
21 research listed in your Exhibit A?

Page 85

1    A.   It's listed under individual research on the
2    merchants found on the Plaintiff's Exhibit 19 under
3    section 5, Research and Other.  It does not list every
4    specific piece of information we gathered from that
5    research.
6        Q.   Okay.
7             So generically it says you did research, but
8    you don't list the results of that research; is that
9    fair?
10       A.   Not on Exhibit A.
11       Q.   Okay.
12            Are the results -- turning to your actual
13   report now -- are the results of that research that
14   you did, that is listed generically on Exhibit A,
15   detailed in your report, all of it?
16       A.   The results are incorporated to my final
17   opinions in the report.
18       Q.   Okay.
19            Understanding that it's incorporated, my
20   question, however, is whether the results of the
21   research that you referred to generically in Exhibit A

Page 86

1    is listed anywhere in your report?
2             MR. CARLSON:  Objection to form.
3             THE WITNESS:  The comprehensive list of the
4    documents that we obtained through research?
5    BY MS. VAN VLIET:
6        Q.   Yes.
7        A.   No, it's not.
8        Q.   Is it compiled anywhere?
9        A.   It is.
10       Q.   Did you provide it to the SEC?
11       A.   I did not.
12       Q.   So anything else in addition to the search
13   terms, for the e-mails, the search terms -- word
14   search terms for the calendar and the results of
15   whatever research it is that you did, anything else
16   that was not provided to the SEC?  Or appended to your
17   report?
18       A.   Not that I can recall.
19       Q.   Okay.
20            Now, let's talk about -- what was your
21   understanding of what BDO had access to when they did

Page 87

1    their review back in the day contemporaneous when all
2    this -- closer, I should say, in time to when this
3    happened?
4             MR. CARLSON:  Objection to form.
5             If you understand, you can answer.
6             THE WITNESS:  I don't -- I don't really have
7    an understanding of what BDO had access to.
8    BY MS. VAN VLIET:
9        Q.   Okay.
10            Well, you seem to be under an understanding
11   that you had all of Mr. Rashid's calendar records; is
12   that right?
13            MR. CARLSON:  Objection to form.
14            THE WITNESS:  My understanding is I have all
15   of the -- Mr. Rashid's calendar entries that Apollo
16   produced.
17   BY MS. VAN VLIET:
18       Q.   Turn to paragraph 39 of your initial report.
19   I believe that states "Mr. Rashid's calendar entries
20   during the relevant period were produced by Apollo."
21            So is it your understanding that all?  Were

Page 88

1    you under the understanding that you were reviewing
2    all of Mr. Rashid's calendar entries?
3             MR. CARLSON:  Objection to form and
4    foundation.
5             I'm not sure he would have any knowledge of
6    what Apollo produced and what their process was.
7             But if you can answer that question --
8             MS. VAN VLIET:  Well, that's why I'm asking.
9    Because what he says in here is that the calendar
10   entries during -- it suggests to me that you're saying
11   all of them were produced.
12            MR. CARLSON:  It doesn't say all of them in
13   the sentence.
14            MS. VAN VLIET:  That's right.  It just
15   says --
16            MR. CARLSON:  Calendar entries.
17            MS. VAN VLIET:  -- calendar entries during
18   the relevant time period.
19   BY MS. VAN VLIET:
20       Q.   So is it your understanding that you did not
21   get all of the calendar entries during the relevant

Page 89

1  time period?

2      MR. CARLSON: Objection to form and

3  foundation.  He has no idea the extent of what Apollo

4  produced, if it was full, complete, partial.

5  BY MS. VAN VLIET:

6      Q.  You were aware that Apollo was adverse to

7  Rashid from the beginning; correct?

8      MR. CARLSON:  Objection to form and

9  foundation.

10      He is not here to make a legal conclusion

11  about who was adverse to whom.

12      MS. VAN VLIET:  Well, if he had read the

13  depositions, you would know that there is testimony to

14  that.

15  BY MS. VAN VLIET:

16      Q.  But is that your understanding?

17      MR. CARLSON:  Same objection.  He's not --

18  BY MS. VAN VLIET:

19      Q.  You can answer it.

20      A.  Can you repeat the question, please?

21      Q.  Sure.

Page 90

1      Was it your understanding that Apollo and

2  Mr. Rashid were adverse?  And Mr. Carlson has an

3  objection to form.

4      MR. CARLSON:  And foundation.

5      But if you can answer that question, go

6  ahead.

7      THE WITNESS:  I don't know that they were

8  adverse.  I don't know the context of the discussions

9  that they were having, whether they would be

10  considered adverse or not.

11  BY MS. VAN VLIET:

12      Q.  Would it be important for you, as an

13  independent person reviewing something, to know if the

14  source of your information was adverse to the subject

15  of your investigation?

16      MR. CARLSON:  Objection to form.

17      THE WITNESS:  Can you repeat the question,

18  please.

19  BY MS. VAN VLIET:

20      Q.  Yes.  If you were doing your independent

21  review, would you want to know whether the source of

Page 91

1  the data that you were being given to review was

2  adverse to the subject that you were reviewing?

3      MR. CARLSON:  Same objection.

4      THE WITNESS:  I don't know that it would

5  impact my conclusions one way or the other.

6  BY MS. VAN VLIET:

7      Q.  Okay.

8      That's nice.  But my question was would it

9  be important for you to know whether the source of the

10  information that you were being provided was adverse

11  to the subject of your review?

12      MR. CARLSON:  Objection to form.

13  Argumentative.  And asked and answered.

14  BY MS. VAN VLIET:

15      Q.  I'm not asking whether it affected your

16  conclusion.  I'm asking --

17      MR. CARLSON:  You have got to let him answer

18  the question first before you complain about it.  You

19  have to let him answer.

20      MS. VAN VLIET:  Actually, I was referring to

21  and responding to your asked and answered, because it

Page 92

1  wasn't.

2      MR. CARLSON:  It was.

3      But you can answer.

4      THE WITNESS:  I'm sorry, can you repeat the

5  question again?

6      MS. VAN VLIET: Sure.

7  BY MS. VAN VLIET:

8      Q.  There is a difference between affects your

9  opinion and whether it's important for you to know.

10      Do you have that understanding in mind?

11      MR. CARLSON:  Objection to form.

12      THE WITNESS:  I do.

13  BY MS. VAN VLIET:

14      Q.  Okay.

15      Would it be important for you in rendering

16  your independent opinion, to know that the source of

17  your information upon which you are going to base that

18  opinion is being provided to you by a source adverse

19  to the subject of your opinion?

20      MR. CARLSON:  Objection to form and

21  foundation.  You can answer.

Page 93

1    THE WITNESS: I don't know that -- I don't
2   know that it would be important. I don't know if it
3   would impact. I don't know the circumstances as to
4   what they were adverse. If they were even adverse, I
5   don't know how that would impact Apollo's data
6   gathering under subpoena to this case.
7      It's just to me I don't know it would
8   impact. I don't believe it would impact my opinions.
9   BY MS. VAN VLIET:
10     Q. Okay. Now, Andrew Ehrlich was not among the
11  depositions -- there is only one copy of Exhibit A,
12  I'm sorry -- Andrew Ehrlich was not among the
13  depositions that the SEC gave you to review for your
14  opinion; is that right?
15     A. I don't recall.
16        MR. CARLSON: Give him a second to get that
17  out.
18  BY MS. VAN VLIET:
19     Q. It's always going to be on the bottom.
20  That's just a given.
21     A. No, he was not.

Page 94

1     Q. Now, are you aware that -- well, strike
2   that.
3        In your review of Mr. Rashid's testimony, do
4   you recall the discussions of the use of BlackBerry --
5   it may be young -- BlackBerry mobile devices during
6   the relevant time period at Apollo?
7        MR. CARLSON: Objection to form. Vague.
8        THE WITNESS: I don't recall specific
9   testimony about BlackBerries. I don't.
10  BY MS. VAN VLIET:
11     Q. Okay.
12        Do you know what a BlackBerry is?
13     A. I do. I do.
14     Q. Okay.
15     A. I'm older than you think.
16     Q. You don't look it.
17     A. Thank you.
18     Q. And BlackBerry also -- will you accept that
19  that also includes the BlueBerries, which at the time
20  were blue in color as opposed to blackberry and were
21  fondly known as BlueBerries by those of us who used

Page 95

1   them at the time?
2        MR. CARLSON: Didn't know that.
3        MS. VAN VLIET: Government gave them. They
4   were initially all black, and then they came as a blue
5   case and were known as BlueBerries.
6   BY MS. VAN VLIET:
7      Q. You don't know about BlueBerries?
8        MR. CARLSON: Can you answer.
9        THE WITNESS: I'm not clear on the question.
10       I do recall BlueBerries.
11  BY MS. VAN VLIET:
12     Q. There you go.
13       Now, did you ever use one of those things?
14     A. I had a BlackBerry, but I think it was after
15  kind of the big square one.
16     Q. Right.
17     A. Yes.
18     Q. But do you remember that they -- like, you
19  know, now we text on smart phones, whatever variety
20  you have, but do you remember they used to have -- the
21  BlackBerry used to have a service called BBM,

Page 96

1   BlackBerry Messenger?
2      A. I do recall BlackBerry Messenger.
3      Q. And in the things that Apollo provided to
4   the SEC in response to the SEC's subpoena, did you
5   review any BlackBerry Messenger records?
6      A. I do recall seeing messages. I don't know
7   whether they were BlackBerry messages or text
8   messages.
9      Q. Okay.
10       And were those messages an exhibit to a
11  deposition? Probably Mr. Rashid's?
12     A. I don't recall --
13     Q. Okay.
14     A. -- specifically, but perhaps.
15     Q. And did you review BlackBerry calendar
16  entries as opposed to Microsoft Office calendar
17  entries, which we talked about earlier?
18       MR. CARLSON: Objection to form.
19       THE WITNESS: I --
20       MR. CARLSON: As I recall, I think the
21  Outlook, the Microsoft Outlook, was synced typically

Page 97

1  to BlackBerry, but I don't know if that's true.
2        MS. VAN VLIET:  And where is that in the
3  records?
4        MR. CARLSON:  Well, I just --
5        MS. VAN VLIET:  I'll move to strike
6  counsel's testimony.
7        MR. CARLSON:  But that's just how it works.
8  You can go ahead.
9        MS. VAN VLIET:  I'll move to strike
10  counsel's testimony since there is no indication that
11  that in fact happened here.
12  BY MS. VAN VLIET:
13      Q.  So did you review any BlackBerry records,
14  calendar?
15      A.  I don't recall seeing anything specifically
16  labeled BlackBerry calender or records.
17      Q.  Do you know if in reviewing those
18  depositions that you were given to review whether BDO
19  had access to any BlackBerry records or indeed has
20  Mr. Rashid's BlackBerry device?
21        MR. CARLSON:  Objection to form and

Page 98

1  foundation.
2        Mr. Pierce is many things, but he is not a
3  representative of BDO.
4  BY MS. VAN VLIET:
5      Q.  I'm asking you based on your review of all
6  these many documents listed in Exhibit A.
7      A.  I don't know one way or the other if BDO had
8  access to that.
9      Q.  Okay.
10        But you know you didn't have access to a
11  BlackBerry device; correct?
12        MR. CARLSON:  Objection to form.
13  BY MS. VAN VLIET:
14      Q.  Okay.  Did you have access to Mr. Rashid's
15  BlackBerry device or any BlackBerry device during the
16  hundreds of hours that you reviewed?
17      A.  I didn't.
18      Q.  If you did, I didn't see it on your list.
19  Do tell.  Did you?
20      A.  I did not.
21      Q.  Now, you said that you didn't recall what

Page 99

1  search parameters you used, word search parameters,
2  with regard to e-mails and calendar entries.  Do I
3  recall that correctly?
4      A.  No, I don't recall all of them.
5      Q.  Okay.
6        Do you recall any of them?
7      A.  The restaurant names, locations,
8  destinations.  I just don't recall a comprehensive
9  list or specifics.
10      Q.  Okay.
11        Are you aware of -- we've talked about the
12  calendar entries before -- let's talk about the
13  e-mails that you reviewed, which if you refer to
14  paragraph 43 of your original report which is at page
15  13, you indicate that you reviewed over 1,200 -- I'm
16  sorry.  You indicate that over 1,200 e-mails --
17        MR. CARLSON:  12,000.
18  BY MS. VAN VLIET:
19      Q.  Sorry.  12,000 e-mails were produced; is
20  that right?
21      A.  That's correct.

Page 100

1      Q.  By the way, were you the only person working
2  on this from Stout, or were there others that worked
3  under your direction and control?
4      A.  There were others.
5      Q.  Okay.  And were some of these others the
6  individuals that would review specific calendar
7  entries that were deemed relevant by whatever search
8  terms you used or e-mails that were deemed relevant by
9  whatever search terms you guys decided to use?
10        MR. CARLSON:  Objection to form.
11        You can answer it, if you understand that.
12        THE WITNESS:  Can you repeat the question or
13  rephrase, please?
14  BY MS. VAN VLIET:
15      Q.  Sure.
16        Were there others that did the review of
17  calendar entries based on what was produced after you
18  applied the search terms that you used?
19      A.  There were others that used the relativity
20  tool to do the searches, and based on the terms and
21  the parameters we set, and then identified the

Page 101

1 documents that arose from those searches. And then
2 they may do a preliminary review, but ultimately I
3 reviewed the documents that were pulled.
4     Q. Let's unpack that answer.
5        Did you review all of the documents -- you
6 personally review all of the documents that were
7 pulled based on the searches and relativity that were
8 done?
9     A. Yes.
10     Q. Okay.
11        Now, you said that you hadn't provided the
12 SEC with a list of the search terms. Did you discuss
13 the search terms that you used with the SEC?
14     A. Not that I recall.
15     Q. Okay.
16        Did the SEC -- did you ever tell the SEC you
17 were using search terms? And when I say "search
18 terms," again I'm not talking about the nine day
19 window both sides. We're talking about the word ones.
20 Okay?
21     A. I don't recall specifically discussing that

Page 102

1 with the SEC.
2     Q. Okay.
3        Now, were you aware that the 12,000 e-mails
4 which were produced in this matter were not, in fact,
5 all of the e-mails of Mr. Rashid during the relevant
6 time period?
7     MR. CARLSON: Objection to form. Foundation.
8     THE WITNESS: I don't have any knowledge to
9 that one way or the other.
10 BY MS. VAN VLIET:
11     Q. Okay. Well, let me ask you whether you've
12 ever reviewed KP-5.
13     (KP Exhibit No. 5 was marked for
14 identification.)
15 BY MS. VAN VLIET:
16     Q. KP-5, for the record, is an e-mail from
17 Donna Norman -- excuse me, to Donna Norman at the SEC
18 from Greg Laugher, who I'll represent to you is a
19 partner at Paul Weise. Copied on there is Mr. A.
20 Kelley at the SEC, and another lawyer at -- two other
21 lawyers rather at Paul Weise, a Lauren Risner and

Page 103

1 Andrew Ehrlich.
2        The date of the e-mail is 1/20/2016 and it
3 is a multi-paged e-mail that the initial e-mail in the
4 chain going back two pages.
5        Take that back. I didn't include the chain.
6 This is not a chain, just a single e-mail.
7        Have you ever seen this e-mail?
8     A. I don't recall ever seeing this e-mail.
9     Q. Were you aware that when the SEC -- excuse
10 me. When Paul Weise initially ran a search of
11 Mr. Rashid and his assistant's e-mails as well as
12 other people listed here -- I recognize that you don't
13 know each of their positions, so I'm just going to
14 refer to the individuals listed on that page -- first
15 page rather than say them all. But were you aware
16 that when these three searches were performed that in
17 excess of 50,000 documents were produced? Were
18 culled?
19     A. Were culled?
20     Q. Were pulled as responsive to those first
21 searches? I didn't want to say produced because --

Page 104

1     A. I was not aware of that.
2     Q. Okay. Were you aware that then after
3 whatever that number that was responsive, which
4 suggests over 50,000, was then winnowed further down
5 by Apollo before giving it to the SEC based on the use
6 of certain search terms, which are on page 2 of this
7 e-mail?
8     MR. CARLSON: Objection to form.
9     THE WITNESS: I was not aware of that
10 process.
11 BY MS. VAN VLIET:
12     Q. Take a look at the search terms on page 2.
13        You testified earlier that you don't -- page
14 2 of the e-mail -- you testified earlier, as I recall,
15 that you don't recall the specific search terms that
16 you used. You being Stout. Sorry. Not you
17 necessarily personally.
18        Take a look through those search terms and
19 tell me whether any of those may refresh your
20 recollection as to terms that you used, recognizing
21 that these are the ones that Paul Weise and Apollo

Page 105

1  used to give to the SEC.
2      If it doesn't, it doesn't.
3      A.  Yeah, I don't have a specific recollection.
4      Q.  Okay.
5          Now, do you -- did you search for --
6  actually hold on just a second.
7          Let me ask you to take a look at Defendant's
8  Exhibit 11.
9          Do you know whether Apollo, by the time the
10 subpoena from the SEC had come in or in that general
11 time period in 2016, do you know whether they still --
12 Apollo -- retained all of their records?
13         MR. CARLSON:  Objection to form.
14 BY MS. VAN VLIET:
15     Q.  From that relevant time period?
16         MR. CARLSON:  Objection to form and
17 foundation.
18         THE WITNESS:  Is this in relation to --
19 BY MS. VAN VLIET:
20     Q.  First, I need to ask you whether you know
21 it, then I'll get into the document.

Page 106

1          I'm asking you whether you know whether the
2  -- whether Apollo as of 2015, which is the date of the
3  first e-mail -- actually about three months later,
4  whether they had, in fact, still retained all of their
5  records?
6          MR. CARLSON:  Same objection.
7          THE WITNESS:  I don't have any knowledge as
8  to what Apollo did.
9  BY MS. VAN VLIET:
10     Q.  Would it be important for you as -- in
11 rendering your independent assessment to know whether
12 all of the original documents that may have been
13 relevant to the issue that you were asked to opine on
14 still existed?
15     A.  Can you repeat the question, please?
16     Q.  Sure.
17         Would it be important for you in rendering
18 your independent opinion to know whether all of the
19 documents that were relevant to the issue that you
20 were asked to opine on still existed?
21         MR. CARLSON:  Objection to form.

Page 107

1          THE WITNESS:  I don't know that all those
2  documents were relevant.
3  BY MS. VAN VLIET:
4      Q.  How would you be able to tell if they hadn't
5  been retained and you could look at them?
6          MR. CARLSON:  Objection to form.
7          THE WITNESS:  I wouldn't know one way or the
8  other if they were relevant.
9  BY MS. VAN VLIET:
10     Q.  Now, do you recall discussions whether in
11 your review or your report, expenses from a
12 LaContessa, Inc.?
13     A.  I recall the name LaContessa.
14     Q.  And through your hundred-plus hours of work
15 in this case, did you come to understand that
16 LaContessa was not, as reflected on some of the
17 expense reports, an Italian restaurant but rather
18 related to certain hair cut or barbering services for
19 lack of a better term?
20         MR. CARLSON:  You mean like a salon?
21         MS. VAN VLIET:  I don't know if it's called

Page 108

1  a salon or not.
2          Women have a different view of a salon.  But
3  I know when a guy gets his hair cut, it is at least
4  called barbering wherever it's done.
5          MR. CARLSON:  I know where one is.
6          MS. VAN VLIET:  You may.
7          MR. CARLSON:  Objection to form.
8          MS. VAN VLIET:  Mine does to, but the hair
9  cut.
10         MR. THOMPSON:  I do not.
11         MS. VAN VLIET:  May the record reflect that
12 Mr. Thomas is making a funny, because his need for
13 said barbering is perhaps less than others.
14         THE WITNESS:  Can you repeat the question,
15 please?
16 BY MS. VAN VLIET:
17     Q.  Sure.  Are you aware that LaContessa was
18 related to some kind of a hair salon or barbering or
19 however we want to refer to it for males, where
20 Mr. Rashid got his hair cut?
21     A.  I'm aware it was a hair salon.  I don't know

Page 109

1 that it was for males or females or what the --

2    Q.  Okay.  But you were aware that in fact it

3 was someplace that Mr. Rashid -- I'm sure other people

4 too -- got their hair cut, right?

5    A.  That's my understanding.

6    Q.  Okay.

7       Now, you know you notice or you know --

8 you'll recall in the exhibit about the search

9 parameters that there was searches about LaContessa an

10 Italian restaurant.  It's on page 2 at the top, right?

11       Do you see those up at the top, the search?

12    A.  Yes.

13    Q.  Now, were you looking for that LaContessa

14 and the Italian restaurant stuff too?  I know you

15 don't remember specifically what your search terms

16 were, but was that among the items that you were

17 looking for in your review of documents?

18    A.  Those -- that name, LaContessa, was in the

19 transaction population that we reviewed, yes.

20    Q.  Okay.

21       And did you actually search for the real

Page 110

1 name of the salon, or did you just use its holding

2 company name, LaContessa?

3    A.  I don't recall the actual name of the salon,

4 but we -- I don't remember whether it was through

5 research or if it was through a deposition that that

6 was -- that there was a -- that was a DBA.  I can't

7 remember which -- there was another name that

8 Mr. Rashid was familiar with.

9    Q.  Okay.  Well, I can't -- let me show you

10 Defendant's Exhibit 88.  Sorry, Plaintiff's 88.

11       Take a look at that.  That would have been

12 one of the exhibits that was introduced at

13 Mr. Rashid's deposition, which you can tell by the

14 date that's indicated down there and the fact that

15 it's called Deponent Rashid.

16       Is this among the exhibits that you reviewed

17 in preparation for preparing your report and issuing

18 your opinion?

19    A.  I recall seeing this.

20    Q.  Okay.  And is the name -- albeit misspelled

21 -- Garren in parenthesis put below LaContessa?

Page 111

1       Do you see that?

2    A.  Yes.

3    Q.  Does that refresh your recollection that the

4 name of the salon was actually Garren's?

5    A.  Yes.

6    Q.  Okay.

7       And did -- well, certainly Apollo didn't --

8 despite the fact that in 2010 they knew the name was

9 Garren's, they didn't run a search for Garren.  Did

10 you?

11       MR. CARLSON:  Objection to form and

12 foundation as to what Apollo did.

13       MS. VAN VLIET:  I think the e-mail to the

14 SEC says so, unless they lied to the SEC.

15       MR. CARLSON:  Well, that's a different

16 question about what's in the e-mail.

17       Are you asking him does Garren appear in KP

18 Exhibit Number 5?  Because that's a different question

19 than did Apollo know.

20       MS. VAN VLIET:  Can you read back the

21 question?

Page 112

1       (Record read back by reporter.)

2 BY MS. VAN VLIET:

3    Q.  Would you agree with me that in the exhibit,

4 the e-mail to the SEC on January 20th, 2016, at page 2

5 where Paul Weise lists the search parameters that they

6 do not include the name Garren?

7    A.  I don't see the term Garren on the e-mail.

8    Q.  And did you search for the -- you've said

9 you became aware during the course of your review of

10 documents in preparation for your issuance of your

11 report that LaContessa was not the street name of the

12 hair salon.  Do I understand your testimony correctly?

13       MR. CARLSON:  Objection to form.

14       THE WITNESS:  Yes.

15 BY MS. VAN VLIET:

16    Q.  Okay.

17       And did you search for the name Garren when

18 you were doing your word searches?  Recognizing that

19 you can't recall all of them specifically, I'm asking

20 whether -- looking at Plaintiff's 88 that now

21 refreshes your recollection and tell me whether or not

Page 113

1  you did searches?

2      A.  I don't recall specifically.

3      Q.  Now, what was your understanding about --

4  oh, by the way, other than -- other than as attached

5  to some of the exhibits that you included in your

6  thing, did you get any separate hard copy documents of

7  expense report-related -- excuse me -- submissions?

8          MR. CARLSON:  Objection to form.

9  BY MS. VAN VLIET:

10      Q.  Go ahead.

11          MR. CARLSON:  Objection to form.

12          THE WITNESS:  What do you mean by

13  expense-related submissions?

14  BY MS. VAN VLIET:

15      Q.  Well, turn back to Defendant's Exhibit 11,

16  if you will, for a moment.  Maybe I can clarify it

17  this way.

18      A.  What is that?

19      Q.  It was the e-mail from Greg Laufer to Donna

20  Norman dated April 13, 2016.

21      A.  Thank you.

Page 114

1      Q.  It has -- got it?

2      A.  Yes.

3      Q.  Now, if you look back to -- by the way, the

4  Bates stamps are on the bottom of the page, the bottom

5  right.  Okay?

6          If you look to Bates stamp 79 -- you're

7  welcome to review the whole thing, but I'm just trying

8  to focus you on a question that was asked by

9  Ms. Norman and the reply e-mail.

10          Are you there?

11          Do you see where Ms. Norman at the bottom of

12  the -- well, actually let me back up.

13          At the bottom of that page, if you'll

14  look -- look at me.  You'll see down here, I'm

15  directing your attention down there on that page, that

16  the e-mail I'm about to refer you to was sent by

17  Ms. Norman to Paul Weise.  Okay?

18          MR. CARLSON:  Are you talking about the

19  April 11th, 9:49 p.m. e-mail from Donna Norman to Greg

20  Laufer?

21          MS. VAN VLIET:  Correct.

Page 115

1  BY MS. VAN VLIET:

2      Q.  So look at the last line in the first

3  paragraph, carryover paragraph on page 7 Bates-stamped

4  79.  Got that?

5      A.  I do.

6      Q.  Were you aware that the SEC had asked Paul

7  Weise "Alternatively, can you explain any electronic

8  verification process that occurred, or confirm if

9  there was no written or electronically verifiable

10  process by which Rashid personally validated his

11  submitted expenses?"

12          Were you aware that that question had been

13  posed by the SEC to Paul Weise?

14      A.  May I look at the document?

15      Q.  Of course.

16      A.  Thank you.

17          Okay.

18      Q.  Okay?

19          So, in that same paragraph we just read

20  from, do you recall or did you have an understanding

21  that the SEC asked Apollo through Paul Weise, its

Page 116

1  lawyers, whether they could explain any electronic

2  verification process that occurred or confirm if there

3  was no written or electronically verifiable process by

4  which Rashid personally validated his expenses?

5          Did you have an understanding whether the

6  SEC asked that question?

7      A.  I didn't have any understanding of that one

8  way or the other.

9      Q.  Okay.  Did you have an understanding looking

10  to the sentence right before that -- referring you to

11  the sentence right before that, did you have any

12  understanding whether the SEC asked Apollo through its

13  lawyers, Paul Weise, whether they, Apollo, could

14  direct the SEC to any documents Rashid signed

15  verifying or validating expenses he submitted from

16  January 2012 through his departure?

17          MR. CARLSON:  Says January 2011.

18          MS. VAN VLIET:  I'm sorry, 2011.  I

19  apologize.

20  BY MS. VAN VLIET:

21      Q.  Did you have an understanding that the SEC

Page 117

1  asked that of Apollo through its lawyer Paul Weise?

2      A.  I have no knowledge of that.

3      Q.  Okay.

4          Similarly, do you know -- other than having

5  just reviewed here today the e-mail, did you have an

6  understanding of whether Paul Weise ever actually

7  responded to the first question about whether Rashid

8  personally validated his expenses?

9      A.  I didn't have an understanding of that.

10     Q.  Okay.

11         Now, let me ask you to take a look at

12 Plaintiff's Exhibit 86 also submitted or attached or

13 used or marked as an exhibit in the Rashid deposition.

14         So this would have been one of the exhibits

15 that you reviewed; is that correct?

16     A.  Yes.

17     Q.  Do you remember this one?  Did you actually

18 read this one as opposed to just seeing it?

19         MR. CARLSON:  Objection.

20 BY MS. VAN VLIET:

21     Q.  I'm not trying to be snippy.  You had said

Page 118

1  earlier that some exhibits you saw but didn't read.  I

2  realize that sounded a list snippy.

3          This one, do you remember reading it as

4  opposed to just seeing it?

5      A.  I don't recall this specific exhibit.  I

6  just don't recall it.

7      Q.  Okay.

8          Did you see similar exhibits to this during

9  -- similar documents to this during your review, that

10 being a notification that a given expense report had

11 been approved for Mr. Rashid?  This particular one

12 being in April 2010?  Do you remember seeing that?

13     A.  I don't recall seeing this type of -- the

14 cover e-mail you're referring to.

15     Q.  Correct.  That's what the exhibit was.

16         MR. CARLSON:  It's an e-mail that's attached

17 to an expense report.

18         MS. VAN VLIET:  Correct.  But for my

19 purposes, I have got to use the exhibit that the SEC

20 introduced, which is this.

21         MR. CARLSON:  The e-mail with an attachment.

Page 119

1          MS. VAN VLIET:  How it came, I don't know.

2  You guys are the ones that introduced it.  So there is

3  the e-mail with the attachment.

4  BY MS. VAN VLIET:

5      Q.  Did you see other e-mails such as this?

6          MR. CARLSON:  Objection.

7  BY MS. VAN VLIET:

8      Q.  Do you remember?

9          MR. CARLSON:  Objection to form.

10         THE WITNESS:  I don't recall seeing other

11 e-mails such as this.

12 BY MS. VAN VLIET:

13     Q.  Did you see other -- turn to the next page.

14         Did you see other employee expense receipt

15 forms?

16     A.  I did.

17     Q.  Okay.

18         Turning back to the first page, the e-mail

19 which is entitled "Expense Report for Rashid, Mohammed

20 Has Been Approved." Report Number 0000003258.  Do you

21 see that?

Page 120

1      A.  I do see that.

2      Q.  Okay.

3          And Mr. Research isn't copied on this, is

4  he?

5      A.  He does not appear to be copied on this

6  e-mail.

7      Q.  Now, let's talk a little bit about what your

8  understanding of a personal expense is.

9          Tell me.

10         MR. CARLSON:  Objection to form.

11         What's the question?

12 BY MS. VAN VLIET:

13     Q.  What is your understanding of what a

14 personal expense is?  I have 19 pages or several -- I

15 think it's 19 -- 14.  Sorry.  14 pages where you

16 determine where a number of the expenses listed on

17 there were personal; correct?

18         So what I'm asking is what is your

19 understanding that you used in what a personal

20 experience is?

21     A.  For purposes of my analysis, anything that

Page 121

1  was not substantiated as a business expense was
2  considered a personal expense.
3      Q.  Okay.
4          And would you agree with me that a personal
5  expense is something that benefits the individual?
6          MR. CARLSON:  Objection to form.
7          THE WITNESS:  It can be.
8  BY MS. VAN VLIET:
9      Q.  And then there could be a matter of degrees
10 of how much it benefits the individual as opposed to
11 work or anybody else; correct?
12         MR. CARLSON:  Objection to form.
13         THE WITNESS:  I'm not sure I understand the
14 question.
15 BY MS. VAN VLIET:
16     Q.  Sure.
17         Are you aware that in this case there were
18 management company, Apollo Global Management Company,
19 as well as certain investor funds that are at issue?
20     A.  I am.
21     Q.  That were involved, I should say?

Page 122

1      A.  I'm sorry, I am.
2      Q.  Okay.  And that there were also portfolio
3  companies that were involved in the mix of how Apollo
4  did its business on these specific funds?
5      A.  I am.
6      Q.  And you're aware that Mr. Rashid was an
7  employee of Apollo who interacted either with the
8  funds or portfolio companies; correct?
9      A.  That's my understanding.
10     Q.  And was it also your understanding that
11 Mr. Rashid was responsible in part from your review of
12 his deposition for searching out new investment
13 vehicles for those funds?  I mean that was his job,
14 right?
15         MR. CARLSON:  Objection to form.
16         THE WITNESS:  I recall that from his
17 deposition or something along those lines.  I don't
18 have a specific recollection, though.
19 BY MS. VAN VLIET:
20     Q.  Okay.
21         And you're aware, were you not, that among

Page 123

1  the funds that he was supposed to be searching out in
2  part, investments for were these natural resources
3  funds, do you recall that?  Apollo Natural Resources
4  Partners, I think it's called.
5      A.  I recall a fund -- yes, I recall that fund,
6  yes.
7      Q.  And you're aware that involved mining and
8  minerals; correct?
9      A.  That's my understanding.
10     Q.  Okay.  By the way, in your searches in -- we
11 can look back at Apollo searches -- did you search for
12 the words mining or minerals?
13     A.  I don't recall.
14     Q.  Now, would you agree with me that an
15 expense, a given expense, can be in violation of a
16 policy, but still not be personal?
17         MR. CARLSON:  Objection to form.
18 Foundation.  He's not here to analyze policies.
19         But if you can answer the question.
20 BY MS. VAN VLIET:
21     Q.  I'm sorry.  Didn't your report deal with

Page 124

1  things that were policy -- not in conformity with the
2  policy?
3          MR. CARLSON:  His report did not analyze
4  policies.  You must have read a different report.
5          MS. VAN VLIET:  I didn't ask about
6  analyzing.  You are.
7  BY MS. VAN VLIET:
8      Q.  My question to you is -- and you'll have
9  your chance -- my question to you is did you not deal
10 with expenses that you found to be in violation of the
11 policy in issuing your report?
12         MR. CARLSON:  Objection to form.
13         THE WITNESS:  So I don't think it's as
14 simple as was in violation of the policy or not.
15         There were certain expenses that were
16 specifically disallowed by the policy, which we did
17 consider in our determination of personal versus
18 business.
19 BY MS. VAN VLIET:
20     Q.  All right.
21     A.  There were other expenses -- or, I'm sorry,

Page 125

1   policy language or policy requirements in regards to
2   limitations on per diem at meals and hotel stays that
3   we did not use in consideration.
4       Q.   Okay.
5       A.   Of determining the personal or business
6   nature of the expenses.
7       Q.   Okay.
8           So recognizing that there are some areas of
9   the policy that you didn't utilize in -- policies in
10  formulating your opinions, my question was there some
11  that you did and you've answered in your report that
12  there were some instances where you did.
13          Would one of those, for example, have been
14  the trade journals or trade publications I believe
15  you've referred to; is that right?  Do you remember
16  that?
17      A.   Yes.  That's correct.
18      Q.   And if I remember correctly, your opinion
19  was that because certain -- the policies in place at
20  the time prohibited the use of, or the purchase
21  rather, of trade journals and charging them back to

Page 126

1   the company, that they were personal expenses;
2   correct?
3       A.   That's correct.
4       Q.   Okay.
5           Do you believe that there is a -- would you
6   agree with me that a -- let me back this up.
7           What's your understanding of what the word
8   "trade" means?
9       A.   Relating to a specific industry or business.
10      Q.   Okay.
11          Would you agree with me that there is a
12  difference between an item being nonreimbursable and
13  an item being personal?
14      A.   For purposes of my analysis, no.
15      Q.   No.  For purposes of reality, is there a --
16  is there a difference between the term -- I'm not
17  quibbling.  I'm not going to quibble with you about
18  what bucket you ended up putting them in.
19          What I want to know is do you recognize in
20  real life that there is a difference between something
21  being nonreimbursable and something being personal?

Page 127

1           MR. CARLSON:  Objection to form.
2           You can answer if it makes sense.
3           THE WITNESS:  If it's specifically -- if
4   it's specifically not allowed by the policy, I would
5   say it is personal.
6   BY MS. VAN VLIET:
7       Q.   Not just nonreimbursable?
8       A.   I don't know what he was using it for, those
9   trade journals.
10      Q.   And you never inquired.  So you defaulted to
11  personal.
12          MR. CARLSON:  Objection.
13  BY MS. VAN VLIET:
14      Q.   Is that correct?
15          MR. CARLSON:  Objection to form.
16          THE WITNESS:  Absent information that it was
17  a business expense, yes.
18  BY MS. VAN VLIET:
19      Q.   And you relied on information only that
20  Apollo had given to the SEC and then the SEC selected
21  to give to you; is that collect?

Page 128

1           MR. CARLSON:  Objection to form.
2           THE WITNESS:  I relied on the information
3   that I was provided with in addition to my own
4   independent research, yes.
5   BY MS. VAN VLIET:
6       Q.   And that entity that gave you all the
7   information, the only information that you relied upon
8   other than this independent research that we don't
9   have a list of was the SEC who got it from Apollo;
10  correct?
11          MR. CARLSON:  Objection.
12  BY MS. VAN VLIET:
13      Q.   Is that right?
14      A.   I received all the information in the matter
15  other than my independent research from the SEC.
16      Q.   Now, so for you, a trade journal having to
17  do with an industry or a business that is not
18  reimbursable under the policy at issue is a personal
19  expense.  Do I understand that correctly?
20      A.   That's correct.
21      Q.   Okay.

Page 129

1    Now, how about work -- work -- after-work
2    gatherings, going away parties, birthday parties, baby
3    showers, whatever, with work colleagues, is that
4    personal or is it a nonreimbursable business expense?
5    Or a nonreimbursable expense, I should say? How would
6    you classify that?
7        A.  Can you -- you listed off a few
8    circumstances.
9        Q.  Sure.  Do you have coworkers?
10       A.  I do.
11       Q.  Do you ever go to a birthday party for any
12   of your coworkers?
13       A.  I've never been to a birthday party for one
14   of my coworkers.
15       Q.  Have you ever been to any function for any
16   of your coworkers?
17           MR. CARLSON:  Objection to form.
18           THE WITNESS:  Yes.
19   BY MS. VAN VLIET:
20       Q.  Okay.
21           Would you consider -- I mean, if it's

Page 130

1    nonreimbursable -- is it nonreimbursable your
2    attendance at that, or a gift that you brought or a
3    beer that you drank, any expense -- expenditure that
4    you may have incurred attending that function, would
5    that be nonreimbursable under Stout's expense
6    policies?
7            MR. CARLSON:  Objection to form and
8    relevance.
9            THE WITNESS:  I'm struggling with the
10   hypothetical.
11   BY MS. VAN VLIET:
12       Q.  Okay.  Let me try to do it this way.
13           A person attends a function at a commercial
14   establishment.  With me so far?
15           I'm sorry you have to answer yes, because he
16   can't take down a nod.
17       A.  Yes.
18       Q.  And present at the function at the
19   commercial establishment are all of the individual
20   coworkers only.  Yes?  You have to answer verbally.
21   Are you with me?

Page 131

1        A.  I am.
2        Q.  All right.
3            And money, expenses are incurred by the
4    individual at that function in the commercial
5    establishment with all of the coworkers.  Do you
6    understand?  Are you with me?
7        A.  I am.
8        Q.  Now, there is a policy in effect at the time
9    that the individual's employer will not reimburse for
10   that expenditure of money at the function with the
11   coworkers at the commercial establishment.  Are you
12   with me?
13       A.  I am.
14       Q.  Is that expenditure of money a
15   nonreimbursable expense or is it a personal expense?
16       A.  I'd say it's both.
17       Q.  Okay.  And what is the distinction that time
18   where it's both?  What makes it personal?
19           MR. CARLSON:  Objection to form.  I don't
20   think he said there was a distinction, but you can
21   answer.

Page 132

1    BY MS. VAN VLIET:
2        Q.  So in your mind there's no distinction
3    between nonreimbursable and personal; is that right?
4    I'm feeding off of Mr. Carlson's question.  I don't
5    think that's what you said, but just to clarify.
6            MR. CARLSON:  I think his testimony was --
7    you asked him whether it was nonreimbursable or
8    personal.
9            MS. VAN VLIET:  You know, it would probably
10   help if you would stop editing and trying to coach
11   your witness and just let him answer the question,
12   but --
13           MR. CARLSON:  I'm referring back to his own
14   testimony.
15           You can answer the question.
16           MS. VAN VLIET:  Well, the record will
17   reflect it.
18           MR. CARLSON:  That's true.
19           THE WITNESS:  What is the question again?
20   I'm sorry.
21   BY MS. VAN VLIET:

Page 133

1    Q.  Sure.

2         Is there a distinction in your mind between

3    nonreimbursable and personal?

4    A.  For purposes of my analysis, I didn't make a

5    distinction.

6    Q.  Okay.

7         How about the rest of life?  Is there a

8    difference?

9         MR. CARLSON:  Objection.

10   BY MS. VAN VLIET:

11   Q.  Recognizing -- you seem to be taking pains

12   to say that for purposes of this you didn't make a

13   distinction.  Are you applying different rules to this

14   job than you are any other?

15   A.  Well, you're asking --

16   Q.  Is there a difference --

17        MR. CARLSON:  Let him answer the question.

18        MS. VAN VLIET:  I haven't finished it yet.

19        MR. CARLSON:  You've asked a number of

20   questions.

21   BY MS. VAN VLIET:

Page 134

1    Q.  You seem to be making a distinction as

2    between this report, for purposes of your opinion in

3    this report, relative to Mr. Rashid.  You didn't cause

4    a distinction between nonreimbursable and personal.

5    Did I understand your testimony correctly?

6         MR. CARLSON:  Objection to form.

7         THE WITNESS:  Let me -- let me -- because

8    there were certain expenses in our report that by the

9    letter of the policy may have been nonreimbursable, or

10   may have been disallowed for limitations that would

11   have been nonreimbursable that we didn't disallow

12   because of those limitations.

13   BY MS. VAN VLIET:

14   Q.  Okay.

15        Did the fact that you believed you

16   understood that research actually admitted -- to use

17   yours words -- or self-identifies, your belief that

18   that in fact happened, did that color your view?

19   Self-identified things personal, sorry.

20        Did that color your view of whether there

21   was a difference between something being

Page 135

1    nonreimbursable and personal?

2    A.  I don't know when I made that -- I don't

3    think it impacted my view one way or the other.

4    Q.  So why did you include it in your report so

5    much?

6         MR. CARLSON:  Objection to form.

7         THE WITNESS:  Include what in my report so

8    much?

9    BY MS. VAN VLIET:

10   Q.  The fact that you believed that Mr. Rashid

11   self-identified or admitted that things were personal.

12   Expenses were personal.

13        You're saying you didn't rely on that as

14   well?

15   A.  Well, not a determination, not in any

16   distinguishing between -- I didn't have a

17   characterization of reimbursable versus personal in my

18   mind, when I was preparing the report.

19   Q.  Did you examine -- you're aware that if,

20   according to Paul Weise, that if an expense had been

21   among those Mr. Rashid was willing to reclassify as

Page 136

1    personal, BDO didn't investigate it.  Were you aware

2    of that?

3         MR. CARLSON:  Objection to form.

4         THE WITNESS:  I was aware of that.

5    BY MS. VAN VLIET:

6    Q.  Okay.

7         Did you follow the same practice in coming

8    up with the categorizations you list in your Exhibit D

9    to your report, which was your summary of all the

10   charges?

11   A.  The population I started with was the 988

12   expense items, which were identified by Mr. Rashid as

13   personal.

14   Q.  Okay.

15        When you say the 900-and-some-odd, you're

16   referring to the master spreadsheet that we talked

17   about before; is that right?

18   A.  The master spreadsheet was -- they were

19   inclusive in the master spreadsheet.  It's not the

20   entire population of the master spreadsheet.

21   Q.  I understand that.

Page 137

1    But when you say when you started with the
2    document, that document that you were referring to
3    just now in your answer is the master spreadsheet; is
4    that right?
5        A.    Yes.
6        Q.    As opposed to any of these other documents;
7    right?
8        A.    Yes.
9        Q.    Now, for that sub-portion that you reviewed
10   from the master spreadsheet, did you follow the same
11   -- strike that.
12       You just testified a moment or two ago that
13   you were aware that BDO -- if Mr. Rashid had been
14   willing to recharacterize an expense as personal,
15   didn't look into that expense. You just testified as
16   I understand it that you were aware of that. Am I
17   correct?
18       A.    Yes.
19       Q.    Did you follow suit? Did you not look into
20   an expense if it was one of the ones that you
21   understood that Mr. Rashid had been willing to

Page 138

1    recategorize as personal?
2        MR. CARLSON:  Objection to form.
3        THE WITNESS:  That was the population that I
4    did test.  That was where all the procedures that I
5    performed were on that population that he identified
6    as personal.
7    BY MS. VAN VLIET:
8        Q.    Okay.  So the answer to my question would
9    be, no, you investigated them; correct?
10       MR. CARLSON:  Objection to form.  The
11   answers to your questions are what he answers.
12       MS. VAN VLIET:  I would actually like a
13   direct answer.
14   BY MS. VAN VLIET:
15       Q.    Did you?
16       MR. CARLSON:  Ask a direct question.  That's
17   the game.
18   BY MS. VAN VLIET:
19       Q.    Did you do the same thing that BDO did?
20       A.    I did not.
21       Q.    Thank you.

Page 139

1        Now, you were aware, for example, that -- do
2    you recall there being testimony or allegations in
3    some of the SEC's questioning of -- strike that.
4        You were aware that Mr. Rashid was
5    questioned prior to his deposition in this case by the
6    SEC; is that correct?  In fact, you indicate you read
7    the transcript of his examination.  Am I right?
8        A.    Yes.  From -- I can't remember the year but,
9    yes.
10       Q.    And do you recall -- it is listed -- I
11   believe it's the first item listed in testimony in
12   your Exhibit A.  You know, the date is what it is.
13       But you've reviewed it, correct?
14       A.    Yes.
15       Q.    And you remember -- is that one of the
16   documents that you actually read?
17       A.    I did.
18       Q.    Do you recall any questions in that document
19   or in Mr. Rashid's testimony about an expense where
20   there was an allegation that Mr. Rashid had taken his
21   wife out for dinner on Valentine's Day?

Page 140

1        A.    I don't recall that specifically from the
2    transcript.
3        Q.    Do you recall it generally from anything
4    that you reviewed in the context of preparing to issue
5    your opinions in this report?
6        A.    I recall a dinner on Valentine's Day.  I
7    don't recall the specifics, as I sit here right now.
8        Q.    Do you remember that it was a dinner on
9    Valentine's Day or that the charge came through on
10   Valentine's Day?
11       A.    I can't say specifically.  I would have to
12   see the traction and the support for it.
13       Q.    Okay.
14       As I understand it, you went through e-mails
15   four days prior to a charge, four days after a charge;
16   correct?  And then obviously the day of the charge
17   itself for a total of nine.  Do I have that correct?
18       A.    That's correct.
19       Q.    Okay.  And when I say you went through, you
20   went through e-mails and calendar entries applying
21   that same temporal filter; is that right?

Page 141

1    A.  I don't know that I used the nine days for

2  the calendar entries, but for the e-mails, yes.  The

3  calendars, I believe we looked at the surrounding --

4  the day before and the day after.

5    Q.  Were you area that Mr. Rashid -- strike

6  that.

7        Did you ask to get copies of anyone else's

8  e-mails at Apollo other then Mr. Rashid's?

9    A.  I did not.

10   Q.  Okay.

11       And you -- did you review -- you've reviewed

12  the back and forth between Crowl and Paul Weise; is

13  that correct?  Or did you not?

14       MR. CARLSON:  Objection to form.

15       THE WITNESS:  Define back and forth, please.

16  BY MS. VAN VLIET:

17   Q.  Communications back and forth.  Did you

18  review them?

19       MR. CARLSON:  Objection to form.

20       All of them?

21       THE WITNESS:  If they were attached to an

Page 142

1  exhibit, I probably looked at them and reviewed them,

2  yes.

3  BY MS. VAN VLIET:

4    Q.  Or if the SEC --

5    A.  Of if they were attached to a deposition.

6    Q.  Or if the SEC gave them to you independent

7  of a deposition?

8    A.  Yes.  I don't know that I would have

9  reviewed it specifically, but if it was in the

10  population of the documents on Exhibit A, it may have

11  been something that came up.

12   Q.  Okay.

13       Did you -- so you've reviewed Defendant's

14  Exhibit 6, right?

15       Have you seen that before?  Again, if you

16  look at the exhibit sticker, it says up at the top

17  "MAR."  And this was one that would have been

18  introduced at Mr. Rashid's depo.

19       Do you remember reviewing this?

20   A.  I don't recall specifically, but in the

21  course of reviewing the deposition, I may have.

Page 143

1    Q.  And the Valentine's Day dinner supposedly

2  took place at Village Tavern, didn't it?  I mean, on

3  this date, didn't it?

4        MR. CARLSON:  Objection to form and

5  foundation.  Are you asking about the e-mail?

6  BY MS. VAN VLIET:

7    Q.  You said you -- no?

8        MR. CARLSON:  He said he didn't recall.

9        MS. VAN VLIET:  Actually, he said he did

10  recall about a Valentine's Day dinner.  So what I'm

11  asking --

12       MR. CARLSON:  It wasn't documented, though.

13       I'm sorry.  Ask your question.

14       MS. VAN VLIET:  I'm trying to, Jim.

15       MR. CARLSON:  Well, it's not --

16       MS. VAN VLIET:  I realize that you don't

17  like the way it's going.  That's too bad.

18       MR. CARLSON:  No, I do, actually.  I'm just

19  trying to get a straight question out of you.

20       MS. VAN VLIET:  I'm trying to get counsel on

21  the other side that will abide by the rules, but I'm

Page 144

1  not being very successful.

2  BY MS. VAN VLIET:

3    Q.  Now, do you recall testifying that you

4  remembered a dinner expense on Valentine's Day?

5    A.  I recall a February 14th expense.  I don't

6  know that I specifically recall it was a dinner.

7    Q.  Okay.

8        Do you recall reviewing this exhibit in your

9  preparation for preparing and opining in your report?

10       MR. CARLSON:  Objection to form.  Asked and

11  answered.

12       THE WITNESS:  I don't specifically recall

13  this exhibit, no.

14  BY MS. VAN VLIET:

15   Q.  Did you consider when determining whether

16  things were personal or business or partially

17  business, the fact that if a charge receipt is

18  actually signed after midnight, it will reflect the

19  current day date?

20   A.  From the timing of the charge?

21   Q.  Yes, sir.

Page 145

1   A.   Yes.
2        Q.   So if a charge receipt was signed by
3   Mr. Research after midnight, and he attended this
4   party for a work colleague on February 13th and paid
5   the bill after midnight, what date would the charge
6   reflect?
7        MR. CARLSON:  Objection to form and
8   foundation.
9        THE WITNESS:  Probably February 14th.
10  BY MS. VAN VLIET:
11       Q.   Now, do you recall reviewing expenses
12  relating to a trip in or about Thanksgiving in Bell
13  Harbor, Florida -- 2011, I'm sorry -- in Bell Harbor,
14  Florida?  Miami, Florida, if you're not familiar
15  particularly with where Bell Harbor is.
16       A.   I do.  I do recall.
17            May I?
18       Q.   Sure.  Of course you may.
19       MR. CARLSON:  What was the date again?
20       MS. VAN VLIET:  Thanksgiving is the third
21  Thursday in November, so it would be the end of

Page 146

1   November.
2        THE WITNESS:  I don't recall if it was 2011
3   or '12.
4   BY MS. VAN VLIET:
5        Q.   I could be wrong on the year, but it was
6   certainly Thanksgiving.
7        MR. CARLSON:  So you're saying 2011?
8        MS. VAN VLIET:  I just said that I could be
9   wrong on the year.
10       MR. CARLSON:  You're now saying 2012?
11       MS. VAN VLIET:  I believe I just said again
12  I could be mistaken on the year.  I think I'm right.
13       MR. CARLSON:  I don't know where you're
14  trying to direct him.  That's all I'm trying to find
15  out.
16       MS. VAN VLIET:  I'm not trying to direct
17  him.  He asked if he could review something.
18       MR. CARLSON:  Okay.
19       MS. VAN VLIET:  So, he's reviewing.  I
20  personally believe it was in 2011, but --
21       THE WITNESS:  It looks like perhaps it was

Page 147

1   2012.
2   BY MS. VAN VLIET:
3        Q.   Okay.
4        A.   Page 13.
5        Q.   Okay.
6             So your understanding is that when you're
7   talking about page 11 of 14, correct?  Down at the
8   bottom, sorry, of your Exhibit D?
9        A.   Sorry?
10       Q.   I'm sorry, that says 13 of 14.
11       A.   I'm on page 13.
12       Q.   All right.
13            And the time period we're talking about is
14  this -- would you agree with me what you're referring
15  to is November 20th, 2012, down through --
16       MR. CARLSON:  He's referring to or that
17  you're referring to?  I got lost in the question.  I'm
18  sorry.
19       MS. VAN VLIET:  The witness just referred to
20  a set of expenses and line items on his report on page
21  13 of 14.

Page 148

1            I'm now trying to narrow down which line
2   items on page 13 of 14 that the witness just referred
3   to that he is specifically referring to.
4            So --
5        MR. CARLSON:  Fair enough.
6   BY MS. VAN VLIET:
7        Q.   Back to my question.
8             Are you referring to the expenses that start
9   on November 20th, November 19th, tell me?
10       A.   Yes, I wasn't referring to them.  I was just
11  verifying, because I thought when you said
12  November 2011, my recollection was 2012.
13       Q.   All right.
14       A.   So I was just using that as a basis.  But I
15  wasn't, like, specifically identifying any of these
16  transactions.  I was just making sure I was on the
17  right year.  That's all.
18       Q.   Understanding that you properly corrected me
19  on the year, you did so based on a reference to page
20  13 of 14 of your report; is that correct?
21       A.   That's correct.

Page 149

1     Q.   Am I correct that -- can you tell me --
2   strike that.
3          Can you just tell me where it is on your
4   report that you believe that trip in 2012 -- I stand
5   corrected -- to start?
6     A.   Like, approximately November 21st,
7   November 20th through, like, approximately
8   November 25th, approximately.
9     Q.   Sorry.
10    A.   Approximately.
11    Q    And would that also including the flights
12  down to Miami from Metals, USA, as you note them,
13  meetings, that occur on the 16th of November, a couple
14  of lines up?  Would those also be included in your
15  consideration of the fact that it happened in '12, not
16  '11?
17    A.   You're referring to the --
18    Q.   Same page a couple of lines down.
19    A.   Right.  The $1,084 charge, is that --
20    Q.   What?
21    A.   I was trying to make sure I'm looking at the

Page 150

1   right transaction.
2     Q.   November 16th, American Airlines.  See where
3   it says -- beg your pardon.
4          United Airlines, see that?
5     A.   Yes.
6     Q.   November 16th.  The description is flight to
7   Florida for business meetings with Metals USA;
8   correct?  That's how you described it; correct?
9          I believe the amount -- and it's a cash
10  refund is $634.80, if I'm --
11    A.   Yes.  And just so we're clear, that's not my
12  description.  That's the description from the expense
13  report.
14    Q.   Okay.
15         And it is a description from whatever source
16  you carried over into your report; is that right?
17    A.   That's right.
18    Q.   Okay.
19         Now, so if you look right below that, United
20  Airlines entry -- it's hard with that piece of
21  paper -- there is a Delta Airlines flight to Florida

Page 151

1   for Metals USA meeting for $1,083.80.  Do you see
2   that?
3     A.   I do.
4     Q.   And then carrying down from there, you've
5   classified with the exception of things that are cash
6   or refunds, everything relating to that trip to
7   Florida for business meetings with Metals USA as
8   personal.
9          It's my understanding you just testified
10  that segment ends on February -- on your sheet on
11  February 30th -- excuse me, November 30, 2012?
12    A.   I'm thinking November 25th, 2012, but
13  without knowing the documents exactly which -- because
14  they are not necessarily sequential, but I would say
15  through November 25th, 2012.
16    Q.   Okay.
17         I'll move on.
18         All of those are deemed by you to be
19  personal, is that right?
20    A.   There is one exception, which is business,
21  which -- on November 19th.  But --

Page 152

1     Q.   Sorry.
2     A.   -- everything else is personal, right.
3     Q.   Sorry.
4          So you acknowledge there was a business
5   luncheon regarding Metals USA during that trip; is
6   that right?  And what was your basis --
7     A.   I --
8     Q.   Sorry?  What was you basis for determining
9   that that particular lunch during this trip was
10  business?
11    A.   So, again, without having the documents in
12  front of me, I believe that lunch was in New York
13  prior to the trip.  Prior to -- prior to when he
14  actually left.
15    Q.   Okay.
16    A.   Based on the taxi the next day to the
17  airport, on Tuesday, November 20th.
18    Q.   When you say the taxi, you're referring to
19  the --
20    A.   Referring to --
21    Q.   You're referring to the Surry Cadillac

Page 153

1  limousine?

2      A.  Yes.

3      Q.  Oh, by the way, did -- you noted in the BDO

4  report -- we'll get back to this in a second, but the

5  taxis, local taxis up in New York.  Focusing you on

6  that for a moment as opposed to limousine services,

7  okay?  To the airport.

8          Did you -- you're aware, are you not, that

9  during the BDO and the Paul Weise review, they just --

10  all of that is personal.  They didn't even look into

11  taxi rides locally?

12          MR. CARLSON:  Objection.

13  BY MS. VAN VLIET:

14      Q.  You're aware of that; correct?

15      A.  I don't know how they made that

16  determination, but there was a category for taxi and

17  car.  I can't remember the exact classification.

18      Q.  And you reviewed, I believe you testified,

19  Defendant's Exhibit -- the final BDO report 111; is

20  that correct?

21      A.  I reviewed it.

Page 154

1      Q.  Okay.  Do you recall notations made by BDO

2  in their column over here on the right that per PW's

3  instructions all taxis and car services were to be

4  taken as personal?

5      A.  I don't recall that specifically.

6      Q.  Would you dispute it was on the document

7  that BDO was telling the truth that that's what they

8  were told to do?

9      A.  I would not.

10      Q.  And how did you treat all the local taxies

11  and -- when I say "local," I mean in New York.

12  Sorry -- and car service expenses -- did you go

13  through them and run them to ground?

14      A.  They were subject to our analysis just like

15  the rest of the transactions.  We did not take a

16  blanket approach to any particular type of

17  transaction.

18      Q.  Okay.

19          And, similarly, you didn't use that

20  retroactive application of the June 2013 policy to per

21  diems for hotels and meals like Paul Weise told BDO to

Page 155

1  do; correct?

2      A.  I didn't.

3      Q.  You actually went through -- sorry?

4      A.  I did not.

5      Q.  Okay.

6          And you used -- what was your dollar limit?

7  A hundred dollars?  In terms of you would review

8  expenses above the $100 limit?

9      A.  So we reviewed expenses above the $100 limit

10  with respect to the nine-day window of e-mails.

11  During the course of doing that review of those

12  e-mails, if we saw e-mails that were relevant to

13  transactions below that threshold, we would capture

14  that as well.

15          In addition, once we finished that process,

16  if we had a population of expenses that -- that we

17  didn't find any information on, we subjected those to

18  additional targeted searches to attempt to ascertain

19  what those charges were for.

20      Q.  And in doing that you relied on whether

21  there was an e-mail or a calendar entry within that

Page 156

1  nine-day period -- let's put aside for a moment

2  another expense that may pop up in that nine-day

3  period that you then would apply to that.  I recognize

4  that you would then capture that.  Okay?

5          Put that aside for a second, and let's just

6  talk about your focus is on a given expense and you

7  look for four days out, four days before, obviously on

8  the date that the expense is -- hits the card; is that

9  correct?

10      A.  That's correct.

11      Q.  And you would agree with me, would you not,

12  that just because an expense hit the card on

13  February 14th doesn't mean that the activity

14  necessarily took place that day, or if it's a flight,

15  that the flight was taken that day?  It just means

16  when the expense hit the American Express card; is

17  that right?

18      A.  I agree with that for flights recognizing

19  that we attempted to using credit card statements or

20  the statements from the travel agency to determine for

21  that charge what were the dates of travel.

Page 157

1    Q.   Sure.

2    A.   And then looked at the relevant -- you know,

3  the e-mails and calendar entries within those dates of

4  travel.

5    Q.   Right.

6       I get that.  But what I'm asking you is a

7  pretty narrow question, which should make Mr. Carlson

8  very happy.

9       The date that an expense hit American

10  Express -- we're only talking about a corporate AMEX

11  card; right?

12       You have to answer yes or no.

13    A.   Right.

14    Q.   Is not necessarily the date of the travel or

15  the hotel booking or the whatever, it's just the date

16  that it hits the card; correct?

17    A.   Yes.

18    Q.   Okay.

19       So you have to do more to try to find out

20  whether there are e-mails or calendar entries or --

21  that's all you had to look at -- you didn't have

Page 158

1  BlackBerries or anything else -- to see if there is

2  some receipt or documentation or something that backs

3  up the charge; correct?

4    A.   I'm sorry, can you repeat the question?

5    Q.   Sure.

6       You just testified that instead of just

7  relying on four days -- if I booked my travel on today

8  for three weeks from now, you would do more if I had

9  been the subject of your investigation, than just

10  looking four days past and four days forward.  You

11  would look to see whether I had e-mails that had come

12  out, you know, after the Apollo searched them, gave

13  them to the SEC, the SEC gave them to you, you

14  searched them that, you know, said something about

15  Theresa is going to travel whenever -- three weeks

16  from now.  You would look as to the actual date of

17  travel; correct?

18    A.   Correct.

19    Q.   Okay.

20       Now --

21       MR. CARLSON:  Theresa, I didn't want to

Page 159

1  interrupt you, but can we settle up for lunch here?

2  Because we're getting deep into the day.

3       MS. VAN VLIET:  We can, but I'm probably

4  only going to be another 30 minutes.

5       MR. CARLSON:  Got that in.

6       MS. VAN VLIET:  Might be 25.

7  BY MS. VAN VLIET:

8    Q.   So taking a look at the Bell Harbor trip in

9  Thanksgiving of 2012, right?

10       You were aware, were you not, from your

11  review of documents and testimony in this case, that

12  there was a huge sale, in the billions of dollars, of

13  one of these portfolio companies that Mr. Rashid was

14  the point on within months of this trip down to

15  Florida, were you not?

16       MR. CARLSON:  Objection to form and

17  foundation.

18       THE WITNESS:  I recall that being discussed

19  in the depositions.

20  BY MS. VAN VLIET:

21    Q.   Well, do you remember reading an SEC filing

Page 160

1  or looking at an SEC filing relating to that very

2  sale?

3       It would be nice if I could actually pick

4  the piece of paper up, but I'm having a hard time

5  doing that.

6       Do you remember seeing a Defendant's Exhibit

7  Number 5, a big, thick, you know, defendant's MAR

8  Exhibit Number 5?  It would have looked like that and

9  it would have been about several pages thick, several

10  inches thick, I should say.

11       Do you remember seeing that?

12    A.   I do.

13    Q.   I'm sorry?

14    A.   I do recall seeing this.

15    Q.   And did you review it?  I mean, were you

16  aware in the SEC's -- the filing with the SEC, which

17  relates to this sale I just described, you know,

18  Mr. Research is quoted extensively as being the point

19  person and working on it?

20       MR. CARLSON:  Objection to form.

21  BY MS. VAN VLIET:

Page 161

1  Q.  Did you actually read it?  I can certainly
2  understand why you wouldn't, but did you read that SEC
3  filing?
4      A.  I don't recall reading it word for word, but
5  I recall reviewing it in the scope of reading the
6  deposition.
7      Q.  And did you review those parts of the SEC's
8  -- the filing with the SEC where it refers to
9  Mr. Rashid and specifically attributes quotations to
10  Mr. Rashid?  Do you remember reading those?
11      A.  I don't specifically recall.
12      Q.  Okay.
13      And so you knew that there had been -- I
14  mean, you would agree with me that a billion dollar
15  sale probably doesn't just happen on a dime and that
16  there has to be some lead up to it and work relating
17  to it and preparation for it and things of that
18  nature; is that fair?
19      MR. CARLSON:  Objection to form.
20      THE WITNESS:  There would be some lead time
21  to get a billion dollar deal done, yes.

Page 162

1  BY MS. VAN VLIET:
2      Q.  Okay.
3      And despite that knowledge and the knowledge
4  that Mr. Rashid was -- at least, according with the
5  filings with the SEC, was the point person quoted in
6  relation to it, you nonetheless discounted everything
7  relating to that trip because there were no e-mails
8  about it that showed up during your either four-day
9  search or actual day of travel search supplementation,
10  or why?
11      A.  That -- that's likely part of the equation,
12  in addition to -- I don't know how to say his name.
13      Q.  Mr. Goncalves?
14      A.  Yes.  In addition to Mr. Goncalves's
15  declaration.
16      Q.  And his recollection that no business
17  happened?
18      A.  Correct.
19      Q.  And he's the same one that recalled that
20  there was never a gift sent; correct?  Well, actually,
21  they all said that; isn't that true?

Page 163

1      A.  Yes, that's my recollection.
2      Q.  In fact, we know that one was sent to him,
3  don't we?  March -- MAR-1.  Did you review MAR-1 when
4  you were reviewing the exhibits attached to
5  Mr. Rashid's deposition?
6      A.  Again, I don't have a specific recollection,
7  but I reviewed the exhibits, so I'm sure I saw it.
8      Q.  That exhibit reflects that a bottle of wine
9  was in fact sent to Mr. Goncalves by Mr. Rashid, and
10  it also happens to be reflected on his AMEX, corporate
11  AMEX.  So, clearly, would you agree with me that
12  Mr. Goncalves's recollection is, to put it nicely,
13  wrong?
14      MR. CARLSON:  Objection to form.
15  Foundation.  Mischaracterizes this document as well.
16      Go ahead, if you can.
17      THE WITNESS:  I don't have any basis to say
18  that Mr. Goncalves was wrong.  This transaction, to my
19  knowledge, was not one that I looked at.  I don't
20  recall a $99 bottle of wine in the population that I
21  reviewed.

Page 164

1      Additionally, it's addressed to Metals USA.
2  BY MS. VAN VLIET:
3      Q.  And what does the note say?
4      A.  The note?  Which note are you referring to?
5      Q.  Let me have it back.
6      A.  Yes.
7      Q.  Right down below the word "total."  So the
8  personalized notes that accompanied said bottle of
9  wine, who is it to?
10      A.  Lorenzo and Rosangela.
11      Q.  Lorenzo and Rosangela.  Would that be
12  Mr. Goncalves, or are you assuming that there is
13  another Lorenzo at Metals USA?
14      MR. CARLSON:  Objection to form.
15      THE WITNESS:  It appears to be him.
16  BY MS. VAN VLIET:
17      Q.  Yes.
18      You mentioned in your report a trip to
19  Louisiana.  Or Louisiana, depending on how you
20  pronounce it.
21      Do you recall that?

Page 165
1  A.  I do.
2  Q.  And you -- am I correct that you determined
3  that all the expenses for that trip were personal?  I
4  think all of them.  I shouldn't say that.  Let me
5  double check.
6      Do you recall whether you allowed any of
7  those expenses related to that trip?  It's 2013, I'm
8  sorry.
9      You kind of moved right in there, so I
10  assumed you knew.  I apologize.
11      If you're following along, it's on the last
12  page of his --.  Go ahead?
13  A.  Are you waiting on me for an answer?
14  Q.  Yes.  The question was did you allow, if you
15  will, as either business or partial business any of
16  the expenses relating to the trip to Louisiana, which
17  you use as an example in your report starting at page
18  14 paragraph 51?
19  A.  I don't believe so.
20  Q.  Now, by the way, just so we're clear, on
21  your chart -- excuse me, your spreadsheet, those

Page 166
1  relating to the -- charges relating to the Louisiana
2  flight, do they start with the United Airline flight
3  charge listed on January 29th, 2013?
4      Again, recognizing that might not be the
5  date of travel, but --
6  A.  That appears to be the case.
7  Q.  Okay.
8      Recognizing that that may not be the date of
9  travel, but for purposes of your chart, is that where
10  your chart starts the analysis of the Louisiana trip
11  that you're referring to in example 51?
12  A.  Again, it's not sequential necessarily, but
13  that's -- those transactions in that range would be
14  that trip, yes.
15  Q.  Okay.
16      What I'm actually asking is -- what I asked
17  was is that where it starts?  I recognize there may be
18  things after that are not in sequence.  My question,
19  however, is that where it starts, or is there one
20  earlier in time?
21  A.  It appears to.  I'm not -- I can't recall if

Page 167
1  there was one earlier, but that appears to be the
2  start.
3  Q.  Okay.
4      Now, you were -- and all of the -- forgive
5  me if you just answered this.  But all of the -- I
6  believe you testified that all of the expenses
7  relating to the Louisiana trip were classified by you
8  as personal; correct?
9  A.  I believe that's correct.
10  Q.  Okay.  Now, you reference, I believe, in
11  your report the fact that Gary Enzor said there was
12  some function for QDI employees that Mr. Rashid
13  attended.  Do I recall your report correctly?
14  A.  Yes.
15  Q.  Okay.
16      And, again, we're starting -- we're
17  referring to the example 1 that you discussed starting
18  at paragraph 51.  And there are several bullet points
19  after that.
20      Bullet points aren't numbered.  If you look
21  at the last bullet point on 15 baring up into the next

Page 168
1  page -- it's a brunch.  Sorry.  I thought was a lunch.
2      You note that Mr. Enzor doesn't think that
3  attendance at the brunch was, in his view, sufficient
4  to be a business expense.  Is that correct in terms of
5  your notation?
6      MR. CARLSON:  Objection to form.
7  BY MS. VAN VLIET:
8  Q.  Is that what you said in your report?
9  A.  I'm reading it.  It says that Mr. Enzor did
10  not believe that the brunch would constitute treating
11  his travel expenses, as I related, correct.
12  Q.  And, obviously, you consider that to be
13  significant because you actually included it in your
14  report; correct?
15  A.  Correct.
16  Q.  All right.
17      Any evidence that Mr. Enzor has any
18  knowledge of what are proper business expenses in --
19  under Apollo policies at the time?
20      MR. CARLSON:  Objection to form and
21  foundation.

Page 169

1    THE WITNESS: I have no understanding of
2  Mr. Enzor's understanding of Apollo's policies.
3  BY MS. VAN VLIET:
4    Q. Yeah. But in anything that you ever
5  reviewed give you any belief that Enzor had any idea
6  what Apollo's policies were for what a business
7  expense was or what was not a business expense?
8        MR. CARLSON: Objection to form.
9        THE WITNESS: I have no basis to know
10  Mr. Enzor's understanding of Apollo's --
11  BY MS. VAN VLIET:
12    Q. I'm not asking you that. I'm asking you,
13  once again, in anything that you reviewed, did you see
14  any evidence that Mr. Enzor had any understanding of
15  what Apollo's policies were?
16        MR. CARLSON: Same objection.
17        THE WITNESS: I did not.
18  BY MS. VAN VLIET:
19    Q. Thank you.
20      Now, you also note, do you not, that
21  Mr. Research in fact had dinner with the general

Page 170

1  counsel, outside counsel rather, for QDI at least once
2  while in Louisiana, do you not?
3    A. Can you point me to where you're reading?
4    Q. Well, here is the exhibit that you would
5  have reviewed, which would be MAR-4. And I believe
6  that you also -- oh, lucky.
7      Next bullet point -- first bullet point on
8  16.
9      Are you aware that the gentleman, the
10  blond-haired gentleman in MAR-4 has been -- when you
11  reviewed the exhibits to Mr. Rashid's deposition that
12  you're talking about right here, is Mr. Ostendorf?
13        MR. CARLSON: Objection to form.
14        THE WITNESS: I believe that was discussed
15  in the deposition.
16  BY MS. VAN VLIET:
17    Q. Well --
18    A. That that was Lance Ostendorf.
19    Q. You included that in your report on page 16;
20  correct? First bullet?
21    A. That Mr. Rashid states that he had meetings

Page 171

1  with Lance Ostendorf; correct.
2    Q. Yes, in this deposition; correct?
3    A. Yes.
4    Q. As well as other people; correct?
5    A. Correct.
6    Q. Relating to QDI business; correct?
7    A. Correct.
8    Q. Now, you also in your review found e-mails
9  relating to this trip between and among -- between or
10  among research and some of his personal friends saying
11  "I'm going to be in New Orleans on thus and such a
12  date, let's go to the Super Bowl," or personal kind of
13  e-mails; correct?
14    A. Correct.
15    Q. And those are the ones you've referred to in
16  the second full bullet on page 16, correct?
17    A. Correct.
18    Q. And so help me understand. So if there is
19  not a specific e-mail to somebody at QDI saying,
20  "Lance, I'm going to talk to you about business issue
21  ABC," the fact that there is documentary evidence that

Page 172

1  he in fact met with these people doesn't mean to you
2  that it is related to business?
3    A. It appears that he may have had business
4  meetings or somewhat business-related meetings. I
5  don't know what the contents of those meetings was,
6  while he was in New Orleans. It does not appear that
7  that was the driver for the trip.
8    Q. And so it's only partially business or --
9  how -- where is the tipping point for you as to how do
10  you determine what is the primary reason for
11  something?
12    A. Well, he was going to be in New Orleans for
13  the Super Bowl.
14    Q. He definitely says that, yes.
15    A. That there was calendar entry for the
16  flight. I can't remember specifically. There was an
17  e-mail discussing the Super Bowl. I'm going to the
18  Super Bowl.
19      I didn't see any meetings in relation -- or
20  discussed in e-mails. I didn't see any meetings on
21  his calendar in relation to any of these meetings that

Page 173

1    he testified that he had.

2         Q.   Okay.

3         A.   Which indicates to me that he was going down

4    there for the Super Bowl.

5         Q.   Okay.

6              Unless it was on a calendar entry that the

7    SEC supplied you that Apollo supplied them based on

8    their search parameters and terms, or in an e-mail

9    that the SEC provided to you that Apollo provided to

10   them based on their search terms, because they didn't

11   give you the BlackBerry, unless it's the fact and it

12   doesn't make any difference how many photographs of

13   him in meetings there are or anything else, unless

14   there is an e-mail or a calendar entry, it's personal?

15             MR. CARLSON:   Objection to form.

16   BY MS. VAN VLIET:

17        Q.   Is that right?

18        A.   If the primary driver for the reason for him

19   being in New York is personal and he's going for

20   personal reasons, and he has business meetings while

21   he's there, it's personal to me, yes.

Page 174

1    BY MS. VAN VLIET:

2         Q.   First of all, I assume you're meaning New

3    Orleans not New York, right?

4         A.   I'm sorry.

5         Q.   That's all right.

6              Okay.  So the driver for you is if there is

7    nothing in the e-mails or the calendar entries, that

8    say, "Lance, we're going to talk about business 1, one

9    business 2, business 3," then it's primarily personal?

10        A.   I think that the lack of calendar entries or

11   correspondence relating to business meetings is

12   indicative that it's personal.

13        Q.   Do you know whether or not they communicated

14   by BlackBerry Messenger?

15        A.   I don't.

16        Q.   By the way, are you familiar with the

17   concept of in lieu of travel?

18        A.   I'm not.

19        Q.   You're not?

20        A.   It's not a term I've heard.

21        Q.   Okay.

Page 175

1         Are you familiar with the concept of if you

2    have to be in -- let's pick a place -- London for

3    meetings this week, as well as next week, and then

4    there's the weekend in between -- are you familiar

5    with the concept of not flying home on that weekend at

6    a cost of, let's say, $15,000 per flight, and instead

7    going someplace else that costs less than that, and

8    ultimately saving your employer money, and then

9    returning to London so that you can be there next

10   week.

11             So, in lieu of going home and spending

12   $15,000, you go someplace else and spend 5?  Are you

13   familiar with that concept?

14        A.   It sounds like a circumstance that could

15   occur.  I don't know that I'm familiar with a concept

16   of it.

17        Q.   Okay.

18             Well, in your many years of doing CPA work

19   or travel and expense policies you have never come

20   across the term in lieu of travel?

21        A.   I don't recall seeing in lieu of travel.

Page 176

1         Q.   So you're not familiar with the general

2    recognized -- any criteria that might be recognized in

3    evaluating whether travel is in lieu of?

4              MR. CARLSON:   Objection to form.

5    BY MS. VAN VLIET:

6         Q.   Fair?

7              MR. CARLSON:   Objection to form.

8              THE WITNESS:   I understand what you're

9    describing is somewhat -- is discussed in the T & E

10   policies regarding extending a hotel stay due to the

11   increased cost of airfare and not staying a weekend.

12   I just hadn't heard of the term in lieu of travel.

13   BY MS. VAN VLIET:

14        Q.   I understand that's one of them and that

15   deals with hotels.  That's not what I'm talking about.

16             You're not familiar with in lieu of travel;

17   correct?

18        A.   I'm not familiar with that term.

19        Q.   Okay.

20             Are you familiar with the general principle

21   of saving your employer money in the kind of

Page 177

1  circumstances I just described a moment ago with the
2  London example?
3      A.  Yes.
4      Q.  Okay.
5          And are you familiar with the manner in
6  which people that routinely review travel and
7  entertainment, sorry, expense reviews, evaluate such
8  travel as described in that London -- I used the word
9  in lieu of -- the London example I just gave you?
10     A.  Am I familiar with what?  I'm sorry?
11     Q.  Things that -- criteria that they use to
12 evaluate whether such travel is, in fact, in lieu of
13 travel.
14         MR. CARLSON:  Objection.
15         THE WITNESS:  If you're referring to is
16 their actual cost savings from the trip, yes.
17 BY MS. VAN VLIET:
18     Q.  Okay.  And did you do that here?
19     A.  I evaluated the records that I had to
20 determine if that was, in fact, proven to be the case
21 by the documents that I reviewed.

Page 178

1      Q.  Did you, for example, review Exhibit 111,
2  which would have given you the actual costs of other
3  first class tickets to London and LA and --
4          MR. CARLSON:  Objection to form.  Asked and
5  answered as well.
6  BY MR. VAN VLIET:
7      Q.  Did you?  Which would have given you the
8  baseline.  Did you bother to do that?
9          MR. CARLSON:  Same objection.
10 BY MS. VAN VLIET:
11     Q.  Did you?
12     A.  I didn't review Exhibit 11 with that, the
13 BDO spreadsheet with that in mind.
14         I don't recall it having -- in relation to
15 the expenses that I reviewed, having alternative
16 airfare.
17     Q.  Or hotels.  By the way, it's 111.  You're
18 referring to 111; correct?
19     A.  Yes.
20     Q.  So you didn't go through that exercise to
21 find out whether, in fact, example 2, the travel hotel

Page 179

1  that you cite at paragraph 52 of your report in fact
2  was what I've described and gave you an example of it
3  in lieu of travel; is that correct?
4      A.  In the circumstance you described, I believe
5  you said in lieu of flying back to New York and then
6  flying to -- flying the London.  Flying from London to
7  New York then back to London to continue a meeting.
8          I believe in this instance --
9      Q.  I didn't.
10     A.  You didn't?
11     Q.  I didn't say continue a meeting.  I said a
12 different meeting, but go ahead.
13     A.  I believe in this instance Mr. Rashid
14 actually went from -- I can't remember specifically,
15 Switzerland or London where he was to Barcelona and
16 then flew back to New York from there.
17     Q.  And did you examine what the cost savings
18 were by him doing that based on the other acknowledged
19 business expenses listed in flight and hotel things in
20 111?
21         MR. CARLSON:  Objection to form.

Page 180

1  BY MS. VAN VLIET:
2      Q.  If you didn't, that's fine.  Just tell me
3  whether you did or you didn't.
4          MR. CARLSON:  Same objection.
5          THE WITNESS:  Based on the documents I did
6  not.
7          I reviewed the documents that were submitted
8  by Mr. Rashid, and there was not evidence that there
9  was cost savings.
10 BY MS. VAN VLIET:
11     Q.  I'm sorry.  What documents?
12     A.  Submitted with the expense reports, the
13 documents that were provided with the expense
14 documentation that I had that demonstrated there was
15 cost savings.
16     Q.  And you were -- you're aware that
17 Mr. Research didn't submit those reports, that his
18 assistants did; correct?
19         MR. CARLSON:  Objection to form.
20 Foundation.  Assumes facts not in evidence.
21         MS. VAN VLIET:  Well, that's just not true.

Page 181

1  That's bologna.

2  BY MS. VAN VLIET:

3      Q.  Are you aware that the testimony and the

4  evidence in this case is that the reports were

5  submitted by the assistants.  That's not to say he

6  didn't properly supervise them in doing it, but the

7  button is hit by the assistants, not Mr. Rashid.

8      You're aware of that; correct?

9      MR. CARLSON:  Same objection.

10      THE WITNESS:  I'm aware there is a dispute

11  of that as to that fact.

12  BY MS. VAN VLIET:

13      Q.  Really, you're aware?

14      A.  I'm aware -- I should have said Mr. Rashid's

15  expense report.

16      Q.  Yes.  Other than Mr. Carlson just now saying

17  that there is a dispute, where in anything that you

18  have reviewed do you see any indication that anyone

19  other than Mr. Rashid's assistants were responsible

20  for actually submitting the reports?

21      MR. CARLSON:  Objection to form.

Page 182

1  Foundation.  Assumes facts not in evidence.

2      THE WITNESS:  I can't recall seeing any

3  documents.

4  BY MS. VAN VLIET:

5      Q.  You were aware, are you not, that the SEC

6  settled the case with Apollo in August of 2016;

7  correct?

8      And I specifically refer you to your

9  rebuttal report where you referenced it.  Is that

10  right?

11      A.  I am.

12      Q.  Okay.

13      Let me hand you Defendant's Exhibit 9.

14      Now, you're aware that the SEC's settlement

15  with Apollo goes well beyond -- let me have you get

16  your --

17      A.  All right.

18      Q.  No worries.

19      I'm actually going to talk about the

20  settlement document.  I just wanted to cut off the you

21  didn't have any foundation objections to talk about

Page 183

1  it.

2      Now, have you actually read the -- did you

3  actually read the settlement agreement?

4      I'm sorry.  That sounded snippy too.  And I

5  didn't mean it to.

6      Did you read the settlement agreement?

7      Sorry, the order instituting administrative

8  cease and desist procedures, the document that is

9  Defendant's Exhibit 9?

10      A.  I have not read it in its entirety.

11      Q.  Did you read any part of it?

12      A.  I don't recall specifically reading any part

13  of it.  Or any specific part of it.

14      Q.  You are aware -- are you aware that -- well,

15  you do know that it took place in August --

16  August 23rd, 2016, and I'll refer you to the top of

17  the document on the left-hand side; is that right?

18      A.  Yes, that's the date.

19      Q.  Okay.  And you are aware that Mr. Rashid --

20  your recollection having been refreshed earlier, was

21  suspended as of July 2013; correct?

Page 184

1      A.  Yes, I recall about that time.

2      Q.  Okay.  And while not number 1 or number 2

3  among the items that the SEC put in its cease and

4  desist order, if you go to page 3 paragraph 3, there

5  is a portion of the cease and desist order in

6  paragraph 3 that refers to, like, an Apollo partner

7  that Apollo failed to supervise.  And would you agree

8  with me that based on your knowledge of this case

9  that's Mr. Rashid?

10      A.  Based on that description it appears to be

11  Mr. Rashid.

12      Q.  Okay.

13      And, so, there are three -- and there is

14  another basis for the cease and desist order in

15  paragraph 4, being implementation of policies and

16  procedures and then issues with the monitoring fee in

17  paragraph 1 and issues with improper loans in

18  paragraph 2.  So you're on the second page.

19      Those are, in summary, the basis of the

20  cease and desist; correct?

21      MR. CARLSON:  Objection to form.  The

Page 185

1  document does speak for itself.
2       Just to clarify for my interests, you're
3  asking him what the basis of the cease and desist
4  order is?
5       MS. VAN VLIET: I'm asking if those four
6  paragraphs are the basis in terms of summary for the
7  cease and desist.
8       MR. CARLSON: Five paragraphs, or four.
9       MS. VAN VLIET: Paragraph 1, 2, 3, 4.
10      THE WITNESS: The document says on the basis
11  of this order the Commission finds that, and then
12  those four paragraphs.
13  BY MS. VAN VLIET:
14      Q.  Thank you.
15          Now, in your rebuttal report at pages 7 and
16  8, you talk about Mr. Quintero's assessment of
17  materiality?
18      A.  Yes.
19      Q.  And talk about SAB 99, correct? In the --
20  you do that in paragraph 18?
21      A.  Yes.

Page 186

1       Q.  Okay.
2           Now, certainly as to Mr. Rashid, Apollo and
3  the SEC knew about all of the facts that relate to
4  him -- at least the allegations that they've come out
5  with in their complaint -- in 2013; is that right?
6       MR. CARLSON: Objection to form and
7  foundation. He has no basis to know what the SEC or
8  Apollo knew at any point in time.
9  BY MS. VAN VLIET:
10      Q.  Well, then let's go back and take a look at
11  the PowerPoint presentations to the SEC, which are
12  dated in '13, September.
13          Those would be Exhibit 3, Exhibit 1. Do not
14  look at Exhibit 5, because that is to the Apollo
15  executive -- I mean, you can, but that was to the
16  Apollo executive committee. The others were to the
17  SEC.
18          So if you just -- we've reviewed this
19  before. These are the exhibit things that we talked
20  about with BDO and --
21      A.  Exhibits 3 and 5?

Page 187

1       Q.  Yes. No, no, no. 3 and 1. Sorry. 5 is to
2  the executive committee.
3           Just take a look at 3, if you have it based
4  on that.
5           Are you aware of the SEC or Apollo making
6  any disclosures publicly or to any of the funds or any
7  of the portfolio companies or anybody about all of
8  these red flags with Mr. Rashid at any point in time
9  between February 2014 and August 23, 2016?
10      MR. CARLSON: Objection to form.
11      THE WITNESS: I don't have a specific
12  recollection of that.
13  BY MS. VAN VLIET:
14      Q.  Did you ever see any evidence that they did
15  in your review of all these documents or those
16  documents which were provided to you for review?
17      A.  I don't have a specific recollection as to
18  where, but I do recall seeing that.
19      Q.  Do you recall the SEC and Apollo making
20  public something about Mr. Rashid, whether named or
21  not, prior to August -- whatever the date is,

Page 188

1  August 2016? August 23rd, 2016?
2       A.  I don't remember the timing as to when it
3  took place. I remember there being a discussion in
4  the deposition, Mr. Rashid's -- I believe Mr. Rashid's
5  deposition regarding -- regarding the publication or
6  the articles or something.
7       Q.  Oh, you mean questions that the SEC asked
8  him about some newspaper publication that happened
9  after the fact from some tabloid; is that what you're
10  referring to?
11      A.  I don't recall specifically what it was. I
12  just recall the deposition.
13      Q.  So you don't remember it being anything by
14  the SEC or Apollo. You just remember some
15  publication, some media publication?
16      A.  I don't recall how they got the information.
17      Q.  How who got it?
18      A.  I would have no knowledge as to how they got
19  the information.
20      Q.  Other than that, that you are describing
21  right now, do you recall any piece of evidence that

**Page 189**

1  the SEC or Apollo ever publicly or to the investors or
2  to the portfolio companies said a word about
3  Mr. Research in their allegations of his improper
4  expenses in the two and change years between
5  February 2014 and April 23rd, 2016?
6         MR. CARLSON:  Objection to form.
7         THE WITNESS:  I don't recall.
8         MS. VAN VLIET:  I'm going to take a break.
9  I think I'm done.
10        (Whereupon, a recess ensued.)
11        MS. VAN VLIET:  Mr. Pierce, I have no
12  further questions.  Thank you.
13        MR. CARLSON:  And no questions from the SEC.
14  We'll read and sign.
15        (The deposition concluded at 1:42 p.m.)
16
17
18
19
20
21

**Page 190**

1         REPORTER'S CERTIFICATE
2    District of Columbia
3    City of Washington, to wit:
4         I, KENNETH NORRIS, a Notary Public of
5  the District of Columbia, City of Washington, do
6  hereby certify that the within named witness
7  personally appeared before me at the time and place
8  herein set out, and after having been duly sworn by
9  me, according to law, was examined.
10        I further certify that the examination
11 was recorded stenographically by me and this
12 transcript is a true record of the proceedings.
13        I further certify that I am not of
14 counsel to any of the parties, nor in any way
15 interested in the outcome of this action.
16        As witness my hand and notarial seal
17 this 4th day of June, 2019.
18        _____
19            KENNETH NORRIS
20            Notary Public
21 My Commission Expires:  1-4-24

**Page 191**

1         CERTIFICATE OF DEPONENT
2
3         I hereby certify that I have read and
4  examined the foregoing transcript, and the same is a
5  true and accurate record of the testimony given by me.
6
7         Any additions or corrections that I feel are
8  necessary, I will attach on a separate sheet of paper
9  to the original transcript.
10
11        _____
12            Kevin Maurice Pierce
13
14
15
16
17
18
19
20
21

**Page 192**

1  Reference No.: 4140714
2
3  Case:  SECURITIES AND EXCHANGE vs RASHID
4
      DECLARATION UNDER PENALTY OF PERJURY
5
      I declare under penalty of perjury that
6  I have read the entire transcript of my Depo-
   sition taken in the captioned matter or the
7  same has been read to me, and the same is
   true and accurate, save and except for
8  changes and/or corrections, if any, as indi-
   cated by me on the DEPOSITION ERRATA SHEET
9  hereof, with the understanding that I offer
   these changes as if still under oath.
10
11        _____
12            Kevin Maurice Pierce
13
14        NOTARIZATION OF CHANGES
15            (If Required)
16
17 Subscribed and sworn to on the _____ day of
18
19 _____, 20____ before me,
20
21 (Notary Sign)_____
22
23 (Print Name)            Notary Public,
24
25 in and for the State of _____

**Page 193**

1  Reference No.: 4140714
   Case: SECURITIES AND EXCHANGE vs RASHID
2
3  Page No._____ Line No._____ Change to:_____
4  _____
5  Reason for change:_____
6  Page No._____ Line No._____ Change to:_____
7  _____
8  Reason for change:_____
9  Page No._____ Line No._____ Change to:_____
10 _____
11 Reason for change:_____
12 Page No._____ Line No._____ Change to:_____
13 _____
14 Reason for change:_____
15 Page No._____ Line No._____ Change to:_____
16 _____
17 Reason for change:_____
18 Page No._____ Line No._____ Change to:_____
19 _____
20 Reason for change:_____
21 Page No._____ Line No._____ Change to:_____
22 _____
23 Reason for change:_____
24
   SIGNATURE:_____DATE:_____
25 Kevin Maurice Pierce

**Page 194**

1  Reference No.: 4140714
   Case: SECURITIES AND EXCHANGE vs RASHID
2
3  Page No._____ Line No._____ Change to:_____
4  _____
5  Reason for change:_____
6  Page No._____ Line No._____ Change to:_____
7  _____
8  Reason for change:_____
9  Page No._____ Line No._____ Change to:_____
10 _____
11 Reason for change:_____
12 Page No._____ Line No._____ Change to:_____
13 _____
14 Reason for change:_____
15 Page No._____ Line No._____ Change to:_____
16 _____
17 Reason for change:_____
18 Page No._____ Line No._____ Change to:_____
19 _____
20 Reason for change:_____
21 Page No._____ Line No._____ Change to:_____
22 _____
23 Reason for change:_____
24
   SIGNATURE:_____DATE:_____
25 Kevin Maurice Pierce

_____

**$**
_____

**$1,083.80**
 151:1

**$1,084**
 149:19

**$100**
 155:8,9

**$15,000**
 175:6,12

**$634.80**
 150:10

**$75**
 67:16

**$99**
 163:20

_____

**0**
_____

**0000003258**
 119:20

_____

**1**
_____

**1**
 15:12
 16:19
 18:21
 26:13
 31:10
 32:6
 35:5,7
 41:9
 56:10
 69:5
 81:10
 167:17
 174:8
 184:2,17
 185:9
 186:13

 187:1

**1,200**
 99:15,16

**1/20/2016**
 103:2

**10**
 14:9
 30:14
 32:17,18,
 19 75:4

**10-minute**
 75:12

**100**
 82:11

**100,000**
 11:9

**11**
 33:3
 105:8
 113:15
 147:7
 149:16
 178:12

**111**
 49:14
 50:1,11
 51:8
 153:19
 178:1,17,
 18 179:20

**11th**
 114:19

**12**
 10:1,6,20
 146:3
 149:15

**12,000**
 99:17,19
 102:3

**13**
 69:18

 70:3
 99:15
 113:20
 147:4,10,
 11,21
 148:2,20
 186:12

**1306**
 78:16
 79:7

**13th**
 22:14
 62:20
 66:3
 78:13
 145:4

**14**
 120:15
 147:7,10,
 21 148:2,
 20 165:18

**14th**
 22:14
 144:5
 145:9
 156:13

**15**
 167:21

**16**
 35:5,6
 79:4
 170:8,19
 171:16

**16th**
 149:13
 150:2,6

**18**
 71:9,11,
 14,15,16
 73:1
 185:20

**19**
 19:9,13,

 18,20
 20:5 85:2
 120:14,15

**19th**
 30:1
 148:9
 151:21

**1:42**
 189:15

**1st**
 61:7 64:3
 66:2,4
 80:1,7,
 18,20

_____

**2**
_____

**2**
 15:15
 16:19
 19:1
 27:13
 28:18
 31:12
 32:17
 36:6 41:2
 53:4
 70:15
 72:21
 74:21
 75:20
 79:10
 104:6,12,
 14 109:10
 112:4
 174:9
 178:21
 184:2,18
 185:9

**2.2**
 67:2,7

**200,000**
 11:9

**2009**
 60:14
 65:21

**2010**
 70:10,15
 111:8
 118:12

**2011**
 61:2,7
 62:4,9,11
 66:1,2,
 15,21
 67:5
 68:2,17
 69:18
 70:3
 116:17,18
 145:13
 146:2,7,
 20 148:12

**2012**
 27:18
 28:14
 116:16
 146:10
 147:1,15
 148:12
 149:4
 151:11,
 12,15
 159:9

**2013**
 22:12,13
 23:4,15
 30:1
 62:13,20
 64:3
 66:2,4,
 10,16
 69:18
 70:3 71:5
 73:5 79:4
 80:1,5,7,
 18,20
 154:20



165:7
166:3
183:21
186:5

**2014**
187:9
189:5

**2015**
106:2

**2016**
105:11
112:4
113:20
182:6
183:16
187:9
188:1
189:5

**2018**
49:8

**20th**
112:4
147:15
148:9
149:7
152:17

**21st**
149:6

**22**
20:1

**220**
73:17
75:2,4

**220,000**
73:3

**23**
187:9

**23rd**
183:16
188:1
189:5

**25**
159:6

**25th**
149:8
151:12,15

**290**
73:19
75:3

**290,000**
74:21

**29th**
166:3

**2nd**
23:4,15
70:10

_____

**3**

**3**
17:19
19:1
27:15
32:20
43:7,8,9,
11 44:7
56:9 57:9
78:12,19
79:1
174:9
184:4,6
185:9
186:13,21
187:1,3

**30**
17:7
151:11
159:4

**30th**
151:11

**31st**
66:1,2,15

**38**
77:10

**39**
77:10
87:18

_____

**4**

**4**
42:5 77:8
184:15
185:9

**4239**
52:18

**43**
99:14

**4th**
71:5

_____

**5**

**5**
19:6
52:14
56:21
71:17
85:3
102:13
111:18
160:7,8
175:12
186:14,21
187:1

**5-year**
69:19

**50,000**
103:17
104:4

**51**
165:18
166:11
167:18

**52**
179:1

**57**
69:9,17

_____

**6**

**6**
71:17,21
142:14

**61**
75:5

_____

**7**

**7**
19:7 20:2
29:3 30:2
32:7,9,12
77:8
115:3
185:15

**79**
114:6
115:4

_____

**8**

**8**
29:3 30:2
185:16

**86**
117:12

**88**
110:10
112:20

_____

**9**

**9**
182:13

183:9

**900-and-
some-odd**
136:15

**988**
46:19
136:11

**99**
185:19

**9:49**
114:19

_____

**A**

_____

**ABC**
171:21

**abide**
143:21

**Absent**
127:16

**accept**
63:10
65:6,9
94:18

**access**
25:6
84:1,13
86:21
87:7
97:19
98:8,10,
14

**accompanied**
164:8

**accountant**
9:15

**accounting**
9:3,5
10:7 49:4

**acknowledge**



152:4

acknowledge
d
  80:13
  179:18

activity
  156:13

actual
  53:2
  85:12
  110:3
  158:16
  162:9
  177:16
  178:2

addition
  16:3 27:5
  34:11
  37:18
  86:12
  128:3
  155:15
  162:12,14

additional
  155:18

Additionall
y
  164:1

addressed
  164:1

adjusted
  33:3

adjustment
  31:15,19

adjustments
  32:20

administrat
ive
  183:7

admission
  71:18

admitted
  71:10
  134:16
  135:11

admittedly
  52:5 53:1
  72:5,10

adopted
  53:3

advanced
  9:4,7

adverse
  89:6,11
  90:2,8,
  10,14
  91:2,10
  92:18
  93:4

advisors
  20:15,17
  21:8
  82:16,21

affected
  91:15

affects
  92:8

afraid
  83:12

after-work
  129:1

afternoon
  7:14

age
  6:4

agency
  156:20

agree
  34:19
  112:3
  121:4
  123:14

126:6,11
147:14
156:11,18
161:14
163:11
184:7

agreeing
  42:19

agreement
  183:3,6

ahead
  17:8
  30:7,10
  54:18
  90:6 97:8
  113:10
  163:16
  165:12
  179:12

airfare
  176:11
  178:16

Airline
  166:2

Airlines
  150:2,4,
  20,21

airport
  152:17
  153:7

albeit
  110:20

Ali
  79:10

allegation
  139:20

allegations
  23:6 65:7
  72:16
  139:2
  186:4
  189:3

allocations
  51:18

allowed
  127:4
  165:6

alternative
  178:15

Alternative
ly
  115:7

amend
  78:8

American
  150:2
  156:16
  157:9

AMEX
  157:10
  163:10,11

amount
  45:3 53:2
  73:9 75:1
  150:9

amounts
  11:5

AMX
  68:1,8,16

analysis
  13:20
  19:14
  35:16
  39:11
  45:13
  52:2
  120:21
  126:14
  133:4
  154:14
  166:10

analyze
  13:3
  29:16

123:18
124:3

analyzing
  124:6

and/or
  83:12

Andrew
  93:10,12
  103:1

answers
  138:11

anticipate
  7:13

Apollo
  21:8 22:2
  23:5
  24:16
  25:6
  27:18
  28:1 34:3
  53:4
  60:6,13
  61:6
  62:4,18,
  19 64:1
  67:13,17
  68:1
  78:12
  83:13
  87:15,20
  88:6
  89:3,6
  90:1 94:6
  96:3
  104:5,21
  105:9,12
  106:2,8
  111:7,12,
  19 115:21
  116:12,13
  117:1
  121:18
  122:3,7
  123:3,11



127:20
128:9
141:8
158:12
168:19
173:7,9
182:6,15
184:6,7
186:2,8,
14,16
187:5,19
188:14
189:1

**Apollo's**
21:1 27:7
72:6,11
93:5
169:2,6,
10,15

**apologize**
16:15
29:4 82:7
116:19
165:10

**apparently**
37:7

**appears**
15:14
16:1
18:14
28:15
29:1 35:2
38:10
61:8 80:7
164:15
166:6,21
167:1
172:3
184:10

**appended**
16:11
17:11
86:16

**appending**

17:12

**applicable**
69:19

**application**
154:20

**applied**
47:8,16
100:18

**apply**
47:15
156:3

**applying**
133:13
140:20

**appreciates**
77:19

**approach**
53:3
154:16

**approved**
118:11
119:20

**approximate**
**ly**
10:1
22:12
149:6,7,
8,10

**April**
49:8
113:20
114:19
118:12
189:5

**area**
141:5

**areas**
12:13
125:8

**argumentati**
**ve**

30:5
91:13

**arose**
101:1

**articles**
188:6

**ascertain**
155:18

**assert**
30:13
83:7

**assessment**
106:11
185:16

**assist**
28:9

**assistant**
80:12

**assistant's**
103:11

**assistants**
180:18
181:5,7,
19

**assume**
7:7 174:2

**assumed**
165:10

**assumes**
30:5
180:20
182:1

**assuming**
7:17 59:1
73:4
164:12

**attach**
17:14
67:16

**attached**

10:9 49:8
113:4
117:12
118:16
141:21
142:5
163:4

**attachment**
118:21
119:3

**attempt**
155:18

**attempted**
156:19

**attendance**
130:2
168:3

**attended**
8:18
145:3
167:13

**attendees**
48:16

**attending**
130:4

**attends**
130:13

**attention**
52:15
114:15

**attorney**
21:8

**attributes**
161:9

**audible**
35:17

**audit**
35:9

**August**
30:1

182:6
183:15,16
187:9,21
188:1

**average**
11:6

**aware**
21:10
22:6,9
23:3,4
49:2 52:4
65:20
66:14
89:6 94:1
99:11
102:3
103:9,15
104:1,2,9
108:17,21
109:2
112:9
115:6,12
121:17
122:6,21
123:7
135:19
136:1,4
137:13,16
139:1,4
153:8,14
159:10
160:16
170:9
180:16
181:3,8,
10,13,14
182:5,14
183:14,19
187:5

_____

**B**

_____

**baby**
129:2



**Bachelor**
9 2

**back**
11 17
12 2
31 15
49 1
56 14,21
64 9
65 20
69 15
72 21
74 15
87 1
103 4,5
111 20
112 1
113 15
114 3,12
119 18
123 11
125 21
126 6
132 13
141 12,
15,17
148 7
153 4
164 5
179 5,7,
16 186 10

**background**
8 14

**backs**
158 2

**bad**
143 17

**balls**
12 15

**barbering**
107 18
108 4,13,
18

**Barcelona**
179 15

**baring**
167 21

**base**
92 17

**based**
6 14
13 10
24 19
34 2,21
35 15
68 5
81 4,12
82 9
83 4,6,10
98 5
100 17,20
101 7
104 5
148 19
152 16
173 7,10
179 18
180 5
184 8,10
187 3

**baseline**
19 13
20 20
178 8

**basically**
23 17

**basis**
21 19
24 7
33 16
37 9,14,
15 54 9
148 14
152 6,8
163 17
169 9
184 14,19

185 3,6,
10 186 7

**Bates**
27 12
29 4
52 16,18
79 6,7
84 6
114 4,6

**Bates-ranged**
58 2

**Bates-stamped**
115 3

**BBM**
95 21

**BDO**
20 10
49 4,10,
11 50 7
52 5,21
67 1
86 21
87 7
97 18
98 3,7
136 1
137 13
138 19
153 3,9,
19 154 1,
7,21
178 13
186 20

**BDO's**
49 7 51 7

**BDO-APOLLO**
61 18

**beer**
130 3

**beg**
150 3

**beginning**
75 3 89 7

**belief**
134 17
169 5

**believed**
25 14
40 19
134 15
135 10

**Bell**
145 12,
13,15
159 8

**belong**
77 11

**benefits**
121 5,10

**big**
18 3,4
95 15
160 7

**bill**
145 5

**billion**
161 14,21

**billions**
159 12

**birthday**
129 2,11,
13

**bit**
8 12
18 19
19 3
69 14
83 21
120 7

**black**
95 4

**Blackberries**
94 9
158 1

**blackberry**
94 4,5,
12,18,20
95 14,21
96 1,2,5,
7,15
97 1,13,
16,19,20
98 11,15
173 11
174 14

**blanket**
154 16

**blanking**
75 7

**blond-haired**
170 10

**blue**
94 20
95 4

**Blueberries**
94 19,21
95 5,7,10

**body**
39 6

**bold**
67 7

**bologna**
181 1

**bolts**
12 13

**booked**
158 7

**booking**
157 15

**bother**



178:8

**bottle**
163:8,20
164:8

**bottom**
30:15,16
71:16
79:5,8
93:19
114:4,11,
13 147:8

**Bowl**
171:12
172:13,
17,18
173:4

**break**
7:11,12
74:12,18
75:12
78:2,8,18
189:8

**breakdown**
51:17
73:18
75:5

**broad**
56:3

**broader**
27:20
49:9

**broadly**
10:16

**brought**
11:20
24:15
61:16
130:2

**brunch**
168:1,3,
10

**bucket**
126:18

**bullet**
28:5,7
79:21
80:9
167:18,
20,21
170:7,20
171:16

**bunch**
28:20

**business**
13:4,5
51:18,19
80:12
121:1
122:4
124:18
125:5
126:9
127:17
128:17
129:4
144:16,17
150:7
151:7,20
152:4,10
162:16
165:15
168:4,18
169:6,7
171:6,20
172:2,3,8
173:20
174:8,9,
11 179:19

**business-related**
172:4

**button**
181:7

— **C** —

**Cadillac**
152:21

**calculus**
42:18

**calendar**
47:9,11,
13,17,21
48:8
86:14
87:11,15,
19 88:2,
9,16,17,
21 96:15,
16 97:14
99:2,12
100:6,17
140:20
141:2
155:21
157:3,20
172:15,21
173:6,14
174:7,10

**calendars**
141:3

**calender**
97:16

**California**
8:17,19

**call**
12:15
13:3 46:8
51:21
79:20
80:10
82:21

**called**
10:14
11:12
23:5 68:2

79:20
80:4
95:21
107:21
108:4
110:15
123:4

**calls**
51:17

**candidly**
50:2 79:9

**capture**
155:13
156:4

**car**
153:17
154:3,12

**card**
67:17
68:1,9,16
156:8,12,
16,19
157:11,16

**caret**
53:4,9
79:19
80:9
81:10

**carets**
79:21

**Carlson**
8:3,9
12:17
13:7 15:6
16:9,13,
18 17:4
18:4,7
20:12
21:4,13
22:4,15,
19 23:19
25:8 26:3
28:2

29:8,19
30:4,20
31:3,21
32:9
33:14
34:4,14,
18 35:11
36:8 37:3
38:2,9,
16,21
39:20
40:4
42:6,20
43:9
44:1,3,10
49:16
50:6 52:7
53:5,7,18
54:4,8,14
55:12,18
56:2,15
61:17
62:21
63:4,14
66:18
68:10
71:12
74:11
75:21
76:6,19
77:14,16
81:8
82:14
83:5,14
84:8 86:2
87:4,13
88:3,12,
16 89:2,
8,17
90:2,4,16
91:3,12,
17 92:2,
11,20
93:16
94:7
95:2,8
96:18,20



97 4,7,21
98 12
99 17
100 10
102 7
104 8
105 13,16
106 6,21
107 6,20
108 5,7
111 11,15
112 13
113 8,11
114 18
116 17
117 19
118 16,21
119 6,9
120 10
121 6,12
122 15
123 17
124 3,12
127 1,12,15
128 1,11
129 17
130 7
131 19
132 6,13,18
133 9,17,19
134 6
135 6
136 3
138 2,10,16
141 14,19
143 4,8,12,15,18
144 10
145 7,19
146 7,10,13,18
147 16
148 5
153 12
157 7

158 21
159 5,16
160 20
161 19
163 14
164 14
168 6,20
169 8,16
170 13
173 15
176 4,7
177 14
178 4,9
179 21
180 4,19
181 9,16,21
184 21
185 8
186 6
187 10
189 6,13

Carlson's
41 12
132 4

Carolina
9 1

carried
150 16

carrying
151 4

carryover
115 3

case
6 18
11 16
27 21
28 15
29 1 35 3
42 1
53 13
65 3 83 8
93 6 95 5
107 15
121 17

139 5
159 11
166 6
177 20
181 4
182 6
184 8

cash
150 9
151 5

categories
13 6

categorizations
136 8

category
32 6
153 16

cease
183 8
184 3,5,14,20
185 3,7

certified
9 15,16,17,19
10 12

CFE
9 16

CFF
9 16

chain
103 4,5,6

chance
124 9

change
42 9,11
78 8
189 4

characterization

31 21
135 17

characterized
80 14

charge
140 9,15,16
144 17,20
145 2,5
149 19
156 21
158 3
166 3

charged
67 13,17
72 5,10

charges
67 21
68 8
136 10
155 19
166 1

charging
125 21

Charlotte
9 1

chart
165 21
166 9,10

check
165 5

Cindy
63 2,4

circumstance
175 14
179 4

circumstances
93 3
129 8

177 1

cite
179 1

cited
72 12
73 19
77 1,6

cities
48 15

clarification
75 19

clarify
16 9
29 15
36 4
46 20
50 7
61 11
69 2
113 16
132 5
185 2

clarity
16 14

Clary's
14 21

class
178 3

classification
13 12
153 17

classified
151 5
167 7

classify
129 6

clear
175 5 95 9
150 11



165:20

Cleveland
6:17

client
72:6,11

clients
11:3

closer
87:2

CM-1
60:11
66:1

CM-2
61:5,6,
10,12,14,
15,17
66:3

CM-3
64:2 66:5
79:2

coach
132:10

coffee
77:18

colleague
145:4

colleagues
129:3

collect
127:21

College
8:18

color
94:20
134:18,20

column
31:9,12,
15 32:17,
19,20
154:2

comment
77:7

commercial
130:13,19
131:4,11

Commission
185:11

committee
186:16
187:2

communicate
d
174:13

communicati
on
21:10

Communicati
ons
141:17

Community
8:18

companies
122:3,8
159:13
187:7
189:2

company
10:3
11:14,20
110:2
121:18
126:1

compiled
86:8

complain
91:18

complaint
65:3,7
72:13,16
73:10,12,
19 74:3,9

75:1
186:5

complete
89:4

completed
20:15

comprehensi
ve
86:3 99:8

concept
174:17
175:1,5,
13,15

concepts
82:6

conclude
69:4,6

concluded
189:15

concluding
72:1

conclusion
89:10
91:16

conclusions
51:8,11
57:3 91:5

conference
75:13

confirm
115:8
116:2

conformity
124:1

confronted
23:5

confused
60:10
69:14

connection
50:18
72:20

consequence
s
83:13

considerati
on
125:3
149:15

considered
39:21
57:21
90:10
121:2

constitute
37:15
168:10

consulted
38:4

contained
20:21
33:11

contemporan
eous
87:1

contents
172:5

context
41:2 50:2
54:12
74:8 90:8
140:4

continue
179:7,11

continuing
20:4

control
100:3

cooperate
23:17

copied
102:19
120:3,5

copies
27:11
44:10,13
49:15
61:15
141:7

copy
15:21
18:12
38:10
61:6,16
62:15
93:11
113:6

corner
79:8

corporate
62:18
64:1
67:14,17
68:1,8,16
157:10
163:10

correct
10:9,10
12:10
13:16
14:19
15:1,11
16:4,8
17:12
19:10,11,
12,17
20:1,3,18
21:1,18
22:3,13
23:12
27:18
28:21
32:8,17
33:1



34:13
36:13
39:8,19
41:3,4,6,
9 51:6,
10,14,15,
16,19,21
62:9
66:7,10,
12 68:9,
11,17
69:8,12,
19,21
70:17,21
71:6 72:2
76:15
82:19
84:19
89:7
98:11
99:21
114:21
117:15
118:15,18
120:17
121:11
122:8
123:8
125:17
126:2,3
127:14
128:10,20
137:17
138:9
139:6,13
140:16,
17,18
141:13
147:7
148:20,21
149:1
150:8
153:14,20
155:1
156:9,10
157:16
158:3,17,

18
162:18,20
165:2
167:8,9
168:4,11,
14,15
170:20
171:1,2,
4,5,6,7,
13,14,16,
17 176:17
178:18
179:3
180:18
181:8
182:7
183:21
184:20
185:19

**corrected**
148:18
149:5

**correctly**
39:7
40:16
41:5 47:4
54:13
59:7,16
62:5
69:11,20
71:1
84:18
99:3
112:12
125:18
128:19
134:5
167:13

**corresponde**
**nce**
174:11

**cost**
175:6
176:11
177:16

179:17
180:9,15

**costs**
53:3
175:7
178:2

**counsel**
38:9,19
64:2
75:13
143:20
170:1

**counsel's**
76:15
97:6,10

**couple**
19:2
149:13,18

**court**
7:18

**cover**
118:14

**coworkers**
129:9,12,
14,16
130:20
131:5,11

**CPA**
9:15
175:18

**credit**
51:20
67:17
156:19

**criteria**
176:2
177:11

**crosshatch**
60:9

**Crowl**
141:12

**crummy**
27:11

**culled**
103:18,19

**curious**
54:10

**current**
79:11
144:19

**cut**
27:12
29:4
107:18
108:3,9,
20 109:4
182:20

**CV**
10:9

_____

_____
D
_____

**data**
91:1 93:5

**date**
23:1,15
50:4
69:17
70:15,19
71:2,4
103:2
106:2
110:14
139:12
143:3
144:19
145:5,19
156:8
157:9,14,
15 158:16
166:5,8
171:12
183:18
187:21

**dated**
62:15
79:4
113:20
186:12

**dates**
47:12,14
48:2
156:21
157:3

**David**
17:18

**day**
7:13 8:2
46:7 69:3
87:1
101:18
139:21
140:6,9,
10,16
141:4
143:1,10
144:4,19
152:16
156:14,15
159:2
162:9

**days**
26:10
45:19
140:15
141:1
156:7
158:7,10

**DBA**
110:6

**deal**
123:21
124:9
161:21

**deals**
176:15

**death**



49:19

**decided**
18:18
100:9

**declaration**
162:15

**deemed**
100:7,8
151:18

**deep**
159:2

**defaulted**
127:10

**defendant's**
26:13
43:9,10
49:14
52:14
78:12
79:1
105:7
110:10
113:15
142:13
153:19
160:6,7
182:13
183:9

**defended**
80:11

**Define**
141:15

**degree**
9:7

**degrees**
9:4 121:9

**Delta**
150:21

**demonstrated**
180:14

**departure**
116:16

**depending**
164:19

**depo**
23:12
142:18

**Deponent**
110:15

**deposition**
7:4,9
14:6,19,
21 23:8,
16 24:3,
11 25:20
26:2,9,14
30:9
50:19,21
58:18
59:1
62:14
63:4,11,
17 65:16
76:18
83:11
96:11
110:5,13
117:13
122:12,17
139:5
142:5,7,
21 161:6
163:5
170:11,15
171:2
188:4,5,
12 189:15

**depositions**
8:10
14:15
20:14
39:9,17
40:21
41:16

52:10
58:8,11,
14 59:9
63:13
64:8,21
75:6 83:7
84:1,5
89:13
93:11,13
97:18
159:19

**describing**
176:9
188:20

**description**
150:6,12,
15 184:10

**designed**
35:9,16

**desist**
183:8
184:4,5,
14,20
185:3,7

**destinations**
99:8

**detail**
18:13
19:3
43:18
45:5,6
49:12
51:4
56:7,12
57:7,12
58:5

**detailed**
85:15

**details**
10:8 11:2
16:6
84:20

**determination**
124:17
135:15
153:16

**determine**
11:14
120:16
156:20
172:10
177:20

**determined**
165:2

**determining**
125:5
144:15
152:8

**device**
97:20
98:11,15

**devices**
94:5

**diem**
125:2

**diems**
154:21

**difference**
82:3 92:8
126:12,
16,20
133:8,16
134:21
173:12

**difficult**
31:8,17
49:20
56:4
71:15

**dime**
161:15

**dinner**
139:21

140:6,8
143:1,10
144:4,6
169:21

**direct**
18:10
116:14
138:13,16
146:14,16

**directing**
114:15

**direction**
100:3

**directly**
22:2

**disagreeing**
42:19

**disallow**
134:11

**disallowed**
124:16
134:10

**disclosures**
187:6

**discounted**
162:6

**discuss**
75:16
101:12

**discussed**
45:16
75:17
159:18
167:17
170:14
172:20
176:9

**discussing**
101:21
172:17

**discussion**



74:17
188:3

**discussions**
52:10
83:2 90:8
94:4
107:10

**dispute**
154:6
181:10,17

**distinction**
42:2
131:17,20
132:2
133:2,5,
13 134:1,
4

**distinguish**
**ing**
135:16

**DM**
73:14

**document**
26:16
29:10
30:11
35:13
36:1,2,15
41:14
42:3,21
43:1 45:7
54:3
58:19
60:16,18
62:7,8
68:6 80:6
105:21
115:14
137:2
139:18
154:6
163:15
182:20
183:8,17

185:1,10

**documentary**
171:21

**documentati**
**on**
158:2
180:14

**documented**
143:12

**documents**
13:11
24:20
34:21
36:12,18
37:1,9,
13,17
38:4
39:4,10,
21 40:14
44:21
45:3,11
53:12,16
54:2 55:4
56:11
57:21
58:3
81:5,13
84:12
86:4 98:6
101:1,3,
5,6
103:17
106:12,19
107:2
109:17
112:10
113:6
116:14
118:9
137:6
139:16
142:10
151:13
152:11
159:11

177:21
180:5,7,
11,13
182:3
187:15,16

**dollar**
11:5
155:6
161:14,21

**dollars**
155:7
159:12

**Donna**
102:17
113:19
114:19

**door**
25:5

**double**
165:5

**doubt**
7:8

**drank**
130:3

**drill**
12:14
13:1

**driver**
172:7
173:18
174:6

**due**
176:10

**duly**
6:4

_____

_____

**E**

_____

**e-mail**
48:9
102:16

103:2,3,
6,7,8
104:7,14
106:3
111:13,16
112:4,7
113:19
114:9,16,
19 117:5
118:14,
16,21
119:3,18
120:6
143:5
155:21
171:19
172:17
173:8,14

**e-mailing**
22:1,2

**e-mails**
46:3,6
47:2,3,
17,18
86:13
99:2,13,
16,19
100:8
102:3,5
103:11
119:5,11
140:14,20
141:2,8
155:10,12
157:3,20
158:11
162:7
171:8,13
172:20
174:7

**earlier**
7:16
15:19
70:20
84:17

96:17
104:13,14
118:1
166:20
167:1
183:20

**early**
22:13
23:4
66:10
70:10
80:4

**ease**
18:10

**easier**
15:6

**editing**
132:10

**educational**
**ly**
8:14

**effect**
60:20
61:1,7
62:13
131:8

**effective**
64:3
66:5,15

**Ehrlich**
14:19
93:10,12
103:1

**Ehrlich's**
26:14
30:9

**electronic**
115:7
116:1

**electronica**
**lly**
115:9



116:3

**else's**
141:7

**employee**
28:17
119:14
122:7

**employees**
27:6
34:10
67:15
167:12

**employer**
83:13
131:9
175:8
176:21

**end**
8:1 12:16
69:3 71:9
145:21

**ended**
126:18

**ending**
52:18

**ends**
151:10

**engaged**
27:18,19

**engagement**
36:13,14
53:21
57:5
68:14

**ensued**
74:14
189:10

**entertainme
nt**
10:15
30:17

31:4 32:6
177:7

**entire**
105,6
58:19
72:12
136:20

**entirety**
183:10

**entities**
11:7 83:3

**entitled**
18:13
119:19

**entity**
128:6

**entries**
47:9,11,
13,17,21
48:8
87:15,19
88:2,10,
16,17,21
96:16,17
99:2,12
100:7,17
140:20
141:2
157:3,20
174:7,10

**entry**
150:20
155:21
172:15
173:6,14

**Enzor**
167:11
168:2,9,
17 169:5,
14

**Enzor's**
169:2,10

**equally**
31:8

**equation**
162:11

**establishme
nt**
130:14,19
131:5,11

**estimate**
10:17
14:7

**evaluate**
177:7,12

**evaluated**
177:19

**evaluating**
176:3

**evening**
7:15

**event**
26:2

**eventually**
19:14

**evidence**
13:17,19
23:20
24:20
25:9 30:5
168:17
169:14
171:21
180:8,20
181:4
182:1
187:14
188:21

**exact**
22:21
83:17
153:17

**exam**

10:14

**examination**
6:7 9:19
50:4
79:11
139:7

**examination
s**
10:12,13
11:13

**examine**
135:19
179:17

**examiner**
9:16
12:12

**examples**
38:1

**exception**
18:9
151:5,20

**excess**
103:17

**exchanged**
20:21

**exclusive**
14:5

**excuse**
11:7
22:10
28:17
49:3 66:3
78:11
102:17
103:9
113:7
151:11
165:21

**executive**
186:15,16
187:2

**exercise**
178:20

**exhibit**
15:12,15
16:19
17:18,19
18:3,12
19:9,13,
15,18,20
26:13
35:5,7
37:4,6,7
38:4,10,
11,20
39:16,20
41:9
42:15
43:7,8,9,
11,13,21
44:7,15,
16,19
45:1,8
49:14
50:1
51:8,13,
16,17
55:1
56:9,10,
16,21
57:9,14
58:9,11,
16,17
59:10,11,
13 61:13
63:5 64:9
70:11
84:12,21
85:2,10,
14,21
93:11
96:10
98:6
102:13
105:8
109:8
110:10



111:18
112:3
113:15
117:12,13
118:5,15,
19 136:8
139:12
142:1,10,
14,16
144:8,13
147:8
153:19
160:6,8
163:8
170:4
178:1,12
182:13
183:9
186:13,
14,19

**exhibits**
14:13,15
15:1
16:4,10,
20,21
17:11,13,
14 18:17
39:17
40:21
41:7,15
43:19
45:16
54:12
55:7
58:7,10,
13 61:10
110:12,16
113:5
117:14
118:1,8
163:4,7
170:11
186:21

**existed**
106:14,20

**expenditure**
130:3
131:10,14

**expenditure
s**
80:11

**expense**
10:15
11:15
13:4
28:16,18
31:10,12
32:8
60:6,13
80:13
107:17
113:7
118:10,17
119:14,19
120:8,14
121:1,2,5
123:15
127:17
128:19
129:4,5
130:3,5
131:15
135:20
136:12
137:14,
15,20
139:19
144:4,5
150:12
156:2,6,
8,12,16
157:9
168:4
169:7
175:19
177:7
180:12,13
181:15

**expense-
related**

113:13

**expensed**
53:2

**expenses**
13:13
16:7
18:13
23:6
27:5,7,20
28:12,21
31:6
32:13
33:3
34:1,12
49:5
51:18
52:21
67:16
69:6,15
70:2,6
72:11
73:4
79:12
80:12,14
81:7,16
82:13,17
107:11
115:11
116:4,15
117:8
120:16
124:10,
15,21
125:6
126:1
131:3
134:8
135:12
145:11
147:20
148:8
154:12
155:8,9,
16 165:3,
7,16
167:6

168:11,18
178:15
179:19
189:4

**experience**
120:20

**expert**
6:21 12:6
65:13

**explain**
115:7
116:1

**Express**
156:16
157:10

**extending**
176:10

**extensively**
160:18

**extent**
41:20
89:3

**eyesight**
30:21
_____

_____

         F
_____

**face**
83:12

**faced**
67:7

**fact**
11:19
26:9
39:15
61:14
63:8,11
64:1 66:7
78:4
97:11
102:4

106:4
109:2
110:14
111:8
134:15,18
135:10
139:6
144:17
149:15
163:2,9
167:11
169:21
171:21
172:1
173:11
177:12,20
178:21
179:1
181:11
188:9

**facts**
30:5
65:6,9
180:20
182:1
186:3

**failed**
184:7

**fair**
27:4 29:7
31:20,21
33:20
85:9
148:5
161:18
176:6

**fairly**
80:14

**false**
33:12

**familiar**
7:8 110:8
145:14
174:16



175:1,4,
13,15
176:1,16,
18,20
177:5,10

**February**
144:5
145:4,9
151:10,11
156:13
187:9
189:5

**fee**
184:16

**feeding**
132:4

**feel**
67:8
69:10

**females**
109:1

**fields**
9:18

**filed**
16:4,11
17:10
44:20

**filing**
159:21
160:1,16
161:3,8

**filings**
162:5

**filter**
140:21

**final**
49:7
51:7,17,
21 85:16
153:19

**financial**

9:17

**find**
12:13,14
42:17
46:12
146:14
155:17
157:19
178:21

**finds**
185:11

**fine**
180:2

**finish**
76:19
78:1

**finished**
133:18
155:15

**fired**
83:12

**firm**
49:3,4

**flags**
187:8

**flew**
179:16

**flight**
7:14,15
150:6,21
156:14,15
166:2
172:16
175:6
179:19

**flights**
149:11
156:18

**flip**
27:1

**Florida**

6:15
145:13,14
150:7,21
151:7
159:15

**flying**
7:17
175:5
179:5,6

**focus**
47:13
114:8
156:6

**focused**
47:11
75:1

**Focusing**
153:5

**follow**
136:7
137:10,19

**fondly**
94:21

**footnote**
19:6
37:15,19
39:5
72:21
74:21
75:4,20
77:8

**footnoted**
39:12
40:11

**footnotes**
37:10,11,
17

**forensic**
10:13,14
12:12
35:16

**forensics**
9:17,19

**forgive**
49:18
167:4

**form**
12:17
20:12
21:4,13
22:4,15
23:19
25:8 26:3
28:2 30:4
33:14
34:4,14
35:12
36:8
37:9,13,
14 39:20
41:19
42:20
44:1 52:7
53:7,18
54:14
55:12
66:18
68:10
75:21
76:6 81:8
82:14
83:5,14
86:2
87:4,13
88:3
89:2,8
90:3,16
91:12
92:11,20
94:7
96:18
97:21
98:12
100:10
102:7
104:8
105:13,16

106:21
107:6
108:7
111:11
112:13
113:8,11
119:9
120:10
121:6,12
122:15
123:17
124:12
127:1,15
128:1
129:17
130:7
131:19
134:6
135:6
136:3
138:2,10
141:14,19
143:4
144:10
145:7
159:16
160:20
161:19
163:14
164:14
168:6,20
169:8
170:13
173:15
176:4,7
178:4
179:21
180:19
181:21
184:21
186:6
187:10
189:6

**formed**
41:2



forming
  36:18

forms
  119:15

formulating
  41:17
  125:10

Fort
  6:14

forward
  8:15
  158:10

found
  85:2
  124:10
  171:8

foundation
  29:9
  33:15
  34:5,15
  35:12
  52:8
  53:8,19
  54:16
  55:8 88:4
  89:3,9
  90:4
  92:21
  98:1
  102:7
  105:17
  111:12
  123:18
  143:5
  145:8
  159:17
  163:15
  168:21
  180:20
  182:1,21
  186:7

four-day
  162:8

fraud
  9:16,19
  10:12
  12:11,16

free
  67:8
  69:10

friendly
  18:19

friends
  171:10

front
  38:6
  57:15
  60:12
  152:12

full
  89:4
  171:16

fully
  59:19

function
  129:15
  130:4,13,
  18 131:4,
  10 167:12

fund
  123:5

funds
  121:19
  122:4,8,
  13 123:1,
  3 187:6

funny
  108:12

_____

G

_____

gain
  53:15
  54:2

55:9,17

game
  138:17

Garren
  110:21
  111:9,17
  112:6,7,
  17

Garren's
  111:4,9

Gary
  167:11

gathered
  85:4

gathering
  93:6

gatherings
  129:2

gave
  64:19
  84:2
  93:13
  95:3
  128:6
  142:6
  158:12,13
  177:9
  179:2

general
  19:2 29:6
  49:1
  68:19
  105:10
  169:21
  176:1,20

generally
  24:14,19
  140:3

generated
  22:11

generically

10:15
  12:11
  16:8 84:6
  85:7,14,
  21

gentleman
  170:9,10

gentleman's
  75:7

gentlemen
  77:12

get all
  88:21

gift
  130:2
  162:20

give
  11:5
  13:3,8,9
  36:21
  37:21
  62:21
  84:6
  93:16
  105:1
  127:21
  169:5
  173:11

giving
  38:13
  104:5

glance
  27:1

Global
  60:13
  78:12
  121:18

Goncalves
  162:13
  163:9,18
  164:12

Goncalves's
  162:14
  163:12

Good
  6:9,10

gory
  11:2

Government
  95:3

grab
  74:12

graduated
  8:16 9:2

grant
  30:17

Great
  77:5

Greg
  102:18
  113:19
  114:19

ground
  7:3,9
  154:13

guess
  9:8 13:18
  22:17
  34:11
  43:5,20

guided
  41:20

guy
  108:3

guys
  100:9
  119:2

_____

H

_____

hair



107:18
108:3,8,
18,20,21
109:4
112:12

**half**
10:1,6

**hand**
17:16
18:18
38:19
49:13
182:13

**handing**
15:10,18

**handled**
80:12

**happen**
7:20
161:15

**happened**
12:14
78:18
87:3
97:11
134:18
149:15
162:17
188:8

**happier**
8:1

**happy**
157:8

**Harbor**
145:13,15
159:8

**hard**
30:18
31:2
113:6
150:20
160:4

**head**
65:15

**heard**
12:19
174:20
176:12

**helpful**
37:7

**high**
8:15,16,
17

**highlightin
g**
18:9

**hired**
26:9
28:14

**hiring**
28:8

**hit**
156:12,16
157:9
181:7

**hits**
156:8
157:16

**hold**
9:4,7
78:6
105:6

**holding**
110:1

**home**
7:16
175:5,11

**honest**
50:3

**honestly**
14:7

**hoping**

7:16

**hotel**
125:2
157:15
176:10
178:21
179:19

**hotels**
154:21
176:15
178:17

**hours**
14:9
53:13
68:14
81:5,13
82:11
98:16
107:14

**huge**
159:12

**hundred**
14:9,10,
11 81:13
155:7

**hundred-
plus**
107:14

**hundreds**
53:13
58:4
68:14
81:5
98:16

**hypothetica
l**
130:10

_____

I
_____

**idea**
115:8 83:3

89:3
169:5

**identificat
ion**
15:13,16
17:20
44:17
102:14

**identified**
26:14
82:16
100:21
136:12
138:5

**identify**
35:9,16

**identifying**
148:15

**impact**
91:5
93:3,5,8

**impacted**
135:3

**implementat
ion**
184:15

**important**
13:17,19
65:12
90:12
91:9
92:9,15
93:2
106:10,17

**improper**
184:17
189:3

**improperly**
53:2

**inaccurate**
33:12

**inappropria
te**
23:6

**inches**
160:10

**include**
39:16
103:5
112:6
135:4,7

**included**
20:9
37:10
113:5
149:14
168:13
170:19

**includes**
37:6
94:19

**including**
149:11

**inclusive**
52:11
136:19

**incorporate
d**
85:16,19

**increased**
176:11

**incurred**
67:21
130:4
131:3

**independenc
e**
12:5

**independent**
13:3,10
37:18
65:13
84:15



90:13,20
92:16
106:11,18
128:4,8,
15 142:6

**independently**
76:9

**indication**
97:10
181:18

**indicative**
174:12

**individual**
85:1
121:5,10
130:19
131:4

**individual's**
131:9

**individuals**
100:6
103:14

**individuals'**
32:13

**industry**
126:9
128:17

**influence**
42:8

**information**
13:11
20:9,21
22:3
33:11
35:15
48:16,19
50:12
76:13
85:4

90:14
91:10
92:17
127:16,19
128:2,7,
14 155:17
188:16,19

**informing**
42:18

**informs**
42:13

**initial**
6:21 19:4
38:10
69:5
87:18
103:3

**initially**
28:13
34:2
80:11
95:4
103:10

**inquired**
127:10

**inside**
25:6

**instance**
11:13
42:3
179:8,13

**instances**
11:19
12:2
125:12

**instituting**
183:7

**instruction
s**
154:3

**interacted**
122:7

**interests**
185:2

**internal**
28:16

**interrupt**
159:1

**interview**
80:4,18,
20

**interviewed**
80:2

**introduced**
50:3
110:12
118:20
119:2
142:18

**investigate**
136:1

**investigate
d**
138:9

**investigati
on**
11:21
23:17
27:19
90:15
158:9

**investigati
ons**
11:4,7

**investment**
122:12

**investments**
123:2

**investor**
121:19

**investors**
189:1

**involved**
21:11
121:21
122:3
123:7

**issuance**
112:10

**issue**
106:13,19
121:19
128:18
140:4
171:20

**issues**
10:15
184:16,17

**issuing**
40:15
55:2
110:17
124:11

**Italian**
107:17
109:10,14

**item**
59:12
126:12,13
139:11

**items**
28:12
109:16
136:12
147:20
148:2
184:3

_____

**J**

_____

**January**
60:14
70:10,15
112:4
116:16,17

166:3

**Jim**
143:14

**job**
23:18
122:13
133:14

**Jose**
8:17

**journal**
128:16

**journals**
125:14,21
127:9

**July**
22:12,13,
14,18
23:4,15
66:10
80:1,5,7,
18,20
183:21

**June**
62:13,20
64:3
66:3,4
69:18
70:3 71:5
154:20

_____

**K**

_____

**Kelley**
102:20

**Kevin**
6:3

**kill**
17:1

**kind**
7:9 8:13
11:3,16



12:12
19:13
48:16
50:17
77:13
95:15
108:18
165:9
171:12
176:21

**kinds**
28:20

**knew**
81:9
111:8
161:13
165:10
186:3,8

**knowing**
151:13

**knowledge**
35:12
88:5
102:8
106:7
117:2
162:3
163:19
168:18
184:8
188:18

**KP**
15:12,15
17:19
102:13
111:17

**KP-1**
15:11
19:5 36:6
38:1
40:12
41:2

**KP-2**
15:18

40:12

**KP-3**
17:18
44:15,16
51:17

**KP-5**
102:12,16

———————

**L**

———————

**LA**
178:3

**labeled**
30:11
97:16

**lack**
29:8
107:19
174:10

**Lacontessa**
107:12,
13,16
108:17
109:9,13,
18 110:2,
21 112:11

**Lance**
170:18
171:1,20
174:8

**language**
71:18
72:1 78:5
125:1

**large**
45:3

**larger**
29:6

**Lauderdale**
6:15

**Laufer**
113:19
114:20

**Laugher**
102:18

**Lauren**
102:21

**law**
49:3

**lawful**
6:4

**lawyer**
6:14
21:2,12
102:20
117:1

**lawyers**
20:11,18
21:1,11
24:16
82:20
102:21
116:1,13

**lay**
54:16

**lead**
161:16,20

**leading**
81:6 84:3

**left**
30:20
31:1
152:14

**left-hand**
183:17

**legal**
83:12
89:10

**Leland**
8:16

**letter**
49:18
134:9

**licenses**
9:10,12

**lied**
29:17
111:14

**lieu**
174:17
175:11,
20,21
176:3,12,
16 177:9,
12 179:3,
5

**life**
126:20
133:7

**limit**
155:6,8,9

**limitation**
69:19

**limitations**
69:8
125:2
134:10,12

**limousine**
153:1,6

**lines**
83:19
122:17
149:14,18

**list**
30:12
35:17
36:21
46:12,14
57:21
58:11
85:3,8
86:3

98:18
99:9
101:12
118:2
128:9
136:8

**listed**
39:15
43:20
44:21
63:5 81:9
84:21
85:1,14
86:1 98:6
103:12,14
120:16
129:7
139:10,11
166:3
179:19

**lists**
39:21
84:12
112:5

**LLC**
60:13

**loans**
184:17

**local**
153:5
154:10,11

**locally**
153:11

**locations**
99:7

**logging**
78:3

**London**
175:2,9
177:2,8,9
178:3
179:6,7,
15



long
  7:11 9:21
  14:8

——————
       M
——————

made
  135:2
  153:15
  154:1

longer
  66:5

looked
  20:9
  42:21
  46:19
  55:3,6,7
  56:12
  141:3
  142:1
  157:2
  160:8
  163:19

major
  9:2

make
  8:1 17:5
  49:9,15
  74:6
  89:10
  133:4,12
  149:21
  157:7
  173:12

Lorenzo
  164:10,
  11,13

makes
  127:2
  131:18

lose
  23:18

lost
  147:17

making
  39:18
  41:14
  108:12
  134:1
  148:16
  187:5,19

lot
  68:15,19

Louisiana
  164:19
  165:16
  166:1,10
  167:7
  170:2

males
  108:19
  109:1

lucky
  170:6

man
  8:1

lunch
  152:9,12
  159:1
  168:1

management
  60:13
  78:13
  121:18

luncheon
  152:5

manner
  177:5

MAR
  142:17
  160:7

MAR-1
  163:3

MAR-4
  170:5,10

March
  163:3

mark
  43:20

marked
  15:10,12,
  15 17:17,
  19 44:16
  49:13
  53:4
  57:15
  60:11
  61:5,12,
  14 62:3
  102:13
  117:13

marking
  38:11

master
  19:21
  20:5,8
  22:10
  136:16,
  18,19,20
  137:3,10

material
  30:15

materiality
  185:17

matter
  43:2
  102:4
  121:9
  128:14

Maurice
  6:3

Mcgorty
  25:13

26:6 75:7
  76:10
  77:6

Mcgorty's
  25:20
  26:1,9
  76:18

meal
  32:5

meals
  30:16
  31:3
  125:2
  154:21

meaning
  174:2

means
  32:10
  55:17
  71:12
  126:8
  156:15

media
  188:15

meeting
  23:9,10
  24:15,21
  25:3 26:5
  151:1
  179:7,11,
  12

meetings
  149:13
  150:7
  151:7
  170:21
  172:4,5,
  19,20,21
  173:13,20
  174:11
  175:3

memory
  41:18

76:12

mention
  37:19

mentioned
  164:18

merchant's
  48:15

merchants
  85:2

messages
  96:6,7,8,
  10

Messenger
  96:1,2,5
  174:14

met
  172:1

met already
  6:11

Metals
  149:12
  150:7
  151:1,7
  152:5
  164:1,13

methodology
  47:1
  48:14

Miami
  145:14
  149:12

Michael
  59:3

Michelle
  59:1,3
  63:2,5

Michelle's
  59:1
  63:17

Microsoft



96:16,21

**mid**
22:17,18

**midnight**
144:18
145:3,5

**million**
11:10

**mind**
92:10
132:2
133:2
135:18
178:13

**Mine**
108:8

**minerals**
123:8,12

**minimize**
49:19

**mining**
123:7,12

**minutes**
159:4

**misallocated**
34:12

**mischaracterizes**
23:20
25:9 44:3
163:15

**misleading**
33:13

**misspelled**
110:20

**mistaken**
146:12

**mix**
122:3

**mobile**
94:5

**Mohammed**
79:10
119:19

**moment**
113:16
137:12
153:6
156:1
177:1

**money**
131:3,10,
14 175:8
176:21

**monitoring**
184:16

**months**
106:3
159:14

**Moore**
20:11
21:2

**morning**
6:9,10
36:7

**move**
97:5,9
151:17

**moved**
165:9

**multi-paged**
103:3

_____

**N**

_____

**named**
187:20

**names**
99:7

**narrow**
46:6,9
148:1
157:7

**National**
9:12

**natural**
123:2,3

**nature**
125:6
161:18

**necessarily**
41:13
58:19
61:13
104:17
151:14
156:14
157:14
166:12

**newspaper**
188:8

**nice**
91:8
160:3

**nicely**
163:12

**nine-day**
155:10
156:1,2

**nod**
65:17
130:16

**nodding**
65:15

**nonetheless**
162:6

**nonreimbursable**
13:5
126:12,21

**127:7**
129:4,5
130:1,5
131:15
132:3,7
133:3
134:4,9,
11 135:1

**Norman**
102:17
113:20
114:9,11,
17,19

**North**
9:1

**notation**
168:5

**notations**
154:1

**note**
16:18
38:3 72:1
149:12
164:3,4
168:2
169:20

**noted**
19:4 39:4
80:12
153:3

**notes**
59:21
164:8

**notice**
14:13
109:7

**notification**
118:10

**November**
61:1,7
66:2

145:21
146:1
147:15
148:9,12
149:6,7,
8,13
150:2,6
151:11,
12,15,21
152:17

**number**
16:4
17:13
27:11
28:18
33:20
46:3 53:4
61:18
73:11,13,
14,15,21
74:2
78:12
79:1
104:3
111:18
119:20
120:16
133:19
160:7,8
184:2

**numbered**
79:10
167:20

**numbers**
27:12
79:7 84:7

**nuts**
12:13

_____

**O**

_____

**object**
12:17
35:11



**objecting**
54:8,14

**objection**
13:7
20:12
21:4,13
22:4,15,
19 23:19
25:8 26:3
28:2
29:8,19
30:4 32:9
33:14
34:4,14
36:8
39:20
41:13
42:20
44:1 52:7
53:5,7,18
54:4
55:12
63:14
66:18
68:10
75:21
76:6 81:8
82:14
83:5,14
86:2
87:4,13
88:3
89:2,8,17
90:3,16
91:3,12
92:11,20
94:7
96:18
97:21
98:12
100:10
102:7
104:8
105:13,16
106:6,21
107:6

108:7
111:11
112:13
113:8,11
117:19
119:6,9
120:10
121:6,12
122:15
123:17
124:12
127:1,12,
15 128:1,
11 129:17
130:7
131:19
133:9
134:6
135:6
136:3
138:2,10
141:14,19
143:4
144:10
145:7
153:12
159:16
160:20
161:19
163:14
164:14
168:6,20
169:8,16
170:13
173:15
176:4,7
177:14
178:4,9
179:21
180:4,19
181:9,21
184:21
186:6
187:10
189:6

**objections**

182:21

**obtained**
86:4

**occasions**
34:1

**occur**
63:11
149:13
175:15

**occurred**
115:8
116:2

**October**
66:1

**Office**
96:16

**older**
94:15

**opine**
106:13,20

**opining**
144:9

**opinion**
13:10,12
21:19
33:17
36:19
41:14,19,
20 42:9,
12,13,16
92:9,16,
18,19
93:14
106:18
110:18
125:18
134:2

**opinions**
36:16
37:10
40:15
41:1,17

43:1
85:17
93:8
125:10
140:5

**opposed**
11:16
36:7 48:2
60:1
94:20
96:16
117:18
118:4
121:10
137:6
153:6

**order**
17:15
183:7
184:4,5,
14 185:4,
11

**original**
15:11
16:3
17:11
99:14
106:12

**Orleans**
171:11
172:6,12
174:3

**Ostendorf**
170:12,18
171:1

**outlined**
33:21

**Outlook**
96:21

**overinclusive**
52:6 53:3

**overly**
52:10

**overstate**
53:1

**overview**
30:2

———————

**P**

———————

**p.m.**
114:19
189:15

**pages**
27:1
29:3,7
30:2
58:3,4
77:9 78:3
103:4
120:14,15
160:9
185:15

**paid**
145:4

**pains**
133:11

**paper**
18:19
49:18
150:21
160:4

**paragraph**
20:2 67:7
69:9,17
71:9,12,
14,16
72:1 73:1
87:18
99:14
115:3,19
165:18
167:18
179:1



184 4,6,
15,17,18
185 9,20

paragraphs
185 6,8,
12

parameters
99 1
100 21
109 9
112 5
173 8

pardon
150 3

parenthesis
110 21

part
24 2
40 18
45 20
122 11
123 2
162 11
183 11,
12,13

partial
51 19
89 4
165 15

partially
144 16
172 8

parties
129 2

partner
102 19
184 6

partners
67 15
123 4

parts
161 7

party
129 11,13
145 4

past
39 7
158 10

Paul
14 18
20 10
21 1,2
22 1
24 16
25 7,15,
17 27 19
28 8,13
29 5,17
30 1
33 11
49 2
52 21
80 1
102 19,21
103 10
104 21
112 5
114 17
115 6,13,
21 116 13
117 1,6
135 20
141 12
153 9
154 21

Pearl
20 11

pending
7 11
38 17

people
103 12
109 3
171 4
172 1
177 6

perfect
8 5 13 15

perform
11 21

performed
45 12
103 16
138 5

period
10 11
12 16
68 17,18,
21 69 19
70 3,7,9
87 20
88 18
89 1 94 6
102 6
105 11,15
147 13
156 1,3

person
90 13
100 1
130 13
160 19
162 5

personal
12 15
13 5
51 18
72 10
73 5
80 15
81 7,16
82 13,17
120 8,14,
17,19
121 2,4
123 16
124 17
125 5
126 1,13,
21 127 5,

11 128 18
129 4
131 15,18
132 3,8
133 3
134 4,19
135 1,11,
12,17
136 1,13
137 14
138 1,6
144 16
151 8,19
152 2
153 10
154 4
165 3
167 8
171 10,12
173 14,
19,20,21
174 9,12

personalize
d
164 8

personally
36 10
101 6
104 17
115 10
116 4
117 8
146 20

pertinent
43 1

phase
31 10,12
32 6,17

phones
95 19

photographs
173 12

phrase
74 1

pick
160 3
175 2

piece
85 4
150 20
160 4
188 21

Pierce
6 3,9
15 10
38 9 98 2
189 11

pile
79 5

place
34 2
125 19
143 2
156 14
175 2
183 15
188 3

Plaintiff's
19 9,13
20 5
22 10
42 5 43 7
85 2
110 10
112 20
117 12

pleading
49 8

point
7 10,19
23 21
28 7
49 21
63 17
75 17
159 14
160 18
162 5



167:21
170:3,7
172:9
186:8
187:8

**points**
167:18,20

**policies**
11:16
12:6 60:6
64:10
65:21
66:7
123:18
124:4
125:9,19
130:6
168:19
169:2,6,
15 175:19
176:10
184:15

**policy**
10:15
11:15
60:14,20,
21 61:1,6
62:5,9,12
64:2,4
66:1,2,4,
15,21
67:5,19
68:2
123:16
124:1,2,
11,14,16
125:1,9
127:4
128:18
131:8
134:9
154:20

**pop**
156:2

**population**
32:14
45:10
109:19
136:11,20
138:3,5
142:10
155:16
163:20

**portfolio**
122:2,8
159:13
187:7
189:2

**portion**
58:16,17
184:5

**portions**
20:14
77:1

**posed**
115:13

**positions**
103:13

**potentially**
45:7

**Powerpoint**
29:5,21
186:11

**Practically**
8:5

**practice**
9:18
136:7

**precious**
8:11

**precursor**
8:13
73:14

**preliminary**
78:13

101:2

**preparation**
24:20
35:8
36:15
50:2,18,
20 51:2
53:14
55:1,7
57:2
60:17
82:11
110:17
112:10
144:9
161:17

**prepare**
31:18

**prepared**
19:19

**preparing**
14:5 36:5
39:5
54:12
57:3 70:4
81:14
110:17
135:18
140:4
144:9

**present**
130:18

**presentatio**
**n**
29:18
33:12

**presentatio**
**ns**
186:11

**presented**
29:18
30:1

**pretty**
7:8 52:17
157:7

**previous**
40:10
75:19

**previously**
26:14
60:11
61:5

**Pricewaterh**
**ouse**
27:21
28:8,13

**primarily**
37:9,13
39:3
40:15
47:11
48:15
174:9

**primary**
172:10
173:18

**principle**
176:20

**print**
70:15

**prior**
10:7 30:6
44:3
53:13,14
139:5
140:15
152:13
187:21

**problem**
55:18

**procedures**
27:20
29:6
30:3,12

45:4,12,
17 138:4
183:8
184:16

**process**
88:6
104:10
115:8,10
116:2,3
155:15

**produced**
87:16,20
88:6,11
89:4
99:19
100:17
102:4
103:17,21

**product**
19:14
51:7

**production**
61:18

**prohibited**
125:20

**project**
14:5,8

**pronounce**
164:20

**proper**
168:18

**properly**
148:18
181:6

**proven**
177:20

**provide**
48:19
86:10

**provided**
21:7



25:14
27:12
47:9
64:15
66:16
67:13
86:16
91:10
92:18
96:3
101:11
128:3
173:9
180:13
187:16

**public**
9:15 10:7
187:20

**publication**
188:5,8,
15

**publications**
125:14

**publicly**
187:6
189:1

**pull**
78:3

**pulled**
101:3,7
103:20

**purchase**
125:20

**purpose**
12:10,11
13:1
53:16
54:2

**purposes**
29:16
72:15
118:19

120:21
126:14,15
133:4,12
134:2
166:9

**put**
24:7
31:19
34:2
49:18
63:9 78:6
110:21
156:1,5
163:12
184:3

**putting**
126:18

**PW**
52:20

**PW's**
154:2

**Pwc**
30:3,13
33:4 35:8
52:5

**PWS**
27:21

───────────

**Q**
───────────

**QDI**
167:12
170:1
171:6,19

**question**
7:11
12:20
13:2
29:12,16
30:6
35:14
38:17,21
40:4,7,19

42:6
46:20
47:15
50:14
54:6,9,15
55:9,14
56:4,17
63:19
67:4
74:19
77:14
81:18
85:20
88:7
89:20
90:5,17
91:8,18
92:5 95:9
100:12
106:15
108:14
111:16,
18,21
114:8
115:12
116:6
117:7
120:11
121:14
123:19
124:8,9
125:10
132:4,11,
15,19
133:17
138:8,16
143:13,19
147:17
148:7
157:7
158:4
165:14
166:18

**questioned**
139:5

**questioning**
139:3

**questions**
6:20 19:2
133:20
138:11
139:18
188:7
189:12,13

**quibble**
126:17

**quibbling**
126:17

**quick**
74:12

**quicker**
24:3

**Quintero's**
185:16

**quotations**
161:9

**quote**
71:9

**quoted**
160:18
162:5

───────────

**R**
───────────

**ran**
103:10

**range**
69:17
166:13

**Rashid**
6:19
20:15
21:7 22:1
23:5
24:15
25:1

34:11
66:9 71:9
72:2,10
73:3,9,15
74:1,7
76:10
77:7
79:11
80:2,4,13
81:6,15
82:12,16
83:1,4
89:7 90:2
102:5
103:11
108:20
109:3
110:8,15
115:10
116:4,14
117:7,13
118:11
119:19
122:6,11
134:3
135:10,21
136:12
137:13,21
139:4,20
141:5
159:13
161:9,10
162:4
163:9
167:12
170:21
179:13
180:8
181:7
183:19
184:9,11
186:2
187:8,20

**Rashid's**
20:10
21:2



23:12
24:3,11
25:21
27:5 49:5
50:4
52:21
53:2
68:16
72:6
79:12
82:20
83:11
87:11,15,
19 88:2
94:3
96:11
97:20
98:14
110:13
139:19
141:8
142:18
163:5
170:11
181:14,19
188:4

**reach**
36:16

**reached**
43:2

**reaching**
51:8 57:3

**read**
23:8,12
24:10
27:2 28:5
30:18
31:2,9,17
33:6
34:18
36:2,5,11
43:16,21
49:20
52:16
56:11,12

57:6,11
58:1,4,
12,16
59:8,10,
19 60:1,
17,18
61:13
62:7 66:7
67:14
68:6
71:15
78:15
89:12
111:20
112:1
115:19
117:18
118:1
124:4
139:6,16
161:1,2
183:2,3,
6,10,11
189:14

**reading**
20:13
23:10
24:13
36:7
43:18
44:7 45:2
56:6
57:7,12
59:9 60:5
62:4 68:5
80:16
83:16
118:3
159:21
161:4,5,
10 168:9
170:3
183:12

**readjusted**
34:1,13

**ready**
67:10,11

**real**
109:21
126:20

**reality**
126:15

**realize**
24:6
118:2
143:16

**reason**
21:17
29:17
33:10
172:10
173:18

**reasonable**
23:1

**reasons**
173:20

**rebuttal**
15:19,20,
21 182:9
185:15

**recall**
11:8
17:12
23:14,15
24:10,12,
13,14,19
25:2,4,
11,12,13
26:7,8,11
43:13,14,
18 44:7,8
45:1
49:11,12
50:1 51:3
52:9,13
56:6
57:2,4,7,
10,12

58:13,15
59:19,20
60:3 62:4
66:20
68:19,20
73:11,12,
17 74:3,
4,5
83:17,18
84:17
86:18
93:15
94:4,8
95:10
96:2,6,
12,20
97:15
98:21
99:3,4,6,
8 101:14,
21 103:8
104:14,15
107:10,13
109:8
110:3,19
112:19
113:2
115:20
118:5,6,
13 119:10
122:16
123:3,5,
13 139:2,
10,18
140:1,3,
6,7
142:20
143:8,10
144:3,5,
6,8,12
145:11,16
146:2
154:1,5
159:18
160:14
161:4,5,
11 163:20

164:21
165:6
166:21
167:13
175:21
178:14
182:2
183:12
184:1
187:18,19
188:11,
12,16,21
189:7

**recalled**
56:6
162:19

**recategoriz
e**
138:1

**receipt**
119:14
144:17
145:2
158:2

**receipts**
66:16
67:12,16,
21 68:7,
15,20

**received**
128:14

**recess**
74:14
189:10

**recharacter
ize**
137:14

**reclass**
31:16,17

**reclassifie
d**
81:7,16
82:13



reclassify
  135:21

recognize
  61:21
  62:1
  103:12
  126:19
  156:3
  166:17

recognized
  176:2

recognizing
  104:20
  112:18
  125:8
  133:11
  156:18
  166:4,8

recollectio
n
  23:7,9
  26:8
  38:14
  48:13,17
  59:8,17
  66:11
  76:15,21
  77:9
  78:17
  79:18
  80:3,16,
  19 81:1,
  21 82:4,8
  104:20
  105:3
  111:3
  112:21
  122:18
  148:12
  162:16
  163:1,6,
  12 183:20
  187:12,17

record

6:13
16:10
17:5 24:1
38:3
56:15
63:9
74:15
102:16
108:11
112:1
132:16

records
  87:11
  96:5
  97:3,13,
  16,19
  105:12
  106:5
  177:19

red
  187:8

refer
  20:5
  27:10
  52:18
  69:4,9,17
  84:8,9,11
  99:13
  103:14
  108:19
  114:16
  182:8
  183:16

reference
  39:6,13
  50:6
  58:17
  59:12,14
  74:20
  148:19
  167:10

referenced
  73:1
  84:16

182:9

references
  40:12

referencing
  50:7

referred
  19:21
  50:10
  59:11
  85:21
  125:15
  147:19
  148:2
  171:15

referring
  19:6 27:9
  31:4 42:5
  58:18
  62:9 72:2
  91:20
  116:10
  118:14
  132:13
  136:16
  137:2
  147:14,
  16,17
  148:3,8,
  10 149:17
  152:18,
  20,21
  164:4
  166:11
  167:17
  177:15
  178:18
  188:10

refers
  161:8
  184:6

reflect
  108:11
  132:17
  144:18

145:6

reflected
  51:8 64:8
  107:16
  163:10

reflects
  29:5
  163:8

refresh
  38:14
  80:3,16
  104:19
  111:3

refreshed
  76:12
  78:17
  81:2
  183:20

refreshes
  112:21

refreshing
  79:19

refund
  150:10

refunds
  51:20
  151:6

regard
  33:13
  99:2

reimbursabl
e
  128:18
  135:17

reimburse
  131:9

Reimburseme
nt
  60:14

relate
  41:1

186:3

related
  39:10
  107:18
  108:18
  165:7
  168:11
  172:2

relates
  160:17

relating
  126:9
  145:12
  151:6
  160:1
  161:16
  162:7
  165:16
  166:1
  167:7
  171:6,9
  174:11

relation
  45:12
  48:8,9
  105:18
  162:6
  172:19,21
  178:14

relative
  134:3

relativity
  100:19
  101:7

Releases
  31:16

relevance
  130:8

relevant
  13:19
  18:13
  41:21
  87:20



88:18,21
94:6
100:7,8
102:5
105:15
106:13,19
107:2,8
155:12
157:2

**relied**
36:16,18
37:1,8
39:3,10,
18 40:1,
14 127:19
128:2,7
155:20

**rely**
41:13
135:13

**relying**
158:7

**remember**
11:18
24:6
25:20
26:1 46:2
60:5 62:2
75:11
76:9
83:16
95:18,20
109:15
110:4,7
117:17
118:3,12
119:8
125:15,18
139:8,15
140:8
142:19
153:17
159:21
160:6,11
161:10

172:16
179:14
188:2,3,
13,14

**remembered**
144:4

**remind**
75:18
76:1

**rendering**
92:15
106:11,17

**rep**
64:1

**repeat**
29:12
40:7
89:20
90:17
92:4
100:12
106:15
108:14
158:4

**rephrase**
100:13

**replaced**
60:21
62:12

**reply**
114:9

**report**
6:21 7:1
10:9
14:14
15:4,8,
11,19,20,
21 16:3
17:12,14,
18 18:12
19:3,4,5,
6,15,16
24:7,21

33:11
35:8
36:6,15
37:4,11,
14,16,20
38:5,11
39:5,6,
12,16,18
40:12,13
41:2
44:19
45:1,15
46:16
49:7,10,
11 51:2,
12,13
54:12
55:2,8,
10,21
57:3,14
58:12
60:17
63:5 64:9
69:3,5,9
70:4,12
71:8
77:1,3,4
80:13
81:6,14
82:12
84:3,16
85:13,15,
17 86:1,
17 87:18
99:14
107:11
110:17
112:11
118:10,17
119:19,20
123:21
124:3,4,
11 125:11
134:2,3,8
135:4,7,
18 136:9
140:5

144:9
147:20
148:20
149:4
150:13,16
153:4,19
164:18
165:17
167:11,13
168:8,14
170:19
179:1
181:15
182:9
185:15

**report-
related**
113:7

**reporter**
7:18
112:1

**reporting**
11:15

**reports**
28:18
107:17
180:12,17
181:4,20

**represent**
6:19
23:14
60:12
102:18

**representat
ion**
63:10

**representat
ive**
98:3

**representat
ives'**
62:19

**represented**
65:6,7

**representin
g**
63:21

**represents**
52:2

**requested**
25:15

**require**
66:16

**required**
67:21
68:7

**requirement
s**
125:1

**reread**
67:8

**research**
37:18
40:13
84:15,21
85:1,3,5,
7,8,13,21
86:4,15
110:5
120:3
128:4,8,
15 134:16
145:3
160:18
169:21
171:10
180:17
189:3

**resources**
123:2,3

**respect**
155:10

**responded**
117:7



**responding**
91:21

**response**
96:4

**responsible**
122:11
181:19

**responsive**
103:20
104:3

**rest**
18:16
133:7
154:15

**restaurant**
99:7
107:17
109:10,14

**result**
24:21
25:3

**resulting**
19:14
33:4

**results**
52:2
78:13
85:8,12,
13,16,20
86:14

**retained**
49:3
105:12
106:4
107:5

**retroactive**
154:20

**returning**
175:9

**review**
24:20

26:15
27:5,15
28:14,17
29:7
30:10
33:4,45:6
47:10
49:4,7,10
50:16,17,
18,20
51:3
52:5,21
54:2
55:1,3
58:21
60:9
62:4,18
64:4,8,20
65:3
68:13
69:10,15
70:2,9
78:13
81:5,84:2
87:1
90:21
91:1,11
93:13
94:3
96:5,15
97:13,18
98:5
100:6,16
101:2,5,6
107:11
109:17
112:9
114:7
118:9
122:11
141:11,18
146:17
153:9
155:7,11
159:11
160:15
161:7

163:3
171:8
177:6
178:1,12
187:15,16

**reviewed**
14:3,18,
21 16:7
19:9
21:21
26:19,21
35:1,7,21
36:21
39:18
41:8,16,
21 42:4,
17 45:5
47:3
53:12
54:11
55:11
58:8
59:13
60:1 69:7
70:6,20,
21 71:3,
4,19
81:13
82:10
83:4
98:16
99:13,15
101:3
102:12
109:19
110:16
117:5,15
137:9
139:13
140:4
141:11
142:1,9,
13
153:18,21
155:9
163:7,21

169:5,13
170:5,11
177:21
178:15
180:7
181:18
186:18

**reviewing**
12:5
36:12
41:14
42:12
43:13
49:12
50:1
52:14
53:16
83:7,10
88:1
90:13
91:2
97:17
142:19,21
144:8
145:11
146:19
161:5
163:4

**reviews**
27:6
28:17
177:7

**revisit**
40:20

**rides**
153:11

**right-hand**
79:8

**Risner**
102:21

**road**
8:9

**Rosangela**

164:10,11

**routinely**
177:6

**rules**
7:3,9 8:9
65:16
133:13
143:21

**run**
111:9
154:13

_____

**S**
_____

**SAB**
185:19

**sale**
159:12
160:2,17
161:15

**salon**
107:20
108:1,2,
18,21
110:1,3
111:4
112:12

**San**
8:17

**sans**
16:20,21

**Saratoga**
8:19

**save**
17:15

**saving**
175:8
176:21

**savings**
177:16
179:17



180 9,15

**school**
8 15,16,
17

**Science**
9 2

**scope**
11 4
53 20
161 5

**search**
45 4
46 7,10
47 1,8,16
48 7,17,
20 86 12,
13,14
99 1
100 7,9,
18
101 12,
13,17
103 10
104 6,12,
15,18
105 5
109 8,11,
15,21
111 9
112 5,8,
17 123 11
162 9
173 8,10

**searched**
158 12,14

**searches**
46 5,10,
13 47 18,
20 48 13
100 20
101 1,7
103 16,21
109 9
112 18

113 1
123 10,11
155 18

**searching**
45 11,16
122 12
123 1

**SEC**
29 18
30 1
33 12
48 19
49 8
64 14,17,
19 75 14
84 2
86 10,16
93 13
96 4
101 12,
13,16
102 1,17,
20 103 9
104 5
105 1,10
111 14
112 4
115 6,13,
21 116 6,
12,14,21
118 19
127 20
128 9,15
139 6
142 4,6
158 13
159 21
160 1,16
161 2,8
162 5
173 7,9
182 5
184 3
186 3,7,
11,17
187 5,19

188 7,14
189 1,13

**SEC's**
96 4
139 3
160 16
161 7
182 14

**seconds**
17 7

**section**
67 1
72 12
85 3

**segment**
151 10

**select**
32 18
64 7,11

**selected**
32 6,7,12
64 14
127 20

**Selection**
31 10,13

**selections**
32 8

**self-
identificat
ion**
78 5

**self-
identified**
73 3,9,15
74 1,7,20
75 6
76 11
77 7
134 19
135 11

**self-
identifies**

134 17

**sense**
127 2

**sentence**
88 13
116 10,11

**separate**
47 18
113 6

**September**
78 13
79 4
186 12

**sequence**
166 18

**sequential**
151 14
166 12

**service**
95 21
154 12

**services**
107 18
153 6
154 3

**set**
18 16
100 21
147 20

**settle**
159 1

**settled**
182 6

**settlement**
182 14,20
183 3,6

**sheet**
151 10

**show**
24 1,3

61 5 77 5
110 9

**showed**
162 8

**showers**
129 3

**shown**
25 5

**shows**
33 3

**side**
143 21
183 17

**sides**
101 19

**sign**
189 14

**signed**
116 14
144 18
145 2

**significant**
168 13

**significant
ly**
53 1

**similar**
118 8,9

**similarly**
117 4
154 19

**simple**
124 14

**single**
42 14
45 7 57 1
103 6

**sir**
70 5
78 20



144:21

**sit**
140:7

**slash**
31:16

**small**
52:17

**smart**
95:19

**snippy**
117:21
118:2
183:4

**someplace**
109:3
175:7,12

**sounded**
118:2
183:4

**sounds**
23:1,8
24:12
66:12
175:14

**source**
72:9 73:8
77:6
90:14,21
91:9
92:16,18
150:15

**sourced**
73:18
74:1

**sourcing**
72:17
73:16

**speak**
56:19
185:1

**specific**

23:7,9
24:2
25:19
27:8
39:11,12
48:17
49:4
51:13
59:11,14
63:16
66:11
68:21
81:20
85:4 94:8
100:6
104:15
105:3
118:5
122:4,18
126:9
163:6
171:19
183:13
187:11,17

**specificall
y**
19:6 23:4
25:21
28:12
37:1,2,19
39:4,21
40:1 47:2
52:14
58:13,18
67:1,6
68:20
69:8
73:17
75:11
79:6
83:18
96:14
97:15
101:21
109:15
112:19

113:2
124:16
127:3,4
140:1,11
142:9,20
144:6,12
148:3,15
154:5
161:9,11
172:16
179:14
182:8
183:12
188:11

**specifics**
24:12
26:1 99:9
140:7

**spelled**
59:3

**spend**
14:4
175:12

**spending**
175:11

**spent**
8:8 53:13

**spreadsheet**
19:21
20:6,8,14
21:7
22:11
50:8,20
136:16,
18,19,20
137:3,10
165:21
178:13

**square**
95:15

**stamp**
52:18
84:7

114:6

**stamps**
52:16
114:4

**stand**
149:4

**staple**
44:2

**start**
19:2 60:8
148:8
149:5
166:2
167:2

**started**
41:12
70:9
136:11
137:1

**starting**
165:17
167:16,17

**starts**
166:10,
17,19

**statement**
30:6
40:11
44:4
72:10
73:8 74:7

**statements**
156:19,20

**states**
87:19
170:21

**statute**
69:7

**stay**
176:10

**staying**

176:11

**stays**
125:2

**sticker**
142:16

**stipulated**
63:15
64:2

**stipulates**
62:19

**stipulation**
63:9,11

**stop**
132:10

**story**
12:16

**Stout**
10:3
100:2
104:16

**Stout's**
130:5

**straight**
143:19

**street**
112:11

**strike**
14:1
19:19
69:16
94:1
97:5,9
137:11
139:3
141:5
149:2

**strikes**
12:15

**strive**
12:4



**struggling**
130:9

**stuff**
8:13 11:3
76:11
109:14

**sub-portion**
137:9

**subject**
45:4,11
90:14
91:2,11
92:19
154:14
158:9

**subjected**
155:17

**submissions**
113:7,13

**submit**
180:17

**submitted**
16:13
115:11
116:15
117:12
180:7,12
181:5

**submitting**
181:20

**subpoena**
93:6 96:4
105:10

**substantiat
ed**
121:1

**successful**
144:1

**sufficient**
168:3

**suggest**

22:1

**suggested**
38:14

**suggesting**
83:1

**suggests**
88:10
104:4

**suit**
137:19

**sum**
70:21

**summarizes**
35:8

**summary**
29:7
51:13
136:9
184:19
185:6

**Sunday**
36:7

**Super**
171:12
172:13,
17,18
173:4

**supervise**
181:6
184:7

**supplementa
l**
7:1

**supplementa
tion**
162:9

**supplied**
173:7

**support**
42:16

140:12

**supposed**
65:13
123:1

**supposedly**
143:1

**surrounding**
141:3

**Surry**
152:21

**Susan**
14:21

**suspended**
25:1,2,5
66:9
183:21

**Switzerland**
179:15

**sworn**
6:4

**synced**
96:21

**system**
25:6

———————

T

———————

**table**
18:3,4

**tabloid**
188:9

**taking**
7:18
133:11
159:8

**talk**
7:20 8:3
14:2 24:2
25:17
71:8

72:21
83:21
86:20
99:12
120:7
156:6
171:20
174:8
182:19,21
185:16,19

**talked**
96:17
99:11
136:16
186:19

**talking**
15:8
20:18
41:8 47:2
50:17
51:11
56:10
101:18,19
114:18
147:7,13
157:10
170:12
176:15

**talks**
28:7

**targeted**
46:10,12
155:18

**Tavern**
143:2

**taxi**
152:16,18
153:11,16

**taxies**
154:10

**taxis**
153:5
154:3

**teeny**
70:14

**telling**
154:7

**temporal**
140:21

**ten**
10:17,18
11:6

**Tens**
46:4

**term**
48:17
55:17
107:19
112:7
126:16
174:20
175:20
176:12,18

**terms**
11:1,4
35:9
36:14
46:14,18
47:1,8,
16,19
48:7,20
78:4 82:4
84:2
86:13,14
100:8,9,
18,20
101:12,
13,17,18
104:6,12,
15,18,20
109:15
155:7
168:4
173:8,10
185:6

**test**
138:4



**testified**
  6:5 23:16
  25:13
  35:7
  40:10
  56:5
  59:15
  64:1 66:5
  70:20
  84:14,17
  104:13,14
  137:12,15
  151:9
  153:18
  158:6
  167:6
  173:1

**testifying**
  12:6
  144:3

**testimony**
  39:7
  40:3,16
  41:5 47:4
  53:14
  59:10,15
  62:5,19
  75:16,20
  78:7
  89:13
  94:3,9
  97:6,10
  112:12
  132:6,14
  134:5
  139:2,11,
  19 159:11
  181:3

**testing**
  30:2,11

**text**
  40:13
  95:19
  96:7

**texts**
  41:1

**Thanksgiving**
  145:12,20
  146:6
  159:9

**Theresa**
  6:13 16:9
  38:2
  44:11
  63:1
  74:11
  158:15,21

**thick**
  160:7,9,
  10

**thing**
  56:16
  63:16
  69:2
  113:6
  114:7
  138:19

**things**
  14:2 16:7
  18:10
  21:11
  24:7 34:1
  39:5,15,
  17 40:11
  53:15
  55:10,19
  56:2
  68:15
  70:21
  78:7,17
  79:20
  95:13
  96:3 98:2
  124:1
  134:19
  135:11
  144:16

**151**:5
  161:17
  166:18
  177:11
  179:19
  186:19

**thinking**
  151:12

**thinks**
  25:18

**Thomas**
  108:12

**Thompson**
  18:5
  78:1,19
  108:10

**thought**
  82:7
  148:11
  168:1

**thousand-plus**
  58:4

**thousands**
  46:4

**threshold**
  155:13

**throw**
  18:3

**Thursday**
  145:21

**tick**
  36:17

**tickets**
  178:3

**time**
  7:10 8:8,
  10,11
  10:5,11
  14:4
  54:21

**68**:18,21
  70:3,7,9
  87:2
  88:18
  89:1
  94:6,19
  95:1
  102:6
  105:9,11,
  15 125:20
  131:8,17
  147:13
  160:4
  161:20
  166:20
  168:19
  184:1
  186:8
  187:8

**times**
  10:13,18

**timing**
  144:20
  188:2

**tiny**
  70:14

**tipping**
  172:9

**title**
  33:5 79:9

**today**
  6:20 14:6
  17:17
  50:19
  84:17
  117:5
  158:7

**told**
  23:17
  154:9,21

**tool**
  100:20

**top**
  20:1 31:8
  71:21
  109:10,11
  142:16
  183:16

**tossing**
  18:6

**total**
  140:17
  164:7

**totally**
  60:10

**traction**
  140:12

**trade**
  125:14,21
  126:8
  127:9
  128:16

**transaction**
  35:10
  109:19
  150:1
  154:17
  163:18

**transactions**
  35:17,18
  39:11
  46:19
  148:16
  154:15
  155:13
  166:13

**transcript**
  56:19
  62:15
  139:7
  140:2

**transferred**
  8:20



**transmitted**
20:10

**transpired**
80:17,20

**travel**
10:14
28:17
30:16
31:3 32:5
60:5,13
156:20,21
157:4,14
158:7,15,
17 162:9
166:5,9
168:11
174:17
175:19,
20,21
176:3,12,
16 177:6,
8,12,13
178:21
179:3

**treat**
154:10

**treating**
168:10

**tree**
172,15

**trees**
49:19

**trip**
145:12
149:4
151:6
152:5,9,
13 159:8,
14 162:7
164:18
165:3,7,
16
166:10,14
167:7

171:9
172:7
177:16

**trouble**
78:2

**true**
65:8 97:1
132:18
162:21
180:21

**truth**
65,6
154:7

**Tuesday**
152:17

**turn**
27:19
29:3 33:2
35:5
52:15
78:11,16
79:6 81:3
87:18
113:15
119:13

**turning**
85:12
119:18

**type**
67:7
118:13
154:16

**types**
35:10,18

**typically**
21:14
58:15
96:21

―――――――
**U**
―――――――

**ultimate**

84:3

**ultimately**
51:12
80:13
101:2
175:8

**UNC-
CHARLOTTE**
8:20

**understand**
11:17
15:4
29:21
30:11
38:16
39:7
40:15
41:5
47:3,13
49:16
54:5,13,
17 55:14,
16 58:6
59:7,15
62:5 66:6
69:11,20
71:1 87:5
100:11
107:15
112:12
121:13
128:19
131:6
134:5
136:21
137:16
140:14
161:2
171:18
176:8,14

**understandi
ng**
19:12
20:13
21:3,6

22:12
32:7
34:21
35:6
52:20
53:15
54:3
55:9,17
60:21
61:3
62:11,14
67:12,18,
20 68:1,7
80:17
81:4,12,
15 82:5,
9,15,20
83:6,10
85:19
86:21
87:7,10,
14,21
88:1,20
89:16
90:1
92:10
109:5
113:3
115:20
116:5,7,
9,12,21
117:6,9
120:8,13,
19 122:9,
10 123:9
126:7
147:6
148:18
151:9
169:1,2,
10,14

**understood**
39:14
134:16
137:21

**United**
150:4,19
166:2

**unpack**
101:4

**USA**
149:12
150:7
151:1,7
152:5
164:1,13

**utilize**
125:9

**utilized**
47:1

―――――――
**V**
―――――――

**Vague**
94:7

**Valentine's**
139:21
140:6,9,
10 143:1,
10 144:4

**validated**
115:10
116:4
117:8

**validating**
116:15

**Valley**
8:18

**Van**
6:8,14
8:4,7
12:21
13:14
15:7,9,17
16:12,15,
16,21
17:7,9,21



18 5,8
20 16
21 9,15
22 7,16
23 2
24 5,9
25 16
26 4 28 4
29 14,20
30 8
31 1,5,7
32 2,15
33 18
34 8,16,
20 35 4,
19 36 9
37 5
38 7,13,
18 39 2
40 2,5,8
42 7,10
43 3,10,
12 44 2,
5,12,14,
18 49 17
50 9,15
52 12
53 6,11
54 1,7,20
55 15,20
56 3,8,
18,20
61 19,20
63 2,6,7,
20 66 19
68 12
71 13
74 13,15,
16 76 3,8
77 2,11,
15,17,20
78 20,21
81 11
82 1,18
83 9,15
84 10
86 5

87 8,17
88 8,14,
17,19
89 5,12,
15,18
90 11,19
91 6,14,
20 92 6,
7,13
93 9,18
94 10
95 3,6,11
97 2,5,9,
12 98 4,
13 99 18
100 14
102 10,15
104 11
105 14,19
106 9
107 3,9,
21 108 6,
8,11,16
111 13,20
112 2,15
113 9,14
114 21
115 1
116 18,20
117 20
118 18
119 1,4,
7,12
120 12
121 8,15
122 19
123 20
124 5,7,
19 127 6,
13,18
128 5,12
129 19
130 11
132 1,9,
16,21
133 10,
18,21

134 13
135 9
136 5
138 7,12,
14,18
141 16
142 3
143 6,9,
14,16,20
144 2,14
145 10,20
146 4,8,
11,16,19
147 2,19
148 6
153 13
159 3,6,
7,20
160 21
162 1
164 2,16
168 7
169 3,11,
18 170 16
173 16
174 1
176 5,13
177 17
178 6,10
180 1,10,
21 181 2,
12 182 4
185 5,9,
13 186 9
187 13
189 8,11

**variety**
14 14
95 19

**vehicles**
122 13

**verbally**
130 20

**verbatim**
81 17

**verifiable**
115 9
116 3

**verificatio
n**
115 8
116 2

**verify**
76 14

**verifying**
116 15
148 11

**versus**
124 17
135 17

**Video**
15 3

**view**
108 2
134 18,20
135 3
168 3

**Village**
143 2

**violation**
123 15
124 10,14

**violations**
11 15

**Vliet**
6 8,14
8 4,7
12 21
13 14
15 7,9,17
16 12,15,
16,21
17 7,9,21
18 5,8
20 16
21 9,15
22 7,16

23 2
24 5,9
25 16
26 4 28 4
29 14,20
30 8
31 1,5,7
32 2,15
33 18
34 8,16,
20 35 4,
19 36 9
37 5
38 7,13,
18 39 2
40 2,5,8
42 7,10
43 3,10,
12 44 2,
5,12,14,
18 49 17
50 9,15
52 12
53 6,11
54 1,7,20
55 15,20
56 3,8,
18,20
61 19,20
63 2,6,7,
20 66 19
68 12
71 13
74 13,15,
16 76 3,8
77 2,11,
15,17,20
78 20,21
81 11
82 1,18
83 9,15
84 10
86 5
87 8,17
88 8,14,
17,19
89 5,12,


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

15,18
90:11,19
91:6,14,
20 92:6,
7,13
93:9,18
94:10
95:3,6,11
97:2,5,9,
12 98:4,
13 99:18
100:14
102:10,15
104:11
105:14,19
106:9
107:3,9,
21 108:6,
8,11,16
111:13,20
112:2,16
113:9,14
114:21
115:1
116:18,20
117:20
118:18
119:1,4,
7,12
120:12
121:8,15
122:19
123:20
124:5,7,
19 127:6,
13,18
128:5,12
129:19
130:11
132:1,9,
16,21
133:10,
18,21
134:13
135:9
136:5
138:7,12,

14,18
141:16
142:3
143:6,9,
14,16,20
144:2,14
145:10,20
146:4,8,
11,16,19
147:2,19
148:6
153:13
159:3,6,
7,20
160:21
162:1
164:2,16
168:7
169:3,11,
18 170:16
173:16
174:1
176:5,13
177:17
178:6,10
180:1,10,
21 181:2,
12 182:4
185:5,9,
13 186:9
187:13
189:8,11

———————

———————

**W**

**wait**
77:15,17

**waiting**
165:13

**wanted**
64:19
75:19
76:2
182:20

**Washington**
6:16

**waste**
8:10

**weeds**
18:21

**week**
175:3,10

**weekend**
175:4,5
176:11

**weeks**
158:8,15

**Weise**
20:10
21:1 22:1
25:7,15,
18 27:19
28:8,13
29:17
30:1 49:2
52:21
80:1
102:19,21
103:10
104:21
112:5
114:17
115:7,13,
21 116:13
117:1,6
135:20
141:12
153:9
154:21

**Weise's**
14:19
24:16
29:5
33:11

**West**
8:18

**wide**
18:3

**wife**
139:21

**window**
101:19
155:10

**wine**
163:8,20
164:9

**winnowed**
104:4

**Women**
108:2

**word**
46:5,10,
12 47:20
48:7,13
55:16
86:13
99:1
101:19
112:18
126:7
161:4
164:7
177:8
189:2

**words**
48:2
55:10,21
68:5
76:17
123:12
134:17

**work**
12:4 13:1
19:14
42:1 51:7
68:14
81:5
82:11
107:14

121:11
129:1,3
145:4
161:16
175:18

**worked**
81:14
100:2

**working**
10:12
53:13
82:21
100:1
160:19

**works**
97:7

**worries**
182:18

**worth**
73:3

**written**
15:19,20
55:10
115:9
116:3

**wrong**
12:11
34:2
146:5,9
163:13,18

———————

**Y**

**year**
139:8
146:5,9,
12
148:17,19

**years**
8:19
10:1,6,20
11:17



175:18
189:4

**York**
152:12
153:5
154:11
173:19
174:3
179:5,7,
16

**young**
94:5

_____

**Z**
_____

**Zelenko**
75:8,10,
11 76:10
77:6

