JCAHRAS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

            v.                          17 Civ. 8223 (PKC)

MOHAMMED ALI RASHID,

                    Defendant.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        December 10, 2019
                                        10:45 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                                        District Judge

                            APPEARANCES

DUANE K. THOMPSON
JAMES M. CARLSON
DONNA K. NORMAN
      Attorneys for Plaintiff

GREENBERG TRAURIG, LLP
      Attorneys for Defendant
BY:  GREGORY W. KEHOE
     DANIEL FRIEDMAN
     SARAH E. ATLAS
     -and-
GENOVESE, JOBLOVE & BATTISTA, P.A.
BY:  THERESA M.B. van VLIET

JCAHRAS1

```
 1              (Case called)
 2              THE DEPUTY CLERK:  For plaintiff, please.
 3              THE COURT:  For the SEC, yes.
 4              MR. THOMPSON:  Good morning, Judge Castel.  For the
 5   Securities and Exchange Commission Duane Thompson.
 6              MR. CARLSON:  Good morning, your Honor.  On behalf of
 7   the SEC, James Carlson.
 8              THE COURT:  Good morning.
 9              MS. NORMAN:  Good morning.  Donna Norman, for the
10   Securities and Exchange Commission.
11              THE COURT:  Good morning to you all.  Who else do I
12   have at the front table?
13              MR. HUTTON:  Good morning, your Honor.  I'm the SEC
14   tech, Tony Hutton.
15              THE COURT:  Thank you.
16              MR. LAUFER:  Good morning, your Honor.  I'm Greg
17   Laufer.  I represent certain nonparty Apollo witnesses.
18              THE COURT:  Thank you.
19              For the defendant?
20              MR. KEHOE:  Gregory Kehoe, Theresa van Vliet, and
21   Daniel Friedman for Mr. Rashid.  Mr. Rashid is about to stand
22   up.  And to our far right is Mr. Matthew Hewlett, who's our
23   tech person, your Honor.  Good morning.
24              THE COURT:  All right.  Sir, you are?  To the right of
25   Mr. Rashid, yes, sir.
```

JCAHRAS1

1          MR. FRIEDMAN:  Daniel Friedman, counsel for

2   Mr. Rashid.

3          THE COURT:  Thank you.

4          Good morning to you all.  Mr. Thompson, whenever

5   you're ready, you may call your first witness.

6          MR. KEHOE:  If I may, Judge?

7          THE COURT:  Yes.

8          MR. KEHOE:  I have a -- after the pretrial, your

9   Honor, we went back and looked at some additional evidence, and

10  I have a subject matter jurisdiction issue.  I can make the

11  motion now or carry it through trial, whatever your Honor so

12  pleases.

13         THE COURT:  That's fine.  You can carry it through

14  trial.  What is the basis for your motion of subject matter

15  jurisdiction?

16         MR. KEHOE:  The basis for the motion, your Honor, and

17  it was keyed, of course, by your Honor's comment that only

18  expenses that fall within the Investment Advisers Act are those

19  over which the Court has jurisdiction, and normal business --

20         THE COURT:  I didn't say that.  I said only expenses

21  that are charged to the fund can form the basis for a 206(1) or

22  (2) violation.

23         MR. KEHOE:  Yes, your Honor.

24         THE COURT:  That's what I said.  I didn't say anything

25  about jurisdiction.  If I did, I misspoke.

JCAHRAS1

1          Go ahead.

2          MR. KEHOE:  I don't believe you used the word

3     "jurisdiction," Judge.

4          THE COURT:  All right.

5          MR. KEHOE:  That was my word.  But the presentation on

6     the management agreements all demonstrate that all of these

7     expenses, even if they were improperly made, were supposed to

8     be business expenses and not passed on to either the funds or

9     the portfolio companies.

10          THE COURT:  If that's true, how does that affect the

11     Court's subject matter jurisdiction?

12          MR. KEHOE:  Because the Court can only render a

13     decision based on investment -- those that violate the

14     Investment Advisers Act.

15          THE COURT:  Correct.  And the allegation is that the

16     expenses violate 206(1) and 206(2).  Why do I not have subject

17     matter jurisdiction to adjudicate whether they do or they

18     don't?

19          MR. KEHOE:  Well, your Honor, that's why I'm

20     preserving -- bringing up the argument now, Judge, because if

21     they don't, there's no subject matter jurisdiction.

22          THE COURT:  No, that's not accurate again.  That's not

23     at all accurate.  If a plaintiff brings a lawsuit and invokes

24     the Investment Advisers Act and purports to state a claim for

25     relief, the fact that you have a meritorious defense, assuming

JCAHRAS1

1  that arguendo, does not mean the Court lacks subject matter

2  jurisdiction.  Because if I lacked subject matter jurisdiction,

3  I wouldn't have the jurisdiction to adjudicate whether 206(1)

4  or (2) were violated.  It's as simple as that.

5          MR. KEHOE:  Your Honor, the Court always has

6  jurisdiction to make a determination on jurisdiction.

7          THE COURT:  No, I know that, Mr. Kehoe.  Look it up.

8          MR. KEHOE:  Yes.

9          THE COURT:  The fact that the plaintiff, as you say,

10  will fail in proving a 206(1) and 206(2) violation does not

11  deprive the Court of subject matter jurisdiction.

12          MR. KEHOE:  I present the argument at this point,

13  Judge.  I wanted your Honor to be aware that we were going to

14  make that at some point during the trial.  I didn't want --

15          THE COURT:  You still haven't shown me where that's a

16  subject matter jurisdiction issue.

17          MR. KEHOE:  I think --

18          THE COURT:  That's a merits issue.  That's a claim you

19  win at trial.  That's often the case.  If somebody alleges a

20  10b-5 violation and there's no evidence of scienter, there's no

21  evidence of materiality, that means the party who brought the

22  case loses at trial.  It doesn't in any way implicate the

23  Court's subject matter jurisdiction.

24          MR. KEHOE:  I understand your Honor's position.

25          THE COURT:  You have some support for it, Mr. Kehoe?

JCAHRAS1

1    Because you obviously have a different position.  So what's the

2    support for lack of subject matter jurisdiction?

3         MR. KEHOE:  The support for no subject matter

4    jurisdiction is whether or not the claims that are -- these

5    individual expenses in any way, shape, or form fall under the

6    rubric of the Investment Advisers Act.

7         THE COURT:  You haven't explained to me why an

8    allegation -- the allegation in the complaint is that they do.

9    You haven't explained to me why I do not have subject matter

10   jurisdiction to adjudicate the claim on the merits, and if you

11   have support that there is a lack of subject matter

12   jurisdiction -- I assume you spent time researching this --

13   tell me the case.  I can look at it here.

14        MR. KEHOE:  At this juncture, I do not.

15        THE COURT:  OK.

16        MR. KEHOE:  I have spent the time going back

17   through -- after the pretrial going back through the management

18   agreements for these funds which, based on the discussion that

19   we had in court triggered that, and that's where I came to the

20   understanding as to where these expenses properly should have

21   lay.

22        THE COURT:  All right.  That may be a defense to the

23   merits.  Unless and until you can give me support for the

24   statement that I lack subject matter jurisdiction to preside at

25   this trial, I'm going to preside at this trial.

JCAHRAS1

1          MR. KEHOE:  Yes, your Honor.

2          THE COURT:  So far you haven't cited anything which

3    rises to the level of a defect in this Court's subject matter

4    jurisdiction.

5          MR. KEHOE:  Yes, your Honor.

6          THE COURT:  Thank you.

7          Mr. Thompson, you may call your first witness.

8          MR. THOMPSON:  Your Honor, we have just one

9    preliminary.  We have prepared a list of the plaintiff's trial

10   exhibits that would enable the Court to keep track of what's

11   admitted.  If it would be helpful to your Honor, we're prepared

12   to hand that up.

13         THE COURT:  I'd appreciate that.  I had the fun

14   experience of going through the binders with the declarations

15   where the tabs started off by being off by one, then it grew to

16   being off by two, then at some point off by three and

17   eventually by four.  I also had the fun of going through the

18   exhibit binders which do not tell me -- for example, if it's

19   Exhibit 119, doesn't tell me whether that's in Volume II or III

20   or IV.  It just says on the binder Volume I, II, III, IV, V

21   part 1 and V part 2.

22         MR. THOMPSON:  We apologize for those copying errors,

23   your Honor.  We can provide a corrected set to the Court.

24         THE COURT:  Hand up what you have, and let's get going

25   with your first witness.

JCAHRAS1                         Becker – Direct

1          MR. THOMPSON:  Mr. Carlson may approach?

2          THE COURT:  You may.

3          MR. THOMPSON:  Your Honor, we can provide a corrected

4    set either during trial, or perhaps in connection with

5    post-trial briefing we can provide a corrected set of exhibits

6    that have actually been admitted.

7          THE COURT:  Call your first witness.  Do you have one

8    for the deputy clerk?

9          MR. CARLSON:  We do.

10         THE COURT:  Do you have another one for my law clerk?

11   If not -- thank you.

12         MR. CARLSON:  Thank you, your Honor.

13         MR. THOMPSON:  Your Honor, Mr. Carlson will be

14   presenting our first witness.

15         MR. CARLSON:  Your Honor, the SEC calls Mr. Marc

16   Becker.

17         THE COURT:  All right.

18   MARC BECKER,

19        called as a witness by the Plaintiff,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. CARLSON:

23   Q.  Good morning, Mr. Becker.  In conjunction with this trial,

24   you previously provided a signed declaration setting forth a

25   narrative as your direct testimony in this case.  Is that

1    correct?

2    A.   That's correct.

3             MR. CARLSON:  Your Honor, may I approach to provide

4    Mr. Becker a copy of that?

5             THE COURT:  Yes.

6             Both sides have a revocable license to approach the

7    witness at will without seeking permission.  If it's abused,

8    I'll revoke the license.

9             Go ahead.

10            MR. CARLSON:  Thank you, your Honor.  Your Honor, a

11   copy for the Court as well.

12   Q.  Mr. Becker, if you could take a moment to take a look at

13   that declaration.

14   A.  Yes.  It's in the folder labeled -- marked "Becker

15   Declaration."

16   Q.  Yes, correct.

17            Mr. Becker, are there any errors in that declaration

18   that you would like to correct at this time?

19   A.  No, there is not.

20   Q.  Now, sir, if you turn to paragraph 4 of your declaration,

21   you make reference to an exhibit in your declaration.  Do you

22   see that in the paragraph?

23   A.  Correct.

24   Q.  If you could, turn to what has been marked previously as

25   Plaintiff's Exhibit 152.  There should be a copy provided there

JCAHRAS1                      Becker - Direct

1   for you.

2   A.  OK.

3   Q.  Do you know what this document is?

4   A.  Yes.

5   Q.  How do you know that, sir?

6   A.  Because it's our Fund VI limited partnership agreement

7   which I read at some point a long time ago.

8   Q.  Are you familiar with it based on your employment at

9   Apollo?

10  A.  Correct.

11  Q.  Going back to your direct testimony declaration, sir, do

12  you hereby reaffirm that your declaration of direct testimony

13  is true and correct?

14  A.  I do.

15           MR. CARLSON:  Your Honor, we would move --

16  respectfully offer the direct testimony declaration of Mr. Marc

17  Becker into evidence as PX 300.

18           THE COURT:  Any objection?

19           MR. KEHOE:  No objection, Judge.

20           THE COURT:  Received.

21           (Plaintiff's Exhibit 300 received in evidence)

22           THE COURT:  And you move Plaintiff's Exhibit 152 in

23  evidence.  Any objection?

24           MR. KEHOE:  No objection.

25           THE COURT:  Received.

JCAHRAS1                        Becker - Direct

1                    (Plaintiff's Exhibit 152 received in evidence)

2    BY MR. CARLSON:

3    Q.  Mr. Becker, did you also submit a rebuttal declaration in

4    this case?

5    A.  Yes.

6    Q.  Sir, I'm providing you a copy of that declaration

7    presently.

8                    THE COURT:  I take it that's not in the binder that

9    was handed up to me prior to trial, direct testimony

10   declarations?

11                   MR. CARLSON:  They're in the rebuttal testimony.

12                   THE COURT:  Is there a separate binder?

13                   MR. CARLSON:  I believe there is, your Honor.  If not,

14   then we can provide one.

15                   THE COURT:  I'm just trying to find out.  Maybe you

16   could find out.  I didn't see one, so that's why I'm curious.

17                   MR. CARLSON:  We can look into that, your Honor.  I'm

18   not sure, as I stand here, if a binder was provided to you with

19   that.  If not, it will be.

20                   THE COURT:  Mr. Thompson, do you know?

21                   MR. THOMPSON:  I'm not certain as we sit here, your

22   Honor.  Does the Court need a copy of the declaration?

23                   THE COURT:  I have it right here.  I just want to make

24   sure that I didn't overlook something that you submitted to me.

25   I've been through the materials you submitted, and I didn't see

JCAHRAS1                          Becker - Direct

 1    a rebuttal declaration binder.  OK.

 2              MR. THOMPSON:  Your Honor, during the first break, I

 3    will consult with our team, and we'll have an answer for the

 4    Court.

 5              THE COURT:  Thank you.

 6              MR. CARLSON:  Your Honor, for the Court's reference,

 7    it was previously filed as document 111 -- or 119-1.

 8              THE COURT:  Thank you.

 9    BY MR. CARLSON:

10    Q.  Mr. Becker, you had a chance to review this rebuttal

11    declaration?

12    A.  Yes.

13    Q.  Are there any errors in this rebuttal declaration or

14    corrections that you would like to make?

15    A.  Not at this point, no.

16    Q.  Mr. Becker, do you hereby reaffirm that your declaration of

17    rebuttal testimony is both true and correct?

18    A.  I do.

19              MR. CARLSON:  Your Honor, we would respectfully offer

20    the rebuttal testimony declaration of Mr. Becker into evidence

21    as PX 301.

22              THE COURT:  All right.  Any objection?

23              MR. KEHOE:  No objection, Judge.

24              THE COURT:  And the direct testimony was PX?

25              MR. CARLSON:  300.

JCAHRAS1                        Becker – Cross

1            THE COURT:  Thank you very much.

2            MR. CARLSON:  Yes, your Honor.

3            THE COURT:  All right.

4            (Plaintiff's Exhibit 301 received in evidence)

5            THE COURT:  Mr. Becker, I have a question for you.  In

6    paragraph 3, the first line, it says during the period

7    January 10 to June 2013, the "relative period."  I assume that

8    was information that was provided to you?

9            THE WITNESS:  Correct.

10           THE COURT:  Thank you.

11           You may cross-examine.

12           MR. CARLSON:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. KEHOE:

15   Q.  Good morning, Mr. Becker.  We haven't had the pleasure.  My

16   name is Greg Kehoe for Mr. Rashid.

17   A.  Good morning.

18   Q.  Mr. Becker, the actual affidavits, the declarations that

19   you have before you, did you write those?

20   A.  Yes.

21   Q.  You prepared those yourself?

22   A.  In conjunction with counsel.

23   Q.  With your counsel?

24   A.  Correct.

25   Q.  Now, I'm going to talk about a few issues that are in your

JCAHRAS1                         Becker - Cross

1    declarations, if I may, and go through some of the matters.

2              THE COURT:  Just ask a question.

3              MR. KEHOE:  Yes, your Honor.

4    Q.  Now, when you were working at Apollo, you were senior to

5    Mr. Rashid, were you not?

6    A.  Correct.

7    Q.  Did you work with him extensively?

8    A.  Extensively, you said?

9    Q.  Yes.

10   A.  I did.

11   Q.  Are you familiar with his work ethic?

12   A.  Yes.

13   Q.  What was his work ethic?

14   A.  He worked very hard.

15   Q.  When you say "he worked very hard," tell the Court what

16   that means.  Hour-wise what, in fact, he did.

17   A.  Well, he was an investment professional.  He worked

18   extremely long hours, from early in the morning to, many

19   instances, late hours of the night.

20   Q.  Did that include travel throughout the world on a regular

21   basis?

22   A.  In situations he worked with me, it involved travel at

23   least throughout the country.

24   Q.  I'm sorry?

25   A.  Throughout the country in instances he worked with me.

1    Q.  Well, he was -- had oversight for various entities in

2    India, did he not?

3    A.  Nothing that he worked on with me.

4    Q.  Well, do you know independently whether or not he did?

5    A.  I can't recall.

6    Q.  You can't recall.  OK.

7             How about travel to London and Paris for work for

8    Apollo?

9    A.  It's my recollection that he did travel to London and

10   Paris.

11   Q.  How about travel to Los Angeles, at the Apollo office in

12   Los Angeles?  Did he do that as well?

13   A.  It's my recollection that he definitely traveled to

14   Los Angeles as well.

15   Q.  So when he was traveling around the United States, he was

16   monitoring portfolio companies and funds, is that right?

17   A.  In some instances that might have been the case.

18   Q.  Well, when you were, in fact, on Realogy with him, he

19   was -- when he was traveling around on Realogy matters, he was

20   monitoring that portfolio company, wasn't he?

21   A.  With respect to Realogy specifically, that company was

22   based in New Jersey.  I don't recall it being a significant

23   amount of travel around the country for that specific

24   investment.

25   Q.  Realogy, the headquarters were in Parsippany, New Jersey,

JCAHRAS1                          Becker - Cross

1   correct?

2   A.   Correct.

3   Q.   And they had offices, for instance, in Greenwich,

4   Connecticut, correct?

5   A.   They have and had brokerage offices throughout the country.

6   Q.   Putting aside travel for Realogy, he traveled throughout

7   the country for some of the other portfolio companies, such as

8   Metals U.S.A.?

9   A.   Correct, to my knowledge.

10  Q.   I'm sorry?

11  A.   To my knowledge, correct.

12  Q.   Did you actually supervise Mr. Rashid?

13  A.   With respect to the deals we worked on together, I was the

14  senior partner on that deal team.

15  Q.   Did you, in fact, supervise his work?

16  A.   I had oversight over his work product.

17  Q.   Did you at the end of the year review his work within

18  Apollo?

19  A.   My recollection is there were instances where I was in his

20  review.

21  Q.   And in all of the reviews that you tendered with regard to

22  Mr. Rashid, those reviews were very positive, weren't they?

23  A.   My recollection of the reviews that we gave him with

24  respect to his work product, they were very positive.

25  Q.   Now, with regard to his work ethic, I wonder if I can just

1   ask a few questions.

2            Is it fair to say -- I think you said he was a

3   hard-working guy.  Is it fair to say that he spent, when he was

4   in New York, for instance, he spent a tremendous amount of time

5   in the office?

6   A.   Correct.

7   Q.   Would it be fair to say he spent a -- when he was spending

8   this time in the office, he was working late as well, is that

9   right?

10            THE COURT:  Mr. Kehoe, you've already elicited from

11   this witness on cross-examination that Rashid worked very hard,

12   long hours, to late hours of the night.  You've already

13   elicited that.

14            MR. KEHOE:  Yes.

15            THE COURT:  Please move on.

16            MR. KEHOE:  I will.  Judge, I don't want to go

17   crosswise.  Can I ask him one question about weekends,

18   holidays?

19            THE COURT:  Go ahead.  I'm just talking about

20   questions you've already asked and gotten answers to.

21            MR. KEHOE:  I understand.

22   BY MR. KEHOE:

23   Q.   Mr. Rashid was in fact one of those people, one of those

24   partners, who was available on weekends, was available at

25   nights, isn't that right?

JCAHRAS1                          Becker - Cross

1   A.  Correct.

2   Q.  His work ethic was such that at various times, Apollo asked

3   him to take over the LA office and to take over the London

4   office, isn't that right?

5   A.  I'm not aware of them asking him to take over the -- I'm

6   not sure how you define "take over."  I recall -- there was an

7   instance I recall where they asked him to move out to the

8   Los Angeles office and also an instance where they asked him to

9   move out to the London office.

10  Q.  Was that to take over, to head up, those offices?  Was that

11  what it was?

12  A.  I wasn't the one that asked him.  I recall it being a very

13  senior capacity.

14  Q.  This was a discussion within -- you were in senior

15  management at the time, were you not?

16  A.  I was senior deal partner.  I'm not necessarily involved in

17  the management decisions of how the firm operates.

18  Q.  Suffice it to say, you knew those discussions were taking

19  place where senior management wanted Rashid to go to

20  Los Angeles and London?

21  A.  At some point in time, I was aware, correct.

22  Q.  Now, you talk in your declaration about the Realogy deal.

23  The Realogy deal was in Fund VI, is that right?

24  A.  I believe that's correct, yes.

25  Q.  And how large was Fund VI?

JCAHRAS1                        Becker - Cross

1    A.  Trying to recall the exact fund size which -- I believe it

2    was approximately $12 billion fund, but I can't say

3    specifically.

4    Q.  Well, it was one of the larger funds that Apollo was

5    managing, was it not?

6    A.  At that time, correct.

7    Q.  I know things have changed since then, but at the time --

8    and we're talking about -- they purchased -- well, Apollo was

9    involved in the acquisition of Realogy in, what, 2006/2007, is

10   that about right?

11   A.  My recollection, that's about the right time period.

12   Q.  At the time, this acquisition was one of the largest

13   acquisitions that Apollo had ever been involved in, wasn't it?

14   A.  Correct.

15   Q.  By the way, for Realogy, what kind of company is that, just

16   so you inform the Court?  I don't know if we put that in your

17   declaration.

18            THE COURT:  I think we have several witnesses from

19   Realogy who are going to be testifying, so I assume that's

20   going to be coming out from them.

21            Go ahead.  You can answer, though.

22            THE WITNESS:  Thank you, your Honor.

23   A.  Realogy is a real estate brokerage company.

24   Q.  And Citi Habitats was a subsidiary of Realogy, wasn't it?

25   A.  Citi Habitats, it was one of the brands, correct.

1    Q.  Now, before you folks got involved -- and I say "you

2    folks."  I'm talking about Apollo.  I don't mean to be too

3    conversational about this -- Realogy itself was having

4    significant financial problems in 2006 and 2007, were they not?

5    A.  I can't recall the exact time period, but when we acquired

6    the company, it wasn't having financial difficulties.  It was a

7    public company.

8    Q.  When you were acquired -- in the acquisition of this

9    portfolio company as part of the Fund VI, you were the senior

10   person on it, and the person who was doing a lot of the legwork

11   was, in fact, Mr. Rashid, was it not?

12   A.  Correct.

13   Q.  Now, when did that deal close?  I'm sorry.  Maybe you said

14   this before.  My apologies.

15           THE COURT:  He testified, you elicited from him, this

16   was in the 2006/2007 time period.  Do you need more specific

17   than that?

18           MR. KEHOE:  Not really, Judge.  If I can just --

19           THE COURT:  OK.  Move on.

20           MR. KEHOE:  Yes.

21   BY MR. KEHOE:

22   Q.  So 2008 comes up, and that is, of course, the economic

23   downturn, right?

24   A.  Right around that time period.

25   Q.  Yes.  And as a result of that economic downturn, Realogy

JCAHRAS1                          Becker - Cross

1    started having a lot of financial problems, didn't they?

2    A.  Yes.

3    Q.  They had liquidity issues, didn't they?

4    A.  They didn't actually have liquidity issues.

5    Q.  They certainly had covenant issues, right?

6    A.  Yes.

7    Q.  They had --

8    A.  They had covenant challenges.

9    Q.  What were those challenges?

10           THE COURT:  How is this relevant?

11           MR. KEHOE:  Because, in fact, it's going to show

12   Mr. Rashid was a central person in bringing about the

13   ultimate --

14           THE COURT:  Go ahead.

15           MR. KEHOE:  -- ultimate recovery of Realogy where it

16   was sold, and both Apollo and everyone made a tremendous amount

17   of money.

18           THE COURT:  How is that relevant?

19           MR. KEHOE:  It is relevant because it goes to the

20   argument that we have presented, for instance, in the pretrial

21   of how hard this person is working during this operative time

22   frame.

23           THE COURT:  You've already elicited that from this

24   witness.  Whether it was clever work, productive work,

25   money-making work or money-losing work, I don't see how that's

JCAHRAS1                          Becker - Cross

1    relevant.

2              MR. KEHOE:  If your Honor doesn't think that's

3    relevant, we can --

4              THE COURT:  I'm inviting you to tell me how it's

5    relevant.  That's really a question on my part to you.  I'm not

6    seeing how it's relevant.  I invite you to tell me how it's

7    relevant.

8              MR. KEHOE:  It's relevant, Judge, because -- I am

9    picking the Realogy situation and the economic challenges with

10   Realogy after the 2008 downturn because Mr. Becker was central

11   to that entire matter where Realogy was ultimately sold in 2012

12   and that Mr. Rashid worked a tremendous amount of hours on that

13   particular case.  It's a matter of just bringing an example to

14   your Honor's attention of a portfolio company where this

15   gentleman, in conjunction with Mr. Rashid, worked a tremendous

16   amount and successfully brought about the sale of this company.

17             THE COURT:  That's where I think I started this

18   discussion.  Whether it was successfully or unsuccessfully, how

19   is that relevant?  If Apollo made a lot of money or lost a lot

20   of money, how is that relevant?

21             MR. KEHOE:  It's relevant, your Honor, just to

22   demonstrate, in conjunction with Mr. Rashid's work at this

23   company, not only was he working very hard, he was working very

24   successfully.  And within all of the particular issues

25   concerning expenses, certainly in 2010/2012, he was being

JCAHRAS1                          Becker - Cross

1    promoted.

2            THE COURT:  Yes.  I don't think there's any dispute

3    about any of this from what I've read.

4            It seems to me that whether the Realogy investment was

5    a success or a dismal failure is not particularly relevant.

6    Move on.

7    BY MR. KEHOE:

8    Q.  Now, just to talk about a few of the companies, in addition

9    to -- and, your Honor, I don't want to transgress your

10   Honor's --

11           THE COURT:  Ask a question, and we'll see where you

12   are.

13   Q.  For instance, when we talk about Metals U.S.A., Mr. Rashid

14   was traveling extensively, certainly up till the sale of Metals

15   U.S.A., through Texas and Florida, was he not?

16   A.  That's my understanding.

17   Q.  And QDI, are you familiar with QDI?

18   A.  Quality Distribution.

19   Q.  And he was with Quality Distribution, and he was a, at

20   minimum, traveling around to and Tampa on QDI?

21           MR. CARLSON:  Your Honor, objection.  I don't think

22   there's foundation that this witness knows about those

23   particular portfolio companies.

24           THE COURT:  Well, we'll find out.

25           Do you know what Mr. Rashid was doing for Quality,

JCAHRAS1                        Becker - Cross

1    QDI?

2              THE WITNESS:  Broadly speaking, yes.

3              THE COURT:  OK.  You can answer.  That's fine.

4              Overruled.

5    BY MR. KEHOE:

6    Q.  Can you answer the question.

7    A.  I don't remember what the question was.

8    Q.  OK.  We were talking about QDI.  Mr. Rashid was traveling

9    around the country, especially down in Florida, for Quality

10   Distribution, is that right?

11   A.  The vast majority of the travel was to Tampa.  I don't

12   think it was necessarily around the country.

13   Q.  And let's go international.  Now, there was a portfolio

14   company called Welspun in India, correct?

15   A.  That is correct.  That was a Apollo portfolio company that

16   I did not work on.

17   Q.  But Mr. Rashid was working on that, was he not, and

18   traveling to India?

19   A.  My recollection is that he worked on Welspun.

20   Q.  He did?

21   A.  It's my recollection.

22   Q.  And that required him to travel to India, didn't it?

23             THE COURT:  If you know.

24   A.  I did not work on that investment with him, so I did not

25   see him travel, but one would assume he did travel to India.

JCAHRAS1                          Becker – Cross

1   Q.  And Ascometal -- the spelling of that is

2   A-s-c-o-m-e-t-a-l -- that was a French company, wasn't it?

3   That was a portfolio company?

4   A.  That was a portfolio company of Apollo as well.

5   Q.  That was located in France, and they had business

6   transactions in London during your operative time frame that

7   you have in your indictment.  I think you called it the

8   relevant period.

9           MR. CARLSON:  Objection, your Honor.

10  Q.  I mean in your declaration, my apologies.

11  A.  That was not --

12          THE COURT:  Basis?

13          MR. CARLSON:  Your Honor, I think he said

14  "indictment," and I think --

15          MR. KEHOE:  I meant his declaration.

16          THE COURT:  All right.  Go ahead.

17          MR. KEHOE:  My apologies.

18  A.  I did not personally work on that investment, so I'm not

19  familiar with it and who spent time working on that investment.

20  Q.  Were you aware that Mr. Rashid was working on that

21  investment?

22  A.  I vaguely recollect that he worked on that investment.

23  Q.  How about Alaris from Cleveland, Ohio?  Was he working on

24  that?

25  A.  I vaguely recollect he was working on Alaris.  I can't tell

JCAHRAS1                          Becker - Cross

1    you where it was located.

2    Q.  Now, as part of his job, his job was to monitor these

3    portfolio companies, wasn't it?

4    A.  Correct.

5    Q.  As part of that monitoring, what that entailed was

6    developing personal relationships with management in these

7    companies, wasn't it?

8    A.  Developing relationships with management teams was part of

9    the job, correct.

10   Q.  Yeah, and that means not only visiting the company, that

11   means dining out, business dinners, etc., isn't that right?

12   A.  There -- we would have -- we do have business dinners from

13   time to time with management.

14   Q.  And you do that yourself as part of your work on a

15   day-to-day basis at Apollo, don't you?

16   A.  Dinner with portfolio company management teams?

17   Q.  Yes.

18   A.  Yes.

19   Q.  Now, when you are involved in the purchase and sale of a

20   company, such interaction with the management in the company is

21   not only very important but much more frequent, isn't it?

22   A.  More frequent than what?

23   Q.  More frequent than the visits to the individual company.

24        That was a bad question.  My apologies.

25   A.  Can you restate the question, please?

JCAHRAS1                        Becker - Cross

1    Q.  Sure, sure.

2            At the time a company is being either purchased or

3    sold, the -- let's just say with being sold, the monitoring of

4    that company and relationships with management are more

5    frequent, aren't they?

6    A.  You're referring to when we sell a portfolio company or

7    buying?

8    Q.  When you sell a portfolio company.

9    A.  Typically, that's when the relationship ends.

10   Q.  No.  I'm talking about the run-up to that.  Maybe my

11   question wasn't clear.

12           The run-up to that sale, there's a lot of interaction

13   between Apollo and the management of the company as a run-up to

14   the sale, right?

15   A.  Usually.

16   Q.  Now let me just shift gears a bit.

17           When were you first made aware of Mr. Rashid's travel

18   and expense issues in Apollo?

19           THE COURT:  Is this covered in either the declaration

20   or the rebuttal declaration?

21           MR. CARLSON:  Your Honor, I don't believe it is.

22           MR. KEHOE:  We're generally talking about the expenses

23   in the declaration, Judge.  This is cross-examination.

24           THE COURT:  It's cross-examination, but I don't know

25   that it's covered in the direct.  He talks about Apollo's

JCAHRAS1                          Becker - Cross

1    travel and expense system and how the system worked.  He

2    doesn't talk at all about Mr. Rashid doing anything untoward,

3    improper, or ever being questioned about his expenses, unless I

4    missed that.  I don't see that anywhere in the declaration.

5             MR. KEHOE:  I don't think that's squarely within the

6    declaration, but if I may, Judge, we had talked to the SEC

7    about calling witnesses just once, be it in the --

8             THE COURT:  So this is a witness on your witness list?

9             MR. KEHOE:  If it's -- yes, we put in our witnesses,

10   any witness that were called by the SEC would be called on our

11   witness list as a potential witness.

12            THE COURT:  How many witnesses do you have?

13            MR. KEHOE:  At this point I have very few, but what we

14   were going to do, based on the agreement with the SEC, is the

15   witnesses they put on would just be put on once.  And even

16   though it's outside the scope of direct --

17            THE COURT:  So you plan to go beyond the scope of the

18   direct examination as to every witness based on your discretion

19   under the circumstances.  Is that basically it?

20            MR. KEHOE:  Not every witness, Judge.  It was just a

21   practical agreement with the SEC, which I'm sure that they will

22   verify, that we were just calling these witnesses on one

23   occasion, and that we weren't going to object as outside the

24   scope.

25            THE COURT:  Is that the agreement, that as to each and

1    every witness who the SEC is calling, that they are also

2    Mr. Rashid's witness, and they may be questioned on any

3    relevant matter that Mr. Rashid wishes to question them on,

4    regardless of whether it's beyond the scope of the direct?

5           MR. CARLSON:  Your Honor, that's a broad

6    understanding, but we have no objection if they're going to be

7    brief.  We would object if that's going to be the case for

8    every single witness.

9           THE COURT:  What's the brevity rule?  How do I enforce

10   a brevity rule?

11          MR. CARLSON:  We had no idea that Mr. --

12          THE COURT:  Let's say he wants to question for three

13   hours on a subject beyond the scope of direct.  On what basis

14   in your agreement do I rule on that?

15          MR. CARLSON:  The agreement, your Honor, was to call a

16   witness once, and the idea was for folks that were traveling.

17   I mean, that was the genesis of this, so we don't have to keep

18   flying people back and forth across the country.  So, your

19   Honor, respectfully, if it's a few questions here or there, I

20   don't know that the SEC has an objection, but if it is as your

21   Honor is contemplating, something like three hours, we would of

22   course say that that's far beyond the scope.

23          THE COURT:  Then I'm not understanding.  If what

24   you're saying is he cannot elicit testimony beyond the scope of

25   the direct, however, you don't choose to object if there are a

JCAHRAS1                        Becker - Cross

1   few questions he wants to ask beyond the scope of the direct, I

2   understand that.  But what Mr. Kehoe is positing is his

3   understanding that by saying he's calling any witness who the

4   SEC is calling, that he reserves the right to conduct such

5   examination as he chooses beyond the scope of the direct.  And

6   that's what I'm just trying to find out, if that was the

7   understanding between the parties.

8            MR. CARLSON:  Yes, your Honor.  Our understanding is

9   that was just for witnesses that were traveling and thus would

10  inconvenience the witness having to fly back and forth about

11  the country.  The second part of your reading of that is not

12  how the SEC understood that agreement.

13           MR. KEHOE:  With all due respect to Mr. Carlson, that

14  was absolutely not the understanding.

15           THE COURT:  All right.  Let me take a look at your

16  witness list.

17           MR. KEHOE:  If I may, Judge, I understand from

18  Ms. van Vliet that it was the subject of a stipulation that was

19  filed yesterday.

20           THE COURT:  All right.  It's not in the pretrial

21  order.  I don't see it in the pretrial order.  Where in the

22  pretrial order, the original pretrial order, do you indicate

23  you are calling all of the SEC's witnesses?

24           MR. KEHOE:  I believe we had a line in the pretrial

25  order that we were --

JCAHRAS1                          Becker - Cross

1              THE COURT:  OK.  I believe you.  Could you just point

2       me to it.

3              MR. KEHOE:  Yes, your Honor.

4              If I may, Judge, in the proposed pretrial order, in

5       our filing, this is document 121-4.

6              THE COURT:  I have the document in front of me.

7              MR. KEHOE:  The last page says Mr. Rashid reserves the

8       right to call any witness on the SEC's witness list or any

9       witness from whom the SEC has submitted a declaration.  But in

10      an effort, Judge, to streamline things and not call people back

11      and forth, that was why we entered into the stipulation

12      where --

13             THE COURT:  Forgive me.  What page number are you

14      looking at?

15             MR. KEHOE:  It is document 121-4, page 2 of 2.

16             THE COURT:  OK.  I have in front of me the joint

17      pretrial order proposed.  The bottom of the page of the joint

18      pretrial order are page Nos. 1 to 23.  Could you tell me what

19      page it's on in the joint pretrial order.

20             MR. KEHOE:  It will take me a second, Judge, just to

21      review this.

22             On page 24, Judge -- 24.

23             THE COURT:  That's the problem here.  Mine only goes

24      up to page 23, and it ends with dated September 13, 2019, with

25      your signature at the top of the page, and it says, "Attorneys

JCAHRAS1                          Becker - Cross

1    for defendant."  That's the copy of the final pretrial order

2    that I have.  If there is more to the final pretrial order, I

3    don't have it.

4                MS. van VLIET:  May I?

5                MR. KEHOE:  If I could turn this to Ms. van Vliet, she

6    actually was --

7                MS. van VLIET:  I actually have --

8                MR. KEHOE:  -- going through these exhibits.

9                MS. van VLIET:  May I, Judge?

10               THE COURT:  Yes.

11               MS. van VLIET:  On page 22, right above the signature

12   blocks that the Court just referred to --

13               THE COURT:  Yes.

14               MS. van VLIET:  -- it says:  A copy of the SEC's

15   witness last -- list is attached as Exhibit C.  Rashid's trial

16   exhibit list is attached hereto as Exhibit D.  That's a

17   typographical error.  It should read "witness list," because if

18   the Court then refers to -- how it's not attached to what the

19   Court is looking at, I don't know, but if the Court looks at

20   document 121-4, which was filed on the same day, 9/13/19, it is

21   titled "Exhibit D, Defendant Mohammed Ali Rashid's Trial

22   Witness List."  The second page of that document, which is a

23   two-page document, literally the last typewritten information

24   on the second page is the reservation regarding SEC witnesses.

25               THE COURT:  I think you'll find, if you look at the

JCAHRAS1                          Becker - Cross

1    docket, that the list is not part of the joint pretrial order

2    which the Court entered as an order, and that's part of my

3    confusion.  I have the actual pretrial order as entered by the

4    Court, but let me look.

5              Flo, can you print that out for me, please.

6              All right.  I'll allow you to proceed with the

7    questioning.  Go ahead.

8              MR. KEHOE:  Thank you, your Honor.

9              THE WITNESS:  If you can repeat the question.

10   BY MR. KEHOE:

11   Q.  Yes.  Yes, we can start from the initial questions in this

12   area.

13             Mr. Becker, when were you first made aware of

14   Mr. Rashid's travel and expenses issues at Apollo?

15   A.  My recollection was it was in the -- kind of the weeks

16   leading up to his departure from the firm.

17   Q.  So nothing in 2010.  You have the relevant period in your

18   declaration as January 10 -- excuse me, January 2010 through

19   June of 2013.  Using that relevant period, when did you find

20   out about it?

21             MR. CARLSON:  Objection, your Honor.  That's been

22   asked and answered, I believe.

23             THE COURT:  I'll allow it.

24             Go ahead.

25   A.  I can't give you the specific date.  It was -- I recall

1   that it was sometime in the month or so leading up to his

2   departure that there were expense issues.

3   Q.  So if his departure and suspension was on July the 1st --

4   and, Judge, I think we'll all stipulate that Mr. Rashid was

5   suspended on July 1, 2013.

6            MR. CARLSON:  Objection, your Honor.  Is it departure

7   or suspension

8            MR. KEHOE:  Suspension, suspension.

9            THE COURT:  Put a question to the witness, Mr. Kehoe.

10  Q.  So is it your testimony, Mr. Becker, that you learned about

11  his travel and expense issues shortly before his suspension on

12  July the 1st of 2013?

13  A.  That's my recollection.

14  Q.  So when Mr. Rashid was promoted in 2010 and 2012, none of

15  the issues concerning his expenses came up, to your knowledge?

16  A.  Not to mine that I recollect.

17  Q.  By the way, with these individual funds that we are talking

18  about, and we were talking about Fund VI here, you and

19  Mr. Rashid, all of the partners have a financial stake in these

20  funds, don't you?

21  A.  Correct.

22  Q.  Now, I want to turn to paragraph 7 in your declaration, if

23  I may.  And you note -- this is paragraph 7 if you have it

24  before you:  "I understood that it was important to allocate

25  business expenses accurately.  I also understood that

JCAHRAS1                        Becker - Cross

1   investment funds and portfolio companies would, in fact,

2   reimburse Apollo for any expenses allocated to them," and then

3   you have directed to paragraph 7.1 in Exhibit 152.

4          Is it from that particular section of 152 that you

5   obtained that information?  The information I'm saying is your

6   understanding that Apollo would be reimbursed for expenses

7   allocated to the individual investment funds and portfolio

8   companies.

9   A.  I can say it was my understanding because it was my

10  knowledge.  I can't say it was specifically from my reading

11  this at one point in time and then directly translating that

12  knowledge.

13  Q.  Well, turning your attention to Exhibit, Plaintiff's

14  Exhibit, 152, and I believe that's the portfolio -- that's the

15  management agreement that is before you?

16  A.  Yep.

17  Q.  And this is for Fund VI, is that right?

18  A.  Correct.

19  Q.  And you were involved in Fund VI, were you not?

20  A.  Yes.

21  Q.  What was your involvement in Fund VI?

22  A.  I was a deal partner in Fund VI.

23  Q.  What does that mean?

24  A.  I was responsible for sourcing, overseeing, and then

25  monetizing investments.

JCAHRAS1                        Becker - Cross

```
1   Q.  You had people like Mr. Ali that was monitoring these
2   portfolio companies that were part of the fund?
3   A.  He was part of the deal team that would help monitor those
4   portfolio companies.
5   Q.  Now, with regard to -- if you could turn to -- I want to
6   talk to you about paragraph 7.1 which you cite.  That's at
7   Bates stamp number, if you look at the lower right-hand corner,
8   5371, so you don't have to search in vain for it.
9   A.  Thank you.
10  Q.  Do you see that, sir?
11  A.  I see the paragraph.
12  Q.  I'm sorry?
13  A.  Yes, I see the paragraph.
14  Q.  7.1, right?
15  A.  Yes.
16  Q.  This is on expenses and management fees.  Now, the
17  management company here is Apollo, isn't it?
18  A.  It's the GP of Apollo, I believe.
19  Q.  Well, the management company here that they refer to here
20  is Apollo.  We can go to the beginning definitions, and we can
21  clarify this.
22          Pardon me, Judge.
23          Now, if you turn to page 7 of that document, Bates
24  stamp 5317, the management company -- I'm sorry.  You can get
25  there.
```

JCAHRAS1                          Becker - Cross

1    A.  A second, please.

2                MR. CARLSON:  Counsel, what was the page?

3                MR. KEHOE:  It is page Bates stamp No. 5317, Jim.

4    Q.  There is no -- I'm sure there is at some point, but on the

5    center of the page, there's no designation of paragraphs.  It's

6    on page 7 of the document itself.

7    A.  Yep, OK.

8    Q.  What we have is Apollo Management VI limited partnership is

9    the management company for Fund VI, right?

10   A.  Correct.

11   Q.  Now, if we turn our attention back to 7.1, and that is,

12   again, Bates stamp No. 5371, and this is under the rubric of

13   expenses and management fees, it says:  7.1.  Administrative

14   expenses, placement fees.  The management company shall bear

15   and be charged with the following, to the extent applied by

16   special fees:  All costs and expenses, if any, incurred in

17   developing, negotiating, and structuring portfolio investments.

18

19               So any expenses in developing, negotiating, and

20   structuring portfolio expenses are to be picked up by Apollo

21   Management, weren't they?

22   A.  That's what it says.  You said portfolio investments.

23   Q.  Excuse me?  I'm just -- portfolio -- I'm just reading what

24   the document says.

25   A.  You read it wrong.

JCAHRAS1                          Becker – Cross

1  Q.  Did I?  I stand corrected if I did.

2          But suffice it to say that expenses that are incurred

3  in development, negotiating, structuring portfolio investments

4  are management expenses, not fund expenses and not portfolio

5  expenses, right?

6  A.  Correct.

7  Q.  Now, let's turn to B.  All ordinary costs and expenses, if

8  any, incurred in monitoring portfolio investments and

9  overhead -- there's information there about their advisory

10  board -- and overhead expenses in connection therewith, subject

11  to any reimbursement of such costs and expenses by portfolio

12  company.

13          So expenses incurred in monitoring portfolio

14  investments are management company investment -- management

15  company expenses, aren't they?

16  A.  I'm going to trace the language.

17  Q.  Please do.  Please take your time.  I do recognize these

18  documents are a bit dense.  Just take your time.

19  A.  Correct.

20          (Continued on next page)

21

22

23

24

25

JcaWras2                    Becker - Cross

1   BY MR. KEHOE:

2   Q.  So the expenses in monitoring the portfolio companies are a

3   management company expense, aren't they?

4   A.  This is all ordinary costs and expenses.

5   Q.  All ordinary costs and expenses, if any, incurred in

6   monitoring portfolio investments.  Those expenses are

7   management company expenses, right?  According to this

8   document.

9   A.  Yes.

10  Q.  Is that right?

11  A.  Yes.

12  Q.  So they're not expenses that should be passed on to either

13  the portfolio companies or the funds, right?

14  A.  All ordinary costs and expenses.

15  Q.  Incurred in monitoring.  Monitoring of portfolio companies,

16  those are expenses that are supposed to be absorbed by the

17  management company, right?

18          MR. CARLSON:  Objection, your Honor.  Mischaracterized

19  the document.

20          THE COURT:  No.  It's a question.

21  A.  Correct.

22  Q.  Now, if we continue on with the document and we go down to

23  (c), it says, again, these are -- the following costs and

24  expenses shall be borne by the management company, C, all costs

25  and expenses of providing to the partnership the office space,

JcaWras2                          Becker - Cross

1    facilities, supplies and necessary administrative and clerical

2    functions connected with the partnership's operation.

3         So all of the day-to-day costs and expenses and overhead

4    are likewise being absorbed by the management company, right?

5    A.   Yeah, office space and Apollo facilities.  Yes, it's the

6    management company, correct.

7    Q.   And not an expense that --

8              MR. KEHOE:  I'm sorry, Judge.

9              THE COURT:  What entity is the management company?

10   Sir, do you know?

11             THE WITNESS:  In this case, it's Apollo Management VI.

12             MR. KEHOE:  If I turn to --

13             THE COURT:  Hang on.

14             And Apollo Management VI is distinct from Apollo

15   Investment Fund VI, correct?

16             THE WITNESS:  Correct.

17             THE COURT:  All right.  Thank you.

18             And who owns Apollo Management VI?  If you know.

19             THE WITNESS:  I can't give you -- I can't say

20   specifically who owns it.

21             THE COURT:  Are there persons who are not affiliated

22   with Apollo who have any ownership interest in Apollo

23   Management VI?

24             THE WITNESS:  Your Honor, you're getting into a very

25   technical level, which I believe also has changed over time

JcaWras2                          Becker - Cross

1    given Apollo's a public company.  I don't think I'm the best

2    person to really give an answer to that.

3              THE COURT:  OK.  And what does Apollo Management VI do

4    as distinguished from Apollo Investment Fund VI?

5              THE WITNESS:  Again, your Honor, you're getting into a

6    level of technicality that I'm not necessarily the best person

7    to answer, but there's the -- the, the fund is the investment

8    fund and the management company is the G -- is the GP.

9              THE COURT:  OK.  Thank you.  I think you've answered

10   it.

11             Go ahead.

12             MR. KEHOE:  May I just ask a follow-up question or

13   two?

14             THE COURT:  Just put a question.

15             MR. KEHOE:  Yes.

16             THE COURT:  We'll see where it goes.

17   BY MR. KEHOE:

18   Q.  Mr. Becker, Apollo Management VI is a subsidiary of Apollo

19   Global Management LLC, isn't it?

20   A.  I can't -- I don't have an org chart in front of me, so I

21   can't specifically answer that question.

22   Q.  But when you were working on Fund VI, you were working as

23   part of the Apollo Management team for Fund VI, weren't you?

24   A.  I'm not sure I -- can you clarify the question, please?

25   Q.  Absolutely.

JcaWras2                         Becker - Cross

            When you were working on Fund VI, be it for a
portfolio company such as Realogy or any other part of the
fund, when you were working on Fund VI, you were working for
Apollo Management VI, which was managing Fund VI, right?
A.   I'm not sure I understood the technicality of working for,
but I worked -- yeah, I worked under the umbrella of Apollo
Management VI.
Q.   And the Apollo Management people were Apollo employees,
weren't they?
A.   Correct.
Q.   So when we talk about Apollo Management managing it,
managing the fund, we have the fund as an independent
investment vehicle with portfolio companies, etc., and the
folks at Apollo actually doing the day-to-day management of
that fund, right?
A.   Correct.
Q.   For which the management agreement before you provides for
a fee, a percentage fee, for Apollo Management.  Isn't that
right?
A.   Correct.
Q.   And that's how they get paid for doing all of this managing
for Fund VI or any other fund that Apollo is managing, right?
A.   It's one of the ways we get paid.
Q.   And do you recall what the percentage of the assets of the
fund that Apollo Management VI was paid on a year-to-year

JcaWras2                          Becker - Cross

1   basis?

2   A.  My recollection is around 1-1/2 percent, but not exactly.

3   Q.  And that would be 1-1/2 percent of what?

4   A.  Of the assets under management.

5   Q.  So if there was -- I think you said there was 8 billion --

6   how many billion in assets were in VI?  I apologize.  I don't

7   recall what you said.

8   A.  I thought I said 10 to 12 billion.

9   Q.  I'm sorry?

10  A.  I thought I said 12 billion --

11  Q.  OK.

12  A.  -- but it's approximate.

13  Q.  Whatever.

14      So they were getting a percentage on a yearly basis of the

15  12 billion that was in Fund VI?

16  A.  Correct.

17  Q.  Now, and it was from that that these expenses that are in

18  7.1 have to be absorbed by management, right?

19  A.  Certain expenses were.

20  Q.  Well, the expenses that we have set forth in the agreement,

21  in 7.1 of Plaintiff's Exhibit 152, are the expenses that Apollo

22  Management is supposed to be paid, right?

23  A.  Sorry.  I was reading.  Please repeat the question.

24  Q.  I'm sorry?

25  A.  I said I was reading.

JcaWras2                        Becker - Cross

1   Q.  No, no.  If you ever want to stop and read --

2              THE COURT:  Enough.  Put the question.

3              MR. KEHOE:  Could I repeat the question back again?

4              THE COURT:  No.  Put a new question to the witness.

5   BY MR. KEHOE:

6   Q.  The expenses that are in 7.1 are supposed to be paid by

7   Apollo Management out of the money they receive from the fund

8   on a yearly basis.  Is that not correct?

9   A.  I'm not sure where exactly the money comes from, but

10  there's a money -- we did get a manage fee.  That's correct.

11  Q.  And it's clear to you that the expenses in 7.1 are

12  management expenses and neither fund nor portfolio expenses?

13  A.  As written.

14  Q.  As written in the document.

15              Now, if we turn, if we just stay with that, we have

16  something different, called organizational and operational

17  expenses, which is in 7.2:  The partnership shall bear and be

18  charged --

19      By the way, before I move to 7.2, just staying with your

20  affidavit and 7.1, (d) says, Except to the extent applied

21  against special fees, all costs and expenses incurred in

22  developing, negotiating, or structuring any authorized

23  investment in which the partnership does not actually invest,

24  the management company also picks up those expenses.  Is that

25  right?

JcaWras2                          Becker - Cross

1   A.  Can you -- I don't -- I don't understand.  Can you please

2   repeat -- clarify the question.

3   Q.  Sure.  If the fund is negotiating to purchase another

4   portfolio company and that portfolio -- that deal falls

5   through, all the expenses incurred in the deal that didn't go

6   through are borne by the management company, isn't that right?

7            MR. CARLSON:  Objection to the form of the question,

8   your Honor.

9            THE COURT:  I'll allow it.

10            Do you understand the question?

11            THE WITNESS:  I do not, because he's referring to (d),

12   and (d) is if --

13            THE COURT:  All right.  Rephrase it, please.

14            MR. KEHOE:  OK.

15   Q.  Take a look at (d), and if you need some time to look at

16   it, in (d) we're talking about expenses when an actual deal

17   falls through, right; when the partnership doesn't actually

18   invest?  Right?

19   A.  Correct.

20   Q.  OK.  So Mr. Rashid, part of his job was to go out, not only

21   meet but also examine other potential investments for the fund,

22   right?

23   A.  That's part of the scope of his job, correct.

24   Q.  Part of the scope of the job.

25        Now, this particular provision maintains that expenses that

JcaWras2                        Becker - Cross

1  are incurred in looking after an investment that doesn't take

2  place, those expenses are borne by the management company and

3  not the fund, correct?

4  A.  With respect to looking for new deals away from a portfolio

5  company.

6  Q.  I'm sorry?

7  A.  For looking -- I think -- assuming you're referring to

8  deals away from a portfolio company.

9  Q.  I'm talking about new deals, sir.

10      If you have a fund, a fund is looking, always looking for

11  potential deals with portfolio companies, are they not?

12  A.  For new portfolio companies.

13  Q.  For new portfolio companies.  And that's, in fact, how Fund

14  VI got involved with Realogy back in 2007, right?

15  A.  Correct.

16  Q.  And now you have Mr. Rashid, and part of his job is to go

17  out and look for potential purchases in portfolio companies for

18  which -- is that right?

19  A.  You said in portfolio companies, which implies that it's

20  existing portfolio companies.  For new portfolio companies.

21  Q.  I stand corrected.  You're absolutely right, Mr. Becker.

22      For new portfolio companies for the fund, right?

23  A.  Yes.

24  Q.  And that, of course, was part of his job?

25  A.  Part of his job.

JcaWras2                        Becker - Cross

1    Q.  So when there are expenses incurred in looking for a new

2    investment in a portfolio company and the investment doesn't

3    finalize, isn't completed, the expenses for that matter that

4    doesn't, for which the fund doesn't actually invest, those

5    expenses are borne by the management company, right?

6    A.  Yes.  But just to clarify, there are instances where we're

7    looking at deals where the target will reimburse us as well.

8    Q.  Well, that would be a side deal, would it not?

9    A.  Yes.

10   Q.  But that is certainly not what Fund VI that you worked on

11   said, did it?

12   A.  I'm just clarifying there are times when we incur expenses

13   that are borne by firms other than Apollo.

14   Q.  And what instances are you talking about?

15   A.  You'd be looking at making an acquisition in order to

16   enhance the likelihood that we want to pursue the acquisition,

17   the target may say they'll share expenses.

18   Q.  Understood.  But according to the terms of this agreement,

19   when you look at a portfolio company, you're trying to look at

20   a new portfolio company and Apollo or the management company

21   has expenses in that, if it falls through, the management

22   company pays those expenses, right?

23   A.  Yes.

24   Q.  Now, turning to paragraph 7.2, this is organizational and

25   operating expenses:  The partnership shall bear and be charged

JcaWras2                       Becker - Cross

1   all costs and expenses other than placement fees, which shall

2   be borne by the general partner as provided in section 7.4,

3   pertaining to the offering and sale of limited partnership

4   interests to prospective limited partners and the organization

5   of the partnership and the general partnership.

6       Now, that contrasts with the management company, does it

7   not; *i.e.*, those expenses for selling limited partnerships,

8   those are borne by the actual partnership itself.  Right?

9   A.  This is not a paragraph I've read in quite some time, nor

10  am I an expert on this.  Would you like me to read the --

11  Q.  Mr. Becker, please do, and if at any point, I think with

12  the Court's approval, if you need a second to read something,

13  please take your time.

14      THE COURT:  I don't want to speak for the Court,

15  Judge.

16      Yes, sir.

17      THE COURT:  You can read the document.

18  A.  Can you repeat the question?

19      THE WITNESS:  Your Honor, I just want to state I'm not

20  an attorney, nor is this something I personally ever had to

21  interact with.

22  BY MR. KEHOE:

23  Q.  Mr. Becker, I understand.  I'm just referring you to -- you

24  refer to paragraph, that this paragraph, excuse me, section 7

25  in your declaration, so therein lies the question.

JcaWras2                        Becker - Cross

1           THE COURT:  Mr. Kehoe, this is not a debate.

2           MR. KEHOE:  Yes, your Honor.

3           THE COURT:  And that was not a question.

4           MR. KEHOE:  Yes, your Honor.

5  Q.  The question with regard to 7.2 is when it comes to costs

6  and expenses pertaining to the offering and sale of limited

7  partnership interest to prospective limited partners and the

8  organization of the partnership and the general partner, those

9  expenses are being paid by the partnership itself and not the

10 management company.  Is that right?

11 A.  According to my read of this document, other than subject

12 to certain expense caps, there seems to be a portion of this

13 paid by the fund.

14 Q.  It's paid by the fund when it comes to selling general --

15 the partnerships in the fund?

16 A.  Based on my read, my novice read of the document.

17 Q.  Now I'm going to shift gears here a moment, sir, and move

18 back to your affidavit, where we talk about -- I'm referring to

19 paragraphs 6 and 7 with regard to allocation of expenses.

20          When was your understanding, with regard to paragraph

21 6, when was your understanding that the travel and expense

22 sheets had to be allocated with some specificity, as you say in

23 paragraph 6?

24 A.  As far as I can remember, we had to allocate expenses with

25 specificity.

JcaWras2                        Becker - Cross

1   Q.  Well, with regard to those allocation expenses, where did

2   your knowledge on how to allocate those expenses come from?

3   A.  Just my general knowledge.  I've been at the firm for 24

4   years.

5   Q.  Does any of that knowledge come from Exhibit 152, paragraph

6   7.1, which you cite in your declaration at paragraph 7?

7   A.  That is definitely a reference document, but as I said, I

8   didn't go and read the document every day and refer to it.  It

9   was just my general knowledge to allocate expenses.

10  Q.  Well, you do know that there were a series of

11  travel-and-expense policy documents within Apollo, is that

12  right?

13  A.  Over the years, correct.

14  Q.  Well, did the travel-and-expense policy in 2009 and 2011

15  require that expenses be allocated with specificity?

16  A.  I have no recollection what the specific policy was way

17  back then.

18  Q.  I mean, did you know that the 2009 travel-and-expense

19  policy did not require allocation?

20         MR. CARLSON:  Objection, your Honor.  If he's going to

21  refer to a document, can he be shown the document?

22         THE COURT:  I think that's reasonable.

23         First of all, can you answer it without regard to the

24  document?

25         THE WITNESS:  If he repeat the question, I can let you

JcaWras2                          Becker - Cross

1   know my answer.

2              THE COURT:  OK.  Why don't you repeat the question,

3   Mr. Kehoe.

4   BY MR. KEHOE:

5   Q.  Are you aware that the policy from 2009 did not require

6   allocation of expenses?

7              MR. CARLSON:  Your Honor, objection.  Assumes facts

8   not in evidence.

9              THE COURT:  I don't understand that objection.  Facts

10  are not in evidence until they're elicited through a witness,

11  so I don't understand the objection.

12             Go ahead.  You may answer if you understand the

13  question.

14  A.  I have no recollection of the expense -- specific expense

15  policy from nine years ago.

16  Q.  And how about the one in 2011; do you have any recollection

17  as to what the allocation requirements, if any, were in the

18  2011 travel-and-expense policy?

19  A.  I can't tell you the specifics on it.

20  Q.  Well, how about did the 2011 policy require allocation of

21  expenses with specificity?

22             MR. CARLSON:  Objection, your Honor.  Asked and

23  answered.

24             THE COURT:  If you know.  If you know.

25  A.  I can't tell you the specifics of the policy.  I can tell

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

JcaWras2                        Becker - Cross

1    you how it operated.

2    Q.  Now, you talk about the expenses themselves in paragraphs 6

3    and 7.  Now, with the expenses that you have that you are

4    talking about here, does that include gifts for clients?

5    A.  I don't understand the question.

6    Q.  If you look at paragraphs 6 and 7, and I don't want to read

7    it word for word, if you stay with six and we talk about the

8    expenses that have to be allocated, did you and people in

9    Apollo, you and others, ask for reimbursement for gifts to

10   clients?

11   A.  I don't have any recollection of giving gifts to the

12   clients personally.

13   Q.  Do you have any knowledge whether or not if, in fact, a

14   gift was made to the client, it was, in fact, a reimbursable

15   expense?

16            THE COURT:  Can you be more specific when you refer to

17   client.

18   BY MR. KEHOE:

19   Q.  If a gift is being made by you or someone working in Fund

20   VI, the management company for Fund VI, to say management and

21   the portfolio company, one of the portfolio companies in Fund

22   VI, would it be fair to say that you could seek reimbursement

23   for the amount of that gift as a business expense?

24   A.  I didn't give gifts, so I can't really say.

25   Q.  Well, do you have any idea if it was common -- well, take

JcaWras2                         Becker - Cross

1    away common knowledge.

2        Do you have any idea if others in the firm, other partners

3    in the firm gave gifts for which they sought reimbursement?

4    A.  With the exception of holiday baskets sent to our portfolio

5    companies, I wasn't aware of any gifts that were given.

6    Q.  Let's stay with holiday baskets.  So holiday baskets were

7    sent to individual portfolio companies by Apollo, right?

8    A.  That was -- that occurred, correct.

9    Q.  And was that a proper business expense within Apollo?

10   A.  I'm not sure what you mean by the word "proper."

11   Q.  Was it a business expense within Apollo to put these

12   holiday baskets together that you again gave out to, for

13   instance, management in portfolio companies?

14       THE COURT:  I think you're looking for the word,

15   perhaps, "reimbursable."

16       MR. KEHOE:  Reimbursable.  Thank you, your Honor.

17   A.  We weren't personally charging them, so we didn't need to

18   be reimbursed.

19   Q.  Well, I'm talking about reimbursement from Apollo

20   Management.  If you and other individuals in Apollo Management

21   were sending holiday baskets to portfolio executives, portfolio

22   company executives, would that expense be reimbursable to the

23   individuals in Apollo Management who were making those

24   expenses?

25   A.  I'm not an expert on that policy, so you'd have to ask

JcaWras2                          Becker - Cross

1    someone else.

2    Q.  But you never did that?

3    A.  I never did what?

4    Q.  You never sent gifts out to portfolio management, holiday

5    baskets, or anything else?

6    A.  As I said, the firm as a whole would send holiday baskets

7    to our portfolio companies.  I personally didn't make that

8    decision.  It was a, it was a general gift.

9    Q.  Now, let us just shift a little bit towards your balance of

10   the matters concerning filling out business expenses.

11        Now, at the top of page 3, in paragraph 6, you say that,

12   During the relevant period, I typically asked my administrative

13   assistant to enter appropriate allocation codes into

14   travel-and-expense system based on descriptions of the purpose

15   and circumstance of the expense, I would ordinarily provide,

16   unless my assistant otherwise knew what the purpose of the

17   circumstances were.

18            So, in instances when you were putting in an expense

19   reimbursement voucher, sometimes you gave information to your

20   administrative assistant and sometimes you relied on her to

21   fill it out, right?

22   A.  Correct.

23   Q.  And after the -- well, let me ask you.  During your -- how

24   many years were you at Apollo?  Pardon me.  I know you answered

25   that question.  How many years have you been at Apollo?

JcaWras2                        Becker - Cross

1    A.  Close to 24 years.

2    Q.  In the 24 years that you have been there, have the

3    administrative assistants made any mistakes?

4              THE COURT:  Just in general any mistakes?  That's

5    sustained.

6              MR. KEHOE:  Just in general.

7              THE COURT:  That's sustained, as to any mistakes.

8              MR. KEHOE:  As to any mistakes with regard to

9    expenses.

10             THE COURT:  Excuse me, sir.  The objection was

11   sustained.  Next question.  Rephrase your question.

12             MR. KEHOE:  Yes, your Honor.

13   Q.  Did your administrative assistant make any mistakes with

14   regard to your expense reimbursement submissions?

15   A.  I can't think of any specific items.  I'm sure over the

16   course of the years there have been some mistakes that have

17   been made.

18   Q.  And in large part, that was because after the initial

19   expense voucher was put together by your assistant, certainly

20   in the early part of the relevant period, you never saw that

21   expense voucher before it was handed in to the Apollo back

22   office for processing, did you?

23   A.  If you could please clarify the question?  You seem to be

24   referring to something very specific, and I don't really

25   understand what you're talking about.

1   Q.  I'm just talking about the reimbursement, reimbursement for

2   expenses.

3        When your assistant filled out the reimbursement

4   travel-and-expense form, you never saw it again before it was

5   given to the back office for processing, did you?

6   A.  That's not true.

7   Q.  You saw it?  How -- did you see it?

8   A.  Correct.

9   Q.  How often did you see it?

10  A.  I'd say, I mean, my recollection is I'd see it in almost

11  every instance before it went to the back office.

12  Q.  And every instance you checked every item that was in

13  there?

14  A.  It was typically handed to me for clarifying questions.

15  Q.  And did you find mistakes?

16  A.  Yes.

17  Q.  And how often did that happen?

18  A.  From time to time.

19  Q.  And there were instances where you maintain that you don't

20  even talk to your assistant if your assistant knew what the

21  purpose and circumstances of the expense were, right?

22  A.  Can you be more specific on the question?

23  Q.  I'm just looking, I'm reading from your declaration,

24  paragraph 6.

25  A.  Yes, but that's referring to certain expenses where she

JcaWras2                          Becker - Cross

1    didn't need to ask me what they were for because it was clear

2    and obvious what they were for.

3    Q.  During the course of your 24 years and your busy schedule,

4    you relied on your assistants to put these travel-and-expense

5    vouchers together properly, didn't you?

6    A.  I relied on their assistance in it, correct.

7    Q.  Now, you note in paragraph 8, In my experience, compliance

8    with the travel-and-expense policies was considered important

9    during the relevant period, and it is today.  That's the first

10   sentence of paragraph 9.

11          Now, when Mr. Rashid was suspended on July the 1st of

12   2013, did anyone in Apollo tell any of the investors in any of

13   the funds that Mr. Rashid had been suspended?

14   A.  I'm not personally aware of what conversations happened.

15   Q.  Is that likewise true for the portfolio companies?  Is it

16   not so that none of the portfolio companies were advised that

17   Mr. Rashid was suspended?  Were they?

18   A.  I'm not aware of what all the portfolio companies were

19   told.

20   Q.  Well, you were, in fact, on the board at Realogy, weren't

21   you?

22          THE COURT:  Let me ask you, how is this line of

23   questioning relevant to anything?

24          MR. KEHOE:  Materiality, Judge.

25          THE COURT:  How does it relate to materiality?

JcaWras2                        Becker - Cross

1          MR. KEHOE:  Because anything that happened with these

2     expenses was just immaterial.  It was completely immaterial to

3     Apollo.  It's completely immaterial when you're looking to the

4     particular numbers.

5          THE COURT:  You're asking a question of whether

6     Mr. Rashid's suspension on or about July 1 was reported to

7     portfolio companies.  Isn't that what you're inquiring?

8          MR. KEHOE:  Yes, your Honor.

9          THE COURT:  And I still don't understand how that is

10    relevant to the materiality of an allegedly improper charge to

11    a fund.

12         MR. KEHOE:  If, in fact, the position of the SEC is

13    that the investor would want to know about that information, it

14    is.  It goes to materiality, and in this instance --

15         THE COURT:  The portfolio companies, correct me if I'm

16    wrong, are not investors.  Am I correct?

17         MR. KEHOE:  Well, some limited partnerships are,

18    but --

19         THE COURT:  No.  The portfolio companies are the

20    investment that is made in the fund, not the investor in the

21    fund, correct?

22         MR. KEHOE:  Absolutely.

23         THE COURT:  All right.  So my question stands.  How is

24    this line of inquiry relevant to anything?

25         MR. KEHOE:  Well, putting aside Realogy, and let's

JcaWras2                         Becker - Cross

1    talk about the individual investors.

2              THE COURT:  Mr. Kehoe, I'm only asking about the

3    question you asked.

4              MR. KEHOE:  Understood.

5              THE COURT:  I'm not asking about some other question

6    you didn't ask.

7              MR. KEHOE:  Understood, Judge.

8              THE COURT:  I'm sustaining an objection to the

9    question.

10             Next question.

11             MR. KEHOE:  Thank you, your Honor.

12   Q.  You're working in Apollo Management VI.  Were any of the

13   investors in Apollo Management VI advised that Mr. Rashid had

14   been suspended on July the 1st of 2013?

15   A.  All I can say is I did not have any conversations with any

16   investors.

17   Q.  Do you know of anybody in Apollo that had conversations

18   with investors in Fund VI that you were working that Mr. Rashid

19   had been suspended?

20   A.  I'm not personally aware.

21   Q.  Do you know if Apollo advised anybody, any of the

22   investors, about any of the issues concerning Mr. Rashid's

23   expenses?

24   A.  I'm not aware.

25   Q.  Now, you do know, as a, and I'm talking about the

JcaWras2                         Becker - Cross

1   importance of this, in paragraph 8, about the compliance with

2   T&E policies.  You do know that there was an SEC investigation.

3   You do know that, going on through 2014, '15 and '16?

4   A.  I was aware there was an SEC investigation.  I think you're

5   referring to on Apollo.

6   Q.  Yes.

7   A.  Yes.

8   Q.  And you're aware that there was, in fact, a settlement with

9   the SEC?

10  A.  I'm aware there was a settlement, yes.

11  Q.  And do you recall that the date of that settlement was

12  August the 23rd of 2016?

13  A.  I have no recollection of the details of that.

14  Q.  Well, isn't it a fact that after that announcement of the

15  settlement, that Apollo's stock did not go down?

16          MR. CARLSON:  Objection as to relevance, your Honor.

17          MR. KEHOE:  Materiality.

18  A.  If I don't know the date, I obviously --

19          THE COURT:  No.  I'm sustaining the objection.

20          MR. KEHOE:  May I rephrase the question, Judge?  Or is

21  it --

22          THE COURT:  It's not an objection as to form.  It's an

23  objection on the grounds stated, that any settlement between an

24  Apollo entity and the SEC is not relevant to the materiality of

25  any actions taken by Mr. Rashid.

JcaWras2                          Becker - Cross

1              MR. KEHOE:  So the question, if I ask the question

2      that after --

3              THE COURT:  No, no.  If you want to put another

4      question --

5              MR. KEHOE:  Yes, your Honor.

6              THE COURT:  We'll see what will happen.

7              Just so we understand each other --

8              MR. KEHOE:  Yes, your Honor.

9              THE COURT:  -- you ask questions, I rule on them.

10             MR. KEHOE:  Yes, your Honor.

11     Q.  Part of the settlement included a lack of supervision of

12     Mr. Rashid.  Is that not correct?

13             MR. CARLSON:  Same objection, as to materiality, your

14     Honor.

15             THE COURT:  I'll allow that question.

16     A.  I'm not aware of the details of the settlement.

17     Q.  But isn't it a fact that after the settlement the stock

18     price, you being a partner there or working there for 23 years,

19     the stock price in Apollo did not go down; it went up, didn't

20     it?

21             MR. CARLSON:  Objection as to materiality and

22     relevancy, your Honor.

23             THE COURT:  The objection as to materiality, I don't

24     get.  I'm going to allow the question.

25             THE WITNESS:  Your Honor, I just stated that I didn't

JcaWras2                         Becker – Redirect

1   know when the settlement was, so obviously I cannot give an

2   answer with respect to what the stock price was before and

3   after.

4           THE COURT:  Thank you.

5           MR. KEHOE:  May I have a moment, your Honor?

6           THE COURT:  You may.

7           MR. KEHOE:  Mr. Becker, thank you very much.  I have

8   no further questions.

9           THE COURT:  All right.  Any redirect?

10          MR. CARLSON:  Very briefly, your Honor.

11  REDIRECT EXAMINATION

12  BY MR. CARLSON:

13  Q.  Mr. Becker, you were speaking with counsel about times when

14  you reviewed your expense reports.  Do you recall that

15  testimony?

16  A.  Correct.

17  Q.  And Mr. Kehoe asked you if there were ever times where you

18  found mistakes made by your assistant.  Do you recall that?

19  A.  He referred to a lot of mistakes.  I can't specifically

20  remember what he was referring to at this point.

21  Q.  That's my question, sir.

22          How often were these mistakes that you identified that your

23  assistant had performed in creating the expense reports when

24  you were reviewing them?

25  A.  Every once in a while, I'd have to clarify something on the

JcaWras2                              Becker - Redirect

1    sheet that was being submitted.

2              THE COURT:  Well, that's what I don't understand.  I'm

3    lost.

4              If you put in an expense report or authorized your

5    assistant to put in an expense report, and it's transmitted,

6    and there's an error on it, is that what you would call a

7    mistake?

8              THE WITNESS:  To clarify, your Honor, talking very

9    generally, I've been at the firm for 24 years, but generally

10   speaking, the assistants prepare an expense --

11             THE COURT:  I'm going to get to that.  That's

12   precisely where I'm going.

13             As I understand it, the assistants -- is this your

14   practice, that your assistant prepares a draft of an expense

15   report?

16             THE WITNESS:  Yes.

17             THE COURT:  OK.  Now, is a draft of an expense report,

18   in your mind, the same thing as the final expense report?

19             THE WITNESS:  No.

20             THE COURT:  So if an assistant has a question mark on

21   a draft or a question to you on a draft or a supposed reason

22   for an expense, and the assistant is not correct, is that an

23   error in your expense report, or is that the process of

24   drafting?

25             THE WITNESS:  That's the process of drafting.

JcaWras2                          Kelly - Direct

1                    THE COURT:  All right.  Thank you.

2              Next question.

3                    MR. CARLSON:  Your Honor predicted my line of

4    questioning there.

5    Q.  The mistakes that you identified that you testified about,

6    were those mistakes corrected prior to submitting those

7    reports?

8    A.  Yes.

9    Q.  And whose responsibility was it for getting the expense

10   reports right?

11   A.  Ultimately, it was my responsibility.

12                   MR. KEHOE:  Your Honor, one moment?

13                   No further questions for this witness, your Honor.

14                   THE COURT:  All right.  Mr. Becker, you may step down.

15                   (Witness excused)

16                   THE COURT:  Call your next witness.

17                   MR. CARLSON:  Your Honor, the SEC calls Martin Kelly.

18                   THE COURT:  The lawyers should collect their exhibits

19   from the witness stand, please.

20   MARTIN KELLY,

21        called as a witness by the Plaintiff,

22        having been duly sworn, testified as follows:

23                   THE COURT:  You may inquire.

24   DIRECT EXAMINATION

25   BY MR. CARLSON:

JcaWras2                          Kelly - Direct

1   Q.  Good morning, Mr. Kelly.

2   A.  Good morning.

3   Q.  In conjunction with this trial, you previously signed a

4   declaration setting forth the narrative of your direct

5   testimony in this case, correct?

6   A.  Correct.

7   Q.  Let me provide you with a copy of that as well as the Court

8   and clerk.

9          Mr. Kelly, let me point you to your direct testimony

10  declaration.  You had a chance to look over that?

11  A.  Yes, I did, last week.

12  Q.  Are there any errors in that declaration?

13  A.  No.

14  Q.  Are there any corrections in that declaration that you'd

15  like to make?

16  A.  No.  We picked up a typo or two, but nothing substantive.

17  Q.  Where is that typo, sir?

18  A.  I'd need to read it.  I'm sorry.

19  Q.  Sorry?

20  A.  I would need to read it.  I'm sorry.  I can do that if you

21  wish.

22          THE COURT:  The witness said I can point it out to you

23  if you wish.

24          MR. CARLSON:  I'm sorry.

25          THE COURT:  Do you want him to do that, sir?

JcaWras2                         Kelly - Direct

1            MR. CARLSON:  Yes.

2    Q.  Mr. Kelly, could you point that out, please?  I believe

3    you're reading it.

4    A.  Right.  I just need a minute to find the reference.

5            I'm sorry.  I can't locate it.  There were two

6    declarations.  It may have been the other one.

7        Can I consult my lawyers?  It really wasn't substantive.

8    Q.  Sir, I'm going to show you your rebuttal declaration as

9    well.  Perhaps that's what you're referring to.

10   A.  Yeah, that may be it.  Yes.

11   Q.  But the declaration that you have in front of you, sir, you

12   don't see any errors or corrections that need to be made in

13   that one?

14   A.  Correct.

15   Q.  And so, you also reference a document in that declaration,

16   in paragraph 11, and it's referred to as Apollo Investment Fund

17   VII limited partnership agreement.  Do you see that?

18           THE COURT:  You're moving for the admission of the

19   documents which are referred to in the declaration, which are

20   PX150, 151, 152, 154 and 155, is that correct?

21           MR. CARLSON:  I think it's actually -- I think I might

22   have given your Honor too many exhibits for this witness.  I

23   think it's just PX154, your Honor.

24           THE COURT:  All right.  I think you did also.

25           You're moving the admission of PX154, is that correct?

JcaWras2                          Kelly - Direct

1              MR. CARLSON:  Yes, your Honor.

2              THE COURT:  Any objection?

3              MR. KEHOE:  No objection, Judge.

4              THE COURT:  All right.  Received.

5              (Plaintiff's Exhibit 154 received in evidence)

6              THE COURT:  And the number of the declaration is PX

7    what?

8              MR. CARLSON:  302, your Honor.

9              THE COURT:  And you're moving for the admission of

10   that, is that correct?

11             MR. CARLSON:  Yes, your Honor.

12             THE COURT:  Any objection?

13             MR. KEHOE:  No objection.

14             THE COURT:  Received.

15             Next question.

16             (Plaintiff's Exhibit 302 received in evidence)

17   BY MR. CARLSON:

18   Q.  Mr. Kelly, I'm showing you your rebuttal declaration in

19   this case.  Can you take a quick look at that?

20   A.  Yes.

21   Q.  Are there any errors or corrections in this rebuttal

22   declaration?

23   A.  Yeah, the typo is here.  The only error in this is the

24   start date of my employment, which is the second-to-last line

25   on page 1, which references 2013.  The correct date is 2012.

JcaWras2                          Kelly - Cross

1        THE COURT:  All right.  And this is plaintiff's

2   exhibit what number?

3        MR. CARLSON:  I believe this is 303, your Honor.

4        THE COURT:  303, and you're moving it into evidence.

5        MR. CARLSON:  Yes, your Honor.

6        THE COURT:  Any objection?

7        MR. KEHOE:  No objection.

8        THE COURT:  Received.

9        (Plaintiff's Exhibit 303 received in evidence)

10       MR. CARLSON:  Tender for cross, your Honor.

11       THE COURT:  All right.

12       Mr. Kehoe.

13       MR. KEHOE:  Yes, your Honor.  Thank you.

14  CROSS-EXAMINATION

15  BY MR. KEHOE:

16  Q.  Good afternoon, Mr. Kelly.  My name is Greg Kehoe.  I don't

17  think we've ever had the pleasure.

18  A.  Good afternoon.

19  Q.  I'm going to ask you these questions based on your

20  declaration.

21       THE COURT:  Just put the questions to the witness.

22       MR. KEHOE:  Yes, your Honor.

23       THE COURT:  Put a question to the witness.

24  BY MR. KEHOE:

25  Q.  In paragraph 6 you talk about -- one, two, three, four,

JcaWras2                          Kelly - Cross

1    five -- five funds that, during the operative time frame,

2    Apollo had under management or advised these private equity

3    funds, is that right?

4    A.  I, I -- yes, I can see that reference.

5    Q.  OK.

6    A.  Yes, at the time that was right.

7    Q.  And I think that you just put, I believe that you put the

8    management agreement for 154, PX154, into evidence, which is

9    the management agreement for Fund VII, is that right?

10   A.  I can reference Fund VII.  I don't, I don't know what 154

11   refers to, but --

12   Q.  Let me show you, in addition -- do you have that document,

13   154, before you?

14   A.  Yes.

15   Q.  You can look at that.

16        MR. KEHOE:  Judge, do you mind if I question just from

17   here?  It might be a little easier.

18        THE COURT:  Just give him the documents and you can

19   return to the podium.

20        MR. KEHOE:  Just trying to get the numbers, actually,

21   aligned.

22   Q.  Now, you have the documents for Fund III, which is Exhibit

23   150, is that right?

24   A.  Yes.

25        MR. KEHOE:  Your Honor, at this time we'll move

JcaWras2                        Kelly - Cross

1   plaintiff's 150 into evidence.

2            THE COURT:  Any objection?

3            MR. CARLSON:  No, your Honor.

4            THE COURT:  Received.

5            (Plaintiff's Exhibit 150 received in evidence)

6   BY MR. KEHOE:

7   Q.  Do you have the documents for Fund VII, the management

8   agreement, which is plaintiff's 185?  In the stack to your

9   right hand, in those manila envelopes, do you have Fund V

10  designated as Exhibit 185, plaintiff's 185?

11       Let me help you.

12  A.  No.  I can see it.

13       155.  I'm sorry.

14  Q.  Oh, I stand corrected.  155.

15  A.  Actually, no.  That's the natural resources fund.  It's

16  151.  Fund V is 151.

17  Q.  151?

18  A.  Yup.

19  Q.  And which is that one?

20  A.  PX151.

21  Q.  Is which fund?

22  A.  Fund V.

23            MR. KEHOE:  Your Honor, at this time we'll offer into

24  evidence the management agreement for Fund V.

25            THE COURT:  You're offering PX151.

JcaWras2                    Kelly - Cross

1           MR. KEHOE:  Yes.

2           THE COURT:  Is that what you're offering?

3           MR. KEHOE:  Yes, your Honor.

4           THE COURT:  Any objection?

5           MR. CARLSON:  No, your Honor.

6           THE COURT:  Received.

7           (Plaintiff's Exhibit 151 received in evidence)

8   BY MR. KEHOE:

9   Q.  And you have Fund VI there, which is 152?

10  A.  Yes.

11  Q.  And that's the management agreement for Fund VI, is that

12  right?

13  A.  It's the -- yeah, right, it's the LPA.

14          MR. KEHOE:  Your Honor, at this time we'll offer into

15  evidence Plaintiff's Exhibit 152.

16          THE COURT:  Any objection?

17          MR. CARLSON:  No, your Honor.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 152 received in evidence)

20  BY MR. KEHOE:

21  Q.  And I turn your attention to, I believe it is Plaintiff's

22  Exhibit 155, the limited partnership for Apollo Natural

23  Resource Partners LLP.  See that, sir?

24  A.  Yes.

25  Q.  And you have that management agreement before you?

JcaWras2                        Kelly - Cross

1    A.  Yes, I have the LPA.  Yes.

2            MR. KEHOE:  Your Honor, at this time we'll offer into

3    evidence Plaintiff's Exhibit 155.

4            THE COURT:  Any objection?

5            MR. CARLSON:  No, your Honor.

6            THE COURT:  Received.

7            (Plaintiff's Exhibit 155 received in evidence)

8    BY MR. KEHOE:

9    Q.  Now, of these management agreements -- your declaration

10   notes that you came to Apollo as the CFO in September of 2012.

11   Is that right?

12   A.  Yes.

13   Q.  And all of these other funds that you have noted -- let's

14   go through them.  Apollo Fund III, that was formed in 2005 --

15   1995; Apollo Fund V, 2000; Apollo Investment Fund VI, 2005; and

16   Apollo Fund VII in 2007.

17       All of those funds came into existence before you became

18   the CFO, right?

19   A.  Correct.

20   Q.  The only one in this list in your declaration, on page 2 at

21   paragraph 6, that came into existence when you were there is

22   this, I believe it's 155, this limited partnership agreement

23   for Apollo Natural Resource Partners, and that is dated October

24   29, 2013?

25   A.  That's correct.

JcaWras2                    Kelly - Cross

1   Q.  OK.  Now -- I may have misspoken.  These are all limited

2   partnership agreements, right?

3   A.  Correct.

4   Q.  Now, if we go through these, Fund III, that has assets

5   under management of approximately 1.5 billion.  Is that right?

6   A.  I don't recall.

7   Q.  Do you recall --

8   A.  It depends on, depends on at what time you're referring to.

9   Q.  I'm referring to when you came on.  When you came on in

10  2012, do you know what assets under management Apollo Fund III

11  had?

12  A.  No.

13  Q.  How about Fund V?

14  A.  No, I don't specifically recall.

15  Q.  How about Fund VI?

16  A.  Six was substantive.  I would estimate it was 5 billion,

17  give or take.

18  Q.  5 billion?

19  A.  Give or take.

20  Q.  How about Fund VII?

21  A.  Fund VII was then an active fund and also our largest fund,

22  so I -- I believe Fund VII at the time would have had a value

23  around $15 billion or greater.

24  Q.  15 billion?

25  A.  Correct.

JcaWras2                    Kelly - Cross

1    Q.  And when you came -- so in total, and this is a rough

2    estimate, Mr. Kelly.  When you came on the job in 2012,

3    approximately how many assets did Apollo have under management?

4    A.  In total, across our three businesses, around about $75

5    billion.

6    Q.  75 billion?

7    A.  Correct.

8    Q.  Now, when you look through these agreements and the

9    agreements that are before you, all of them, if you will, the

10   management -- excuse me.  The management company that's

11   referenced in this limited partnership is Apollo, is it not?

12   A.  There's different management entities, all of which fit

13   with our broad umbrella which I would call Apollo Global

14   Management.

15   Q.  And in these agreements, they each have designations, and

16   let's talk about all of the limited partnership agreements,

17   except Exhibit 155, and take a look through all of these

18   agreements.  And I ask you to take a look at paragraph 7.1 in

19   each of those documents and ask you whether or not that

20   language is virtually the same.  Could you do that for us?  And

21   I'll help you with finding the pagination.

22            THE COURT:  Do you want to make a representation in

23   that regard, sir?

24            MR. KEHOE:  I will do that, Judge.

25            THE COURT:  All right.  Any dispute?

JcaWras2                              Kelly - Cross

1          MR. CARLSON:  Your Honor, I think -- is he talking

2     about the limited partnership agreements or the actual

3     management agreements?  Because I'm not sure that we've seen

4     each and every management agreement.

5          THE COURT:  I think he's talking about the limited

6     partnership agreement.

7          MR. KEHOE:  And the management agreement.

8          THE COURT:  All right.

9          MR. KEHOE:  They're all one document.  There's only

10    one document.  This is it.

11         MR. CARLSON:  As to the LPs, that's fine.

12         The problem is I don't think all the LPs have sample

13    management agreements attached or appended to them.  As to the

14    management agreements, we're unable to stipulate.  As to the

15    language within the various LPs, I think that we can stipulate

16    to.

17         THE COURT:  All right.  They're in evidence, and they

18    speak for themselves.

19         Why don't you ask a question if you want to ask about

20    one of the documents.  And if you want to put in a submission

21    on whether the language is identical or not, the parties are

22    welcome to do that, but we don't need to take this witness's

23    time in examining that because the documents are in evidence.

24         MR. KEHOE:  Yes, your Honor.

25    Q.  Now, with regard to these documents, take a look at 7.1.

JCAHRAS3                      Kelly – Cross

1           THE COURT:  In which document?

2           MR. KEHOE:  In, let's just say, Exhibit 150.  If I can

3   just look at what document he has before him?

4   A.  I turned to the most recent, so I turned to 154, which is

5   Fund VII.

6   Q.  OK.

7   A.  And I'm looking at 7.1.

8           (Continued on next page)

JCAHRAS3                         Kelly - Cross

1    Q.  And if you turn to 7.1, which notes that it's talking about

2    administrative expenses and placement fees, right?

3    A.  Well, in the header it's administrative expenses.

4    Q.  And that's the one that notes that the management company

5    shall bear and be charged with the following costs and expenses

6    of the partnership activities, except to the extent applied

7    against special fees:  All costs and expenses, if incurred, in

8    developing, negotiating, and structuring portfolio investments.

9    That's a management company expense, right?

10   A.  Yeah, the reference to special fees is not evident in this

11   particular agreement, Fund VI.  But apart from that, it states

12   what you said, including that all costs and expenses, other

13   than broker-dealer expenses, if any, incurred in developing,

14   negotiating, and structuring portfolio investments --

15           THE COURT:  Slow down, please.

16   A.  Sure.  In developing, negotiating, and structuring

17   portfolio investments.

18   Q.  Be --

19   A.  And it continues, obviously.

20   Q.  I'm sorry.  I didn't mean to cut you off.

21   A.  And it continues, but we're referencing the same paragraph.

22   Q.  (b) notes all ordinary costs and expenses, if any, incurred

23   in monitoring portfolio investments.  That's a management

24   expense, right?

25   A.  It's an administrative expense, yes.

JCAHRAS3                          Kelly - Cross

1   Q.  It notes at the top of the page that the management company

2   shall bear and be charged with the following costs and

3   expenses.  So those costs and expenses, if any, incurred in

4   monitoring portfolio investments is a management company

5   expense, right?

6   A.  Yes, in this section, yes, it references that.

7            THE COURT:  All right.  Let me ask a question which

8   may be way too obvious.  But if an expense is, under this

9   Article 7.1, the expense of a management company, then by

10  definition it is not in any respect an expense of the fund, is

11  that correct?

12           THE WITNESS:  Your Honor, I think it actually depends.

13  There are instances where expenses incurred by the manager can

14  be allocated or charged back to the funds.

15           THE COURT:  Well, for example, breakup expenses on a

16  broken deal.  There's a broken deal.  That can be charged to

17  the fund under certain circumstances, right?

18           THE WITNESS:  Correct.

19           THE COURT:  If we're excluding broken deal expenses,

20  an expense which is allocable to the management company is an

21  expense that remains with the management company, and there is

22  not some other vehicle by which it is charged to the fund, is

23  that correct?

24           THE DEFENDANT:  I believe that's true -- and I'm

25  trying to answer your question -- unless there's a separate

JCAHRAS3                         Kelly - Cross

1   paragraph that permits that.  And these documents evolve with

2   time, so different funds allow for different costs to be

3   charged.  But if this is the paragraph and there's no

4   contravening paragraph, then that would be the case.

5           THE COURT:  Thank you very much.

6   BY MR. KEHOE:

7   Q.  So turning to 7.2, those are different from organizational

8   expenses, right?

9   A.  Yes.

10  Q.  And organizational such as offering limited partnerships

11  for sale, right?

12  A.  Yes.

13  Q.  And that is a fund expense, isn't it?

14  A.  In this case, yes.

15  Q.  Now, you said you came on in 2012, and the document that we

16  have in 155 is dated October 29, 2013.  If you could turn to

17  155.

18          Do you have that before you?  Can I help you out?

19  A.  No, I have it.

20  Q.  Let me just -- you got that one?

21  A.  155, yes.

22  Q.  155 is the limited partnership document for Apollo Natural

23  Resource Partners, right?

24  A.  Yes.

25  Q.  And this is October 29, 2013.  That was after Mr. Rashid

JCAHRAS3                      Kelly - Cross

1    had been suspended, wasn't it?

2    A.  I'm not aware of the actual suspension date of Mr. Rashid,

3    but I believe that to be correct.  I believe it was the summer

4    of 2013.

5    Q.  Now, if you can turn your attention to -- I'm going to give

6    this to you.  It's Bates stamp No. 3657, and it is expenses and

7    management fees, 7.1, 7.3.  It's 73, the bottom page.  I gave

8    you the Bates Stamp number, but it might be easier just to turn

9    to page 73.

10   A.  Right.

11   Q.  Do you have that?

12   A.  I do, operating expenses.

13   Q.  The language in 7.1 and 7.2 is very different from the

14   language that we were just looking at in the other limited

15   partnership agreements, isn't it?

16   A.  Well, I'd need to read it.  It's certainly a lot longer.

17   Q.  Well, if you can just take a look at -- if you can take a

18   look at Exhibit 155, 7.1.  7.1 is in fact shorter, isn't it?

19   A.  7.1 is shorter.  7.2 looks to be longer.

20   Q.  In 7.1 it says:  "Subject to Section 7.2, the general

21   partner and the management company shall pay all their own

22   operating and overhead cost without reimbursement from the

23   partnership."  7.2 says -- 7.2:  "The partnership and not the

24   general partner or the management company shall pay all other

25   costs and expenses arising in connection with the partnership

JCAHRAS3                        Kelly - Cross

1    operations, acquisitions, ownership, maintenance, and

2    monitoring of the portfolio investments."

3            Do you see that in paragraph 2?

4    A.  Yes, I do.

5    Q.  So in the prior agreement that we were looking at,

6    Exhibit 150, Exhibit 154, the monitoring costs were being paid

7    by the management company, but in this agreement from October

8    of 2013, the monitoring costs are being paid by the

9    partnership, isn't it?

10   A.  That's correct.

11   Q.  So in all of the agreements that you were talking about --

12   and I am talking about those in your affidavit at

13   paragraph 6 -- all of those funds, other than Natural Resources

14   and all of those funds, something like monitoring expenses was

15   a management expense, but when in October of 2013 Apollo

16   executed the Natural Resources deal in 155, those expenses now

17   become partnership expenses, right?

18   A.  Yes, subject to limitations and specific definitions of

19   what costs are eligible or appropriate.

20   Q.  Now, throughout your career -- and I understand that your

21   time with Mr. Rashid was only brief.  You came in 2012; he was

22   suspended in 2013.  The work that he was doing, in large part,

23   was monitoring portfolio companies, wasn't he?

24   A.  I'm not familiar with his work specifically.  I could

25   speculate based on his work as a partner in that business.

JCAHRAS3                        Kelly - Cross

```
 1   Q.  Now, if I can just shift gears in your affidavit.  In the
 2   paragraph 14, you're talking about allocation, and the last
 3   sentence in paragraph 14 -- you have that with you, your
 4   affidavit?
 5   A.  Yes.
 6   Q.  -- you note that employees, Apollo staff, was required to
 7   use best efforts to appropriately allocate the expense by using
 8   project codes to identify the amounts that should be billed to,
 9   for instance, Apollo investment funds or portfolio companies.
10   Do you see that?
11   A.  Yes.
12   Q.  That requirement was not in the travel and expense policy
13   in either 2009 or 2011 when you arrived, was it?
14   A.  I don't know.
15              THE COURT:  Let me ask you a question, Mr. Kelly.
16   Let's say an employee or partner of Apollo's is tasked with the
17   assignment of monitoring the performance of a portfolio
18   company, serving on its board, and generally being
19   well-informed on the success, failures, needs for improvement
20   of an investment in a portfolio company.  Let's say further
21   that in the course of doing so that Apollo partner incurred
22   expenses, travel expenses, perhaps took members of management
23   out to dine.  Would that not be properly an expense of the
24   management company rather than the fund?
25              THE WITNESS:  Generally speaking, yes.  Although each
```

JCAHRAS3                          Kelly - Cross

1    fund -- each fund is different.  Each fund has its own

2    requirements that dictate that, but certainly --

3         THE COURT:  But you would look at, for example,

4    paragraph 7.1, and if you confine yourself to, I guess, Apollo

5    Investment Fund VII which is reflected PX 154 and you look at

6    7.1, the entirety of Article 7, if it was an expense of the

7    nature that I described, it would not be properly allocable to

8    the fund; it would be allocable to the management company.  Is

9    that correct?

10        THE WITNESS:  I think that's correct, yes.  I think if

11   it's not -- the way I interpret this now is if it's not a cost

12   represented by the management fee, which it's clearly not, nor

13   is it a cost which fits within 7.2 as an organizational or

14   operating expense, then it would fit within paragraph 1 as an

15   administrative expense.  And I think if these documents are

16   similar, prior to the last exhibit, the Natural Resources fund,

17   then they would be expenses of the management company and not

18   the fund.

19        THE COURT:  All right.  If they're an expense of the

20   management company, they don't, through some subsequent

21   reallocation process get allocated to the fund; in other words,

22   it's not pass through the management company back to the fund?

23        THE WITNESS:  They should not, unless there's a

24   specific condition proviso requirement in the LPA document that

25   permits that.

JCAHRAS3                          Kelly - Cross

1          THE COURT:  All right.  Thank you very much,

2   Mr. Kelly.

3          MR. KEHOE:  Your Honor, may I just have 30 -- 10

4   seconds?

5          THE COURT:  Yes.

6          MR. KEHOE:  My colleague is giving me a note that I

7   can't read.

8   BY MR. KEHOE:

9   Q.  Mr. Kelly, if we can just stay on this document again, and

10  I'm talking about Exhibit 155, the Natural Resources document.

11  A.  Yes.

12  Q.  This says that this is the fifth amended and restated

13  agreement.  You see that on the front page?

14  A.  Yes.

15  Q.  Do you know what happened to one, two, three, and four?

16  A.  Specific to this fund, no.  I could provide general color,

17  if helpful.

18  Q.  No, I'm talking about with regard to this fund

19  specifically.

20  A.  No.

21  Q.  Now, you were at the company when Mr. Rashid was suspended,

22  is that right?

23  A.  Yes.

24  Q.  To your knowledge, were any investors in any of the funds

25  informed that he had been suspended and why?

JCAHRAS3                         Kelly - Cross

1   A.   I believe they were notified through a process we have

2   which is called the advisory board process, but I'm not -- I

3   don't know specifically what was said.

4   Q.   Do you have any document to support the fact that the

5   advisory board sent any information to any of the investors

6   that Mr. Rashid had been suspended and why?

7   A.   No.

8   Q.   So, as you sit here, you really don't know if the investors

9   had been advised or not?

10  A.   Not specifically, no.

11  Q.   Now, you do know that there was ultimately a settlement

12  with the SEC in August of 2016, right?

13  A.   Yes.

14  Q.   Let me show you Defense 29.

15          Excuse me, your Honor.

16          Is that the document, sir?

17  A.   I believe it to be.  It's -- I believe I saw a draft of

18  this or the final document.

19          MR. KEHOE:  Your Honor, at this time we'll offer into

20  evidence Defense Exhibit 29, which is the SEC settlement order

21  instituting administrative cease and desist proceeding agasint

22  Apollo.

23          THE COURT:  Any objection?

24          MR. CARLSON:  Your Honor, objection as to relevancy.

25          THE COURT:  Let me see the document.

JCAHRAS3                          Kelly - Cross

1        Well, it looks like the Defendant's Exhibit 29

2   relates, at least in part, to allegations that a former senior

3   partner at Apollo improperly charged personal items and

4   services to Apollo advised funds and fund portfolio companies,

5   and that Apollo failed reasonably to supervise the partner.

6   Seems to me that, at least on that basis, there is some

7   relevance, so it's received.

8            (Defendant's Exhibit 29 received in evidence)

9   BY MR. KEHOE:

10  Q.  Mr. Kelly, turning to Exhibit 29, this failure to supervise

11  statement in the settlement agreement, that involves

12  Mr. Rashid, does it not?

13  A.  Yes, I believe it does, yeah.

14  Q.  The date of this is August the 23rd of 2016, isn't it, the

15  front page?

16  A.  Yes.

17  Q.  Now, thereafter, sir, do you recall if the stock in Apollo,

18  after this announcement, went up or down?

19            MR. CARLSON:  Objection as to relevance, your Honor.

20            THE COURT:  Yes, it's of limited relevance, but I'll

21  take it.

22  Q.  Do you recall, sir?

23  A.  Not -- not specifically, because I don't recall the timing

24  of this document relative to when we accrued for the costs that

25  we expected would be likely and disclosed that.

JCAHRAS3                          Kelly - Cross

1   Q.   If I showed you something, would it refresh your

2   recollection?

3   A.   It may.

4        THE COURT:   Now, the concept of refreshing your

5   recollection, you can look at certified documents with ribbons

6   and seals and have no reason to question the authenticity of

7   the document, but looking at that document may cause you to

8   have a new and refreshed recollection, or you may simply say:

9   I see the document.  I see it looks very authentic, but I don't

10  have a new and refreshed recollection.  What you're being asked

11  is to look at this and see if it gives you a new and refreshed

12  recollection.

13       THE WITNESS:   OK.  Thank you.

14  A.   OK.  This document is not familiar to me, and it does not

15  change my prior answer.

16  Q.   It does not refresh your recollection?

17  A.   Correct.

18  Q.   OK.  Independent of this document, do you have any

19  recollection whether the stock price in Apollo went up or down

20  after this announcement on August the 23rd of 2016?

21  A.   No, I don't.

22  Q.   Now, this settlement took place in the third quarter, is

23  that right?

24  A.   Yeah.  From looking at the document, it's date stamped

25  August of 2016.

JCAHRAS3                          Kelly - Cross

1   Q.  That would be in the third quarter of the fiscal year?

2   A.  Correct.

3   Q.  As the CFO, did you participate in an earnings call for

4   Apollo on October the 28th, 2016?

5   A.  I participated in the earnings call.  If that's the date

6   that is on the record, then, yes, it was around about that

7   time.

8   Q.  Do you recall saying in that earnings call that a handful

9   of one-off items took place, and none of which were

10  "individually significant"?  Do you recall saying that?

11  A.  No.

12  Q.  Might I show you something to refresh your recollection?

13  A.  Sure.

14  Q.  It is page -- your Honor, with the Court's permission, I'm

15  giving him the document to refresh his recollection but just

16  asking him to look at a particular page in the document.

17          THE COURT:  OK.

18  Q.  I'm giving you this document.  It is Exhibit 92.  You're

19  certainly more than welcome to look at it, but I'm going to ask

20  you if your recollection is refreshed on page 6.

21  A.  So this does not change my recollection, but I think I

22  would point out that there's a comment in there that I made

23  that said, "And part of it was a slight increase to the SEC

24  settlement."  So that would imply that we'd taken a majority of

25  what we expected to be the settlement costs before this

1    particular quarter.

2    Q.  And that had to do with the 50-million-plus settlement?

3    A.  Yes, the reference to the SEC settlement is referencing the

4    $50 million.  But my original comment was I couldn't recall the

5    quarter when we had accrued for the costs, and so this comment

6    that I'm making in the earnings script would be consistent with

7    that, that we likely took the majority of the costs prior to

8    this particular quarter with a slight adjustment or increase.

9    Q.  The one-off items were not individually significant, were

10   they?

11   A.  From reading this, that's what I said, yes.

12   Q.  And the one that was not individually significant was the

13   matter as it pertained to Mr. Rashid, isn't that right?

14   A.  It pertains to Mr. Rashid, but I think it's important that

15   what I said was "And part of it was a slight increase," and so

16   that means -- that means, just restating what I said, most of

17   the cost of what we expected to be the settlement would have

18   been taken in a prior quarter or quarters, with a slight

19   adjustment in this particular quarter.

20   Q.  So there was an adjustment that had been made prior to that

21   to account for the SEC settlement, and then you had to make a

22   minor adjustment in Q3 for the increased settlement, right?

23   A.  I expect that what we did was we accrued what we expected

24   to be the likely settlement cost in a prior quarter, and then

25   you don't know the actual final amount until the settlement is

JCAHRAS3                       Kelly - Cross

1    completed and concluded and agreed to by the parties.  And from

2    reading this, it looks like there was a slight adjustment to

3    the prior estimate that we took.

4    Q.  But the matters concerning Mr. Rashid were not significant,

5    were they?

6    A.  No, I never said that.

7    Q.  No, I'm asking you that question.

8              MR. CARLSON:  Objection, your Honor.

9    Q.  The matters concerning Mr. Rashid were not significant,

10   were they?

11             THE COURT:  Significant to whom?

12             MR. KEHOE:  Significant to the investing public.

13             THE COURT:  No, no, no.  You mean somebody who has

14   their entire portfolio in General Motors stock?

15             MR. KEHOE:  I'll rephrase the question.

16   Q.  Was it your intent to infer to the individuals that were at

17   the earnings call that the matter concerning Mr. Rashid was not

18   significant?

19   A.  No.

20             THE COURT:  Let me ask you, this was an earnings call

21   for what entity?

22             THE WITNESS:  It was for the public company, the top

23   management company within the group.

24             THE COURT:  And those shares are traded where?

25             THE WITNESS:  On the New York Stock Exchange.

JCAHRAS3                       Kelly - Cross

1          THE COURT:  OK.

2     BY MR. KEHOE:

3     Q.  Prior to -- your Honor?

4          THE COURT:  Go ahead.

5     Q.  Prior to this settlement on August 23 of 2016, had Apollo

6     informed any of the investors as to what had happened to

7     Mr. Rashid and issues concerning his expenses?  If so, do you

8     have any documentation to support that?

9     A.  So I think it's important to delineate different groups of

10    investors.  So shareholders are a group of investors.  Reading

11    this today and it's my recollection that we had taken the

12    majority of the cost that we expected to be incurred to settle

13    the matter with the SEC in a prior quarter or quarters, and so

14    we had made disclosures and informed the shareholder public

15    prior to this quarter.

16          As it relates to the other set of investors, which we

17    call the limited partners, the investors in the funds, I

18    don't -- I don't know specifically on what date and in what

19    form or forum they were notified or of what.

20          MR. KEHOE:  Thank you, Mr. Kelly.  Nothing further.

21          If I may have one moment, your Honor?

22          Thank you, Mr. Kelly.  I have no further questions.

23          THE COURT:  All right.  Cross-examination -- I'm

24    sorry, redirect.

25          MR. CARLSON:  Yes, your Honor.

1    REDIRECT EXAMINATION

2    BY MR. CARLSON:

3    Q.  Mr. Kelly, counsel pointed you toward PX 155 and, in

4    particular, Section 7.1 and 7.2.  There was a discussion had

5    about expenses that are discussed in those two paragraphs.

6          Let me ask you this, Mr. Kelly:  Do you have an

7    understanding as to whether or not Apollo partners or Apollo

8    executives expensed or charged expenses to funds or portfolio

9    companies owned by Apollo funds during your tenure at Apollo?

10   A.  Yes, they do.  It depends on the fund and then the

11   governing documents, the LPAs, for each fund that are specific

12   in that respect.

13   Q.  Can you explain the basis for charging such expenses.

14   A.  To funds or portfolio companies?

15   Q.  Let's start with funds.

16   A.  So the types of expenses and sometimes the quantum of

17   expenses in certain categories is agreed to and negotiated up

18   front with limited partners as they're considering an

19   investment in the fund, together with the management fee

20   schedule.  So on occasion, and certainly as we saw with this

21   most recent fund, that's a permitted -- that's a negotiated

22   item and that's a permitted condition that permits certain

23   expenses to be charged back to funds.

24          THE COURT:  Is that typically at the outset of the

25   limited partner's investment in the fund?

JCAHRAS3                    Kelly - Redirect

1           THE WITNESS:  It is, and I think that's one of the

2      reasons that these LPAs go through amendments.  But typically,

3      the last amendment, if this is the final amendment, governs

4      expenses that would be charged to the fund, and all investors

5      in the fund would then be subject to the same terms.

6           THE COURT:  All right.  So this would be, what, an

7      investor doing due diligence in the fund, for example?

8           THE WITNESS:  It would be part of their diligence and

9      part of a negotiation up front around fee schedule and expenses

10     that --

11          THE COURT:  So their attorney's fees and negotiating

12     the fee schedule, for example, would that be something that

13     would be chargeable to the fund?

14          THE WITNESS:  I would put attorney's fees, our

15     attorney's fees, into a broad category called organizational

16     costs, and that also includes travel to meet with prospective

17     investors, and so on.  And typically funds have a cap

18     prescribed in the documents under which costs can be charged

19     back to the fund.

20          THE COURT:  But that's basically in connection with

21     marketing the fund?

22          THE WITNESS:  Correct.

23          THE COURT:  Not the monitoring of the investments of

24     the fund, which is something different, right?

25          THE WITNESS:  It actually -- it actually depends.  So

JCAHRAS3                         Kelly - Redirect

1    there's typically an organizational cost category and a cap on

2    those costs.  Once the fund is raised, those costs are final

3    and completed, and the costs, if they're under the cap, are

4    charged back; and if they're above the cap, they're charged at

5    the cap.  The ongoing monitoring fees, the ability or -- or

6    practice of charging ongoing monitoring fees, be they travel,

7    hotels, flights, food, accommodation, attorney's fees,

8    accounting fees, diligence fees, banker's fees, are then all

9    subject to a negotiation in this LPA document.

10             THE COURT:  Right.  And that would result in a

11   paragraph such as 7.1?

12             THE WITNESS:  Correct.

13             THE COURT:  All right.  Next question.

14   BY MR. CARLSON:

15   Q.  Mr. Kelly, outside of 7.1, were you aware of partners at

16   Apollo that, despite 7.1, still allocated or charged expenses

17   to Apollo funds?

18             MR. KEHOE:  Object to the form, Judge.  Some partners

19   that did what?

20             THE COURT:  I'll allow it.

21   A.  Do you mind repeating the question?

22   Q.  Sure.  You have your reading of 7.1 and 7.2 and how

23   expenses are supposed to be allocated to funds, right?  That's

24   what you've been talking about?

25             MR. KEHOE:  Object to the form, Judge.

1           MR. CARLSON:  I haven't asked a question.

2           THE COURT:  I'll allow it.

3   A.   The answer's yes.

4   Q.   OK.  So outside of that, do you have an understanding of

5   whether or not anybody at Apollo, outside of this document,

6   still went ahead and charged Apollo funds for the kinds of

7   expenses that we've been talking about, travel, meals, and that

8   sort of thing?

9   A.   Only with respect to the matter today in the court, which

10  is Mr. Rashid.  I'm not aware of -- I'm not aware of a legal

11  document or provision that permits that activity or a practice

12  in that regard.

13  Q.   What's your understanding of how Mr. Rashid allocated

14  expenses to funds?

15  A.   My understanding is that costs were -- that were

16  inappropriate costs to be absorbed by funds were allocated.

17  Specifically around the process, I don't know how that was

18  done, but the consequence of that was certain costs that were

19  not permissible for those particular funds were indeed

20  allocated.

21  Q.   What about if -- well, did you have an understanding about

22  expenses that were charged by Apollo partners to portfolio

23  companies that were actually inside the Apollo funds?

24          THE COURT:  Sustained as to form.

25  Q.   Mr. Kelly, are you aware that each of the Apollo funds have

1   portfolio companies within them?

2   A.  Yes.

3   Q.  Do you have any understanding about charges that were made

4   by Apollo partners to those portfolio funds particularly?

5   A.  No.

6   Q.  Do you have any knowledge of charges that Mr. Rashid

7   allocated to portfolio funds?

8   A.  No.

9          MR. CARLSON:  Your Honor, just one moment.

10         (Counsel confer)

11         MR. CARLSON:  Nothing further, your Honor.

12         THE COURT:  All right.  You may step down.

13         We're going to break for lunch, and we'll pick up at

14  five minutes after 2:00.  Thank you.

15         (Lunch recess)

16         (Continued next page)

17

18

19

20

21

22

23

24

25

1                           AFTERNOON SESSION

2                                2:10 p.m.

3            (Trial resumed)

4            THE COURT:  The SEC may call its next witness.

5            MR. THOMPSON:  Good afternoon, your Honor.  As its

6    next witness, the SEC calls Ms. Cindy Michel.

7            THE COURT:  All right.

8    CINDY MICHEL,

9         called as a witness by the Plaintiff,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. THOMPSON:

13   Q.  Good afternoon, Ms. Michel.  I'm going to provide you with

14   a copy of the declaration and rebuttal declaration that you

15   issued in this case, along with the exhibits cited in that

16   declaration.

17           Ms. Michel, if you could look in the Redweld, in the

18   first folder are copies of your declaration and rebuttal

19   declaration.  Do you have the declaration in front of you now,

20   Ms. Michel?

21   A.  I do.

22   Q.  If you could turn to page 6 of your declaration, is that

23   your signature that appears on the document?

24   A.  It is.

25   Q.  Have you had a chance to review the declaration again since

1   signing it?

2   A.  I have.

3   Q.  Are there any errors in the declaration?

4   A.  No.

5   Q.  Do you have any corrections to make?

6   A.  No.

7   Q.  If you could now look at the rebuttal declaration that's in

8   the same folder.

9           Is this, in fact, a rebuttal declaration that you

10  executed in connection with this case, Ms. Michel?

11  A.  Yes.

12  Q.  Have you had a chance to review the declaration since

13  executing it?

14  A.  Yes.

15  Q.  Are there any errors that you need to correct?

16  A.  No.

17  Q.  Ms. Michel, do you hereby affirm that your rebuttal

18  declaration and your -- I'm sorry -- that your initial

19  declaration and your rebuttal declarations are true and

20  correct?

21  A.  Yes.

22          MR. THOMPSON:  Your Honor, at this time the SEC

23  respectfully offers the direct and rebuttal declarations of

24  Ms. Michel into evidence as Plaintiff's Exhibits 304 and 305

25  respectively.

1          THE COURT:  All right.  I do not have the rebuttal

2    declaration, so if you have a copy of that, it would be

3    appreciated.  Or you're going to hand that up?

4          MR. THOMPSON:  If I may approach, I will give it to

5    your Honor right now.

6          THE COURT:  All right.  Any objection to 304 and 305?

7          MS. van VLIET:  No objection, your Honor.

8          THE COURT:  All right.  They're received.

9          (Plaintiff's Exhibits 304 and 305 received in

10   evidence)

11         THE COURT:  Thank you.

12         MR. THOMPSON:  Judge Castel, there were a number of

13   exhibits referenced in Ms. Michel's declaration, and I can go

14   through them one by one or I can simply list them and move them

15   into evidence and see if there's an objection.

16         THE COURT:  I think the latter sounds acceptable, yes.

17         MS. van VLIET:  And there will be no objection.

18         THE COURT:  So move them, if you will, please.

19         MR. THOMPSON:  The SEC moves the following exhibits

20   into evidence:  Plaintiff's Exhibit 90, 91, 93, 96, 97, 114,

21   175, 176, and 180.

22         THE COURT:  And there's no objection, correct?

23         MS. van VLIET:  That's correct, your Honor.

24         THE COURT:  All right.  They're received.

25         (Plaintiff's Exhibits 90, 91, 93, 96, 97, 114, 175,

JCAHRAS3                         Michel - Cross

1    176, and 180 received in evidence)

2             MR. THOMPSON:  Pass the witness for cross-examination.

3             THE COURT:  Thank you, Mr. Thompson.

4    CROSS-EXAMINATION

5    BY MS. van VLIET:

6    Q.  Good morning, Ms. -- I'm sorry.  Good afternoon,

7    Ms. Michel.  We have met before?

8    A.  Yes.

9    Q.  I'm Theresa van Vliet.  I represent Mr. Rashid.  We met a

10   while ago when you gave a deposition in this case, is that

11   correct?

12            THE COURT:  If I could just ask you to start with your

13   first question on a relevant subject.  Go ahead.

14   Q.  Do you recall your deposition in this case?

15   A.  Yes.

16   Q.  Have you had an opportunity to review it prior to your

17   testimony here today?

18   A.  Yes.

19   Q.  First of all, your title at Apollo now is as chief

20   compliance officer, is that correct?

21   A.  Correct.

22   Q.  How long have you been in that position?

23   A.  So i started at Apollo in 2007 as a director of compliance

24   and was promoted into the chief compliance officer position in

25   2014.

JCAHRAS3                        Michel - Cross

1    Q.  Are you familiar with the term "the relevant time period"

2    as it's been used in this case?

3    A.  Is it 2010 to 2013?

4    Q.  Yes, ma'am.

5            So during that entire period, you were a member of the

6    compliance department at Apollo, am I correct?

7    A.  Correct.

8    Q.  Now, pardon me, turning to Plaintiff's Exhibit 304, your

9    initial declaration, if you would, please.  Paragraph 1, you

10   state that you've been represented by your own counsel in

11   connection with the preparation of this declaration.  Do you

12   see that?  It's the last sentence in 304.

13   A.  Yes.

14   Q.  And who was that counsel?

15   A.  Paul Weiss.

16   Q.  Did you prepare the declaration 304?

17   A.  Paul Weiss prepared it on my behalf, and I reviewed it.

18   Q.  Now, would the same be true for Exhibit 305, your rebuttal

19   declaration?

20   A.  Yes.

21   Q.  Again, I'd refer you to paragraph 1 and actually the second

22   to the last sentence in paragraph 1 of the rebuttal

23   declaration, Exhibit 305.

24   A.  The same is true.

25   Q.  Now, if you'll turn to paragraph 3 of Exhibit 304, your

JCAHRAS3                         Michel - Cross

1   initial declaration, just let me know when you have it.

2   A.   I'm there.

3   Q.   In paragraph 3 you talk about that Apollo is a public

4   company whose stock is traded on the New York Stock Exchange,

5   and then you state that Apollo is an indirect parent company of

6   various registered investment advisers, including Apollo

7   Management LP, Apollo Management III L.P., Apollo Management V

8   L.P., Apollo Management VI L.P., Apollo Management VII, L.P.,

9   and Apollo Commodities Management, L.P. Is that correct?

10  A.   Correct.

11  Q.   A couple sentences down from there you list several,

12  although not all, of the funds that Apollo manages and advises,

13  is that correct?  The last sentence of paragraph 3 in

14  Exhibit 304.

15  A.   Correct.

16  Q.   Is there a distinction between Apollo Management II, III,

17  IV, V, and so on, and the funds?

18  A.   Yes.  One is the management company and the other is the

19  fund it advises.

20  Q.   Now, you also make reference -- and, again, we're still in

21  304 -- in paragraph 4 of 304, as well as carrying on too a

22  little bit in paragraph 5, certain codes of ethics.  Is that

23  correct?

24  A.   Correct.

25  Q.   Those codes of ethics are among those that were just

JCAHRAS3                     Michel - Cross

1    introduced into evidence relating to the time periods 2009,

2    2010, and 2011.  Is that correct?

3    A.  I don't know the corresponding numbers, but I assume.

4    Q.  I beg your pardon.  It's in paragraph 4 of your

5    declaration, No. 304, the indented and bullet point.

6    A.  Yes, OK.

7    Q.  Now, is it fair to say that the code of ethics is more of a

8    general document that discusses all sorts of different

9    conceivable actions that occur at Apollo and its various

10   subsidiaries or related entities as opposed to one specific

11   manner of transactions, for example, time and entertainment --

12   travel and entertainment policies?

13   A.  It's mandated by the Advisers Act.  It has some specific

14   provisions that are required by 204(a)(1) which is cited here,

15   but overall, yes, it's a general guideline of how employees and

16   partners are expected to conduct their behavior.

17   Q.  Then am I correct that for more specific guidance, one --

18   in the travel and entertainment policy area, for example, one

19   would look to the travel and entertainment policies in effect

20   at the time the expense at issue was generated?  Do I

21   understand that correctly?

22   A.  Yes.

23   Q.  Now, certainly, as you quote here, the codes of ethics --

24   and you quote it, I believe, in paragraph 5 -- stand for the

25   concept and specifically state that falsification of any book,

JCAHRAS3                        Michel - Cross

1  record, or account relating to the business of Apollo is

2  prohibited, correct?

3  A.   Correct.

4  Q.   Now, the concept here in that statement that you quote,

5  though, is not just limited to intentional falsification of

6  records as to an investor, is that correct?  It's broader.  It

7  deals with Apollo itself, portfolio companies, and investors,

8  is that right?

9  A.   Yes.

10  Q.   Now let's turn to some of those policies, if I may.

11        Are you familiar with a policy from Apollo that was

12  effected in 2009 through October 31, 2011?

13  A.   The T&E policy?

14  Q.   Yes, ma'am.  I'm sorry.

15  A.   Yes.

16  Q.   Ms. Michel, I've handed you Plaintiff's Exhibit 102.  I ask

17  you to take a look at that and tell me whether you recognize

18  that document.

19  A.   I do.

20        THE COURT:  This is already in evidence?

21        MS. van VLIET:  I don't believe so.

22  Q.   How do you recognize that document?

23  A.   It is the travel and expense reimbursement policy for the

24  firm dated January 2009.

25  Q.   When you say "the firm," you're referring to Apollo Global

JCAHRAS3                      Michel - Cross

1   Management, LLC?

2   A.   That's right.

3             MS. van VLIET:  Your Honor, at this time we'd move in

4   Plaintiff's 102, which is the --

5             THE COURT:  Any objection?

6             MR. THOMPSON:  No objection.

7             THE COURT:  Received.

8             (Plaintiff's Exhibit 102 received in evidence)

9   BY MS. van VLIET:

10  Q.   Let me just get the rest of these housekeeping out of the

11  way, if I may, Ms. Michel, and then we'll talk about them.

12            Ma'am, I've handed you Plaintiff's Exhibit 103.  Do

13  you recognize that document?

14  A.   Yes.

15  Q.   How do you recognize it?

16  A.   From being an employee at Apollo.  It's a T&E policies and

17  procedure dated 2011.

18            MS. van VLIET:  Your Honor, at this time we'd move in

19  Plaintiff's 103.

20            THE COURT:  Any objection?

21            MR. THOMPSON:  No objection.

22            THE COURT:  Received.

23            (Plaintiff's Exhibit 103 received in evidence)

24  BY MS. van VLIET:

25  Q.   For the record, ma'am, the effective date of

JCAHRAS3                    Michel - Cross

1   Plaintiff's 103, the travel and entertainment policies and

2   procedures, is November 1, 2011, is that correct?

3   A.   Yes.

4   Q.   I'm about to hand you Plaintiff's Exhibit 4.  Do you

5   recognize Plaintiff's Exhibit 4?

6   A.   Yes.

7   Q.   It is 4, and not 104.

8          How do you recognize Plaintiff's 4?

9   A.   It's the T&E policy.  Let's see.  This is dated -- or I

10  assume it's the one that succeeded the 2011 policy.

11  Q.   Do you recall testifying about that in your deposition?

12  A.   Yes.

13  Q.   Would reviewing your deposition testimony about that help

14  refresh your recollection a little more particularly or --

15  Judge, may I have a moment to confer with opposing counsel?  It

16  may save some time.

17          THE COURT:  You may.

18          (Counsel confer)

19          MS. van VLIET:  Your Honor, we'll move in

20  Plaintiff's 4.  The SEC's already stipulated that it's the

21  policy that came effective June 1, 2013.

22          THE COURT:  All right.  Without objection, it's

23  received.

24          (Plaintiff's Exhibit 4 received in evidence)

25  BY MS. van VLIET:

1   Q.  Now, are you aware of when Mr. Rashid was suspended from

2   Apollo as opposed to the actual separation date, the suspension

3   date?

4   A.  Yes.

5   Q.  When was that?

6   A.  The summer of 2013.

7   Q.  Would July 1, 2013, sound about right to you?

8   A.  That sounds about right.

9   Q.  And he actually separated from Apollo sometime later as a

10  result of a separation and termination agreement in February of

11  the following year, 2014, is that right?

12  A.  I believe so.

13  Q.  Now, after he was suspended on July 1, 2013 -- "he" being

14  Mr. Rashid -- was he permitted to generate any expenses on

15  behalf of Apollo --

16  A.  No.

17  Q.  -- or his job?

18  A.  No.

19  Q.  At that time, his BlackBerry was taken away; he was out of

20  the office.  He was still being paid, but he ceased doing

21  business as an Apollo employee functionally on July 1, 2013.

22  Is that correct?

23  A.  Correct.

24  Q.  So the last policy that I handed you, the last T&E policy

25  that I handed you, Plaintiff's Exhibit No. 4, would have only

1    been applicable to any expenditures that Mr. Rashid made from

2    June 1, 2013, to the date of his suspension on July 1, 2013.

3    Do I understand that correctly?

4    A.   I can't recall the exact date, but if you -- if that's in

5    evidence, yeah.

6    Q.   OK.   Well, let's turn to your declaration.

7         Do you recall in your declaration -- I think the date

8    is in there.   Let me see if I can --

9         THE COURT:   Well, you know that his suspension was in

10   2013, right?

11        THE WITNESS:   Correct, yes.

12        THE COURT:   So this would be in effect from June 1,

13   2013, to such date as is the date he was suspended, right?

14        THE WITNESS:   I'm just confused because it's not

15   dated, that's all.

16        THE COURT:   All right.   Thank you.

17   BY MS. van VLIET:

18   Q.   If you take a look at paragraph 13 of Exhibit 304, your

19   initial declaration, read through that, it gives a date of

20   July 1, 2013, at that time.   Do you see that?   If you go on, it

21   discusses what happened at that meeting and thereafter.

22        Does that refresh your recollection of when he was

23   terminated?

24   A.   Yes.

25   Q.   Excuse me, I beg your pardon, suspended?

JCAHRAS3                    Michel - Cross

1    A.  Yes.

2            THE COURT:  You have factual stipulations one and two

3    which substantially covers this.  So if there's -- one, two,

4    and three.  So if there's something specific, please ask.

5            MS. van VLIET:  I'll move on.

6    Q.  Let's talk about the policies in effect from January 2009

7    to the next effective date.  For that, I'd ask you to refer to

8    Plaintiff's 102.

9    A.  OK.

10   Q.  As you noted earlier in your testimony, the relevant time

11   period starts in 2010, is that correct?  Do I recall your

12   testimony correctly?

13   A.  Yes.

14   Q.  If you'll take a look at Plaintiff's 103, the effective

15   date of that is November 1, 2011, is that correct?

16   A.  Yes.

17   Q.  Am I correct, then, that Plaintiff's 102, the January 2009

18   policy, was effective until October 31, 2011, the day before

19   the effective date of Plaintiff's 103?

20   A.  Yes.

21   Q.  Thank you.

22           Now, are you aware of anything in Plaintiff's 102, the

23   policy that would have been in effect through Halloween 2011

24   that requires an employee to insert a project code?  If so, can

25   you tell me where it is?

1   A.  I'm sorry.  You are asking if it is, like, stated in this

2   policy whether an employee is required to insert a project

3   code?

4   Q.  Yes, ma'am.

5   A.  I don't know if it is.  I haven't looked at this word for

6   word in a while, but it sounds like it's not.  But the policy

7   is really a general guideline, and we had practices and

8   procedures that were associated with T&E at Apollo.

9   Q.  OK.  Was there anywhere -- because I note in your

10  declarations you say that your understanding was that

11  allocations were required throughout.  Do I understand your

12  declarations correctly --

13  A.  Yes.

14  Q.  -- on that score?

15  A.  Yes.

16  Q.  It's not in the 2009 policy, as you just testified.  Can

17  you tell me where it might have been written?

18  A.  That's what I'm saying, it may not have been written, but

19  it was the practice and the expectation and, you know, everyone

20  was expected to allocate accordingly.

21  Q.  Was there any record of communicating that expectation to

22  employees so that they would know about the expectation?  If

23  so, where was that?

24  A.  In 2009, there may not have been.

25  Q.  When you say "in 2009," are you referring to the entire

JCAHRAS3                    Michel - Cross

1  period the Plaintiff's Exhibit 102 is in effect, that is,

2  through October 31, 2011?

3  A.  Yes.

4  Q.  Now, during the time period through October 31, 2011, were

5  employees permitted, in fact, encouraged, to stay overnight on

6  Saturdays when they were traveling in order to minimize costs,

7  if possible?

8  A.  I don't recall specifically, but it's always the guideline

9  if they wanted to and it was cheaper, then it was permissible.

10  But I don't know if it was encouraged to stay overnight.

11  Q.  OK.

12  A.  It was just, you know, it was permissible.

13  Q.  I apologize.

14          Could you turn your attention to paragraph --

15  paragraph, page 6 of the 2009 policy, which again is

16  Plaintiff's Exhibit 102.  In the middle of that page, there's

17  a --

18  A.  Sorry.  What page, sorry?

19  Q.  Page 6.

20  A.  OK.

21  Q.  The actual page 6, the Bates stamp is Apollo 00004583.  Let

22  me know when you're there.  I'm going to direct you

23  specifically to the middle of the page under the underlined

24  bold-type heading "Extending Business Trips for Weekend Stays."

25  A.  Yeah, I see that.

1  Q.  Do you see that?

2  A.  Yeah.

3  Q.  Do you see that second sentence there is, "Use of these

4  fares is encouraged whenever possible," is that right?

5  A.  Yes.

6  Q.  Furthermore, when those circumstances obtained and an

7  employee stayed over a Saturday night, their hotel costs were

8  also reimbursed, although not like their meals and

9  entertainment if they got a movie in the room and dinner,

10  whatever?  Did I understand that correctly, at that time?

11  A.  Yes.  It's different today, so I apologize.  I didn't

12  remember this.

13  Q.  No worries.

14         Now, similarly, if you'd look at page 7 -- well, is it

15  true that under the 2009 policy, Internet and phone usage was

16  paid for by Apollo Management?

17  A.  At a hotel, you mean?

18  Q.  No, no, like your BlackBerry phone.  Your Apollo-issued

19  BlackBerry phone was paid for by Apollo, correct?

20  A.  Yes.

21  Q.  And if you were on a flight and had a Gogo Wi-Fi service,

22  which I think they had back then, that too would be picked up

23  by Apollo, is that right?

24  A.  If it's in the policy, then, yes, that's correct.

25  Q.  Now, in terms of -- if you turn to page 12 of the 2009

JCAHRAS3                        Michel - Cross

1   policies, please, there's a section of the T&E policy that

2   refers to in-town meals, is that correct?

3   A.  Uh-huh.

4           THE COURT:  You have to answer out loud.

5   A.  Sorry, yes.

6   Q.  Do I understand that's distinguished, for example, when an

7   employee might be traveling on business and they were in a

8   place other than their usual office of assignment?

9   A.  Yes.  It says in-town meals during nonbusiness hours.

10  Q.  The policy sets forth -- we can all read it -- what the

11  times were that were allowed, is that right?  And what was

12  allowed in terms of if you worked overtime on Saturday, Sunday,

13  or a holiday, what you got for breakfast, what you got for

14  lunch, what you got for dinner in terms of the per diem

15  allowances, is that right?

16  A.  Yes.

17  Q.  There was something, though, that was called the Seamless

18  web, is that right?

19  A.  Yes.

20  Q.  And if you look, there's a line in very small print

21  underneath the --

22  A.  I see it.

23  Q.  And what was the Seamless web?

24  A.  It's a website where you can order dinner from a variety of

25  restaurants, you know, that they offer.  And they deliver it to

JCAHRAS3                      Michel - Cross

1    you.

2    Q.  Like Delivery Dudes, or whatever?

3    A.  Yes.

4    Q.  But, as I understand it, Seamless web was not available in

5    all of the Apollo offices.  For sure it was in New York,

6    though, right?

7    A.  Yes.

8    Q.  To the best of your recollection?

9    A.  Yes.

10   Q.  Now, if you turn to page 9 of the 2009 policy, there were

11   certain -- are you there?

12   A.  Yes.

13   Q.  There were certain -- right here we're talking about -- or

14   this part of the policy talks about

15   meal-and-entertainment-expense-type guidance, is that right?

16   A.  Yes.

17   Q.  And there were certain limits, basically, for meals and

18   entertainment as opposed to in-town meals in various city

19   locations, is that right?

20   A.  Yes.

21   Q.  OK.  If someone had occasion to entertain a portfolio

22   executive or business development someone, and they went over

23   that amount, for example, in New York City, over $125 per

24   person, would that be treated as a total unreimbursable expense

25   or just the amount above the cap for the location?

JCAHRAS3                    Michel - Cross

1   A.  Just the amount above the cap.

2   Q.  And even in those instances, did the employee have the

3   ability to go in to whoever his or her supervisor was or

4   responsible person who had the authority to approve and say,

5   you know, it was the guy's birthday or their anniversary, or

6   whatever, and perhaps get an excuse to that cap?

7   A.  Yes.

8   Q.  Thank you, ma'am.

9         If you could turn your attention to Plaintiff's

10  Exhibit 3, then -- I beg your pardon, 103.

11  A.  OK.

12  Q.  Now, 103 is the policy that became effective in November 1,

13  on November 1, 2011, is that right?

14  A.  Yes.

15  Q.  So it supersedes Plaintiff's 102, is that correct?

16  A.  Correct.

17  Q.  Now, in the 2011 policy, was there -- as with the 2009, is

18  there anywhere in this travel and entertainment policy that

19  says that the employee is supposed to allocate an expense?  If

20  so, could you tell me where.

21  A.  It does not specifically say that.

22  Q.  OK.  So do I understand it correctly that, as with the 2009

23  policy, your declaration and your testimony with regard to your

24  understanding that it was required for Apollo employees to

25  allocate was based on this unwritten understanding of what

1    people did?

2    A.  Yes.

3    Q.  And at least with regard specifically to the November 2011

4    time period forward, through July 1, 2013, are you aware of

5    what manner in which that expectation was communicated to the

6    Apollo employees, the expectation that they would allocate?

7    A.  Well, when you submit an expense for reimbursement, you are

8    asked how those expenses ought to be allocated.  So if you want

9    to get paid back, you have to provide an allocation.

10   Q.  Now, what was the purpose of the allocation?

11   A.  So we are investment managers.  We owe fiduciary duties to

12   our funds, and in order to allocate appropriately, according to

13   the governing documents between the fund and the manager, we

14   need to document and make sure we're only charging the fund the

15   expenses they are -- they owe, and the management company

16   should pick up what --

17   Q.  Are you, in fact, familiar --

18           THE COURT:  Let me ask you, can you generally describe

19   the type of expenses that are properly allocated to a fund.

20           THE WITNESS:  Sure.  So if -- so, for instance, if you

21   are hosting an advisory board event, that is cited specifically

22   in the limited partnership agreement that the fund pays for

23   that expense.  If you're working on a deal for the fund, the

24   deal expenses ought to be billed back to the deal and whatever

25   deal -- all the expenses at the end of the day in connection

JCAHRAS3                          Michel - Cross

1    with that deal is then reimbursed by the portfolio company or

2    the fund.

3                THE COURT:  Whether or not the deal goes through?

4                THE WITNESS:  Broken deal expenses are different.  If

5    the deal is broken, then there are other ways -- yes, then the

6    fund picks that up, yes.

7                THE COURT:  But if the deal goes through, the fund

8    also picks it up is what you're saying?

9                THE WITNESS:  It gets capped into the cost of the

10   deal, yes.

11               THE COURT:  All right.  Say, you're monitoring the

12   performance of a portfolio company of a fund, and you have

13   travel expenses, meal expenses, entertainment expenses.  Who

14   are they to be allocated to?

15               THE WITNESS:  So, in ordinary course monitoring, it

16   was the management company, but if there is an acquisition

17   being contemplated by the portfolio company, that can also be

18   picked up by the portfolio company.

19               THE COURT:  So there is a board meeting of the

20   portfolio company, and one would suppose that the business

21   conducted at the board meeting would include any investments

22   that the portfolio company was making but also the ordinary

23   course of business of the portfolio company as reported to the

24   board?

25               THE WITNESS:  That is right.

1          THE COURT:  Is that something that's allocated to the

2     management company or is that allocated to the fund?

3          THE WITNESS:  So then there may be two different

4     charges there.  That's the allocation.

5          THE COURT:  All right.  Thank you.

6     BY MS. van VLIET:

7     Q.  Bottom line is, at the end of the day, the LP agreements

8     for each, whatever the fund at issue, is what controls, is that

9     right?

10    A.  For specific things, right.  But there are some judgment

11    calls, right?

12         THE COURT:  Well, tell me about the judgment calls on

13    allocation.  I pull out the LPA, and I look at, what seems to

14    be in several of them, Article 7.  What are the judgment calls

15    that I would be called upon as a partner of the firm to make

16    with regard to allocation?

17         THE WITNESS:  So a common one that comes up, if you go

18    to a conference, say, and you are there for two purposes.  You

19    could be meeting with investors, which is a fundraising cost,

20    and that is a fund expense, or you could be also there for

21    another purpose, for instance, finding a deal.  So then that

22    also could be billed to a specific portfolio company, etc., or

23    the fund itself.

24         THE COURT:  Under what circumstances are things billed

25    to a portfolio company?

JCAHRAS3                        Michel - Cross

1            THE WITNESS:  So usually deal-related expenses in

2      connection with that portfolio.

3            THE COURT:  So expenses in your capacity as a director

4      of the portfolio company, is that accurate?  So, in other

5      words, you would have a partner in Apollo serving as a member

6      of the board of directors of a portfolio company, and if it's

7      service to the portfolio company, it could be a business

8      expense of the portfolio company?

9            THE WITNESS:  Yes.

10           THE COURT:  All right.  Thank you.

11     BY MS. van VLIET:

12     Q.  Let me kind of back up and follow up with a couple of

13     things you just testified about in response to the Court's

14     questions.

15           You testified that in some instances, for example,

16     that allocation was a judgment call, is that right?  You used

17     the example if you were at a conference?

18     A.  Yes.

19     Q.  Whose judgment call was it?

20     A.  The investment professional's or whoever's incurring the

21     expense.

22     Q.  Now, was there some guidance for that person who is to make

23     the judgment call as to what the judgment call should or would

24     be other than the T&E policies?

25     A.  Yeah, the LPA.  You could also call legal.  You can call

JCAHRAS3                        Michel - Cross

1   compliance.  You can call the controller.  So there were

2   resources.

3   Q.  When you refer to the LPA, you're talking about the --

4   A.  The limited partnership agreement for the governing fund.

5   Q.  Thanks.

6   A.  For the applicable fund.

7   Q.  You're familiar, I take it, based on your testimony, with

8   the LPA agreements for the governing funds, is that right?

9   A.  It depends on what you mean by "familiar."  I'm not a funds

10  lawyer, but I have looked at provisions from time to time in my

11  capacity.

12  Q.  Are you familiar with the limited partnership agreement for

13  the Apollo Natural Resource Partners, L.P., NARP?

14  A.  Again, I've looked at that, but I'm not a funds lawyer is

15  all I'm saying.

16  Q.  I have a very general question for you.

17  A.  OK.  Sure.

18  Q.  Let me hand you Plaintiff's Exhibit 155.  First, let me

19  take my paper out of there.  You don't have to review it.  It's

20  a very -- you may review it, obviously.

21          155 is the fifth amended and restated LP agreement for

22  the Apollo Natural Resource Partners, is that right?

23  A.  Yes.

24  Q.  Was there one through four?

25  A.  Yes, I assume that there was.

JCAHRAS3                      Michel - Cross

1    Q.  Do you know what the provisions of Article 7.1 or 7.2 were

2    of the prior versions?

3    A.  I don't.

4    Q.  OK.  Thank you.

5            Now, turning back to Plaintiff's 103, the 2011 policy.

6    A.  OK.

7    Q.  If you turn to the page that is -- let me see if I can --

8    it's page 6 of 12 of the document, and it's Section 5.  It says

9    "Lodging."  Let me know when you're there.

10   A.  I'm there.

11   Q.  Unlike the 2009 policy and the 2013 one, there are no

12   specific caps on the amount of money that an employee could

13   charge or could be reimbursed for hotels, is that correct --

14   strike that.  Hold on just a second.

15           Is it fair to say that in the 2011 policy, as you know

16   it, a concept of reasonableness, business reasonableness, was

17   embodied in the document from the beginning?

18   A.  Yes.

19   Q.  Apart from that kind of general "don't go crazy" standard,

20   there's no specific, you know, you can spend $250 a night in

21   New York and 300 in Paris, correct?  It's just a general,

22   lodging will be --

23   A.  Just if you look at the second sentence, employees should

24   work with the travel agency to select the most reasonable room

25   rate, I think that was supposed to be the control.  We were --

1    as I understand it, when this policy was put into place, that

2    was where the control was going to reside.

3    Q.  At the travel agency?

4    A.  Correct.  They were going to have the list of approved

5    hotels, I believe, if recall correctly.

6    Q.  OK.  But in your experience, did the actual Apollo senior

7    partners or the employees who were generating these expenses,

8    doing these travels, making these deals, courting these

9    investors, monitoring these portfolio companies, and incurring

10   these funds, were they the ones talking to the travel agencies

11   or was it their assistants?

12   A.  I don't know.

13   Q.  Now, is it true that spouses or significant others of

14   Apollo partners in certain circumstances were permitted to

15   attend functions, and their travel would be paid for?

16   A.  I don't know.

17   Q.  Turning to page 5.

18   A.  If there was a business reason.

19   Q.  Certainly.

20   A.  Yeah, is that what you mean?

21   Q.  Yes, ma'am.  Again, within the general ambit of a

22   reasonable business expense --

23   A.  Correct.

24   Q.  -- as we discussed earlier.

25           Page 5 of 12, under transportation, which is No. 4,

```
 1   it's one, two, three -- four, the fourth bullet down, if you
 2   could turn your attention there.
 3   A.  Yes.
 4   Q.  Am I correct that in the 2011 policy and actually in the
 5   2009, spouses were, again, if it was expected from a business
 6   perspective to attend, that they were -- their hotel and flight
 7   tariffs were reimbursable, right?
 8   A.  It says if preapproved by the appropriate supervisor.
 9           THE COURT:  If preapproved by?  Say it again, please.
10           THE WITNESS:  The appropriate supervisor.
11           THE COURT:  Thank you.
12   Q.  Now, was there a requirement in the -- well, strike that.
13           In the travel policies that we've been talking about,
14   the 2009, the 2011, and for the month that it applied to
15   Mr. Rashid, the 2013, there are certain circumstances where
16   approval, whether before or after, is required or discussed in
17   those policies, is that right, generally?
18   A.  Yes.
19   Q.  And in any of those instances, was it required, the
20   approval, I mean, to be documented someplace?
21   A.  Yes.
22   Q.  Tell me where.
23   A.  Typically, by email and then it gets forwarded to shared
24   services.
25   Q.  No, I'm sorry.  Bad question.
```

1          Where in the policy does it alert the employee that

2     they've got to get it in writing?  That they could spend $150

3     in New York for dinner, for example.

4     A.   That they can spend $150 because there's no limits in this

5     one, you're saying?

6     Q.   There's no limits in 2011 and 2009.  As we discussed

7     earlier, the limit for food in New York was $125 per person a

8     night?

9     A.   Right.

10    Q.   Is there anywhere in the policy that you know of -- I'm not

11    asking you to read through the whole policy because they speak

12    for themselves -- but that you know of, based on your knowledge

13    of these things as the chief compliance officer, that

14    requires -- or that alerts an employee that they are required

15    to get their approval for deviations of the policy in writing?

16    A.   So the question is, I'm sorry, that --

17    Q.   No worries.

18    A.   Is there anywhere in this policy a requirement to get

19    pre-approval from the supervisor for --

20    Q.   No, ma'am.

21         Is there in any, in any of the policies, any of the

22    policies, is there a requirement that the approval, the

23    pre-approval or the post-approval, be documented in writing?

24    A.   No.

25    Q.   Now, you testified a moment ago about the extended stays on

1    Saturdays and the concept of if it could save the company

2    money.  Do you recall that testimony?

3    A.  Yes.

4    Q.  Now, how about companion tickets?  Was there a provision

5    for -- first of all, do you have an understanding what I mean

6    when I refer to the term "companion ticket"?

7    A.  No.

8    Q.  OK.  Are you aware of instances where certain credit cards,

9    for example --

10   A.  The Amex platinum, is that what you're talking about?

11   Q.  In Amex platinum, if you buy typically a business-class

12   ticket, your companion flies free?

13   A.  Yes.

14   Q.  Is that something that Apollo employees -- strike that.

15         If you were a senior partner at Apollo, were you

16   permitted to fly in first class?

17   A.  Yes.

18   Q.  And the companion ticket program that Amex had for platinum

19   cardholders, was an Apollo employee, who was otherwise able to

20   charge a first-class ticket, able to large a less expensive

21   business-class ticket and get a free companion ticket, as long

22   as they paid the taxes on it?

23   A.  Correct.

24   Q.  There's nothing wrong with that, no violation, no issue

25   with that, is that correct?

JCAHRAS3                    Michel - Cross

```
 1   A.  Correct.

 2   Q.  Now, let's talk a little bit about your rebuttal

 3   declaration, if you will, which would be 305, as I recall.  Do

 4   you have that?

 5   A.  Yep.

 6   Q.  Now, you talk about in your rebuttal declaration your

 7   disagreement with Mr. Rashid's description of allocations,

 8   expense allocations, prior to 2013.  Do you see that first --

 9   beg your pardon, first line of paragraph 3?

10   A.  Yes.

11   Q.  Why particular as to 2013?  What happened in 2013 in the

12   policies that sets it apart from the other relevant time

13   period?

14   A.  I think, as part of the enhancement, we specified that

15   investment professionals are required to allocate their

16   expenses.

17   Q.  If you take a look at Plaintiff's 4 that is up there, are

18   you referring to the first page of the document, the minimum

19   standards that's on that page?

20   A.  Yes.

21   Q.  Yes, ma'am?

22   A.  Uh-huh, yes.

23   Q.  Now, with regard to your initial declaration and your

24   description of the events of July 1, 2013, starting at

25   paragraph 13 of Exhibit 304, let me know when you're there.
```

JCAHRAS3                          Michel - Cross

1   A.  Yes.

2   Q.  And paragraph 13, just so you know, flows onto the next

3   page, which is paragraph 6.

4          At that point in time, you were present during this

5   meeting where Mr. Rashid was called in, is that correct?

6   A.  Correct.

7   Q.  As I understand it, also present was Apollo's outside

8   counsel from Paul Weiss, is that correct?

9   A.  Correct.

10  Q.  Included among the individuals from Paul Weiss that were

11  present during this meeting was a lawyer by the name of Roberto

12  Finzi, is that correct?

13  A.  Correct.

14  Q.  And fair to say, Mr. Finzi was the lead on the discussion

15  and the questioning of Mr. Rashid?

16  A.  That day?

17  Q.  Yes, ma'am.  Sorry, during the July 1 meeting.

18  A.  I don't really recall because I feel like John spoke a lot

19  that day too.

20  Q.  When you refer to John --

21  A.  John Suydam.

22  Q.  John Suydam had what position?

23  A.  He's the chief legal officer at Apollo.

24  Q.  OK.  Now, do you recall Mr. Finzi giving -- you state that

25  you recall Mr. Finzi giving Mr. Rashid *Upjohn* warnings, is that

JCAHRAS3                          Michel - Cross

1  correct?

2  A.  Correct.

3  Q.  Is there any doubt in your mind that Mr. Rashid understood

4  that Paul Weiss represented Apollo and that they were there to

5  ask him some tough questions?

6  A.  Yeah.  I can't speak to exactly what he was feeling, but --

7  Q.  What you observed is what I'm getting at.

8  A.  Uh-huh, uh-huh.

9  Q.  Now, you have general recollections of the specifics of the

10  meeting, is that correct?  I refer specifically to the sentence

11  of your declaration in paragraph 13 that says:  "I generally

12  recall that at the end of that discussion, Mr. Rashid appeared

13  to acknowledge that many of the expenses were not legitimate

14  business expenses."

15          Did I read that correctly?

16  A.  You read that correctly.

17  Q.  OK.  Tell me specifically what you remember, if at all,

18  Mr. Rashid saying vis-a-vis it not -- any expense not being

19  legitimate.

20  A.  I have a general recollection that he was owning up to the

21  situation.

22  Q.  In fact, you were aware of the fact that previously when

23  things had been brought to his attention, the nine or ten, I

24  can't remember how many, haircuts that didn't bear the salon's

25  name but bore the legal entity's, La Contessa, was brought to

1    his attention, he paid it right away, correct?  It happened way

2    in the past, but that he had dealt with those issues in the

3    past, is that correct?

4    A.  I think he paid them when he was questioned about them,

5    right.

6    Q.  Right, when it was brought to his attention?

7    A.  Yes.

8    Q.  That's correct.  But those had happened in the past,

9    correct, and he was --

10   A.  Yes.

11   Q.  All right.  Did the subject of a trip to Hawaii, Maui in

12   particular, come up in that meeting on July 1, 2013?

13   A.  I don't remember.

14            MS. van VLIET:  May I have a moment?

15            THE COURT:  You may.

16            MS. van VLIET:  Thank you.

17            No further questions.

18            Thank you, Ms. Michel.

19            THE COURT:  Thank you.  Redirect?

20            MR. THOMPSON:  Briefly, your Honor.

21   REDIRECT EXAMINATION

22   BY MR. THOMPSON:

23   Q.  Ms. Michel, in response to Ms. van Vliet's questions, you

24   indicated that in order to submit a claim for reimbursement,

25   Apollo employees and partners were required to allocate the

JCAHRAS3                        Michel - Redirect

1    expense.  Is that correct?

2    A.  Correct.

3    Q.  What was the name of the computerized system that was used

4    at Apollo during the relevant time period for the submission of

5    expenses?

6    A.  I believe at that time it was PeopleSoft.

7    Q.  Did the PeopleSoft system itself require the input of

8    project codes or allocation codes?

9    A.  I think so.

10   Q.  Would it be the employee who incurred the expense who was

11   responsible for assigning an allocation code, or at least

12   telling the assistant if the assistant was assisting with the

13   expense report, what the code should be?

14   A.  Yes, or what the allocation should be, correct.

15   Q.  Now, was there any means for the PeopleSoft system itself

16   or anyone reviewing the expense report to double-check the

17   veracity of the project code or allocation code that was

18   assigned for a particular expense?

19   A.  So we had a shared services department which would

20   review -- the team would review these expenses for any

21   anomalies or anything that seemed like a red flag.

22   Q.  And, typically, would that shared services review for

23   improper allocations?

24   A.  It could, yes, but it's hard for them to -- to detect that.

25            THE COURT:  What is your relationship or reporting

JCAHRAS3                          Michel - Redirect

1   line with this team?

2              THE WITNESS:  There was no reporting line into me.

3   However, we would partner up.  They would definitely -- more in

4   recent times they, you know, consult with me on things that

5   could look strange or they may escalate issues on, you know,

6   excessive expenses, etc.

7              THE COURT:  OK.  Thank you.

8   Q.  On cross-examination you also testified about the section

9   of the, I believe it was, the 2011 T&E policy that spoke to the

10  need to obtain pre-approvals or prior approvals of expenses,

11  for example, expenses of a spouse accompanying a professional

12  to a particular event, I believe you indicated that it was

13  typically done by email, but Ms. van Vliet elicited from you

14  that you did not recall any explicit statement in the policy

15  itself saying that the approval had to be documented by email.

16  Do you recall that testimony?

17  A.  Yes.

18  Q.  Was it the practice at Apollo for approvals to be

19  documented by emails?

20  A.  Yes.

21  Q.  In fact, is that something that you typically did when a

22  professional would request approval for a particular expense?

23  A.  If it were in my area, yes.  For something like that, you

24  know, the supervisor would preapprove.

25              (Continued on next page)

JcaWras4                         Michel - Redirect

1    BY MR. THOMPSON:

2    Q.  Let me ask you to look back at Plaintiff's Exhibit 103,

3    which should be in front of you.

4    A.  Yup.

5    Q.  You were directed to page 6 of 12 of that document in the

6    section titled "lodging."  Can you go there?

7    A.  Yup.

8    Q.  And I believe there was a question about the need to use

9    reasonable business judgment, but at least as my notes recorded

10   your testimony -- or the question, rather -- there was a

11   reference made to the travel agent using reasonable judgment.

12        If you read the last sentence of the second bullet point,

13   does it not, in fact, read the employee should use reasonable

14   business judgment when booking a hotel and make note of the

15   conference attendance on the expense report?

16   A.  Yes.  I'm sorry.  What I was trying to clarify was just

17   that the travel agent would have a list of all the hotels that

18   were within policy.  That's all.

19        MR. THOMPSON:  Thank you, Ms. Michel.  I have no

20   further redirect at this time.

21        THE COURT:  All right.  You may step down.  We'll take

22   a ten-minute recess and then continue.

23        (Recess)

24        THE COURT:  You may call your next witness.

25        MR. THOMPSON:  At this time the Securities and

JcaWras4                          LaMons - Direct

1    Exchange Commission calls Ms. Nicole LaMons to the stand.

2             THE COURT:  All right.

3    NICOLE LA MONS,

4         called as a witness by the Plaintiff,

5         having been duly sworn, testified as follows:

6             THE COURT:  You may inquire.

7    DIRECT EXAMINATION

8    BY MR. THOMPSON:

9    Q.  Good afternoon, Ms. LaMons.

10        Ms. LaMons, I'm going to approach you to provide you with a

11   copy of a declaration that you signed in this case as well as

12   the two exhibits that were attached to it.

13   A.  Yes.

14   Q.  Ms. LaMons, have you, in fact, signed the declaration

15   produced in this case?

16   A.  Yes.

17   Q.  And I believe your signature -- well, if you can turn to

18   page 6 of the declaration, is that your signature?

19   A.  Yes, it is.

20   Q.  Have you had a chance to review the declaration again after

21   signing it?

22   A.  Yes.

23   Q.  Are there any errors in the declaration, to your knowledge?

24   A.  No.

25   Q.  And do you adopt the declaration as your direct testimony

1   in this case?

2   A.   Yes.   Yes.

3         MR. THOMPSON:   Your Honor, at this time I would move

4   Ms. LaMons's declaration into evidence as Plaintiff's Exhibit

5   306.

6         MS. van VLIET:   No objection.

7         THE COURT:   Received.

8         (Plaintiff's Exhibit 306 received in evidence)

9         MR. THOMPSON:   I would also move into evidence the two

10  plaintiff's exhibits referenced in the declaration, plaintiff's

11  141 and 142.

12        MS. van VLIET:   No objection.

13        THE COURT:   Received.

14        (Plaintiff's Exhibits 141 and 142 received in

15  evidence)

16        MR. THOMPSON:   Your Honor, I would request permission

17  to elicit very brief amount of additional direct testimony from

18  Ms. LaMons.

19        THE COURT:   All right.   I'll allow it.

20  BY MR. THOMPSON:

21  Q.   Ms. LaMons, I'm going to approach and provide you with a

22  copy of what was previously marked and entered into evidence in

23  this case as Plaintiff's Exhibit 96.

24        Ms. LaMons, I'm going to give you a moment to review

25  the cover email and the spreadsheet that's attached to it.   The

JcaWras4                          LaMons - Direct

1   spreadsheet is obviously voluminous.  I'm not asking you to

2   read all the particular entries, but if you could just review

3   it enough to indicate to me whether you believe that you saw

4   such a spreadsheet in 2013.

5   A.  No, I don't recall seeing this email or this spreadsheet.

6            THE COURT:  Let me see.

7            Have you offered PX96?

8            MR. THOMPSON:  It's been admitted, your Honor.

9            THE COURT:  All right.  Thank you.

10           That's an extra copy?

11           MR. THOMPSON:  Yes, your Honor.

12           THE COURT:  Thank you.

13  BY MR. THOMPSON:

14  Q.  Ms. LaMons, the cover email is from an address stated as

15  rashid@apollolp.com on behalf of Ali Rashid, and it's to

16  Ms. Cindy Michel.  Do you see that?

17  A.  Yes.

18  Q.  During the time when you served as Mr. Rashid's personal

19  assistant, did you have the ability to send emails that

20  appeared to come from Mr. Rashid?

21  A.  No.  I don't recall having access to send emails on his

22  behalf.

23  Q.  And you didn't have any authorization to send emails that

24  appeared to come from him, did you?

25  A.  Absolutely not.

JcaWras4                        LaMons - Cross

1   Q.  Do you recall at any time in early to mid-2013 assisting

2   Mr. Rashid with an expense review -- I know in your declaration

3   you testify about a review of, I believe it's taxicab expenses,

4   an expense review separate and apart from that?

5   A.  I only remember the one with the taxicabs.

6   Q.  Did you ever have authority to reclassify expenses from

7   business expenses to personal expenses on Mr. Rashid's expense

8   reports?

9   A.  No.

10  Q.  Were you ever given that authority in connection with any

11  audit review, any retrospective review of Mr. Rashid's

12  expenses?

13  A.  No.

14          MR. THOMPSON:  Thank you, Ms. LaMons.

15          Pass the witness.

16  CROSS-EXAMINATION

17  BY MS. van VLIET:

18  Q.  Good afternoon, Ms. LaMons.  My name is Theresa van Vliet.

19  I represent Mr. Rashid.

20          Just so we're clear, you testified a moment ago in

21  direct, in response to Mr. Thompson that the spreadsheet that

22  is in Plaintiff's Exhibit 96, the one he just handed you --

23  A.  Yes.

24  Q.  -- you didn't recognize that or the cover email, is that

25  correct?  Do I recall your testimony correctly?

JcaWras4                          LaMons - Cross

1   A.  That's correct.

2   Q.  So this, Plaintiff's Exhibit 96, is not the taxicab review,

3   the taxicab expense review that you're referring to in your

4   declaration that you said you did recall.  Is that correct?

5   A.  Correct.

6   Q.  Thank you.

7          Now, ma'am, you were originally hired at Apollo in a

8   temporary capacity, do I recall -- do I understand your

9   declaration correctly?

10  A.  Yes.  Yes, that's correct.

11  Q.  And how long were you a temp there?

12  A.  Started April 2012, and I became permanent in October 2012.

13  Q.  OK.  And when did you start -- when were you assigned to

14  Mr. Rashid?

15  A.  It was around September 2012-ish.

16  Q.  OK.  And in your declaration, we'll go into a little bit

17  more in a minute, you describe among your duties was the

18  preparation of and compilation of expense reports.  Is that

19  correct?

20  A.  Yes.

21  Q.  And certainly there were other duties as well, correct?

22  A.  Correct.

23  Q.  I'm sorry.  I'm having a little bit -- maybe, I'm having a

24  wee bit of trouble hearing you.

25  A.  I'll move up.

JcaWras4                          LaMons - Cross

1   Q.  Would you also, for example, be required to make travel

2   arrangements for Mr. Rashid, or whoever you might have been

3   working for?

4   A.  Yes.

5   Q.  By the way, you worked for other professionals at Apollo

6   then and now, correct?

7   A.  Yes.

8   Q.  To be clear, you still work at Apollo, correct?

9   A.  I still work at Apollo, yes.

10  Q.  And you still work as an assistant to senior partners doing

11  the same kind of things that you describe in your declaration,

12  is that correct?

13  A.  Yes, I work for people of different levels.

14  Q.  OK.  But the same basic duties, right?

15  A.  Yes.

16  Q.  Now, as part of your duties in particularly the time period

17  that you worked for Mr. Rashid, did you receive training on how

18  to specifically deal with the T&E software that the firm used

19  at the time?

20  A.  Yes.

21  Q.  And the name of that software, the T&E software, was

22  PeopleSoft, is that correct?

23  A.  That's correct.

24  Q.  And as I understand it, the charges that Mr. Rashid in this

25  case would put on his Amex card, the bill would be sent to

JcaWras4                          LaMons – Cross

1    Apollo, correct, as opposed to Mr. Rashid individually?  Is

2    that correct?

3    A.   That's correct.

4    Q.   And if anybody has an Amex card, and I think you talk about

5    it in your declaration, Amex pre populates categories of the

6    way they view the world as these expenses may be, is that

7    correct?

8    A.   That's correct.

9        Can I just add that I believe that they also received an

10   American Express as well as the populated system.  They got

11   their own American Express bill.

12   Q.   I'm sorry.  When you say they got, who do you mean?

13   A.   Anyone who had a corporate card.

14   Q.   You're saying that it's your recollection that anyone who

15   had an Apollo Amex corporate card would receive a statement

16   from Amex directly?

17   A.   Yes.

18   Q.   And how -- where do you get that recollection from?

19   A.   It would come in the mail.

20   Q.   It would come in the --

21   A.   In the interoffice mail.

22   Q.   The regular mail as opposed to electronic mail?

23   A.   Correct.

24   Q.   And would you receive those on behalf of the partners that

25   had cards that you worked for?

JcaWras4                       LaMons - Cross

1    A.   Yes, there's -- well, I would office mail.  Yes.

2    Q.   And did you work for other individuals at the time?

3    A.   Yes.

4    Q.   And those other individuals for whom you worked at the

5    time, did they also have Apollo credit cards, Amex cards?

6    A.   Yes, yes.

7    Q.   And did they similarly get Apollo Amex statements mailed to

8    them individually for their Amex card?

9    A.   I don't know if all of them did, but I've seen them for

10   other people, yes.

11   Q.   OK.  And you're certain that those were statements from the

12   Apollo corporate card as opposed to somebody may have also had

13   a personal platinum card?

14   A.   Yes.

15   Q.   Or a personal Amex card, I should say.

16   A.   Correct.

17   Q.   OK.  So when you got these Apollo Amex statements mailed to

18   Mr. Rashid and you opened them, what did you do with them?

19   A.   I didn't open them.

20   Q.   OK.  What did you -- you got his mail, as I understand it.

21   Is that right?

22   A.   Yes.

23   Q.   And I take it that you saw Apollo -- I mean, American

24   Express envelopes with the blue line and a statement addressed

25   to Mr. Rashid at Apollo Global Management?

JcaWras4                         LaMons - Cross

1    A.   Yes.

2    Q.   And you didn't open it, correct?

3    A.   No.

4    Q.   So what was it on the address line that indicated to you

5    that it was a statement for the corporate card as opposed to a

6    personal card?

7    A.   I had seen it before, and I just knew from seeing, from

8    other people that I knew it was a statement, and it was an

9    American Express statement.

10   Q.   OK.  My question to you, though, is how did you know?  You

11   said you didn't open these envelopes, correct?

12   A.   Uh-huh.

13            THE COURT:  You have to answer in words.

14            THE WITNESS:   OK.

15   A.   Because the address that it would have been sent to was an

16   Apollo address, so --

17   Q.   Do you know whether Mr. Rashid or any other individual may

18   have had their personal mail sometimes sent to the office?

19   A.   It's possible.

20   Q.   But in any event, you didn't open these things --

21   A.   Correct.

22   Q.   -- so you don't know whether it was a personal statement or

23   a corporate Amex statement, correct?

24   A.   Correct.

25   Q.   OK.  Now, let's get back to what you received from Apollo's

JcaWras4                          LaMons - Cross

1   system that was prepopulated that you talked about in your

2   declaration.  OK?

3           Who, or what section, at Apollo transmitted that

4   information to you?

5   A.  I'm not sure I understand what you're asking me.

6   Q.  Let me see if I can make that clear.  You testified and

7   spoke in your declaration about the process that you went

8   through when you prepared Mr. Rashid's expense reports.  Do I

9   recall that correctly?

10  A.  Yes.

11  Q.  OK.  When that process started, did you receive something

12  in the way of a statement from the PeopleSoft system that would

13  have a listing of charges that had been made to Mr. Rashid's

14  corporate card for that billing time period?

15  A.  Yes.

16  Q.  From whom did you receive that statement?

17  A.  It was within the PeopleSoft system.  It would load into,

18  into what we called the wallet.

19  Q.  OK.  And how did you know to open -- how did you know that

20  there was a statement that had been populated?  Did it send you

21  an alert, or did you just check every once in a while?  How did

22  you know?

23  A.  No.  I would just check it.

24  Q.  OK.  And how often would you check it?

25  A.  I usually checked it when it was time for me to prepare

JcaWras4                       LaMons - Cross

1   expenses.

2   Q.  And how often would you all have to prepare expenses?

3   A.  It was submitted on a monthly basis.

4   Q.  So every 30 days --

5   A.  Yes.

6   Q.  -- you would go in and do this?

7   A.  Or around 30 days.

8   Q.  OK.  As opposed to doing it every week?

9   A.  It could be possible I would go in prior to, but on average

10  it would've been around the time I tried to prepare them.  I

11  would prepare them not the same exact time, but they needed to

12  be submitted around the same time, so I could prepare earlier.

13  Q.  OK.  You mentioned -- rather, in connection with your

14  declaration, there were two exhibits, I believe, that were

15  attached and provided to you up there, Plaintiff's Exhibit 141.

16  Do you have it?

17  A.  I have it.

18  Q.  Could you take that out for me?

19  A.  Yes.

20  Q.  Let me know when you're ready.

21  A.  I'm ready.

22  Q.  OK.  Plaintiff's 141 is a printout of an Apollo my wallet

23  page, is that correct, up at the top left?

24  A.  Yes.

25  Q.  When you referred earlier in your testimony to the

JcaWras4                         LaMons - Cross

1   PeopleSoft system generated something called my wallet, is this

2   what you're referring to, an example of the screenshot?

3   A.  Yes, this is an example of that.

4   Q.  OK.  Now, at the bottom -- let's go from the bottom up.  At

5   the bottom, there's some handwriting on Exhibit 141, is that

6   correct?

7   A.  Yes.

8   Q.  Is that your handwriting?

9   A.  It looks like my handwriting.

10  Q.  Where it says, Can you provide the deal for the circled

11  expenses, and am I, looks to me to be expensing the Apple and

12  AT&T charges?

13  A.  Yes.

14  Q.  That's your handwriting?

15  A.  Yes.

16  Q.  Now, above that, there are circled expenses, correct?

17  A.  Yes.

18  Q.  Is that what you're referring to, those circles up top?  Is

19  that what you're referring to when you provide the deal for the

20  circled expenses?

21  A.  Looks like it.

22  Q.  I'm sorry?

23  A.  Looks like that's what I'm referring to, yes.

24  Q.  Thank you.

25          Now, when you look at the deal, I mean the snapshot,

JcaWras4                        LaMons – Cross

there's a column where there's a box that you could check off,

is that correct?

A.  Yes.

Q.  And next to it there's an icon, is that correct?  And then

the date, is that right?

A.  Yes.

Q.  And then there's an expense type, is that correct?

A.  Yes.

Q.  The merchant, is that right?

A.  Yes.

Q.  Additional details.  In one of these there's a description

late night working meet?

A.  Meal.

Q.  Meal.  Sorry.

    Is that right?

A.  Yes.

Q.  And there's no other, additional description on any of the

rest of these on this page, is that correct?

A.  Correct.

            THE COURT:  May I see the exhibit, please.

            MS. van VLIET:  I'm sorry, Judge.

            MR. CARLSON:  Your Honor, we can put that on the

screen electronically if that would help you.

            THE COURT:  That's fine.

            MS. van VLIET:  Your Honor, I apologize.

JcaWras4                        LaMons - Cross

1            THE COURT:  I would like to have it in some form or

2    another.

3            MS. van VLIET:  I thought they had provided it.  My

4    apologies.

5            THE COURT:  Thank you.

6            Go ahead.

7    BY MS. van VLIET:

8    Q.  OK.  Do you see where, next to the date, there's a it's

9    faint because of the manner in which the copying was done, but

10   an area where there's an icon next to the date?  See that?

11   A.  I see a little -- I can't tell what it is, but --

12   Q.  Exactly my question.

13       You had and still have, I gather, experience doing the

14   expense reports.  Was that an icon where you could actually

15   click into the underlying charges on Amex so you could see what

16   they were?

17   A.  It's possible.

18   Q.  Do you recall?

19   A.  No.  If you wanted to expand it, I believe you clicked on

20   the actual expense type, like the word.

21   Q.  And the expense type that someone has just been kind enough

22   to highlight for us, that was the prepopulated column that had

23   been prepopulated by Amex, is that --

24   A.  Yes.

25   Q.  -- your testimony?

JcaWras4                          LaMons - Cross

1    A.  Yes.

2    Q.  OK.  Now, in your experience, did Amex always get it right

3    when they were prepopulating things?

4    A.  No.  Oftentimes you would have to change it.

5    Q.  OK.  Now, when you were reviewing expense reports, would

6    you oftentimes see the names of LLCs, for example, the Pain

7    D'Avignon Plaza LLC that's on there for $9.25 in the middle?

8    Would you often see those kind of things and not know whether

9    it was an Au Bon Pain, or what the actual name of the

10   restaurant was as it was presented on the street?

11            THE COURT:  Do you understand the question?

12            THE WITNESS:  Not exactly.

13            THE COURT:  OK.  That makes two of us.

14            MS. van VLIET:  OK.

15            THE COURT:  Please rephrase.

16            MS. van VLIET:  Yes, sir.

17   Q.  Were there times in the Amex bills that you reviewed in the

18   PeopleSoft system where there were names of legal entities that

19   were wholly unfamiliar to you?

20   A.  It's possible.

21   Q.  And for example, when one of those names was assigned a

22   prepopulated expense type as a meal or entertainment, would you

23   then endeavor to find out on your own what restaurant that was?

24   A.  Yes.

25   Q.  OK.  And were you always able to identify the name that was

1   on the front of the edifice that you ate at, that one would eat

2   at, as opposed to the legal name?

3   A.  I don't remember offhand, but I'm sure I did.

4   Q.  OK.  And you went about that review process by your, on

5   your own initiative, is that right?

6   A.  I can't say necessarily my own, because I always asked

7   questions, so it's possible I could have asked what it was for,

8   if, you know, what was the maim name of the restaurant or, etc.

9   Q.  OK.  Now, turning --

10          MS. van VLIET:  I'm done with this exhibit.  Thank

11  you.

12  Q.  In paragraph 6 of your declaration, you note that in or

13  about the first week of July 2013, Mr. Rashid stopped coming

14  into the office and requesting any administrative support from

15  you?

16  A.  Yes.

17  Q.  Is that right, paragraph 6?

18  A.  Yes.

19  Q.  And were you told in that time period, July 13 -- July 2013

20  why Mr. Rashid had stopped coming into the office?

21  A.  I don't remember specifically what I was told, but I was

22  told that he would not be coming back in the office at some

23  point in July, yes.

24  Q.  And so it wasn't surprising to you that, therefore, he

25  wasn't requesting any assistance for you, correct?

JcaWras4                        LaMons - Cross

1   A.  Yes.

2   Q.  From you, I should say.

3        Now, during the time period that you worked for

4   Mr. Rashid, he often traveled on business, is that right?

5   A.  Yes.

6   Q.  Now, let's go through some of the portfolio companies that

7   he was working with.  Do you recall a portfolio company QDI?

8   A.  Yes.

9   Q.  And where was QDI based; do you recall?

10  A.  I don't remember where QDI was based.

11  Q.  And do you remember one called Ascometal?

12  A.  Yes.  Yes.

13  Q.  And do you recall where Ascometal was based?  Was it based

14  in Paris?

15  A.  I don't remember where Ascometal was based at this point.

16  Q.  OK.  But certainly at that time when you were working with

17  Mr. Rashid, with his travels, you knew where these things were?

18  A.  There was some documentation --

19  Q.  Is that right?

20  A.  Either he told me or there was some documentation showing

21  where it was based.

22  Q.  And there was also an entity called Metals U.S.A., is that

23  right?

24  A.  Yes.

25  Q.  Were you familiar with the individuals who were associated

JcaWras4                     LaMons - Cross

1   with those portfolio companies in terms of their CEOs or their

2   upper management?

3   A.   No, I don't remember offhand.

4   Q.   OK.  At that point in time when you were there initially

5   working for Mr. Rashid, was there any kind of guidance that

6   prior assistants had left as to who were the CEOs of these

7   various companies?

8   A.   Are you asking for me or for other assistants?

9   Q.   Both.  For you, first of all.

10  A.   I don't recall seeing a document with a list of CEOs on it.

11  Q.   How about -- let's expand it beyond just CEOs.  How about

12  any other folks that would have worked for any of the portfolio

13  companies that Mr. Rashid was working on or with?

14  A.   Well, there were documents and there were files, so within

15  those documents and files they could have had that information,

16  but I don't remember an actual, like, breakdown list.

17  Q.   OK.  And you testified earlier about you would ask other

18  people about the names of restaurants, for example, you would

19  go through files or ask people.  Did you do the same thing when

20  trying to investigate who were people that were in management

21  of any of the given portfolio companies?

22  A.   I don't recall.

23  Q.   OK.  Now, in terms of what were permissible business

24  expenses that could be put either on the Amex card or

25  reimbursed, were you, as an employee at Apollo, required to

JcaWras4                         LaMons - Cross

1    familiarize yourself with the details of the T&E policies, the

2    travel-and-entertainment policies in effect at the time the

3    expenses were incurred?

4    A.   Yes.

5    Q.   OK.  Now, let's talk a little bit about what you would do

6    when you were filling out these travel policies.  As I

7    understand it, you didn't have access to Mr. Rashid's emails so

8    that you could send out an email on his behalf with his name on

9    it.  Do I understand that correctly?

10   A.   That's correct.

11   Q.   But you did have access, for example, to his calendar to

12   see what his calendar entries were, correct?

13   A.   Yes.

14   Q.   Was there any limitation on the kinds of calendars that you

15   could see?  For example, does Microsoft permit you to have more

16   than one kind of account, for personal or birthdays, etc.?

17   A.   I just had his work calendar.

18   Q.   OK.

19   A.   So that's the one I looked at.

20   Q.   OK.

21           THE COURT:  Keep your voice up, if you will, please.

22           THE WITNESS:  Sure.

23           THE COURT:  Thank you.

24   BY MS. van VLIET:

25   Q.   Do I understand you correctly to say that you had access to

1   his work calendar?  Is that correct?

2   A.  Yes.  His business calendar.

3   Q.  Thank you.

4       And you had full access to it, is that correct?  You could

5   put things in there as well as view other things that had been

6   placed on the business calendar, is that correct?

7   A.  I believe so.

8   Q.  Now, how about his email; could you view his work email?

9   A.  I don't recall ever having access to his work email.

10  Q.  OK.

11  A.  Or viewing it.

12  Q.  And any of the other individuals that you've worked for

13  since Mr. Rashid, have you had -- does Apollo now let you have

14  access to their emails?

15          MR. THOMPSON:  Objection.  Relevancy, your Honor.

16          THE COURT:  Sustained.

17  BY MS. van VLIET:

18  Q.  Now, you testified in your declaration, at paragraph 8,

19  that Mr. Dunayer trained you on the PeopleSoft system.  Is that

20  correct?

21  A.  Yes.

22  Q.  And when did he do that?

23  A.  That would have been shortly after I started, in April, so

24  it would have been within a short time after that, of 2012.

25  Q.  OK.  When you were still a temporary?

JcaWras4                          LaMons - Cross

1   A.  Yes.

2   Q.  But right after you signed on board, you got your training,

3   is that right?

4   A.  I was still working as a temp, yes, at that time.

5   Q.  OK.  Now, as I understand it, Mr. Rashid's corporate Amex

6   cards were paid directly by Apollo.  Is that correct?

7   A.  Yes.

8   Q.  There were, you said that you were familiar with the T&E

9   policies and procedures at the time.  There were policies on

10  how employees were supposed to pay for personal charges that

11  may have found their way onto a corporate Amex statement, is

12  that right?

13  A.  Yes.

14  Q.  In those instances, where some of those personal charges

15  may have found their way onto a corporate Amex statement, would

16  Apollo, during the time you were working there, pay the charges

17  directly, or was the employee supposed to pay them, if you

18  recall?

19  A.  I recall that the employees were supposed to pay them

20  directly --

21  Q.  OK.

22  A.  -- to American Express.

23  Q.  OK.  So at the time you were there, as to the statement in

24  paragraph 9, the monthly Apollo Amex bills were paid by Apollo

25  directly except if they were personal ones that the employee

JcaWras4                          LaMons - Cross

1   was paying, is that right?

2   A.  Correct.

3   Q.  Now, paragraph 10 of your declaration, ma'am, you talk at

4   the end of that paragraph about how executives were generally

5   supposed to identify how an expense was to be allocated, is

6   that correct?

7   A.  Yes.

8   Q.  And do you recall such a -- well, strike that.

9           If -- what were the options in terms of where an

10  expense could be allocated from your recollection on the

11  PeopleSoft system?

12  A.  Could you repeat that?

13  Q.  Sure.  On Plaintiff's Exhibit 141, the snapshot of the

14  wallet --

15  A.  Yes.

16  Q.  -- that we had --

17  A.  Yes.

18  Q.  -- where would you, on this, allocate --

19  A.  I would not allocate on this, because this is just where

20  the expenses were populated.  It would be from this page added

21  to another page, and this is where you would actually create

22  the report, and at that point was where you would enter the

23  details.

24  Q.  OK.  Do you have Exhibit 142?  I know you do have Exhibit

25  142.  Could you turn to that.  That was also one of the

JcaWras4                        LaMons – Cross

1   exhibits that was introduced in connection with your

2   declaration.

3   A.  Yes.

4   Q.  These are -- this is for, that's 142.

5           THE COURT:  And 142 is in evidence?

6           MS. van VLIET:  Yes, sir.  It was among the exhibits

7   that were attached to the witness's declaration.

8           THE COURT:  Thank you.

9   BY MS. van VLIET:

10  Q.  Now, 142, ma'am, is a series of email communications

11  between you and Mr. Rashid, correct?

12  A.  Yes.

13  Q.  Where Mr. Rashid is providing direction to you, for lack of

14  a better term, as to what he's doing with cabs and taking,

15  where he's going with them, and etc., etc.  Is that right?

16  A.  Yes.

17  Q.  And are these communications in relation to the taxicab

18  review that you testified about earlier, specifically?

19  A.  Are these -- what do you mean in relation to?

20  Q.  Were these sent to you as a result of that review, or were

21  these kind of emails "I'm taking a taxi to the office"

22  something that he would do throughout the period?

23  A.  These -- if I'm looking at the date correctly, this would

24  have been after the review.

25  Q.  OK.  And just so we're clear, the review we're talking

JcaWras4                    LaMons - Cross

1    about again is the review on these taxicabs and car services,

2    is that correct?

3    A.  Yes.

4    Q.  Now, at Apollo, in addition to regular taxicabs, there were

5    also a number of what I refer to as black car services that

6    were used by the Apollo employees.  Is that right?

7    A.  Yes.

8    Q.  And were there certain, during your time period, certain

9    companies in particular that would be used for transportation

10   to airports, for example, Surrey?

11   A.  Yes.

12   Q.  OK.  Carey limousine service, was that a service that was

13   used almost exclusively for foreign trips?

14   A.  I don't know if it was exclusively, but I recall some

15   Careys, yes.

16   Q.  And the Careys that you recall, were they for overseas

17   transportation when employees would be an a business trip to

18   Paris, wherever?

19   A.  I don't know if it was overseas or not.

20   Q.  OK.  And then there were also other black cab kind of

21   services, Vital Transportation, and things like that, correct?

22   A.  Yes.

23   Q.  Is it fair to say that the use of these car services by the

24   employees was pretty regular?

25   A.  With their travel, yes.

JcaWras4                        LaMons – Cross

Q.  And they were also in use by people at Apollo, senior

employees and partners and things like that, for permitted

travel around town, to portfolio company meetings; or if they

worked late to, get home; or if they had to come in early, to

come in early, things like that, right?

A.  Yes.

Q.  And was there some kind of a strict system that, you know,

a specific car would be assigned to a specific person, or how

was that controlled, if you know, in terms of there are a

number of cars out there waiting, how did you know which one

was yours as opposed to somebody else's?

A.  Well, depending on the car company, there could be a car

number that they would give that would say car No. 123 is

outside.

Q.  And did you take care of making those kind of arrangements,

you as the assistant, would you make those specific

arrangements for the individuals, or was there a specific

pooling area at Apollo that would take care of that?

A.  Usually the assistants would make the cars for trips.

Q.  OK.  And when you say for trips, does your understanding of

trips mean local travel as I've is described it as well as the

business travel outside of the office area, in this case, the

New York area?

A.  If it was requested, yes.

Q.  Thank you.

JcaWras4                          LaMons – Cross

1            Now, ma'am, I'm going to hand you what's been marked

2      as Plaintiff's Exhibit 111, and I'm going to -- don't worry.

3      It's going to be up on the screen because I personally find

4      this impossible to read.

5            MS. van VLIET:  Your Honor, I've discussed this

6      with -- it's going to be up on the screen.  It's impossible to

7      read this in the fashion that it is.  The exhibit is being

8      offered subject to the 408 motions that we filed but

9      understanding the Court's indication at the pretrial conference

10     that it would reserve ruling on that particular issue.

11           THE COURT:  It's received on that basis without

12     objection.

13           Correct?

14           MR. THOMPSON:  No objection.

15           (Plaintiff's Exhibit 111 received in evidence)

16     BY MS. van VLIET:

17     Q.  Ma'am, I'm going to direct you to certain line items in

18     this report that my good friend, Mr. Hewlett, over here will

19     locate and highlight for you on the screen so that we won't

20     have to suffer through ruining your eyesight trying to read

21     them, and I'd like to start with BDO line 2131.

22           Now, do you recall that expenses for Apollo-issued

23     mobile communication devices were paid for by Apollo?

24           MR. THOMPSON:  Your Honor, I don't object to this

25     document being displayed on the screen, but I don't think

JcaWras4                    LaMons – Cross

1    there's any foundation that this witness has ever seen this

2    document or knows what it is.

3               THE COURT:  Well, let's find out.

4               Have you seen this document before?

5               THE WITNESS:  It doesn't look familiar, but I can

6    barely read it.

7               THE COURT:  OK.

8               All right.  Let's see what the question is.

9    BY MS. van VLIET:

10   Q.  The question is are you familiar with the policies of

11   Apollo -- it doesn't have anything to do with this particular

12   document -- the policies of Apollo in paying for its employees

13   mobile telephone devices?

14   A.  I believe so, yes.

15   Q.  OK.

16   A.  Yes.

17   Q.  And specifically, the device of choice was at that time a

18   Blackberry, is that correct?  Do you recall?

19   A.  For some, yes.

20   Q.  Do you recall that Mr. Rashid had been issued a Blackberry?

21   A.  I don't recall he had a Blackberry or not.

22   Q.  He had some Apollo-issued phone, is that right?

23   A.  Yes, yes.

24   Q.  Now, when you got the monthly Amex bills, the corporate

25   bills, would the charges for the Blackberry and/or phone cases

JcaWras4                         LaMons - Cross

1    or earbuds sometimes present on those Amex bills?

2    A.  I believe so.

3              THE COURT:  Do you recall whether the Blackberry was

4    physically or the mobile phone was physically issued to the

5    person, or they went out and picked one out and then sought

6    reimbursement for it?

7              THE WITNESS:  I believe it was issued, but it could

8    have been possibly that you had a choice.  I just don't

9    remember.

10             THE COURT:  OK.  Thank you.

11   BY MS. van VLIET:

12   Q.  Now, when things were purchased, not only the actual

13   service for the device, but like headsets and cases and things

14   like that, those would be things, to your understanding, that

15   Apollo Management would provide for, is that correct?

16   A.  I don't know.  It would be something I would have to ask.

17   Q.  Well, in any case, would you ever have assigned it, the

18   payment for it to a portfolio company?

19   A.  If they told me it was to the portfolio company, then

20   that's what I would have done.

21   Q.  But if nobody told you that, your testimony is you never

22   would've -- you couldn't have made a mistake and done it that

23   way?

24   A.  I don't believe I did that intentionally, no.

25   Q.  I didn't say intentionally.  You could have made a mistake

1    and done it, is that right?

2    A.  It's possible, but I don't recall doing that.

3    Q.  OK.

4              Turning your attention to line 2288.

5    A.  I don't have anything on my screen.

6              MS. van VLIET:  You will in a moment.  The gentleman's

7    going to -- 2288.

8              THE COURT:  There does not appear to be anything on

9    the witness's screen.

10             MR. HEWLETT:  Can I come up and check on it?

11             THE COURT:  You may.

12             MS. van VLIET:  Judge, I can go forward without the

13   screen, and then maybe we can --

14             THE COURT:  OK.  We're back in action.

15   BY MS. van VLIET:

16   Q.  Ma'am, let me just ask you some general questions while Mr.

17   Hewlett gets back in place.

18             We talked a little bit --

19             MS. van VLIET:  Let's go to line 2551 instead.

20   Q.  You mentioned that you would, when populating these expense

21   reports, provide a description of the charges, is that right?

22   A.  Yes.

23             (Continued on next page)

24

25

JCAHRAS5                       LaMons - Cross

1    Q.  Sometimes that -- you know, it was a longer description.

2    For example, in the earlier exhibit, it was something about

3    working late meal, is that right?

4              MR. THOMPSON:  Objection, your Honor.  Again, there's

5    been no foundation this witness -- I believe she said she's

6    never seen the document before, and if the defense wants to ask

7    about what was in expense reports, they should either show her

8    expense reports or make some representation that the long

9    description here is derived from the expense report verbatim.

10   But just to ask the witness about a document she's never seen

11   before --

12             THE COURT:  I don't understand the question to relate

13   to the document.

14             Does it relate to the document?

15             MS. van VLIET:  It does not yet.

16             THE COURT:  Well, please take the document down off

17   the screen, then.

18             MS. van VLIET:  OK.

19   Q.  Do you recall testifying about when you would fill out the

20   descriptions of expense reports that you would sometimes

21   include names of individuals that had been in attendance at a

22   given meal, for example?

23   A.  Yes.

24   Q.  Now, in some instances, do you recall naming individuals

25   who were at a meal who were no longer at the portfolio company

1   that you were referring to?

2   A.  No, I don't.

3   Q.  If you did that, if you, for example, put the name of Mr. X

4   as well as Mr. Y, one of whom had replaced the other, is it

5   your testimony that Mr. Rashid would have told you that those

6   people were at the dinner?

7   A.  It's my testimony that I would ask him about people who

8   attended dinners, and then he would have told me that, yes.

9   Q.  So anyplace in any of the expense reports -- if we had

10  them, I would show them to you -- if it says that people that

11  were no longer with the portfolio company that Mr. Rashid was

12  working intimately with, that that information would have come

13  to you from Mr. Rashid, is that right?  Do I understand that?

14  A.  Can you rephrase that, please?

15  Q.  Sure.  If there was a mistake in the description of the

16  individuals who were at a dinner, including, for example,

17  naming individuals who were no longer working for the company

18  at the time the dinner happened, is it your testimony that that

19  erroneous information would have come from Mr. Rashid to you?

20  A.  Yes, he would have told me who was at the dinners with him

21  on his expenses or dinner.

22          THE COURT:  Please pause for a moment.

23          (Pause)

24          THE COURT:  You may proceed.

25          MS. van VLIET:  Thank you, your Honor.  I believe the

JCAHRAS5                         LaMons - Cross

1    SEC is stipulating that the long description column on

2    Plaintiff's Exhibit 111 is taken from the expense reports.

3            MR. THOMPSON:  More particularly, your Honor, I think

4    both parties are stipulating to that effect.

5            MS. van VLIET:  Correct.

6            THE COURT:  OK.  So stipulated.

7    BY MS. van VLIET:

8    Q.  Now, turn back up, then, to line 2370, if you please, sir.

9    Actually, stop.  Let me ask it this way:

10           Do I understand you correctly that if there is a

11   mistaken entry in the description of a flight to Paris and it's

12   attributed to a portfolio company that is not based in Paris,

13   that that erroneous information would have been given to you by

14   Mr. Rashid?

15   A.  Yes.

16   Q.  Am I correct that regardless whether -- whether you put the

17   wrong -- whether the wrong portfolio company was listed in the

18   long description, at the end of the day, Apollo was going to

19   pay for that as a business expense if he, Mr. Rashid, was

20   traveling to a portfolio company meeting?  Is that your

21   understanding of the T&E policies?

22   A.  Can you rephrase that?  I'm not sure I'm following what

23   you're saying.

24   Q.  Sure.  If there was a mistake in the long descriptions on

25   the T&E expense reports that you entered and you said, for

1   example, that a meeting in Paris was attributable to a company

2   other than Ascometal, at the end of the day, Mr. Rashid wasn't

3   going to have to pay for that because he would -- Apollo was

4   going to pick up the expense of the meeting at the portfolio

5   company.  Was that your understanding of the T&E policy?

6               MR. THOMPSON:  I'll just note an objection to form.  I

7   believe the question assumed that Ms. LaMons made a mistake.

8               THE COURT:  Sustained.  Sustained.

9               MS. van VLIET:  Let me clarify what I meant.

10  Q.  Who is it that types in the long description?  Were you the

11  person who typed in the long description during the time period

12  that you worked for Mr. Rashid?

13  A.  Yes.

14  Q.  Recognizing that it is your testimony in the declaration

15  that any errors that may have been typed in were attributable

16  to information given to you by Mr. Rashid, if the information

17  that you typed in was wrong, at the end of the day, was it your

18  understanding that if Mr. Rashid had been on a business trip,

19  that Apollo would pick up those charges?

20  A.  No, that wasn't my understanding.

21              THE COURT:  Next question.

22  Q.  OK.  Do you remember -- or did you ever attend going-away

23  functions for other colleagues at Apollo?

24  A.  I don't recall.

25  Q.  Do you recall a going-away function for a Ms. Emily

JCAHRAS5                          LaMons - Cross

1   Hagerman on February 13, 2012 -- I'm sorry, '13?

2   A.   What was the name?

3   Q.   Emily Hagerman?

4   A.   I don't recall that.

5   Q.   Do you recall Ms. Hagerman?

6   A.   That name doesn't ring a bell.

7   Q.   And you would have, as I understand your declaration,

8   checked Mr. Rashid's calendar entries to determine whether he

9   had calendared or had notations about attending such going-away

10  parties on, for example, February 13, 2013, is that right?  I

11  understand that was your routine.

12  A.   Yes.

13            MS. van VLIET:  May I have a moment, Judge?

14            THE COURT:  You may.

15            MS. van VLIET:  No further questions.  Thank you.

16            THE COURT:  All right.  Redirect?

17            MR. THOMPSON:  No redirect, your Honor.

18            THE COURT:  All right.  Thank you very much.  You may

19  step down.

20            THE WITNESS:  Thank you.

21            (Witness excused)

22            THE COURT:  Call your next witness.

23            Just leave all the papers there.  That's the lawyers'

24  problem.

25            MR. THOMPSON:  One moment, your Honor.  If I can do

1   housekeeping here.

2              THE COURT:  OK.

3              MR. THOMPSON:  Your Honor, with permission, I'll place

4   a copy of the next witness' declaration in the box.

5              THE COURT:  That's fine.  Thank you.

6              MR. THOMPSON:  I also have a copy for the bench.  I

7   apologize for the --

8              THE COURT:  That's fine.  Thank you.

9              Please step up, ma'am.  Please step into the witness

10  box.  Remain standing and raise your right hand.

11  BARBARA FEEHAN,

12       called as a witness by the Plaintiff,

13       having been duly sworn, testified as follows:

14             THE COURT:  All right.  You may inquire.

15             MR. THOMPSON:  Thank you, your Honor.

16  DIRECT EXAMINATION

17  BY MR. THOMPSON:

18  Q.  Good afternoon, Ms. Feehan.

19  A.  Good afternoon.

20  Q.  Ms. Feehan, have you previously provided a declaration

21  setting forth the narrative of your direct testimony in this

22  case?

23  A.  I have.

24  Q.  I have taken the liberty of placing before you a Redweld of

25  documents, Ms. Feehan.  It's to your right.  It contains a copy

JCAHRAS5                      Feehan – Direct

1   of your declaration and the documents referenced in it.  If you

2   could take a moment to look at it, I would appreciate it.

3   A.  I see the expense receipts.  OK.

4   Q.  Do you have the declaration in front of you, Ms. Feehan?

5   A.  The folder that says "Barbara Feehan Declaration" is

6   actually empty.

7   Q.  Oh.  I'm sorry.  My apologies, Ms. Feehan.

8   A.  That's OK.  Thank you.

9   Q.  Ms. Feehan, if you turn to page 12 of the declaration, is

10  that, in fact, your signature?

11  A.  Yes.

12  Q.  Did you, in fact, review the declaration before signing it?

13  A.  I did.

14  Q.  Have you had a chance to review the declaration after

15  signing it?

16  A.  I have.

17  Q.  Have you noticed any errors in your declaration?

18  A.  I did not.

19  Q.  Are there any corrections you believe you need to make?

20  A.  No.

21  Q.  Do you adopt the declaration as your direct testimony in

22  this case?

23  A.  I'm sorry?

24  Q.  Do you adopt the declaration as your direct testimony in

25  this case?

JCAHRAS5                        Feehan - Cross

1    A.  Yes, I do.

2            MR. THOMPSON:  Your Honor, at this time I would ask

3    that Ms. Feehan's declaration be admitted as Plaintiff's

4    Exhibit 307.

5            MS. van VLIET:  No objection.

6            THE COURT:  Received.

7            (Plaintiff's Exhibit 307 received in evidence)

8            MR. THOMPSON:  Also, your Honor, there are four

9    exhibits to Ms. Feehan's declaration that we would ask be

10   admitted, Plaintiff's Exhibit 86, 87, 139, and 140.

11           THE COURT:  Any objection?

12           MS. van VLIET:  No objection.

13           THE COURT:  Received.

14           (Plaintiff's Exhibits 86, 87, 139, and 140 received in

15   evidence)

16           MR. THOMPSON:  No further questions at this time, your

17   Honor.  Pass the witness for cross-examination.

18           THE COURT:  Thank you very much.

19   CROSS-EXAMINATION

20   BY MS. van VLIET:

21   Q.  Good afternoon, Ms. Feehan.

22   A.  Good afternoon.

23   Q.  My name is Theresa van Vliet.  I represent Mr. Rashid.

24           Now, let's talk about your declaration first for a

25   moment.  That's Plaintiff's Exhibit 307, is that right?  You

JCAHRAS5                          Feehan - Cross

1   have that in front of you?

2   A.   Yes.

3   Q.   It says in the first paragraph that you were represented by

4   your own counsel in connection with the preparation of this

5   declaration, is that correct?

6   A.   Yes.

7   Q.   Who is your counsel?

8   A.   Paul Weiss.

9   Q.   By the way, did you write this declaration?

10  A.   Yes.

11  Q.   You did?

12  A.   Well, I was a part of it, yes.

13  Q.   OK.  Did you write the entire declaration?

14  A.   Yes.

15  Q.   OK.  Then, I take it, you submitted it to Paul Weiss?

16  A.   Yes.

17  Q.   I don't want to get into any communications between you and

18  Paul Weiss who was representing you, just so we're clear on

19  that.

20        In preparing your declaration that you wrote, did you

21  review any documents in preparation of the declaration?

22  A.   I did review documents, yes.

23  Q.   What documents were those?

24  A.   I did review expense reports.

25  Q.   You reviewed expense reports?

1  A.  I did.

2  Q.  Who gave you those expense reports?

3  A.  I retrieved them at the office of Paul Weiss.

4  Q.  Were they actual expense reports or were they summaries?

5  A.  I'm sorry?

6  Q.  Were they actual expense reports or were they summaries?

7  A.  It looked like the expense report, I guess the draft,

8  because my questions were on those reports.

9  Q.  Apologies.  I did not mean to interrupt you.

10  A.  That's OK.

11  Q.  So you reviewed draft expense reports, is that correct, at

12  Paul Weiss?  Is that my understanding?

13  A.  Right.

14  Q.  Did you review finally completed and submitted expense

15  reports?

16  A.  I think I did review a couple of those as well, from my

17  memory.  I'm trying to remember if it had the final

18  confirmation, but I feel like I did review those as well.

19  Q.  Any other documents other than the draft expense reports

20  that you've mentioned, the couple of final expense reports that

21  you recall seeing, and the exhibits that you've already

22  testified about that were attached to your declaration,

23  anything else that you reviewed when you prepared your

24  declaration?

25  A.  I don't believe so.

Q.   OK.  Now, how many times have you met with the SEC in

connection with your testimony in your declaration?

A.   Three.

Q.   When was the first time you met with the SEC?

A.   The first time, I want to say it was sometime, I believe,

in 2016, if I remember correctly.

Q.   Then --

A.   And then the other two were this year.

Q.   2019?

A.   '19, yes.

Q.   Now, in addition, did you review any additional documents,

other than ones you've already described for us, in terms of

what you looked at to prepare to write your declaration when

you met with the SEC?

A.   No.

Q.   Now, you worked for Mr. Rashid for a six-month period in

2000 -- well, you worked for Mr. Rashid for a period of time

that ended in June of 2010 and went back prior to that, is that

right?

A.   Correct.

Q.   Let's focus on the time period January 2010 to June 2010.

A.   OK.

Q.   At that point in time, Mr. Rashid was traveling an awful

lot for work, is that right?

A.   Correct.

JCAHRAS5                          Feehan - Cross

1    Q.  And he was someone that worked long, long hours, is that

2    right?

3    A.  Correct.

4    Q.  Long into the night, weekends, holidays, was that your

5    recollection of his work ethic?

6    A.  Yes.

7    Q.  In terms of his travel schedule and his travel volume, was

8    he someone that was required by the duties of his position to

9    travel frequently internationally as well as domestically?

10   A.  Yes, he did travel internationally as well.

11   Q.  Do you recall a portfolio company -- well, strike that.

12           Do you recall that, among his various duties, was

13   liaisoning and dealing with and interacting with certain

14   portfolio companies?

15   A.  Yes.

16   Q.  Do you recall a company by the name of Ascometal?

17   A.  No, I'm sorry, I don't recall that.

18   Q.  Do you recall that he was -- a lot of his portfolio

19   companies, a lot of his work surrounded metals and mining?

20   A.  Yes.

21   Q.  And in addition to actual portfolio companies that dealt

22   with metals and mining, was it also part of his job

23   responsibilities to try to find new investments in the arenas

24   of metals and mining?

25   A.  Yes.

JCAHRAS5                        Feehan - Cross

1    Q.  Now, in addition to metals and mining, there were other

2    kinds of businesses too.  For example, were you familiar with a

3    business called Realogy?

4    A.  Yes, I was.

5    Q.  Realogy had to do with real estate, is that right?  Sorry,

6    you have to --

7    A.  Yes.  I'm sorry.  Yes.

8    Q.  And then there was also a business called QDI that was

9    involved in the transportation businesses and was headquartered

10   down in Florida.  Do you remember that?

11   A.  Yes, I remember QDI.

12   Q.  Now, as part of your work as Mr. Rashid's assistant, were

13   you trained in using the software that Apollo employed to

14   generate and record expenses?

15   A.  Yes, I was.

16   Q.  The name of that software system was PeopleSoft, is that

17   right?

18   A.  Correct.

19   Q.  When were you trained -- who trained you on the use of

20   PeopleSoft, if you can recall?

21   A.  Seth Dunayer, who was the account manager at the time.

22   Q.  And the PeopleSoft system was a system that you had access

23   to to input information that would ultimately generate some

24   kind of expense report, correct?

25   A.  I had to put in the long description.  The expenses were

JCAHRAS5                          Feehan - Cross

1   already there as far as date, the vendor, the amounts.  I had

2   to put in the deal and put in a long description describing --

3   Q.  You said that you had to put in a deal.  You were familiar

4   with the travel and entertainment policies that were in effect

5   at the time, correct?

6   A.  Correct.

7   Q.  Was the allocation of a deal or a project code something

8   that was required by those T&E policies, to the best of your

9   recollection?

10  A.  Yes.

11  Q.  So --

12  A.  Everything had to be coded to a deal, yes.

13  Q.  My question, though, is you were familiar with those travel

14  and entertainment policies.  Do you recall that the policies

15  actually required you to put in a deal?

16  A.  Yes, if you didn't put in a deal, it did not go through.

17  Q.  OK.

18  A.  As far as I can remember, it would not submit.

19  Q.  Let me understand this.  Let me make sure I understand this

20  correctly.

21         If there was no allocation on an expense report that

22  was submitted, it wouldn't go through and the expense report

23  would be kicked back and nothing would happen with it?

24  A.  Right, I was not able to submit.  If I remember, no, it had

25  to be filled out.

JCAHRAS5                         Feehan - Cross

1    Q.  OK.

2    A.  There could not be any blanks.

3    Q.  Now, when you got the original information, it would come

4    to you via the PeopleSoft application, isn't that right?

5    A.  Correct.

6    Q.  OK.  Could you take a look at Plaintiff's Exhibit 87, which

7    is the -- of the two exhibits that were attached to your

8    declaration.

9    A.  Attached to my declaration?

10   Q.  Yes, ma'am.

11           Does the Court have a copy?  If not, I have an extra

12   here.

13           MR. THOMPSON:  I believe the Court should have a copy,

14   your Honor.

15           THE COURT:  Yes.  Is it 86 or 87?

16           MS. van VLIET:  It's Plaintiff's Exhibit 87, your

17   Honor.  It's the --

18           THE COURT:  I have --

19           THE WITNESS:  I have it right here, 87.

20           THE COURT:  I have it now.  OK.  Thank you.

21           THE WITNESS:  I'm sorry.  What page do you want me to

22   look at?

23           MS. van VLIET:  Haven't gotten that far.

24           THE WITNESS:  Sorry.

25           MS. van VLIET:  No worries.

JCAHRAS5                         Feehan - Cross

1   BY MS. van VLIET:

2   Q.  So Plaintiff's Exhibit 87, the front page of it, it says,

3   "Employee Expense Receipt Form"?

4   A.  Correct.

5   Q.  And what was your understanding -- because this is attached

6   to your affidavit, what was your understanding of what this

7   receipt form was?  This wasn't the actual expense report,

8   right?

9   A.  This actually looks like stuff that he would have paid out

10  of pocket with his cash.  He didn't -- he wasn't able to use

11  the corporate card.

12  Q.  OK.  So this --

13  A.  Or he would have maybe used his personal card, but it

14  wasn't on the corporate card.

15  Q.  So there are, then, two different kinds of expense

16  submissions, as I understand it from what you're saying, that

17  any given employee could make: one for out-of-pocket expenses

18  and one that would be attributable to the corporate Amex card.

19  Do I understand you correctly?

20  A.  Correct.

21  Q.  Now, if you look at the bottom right hand of each of the

22  pages in Exhibit 87, you'll see what's called a Bates stamp

23  number.  The first one on the first page is 41245.

24  A.  Right.

25  Q.  I'm going to ask you to look at 41254.

1   A.  OK.

2   Q.  Are you there?

3   A.  I am.

4   Q.  Now, 1254, is that an example of the Amex charges portion

5   of the expense report that would appear in the My Wallet?

6   A.  Yes, it is.

7   Q.  Now, I note that on the right-hand side of the page, the

8   exhibit that Apollo provided was cut off.  Do you see that?

9   A.  I'm sorry.  Where is it cut off you're saying?

10          MS. van VLIET:  May I approach the witness?

11          THE COURT:  Yes.

12          If you look at the top, it says -- the word looks like

13   "train" on the first line, and then if you look at the second

14   line, it looks like it starts off "meal WIT" and ends there.

15   The question is, does it appear to you that language to the

16   right of those letters and words was not reproduced?

17          THE WITNESS:  I'm sorry.

18          THE COURT:  See over here?  There's a column that says

19   "train"?

20          THE WITNESS:  Right, OK.

21          THE COURT:  You look down, the next entry, it says

22   "meal" and then "WIT."

23          THE WITNESS:  Right.

24          THE COURT:  The question I think you're being asked is

25   does it appear to you that there were more letters on these

JCAHRAS5                          Feehan - Cross

1   lines, but they were not reproduced --

2              THE WITNESS:  Right.

3              THE COURT:  -- or copied?

4              THE WITNESS:  Yes, it does look like that.

5              THE COURT:  Thank you.

6   BY MS. van VLIET:

7   Q.  Ma'am --

8   A.  But I'm on the wrong page, I think.  I'm sorry.  What page

9   was it?

10  Q.  41254.

11  A.  OK.

12  Q.  Actually, I'd like you to focus on the headings.

13  A.  OK.

14  Q.  You see the headings on that page?  Let me know when you're

15  there, ma'am.

16  A.  41254, I have it in front of me.

17  Q.  You have it?

18  A.  Yes.

19  Q.  Just so we're sure we're on the same page, the first date

20  on the list should be 12/22/09.

21  A.  Yes.

22  Q.  Is that right?

23  A.  Uh-huh.

24  Q.  Looking at the headings above that, do you see all the way

25  to the right the headings, the last two columns, if you will,

JCAHRAS5                        Feehan - Cross

1   one says "Doc type"?

2   A.   Uh-huh.

3   Q.   And then --

4             THE COURT:  You have to use words.  Excuse me.  You

5   have to answer in words.

6   A.   I'm sorry.  Yes.

7   Q.   Apologize.

8             And the one immediately to the right of it, there's

9   two letters, "ID"?

10  A.   Yes.

11  Q.   And it appears to be cut off, is that correct?

12  A.   Yes.

13  Q.   I recognize it's been a long time, but can you tell me what

14  the other lines, categories, were on this form that you were

15  filling out every day?

16  A.   There's a column missing where it asks to describe the

17  description.

18  Q.   OK.

19  A.   I notice that column is not there.

20  Q.   When you say where it's asked to describe the description,

21  are you referring to that long description you talked about a

22  moment ago?

23  A.   Yes.

24  Q.   Now, some of the handwriting on, again, page 41254 is

25  yours, correct?

1  A.  The questions, yes.

2  Q.  For example, where it says "meal W\who," who is this,

3  that's your handwriting?

4  A.  Correct.

5  Q.  And it's your recollection, ten years later, that the rest

6  of this is Mr. Rashid's?

7  A.  The answers are his, yes.

8  Q.  Without going through every single page in this exhibit

9  where there's handwriting, where there are on these kind of

10  pages, it's your recollection that it is Mr. Rashid's

11  handwriting providing, as you've described it, the answers, is

12  that right?

13  A.  Yes.

14  Q.  Now let's take a look at, in the Plaintiff's Exhibit 111,

15  which is going to be displayed for you on the screen, ma'am,

16  line 259.

17            MR. THOMPSON:  Your Honor.

18            MS. van VLIET:  Do we have the same stipulation, I'm

19  assuming?

20            MR. THOMPSON:  Yes, your Honor, and I would request,

21  since there's no foundation that the witness has ever seen this

22  document, that she at least be apprised of the parties'

23  stipulation with respect to the long description field if it's

24  being used as a convenience, just to orient her to long

25  descriptions.

1          THE COURT:  Why don't you state the stipulation for

2     the witness.

3          MS. van VLIET:  I was actually going to do it as soon

4     as it got pulled up so I could refer her to something.

5          THE COURT:  OK.  Go ahead.

6     BY MS. van VLIET:

7     Q.  Do you see, ma'am, on the screen before you one of the

8     columns says "Long Descr"?  Do you see that?

9     A.  Yes.

10    Q.  OK.  Below that generically there are writings describing

11    things like cab, work late, research for QDI, things of that

12    nature?

13    A.  Yes.

14         THE COURT:  Slow down, slow down.

15    Q.  Things of that nature.

16         Are those the kind of descriptions that you were

17    referring to earlier in your testimony when you stated that you

18    would input long descriptions into the expense report

19    PeopleSoft system?

20         THE COURT:  When is the stipulation coming?

21         MS. van VLIET:  He asked, the government -- I mean,

22    the SEC stipulates that those are, in fact, from the SEC.  I

23    understood that Mr. Thompson asked me to alert the witness that

24    that's what they were.

25         THE COURT:  The stipulation is that they're from the

JCAHRAS5                          Feehan - Cross

1   SEC.  Is that what you're saying, ma'am?

2              MS. van VLIET:  No.  The SEC stipulated that they are

3   from the expense report long description.

4              THE COURT:  That's what I thought it was.

5              And that's the stipulation, correct, Mr. Thompson?

6              MR. THOMPSON:  Yes, sir.

7              THE COURT:  OK.  Now, what's the question for the

8   witness?

9   BY MS. van VLIET:

10  Q.  Are these the kind of -- you see where it says long

11  description?

12  A.  Yes, I see that.

13  Q.  Are these the kind of long descriptions that you would

14  enter into the PeopleSoft system?

15  A.  Yes.

16  Q.  OK.  Now, turning to line 259, which is a charge for Delta

17  Air Lines, do you see that, ma'am?

18  A.  Yes.

19  Q.  Where the long description is "Business trip, do not see

20  details"?

21  A.  Yes, I see that.

22  Q.  When you say -- when you said "do not see details," what

23  did you mean?

24  A.  I didn't see necessary information needed.

25  Q.  Did you have available to you Mr. Rashid's calendar?

JCAHRAS5                        Feehan - Cross

1   A.  I did.

2   Q.  And when you couldn't find something, would you have

3   occasion, then, to look and see if you could find something on

4   his calendar that would relate to that?

5   A.  Yes.  If I did not see it on the calendar, that is when I

6   would ask him.

7   Q.  Is it your testimony that there were no calendar entries

8   relating to this meeting on the 10th of May that generated this

9   Delta Air Lines flight?

10  A.  If I put in that I did not see the details, then I didn't,

11  and that's why I would ask him.  If the details were in the

12  calendar, then I knew what deal it would be related to.

13  Q.  And you would have then booked it to whatever the proper

14  portfolio company was, is that right?

15  A.  Correct.

16  Q.  But on no occasion would you have just skipped looking at

17  his calendar and entering the information correctly, is that

18  right?

19  A.  No.  My process was to look at the calendar.  If it was not

20  there, then I would write questions on the expense report and

21  wait for his answers or his response.

22  Q.  OK.  Let's take a look at line 265, which would be on the

23  next page -- I'm sorry, two pages down.  The long description

24  for the May 11, 2010, American Airlines flight is business trip

25  to Dallas for QDI meetings.  Is that correct?

JCAHRAS5                          Feehan - Cross

1   A.  Yes, that's what it says.

2   Q.  You testified earlier that you recalled QDI, is that right?

3   A.  Yes, I do.

4   Q.  And QDI was in Tampa, isn't that right?

5   A.  QDI was in Dallas, if I can remember correctly.  You know,

6   I --

7   Q.  OK.  Granted, this was ten years ago.

8          Nonetheless, so you attributed this American Airlines

9   flight to QDI, is that right?  As well as the one right below

10  it, you also charged another airline -- attributed, I should

11  say, another airline trip to QDI, is that right?

12         MR. THOMPSON:  Objection to form, your Honor.  I

13  believe the witness' testimony was that she asked Mr. Rashid if

14  she did not know, and the question is you attributed this and

15  you contributed that.

16         THE COURT:  Rephrase your question or lay a better

17  foundation for it.

18         MS. van VLIET:  Absolutely, your Honor.

19  Q.  Is it your testimony that specifically with regard, for

20  example, to these two American Airline flights that you

21  attribute -- that are attributed to QDI, that you asked

22  Mr. Rashid and he told you to attribute them to Quality

23  Distribution, Incorporated?

24  A.  Yes, that was my process.  I would ask him and then I would

25  put in the information that he gave me.

JCAHRAS5                    Feehan - Cross

Q.  So if, for example, these trips really related to an in

lieu of trip to Maui, Hawaii, that the SEC has stipulated was

proper, then how would you explain the attribution in the long

description to QDI?

          MR. THOMPSON:  Objection to the statement of the

stipulation, your Honor.

          THE COURT:  I don't understand the objection.

          MR. THOMPSON:  The SEC is not contesting the trip to

Hawaii as an improper personal expense.  I don't think we

stipulated that it was proper in all respects.

          THE COURT:  Rephrase your question.

          MS. van VLIET:  I'll move on, Judge.

Q.  Let's look at line 305.  You see that, ma'am?

A.  Yes.

Q.  The long description for the Ritz-Carlton Hotel charge in

May of 2010 is for a Metals U.S.A. conference, is that right?

A.  That's what I'm reading, yes.

Q.  Did you have an understanding that the Ritz-Carlton Hotel

was the hotel that was associated with the American Airlines

flights that were booked earlier in May?

A.  I'm sorry.  Can you repeat?

          THE COURT:  Are you asking did she have an

understanding in 2010, or are you asking does she have an

understanding now from a review of the document?  What do you

want to know?

JCAHRAS5                              Feehan - Cross

1    Q.  Did you in the past, in 2010, have an understanding that

2    the American Airlines travel that you -- that is attributed to

3    QDI that we just discussed was related to the Ritz-Carlton

4    Hotel charges that you then -- that are then attributed to

5    Metals U.S.A.?

6    A.  Whatever information I put in the long description is

7    information that I acquired from Mr. Rashid.  I wouldn't just

8    put it down.

9    Q.  OK.

10   A.  So if that's what he had told me, then that's what I put

11   into the description.

12   Q.  Now, do you recall a entity called Citi Habitats?

13   A.  No, I do not.

14   Q.  Do you remember Realogy, correct?

15   A.  Yes.

16   Q.  Did you ever take -- strike that.

17        Did Mr. Rashid move several times when he was working

18   at Apollo?

19   A.  Yes, he did move.

20   Q.  OK.  At least one of those moves you, as his assistant,

21   assisted him in setting up some of the move transactions, is

22   that right, the movers, things of that nature?

23   A.  I don't recall the details, but I'm sure I did assist him.

24   Q.  When you say sure you did assist him, you assisted him with

25   the move, although you don't recall the specific details of

JCAHRAS5                          Feehan - Cross

1   what assistance you provided?  Do understand I that?

2   A.   Correct.

3   Q.   Now, let's turn back to Plaintiff's Exhibit 87, the larger

4   of the two exhibits.  If you would turn to Bates stamp

5   No. 41285, please, ma'am.

6   A.   41285?

7   Q.   Yes, ma'am.

8   A.   OK.

9   Q.   Now, when you testified earlier, you testified that the

10  expense type column, as I recall your testimony, had been --

11  was prepopulated when you first got the expense charges from

12  Apollo Amex cards.  Do I recall that correctly?

13  A.   Correct.

14  Q.   And the prepopulation would be something that Amex did, is

15  that right?

16  A.   Yes.

17  Q.   Take a look down to the middle of the page on charges that

18  were incurred on March 18, 2010.

19  A.   OK.

20  Q.   Do you see that for research services?

21  A.   Yes.

22  Q.   It says Citi Habitats 2.  Do you see that?

23  A.   Yes.

24  Q.   As the vendor -- excuse me, the merchant?

25  A.   Yes.

JCAHRAS5                          Feehan - Cross

Q.  Now, those were prepopulated as research services.  What
was your understanding of what research services was when you
were going through this at the time in 2010?

A.  I still wanted to get an explanation from him, so I did ask
him because, as you can see, he wrote "research" right next to
it.  That's his handwriting.

Q.  I understand that your testimony is that that's his
handwriting.  My question, though, refers to what your
understanding was in 2010 as to what the category of expenses,
research services entailed.

A.  Research on companies.

Q.  OK.  Do you recall that Citi Habitats was a subsidiary of
Realogy?

A.  No, I do not recall.

Q.  Do you see next to the far left column on this particular
page there appear to be icons running down that page?

A.  To the left?  I'm sorry.

Q.  Yes, ma'am, all the way to the left.  If you see the
employee ID.

A.  Right.

Q.  The column up at the top, just to the left of that, do you
see that?

A.  Yes.

Q.  And do you recall what those icons were -- signified?
Could you, for example, click on and get a more detailed

1    description of the charge on the Amex?

2    A.  I'm sorry.  I really don't recall.

3    Q.  OK.  Was there any way, when you were filling out these and

4    attributing and looking at these Amex charges, that you could

5    get into the charge in more detail to see what it was about

6    before talking to anybody about it?

7    A.  I don't recall being able to do that because, like I said,

8    I always went to him when I was unsure to find out what the

9    exact deal was and what the description was.

10   Q.  And you would show him this document, obviously?

11   A.  Yes, with my questions, correct.

12   Q.  Now, do you know why this particular Citi Habitats charge

13   is broken out into two charges on the same day?

14   A.  No, I do not.

15   Q.  Did you ask Mr. Rashid that or did you do further research

16   into it at the time?

17   A.  No, I just went by his description of what he wrote on the

18   report.

19   Q.  When you say "what he wrote on the report," you're

20   referring to this specific page and your testimony that this is

21   his handwriting, right?  This is the report you're referring to

22   in your testimony?

23   A.  Correct.

24   Q.  Now, turn to page 41263, if you will.

25          Do you remember some charges with regard to a place

JCAHRAS5                         Feehan - Cross

1   called La Contessa?

2   A.   Yes, I do remember seeing charges for that.

3   Q.   And 41263, if you tell me when you're there.

4   A.   I'm here.

5   Q.   If you look down at the bottom -- well, second to the

6   bottom, I apologize.

7   A.   I see it.

8   Q.   There's a notation for a meal, clients in the prepopulated

9   line, and La Contessa Inc. dated January 12, 2010.  Is that

10  right?

11  A.   Yes.

12  Q.   And then the last column that's at least printed on the

13  page with the Apollo Bates stamp is "Descript," and it at least

14  says Dinner and a "W," is that right?

15  A.   Yes.

16  Q.   I'm sorry, it says meals.

17  A.   It says meal with, right.

18  Q.   We both caught my mistake at the same time.  It says meal

19  W.  It says WIT.

20  A.   Right.

21  Q.   Now, there were a couple of times where La Contessa shows

22  up thereafter in Amex charges, is that right?

23  A.   I believe so, yes.

24  Q.   And it was always prepopulated as -- I'll represent to you

25  that if you looked through every page on Plaintiff's Exhibit 87

JCAHRAS5                          Feehan - Cross

1   where it said La Contessa, it would always populate as meals,

2   OK.

3   A.   OK.

4   Q.   Did you often find instances where the legal name or a

5   legal entity name like La Contessa, LLC, or La Contessa, Inc.,

6   would be on these Amex charges that you just didn't recognize

7   the name of the business?

8   A.   Right.  And if I didn't recognize the name, that is when I

9   asked him because, especially with meals, I need to know

10  everyone that attended that meal.

11  Q.   So it wasn't just a situation limited to this La Contessa

12  incident.  There were other times, do I understand you

13  correctly, where the name that appeared on the Amex charges

14  would not match the familiar doing business as name of an

15  entity, is that right?

16  A.   Correct.

17  Q.   Now, you testified that you did some personal assistant

18  kind of things for Mr. Rashid, the move you discussed, and I

19  assume if he had other personal appointments that had to be

20  canceled or scheduled and rescheduled because of work

21  exigencies, that he would ask you to take care of those and you

22  would, right?

23  A.   Yes.  If it was things like dealing with his Time Warner or

24  his *Wall Street Journal*, tasks like that.

25  Q.   And other, if he had, other personal appointments?

JCAHRAS5                          Feehan - Cross

1   A.  If he was going to go away, to stop the paper from being

2   delivered; if he had an appointment, having Time Warner to

3   come, make an appointment, things like that.

4   Q.  So you would on a regular basis handle such kind of

5   personal assignments for him when they were requested by him,

6   is that right?

7   A.  Yes.

8   Q.  Now, do you ever recall him having to cancel or asking you,

9   rather, to cancel for him personal appointments, like either

10  doctors' appointments or grooming appointments or things of

11  that nature?

12  A.  No, I don't recall anything like that, but also, it's been

13  quite some time, so --

14  Q.  So it's possible.  I mean, if he asked you to do it --

15  A.  If he asked me.

16          THE COURT:  Sustained as to possible.

17  Q.  If he had asked you to do it, you would have done it, is

18  that right?

19  A.  Correct.

20  Q.  Now, in Plaintiff's Exhibit 87 --

21  A.  I'm sorry?

22  Q.  In Plaintiff's Exhibit 87, the large one, there are

23  instances where La Contessa appears, for example, at 41 --

24  41284, where there's no direction in handwriting as to where

25  the expense should be allocated.  In such instances, would

1  you -- how would you know where to allocate it on your --

2  A.  Because the information would be in the calendar.  He'd

3  have meetings in the calendar.  So if it was on the same day

4  that he had a dinner or a lunch, it would be there, dinner

5  meeting, lunch meeting, and then I would know it was pertaining

6  to that deal that he was working on at that time.  It's not

7  something I would just put in without knowing.

8  Q.  OK.  So if there was a charge for dinner on December 10,

9  2019, and you looked in the calendar and it said "dinner

10 meeting with QDI," you would attribute that meal on that La

11 Contessa, whatever had been prepopulated, as a meal.  If

12 there's no handwriting, you would attribute it to whatever deal

13 he was working on in his calendar?

14 A.  Correct.  But at certain -- if it was over a certain

15 amount, I did have to get the names, so I would actually have

16 to ask him who was a part of the meal, who was a part of the

17 meeting.

18 Q.  Depending what the limitations were --

19 A.  Correct.

20 Q.  -- in the T&E policies at the time, is that right?

21 A.  Correct.

22         MS. van VLIET:  Can you give me just a moment, Judge?

23         THE COURT:  Yes.

24         MS. van VLIET:  Please excuse me.

25         (Counsel confer)

JCAHRAS5                          Feehan - Cross

1              MS. van VLIET:  Thank you very much, ma'am.  I have no

2       further questions.

3              THE COURT:  All right.

4              THE WITNESS:  Thank you.

5              THE COURT:  Any cross -- or redirect, rather?

6              MR. THOMPSON:  No redirect, your Honor.

7              THE COURT:  All right.  You may step down.  Thank you,

8       ma'am.

9              THE WITNESS:  Thank you.

10             THE COURT:  Call your next witness.

11             THE WITNESS:  You want me to leave that with you?

12             THE COURT:  Leave all the papers.  That's the lawyers'

13      problem.

14             (Witness excused)

15             MR. THOMPSON:  As before, your Honor, I'd like to

16      place the witness' declaration and exhibits.

17             THE COURT:  Sure, go right ahead.

18             MS. van VLIET:  Judge, may I -- this is Mr. Kehoe's

19      witness.  Do you mind if I just step outside for a moment?

20             THE COURT:  That's fine.

21             MS. van VLIET:  Thank you.

22             THE COURT:  Call your next witness.  Mr. Thompson, you

23      can call your witness.

24             MR. THOMPSON:  Your Honor, the SEC at this time calls

25      Mr. Seth Dunayer.

JCAHRAS5                         Dunayer - Direct

1    SETH DUNAYER,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4              THE COURT:  You may inquire, Mr. Thompson.

5    DIRECT EXAMINATION

6    BY MR. THOMPSON:

7    Q.  Good afternoon, Mr. Dunayer.

8    A.  Good afternoon.

9    Q.  You have previously provided a declaration in this case, is

10   that correct?

11   A.  Yes.

12   Q.  Mr. Dunayer, we have placed before you to your right a

13   large Redweld which contains copies of both your initial

14   declaration and your rebuttal declaration, as well as the

15   documents that are cited in your initial declaration.

16            Could you find in there -- I believe it's right on the

17   top -- could you find the copies of your declaration and

18   rebuttal declaration, please.

19   A.  Yes.

20   Q.  Now, with respect to your initial declaration executed on

21   July 19, 2019, could you turn to page 11, sir.

22   A.  OK.

23   Q.  Is that, in fact, your declaration?

24   A.  Yes, it is.

25   Q.  Is that your signature on the declaration?

JCAHRAS5                          Dunayer - Direct

1    A.  Yes.

2    Q.  Did you review the content of the declaration before you

3    executed it?

4    A.  Yes, I did.

5    Q.  Have you had an opportunity to review it since that time?

6    A.  Yes.

7    Q.  Mr. Dunayer, are there any corrections that need to be made

8    to your declaration, to your knowledge?

9    A.  No.

10   Q.  Do you adopt the declaration as your direct testimony in

11   this case?

12   A.  Yes, I do.

13   Q.  Mr. Dunayer, I'd like you to now take a look at your

14   rebuttal declaration which is executed on September 4, 2019.

15   You see that, sir?

16   A.  Yes.

17   Q.  Did you, in fact, execute that declaration on September 4,

18   2019?

19   A.  Yes, I did.

20   Q.  Did you have a chance to review the content before

21   executing it?

22   A.  Yes.

23   Q.  Have you had an opportunity to review the content since

24   that time?

25   A.  Yes.

JCAHRAS5                        Dunayer - Direct

1   Q.  Are there any errors or corrections you need to make in

2   your rebuttal declaration?

3   A.  No.

4   Q.  Do you adopt your rebuttal declaration as your rebuttal

5   testimony in this case?

6   A.  Yes, I do.

7           MR. THOMPSON:  Your Honor, at this time I would

8   offer -- bear with me for one moment -- I would offer

9   Mr. Dunayer's initial declaration as Plaintiff's Exhibit 308

10  and the rebuttal declaration as Plaintiff's Exhibit 309.

11          THE COURT:  Any objection?

12          MR. KEHOE:  No objection, Judge.

13          THE COURT:  Received.

14          (Plaintiff's Exhibits 308 and 309 received in

15  evidence)

16          MR. THOMPSON:  Your Honor, there are a large number of

17  exhibits referenced in Mr. Dunayer's declaration.  I believe

18  some of them have previously been admitted into evidence, but

19  those that have not, I'd like to move into evidence now.

20          THE COURT:  All right.

21          MR. THOMPSON:  Those would be Plaintiff's Exhibit 77,

22  88, 89, 92, 95, 102, 103, 108, 111 was the spreadsheet that

23  Ms. Van Vliet used with other witnesses.  I'm not sure whether

24  that's been --

25          MS. van VLIET:  111?

1              MR. THOMPSON:  111.

2              MS. van VLIET:  I believe the Court admitted it

3     subject to the 408 consideration and ultimately its ruling.

4              THE COURT:  That's correct.

5              MR. THOMPSON:  141, 177, 178, and 179.

6              THE COURT:  Any objection?

7              MR. KEHOE:  No objection, Judge.

8              THE COURT:  They're received.

9              (Plaintiff's Exhibits 77, 88, 89, 92, 95, 102, 103,

10    108,  141, 177, 178, and 179 received in evidence)

11             MR. THOMPSON:  Your Honor, at this time I would pass

12    the witness for cross-examination.

13             THE COURT:  All right.  Mr. Kehoe.

14    CROSS-EXAMINATION

15    BY MR. KEHOE:

16    Q.  Good afternoon, Mr. Dunayer.  My name is Greg Kehoe.  I

17    represent Mr. Rashid.

18    A.  Good afternoon.

19    Q.  Mr. Dunayer, you started working at Apollo in 2008?

20    A.  Correct.

21    Q.  And I think you noted at paragraph 3 of your declaration

22    that you trained the Apollo personnel on the use of the

23    PeopleSoft system?

24    A.  The T&E.

25    Q.  The T&E?

JCAHRAS5                         Dunayer - Cross

1    A.   Yes.

2    Q.   And how did that system work?

3    A.   There were two different types of expense reports.  There's

4    an American Express report and an out-of-pocket report.  When

5    the American Express charges came in, which they came in

6    electronically, they would be put into each person's queue what

7    we call line, and the admin would go in or the person

8    themselves or an admin that declared that would do it for them,

9    and they would take the information out of the wallet and put

10   it into an expense report.  And from there they would start

11   putting in all the information, such as the descriptions, the

12   type of information -- the type of charge it was, if it wasn't

13   already in the correct expense type.  And it would also then,

14   if need be, they would have to go in and they would have to put

15   in -- they would have to put an allocation in, whether it would

16   go to the funds or to a portfolio company or, if there was

17   none, it would go to the person's department, the cost center.

18   Q.   So with regard to the PeopleSoft information on the Amex,

19   that information would come in from American Express, it would

20   prepopulate the wallet with what the charge was and what

21   American Express said it was, is that right?

22   A.   Yes.

23   Q.   And then the expense approval process would begin?

24   A.   Yes.

25   Q.   By the way, you noted, I think, that you had trained the

JCAHRAS5                        Dunayer – Cross

1   assistants in –– or the office in the travel-and-expense

2   issues.  Did you train Mr. Rashid's?

3   A.  Assistant.

4   Q.  Assistants.

5   A.  Yes.

6   Q.  How many did he have?

7   A.  I believe in the time he was there, I think there were five

8   in total.

9   Q.  Did that include temporary assistants?

10  A.  Yes.

11  Q.  So five in total from when to when, excuse me?

12  A.  From 2008 until, I guess, 2011.  I don't know when he left,

13  2013.

14  Q.  Now, sir, going back to the PeopleSoft issue, the

15  professionals at Apollo weren't trained on PeopleSoft, were

16  they?

17  A.  Only the professionals who asked to be, like accountants

18  would be.  But the professionals in the front office would

19  never be trained on using the system as far as entering the

20  data.

21  Q.  Well, they left that to their assistants ––

22  A.  Yes.

23  Q.  –– to work on, right?

24  A.  Uh-huh.

25            THE COURT:  Wait a minute.  Wait a minute.  Did you

JCAHRAS5                        Dunayer - Cross

1   hear the question?

2            THE WITNESS:  About they left it to their assistants?

3            THE COURT:  Yes.

4            THE WITNESS:  Yes.

5            THE COURT:  And your answer is?

6            THE WITNESS:  Yes.

7            THE COURT:  Next question.

8   BY MR. KEHOE:

9   Q.  The PeopleSoft software was not installed on the

10  professional's computers, was it?

11  A.  It's not software.  It's through a website, and everybody

12  at the company had access to the website.

13  Q.  So everybody could potentially do it?

14  A.  Yes.

15  Q.  But the practical reality is only the assistants did it,

16  correct?

17  A.  The assistants would do the work, but the -- the

18  professionals could go in and look at their expense reports

19  anytime they wanted to.

20  Q.  The practical reality, in your experience since you've been

21  at Apollo in 2008, is that they didn't, did they?

22  A.  Right.  They would usually get a paper copy or a PDF

23  electronic copy.

24  Q.  Now, you were involved, I think you said in your

25  declaration -- and I'm talking about 308, Exhibit 308, on the

JCAHRAS5                          Dunayer – Cross

1    Apollo's travel-and-expense policy.  Would those have been the

2    policies in 2009, '11, '13, and '14?

3    A.  I only worked on '9 and '11, not -- yeah, '9, '11, and '13,

4    not '14.  But 14 was just a revision of '13, so --

5    Q.  You worked on '9, '11, and '13, or not 13?

6    A.  Yes, '13.

7    Q.  Yes, '13?

8    A.  Yes.

9    Q.  Now, sir, let us talk about putting together these travel

10   and expenses.  It is, for lack of a better term, a laborious,

11   boring task for the staff, isn't it?

12   A.  It can be.

13   Q.  I mean, in fact, do you recall telling one of the staff

14   members that it's the most unexciting and annoying task in the

15   entire world?  Do you recall saying that?

16   A.  I don't think so.

17   Q.  If I showed you something --

18   A.  Yeah.

19   Q.  -- to refresh your recollection --

20   A.  OK.  I probably said it.  If I did, out of being glib,

21   sure.

22   Q.  OK.  So you do recall talking about doing travel and

23   expense forms as the most unexciting and annoying task in the

24   entire world?

25   A.  It's possible, yeah.

1    Q.  Now, as a consequence of that, it would also -- well, as a

2    result of that, if you go into your declaration on page 10,

3    it's a fact, is it not, sir -- and I'm talking about page 10

4    the first sentence -- excuse me, paragraph 10, page 4, the

5    first sentence, it says:  "During the relevant period,

6    professionals typically relied on their administrative

7    assistants to prepare their expense reports for entry into the

8    PeopleSoft system."

9         Is that accurate, sir?

10   A.  Yes.

11   Q.  And if you go to 13, paragraph 13 on the next page, it

12   noted that the assistant would typically then review the wallet

13   and might recognize some of the expenses and thus be able to

14   draft a description of their business purpose without having to

15   ask the professional.

16        Now, you mention that in your declaration.  That

17   happened quite frequently, didn't it?

18   A.  Yeah, they would recognize some of the expenses, yes.

19   Q.  And in your experience since 2008, that happened quite

20   frequently within Apollo that the assistants would look through

21   PeopleSoft and examine it and fill out whatever description

22   they had for that particular expense without, as you say,

23   having to ask the professional?

24   A.  Yes.

25   Q.  Now, the travel expenses -- excuse me, the T&E policies

JCAHRAS5                          Dunayer - Cross

1   require that the expenses be submitted every 30 days, isn't

2   that right?

3   A.  Yes.

4   Q.  Well, that didn't happen, did it?

5   A.  Not back in 2008.  It was -- it happened with most people,

6   yes, but there were some professionals who didn't submit them

7   timely.

8   Q.  Well, was it the professionals or was it the assistants or

9   both?

10  A.  I'm not sure.  It depends on who the assistant was and who

11  the professional was.

12  Q.  Well, let's look at Plaintiff's Exhibit 87.

13  A.  87.

14          MR. KEHOE:  This has already been received in

15  evidence, Judge.

16          THE COURT:  Yes.

17          (Continued on next page)

18

19

20

21

22

23

24

25

JcaWras6                        Dunayer - Cross

```
 1   BY MR. KEHOE:
 2   Q.  Now, if we look at, you see the Bates stamp numbers in the
 3   lower right-hand corner?
 4   A.  Yes.
 5   Q.  And if you look at 41298?
 6   A.  OK.
 7   Q.  OK.  And this is a business expense for June the 3rd of
 8   2010, is that right?  Look at the upper right-hand corner on
 9   41298.
10   A.  Say it again?  I'm sorry.  6/3/2010?
11   Q.  If you look at 41298, this is for, what, June the 3rd,
12   2010?
13   A.  Yes.
14   Q.  And do you remember who Mr. Rashid's assistant was then?
15   If you recall, sir.
16   A.  No, I don't recall.
17   Q.  OK.  And if you turn to the next, the actual expense entry
18   report, this is a report that is sent in in the beginning of
19   June of 2010, and it has entries in it from March 2010, April
20   2010, and May 2010?
21   A.  Yes.
22   Q.  And this is, of course, a document that you approved.
23       Now, this was, you would agree with me, was well beyond the
24   30-day period of time for sending expenses in, wasn't it?
25   A.  Yes.
```

JcaWras6                        Dunayer - Cross

1   Q.  And this happened quite frequently, didn't it, that these

2   expenses were never timely sent in by the assistants?

3          THE COURT:  Just rephrase your question.

4   BY MR. KEHOE:

5   Q.  Wasn't it a fact that it was often --

6          MR. KEHOE:  Let me withdraw the question.

7   Q.  It often occurred that the expenses were not timely sent to

8   you in a 30-day period, isn't that right?

9   A.  For Mr. Rashid or for everybody?

10  Q.  For many of the professionals that were in Apollo.

11  A.  No.

12  Q.  No?  It was just Mr. Rashid?

13  A.  No.  Not just Mr. Rashid, but not many.

14  Q.  But there were others?

15  A.  Yes.

16  Q.  Well, let's talk about it.  Let's talk about these

17  expenses, and we talked a little bit about the prepopulation of

18  the Amex card.

19         THE COURT:  Just ask the question.

20         MR. KEHOE:  Yes, your Honor.  I'm just shifting gears

21  and going to the Amex one.

22         THE COURT:  Just ask the question.

23  BY MR. KEHOE:

24  Q.  When the Amex bill went in, sir, that went directly to

25  Apollo, did it not?

JcaWras6                          Dunayer - Cross

```
 1   A.  The bill itself, yes.
 2   Q.  And the bill was then prepopulated into PeopleSoft,
 3   correct?
 4   A.  Yes.  According to each card, yes.
 5   Q.  And they, Mr. Rashid or the professionals didn't
 6   prepopulate this, did they?
 7   A.  No.  It came from Amex.
 8   Q.  So when you got the Amex bill, whatever they had as a
 9   description on the Amex bill was what went on, what went on the
10   wallet, didn't it?
11   A.  No, not the description.  The expense type.  But --
12   Q.  Excuse me.  Expense type.
13   A.  But the expense type could be changed in the wallet.
14   Q.  Understood.
15       But the expense type that was retrieved from the Amex bill
16   went on the people -- excuse me, went on the wallet, right?
17   A.  Yes.  It was a default, yes.
18   Q.  So if they said it was a particular restaurant, if it said
19   a particular name and it said meals, then that meals would show
20   up on the wallet itself, right?
21   A.  If it was -- yeah.  If it was a restaurant, it would assume
22   that it was a meal, yes.
23   Q.  OK.  Now, you make a lot to -- you say quite a few things
24   in your report about allocation codes and the requirement of
25   allocation codes?
```

JcaWras6                          Dunayer - Cross

A.   Yes.

Q.   Were allocation codes required under the 2009 and 2011 travel-and-expense policy?

A.   I don't know if they were explicitly in there, but they were in -- all the admins were trained that they had to allocate their expenses.

Q.   That wasn't my question.

     Within the 2009 policy and the 2011 policy, it is a fact, sir, that there was no requirement for allocation codes, is there?

A.   It may not mention it.

Q.   Now, with regard to your statement that matters -- you needed an allocation code in order for it to be approved, and I'm looking at paragraph 9 of your declaration, it is a fact that you routinely authorized payments for expenses with no allocation code, didn't you?

A.   Well, it -- it doesn't have to have an allocation code to a firm -- to a fund or a company, but it could be allocated to Apollo itself, so it had to have an allocation code.  It didn't necessarily have to be charged out to, outside of Apollo.

Q.   OK.

A.   It could be charged in the department, yes.

Q.   And you received direction from expenses that were picked up by Apollo from the management agreements for the funds, didn't you?

JcaWras6                        Dunayer - Cross

1    A.   No.   The way we did it, we, we would code it as is.   The --

2    later on, the receivable department would bill.   And if they

3    couldn't bill out to a specific fund, they knew the rule there.

4    But here, if you did work for a specific company or fund, you

5    put it in here.

6              THE COURT:   All right.   Let me get this straight.

7              THE WITNESS:   Yes.

8              THE COURT:   Who, to the best of your knowledge and

9    information, inserted the allocation code?

10             THE WITNESS:   The admin would insert the code.

11             THE COURT:   And based on what information would the

12   assistant, the admin, input that information?

13             THE WITNESS:   Well, they would have several ways to do

14   it.   They could look at a calendar and say, Well, the trip for

15   this was made for a specific fund, so everything on that trip

16   was allocated to that fund.   They wouldn't have to ask the

17   professional.

18             But if something came through and they're like, Oh,

19   I'm not really sure what this is, they could print it out for

20   the professional and say where do I allocate these codes --

21   where do I allocate the expenses.

22             THE COURT:   All right.

23             THE WITNESS:   And then they would put in what they

24   were told.

25             THE COURT:   All right.   And were professionals

1    responsible for reviewing the report before it was put in?

2              THE WITNESS:  Yes.

3              THE COURT:  All right.  Now, after the report was put

4    in, would your group from time to time change an allocation

5    code?

6              THE WITNESS:  Not on the reports that came in.  If

7    they were approved, they went in.  But sometimes later somebody

8    would say I put it to one code, I meant to put it to another,

9    then we could go in and do an addendum and make sort of like a

10   new report, back out the old code, put in the new code, but

11   when we'd have an email telling us to do that.

12             THE COURT:  All right.  So there would be a paper

13   trail when that occurred.

14             THE WITNESS:  Yes, yes.

15             THE COURT:  The original expense report from the

16   professional, transmitted by a professional's administrative

17   assistant, would remain intact with the allocation given by the

18   professional and its assistant, correct?

19             THE WITNESS:  Yes.  In fact, I couldn't change those

20   even if I wanted to.

21             THE COURT:  OK.  And you would on some occasions do a

22   reallocation.

23             THE WITNESS:  On a new report.

24             THE COURT:  And would the professional be made aware

25   that that had happened?

1          THE WITNESS:  Not unless they were copied on the email

2    telling us to do that.  But unless it was a personal expense,

3    where it changed from, let's say, a business to a personal,

4    they usually wouldn't be involved.

5          THE COURT:  And if it was a business change to a

6    personal, how would they know that?

7          THE WITNESS:  They would most likely be copied, or

8    they're the ones who would come back and say:  Oh, I made a

9    mistake, this is personal.  The admins would rarely ever come

10   back and say I made a mistake.  And I would say back to them,

11   you got to tell them, especially if it's a very expensive

12   mistake, like a couple thousand dollars or something.

13         THE COURT:  Right.  But the professional would be

14   aware of a reallocation from business to personal why and how?

15         THE WITNESS:  I would -- I'm, I'm, I'm not sure I

16   would want the admin to tell them.  But the other way they

17   would find out is every quarter we would bill everybody for

18   their personal expenses.  And if they then saw their bill and

19   said I don't know what this is, we would explain it and then

20   they would either say, Oh, I get it, that's right; or, I'm not

21   paying that, it's not personal.  And they would have to then

22   get an approval from someone to say it's not personal.

23         THE COURT:  What about a situation where the

24   allocation code reflected that something was to be billed to,

25   let's say, one of the management companies, and your group

1   wanted to reallocate it to a fund; did that ever occur?

2               THE WITNESS:  No, not -- it was not our call to make.

3               THE COURT:  OK.  How about allocating it to a fund on

4   the professional's expense report and your group saying that

5   should be reallocated to a management company; did that ever

6   occur?

7               THE WITNESS:  No.

8               THE COURT:  OK.  Next question.

9   BY MR. KEHOE:

10  Q.  Mr. Dunayer, so, in a situation where Mr. Rashid is

11  traveling to review and monitor a portfolio company in a

12  fund --

13  A.  Yes.

14  Q.  -- and he has expenses in there, who pays those expenses?

15  A.  Apollo.

16  Q.  Now, is that laid out in their expenses, that when he

17  travels to monitor a company that Apollo is paying it?

18              THE COURT:  I don't understand the question.  Rephrase

19  it.

20  BY MR. KEHOE:

21  Q.  Is it laid out in the expense voucher when someone is going

22  to travel to see a portfolio company that Apollo Management

23  pays those expenses?  Where is that?  Where do you get that

24  from?

25  A.  Well, anything that's not personal is paid by Apollo.

JcaWras6                          Dunayer - Cross

Q.   And what does the portfolio company or the fund pay?

A.   Then everything goes into Apollo.  It gets -- when it's

coded, and then the accounts receivable department gets that at

the end of each month, and then they bill out to the portfolio

or the fund.

Q.   Then I missed a step there.

A.   OK.

Q.   My apologies.  My question was not accurate.

          So when Mr. Rashid travels to monitor a portfolio

company --

A.   Yes.

Q.   -- and he has certain expenses when he travels, be it local

or national or international --

A.   Of course.

Q.   -- and he submits expenses for that and says I went to work

for Realogy, for instance, I went to visit them --

A.   Right.

Q.   -- Apollo reimburses him, Apollo Management reimburses

Mr. Rashid and then the management then bills out the portfolio

company, is that right?

A.   Depends on the type of expense.  If it's an American

Express expense, Apollo pays American Express.  If it's an

out-of-pocket expense and he paid for it with another credit

card or cash, we would then reimburse him.

Q.   I stand corrected.

JcaWras6                         Dunayer - Cross

          so in a situation where Mr. Rashid is going out to visit a

portfolio company and has certain expenses and puts that on his

American Express corporate card --

A.   Gotcha.

Q.   -- Apollo will pay the corporate card expense, but then

while he's -- for the expenses while he's monitoring that

portfolio company, then they will bill the portfolio company,

is that right?

A.   Eventually, yes.

Q.   OK.  Where is it written?

A.   Can I make one clarification?

Q.   Absolutely, sir.

A.   At the point when these expenses were being done, the

cards -- we would get billed at Apollo one big, huge bill.  We

would pay that bill.

Q.   OK.

A.   It was not dependent upon him or anybody putting an expense

report in at that point.  So the bills were paid and then

everything went into a prepaid expense account, and as they did

their expenses, it would move from that prepaid account into

the different expense buckets, like airline, hotel, etc.

Q.   And my only issue here is that Apollo would pay this big

American Express bill, but then for his expenses incurred in

monitoring a portfolio company, they would charge the portfolio

company ultimately?

JcaWras6                      Dunayer - Cross

A.   Right, when the expenses were done.

Q.   When the expenses were done.

THE COURT:  How do you know portfolio companies were charged for expenses relating to their being monitored?  Where did you get that information from?

THE WITNESS:  From the professionals.  By putting in the expense reports, they're declaring that the expenses that are here, and then they put in the code, the admin, or, you know, with the professional's blessing, put in the code, they're saying, basically, I'm attesting that this is correct; that expense belongs to this company or this fund.

THE COURT:  But in the regular course of your business, did you review the limited partnership agreements to see what the agreement was between the management company and the funds as to what expenses could be charged to a fund or to a portfolio company versus the management company?

THE WITNESS:  No, we didn't do it at the expense report level.  They did it with the accounts receivable level. They would then go meet with the funds, because the funds are Apollo funds, and then they would say, Well, I'm not accepting these charges because it's not, you know, something we're going to accept; or, These are fine, we'll pay these.  And the same with the portfolio companies.  They would send those bills out and they would pay.

I was not privy to the agreements of the limited

JcaWras6                         Dunayer - Cross

partnership.

THE COURT:  OK.  So you did not consider yourself to be an expert or a knowledgeable person on what can properly be charged to a portfolio company or to a fund?

THE WITNESS:  Correct.

THE COURT:  That was somebody else's responsibility?

THE WITNESS:  Yes.

THE COURT:  And if I gave you a bunch of expenses and I asked you should this be paid for, properly paid for by Apollo, a portfolio company, or a fund, is it the case that you would say that was not my job when I worked at Apollo?

THE WITNESS:  That's correct.  Those should have been -- the professionals should have provided the codes, and if they weren't aware that if something couldn't be charged, it would be worked out later by the fund managers and the -- I'm sorry, fund controllers or the portfolio company accounting departments.

THE COURT:  And the funds had their own controllers.

THE WITNESS:  Yes, they did.

THE COURT:  Thank you.

BY MR. KEHOE:

Q.  Taking this one step further, after the expenses were going out to the funds, the funds themselves would make that determination as to whether or not the fund was going to pay that or -- excuse me, or the management company, I take it,

JcaWras6                          Dunayer – Cross

1    Apollo Management for the fund.  It wasn't the fund because the

2    fund was just an investment vehicle, right?

3    A.  No.  The funds had their controllers.  They would push back

4    if they thought it was an improper expense, something that --

5    if they -- I guess they had their agreement and said, Well,

6    we're not paying for taxis, we're not paying for taxis.  And I

7    know they did do that at points.  But those would then be

8    reallocated back to the management company, but not through the

9    expense system.  That would be through the AR system.

10   Q.  So a decision was made within Apollo between management and

11   the fund exactly what expenses were to be picked up by the

12   limited partnership agreement and which wasn't?

13   A.  I assume so.  I never read any of the limited partner

14   agreements.

15   Q.  Did you read any of the allocation-of-expenses paragraphs

16   in any of the limited partnerships that are involved here?

17   A.  No, I wasn't involved in it.

18   Q.  You weren't involved in that.

19       Did you ever discuss with anybody in Apollo exactly that

20   the management company is responsible, for instance, all

21   monitoring costs by professionals?

22   A.  I know that it was, it was a big thing being discussed

23   between some of the upper-level accounting -- management

24   accounting people and the legal team, but it never was formally

25   put into a way that -- and so we just basically did it this

JcaWras6                          Dunayer - Cross

way.  So it was always done, then, at the fund level, where

they would talk about what they're going to accept and what

they're not going to accept.

Q.  And that was at the fund level in conjunction with the

management company, which was Apollo, wasn't it?

A.  Yes.

          THE COURT:  But you weren't privy to any of that.

          THE WITNESS:  No.  I was -- no, I was not.

          THE COURT:  OK.  Why don't we break for the evening

and we'll pick up in the morning.  We'll get together at 9:45

tomorrow morning and resume.

          MR. KEHOE:  Yes, your Honor.

          THE COURT:  Thank you, all.  See you tomorrow morning.

          (Adjourned to December 11, 2019, at 9:45 a.m.)

                              INDEX OF EXAMINATION

Examination  of:                                      Page

MARC BECKER

Direct By Mr. Carlson . . . . . . . . . . . . 8

Cross By Mr. Kehoe . . . . . . . . . . . . . .13

Redirect By Mr. Carlson . . . . . . . . . . .62

MARTIN KELLY

Direct By Mr. Carlson . . . . . . . . . . . .64

Cross By Mr. Kehoe . . . . . . . . . . . . . .68

CINDY MICHEL

Direct By Mr. Thompson . . . . . . . . . . . .97

Cross By Ms. van Vliet . . . . . . . . . . . 100

Redirect By Mr. Thompson . . . . . . . . . . 129

NICOLE LA MONS

Direct By Mr. Thompson . . . . . . . . . . . 133

Cross By Ms. van Vliet . . . . . . . . . . . 136

BARBARA FEEHAN

Direct By Mr. Thompson . . . . . . . . . . . 167

Cross By Ms. van Vliet . . . . . . . . . . . 169

SETH DUNAYER

Direct By Mr. Thompson . . . . . . . . . . . 196

Cross By Mr. Kehoe . . . . . . . . . . . . . 199

                           PLAINTIFF EXHIBITS

Exhibit No.                                   Received

  300    . . . . . . . . . . . . . . . . . . . . . . . . 10

 1   152    . . . . . . . . . . . . . . . . . . . . . . . . . 11

 2   301    . . . . . . . . . . . . . . . . . . . . . . . . . 13

 3   154    . . . . . . . . . . . . . . . . . . . . . . . . . 67

 4   302    . . . . . . . . . . . . . . . . . . . . . . . . . 67

 5   303    . . . . . . . . . . . . . . . . . . . . . . . . . 68

 6   150    . . . . . . . . . . . . . . . . . . . . . . . . . 70

 7   151    . . . . . . . . . . . . . . . . . . . . . . . . . 71

 8   152    . . . . . . . . . . . . . . . . . . . . . . . . . 71

 9   155    . . . . . . . . . . . . . . . . . . . . . . . . . 72

10   304 and 305   . . . . . . . . . . . . . . . . . . . . . 99

11   90, 91, 93, 96, 97, 114, 175, 176, and  . . . .99

12            180

13   102    . . . . . . . . . . . . . . . . . . . . . . . . .105

14   103    . . . . . . . . . . . . . . . . . . . . . . . . .105

15   4    . . . . . . . . . . . . . . . . . . . . . . . . . .106

16   306    . . . . . . . . . . . . . . . . . . . . . . . . .134

17   141 and 142   . . . . . . . . . . . . . . . 134

18   111    . . . . . . . . . . . . . . . . . . . . . . . . .158

19   307    . . . . . . . . . . . . . . . . . . . . . . . . .169

20   86, 87, 139, and 140  . . . . . . . . . . . 169

21   308 and 309   . . . . . . . . . . . . . . . 198

22   77, 88, 89, 92, 95, 102, 103, 108,  . . . . . 199

23            141, 177, 178, and 179

24                    DEFENDANT EXHIBITS

25   Exhibit No.                            Received
     29    . . . . . . . . . . . . . . . . . . . . . . . . . 86