**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> MOHAMMED ALI RASHID, <br><br> Defendant. | No. 17-cv-8223 (PKC) |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**POST-TRIAL REPLY MEMORANDUM**

Duane K. Thompson
James M. Carlson
Donna K. Norman
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Direct: (202) 551-3711

*Counsel for the Plaintiff*

### TABLE OF CONTENTS

I.    INTRODUCTION...................................................................................................... 1

II.   ARGUMENT ............................................................................................................. 2

      A.    RASHID VIOLATED SECTION 206(1) OF THE ACT................................... 2

            1.    Rashid's Argument that His Fraud is not Actionable Because He
                  Supposedly Believed that Apollo was Paying His Expenses
                  Is Legally and Factually without Merit......................................................... 5

            2.    Rashid's *Post Hoc,* Revisionist Business Justifications
                  Do Not Justify His Fraudulent Expense Submissions .............................. 12

                  a.    Rashid's Arguments about
                        Particular Expenses are Frivolous................................................. 12

                  b.    Rashid's Fallback Positions on Expenses that are Listed
                        in the BDO Spreadsheet but for which the Underlying
                        Expense Report Was Not Presented are Without Merit................ 14

                  c.    Rashid's Arguments for Disregarding Expenses
                        Not Listed in "the Cindy Michel Spreadsheet"
                        is Frivolous and Without Merit....................................................... 18

                  d.    Rashid's Arguments for Disregarding Expenses
                        He "Corrected" And/or Offered to Repay Lack Merit.................. 20

            3.    Rashid's Fraud was Material ...................................................................... 22

            4.    Rashid's Arguments for Exclusion of
                  the Evidence of his Fraud are Without Merit............................................ 25

                  a.    Rashid's Attempt to Exclude the Master Spreadsheet
                        and the Pierce Report and the BDO Report on the Basis
                        that They Reference the Master Spreadsheet is Baseless ............ 25

                  b.    Rashid's *Daubert* Motion Regarding
                        the Pierce Report is Baseless ........................................................ 29

      B.    RASHID VIOLATED SECTION 206 (2) OF THE ADVISERS ACT .......... 32

      C.    RASHID IS LIABLE UNDER
            SECTIONS 209 (D) AND (F) OF THE ACT................................................... 34

      D.    RASHID'S CONDUCT WAS EGREGIOUS AND SIGNIFICANT
            SANCTIONS ARE WARRANTED ................................................................. 35

            1.    Rashid's Fraudulent Conduct Warrants Injunctive Relief........................ 35

            2.    Rashid's Fraudulent Conduct Warrants A Third Tier Monetary Penalty . 38

III.  CONCLUSION ........................................................................................................ 39

## **TABLE OF AUTHORITIES**

<u>CASES</u>

*Big O Tire Dealers v. Goodyear Tire & Rubber Co.*,
    561 F.2d 1365 (10th Cir.1977) .................................................................... 26

*Cassino v. Reichhold Chemicals*,
    817 F.2d 1338 (9th Cir. 1987) ..................................................................... 25

*ECA, Local 134 IBEW Joint Pension Trust of Chicago, et al. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).......................................................................... 22

*In Re Ply Gem Holdings, Inc. Sec. Litig*,
    135 F. Supp. 3d 145 (S.D.N.Y. 2015)........................................................... 24

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)............................................................................ 22

*Pierce v. F.R. Tripler & Co.*,
    955 F.2d 820 (2d Cir. 1992).......................................................................... 25

*SEC v. Alpine Secs.*,
    17-cv-4179 (DLC), 2019 WL 4686716 (S.D.N.Y. Sept. 29, 2019)................... 38

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012).......................................................................... 10

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963)........................................................................................ 6

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir.1998)........................................................................... 36

*SEC v. Commonwealth Chem. Sec., Inc.*,
    574 F.2d 90 (2d Cir.1978)............................................................................. 36

*SEC v. Haligiannis*,
    470 F. Supp. 2d 373 (S.D.N.Y. 2007)........................................................... 38

*SEC v. Koenig*,
    Case No. 02 C 2180, 2007 WL 1074901 (N.D. Cal. 2007)............................. 35

*SEC v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1972)........................................................................ 36

*SEC v. Penn,*
    225 F. Supp. 3d 225 (S.D.N.Y. 2016)........................................................................ 22

*SEC v. Rapp,*
    304 F.2d 786 (2d Cir. 1962)...................................................................................... 33

*SEC v. Tourre,*
    Case No. 10 Civ. 3229, 2014 U.S. Dist. LEXIS 1570 (S.D.N.Y Jan. 7, 2014) ............... 35

*SEC v. Westport Capital Markets LLC,*
    408 F. Supp. 3d 93 (D. Conn. 2019) ........................................................................... 6

*Stagl v. Delta Airlines, Inc.,*
    52 F.3d 463 (2d Cir. 1995)....................................................................................... 10

*Stinson v. City of New York,*
    Case No. 10 Civ. 4228, 2015 WL 4610422, at *5 (S.D.N.Y. July 23, 2015).................. 30

*West v. SEC,*
    641 Fed. Appx. 27 (2d Cir. 2016) .............................................................................. 22

## STATUTES

Section 206(1) of the Advisers Act, 15 U.S.C. 80b-6(1).................................................... 2
Sections 209 (d) and (f) of the Adviser's Act ............................................................... 34

## RULES

Federal Rule of Evidence 408.................................................................................. 25

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") respectfully submits this brief in further support of its Proposed Findings of Fact and Conclusions of Law ("SEC FOF") [Doc. 204].  This brief also replies to Defendant Mohammed Ali Rashid's Proposed Findings of Fact and Conclusions of Law, Proposed Rulings on Defendant's *Motion in Limine* Based on FRE 408 and Proposed Ruling on Defendant's Motion to Exclude the Testimony of Expert Kevin Pierce ("Rashid FOF").  [Doc. 206].[1]

## I.   **INTRODUCTION**

As the SEC proved by a preponderance of the evidence at trial, Defendant Mohammed Ali Rashid ("Rashid") engaged in a multi-year course of fraudulent conduct in violation of the Investment Advisers Act of 1940 (the "Adviser Act" or the "Act").  He exploited the Travel and Entertainment ("T&E") expense process at Apollo Management, L.P. ("Apollo") to subsidize his personal expenses by falsely claiming they were legitimate business expenses incurred on behalf of the private equity funds he advised.  While Rashid maintains that he was merely sloppy and meant no harm to his client funds, the record shows that he repeatedly violated his most basic duties as a fiduciary to them.  He also attempts to pose as a victim of his administrative assistants' alleged incompetence and Apollo's supposed attempt to unfairly scapegoat him.  But his version of the facts is transparently revisionist and at odds with contemporaneous documents.  It is also belied by the testimony of a host of credible fact witnesses who testified about Rashid's conduct, and him being the only Apollo professional whose expense reporting was an integrity issue.

Rashid is also wrong in attempting to recast this securities fraud case as either an employment case or a contract case.  While Apollo's T&E policies and its limited partnership

---

[1] This brief will cite to the SEC FOF and Rashid FOF by paragraph number.  Because the paragraph numbering starts over in the Conclusions of Law section in the SEC's Proposed Findings of Fact and Conclusions of Law, citations to that section will be abbreviated herein as "SEC COL."

agreements with investment funds are important background, they neither constitute the SEC's charges nor provide a defense against them.  It is ultimately Rashid's fraudulent conduct – passing off his personal expenses as business expenses and allocating them to the funds – that establishes his violation of the Advisers Act.   Rashid's suggestion to the contrary is merely an attempt to obfuscate the real issues for the Court as trier-of-fact to determine.

Moreover, while Rashid attempts to erect a firewall between his admitted negligence and his scienter, the record shows that he personally provided hundreds of blatantly false business justifications for his personal expenses and false representations that those expenses pertained to client funds and/or their portfolio companies.  Rashid continued his fraudulent course of conduct even after Apollo's CFO twice reprimanded him.  As demonstrated below, Rashid was at least reckless in continuing to submit disguised personal expenses and doing nothing to prevent them from being billed to clients.  His self-serving excuses are not credible and do not withstand analysis.  Accordingly, this Court should adopt the proposed findings of fact and conclusions of law set forth in the SEC's initial brief.

## II.   ARGUMENT

### A.   RASHID VIOLATED SECTION 206(1) OF THE ACT

Nothing in Rashid's filing undercuts the SEC's showing by a preponderance of the evidence that he violated Section 206(1) of the Advisers Act, 15 U.S.C. 80b-6(1). The SEC proved that Rashid was responsible for the false representations and allocation instructions contained in his expense reports.  Multiple witnesses testified that Apollo executives were required to allocate their business expenses to cost centers, and that this requirement was common knowledge within Apollo.  (PX 300, Becker Decl. ¶¶ 6-8 and Tr. at 34-5; PX 302, Kelly Decl., ¶¶ 14-15; PX 303, Kelly Rebuttal Decl. ¶ 3; Tr. at 82-3; PX 304, Michel Decl., ¶ 7; PX 305, Michel Rebuttal Decl.

¶¶ 2-3, and Tr. at 110;  PX 306, Le Mons Decl., ¶ 10, and Tr. at 154; PX 307, Feehan Decl. ¶ 14, Tr. at 174-5; PX 311, Gatsik Decl. ¶ 7, Tr. at 347-48.**)**  The SEC also adduced credible evidence that Apollo billed Rashid's personal expenses to investment funds based solely on his instructions. (SEC FOF ¶¶ 23-26.)[2]  Rashid's own expert, Denis O'Connor, acknowledged that "[a] reasonable employee in Mr. Rashid's position should have known that expenses which he placed on his business card and represented to have been incurred on behalf of private equity funds and/or portfolio companies in which such finds had an investment interest ultimately would be submitted to the relevant funds as reimbursable management expenses." (Tr. at 1423-24.)  Consistent with the evidence of general practices, several of his former personal assistants specifically testified that Rashid routinely provided them with business justifications and expense allocations needed to prepare his expense reports. (SEC FOF ¶¶ 31-33.)  Contemporaneous emails and handwriting on drafts of expense reports supported that testimony, and other emails established that Rashid likewise provided business justifications and allocation instructions to his other personal assistants, including descriptions for the "Project Name" field of his expense reports, and what he called "deal codes."  (*Id.* ¶¶ 37-44.)

---

[2] Apollo CFO for Private Equity and Real Assets, James Crossen, who served as Controller for Apollo Investment Fund VII, LP ("Fund VII") and Apollo Natural Resources Partners, LP ("ANRP") during the Relevant Period, testified that the investment professional who incurred a particular expense was responsible for its proper allocation.  (Tr.at 676-77, 710.)  He also testified that if a project code for a given expense identified a portfolio company without reference to the fund or funds that owned it, the expense was nonetheless billed to the underlying fund or funds. (*Id.* at 684-89.)   Some expenses were billed to the portfolio companies themselves if the professional so instructed. (*Id.*)  Rashid misses the mark in placing reliance on former Apollo Expense Manager Seth Dunayer testimony that Apollo's accounts receivable personnel may have changed the investment professional's allocation.  (Rashid FOF ¶ 21.)  He overlooks Dunayer's subsequent statement that he did not actually know what, if any, role Apollo's accounts receivable personnel had in reviewing the investment professional's allocation decision.  (Tr. at 278.)

Moreover, the SEC not only proved that Rashid was responsible for his expense reports but also adduced overwhelming proof of the substance of its Section 206(1) charge, namely – Rashid engaged in a continuous pattern of fraudulently passing off personal expenses as legitimate business expenses, and was at least reckless in allowing them to be billed to investment funds. (SEC FOF ¶¶ 59-111 and Appx. A.)   The SEC's proof was robust.  It included contemporaneous emails which showed the falsity of scores of Rashid's purported business justifications.  The SEC's proof also included fourteen portfolio company executives who testified that the voluminous list of supposed meetings and other contacts, which Rashid's business justifications relied upon, were fictitious.  (PX 312, Hull Decl.; PX 313, Truwitt Decl.; PX 314, Swift Decl.; PX 315, Wasser Decl.; PX 316, Zipf Decl.; PX 319, Goncalves Decl.; PX 320, Koci Decl.; PX 321, R. Smith Decl.; PX 322, Kelleher Decl.; PX 323, Casey Decl.; PX 324, Atwood Decl.; PX 325, Troy Decl.; PX 331, W. Smith Decl.; and PX 332, Enzor Decl.)

Rashid's attempts to defend his conduct are unpersuasive in light of this overwhelming contemporaneous and unbiased evidence.  Rashid tries to walk away from the many falsehoods in his expense reports by blaming them on his personal assistants.  (Rashid FOF ¶¶ 31-37.)  But the isolated examples of possible mistakes that Rashid cites are few and far between.  They do not absolve Rashid of responsibility for the hundreds of blatantly false expenses he approved over the years.  Far greater weight should be given to the trial exhibits – largely contemporaneous documents – which showed that Rashid gave explicit instructions to the assistants and that they followed those instructions.  (SEC FOF ¶¶ 28-44.)  The Court should also give significant weight to the unbiased testimony of the assistants, who credibly and consistently stated that they approached their jobs with great care, did not guess when preparing expense reports, and often received specific instructions from Rashid.  (PX 307, Feehan Decl. ¶¶ 16-24; PX 306, Le Mons

Decl. ¶¶ 12-20; PX 311, Gatsik Decl. ¶¶ 10-12; Tr. at 347-48.)  Notably, Rashid was not the only investment professional to whom these assistants were assigned, but he was the only one with significant integrity issues in his expense reporting.  (PX 310, Donnelly Decl. ¶ 15; Tr. 856-58 [Ehrlich]; DX 15 at Apollo 00004227 and 4230.)  And, in contrast to other Apollo personnel who reviewed their own expense reports, Rashid's failure to review his expense reports after multiple warnings appears to be a premediated plan so he could later claim he could not know his personal expenses were falsely being billed to client funds.  For example, Apollo partner Marc Becker testified that he routinely reviewed his expense reports for errors and the accuracy of his expense reports were ultimately his responsibility – not his assistants'.  (Tr. at 56:3-57:2 and 63:4-64:11.)

Furthermore, although much of Rashid's own testimony revealed his lack of credibility (SEC FOF ¶¶ 179-96.), he nonetheless made some critical admissions.  Perhaps most notably, Rashid was forced to admit that he never did anything to prevent his personal expenses from being billed to funds based on his instructions to his assistants. (SEC FOF ¶¶ 194-96.)  Put another way, the evidence at trial proved that Rashid took a cavalier attitude towards his expenses – even though he was a fiduciary to the funds – and was at a minimum reckless in his conduct.

> ### 1.    Rashid's Argument that His Fraud is not Actionable Because He Supposedly Believed that Apollo was Paying His Expenses Is Legally and Factually without Merit

Rashid asserts that he cannot be held to have violated Section 206(1) of the Advisers Act because he testified that he thought Apollo management, not investment funds, was paying his fraudulently submitted personal expenses.  (Rashid FOF ¶ 8.)  Rashid now claims to have relied on Section 7.1 of the Limited Partnership Agreements ("LPAs") between Apollo and Apollo Funds III, V, VI and VII as evidence that he reasonably believed his expenses were being paid by Apollo management companies.  (Rashid FOF ¶ 13.)  He also argues that Apollo violated those

LPA's by billing his expenses to funds, and that Apollo's alleged violation constituted a "superseding act" that broke the chain of causation between his submission of false expense reports and the improper allocation of his expenses to investment funds. (Rashid FOF pp. 53-54.) None of Rashid's arguments excuse his fraud on his client funds.

First, as discussed in the SEC's initial post-trial submission, the Section 206(1) charge does not require proof that Rashid knew his personal expenses were being billed to investment funds. (SEC COL., 68-69, *citing SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 195 (1963) (section 206…does not "require proof of intent to injure and actual injury to the clients."); *SEC v. Westport Capital Markets LLC,* 408 F. Supp. 3d 93, 103-04 (D. Conn. 2019) ("an investment adviser may violate section 206(1) by failing to disclose material information about the adviser's conflict of interest even if the adviser had no intent to injure his clients and even if his clients were not injured.").[3]  At a minimum, the SEC established that Rashid knew he was submitting hundreds of personal expenses, while also knowing he was falsely representing them as legitimate business expenses he had purportedly incurred of behalf of funds or their portfolio companies.  Because he possessed that knowledge, it was incumbent on him, as a fiduciary to the funds, to ensure his parade of falsely categorized expenses did not get billed to those funds.  Yet Rashid failed to do *anything* to prevent or even inquire about such billings to funds.[4] (SEC FOF ¶¶ 194-96; Tr. at 934-35.)   Rashid's failure to prevent his false expense reports from impacting his funds was at

---

[3] Tellingly, Rashid does not address this authority. Rashid cites *Capital Gains* only in regard to the SEC's charges against him under Section 206(2) of the Advisers Act.  (Rashid FOF p. 63.) Rashid does not mention *Westport Capital Markets* at all.

[4] At trial, Rashid was evasive and tried to give the impression that he simply did not remember whether or not he instructed his assistants to take appropriate steps to prevent his expenses form being billed to clients.  But in response to the Court's questioning, Rashid was forced to finally admit that he had done nothing whatsoever.  (SEC FOF ¶¶ 194-96.)

least reckless in violation of Section 206(1).  Thus, he cannot escape liability on the basis that he

thought he was only cheating Apollo management as opposed to the funds.[5]

Second, the evidence supports a finding that Rashid *did know* that by falsely claiming to

have incurred expenses on behalf of funds and portfolio companies, he was thereby allocating

expenses to funds.  (SEC FOF ¶¶ 23-42; SEC COL ¶¶ 14-17.)  As already discussed above, a host

of current and former Apollo employees credibly testified that the requirement to allocate

expenses was common knowledge at Apollo throughout the Relevant Period, and that Rashid

regularly provided allocation instructions to the assistants who prepared drafts of his expense

reports.  That testimony is corroborated by Apollo's 2009 T&E policy, which specifically stated

the requirement to allocate expenses:

> The financial data from the American Express Corporate charges are uploaded into
> the PeopleSoft expense module and the process of applying the charges to the
> proper expense categories takes place for each individual employee.  The process
> is completed by the employee or a representative authorized to fill out the expense
> report for the Apollo employee using the PeopleSoft expense module.  If *the*

---

[5] Rashid's claim that PX 177 does not contain management codes is unsupported by the record.
(Rashid FOF ¶ 23.)  At trial, his counsel asked James Crossen if there was an allocation code to
bill expenses to a management company, and Mr. Crossen testified there was.  (Tr. at 712:11-15.)
Rashid's counsel then showed Mr. Crossen PX 177, a voluminous document, which the Court
recognized contained thousands of codes. (Tr. at 713.)  Rashid's **counsel** then made the
**representation** that he – not Mr. Crossen – had looked through the codes, and there were not any
management codes in the exhibit.  (*Id.*)  Mr. Crossen, however, testified that he knew there were
codes to allocate expenses to the Apollo management company because he himself had done so.
(Tr. at 713:24 – 714:5.)  Mr. Crossen further testified that Apollo employees could also simply ask
how to allocate an expense if one forgot the appropriate "code."  (Tr. at 761-62.)  The Court also
briefly reviewed PX 177 and noted:

> I do see here – I don't know what the heck this means. I just happened to land on a
> page at a line 3165, Apollo Management internat- -- it looks like the word
> "international: with the "L" cut off at line 3165.  I don't know what else -- I see
> various codes for Apollo fund admin...

(Tr. 715:2-7.)  Once the Court acknowledged the representation from Rashid's counsel and having
heard Mr. Crossen's testimony, Rashid's counsel moved on to a new topic.  (Tr. at 715.)

> *process of allocating expenses* has not been completed within 60 days of receiving
> the data, Apollo will assume the charges are personal.

(PX 102 at Apollo 00004594) (emphasis supplied); *see also* (Tr. at 797-99.)

Moreover, when Apollo's CFO confronted Rashid about his expense reporting in 2010 and again in 2012, Rashid did *not* seek to excuse his conduct on the basis that he thought Apollo was paying his expenses.[6] (Tr. at 921-22.)  A reasonable inference is that he did not raise that excuse because he knew funds were being billed for expenses he claimed to have incurred on their behalf. Rashid did not contemporaneously indicate to anybody – whether his contemporaries at Apollo, his superiors, or even his assistants – the supposed belief that only Apollo management would pay his expenses.  (Tr. at 924-25.)  Nor is there a contemporaneous document reflecting this position.

Most notably, despite the emphasis which Rashid's defense now places on Section 7.1 of the LPAs, Rashid admitted that *he did not rely on the LPAs* in working on his expense reports. (Tr. at 807.)  Rashid knew that the LPAs existed.  (*Id*. at 806.)  He may have even read them "way back when," but not in their entirety.  (*Id*.; *see also id*. at 923-24.)  The depth of whatever understanding Rashid had during the Relevant Period is reflected in his testimony that he did not understand the distinction between the LPAs and the Management Agreements.  (Tr. at 922-23.) Rashid thought that the LPAs and the Management Agreements were "one in the same" *(id.),* even though his post-trial submission stresses that they are separate instruments. (Rashid FOF ¶ 15.) Viewed in this light, Rashid's inability to recall whether he had ever read the "Management

---

[6]  Rashid argues that the fact that the checks which he wrote to repay personal expenses in 2010 and 2012 were made payable to Apollo supports his assertion that he thought Apollo was paying his expenses.  (Rashid FOF p. 10, n.3.)  This fact has little probative value, and there is no evidence that Rashid could have repaid the funds directly.  In fact, the record shows that there was an indirect route by which Rashid's other fraudulently submitted expenses were ultimately repaid to funds. His monetary settlement with Apollo, which was part of his Separation Agreement, included a $325,000 offset for his expense billings. (DX 34 at ¶ 6.)  As Crossen testified, Apollo reimbursed the funds for the personal expenses Rashid had allocated to them.  (PX 328, Crossen Decl. ¶ 20.)

Agreements" cast significant doubt on whether he had ever actually read *any part* of the LPAs themselves, much less Section 7.1. (Tr. at 922-24 and PX 233.)   Thus, on this record, Rashid's suggestion (Tr. at 799) that his state of mind during the Relevant Period was informed by an understanding of Section 7.1 of the LPAs is simply not supported.[7]

Third, Rashid's related argument that Apollo violated the LPAs by billing his personal expenses to the funds completely misses the point.  (Rashid FOF ¶¶ 13-15, 153-55, 163-168.)  It is correct that Apollo interpreted Section 7.1 of the LPAs to permit Apollo to bill the funds for monitoring expenses, and in fact, Apollo did routinely bill such expenses.  (Tr. at 912 [Ehrlich].) It is also correct that Apollo billed hundreds of Rashid's personal expenses to the funds. (Tr. at 681-82 [Crossen].)[8]  As stated by Apollo's outside counsel, Andrew Ehrlich of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, Apollo had always interpreted Section 7.1 of the Fund VII LPA to permit Apollo to bill funds for expenses associated with monitoring investments in portfolio companies.  (PX 154; Tr. at 881; 909-912.)  Apollo specifically relied on the clause in Section 7.1 (a) which states that the management company shall bear such expenses "subject to any reimbursement of such costs and expenses by Portfolio Companies, or capitalization of such payments and expenses in the purchase price of Portfolio Investments, in completed transactions."

---

[7]  As Rashid admitted at his deposition:

> Q.  Did you ever look at any management agreements for the funds?
>
> A.  I know they existed.  I don't know that I ever read them, because I had no ability to ever comment or opine on them. Nor was I ever asked for my opinion on them.

(PX 233.)

[8] Crossen testified that the expenses which Rashid had previously allocated to a fund but that were later determined to be personal expenses were, in fact, billed to the fund Rashid had identified. (PX 328, Crossen Decl.; PX 183, 190, 191; Tr. 681-82.)  His testimony is unrebutted.

(PX 154 at SEC-Correspond-E 0003384.)  Ehrlich also testified that, while that wording was different from the wording subsequently used in the ANRP LPA, Apollo's interpretation and billing practices were the same as to both of those LPAs. (Tr. at 881; 909-912.)  Rashid acknowledges that "there is no question" that Apollo interpreted Section 7.1 of the LPAs for Funds III, V, VI, VII and ANRP to permit the billing of monitoring expenses to the funds. (Rashid FOF ¶ 14, n. 2.)[9]

Rashid nonetheless argues that Apollo's interpretation of Section 7.1 was incorrect, and that its "unforeseeably negligent billing practices" constituted a "superseding act" that broke the chain of "causation," and thus, rendered his conduct nonactionable under Section 206 (1) of the Advisers Act.  (Rashid FOF ¶¶ 153-55, 165-68.)  He is wrong.  Whether or not Apollo's billing practices complied with the LPAs is totally irrelevant here.  This is a securities enforcement action against Rashid, not a contract dispute between Apollo and the funds.  Nor is this a tort case in which "superseding act" considerations might apply.[10]  The salient fact for purposes of *this case*

---

[9] Rashid asserts that Ehrlich's testimony is unreliable because Apollo partner Mark Becker and Apollo CFO Martin Kelly testified that Section 7.1 of the LPAs appears to call for an Apollo management company to absorb expenses associated with monitoring portfolio companies. (Rashid FOF ¶ 14, n.2.) However, neither of the witnesses testified as to how Apollo interpreted the LPAs during the Relevant Period.  Becker stressed that his testimony was based upon reading the LPAs "as written," and Kelly qualified his testimony by noting a proviso might have existed that would allow Apollo to pass monitoring expenses on to funds. (Tr. at 44, 83.)  This testimony is not inconsistent with Ehrlich's testimony that Apollo *did* rely on such a proviso, as noted in the text above.  More importantly, Becker and Kelly's interpretation of the literal language of Section 7.1 of LPAs does not change the fact that Apollo indisputably *did* bill monitoring expenses to funds during the Relevant Period.

[10] Rashid relies on *SEC v. Apuzzo,* 689 F.3d 204 (2d Cir. 2012).  (Rashid FOF at 54.)  But *Apuzzo rejected* a defendant's attempt to rely on the intervening act argument in in the context of an aiding and abetting charge in an SEC enforcement action.  689 F.3d at 215.  The Second Circuit held that "the SEC is *not* required to plead or prove that an aider and abettor proximately caused the primary securities law violation." *Id.* at 213 (emphasis added).  Moreover, the case which *Apuzzo* quoted – *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463 (2d Cir. 1995) -- was a private *tort suit* that has nothing to do with SEC enforcement suits.

is that Apollo *did* bill his fraudulently submitted personal expenses to investment funds, and did so based the expense descriptions and Project Names given in Rashid's expense reports.  That result was entirely foreseeable based on the evidence the SEC adduced concerning Apollo's expense reporting procedures and Rashid's involvement with his expense reports.  Rashid's conduct in facilitating that foreseeable result was at least reckless, if not quite intentional.

Finally, Rashid's assertion that Apollo did not actually require expenses to be allocated in order for them to be processed through the PeopleSoft system is another red herring.  (Rashid FOF ¶ 41, p. 12, n. 7 and Appx. B.)   Rashid observes that the BDO Spreadsheet (PX 111) includes expenses with blanks in the "Project Name" field and posits that such expenses were processed through the PeopleSoft system without being allocated to a cost center.  *(Id.)*  But that observation is wholly irrelevant because the SEC's charges pertain only to expenses *were* allocated to a fund or portfolio company.  Moreover, the vast majority of the expenses in the BDO Spreadsheet *do* have Project Names.  Some of the expenses that do not have Project Names were apparently allocated in accordance with closely related expenses, entered at the same time, for which a Project Name was supplied.  For example, while Rashid's Appendix B edits the BDO Spreadsheet to show that BDO # 1330 (a charge for airfare) does not have a corresponding Project Name, review of the actual BDO Spreadsheet shows that the very next entry – BDO # 1331 – was a service fee for the same trip on the same day submitted under the Project Name "Ascometals USA." (PX 111 at BDO 1331.)[11]  Other expenses that do not have Project Names, like the fraudulent Zegna and Bliss Spa charges in 2012, were exposed as Rashid's personal expenses before they could be billed to clients.  *See* Rashid Appx. B at BDO # 1846 ($3,500 charge at Zegna on April 27, 2012).

---

[11] Moreover, the "Long Description" given for Entry # 1330 refers to "flight for ascometal trip."

**2.      Rashid's *Post Hoc,* Revisionist Business Justifications Do Not Justify His Fraudulent Expense Submissions**

Rashid makes no real attempt to defend the many blatantly false business justifications contained in his expense reports or to address the many contemporaneous emails and other affirmative evidence of his deceptiveness.  He instead asks the Court to simply ignore many of his expenses on rationales such as that the underlying expense reports were not introduced into evidence and/or that the expenses were not listed on the Master Spreadsheet which his former counsel at Crowell & Moring transmitted to Apollo's outside counsel, and thus, to BDO.  Rashid also continues to blame his personal assistants for the contents of his expense reports – insinuating that they were grossly incompetent – and attempts to pivot to entirely new business justifications which he presumably believes are more defensible.  Not surprisingly, Rashid takes this revisionist approach based solely on his own *post hoc,* self-serving assertions, without any independent corroboration of the new business justifications.  As discussed below, this argument lacks merit.

**a.      Rashid's Arguments about Particular Expenses are Frivolous**

Rashid purports to address some of the specific examples of his personal expenses within the Limitation Period (June 12, 2011 – June 2013) that the SEC discussed in its initial post-trial submission. (Rashid FOF ¶¶ 135 – 151.)[12]  Rashid notes that 20 of those expenses came from expense reports that were not included in the composite exhibit that the SEC introduced as PX 87 and showed was a partial collection of his expense reports.  On that basis, Rashid argues that "there is no direct evidence that at the time of the original submission of the expense, Mr. Rashid gave

---

[12] Rashid does not address *any* of 22 examples of his personal expenses predating the Limitations Period list in Appx A to the SEC's initial post-trial brief.  As the SEC argued, his submission of those personal expenses is evidence of the longstanding and continuous duration of his fraudulent conduct, and thus, is relevant both to show scienter and the need for injunctive relief.

any direction from which the Court could infer a fraudulent intent." *See, e.g.,* (Rashid's FOF ¶ 136.)   In other words, Rashid's argument is that he cannot be held responsible for the fraudulent "long description" business justifications entered for those 20 expenses because the record does not include the actual original expense report reflecting his specific input.[13]

The complete answer to Rashid's flawed argument is that he *stipulated* that the BDO Spreadsheet imported the long descriptions for all of his expenses – including the 20 expenses in question – verbatim from Apollo's PeopleSoft system, and ultimately, from the original expense reports themselves.   (Tr. at 181-83; 954-56.)   Given that stipulation, the absence of the original underlying expense report as part of the record is of no evidentiary consequence.   Moreover, 18

---

[13] In the order Rashid identifies them, these 20 expenses are as follows:  **(1)** July 22 and 23, 2011 - $760.83 in charges for bachelor party in Montreal (Rashid FOF, ¶ 135; SEC FOF ¶ 58; PX 111 at BDO # 1241, 1244, and 1253); **(2)** Nov. 3-6, 2011 - $3,806.69 in charges for air fare, lodging and meal for wedding in Miami (Rashid FOF ¶ 136; SEC FOF ¶ 64); **(3)** 8/2/11 - $1,886 charge for air fare from NYC to San Francisco for brother-in-law's funeral arrangements (Rashid FOF ¶ 137; SEC FOF ¶ 59.); **(4)** Christmas 2011/New Year 2012 - $10,049 charge for air fare to Brazil and related charges (Rashid FOF¶ 138; SEC FOF, ¶ 67); **(5)** Thanksgiving Weekend, 2012 - $2,160 in meal and room charges in Bal Harbor, FL (Rashid FOF ¶ 139; SEC FOF ¶ 82); **(6)** 1/29/13 - $1,548 charge for air fare to the Super Bowl in New Orleans (Rashid FOF ¶ 140; SEC FOF ¶ 85); **(7)** 12/12/11 - $259 charge for dinner at "Made in Italy" restaurant (Rashid FOF ¶ 141, n. 25; SEC FOF ¶ 66); **(8)** 3/13/12 - $1,174 charge at a restaurant operated by Lucky 13 Associates (Rashid FOF ¶ 141, n. 26; SEC FOF ¶ 69); **(9)** 2/15/13 - $243.44 charge for meal at "Nobu" restaurant (Rashid FOF ¶ 141, n. 25; SEC FOF, ¶ 88); **(10)** 12/13/12 - $930 charge for dinner at an unnamed restaurant (Rashid FOF ¶ 143, n. 29; SEC FOF ¶ 84); **(11)** 2/14,/13 - $1,542.98 charge for dinner at a restaurant operated by Lion Restaurant Group LLC (Rashid FOF ¶ 143, n. 30; SEC FOF ¶ 87)*;* **(12)** 6/17/11 - $359 charge for dinner at Spasso restaurant (Rashid FOF ¶ 145, n. 31; SEC FOF ¶ 52); **(13)** 10/5/11 - $120.88 charge for meal at a restaurant operated by Honey Jar Inc. (Rashid FOF ¶ 145, n. 32; SEC FOF, ¶ 63); **(14)** 4/27/12 - $181.52 charge for meal at a restaurant operated by 218 (Rashid FOF¶ 145, n. 33; SEC FOF ¶ 75); **(15)** 4/30/12 - $152.93 charge for a meal at a restaurant operated by Mr. Jonesing LP (Rashid FOF ¶ 145, n. 34; SEC FOF ¶ 77); **(16)** 10/9/12 - $248.26 charge for dinner at Koi NY restaurant (Rashid FOF ¶ 145, n. 35; SEC FOF ¶ 79); **(17)** 3/20/12 - $351 charge for meal at Gramercy Tavern (Rashid FOF ¶ 147, n. 36; SEC FOF ¶ 70); **(18)** 10/26/12 - $148 charge for dinner at a restaurant operated by 1170 Broadway Tenant LLC (Rashid FOF ¶ 147, n. 37; SEC FOF ¶ 80); **(19)** 10/28/12 - $250.13 charge for dinner at a restaurant operated by 228 West 10th St LLC (Rashid FOF ¶ 147, n. 38; SEC FOF ¶ 81); **and (20)** 4/28/12 - $296 charge for meal at a restaurant operated by Superior Restaurant NYCLP (Rashid FOF ¶ 149, n. 39; SEC FOF ¶ 76).

of the 20 expenses were included in the Master Spreadsheet that Rashid worked on with his former

counsel, and he reclassified most of them as being his "personal" expenses.  Furthermore, as

discussed above, the preponderance of the evidence is that Rashid regularly gave his assistants

direction on what should be represented in the "long description" field of is expense reports.

> b. **Rashid's Fallback Positions on Expenses that are Listed in the BDO Spreadsheet but for which the Underlying Expense Report Was Not Presented are Without Merit**

Rashid's resort to the type of counterfactual argument set forth above merely highlights his

inability to refute the substance of the SEC's showing that he routinely passed off his personal

expenses as legitimate business expenses.  The following examples are illustrative:

- **July 22-23, 2011 - The Montreal Bachelor Party.**  The first of the 20 expenses Rashid proposes excluding is his $760.83 in room and meal charges he incurred during his trip to Montreal for his friend's bachelor party.  (*See* PX 111, at BDO ## 1241, 1244, 1253.)  The SEC adduced substantial evidence, including contemporaneous emails, which showed that the bachelor party was clearly the purpose of Rashid's trip.  (SEC FOF ¶ 135.)  Yet, aside from asking the Court to disregard these expenses, Rashid's only other point is that he testified that he scheduled a business lunch with a Mr. Larsen.  (Rashid FOF ¶ 135.)  Rashid cites to Paragraph 67-68 of his Appendix A ("The Court's Findings of Relevant Facts"), but the citation apparently was in error, as those paragraphs do not relate to the Montreal trip.[14]  There is absolutely no corroboration of Rashid's claimed meeting with Larsen – no testimony from Larsen, no calendar entry, no text message, and no email.  Given Rashid's lack of credibility, his mere word is not enough.  Even if believed, Rashid's testimony would only show that he looked for excuses to expense personal trips he had already planned, just as he advised his former wife to "[v]isit your port co on the same trip" in order to create a rationale to seek reimbursement for a pre-planned personal trip.   (SEC COL ¶ 19 and PX 107.)

- **Early November, 2011 - The Miami Wedding.**  Rashid incurred expenses totaling $3,806.69 to attend a friend's wedding in Miami.  (*See* PX 111 at ## 1442-1443, 1454-1464.)  Rashid allocated those expenses to "QDI-Fund III."  (*Id.*)  The SEC showed through contemporaneous emails that the purpose of Rashid's trip was to attend his friend's wedding.  (SEC FOF ¶¶ 64-65.)  The evidence also included Rashid's grudging admission, in response to the Court's questioning, that the

---

[14] This is merely one of a significant number of instances where Rashid's FOF cites to a portion of his Appendix A ("The Court's Findings of Relevant Facts"), that does not appear to even relate to the subject matter of the stated proposition.

purpose of the trip was to attend the wedding. (Tr. at 1049-51.)  Rashid also admitted that he gave specific instruction to his assistant, Ms. Gatsik, on how to describe and allocate the expenses.  (*Id., citing* Tr. at 1037, 1045-51.)  At trial, Rashid was forced to admit that he lied to Ms. Gatsik when she asked him if the expenses were personal.  (Tr. at 1053-54.)  Instead of addressing this mountain of evidence, Rashid cites the groom's testimony that he and Rashid were not together 24 hour a day, and that Rashid missed a cocktail hour, as support for the proposition that this was a "combined business and personal trip." (Rashid ¶ 136.)  There is no documentary corroboration of an actual business meeting. Given Rashid's lack of credibility, and his complete failure to contort the SEC's showing or to confront his own admissions, Rashid's assertion should be rejected.

- **August 2, 2011 - The San Francisco Trip for Wife's Bereavement and Funeral Planning.** The SEC adduced emails which unequivocally showed that the purpose of Rashid charging $1,886 to his corporate AMEX card for air fare from New York to San Francisco (*see* PX 111 # 1270) was to accompany his then wife after her brother had died suddenly. (SEC FOF ¶¶ 59-60.)  The evidence once again included Rashid's explicit admission, in response to questioning from the Court, that the purpose of the trip – which Rashid allocated to Metals USA - was personal. (Tr. 935-939, 1021.)  Yet, aside from asking the Court to simply disregard the expense because the corresponding original expense report was not introduced into evidence, Rashid's only argument for finding this was a mixed business and personal trip is that he testified that he arranged a meeting with a banker who handled an account for Metals USA.  (Rashid FOF ¶ 137.)  There was – once again – no corroboration and no reason to believe Rashid's self-serving assertion. Even if he did schedule a meeting with a banker four days after his brother-in-law's funeral, there is no reason this would justify billing the trip to the funds.  It would simply be more evidence that Rashid would look for reasons to justify a personal expense as a business expense.  This conduct is inappropriate for a fiduciary.

- **Thanksgiving Day Weekend, 2012 - The Family Vacation in Bal Harbor.** Rashid submitted as alleged business expenses, and allocated to Metals USA, $2,160 in meal and room charges during his three-day trip to Bal Harbor with his parents. (*See* BDO Spreadsheet, PX 111 at ## 2323, 2325, 2327, 2335, 2346.) Rashid notes that Metals USA CEO Lorenco Goncalves testified that the subject of business usually came up even during social interactions with Rashid, and that Metals was in the process of being acquired.  (Rashid FOF ¶ 139.)  However, Goncalves testified that Rashid's holiday visit was "entirely social and had no business purpose" and that he only saw Rashid one time that entire weekend. (SEC FOF ¶ 81.)  Rashid and his former counsel reclassified *all* of these expenses as personal in the Master Spreadsheet, not just his Thanksgiving Day dinner with his family that he had expenses as an alleged client meal.  (PX 24 at ## 2193, 2194, 2199, 2205, 2215.)  Rashid's reliance on business having come up during a social call on Goncalves during what otherwise was obviously a family holiday trip is greatly outweighed by Goncalves's testimony and Rashid's own prior admissions.

-15-

- **January 29, 2013 - The Trip to the Super Bowl in New Orleans.** Rashid represented that a $1,548.90 charge for air fare from New York to New Orleans was for "business meetings in Louisiana" and allocated the expense to QDI. (PX 111 at BDO # 2537.) Rashid admits that the primary purpose of the trip was attending the Super Bowl (SEC FOF ¶ 85), but asserts that it was a mixed business/personal trip because he also attended a group brunch at the invitation of QDI's Gary Enzor and saw an attorney who did work for QDI. (Rashid FOF ¶ 140.). Rashid stresses that Apollo's T&E policies did not require business to be the sole purpose for incurring an expense in order to claim it as a business expense. *(Id.)* Rashid's excuses should be rejected because Enzor testified that the brunch was purely social and that he put Rashid in touch with the attorney solely for the purpose of getting Rashid help with arrangements for local transportation and restaurant reservations. Moreover, while Rashid notes that Enzor labeled the brunch as a business meeting on his own expense report, there is no reason to doubt that the brunch had a legitimate business purpose from QDI's perspective that was unrelated to Enzor's extension of a courtesy invitation to Rashid. Likewise, Rashid was a fiduciary to the funds and supposed to act in the funds' best interests at all times. Passing an expense off as belonging to the funds when the trip to New Orleans was for personal pleasure is a violation of Rashid's fiduciary duties.

- **December 12, 2011 - The "Made in Italy" Dinner.** Rashid incurred a $259 AMEX charge for dinner at a restaurant named "Made in Italy". (PX 111 at BDO # 1563.) He allocated the expense to Ascometals. *(Id.)* The SEC showed that the "long description" which Rashid had provided for the expense was false, and that Rashid was actually dining with personal friends, as shown by their email exchange, and not with the person originally named in the long description of the expense. (SEC FOF ¶ 66.) Rashid's response is to point out that BDO considered the same email in concluding that the expense was a business networking expense. (Rashid FOF ¶ 141.) But what Rashid leaves out is that BDO relied on Crowell & Moring's representation that the dinner was a networking event. (PX 111 at BDO # 1563. ["Per Crowell's 8/2/13 Trips Schedule, meal is with finance colleagues while in London.") Rashid also fails to address the fact that BDO reallocated the expense to Apollo. *(Id.)* BDO's conclusion, therefore, does not bear on the falsity of Rashid's original business justification or his attempt to allocate the expense to a portfolio company.[15]

- **December 13, 2012 -The RBC Bar Lunch.** Rashid charged $930 at a restaurant operated by RBC Bar, Inc. for what he represented was a "lunch with Metals USA board' while naming specific Metals USA board members who allegedly attended. (PX 111 at BDO # 2399.) The SEC adduced the testimony of some of those board members denying that they attended such a luncheon. (SEC FOF ¶ 84.) Rashid

---

[15] The same analysis applies to Rashid's attempt (Rashid FOF ¶ 141) to defend his submission of a $1,174 charge on March 13, 2012 for a meal at a restaurant operated by Lucky 13 Associates LLC and allocating the expense to Metals USA (PX 111 at BDO # 1752) and a $243.44 charge at "Nobu" restaurant on February 15, 2013. (PX 111 at # BDO 2583.)

does not address that evidence but instead relies on his having later told Apollo's CCO, in April 2013, that the luncheon was actually a "mentoring event" with a group of people from Apollo itself.  (Rashid FOF ¶ 143, *citing P*X 96 at 42.)  Rashid did not provide any support for his assertion to Ms. Michel or any explanation of why his original business justification asserted he was with the Metals USA board. Nor does he provide any such support or explanation now.  The SEC submits that while Rashid may have successfully rebutted any charge of *recent* fabrication of his substituted business justification, he has failed to refute the SEC's showing that his original business justification and allocation was fraudulent.

- **April 27, 2012 – The Meal at a Restaurant Operated by 218**.  Rashid charged $181.52 for what he represented was a "dinner with Gary Enzor - QDI." (PX 111 at BDO # 1850)  Enzor testified that he recalled no such dinner.  (PX 332 ¶ 29.)  In fact, the evidence showed that Rashid was dining with family and friends. (SEC FOF ¶ 75.)  A contemporaneous email string chronicled the planning for that dinner.  The participants included Rashid, his friend and their wives.  (PX 202 at BDO-Apollo 00002925-2930.)  The email shows that there was no business purposes for the dinner.  For example, Rashid's former wife told the group "ooooh bey is in the mood to glam it up!!! Love it." (*Id.,* at BDO-Apollo 00002927.)  Though there is discussion of baby sitters in the approximately 15-email-long string, there is no mention of QDI.[16]

- **October 5, 2011 - The Honey Jar Inc. Meal**.  Rashid originally represented that his $120.88 charge at a restaurant operated by Honey Jar Inc. was a "business meal for Ascometals."  (PX 111 at BDO # 1384, MS # 1254.)  This is one of a number of meals as to which Rashid argues that the emails which the SEC used to prove he was not dining with the portfolio company executives he identified in his business justifications should now be reinterpreted to show that he was nonetheless having business-related "meals with industry colleagues."  (Rashid FOF ¶ ¶145-146.) Rashid's new explanation for the Honey Jar meal is that his actual dinner companion – Ed Sent – was a fund raising contact.  Rashid asserts that BDO previously concluded as much in the context of reviewing an earlier expense for a meal with Sent at a restaurant named "Hakkasan." (*Id., citing* PX 111 at BDO # 497.)  But Rashid fails to mention that his expense report for the Hakkasan meal – unlike his expense report for the Honey Jar meal – did identify Sent as Rashid's dinner companion from the start, and allocated the expense to "Commodities PE." (PX 111 at BDO #497.)   It was for that reason that BDO concluded that the Hakkasan expense was properly allocated to "Commodities Funding." *(Id.)*  The critical difference between Rashid's respective submissions for the Hakkasan expense and the Honey Jar expense is that Rashid's original business justification and allocation for the former expense were correct, whereas they were demonstrably false for the latter expense.  Just because Rashid may have been justified in expensing a properly identified meal with Sent to an Apollo cost center

---

[16] The SEC is in no way insinuating that Rashid's former spouse in any way participated in, of had any knowledge of, his expense fraud.

does not mean that Rashid is absolved of responsibility for later allocating the cost of a different meal with him to an investment fund under false pretenses.[17]

### c. Rashid's Arguments for Disregarding Expenses Not Listed in "the Cindy Michel Spreadsheet" is Without Merit

Rashid also asks the Court to simply disregard another five expenses he chooses to address in his submission. Rashid asserts the these five expenses – all from June and July of 2011 - should be disregarded because they were not listed on what Rashid now refers to as "the Cindy Michel Spreadsheet" (PX 96, which is the expense spreadsheet that Apollo CCO Cindy Michel asked Rashid to review in April 2013, and that Rashid returned to her with "comments" in which he either acknowledged that certain expenses were personal or inserted additional purported business justifications. (Rashid FOF ¶¶ 54-55.) Rashid asserts that it would be unfair to consider these expenses because he did not have an opportunity to review them when he had full access to his emails before Apollo suspended him in July 2013. *(Id.)* But once again, Rashid has advanced a frivolous argument that merely highlights his inability to defend on the merits.[18]

---

[17] The same analysis applies to Rashid's discussion (Rashid FOF ¶¶ 145-46) of his $152.93 charge on April 30, 2012 at a restaurant operated by Mr. Jonesing LP (PX 111 at BDO # 1856; MS # 1726) and his $248.26 charge on October 9, 2012 at "Koi NY' restaurant. (PX 111 at BDO # 2192; MS # 2062). In each instance, Rashid simply ignores the falsity of his original business justification and allocation instruction. The SEC respectfully refers the Court to its initial post-trial submission for a discussion of Rashid's March 20, 2012 - $351 charge for meal at Gramercy Tavern *(Id.,* ¶ 147, n. 36) and his October 26, 2012 - $148 charge for dinner at a restaurant operated by 1170 Broadway Tenant LLC *(Id.,* ¶ 147, n. 37). (*See* SEC FOF ¶¶ 70 and 80.)

[18] Rashid also suggests that he may not have seen or approved the expense report in which these five expenses were included. (Rashid FOF ¶ 151.) Rashid notes that the tracking number for Expense Report ID 0000002064 is out of numerical sequence with other expense reports in the same chronological sequence. *(Id.)* Rashid also notes that the five expenses were not listed in the Master Spreadsheet (PX 24), and therefore, are marked with a "not on Ali's schedule" designation on the BDO Spreadsheet (PX 111). But given that so many of Rashid's business justifications for other expenses have been proven false, there is no reason for the Court to doubt that he is responsible for the false business justifications asserted for these five expenses as well.

-18-

Rashid had every opportunity to conduct discovery in this case and to file an appropriate discovery motion if he believed that Apollo, or the SEC, was withholding emails that would assist his defense regarding these five expenses.  It was Rashid's decision to take extremely limited discovery which included no motions to compel documents and only two fact witness depositions (neither of which was a portfolio company executive).  More importantly, Rashid's argument ignores the fact that emails pertinent to some of these expenses *were* produced in discovery.  As demonstrated below, those emails, and other competent evidence, prove that Rashid's business justifications for the five expenses were completely false:

- **June 17, 2011 - The "Spasso" Restaurant Dinner.**  Rashid represented that he charged $359.37 for a "Dinner at Spasso with Metals USA - McP[h]erson, Goncalves." (PX 111 at BDO # 1169.)  However, BDO found a contemporaneous email which clearly showed that Rashid had actually dined with some of his friends. (*Id.,* see also PX 333, Cleary Decl. ¶ 12.a; PX 54 and Tr. at 1251-52, 1266-68; PX 105 [a more legible copy of PX 54].)  The email reflects that Rashid was running late for a dinner with friends and one of them quipped that "I heard dinner is on the last man who gets here!!  Note that cabral [sic] and I are waiting at the bar." Rashid was questioned about the email at trial, and admitted that his email exchange was with personal friends and that he was probably the last man to arrive that night. (Tr. 958-59.)  He also admitted that the Metals USA executives named in his expense report were not present. (Tr. 959.)

- **June 21, 2011 - The Dinner at a Restaurant Operated by Cerulean Management LLC.**  Four days after his outing with friends at Spasso, Rashid charged $199.93 at a restaurant operated by Cerulean Management LLC and characterized the business justification as "dinner with Troy from QDI." (PX 111 at BDO # 1181.)  As the SEC addressed in its initial post-trial submission, however, Troy testified that such a dinner with him never happened. (SEC FOF ¶ 54.)  Even if Rashid had availed himself of discovery, there is no reason to believe that an *exculpatory* email exists.  If it could be shown that Rashid was with someone besides Troy (which seems highly likely), that would not explain why his expense report said he was with Troy and that the expense related to QDI.  Nor would such a showing bolster Rashid's position that he was always "networking" whenever he got together with his friends.

- **July 9, 2011 - The Dinner at "Chinos on Main" Restaurant.**  Rashid charged $197.92 for dinner at this restaurant and as a business justification stated "dinner with Enzor." (PX 111 at BDO # 1218.)  The SEC has previously pointed out that Enzor denied attending such a dinner with Rashid. (SEC FOF ¶ 55.)  There is no

reason to believe that all relevant emails in Apollo's possession or control were not produced.  Nor is there any reason to believe that an exculpatory email would have been turned up even if Rashid had availed himself of available discovery methods. Perhaps that explains why he did not do so.

- **July 11, 2011 - The Dinner at a Restaurant Operated by Barolo Ltd**.  Two days after the "Chinos on Main" dinner, Rashid charged $140.94 for a dinner at a restaurant operated by Barolo Ltd. which his expense report asserted was a "dinner with Smith" whose cost was allocated to Metals USA.  (PX 111 at BDO # 1221.) Once again, the portfolio company executive that Rashid named denied attending any such dinner.  (SEC FOF ¶ 56.)  Once again, Rashid's post-trial submission is silent on this evidence. Once again, there is no reason to believe that exculpatory documentary evidence exists.

- **July 14, 2011 - The Second Dinner at a Restaurant Operated by Cerulean Management LLC.**  This time Rashid charged $344 for what his expense report represented was a "dinner with Hull and Smith" allocated toe "Realogy." (PX 111 at BDO # 1229.)  Yet again, the portfolio company denied attending any such dinner.  (SEC FOF ¶ 57.)  Yet again, Rashid's submission fails to address the evidence, and instead, argues that the expense should be ignored. Given that in the space of less than one month Rashid expensed five dinners which he claimed were with portfolio company executives and that those individuals have all been proven *not* to have been present, Rashid's suggestion that a treasure trove of documents might have existed to rebut the obvious inference of fraud is simply untenable.

### d.   Rashid's Arguments for Disregarding Expenses he "Corrected" and/or Offered to Repay Lack Merit

Rashid also argues that the Court should not consider 7 expenses that he "corrected" and/or offered to repay during Apollo's expense review in the spring of 2013.  (Rashid FOF ¶¶ 149-150.)[19]  That argument is frivolous because Rashid's supposed corrections and offers of payment came at least a year after Rashid had already submitted the expenses in question, and only in the context of Apollo CCO Cindy Michel and Apollo's outside counsel scrutinizing his expense reporting history as part of a broader review of expense reporting practices at the firm.  (PX 304, Michel Decl. ¶ 10-12; PX 330, Ehrlich Decl. ¶¶ 3, 5.)   Rashid's *post hoc* "corrections" do not

---

[19] In addition, because Rashid also argues that four of these expenses should be disregarded because the underlying expense reports are not included in PX 87, the SEC has already discussed those four expenses above in Subsection II.a.2.b.

diminish the evidentiary weight of his prior fraudulent course of conduct for purposes of assessing his scienter.  As noted above, for its 206(1) charge, the SEC is only required to prove that Rashid recklessly submitted false expense reports.  Rashid's admission to Michel that seven of his previously submitted expense reports were incorrect meets this standard.

Moreover, the fact that Rashid admitted to Michel that some of his expenses were false (even though he continued to obfuscate about others), does not diminish the SEC's case for injunctive relief.  This is because Rashid can hardly be seen to have "come clean" or demonstrated recognition of the wrongfulness of his conduct by "correcting" or offering to repay a mere 7 personal expenses without admitting that he had put through hundreds of other personal expenses.

Nor has Rashid even shown that the revised business justifications which he gave to Michel – none corroborated by external evidence – are credible.  To the contrary, believing Rashid's entirely new business justifications would require believing him over the assistants who testified that he gave direction on his original expense reports.  And just as documentary evidence shows the falsity of many of Rashid's original business justifications, such evidence shows the falsity of some of his new explanations.  The SEC will not review all seven expenses here, but refers the Court to its prior discussion of those expenses.  (SEC FOF ¶¶ 70-72, 74, 76, 80 and 81.)

One example aptly illustrates the untrustworthy nature of Rashid's substituted business justifications.  On March 20, 2012, Rashid charged $351 at the Gramercy Tavern restaurant for what his expense report represented was a "dinner with Richard Smith for Realogy meeting."  (PX 111 at BBO # 1777.)  To be sure, Rashid later "corrected" his business justification in the expense spreadsheet that he returned to Michel in April 2013.  His new explanation was:  "Dinner with Gary Malin & Nat Faust from Realogy to discuss market outlook for Realogy financial performance."  (PX 96 at p. 25 of the attachment.)  But that "corrected" explanation was *another*

*lie.*  Contrary to his explanation, Rashid's contemporaneous email exchange with his sister shows them planning a dinner for two at Gramercy for the night in question.  (PX 40.)   The reservation was for two people, not for *three* people, as would be the case if Rashid planned to dine with Malin and Faust.  *(Id.)*  Nor is there any mention of them or Realogy in the email to his sister.

### 3.      Rashid's Fraud was Material

Rashid's persistent course of fraudulent conduct was material.  As discussed in the SEC FOF, his violations were material because they involved misappropriation of funds for personal use – regardless of the amount – in violation of Rashid's fiduciary duties as an Investment Adviser. [Doc. 204, SEC COL ¶ 22].   First, the Second Circuit is clear that materiality can rest in either quantitative or qualitative factors. *ECA, Local 134 IBEW Joint Pension Trust of Chicago, et al. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  Second, in the Advisers Act context – where a higher fiduciary standard applies – ***any*** misappropriation of funds for personal use is material regardless of the amount.[20]  Third, at trial, Denis O'Conner, one of Rashid's own expert witnesses, conceded that because investment funds may have limited visibility into the adviser's practices in billing expenses the improper billing of even relatively small sums of money may be of significant concerns because it raises questions about the adviser's internal controls.  (Tr. at 1417-21.)  Fourth, Apollo's own employees confirmed at trial that Rashid's fraudulent misconduct was indeed material.  For example, Marc Becker, a senior Partner, an investor in Apollo funds as

---

[20] *See e.g., Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 93 (2d Cir. 2010) ("[a]ny rational mutual fund investor would be highly leery of dealing with a fiduciary…who, in violation of the law, lined [its] pockets at the expense of investors…"); *SEC v. Penn*, 225 F. Supp. 3d 225, 238 (S.D.N.Y. 2016) ("…diversion and misappropriation of funds by an adviser are necessarily material."); *see also West v. SEC*, 641 Fed. Appx. 27, 30 (2d Cir. 2016) (Second Circuit affirming SEC opinion upholding FINRA lifetime ban on securities professional for misusing $113,500 of client funds for several months before returning it).  Rashid's brief fails to address or distinguish this binding case law.

a limited partner, and contemporary of Rashid's, testified that:

> Based on my experience at Apollo over more than two decades, I believe that the firm's integrity (including compliance with policies such as T&E policies) is extremely important to limited partners in our investment funds, whether they be institutional investors or individuals, as well as to business partners, such as our portfolio companies.

(PX 300 ¶ 9.)  Moreover, Apollo investigated Rashid's contact, ultimately asked him to leave Apollo, and subsequently informed the Funds' limited partners that Rashid's separation was due to expense improprieties.  (Tr. at 904-5.)  These facts all demonstrate, by a preponderance of the evidence, the materiality of Rashid's fraudulent misconduct.

It is also worth noting that the very essence of Rashid's conduct establishes the materiality for purposes of a violation of the Act.  Rashid often attempts to characterize his actions as a simple mistake here or a bit of sloppiness there, but the facts simply do not support that characterization. Rashid's conduct was not sporadic; it was persistent.  It lasted from January 2010 to June 2013, and continued even after Apollo warned him at least twice about his conduct.  For example:

- In or around November 2010, Donnelly, then Apollo's CFO, met with Rashid to discuss Rashid's expenses and told him it was unacceptable for Rashid to submit personal expenses to Apollo as business expenses.  And Rashid acknowledged such behavior was unacceptable.  (PX 310, Donnelly Decl. ¶ 9.)

- In mid-2012, Donnelly again warned Rashid that his continuing conduct was unacceptable.  (PX 310, Donnelly Decl. ¶¶ 3, 13, 17.)  At this meeting, Rashid admitted that certain of his expenses were, in fact, personal not business.  (*Id*.)

- Even one of his assistants, Ms. Gatsik, wrote to Rashid "Sorry to be a pain but they are cracking down on expenses and things are bouncing back for review etc. so I want to make sure its (sic) correct."  (PX 232, email string of 12/ 20/11.)

The very nature of Rashid's long running fraudulent conduct despite knowing and ***even acknowledging*** that his conduct was improper more than establishes materiality by a preponderance of the evidence.

Rashid's response addresses quantitative rather than qualitative materiality, and makes a tortured attempt to apply a materiality guide that applies to disclosures in registration statements of publicly held companies.  Rashid simply ignores the authority, discussed in the SEC's FOF, which holds that materiality can be established through either quantitative *or* qualitative factors. Rashid's reliance on SEC Staff Accounting Bulletin No. 99 ("SAB 99") is misguided.  Rashid points to *In Re Ply Gem Holdings, Inc. Sec. Litig*, 135 F. Supp. 3d 145 (S.D.N.Y. 2015).  But *Gem Holdings* is totally inapposite here.  In *Gem Holdings*, the private plaintiff alleged that the company defendant failed to disclose certain material information in its Form S-1 Registration Statement. *Gem Holdings*, 135 F. Supp. 3d at 147.  In analyzing whether or not the alleged omissions were material, the *Gem Holdings* Court understandably turned to SAB 99.  That is because SAB 99 specifically addresses materiality in the context of ***financial statements***.  In fact, the summary section of SAB 99 states:

> This staff accounting bulletin expresses the views of the staff that exclusive reliance on certain quantitative benchmarks ***to assess materiality in preparing financial statements and performing audits of those financial statements*** is inappropriate; misstatements are not immaterial simply because they fall beneath a numerical threshold.

SAB at 1 (emphasis added).  Even Mr. Rashid's own expert, Mr. Quintero conceded at trial that SAB applies to financial statements and not to the false submission of expense reports.  (Tr. at 1483-84.)  More than SAB 99 being inapplicable on its face, it does not logically address the circumstances in this case.  Rashid, as an investment adviser, owed significant fiduciary duties to the Funds he advised, but he ignored those duties and engaged in a multi-year course of fraudulent conduct in systematically submitting and allocating his personal expenses to his clients. Ultimately, there is no valid reason to apply SAB 99 to this case, which solely focused on Rashid's false submission of his own expenses as business expenses, seeking reimbursement of those false

expenses, and allocating them to Apollo Funds and Portfolio Companies.

   4.   **Rashid's Arguments for Exclusion of the Evidence of his Fraud are Without Merit**

        a.   **Rashid's Attempt to Exclude the Master Spreadsheet and the Pierce Report and the BDO Report on the Basis that They Reference the Master Spreadsheet is Baseless**

In his proposed findings of fact and conclusions or law, Rashid renews his argument to exclude certain "settlement documents" including the Master Spreadsheet.  (Doc. 206 at 31.)[21] The Court should reject these arguments and admit the Master Spreadsheet and related documents into evidence over Mr. Rashid's objections.  When determining whether or not FRE 408 applies, the Second Circuit looks at the timing and existence of a disputed claim to determine whether or not an offer is made "in compromising or attempting to compromise a claim."  *Pierce v. F.R. Tripler & Co.,* 955 F.2d 820, 827 (2d Cir. 1992).  In *Pierce*, the Second Circuit observed that "[i]t is often difficult to determine whether an offer is made 'in compromising or attempting to compromise a claim.' Both the timing and the existence of a disputed claim are relevant to the determination."  *Id.  Pierce* unambiguously states that once a party "is represented by counsel, threatens litigation and has initiated the first administrative steps in that litigation, any offer made between attorneys will be presumed to be an offer within the scope of Rule 408."  *Pierce***,** 955 F.2d at 827.  The Second Circuit, however, goes further and cites two cases where the application of FRE 408 did ***not*** apply.  One of the cited case was *Cassino v. Reichhold Chemicals*, 817 F.2d 1338, 1342–43 (9th Cir. 1987) cert. denied, 484 U.S. 1047, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988).  That case dealt with an Age Discrimination Employment Act claim where the district court admitted

---

[21] Before the trial, the SEC moved to allow the admission of the "Master Spreadsheet" and related documents into evidence.  [Doc. 101-1, Omnibus Mot. in *Limine* at 4-13.]  The SEC further clarified its position in a letter to the Court dated December 6, 2019.  [Doc. 162.]

into evidence the offer of severance pay conditioned on waiver of an age discrimination claim made contemporaneous with discharge.  The Ninth Circuit upheld that decision finding it was not protected by Rule 408.  The court stated that FRE 408 was designed to encourage the compromise and settlement of existing disputes, but does not bar admission of evidence of discussions around potential claims.  *Id*. at 1343.  Likewise, the Second Circuit's decision in *Pierce* also cited to *Big O Tire Dealers v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372–73 (10th Cir.1977) cert. dismissed, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).  In that case, the Tenth Circuit upheld the admission of correspondence between the parties prior to the filing of an action as "business communications" rather than "offers to compromise" and thus outside scope of Rule 408.  The *Big O* court specifically noted that "the discussions had not crystallized to the point of threatened litigation, a clear cut-off point, until after October 10, the date of the conversations between Big O's president and Goodyear's executive vice-president."  *Id*. at 1373.

These two cases, both cited by the Second Circuit in its *Pierce* opinion, demonstrate the necessity for an existing dispute crystallizing to the point of threatened litigation.  The record demonstrates that was not the situation for Rashid.  In fact, there was no evidence adduced at trial that demonstrated an existing dispute crystallizing to the point of a potential lawsuit.  At best, Mr. Ehrlich, one of Apollo's Paul Weiss attorneys, testified about "adversity" between Rashid and Apollo.  (Tr. at 885-86.)  Mr. Ehrlich testified as to what he believed this meant:

> In really sort of almost layman's sense, that Apollo, you know, had information that led it to believe there were potentially serious and intentional violations of its policies and procedures, that investor money was intentionally being used for personal expenses, and that was contrary to the interest of Apollo and its funds and, you know, there was an investigation of an employee, and in that context I think of that as adversity.

(Tr. at 913:5-14.)  So at best, the adversity boiled down to Mr. Rashid wanting to keep his job and

Apollo investigating his actions.[22]  But there was no claim asserted nor any threatened litigation, which is needed to establish protection under FRE 408.

At its heart, Mr. Rashid's 408 argument focuses on the concept that because he was seeking to keep his job, almost anything communicated to Apollo or its counsel, Paul Weiss,[23] should be subject to FRE 408.  This analysis is overly broad and without support.  As the Court noted at the pretrial hearing for this case:

> THE COURT:  If an employer and an employee have a dispute over an employee's performance and the employer says, "I want to tell you right at the outset you're in jeopardy of losing your job, now tell me what happened," and the employee tells the employer what happened, your view of it is that is a 408 settlement negotiation. Am I right?
>
> MR. KEHOE:  It's the beginnings of it.
>
> THE COURT:  It is? That's a 408 settlement negotiation?  OK.  That's a very interesting position.

[Pretrial Hr'g of Dec. 3, 2019 Tr. at 41:5-13.]

Moreover, even if Rule 408 somehow did apply to the Master Spreadsheet. Rashid's attempt to use it as a basis to exclude Pierce's opinions is wholly without merit.  The record shows that Pierce used the Master Spreadsheet solely to identify the specific expenses which Rashid and his former counsel at Crowell & Moring had already reclassified as being Rashid's personal expenses.  (Tr. at 626-27.)  Importantly, Pierce conducted an ***independent review*** of those expenses

---

[22] Rashid had initially disclosed Glenn McGorty and Daniel Zelenko from Crowell Moring as potential trial witnesses.  Both were employed by Rashid as his personal attorneys as of July 1, 2013.  They were the lawyers representing him when the drafts of the Master Spreadsheet were exchanged with Paul Weiss.  Rashid failed to call either attorney.  In fact, Rashid pulled Mr. McGorty from his witness list on the morning he was to testify.  (Tr. at 1350.)

[23] Rashid previously argued that a common interest protection existed between himself and Apollo. [*See e.g.,* Doc. 57.]  Rashid cannot reconcile his current position that the spreadsheet was an offer to settle a claim under Rule 408 with his earlier argument that the spreadsheet was privileged under the common interest doctrine.

and did not rely on the fact that Rashid had already reclassified them as being his personal expenses. (*Id*.) In fact, the designations that Rashid and his lawyers assigned to various expenses did not affect Pierce's work and analysis at all:

> Q: Mr. Pierce, counsel had questioned you about the master spreadsheet and had asked you about designations of business or personal that were already in that master spreadsheet. You recall that?
>
> A: I do.
>
> Q: Did that affect your review of these expenses in any way?
>
> A: That did not. We did not take the classification, give any weight to it in our assessment of the expenses as personal or business. We looked at them each without any – any classification at all and ***determined independently based on our review whether they were personal or business.***

(Emphasis added) (Tr. at 626:16 – 627:1.)

Likewise, any argument to exclude the BDO Spreadsheet is without merit. Rashid seems to be concerned that the designation he placed on certain expenses during the back and forth with his lawyers and Apollo – whether a personal or business designation – impacted BDO's analysis. Put simply, it did not. As discussed above, Rashid's designations in the Master Spreadsheet are not subject to 408 protection. Second, even if they were, they did not affect BDO's analysis, and accordingly, there would be no reason to exclude the BDO Spreadsheet. As BDO's lead accountant, Suzanne Cleary, testified to at trial, Rashid's designation was meaningless to BDO:

> Q. …You understand that there was in fact some self-identification by Mr. Rashid in the master spreadsheet, correct?
>
> A. Yes. At that meeting he had identified some items as personal, and then, also, subsequent to that meeting, we received schedules where items were identified as personal.
>
> Q. Did you review items that Mr. Rashid had already identified as personal for the purpose of making a determination of whether or not they were in fact personal expenses or business expenses?

A. We didn't review – once he identified it as personal we didn't review those expense items.

(Tr. 1255:23 – 1256:9)  In other words, Rashid's designations from the Master Spreadsheet *only* defined the universe of BDO's analysis.  It did not affect BDO's ultimate designation or conclusion for each expense.  Thus, there is no basis whatsoever to exclude the BDO spreadsheet based on supposed "settlement communications" in the Master Spreadsheet.

> **b.     Rashid's *Daubert* Motion Regarding the Pierce Report is Baseless**

Rashid also seeks to exclude the testimony and report of the SEC's sole expert witness, Kevin Pierce.  Rashid argues that Pierce "formulated opinions based on inherently untrustworthy, inadmissible, privileged, and unreliable data."  [Rashid FOF ¶ 124.]  As demonstrated below, however, Rashid's arguments are without support in law or fact.

First, Rashid's criticism of Mr. Pierce's expert analysis starts with a familiar refrain – that he did not look at enough relevant documents.  [Rashid FOF at 30, 38.]  At trial, Mr. Pierce testified that he and his team analyzed "tens of thousands" of pages of documents.  (Tr. at 655.)  As detailed in his report, Mr. Pierce analyzed the documents produced by the parties in this litigation.  [Doc. 101-36, Ex. A to Pierce's Rep.]  Insofar that Rashid's defense thought additional documents were relevant in this case, they could have availed themselves to the typical tools of discovery.  Moreover, they could have filed a motion to compel production if they felt a production was incomplete or some exculpating material had not seen the light of day.[24]  Furthermore, the fact that the emails reviewed by Pierce were the result of "key word" searches does not make them invalid

---

[24] Rashid's counsel failed to file such a motion to compel.

at all.[25]  As argued in more detailed in the SEC's response to Rashid's initial *Daubert* motion, Rashid's argument that Mr. Pierce's review did not review enough documents is a non-starter. [Doc. 118, Resp. to *Daubert* Mot. at 9-12.][26]

Second, Rashid's claim that an expert would not reasonably rely on this kind of data is without support.  Experts routinely base their opinions on contemporaneous emails and calendar entries.  Such evidence speaks louder than words.  As detailed in the SEC's *Daubert* response, the cases cited by Rashid simply do not stand for proposition that such emails are not the proper basis for Pierce's opinions.  [Doc. 118 at 9-10.]  Rashid provides no real support for such an argument and it is contrary to common sense.  In trying to understand whether or not an expense was actually personal in nature, an expert would obviously review Rashid's contemporaneous emails and calendar entries.  Such documents would logically be more trustworthy than Rashid's own biased, retrospective testimony years later.[27]

Third, Rashid appears to argue that Mr. Pierce relied on the classification placed on each expense in the Master Spreadsheet.  (SEC FOF at 38.)  This is false.  At trial, Mr. Pierce clearly testified on this point:

---

[25] Indeed, this Court has recognized that requiring a search of every email or electronic file kept by numerous custodians over a multi-year stretch is unreasonably burdensome.  *Stinson v. City of New York*, Case No. 10 Civ. 4228, 2015 WL 4610422, at *5 (S.D.N.Y. July 23, 2015).  This is why "it is critical that the parties work together to define search criteria that will lessen the burdens of electronic discovery."  *Id.*  Rashid cannot rebuke that process and then later cry foul when he does not like the result.

[26] The Response also details the SEC's attempts to work with Rashid's counsel during litigation to collaborate with regard to document production and Rashid's rejection of that process.

[27] Rashid's proffered expert, Mr. Quintero, takes the approach of reviewing absolutely none of the relevant contemporaneous documents and trusting Mr. Rashid's words and explanation in a vacuum in reaching his own opinions.  For this reason, among others, the SEC seeks to exclude Mr. Quintero's opinions and testimony in their entirety.  [Doc. 100-2, SEC's *Daubert* Mot.]

Q.  Mr. Pierce, counsel had questioned you about the master spreadsheet and had asked you about designations of business or personal that were already in that master spreadsheet. You recall that?

A.  I do.

Q.  Did that affect your review of these expenses in any way?

A.  That did not. We did not take the classification, give any weight to it in our assessment of the expenses as personal or business. We looked at them each without any – any classification at all and determined independently based on our review whether they were personal or business.

(Tr. at 626-27.)  Mr. Pierce then explained that for each of the 988 expenses he and his team reviewed, he would employ the following process:

> …We would take the expense. We would research the merchant, try to determine what the expense was for if it wasn't obvious. We would search Mr. Rashid's calendar entries and emails, given the methodology described in my report, to identify relevant emails and calendar entries or try to identify relevant emails and calendar entries that related to those expenses or that expense. We would review the declarations and depositions to see if there was any testimony regarding those specific expenses, as well as look at the T&E policies that were in place at the time that expense was incurred to see how -- how those -- how that transaction would be treated for -- under Apollo's T&E policies.

(Tr. at 627:7-18.)  Such is the process of credible experts.

Finally, Rashid also claimed Mr. Pierce only presented affirmative evidence of a personal purpose for nine expenses – three in his report and six in a demonstrative.  [Doc. 206 at 31.]  This is simply not true.  In its *Daubert* briefing, the SEC pointed out that:

> In analyzing these documents, ***Mr. Pierce found affirmative evidence that the vast majority of expenses***, which Rashid had previously admitted were wrongly classified as business, were in fact personal in nature.

(emphasis added) [SEC's Resp. to Rashid's *Daubert* Mot. at 1, 12 n.5 ("…it is worth noting that Mr. Pierce ***did*** find affirmative evidence that the vast majority of these expenses were, in fact, personal in nature.")]  Moreover, at trial, Mr. Pierce identified 768 of Rashid's expenses, totaling $185,542, which were personal expenses falsely billed by Mr. Rashid as business related expenses.

-31-

(PX 317, Pierce Decl. ¶ 15; PX 327, Pierce Demo.; PX 117A, Pierce's Spreadsheet of Expenses He Designated Personal.)  Of those, Mr. Pierce's analysis identified 365 of those expenses totaling $101,775.19 that were personal in nature during the Limitations Period.  (PX 317, Pierce Decl. ¶ 15; Exs. C and D to Pierce's Expert Report attached to PX 317; PX 117A.).  His direct testimony affidavit discusses his process and his ultimate conclusions leading to these totals.  And in fact, Mr. Pierce testified that his process in reaching his conclusions for the entirety of the expenses was exactly the same as he described in Court for the specific examples.  (Tr. at 650:18-23.)

Ultimately, Rashid seeks to bar Mr. Pierce's findings not because they are inappropriate, but because they are so damning.  Mr. Pierce and his team went back and analyzed each of the 988 expenses that appear in the Master Spreadsheet and sought to find whether or not the expenses were business or personal in nature.  Rashid did not employ such a method.  He had his expert offer Rashid's own explanation *in spite* of the contemporaneous emails and calendar entries.  Rashid's attempt to limit or bar Mr. Pierce's testimony are meritless and should be discarded.

## B.    RASHID VIOLATED SECTION 206 (2) OF THE ADVISERS ACT

The SEC has previously demonstrated that the evidence (notably including Rashid's own repeated admissions) was more than sufficient to establish that Rashid's conduct was negligent at an absolute minimum.  (SEC FOF pp. 74-76.)[28]  The SEC has also shown that Rashid's argument that Section 206(2) of the Act requires a showing of *"mens rea"* was misguided.  [*Id.; see also* Doc. # 161, SEC Ltr. dated Dec. 6, 2019.]  In his post-trial submission Rashid makes no attempt to argue the merits of the negligence charge, and he has apparently abandoned his mysterious argument about *mens rea*.  Rashid does advance a new argument, but it is equally untenable.

---

[28]  Rashid has expressly admitted his negligence.  *See, e.g.*, [Doc. 206, ¶ 187 ("Mr. Rashid has long acknowledged that he was negligent") and ¶ 199 ("Mr. Rashid was negligent")].

Rashid's latest argument harkens back to the bygone era of hyper-technical pleading standards. Despite no longer explicitly urging application of a *mens rea* standard, Rashid argues that in order to prevail on the Section 206(2) charge, the SEC was required to prove that he engaged in "intentional, fraudulent conduct" that operated as a fraud or deceit on Apollo's clients. (Rashid FOF ¶¶ 186 – 89.) As Rashid would have it, the SEC has to prove intentional fraud in order to prevail on its negligence charge because its Complaint averred that he "engaged in fraudulent conduct that violated Section 206(2)." [Rashid FOF ¶ 186, *citing* Doc. 1, Compl. at ¶ 100.] This is incorrect, and Rashid's argument flies in the face of modern-day pleading standards and Second Circuit's precedent.[29]

The SEC simply was not required to prove intentional fraud to prevail under Section 206(2) even if Rashid is correct that its complaint technically failed to allege negligent conduct. Under Rule 15(b)(2), the negligence count was tried by express or implied consent of the parties.

First, Rashid had ample notice that the SEC was alleging that his conduct was negligent. Rashid deposed the SEC's standard of care expert who expressly opined that his conduct was negligent.[30] Rashid's own expert, Dennis O'Connor, opined on "best practices" in the advisory

---

[29] Rule 15(b)(2) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[w]hen an issue not raised by the pleading is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). In *SEC v. Rapp,* 304 F.2d 786, 790 (2d Cir. 1962), the Second Circuit reversed the district court's dismissal of an SEC complaint as contrary to "[t]he well known objective of [Fed. R. Civ. P. 15(b)] that cases should be decided on resolution of the actual dispute between the parties, rather than on the paper pleadings filed at the inception of suit…"). As the Second Circuit also recognized in *Rapp,* Rule 15(b)(2) "provides for free or delayed amendment, but states that 'failure to amend does not affect the result of the trial of these issues.'" *Id.*

[30] That expert was Matthew Hoffman of the Roundtable Financial Group in New Canaan, CT. Hoffman's reports and deposition transcripts are not in the trial record because the SEC decided his testimony was unnecessary in view of Rashid's subsequent admissions of negligence. Nonetheless, Rashid cannot deny the representation made in the text above.

industry, and offered comments on the report of the SEC's expert regarding what "a reasonable employee in Rashid's position" would have known and done.  [Doc. 113-5, O'Connor Decl.]

Second, at the Final Pretrial Conference, the Court inquired about the scienter standard under Section 206(2).  [Pretrial Hr'g at 2-6.]  The SEC responded that it only needed to prove negligence under Section 206(2) and submitted a letter brief on this issue.  [Doc. 161, SEC's Ltr.] Rashid also responded in writing and pushed his "mens rea" argument forward.  Thus, Rashid cannot credibly claim that he was not prepared to defend a negligence case at trial.

Finally, Rashid's best practices expert also testified at trial, and was questioned on his areas of agreement and disagreement with the SEC's expert. (Tr. 1423-25.)  In short, Rashid at least implicitly consented to inclusions of the Section 206(2) count at trial.  His attempt to obtain what would be essentially a dismissal of the negligence count based on an alleged technicality in the complaint is both anachronistic and frivolous.

**C.      RASHID IS LIABLE UNDER SECTIONS 209 (D) AND (F) OF THE ACT**

Should the Court find it necessary to consider the SEC's charges against Rashid under Sections 209 (d) and (f) of the Adviser's Act, it is clear that Rashid's defense to aiding and abetting liability lacks merit.  Rashid has not fairly addressed the authority cited in the SEC's initial post-trail submission.  (SEC COL, ¶¶ 30-34.)

First, in attempting to distinguish the authorities which specifically hold that an employee's conduct may be imputed to his employer for purposes of establishing the existence of a primary violation of the securities laws, Rashid simply misstates those authorities.  (Rashid FOF ¶ 197.) Rashid asserts that *SEC v. Tourre*, No. 10 Civ. 3229, 2014 U.S. Dist. LEXIS 1570 (S.D.N.Y Jan. 7, 2014) imputed the employee's conduct to the employer *only because* the facts showed the involvement of other corporate actors in the primary violation.  But Rashid's statement of the case

omits the court's statement that imputation was appropriate both "as a matter of fact *and law.*"  *Id.,* at * 19 (emphasis supplied).   *Tourre* expressly held that, as an independent "matter of law," imputation was proper because the defendant's work on the transaction in question was within the scope of his employment.  *Id.*  Similarly, Rashid attempts to distinguish *SEC v. Koenig,* No. 02 C 2180, 2007 WL 1074901 (N.D. Cal. 2007) on the basis that the decision to impute the employee's conduct turned on evidence of wrongdoing by others.  But once again, Rashid leaves out a critical piece – namely, the court's statement that "[o]ne may aid and abet a corporate entity *even if, unlike here, there was evidence of misconduct by only one agent.*"  *Id.,* at *7 (emphasis supplied).

Second, Rashid's related argument that the doctrine of *respondeat superior* (which underlies the imputation cases) is inapplicable because his *fraudulent* conduct was not within the scope of his employment is also meritless.  (Rashid FOF ¶ 195.)  That nonsensical argument is like saying that a restaurant would be not be liable for its delivery person's reckless driving unless *recklessness* was within the scope of his employment.  Of course *expense fraud* was not within the scope of Rashid's employment.  But submitting expense reports was.

Finally, Rashid's argument that the SEC failed to prove that he knew that his expenses were being billed to client funds is fallacious for the same reasons already discussed above.  Namely, the evidence showed that Rashid did know or was at least reckless in not knowing that, by claiming he had incurred expenses on behalf of portfolio companies and funds, he was causing Apollo to pass his fraudulent expenses on to clients for reimbursement.  (*See* SEC FOF, ¶¶ 23-45; SEC COL, ¶¶ 15-17.)

## D.   RASHID'S CONDUCT WAS EGREGIOUS AND SIGNIFICANT SANCTIONS ARE WARRANTED

### 1.   Rashid's Fraudulent Conduct Warrants Injunctive Relief

Rashid argues that even if the Court finds him liable, he should not be enjoined from further

violations.  Given the facts and circumstances of this case, this argument wholly lacks merit.

Injunctive relief should be granted when, as there is here, a "realistic likelihood of recurrence" of the violations.  *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir. 1978).  The Second Circuit recognizes that "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violation."  *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972).  In determining the likelihood of future violations, the Court looks to:  (1) the egregiousness of the past violations; (2) the degree of scienter; (3) the isolated or recurring nature of the fraudulent activity; (4) whether the defendant has accepted blame for his conduct; and (5) whether nature of the defendant's occupation makes it likely he will have opportunities to commit future violations. *Gould,* 2012 WL 13042034, at 13, *citing SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998).

The SEC's briefing has highlighted the egregiousness, scienter, and recurring nature of Rashid's behavior.  His persistent behavior over the course of years and in spite of multiple warnings by Apollo's CFO demonstrate the need for an injunction.  Rashid's fraudulent course of conduct was severely reckless, wanton, and openly shirked the fiduciary duties he owed to the Apollo Funds.  As for accepting responsibility for his behavior, Rashid offers that he paid back the funds he misappropriated and "never hesitated in acknowledging his mistakes and rectified these mistakes."  (Rashid FOF at 75.)  This explanation rings hollow.  While Rashid did eventually pay back the funds, the repayment was largely part of his separation agreement with Apollo in February 2014.  (Tr. at 1090; DX 34, Rashid Separation Agreement.)  In reality, Rashid only offered to reimburse the fund when and if he got caught.  Moreover, Rashid – through numerous sets of attorneys – has denied responsibility throughout the investigation, litigation, and eventual trial of

this case.  There are no facts in the record that support the conclusion that Rashid has taken responsibility for his repeated actions.

More importantly, there is a high likelihood that Rashid will place himself in the position to again violate the federal securities laws.  This is not a case of somebody who is simply moving on with his life and pursuing a different career path.  Thus, it is absolutely crucial to note that Rashid has no intention of leaving the financial industry.  During trial, Rashid was evasive about his future employment plans until the Court questioned him on this point and elicited the truth about his intentions:

> Q.  And you would like to go back to work in the finance industry in the future, correct?
>
> A.  I'm not so sure I thought about what my future holds, sir.
>
> THE COURT: You have not closed the possibility that you may wish to return to the securities industry, is that correct?
>
> THE WITNESS: The finance industry more generally, not necessarily securities.
>
> THE COURT: Well, were you in the finance industry when you were at Apollo?
>
> THE WITNESS: Yes.

(Tr. at 1088:9-19.)  It is also important to note why the injunction in this case is so important.  Upon the Court entering such an injunction, the SEC will have the ability to institute an administrative case seeking to bar Rashid from working in the securities industry.  This step is crucial because it allows the SEC to evaluate the propriety of prophylactic relief and whether Rashid should serve as a fiduciary going forward in an industry that the SEC directly regulates.

Lastly, the need for injunctive relief is particularly compelling in the current case because Rashid committed dozens of additional violations of the Act after being caught by his employer and specifically instructed that his conduct was wrong.  (PX 310, Donnelly Decl. ¶¶ 9, 13.)  There

is thus no indication that Rashid would cease violating the Act absent Court intervention. Accordingly, the Court should enjoin Rashid and prevent further violations of the Act.[31]

### 2. Rashid's Fraudulent Conduct Warrants A Third Tier Monetary Penalty

Rashid also argues that any fine imposed on him should be limited to a single second tier civil penalty. It appears the Parties agree on the factors the Court should consider in weighing whether or not to impose a civil penalty.[32] They clearly disagree, however, on the severity of Rashid's conduct. His proposed conclusions of law attempt to minimize his actions and claim they are "isolated incidents." [Rashid FOF at 75.] Both points fail. First, as discussed at length above and in the SEC's FOF, Rashid's fraudulent conduct was egregious and violated the fiduciary duty inherent in Investment Advisers. Rashid's fraudulent actions during his fraudulent course of conduct are exactly the kinds of violations the Act was enacted to prevent – the exploitation of clients by Investment Advisers. Here, the clients are the Apollo Funds, and Rashid's wanton pattern of fraudulent behavior made a mockery of his fiduciary duties to them. Second, hundreds of violations of those fiduciary duties over the course of years are not "isolated incidents."

---

[31] Moreover, if Rashid pursues any number of other future vocational opportunities unrelated to the securities field, such an injunction would not significantly affect him at all.

[32] The factors include: "(1) the egregiousness of the defendant's conduct; (2) the degree of his scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (noting factors to consider in assessing penalties). However, these factors are not exclusive, and it is appropriate to consider as well factors such as the defendant's financial condition, a defendant's failure to admit wrongdoing, and a defendant's lack of cooperation with authorities." The 'brazenness, scope, and duration' of illegal conduct may warrant 'a significant penalty.'" *SEC v. Alpine Secs.*, 17-cv-4179(DLC), 2019 WL 4686716, at *7 (S.D.N.Y. Sept. 29, 2019) (citations omitted).

Moreover, the imposition of a $750,000 civil penalty is reasonable.  As discussed in its original filing, at trial, the SEC submitted evidence that Rashid's false expenses were passed on to the following five Funds: Fund III, V, VI, VII, and ANRP.  Given the nature of the violations in this case, it is appropriate to assess a maximum third tier penalty in the amount of $150,000 for each Fund that paid Rashid's false expense reports.  Accordingly, the Court should assess a civil penalty in the total amount of $750,000 against Rashid.[33]

## III.   **CONCLUSION**

The preponderance of the trial evidence shows that Defendant Mohammed Ali Rashid violated Section 206(1) and (2), or in the alternative aided and abetted Apollo's violation of the same.  Rashid's FOF adds nothing novel or persuasive to the Court's analysis, and the Court should justifiably discard his arguments.  Moreover, this Court should enter a permanent injunction to prevent Rashid from violating the Act in the future as well as impose a civil monetary penalty of $750,000 against Rashid.  Rashid has raised no argument at trial or in his post-trial filing justifying a lesser sanction.  Ultimately, the SEC's proposed remedy appropriately penalizes Rashid for his years-long fraudulent conduct.

Respectfully submitted,

/s Duane K. Thompson

/s James M. Carlson

/s Donna K. Norman

---

[33] Any claim that this litigation has adversely affected Rashid's earning capability is not supported in the factual record.  To the contrary, Rashid was significantly compensated for his work during the time period, and there are no facts demonstrating that Rashid lacks the funds to pay such a civil penalty.

Of Counsel:

Corey A. Schuster                        Duane K. Thompson
Securities and Exchange Commission       James M. Carlson
100 F Street NE                          Donna K. Norman
Washington, D.C. 20549                   Securities and Exchange Commission
                                         100 F Street NE
                                         Washington, D.C. 20549

                                         ATTORNEYS FOR PLAINTIFF


Dated:  March 31, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by the CM/ECF

system – or by other methods if so noted – on March 31, 2020 upon all counsel listed below:

Gregory W. Kehoe
Daniel Friedman
Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200
Kehoe@gtlaw.com
FriedmanD@gtlaw.com

Theresa M.B. Van Vliet
Genovese Joblove & Battista, P.A.
200 E. Broward Blvd., Ste. 1110
Ft. Lauderdale, FL 33301
(954) 453-8000

***Attorneys for Defendant***

/s James M. Carlson
James M. Carlson