UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,                    17-cv-8223 (PKC)

          -against-
                                                  FINDINGS OF FACT
                                                  AND CONCLUSIONS OF LAW

MOHAMMED ALI RASHID,

                    Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

          Defendant Mohammed Ali Rashid is a former senior partner at the private-equity

firm Apollo Management, L.P. ("Apollo" or the "Company").  Plaintiff Securities and Exchange

Commission ("SEC") asserts that Rashid fraudulently claimed that personal expenses were

business expenses and these expenses were thereafter paid by private-equity funds advised by

Apollo and Rashid.  At trial, the SEC proved that Rashid was reimbursed for personal expenses

that included a New Year's trip to Brazil, a friend's bachelor party and wedding, a flight to the

Super Bowl and numerous dinners with friends and family at high-end Manhattan restaurants.

The SEC urges that Rashid's submission of false expense reports violates sections 206(1) and (2)

of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1), (2), or,

alternatively, that he aided and abetted violations of the Advisers Act pursuant to sections 209(d)

and (f), 15 U.S.C. §§ 80b-9(d), (f).

          The Court presided at a nine-day bench trial at which 33 witnesses testified.  The

Court now finds that the SEC proved by the preponderance of the evidence that Rashid engaged

in a practice of knowingly and falsely submitting personal expenses as business expenses and was recklessly indifferent to whether these false business expenses were charged to the funds he advised. The Court finds that: (1) Rashid knowingly, repeatedly and falsely claimed that personal expenses were business expenses; (2) Rashid, as a senior partner of Apollo, acted with reckless indifference in failing to ensure that none of these false business expenses were charged to the funds he advised; and (3) the false business expenses, in fact, were charged to the funds, thereby operating as a fraud upon them.  These findings lead to the conclusion that Rashid violated section 206(2) of the Advisers Act.  The Court will enter a permanent injunction against Rashid's future violations of section 206, and assess a first-tier civil penalty of $7,500 for each of his thirty-two separate violations that the SEC proved at trial.

**OVERVIEW OF THE ADVISERS ACT.**

"A fundamental purpose" in Congress's passage of the Advisers Act "was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."  SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186 (1963).  "Section 206(1) and 206(2) of the [Investment Advisers] Act set 'federal fiduciary standards to govern the conduct of investment advisers' and impose 'enforceable fiduciary obligations' on those advisers."  SEC v. Penn, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (Caproni, J.) (quoting Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 17 (1979)).  "Given the 'delicate fiduciary nature of . . . [the] investment advisory relationship,' Section 206 places 'an affirmative duty' on advisers to act with the 'utmost good faith, and [with] full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading.'"  SEC v. Gruss, 245 F.

Supp. 3d 527, 591 (S.D.N.Y. 2017) (Sweet, J.) (quoting Capital Gains Research Bureau, Inc., 375 U.S. at 194).

Section 206(1) makes it unlawful for an investment adviser to knowingly and intentionally defraud a client, whereas section 206(2) makes it unlawful to engage in conduct that "operates as a fraud" on a client. Section 206(1) states that: "It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly – (1) to employ any device, scheme, or artifice to defraud any client or prospective client . . . ." 15 U.S.C. §§ 80b-6(1). Section 206(2) makes it unlawful "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . ." Id. § 80b-6(2).

Because of the distinction between intentional fraud and conduct that "operates as a fraud," liability under sections 206(1) and (2) have different state-of-mind requirements. A defendant may be liable under section 206(2) based on proof of negligence. See, e.g., SEC v. DiBella, 587 F.3d 553, 569 (2d Cir. 2009) ("[A]ny transaction that functions or otherwise results in a fraud is punishable under this provision [section 206(2)]. Thus, the Advisers Act holds liable negligent acts."). To be liable under section 206(1), a defendant must have acted with scienter. Dembski v. United States Sec. & Exch. Comm'n, 726 Fed. App'x 841, 844 (2d Cir. 2018) ("Scienter is required for a Section 206(1) violation but need not be found for a violation of Sections 206(2) or (4).") (summary order) (citing In the Matter of David Henry Disraeli & Lifeplan Assocs., Inc., SEC Release No. 8880 (Dec. 21, 2007)); accord SEC v. Moran, 922 F. Supp. 867, 896-97 (S.D.N.Y. 1996); SEC v. Treadway, 430 F. Supp. 2d 293, 338 (S.D.N.Y. 2006) ("Section 206(1) requires fraudulent intent, while § 206(2) requires only negligence.") (Marrero, J.). This is because the language of section 206(1) "is identical in all relevant

respects" to section 17(a)(1) of the Securities Act of 1933, 15 U.S.C. § 17q(a), which has a well-established scienter requirement." Moran, 922 F. Supp. at 896 (citing Aaron v. SEC, 446 U.S. 680, 697 (1980)).  By contrast, when Congress prohibited activity that "operates as a fraud or deceit," as in section 206(2), it did not require proof of intent to injure or defraud.  See, e.g., Moran, 922 F. Supp at 897.

Thus, in order to prove the section 206(1) claim, the SEC must demonstrate by a preponderance of the evidence that in submitting his expense reports, Rashid employed a fraudulent scheme against his clients and did so with scienter.  To prove the section 206(2) claim, the SEC need only demonstrate that Rashid's submissions operated as a fraud or deceit upon his clients, and that his state of mind was at least one of negligence.

The Court finds that the SEC failed to prove by a preponderance of the evidence that Rashid acted with the scienter required of section 206(1) in employing a device, scheme or artifice to defraud a fund.  To be clear, the record amply demonstrates that Rashid intentionally submitted false expense reports for the purpose of obtaining reimbursement for his personal expenses.  But the SEC failed to prove that Rashid had actual knowledge that the funds paid his expenses, or that his recklessness was of a nature that satisfies the scienter required under the federal securities laws.  Rashid's false expense submissions listed research codes associated with various portfolio companies.  Apollo itself then directed the funds who owned those companies to pay the entirety of Rashid's reimbursements.  While Rashid lied on his expense reports and was recklessly indifferent about the source of his reimbursements, significant responsibility lies with Apollo.

The SEC urges that, in the alternative, Rashid is liable under the Advisers Act because he aided and abetted the fraudulent actions of his employer, Apollo. 15 U.S.C. § 80b-

9(f).  To prove that Rashid is liable for aiding and abetting a violation of section 206(1) or (2), the SEC must prove by a preponderance of the evidence "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."  DiBella, 587 F.3d at 566 (quotation marks omitted).  "[T]o satisfy the 'substantial assistance' component of aiding and abetting, the SEC must show that the defendant in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed."  SEC v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012) (quotation marks and alterations omitted).  The same lack of knowledge and intent that dooms the direct violation of section 206(1) also dooms the aider and abettor claim.

However, as noted, the Court finds that Rashid knowingly, falsely and repeatedly claimed that his personal expenses were business expenses and these false business expenses were, in fact, paid by the private-equity funds that he advised.  He was recklessly indifferent to the identity of the entity who paid for these fake business expenses.  Repeatedly, he caused or acquiesced in the entry of internal project codes corresponding to a portfolio company in which a fund held a large equity position and, thus, it was reasonably foreseeable to him that these phony business expenses would be charged to a fund.  His knowing and deliberate actions had the effect of operating as a fraud on the funds.  But even if his actions had been merely negligent, i.e., he failed to use reasonable care to ensure that his knowingly false business expenses were not charged to the funds, it nevertheless would support a finding that he violated section 206(2).

**FINDINGS OF FACT**

1.       Rashid received a bachelor's degree from Georgetown University and an MBA from Stanford University.  (Rashid Dec. ¶ 1.)[1]  He was employed at Apollo from 2004 until February 2014, during which time he was promoted to the job titles of partner and senior partner.  (Fact Stip. ¶¶ 1, 3.)[2]

2.       During his time at Apollo, Rashid was viewed as a "very hard worker" who put in long hours.  (Tr. 14, 479.)  His job primarily consisted of evaluating companies for possible investment, with his expertise principally focused on the metals and mining industries.  (Rashid Dec. ¶ 2; Tr. 173.)  His work required extensive travel.  (Rashid Dec. ¶ 2.)  Apollo ultimately entered into a separation agreement with Rashid, effective February 28, 2014.  (Fact Stip. ¶ 21; DX 34.)

3.       Apollo is a private-equity firm registered as an investment adviser with the SEC, and as of 2018, it managed more than $270 billion in assets.  (Fact Stip. ¶¶ 1, 6; Kelly Dec. ¶ 5.)  Apollo manages and advises individual private investment funds formed for the purpose of making private equity investments.  (Fact Stip. ¶¶ 7-11.)  Those funds are limited partnerships, which are managed by an Apollo-controlled general partner.  (Id.; Kelly Dec. ¶ 8.)  For each fund relevant to this case, a general partner controlled by Apollo had exclusively authority over that fund's "management, operation and control" as well as "its business and the formulation of investment policy."  (Fact Stip. ¶¶ 7-11.). Each fund's general partner, in turn, delegated its authority to an Apollo-formed management company.  (Fact Stip. ¶¶ 7-11.)  The management

_____

[1] The citation to evidence in the course of these findings is for illustrative purposes.  It does not intended to imply that it is the only evidence that supports a finding. If a finding of fact is incorrectly labelled as a conclusion of law or vice versa, it should be considered under the proper label.
[2] Citations to "Fact Stip." are to the Stipulations of Fact found in the parties' Joint Pretrial Order ("JPTO").  (Docket # 164.)

companies were, in fact, owned and operated  by Apollo and were distinct from the funds they managed.  Rashid was among the "private equity professionals" who managed each of the following Apollo-controlled funds: Apollo Investment Fund III, LP ("Fund III"), Apollo Investment Fund V, L.P. ("Fund V"), Apollo Investment Fund VI, L.P. ("Fund VI"), Apollo Investment Fund VII, L.P. ("Fund VII"), and Apollo Natural Resource Partners, L.P. ("ANRP") (collectively, the "Relevant Funds").  (Fact Stip. ¶¶ 7-11.)  Each of the Relevant Funds was governed by a limited partnership agreement that delineated the rights and obligations of the fund and its Apollo-controlled general partner, including issues related to employees' fees and expenses.  (PX 150, 152, 154-55, 185.)

4.      Generally, Apollo's private-equity funds invest in distressed or undervalued companies.  (Fact Stip. ¶ 13.)  Companies acquired by funds are known as "portfolio companies."  (Fact Stip. ¶ 13.)  The funds took large, often controlling, positions in portfolio companies, meaning that they were a part of the fund's portfolio of investments.  (See, e.g., Tr. 513, 536.)  Rashid monitored these portfolio companies and implemented plans to improve their financial performance.  (Compl't ¶ 27; Answer ¶ 27.)  Rashid sat on the board of directors of three publicly-traded portfolio companies: Metals USA, Realogy Holdings Corporation ("Realogy") and Quality Distribution, Inc. ("QDI").  (Fact Stip. ¶¶ 15-16.)  Each of these three portfolio companies figured prominently in Rashid's expense submissions.  Rashid's work relating to a portfolio company was in reality work for the benefit of the fund holding a large equity stake in the portfolio company.

5.      Rashid does not dispute that his role at Apollo falls within the statutory definition of an "investment adviser."  The Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or

through publications or writings, as to the value of securities or as to the advisability of investing

in, purchasing, or selling securities, or who, for compensation and as part of a regular business,

issues or promulgates analyses or reports concerning securities . . . ."  15 U.S.C.§ 80b-2(a)(11).

6.      Rashid admits in his Answer that he was a member of Apollo's private

equity investment group and that he advised Apollo's private-equity funds.  (Compl't ¶ 25;

Answer ¶ 25.)  Specifically, he evaluated and recommended investments to Apollo's private

equity funds and monitored investment performances.  (Compl't ¶ 25; Answer ¶ 25.)  Rashid

monitored the portfolio companies and implemented plans to improve their financial

performance.  (Compl't ¶ 27; Answer ¶ 27.)  He was a "principal point of contact" between

Apollo's private-equity funds and their portfolio companies.  (Compl't ¶ 27; Answer ¶ 27.)

Rashid was compensated for providing investment advice to Apollo's private-equity funds and

received fees for sitting on the corporate boards of certain portfolio companies.  (Compl't ¶ 28;

Answer ¶ 28.)

7.      The Court finds that Rashid's was an investment adviser within the

meaning of the Advisers Act to Fund III, Fund V, Fund VI, Fund VII and the ANRP.  His work

in monitoring and advising portfolio companies was integral part of his service as investment

adviser to the funds.

8.      Apollo tracked employee expenses using a software application called

PeopleSoft.  PeopleSoft is a data-entry platform, through which Apollo personnel submitted

details about their travel expenses.  Once entries were finalized, PeopleSoft generated an

electronic report, which was then forwarded to an Apollo expense manager for review and

approval.

9.     Apollo employees were issued American Express cards for the purpose of covering business expenses.  (Dunayer Dec. ¶ 5.)  Expenses incurred through Apollo's corporate American Express card were automatically loaded into PeopleSoft, whereas out-of-pocket expenses were entered manually.  (Dunayer Dec. ¶¶ 5, 6, 12.)  For American Express charges, PeopleSoft automatically populated on to a spreadsheet each expense's date, merchant and amount charged, and allowed them to be organized chronologically or by event.  (See, e.g., PX 141; Dunayer Dec. ¶ 12.)  The employee, almost always working through his or her administrative assistant, was required to identify the category of expense, its description and where to allocate the expense.  (Dunayer Dec. ¶ 14.)

10.     An exemplar of one of Rashid's completed PeopleSoft expense reports is contained at Plaintiff's Exhibit 207.  It includes columns setting forth the date of each expense; "Expense Type," which categorized expenses as, for example, "Hotel & Lodging" or "Meals – Clients"; Merchant (e.g., "W Hotels Sheraton Cap"); a description of the expense (e.g., "Dinner with lawyers while working late on Metals USA"); the amount of the expense; and the department (e.g., "Private Equity").  (PX 207.)

11.     The final column is headed "Investment," and includes a numeric code and the name of an entity.  (PX 207.)  As will be discussed at length, the numeric code entered in this column guided the later determination of where an expense would be billed for reimbursement.  During trial, witnesses variously referred to the code as a "project code," "deal code," "investment code" or "allocation code."  The Court principally will use the term "project code."  Apollo maintained a document that listed what appears to be well over 2,000 project codes.  (PX 177.)  For instance, an expense relating to the portfolio company Metals USA was denoted through the project code 12700.  (PX 177.)  The "Investment" column of the finalized

expense report at Exhibit 207 contains entries with the project code 13500 next to "Quality Distribution, Inc." and the project code 19127 next to "Private Equity Inv."  (PX 207.)  The PeopleSoft data-entry page prominently included a heading, "PLEASE, ENTER PROPER INVESTMENT CODE FOR EACH EXPENSE LINE."  (PX 87 at 56.)

12.     Once all expense information was complete, PeopleSoft automatically generated a report.  (Dunayer Dec. ¶ 14.)  The report and any attached receipts were e-mailed to Apollo Expense Manager Seth Dunayer, who reviewed and approved employee reports.  (Dunayer Dec. ¶ 14.)

13.     Apollo adopted and promulgated written policies and procedures for the reimbursement of business expenses in 2009, 2011 and 2013.  (PX 4, 102, 103.)  As an example, the Apollo Global Management Travel & Expense Reimbursement Policies and Procedures (the "Reimbursement Policies"), which became effective in 2011, is twelve single-space pages in length.  (PX 103.)  It provided in part that Apollo would reimburse employee expenses "incurred while performing their duties" so long as "the expenses are necessary, reasonable and appropriately documented."  (PX 103 § 1.1.)  Where relevant, employees were to submit documentation as to the amount of the expense, date and place, type of entertainment, names of others in attendance and the specific business purpose of the meeting.  (PX 103 § 2.2.)  The Reimbursement Policies included guidance as to different types of reimbursable expenses, including transportation, lodging, business meals, entertainment and business gifts.  (PX 103 §§ 4-7.)  Certain categories of expenses were expressly listed as not subject to reimbursement, including spa charges, clothing and "[e]xpenses without a specific business purpose and explanation."  (PX 103 § 9.)

14.     The policies of 2009 and 2013 are broadly similar.  The 2009 guidelines were less detailed, whereas the 2013 guidelines devoted several pages to guidance about the reimbursement of flights, car services and lodging.  (PX 4, 102.)  However, none of the written policies gave guidance to employees as to their selection of which entities to list in the project code columns of their expense reports, or explained how reimbursements were collected.

15.     Apollo also promulgated written Codes of Ethics dated April 2009, February 2010 and April 2011.  (PX 175, 176, 90.)  Each of these codes set forth employees' duties as fiduciaries to Apollo's private-equity funds, including "a general duty to act at all times in their best interest," and advised employees that they must comply with the Advisers Act.  (PX 175 at 2, 176 at 2, 90 at 5.)  As required of Apollo employees, Rashid filed a digital certification that he had reviewed the 2011 Code of Ethics.  (PX 91.)

16.     Apollo separately promulgated employee handbooks dated May 7, 2011 and January 1, 2012, which further described expense policies and procedures, and stated that "[e]xpensing items that are not business related is a serious offense."  (PX 108 at 14; PX 92 at 38.)  They stated that employees should use their corporate American Express cards for airline bookings, lodging, meals and other business expenses.  (Id.)  The employee handbooks advised that personnel should report out-of-pocket and American Express charges using the company's PeopleSoft application.  (PX 92 at 38.)

17.     Three administrative assistants who worked with Rashid from January 2010 through June 2013 testified at trial.  (PX 306, 307, 311.)  Each used the PeopleSoft system to prepare expense reports on Rashid's behalf.  (La Mons Dec. ¶ 7-8; Feehan Dec. ¶ 5, 16; Gatsik Dec. ¶ 3, 8.)  Each testified that charges to Rashid's corporate American Express card were automatically listed in PeopleSoft and that it was their responsibility to manually enter the

business justification and project code for Rashid's business expenses.  (See, e.g., La Mons Dec. ¶¶ 11, 12.)  When Rashid personally paid for a purported business expense, he gave the receipt to his assistant, who uploaded it into PeopleSoft.  (See, e.g., Feehan Dec. ¶ 16.)  La Mons and Feehan testified that they would seek information from Rashid as to the appropriate description of expenses and the project code, and that they would sometimes consult his calendar entries. (La Mons Dec. ¶¶ 13-15; Feehan Dec. ¶¶ 18-21.)

18.     Dunayer testified that in 2010, he approved certain expenses submitted by Rashid, including a $180 charge to a vendor called La Contessa Inc., which was described as "dinner with mgmt team for Realogy."  (Dunayer Dec. ¶ 17.)  An administrative assistant who worked with Rashid told Dunayer that La Contessa was a hair salon, not a restaurant, which Dunayer then confirmed.  (Dunayer Dec. ¶ 17.)  Dunayer sought guidance from Apollo's then-CFO, Eugene Donnelly, who instructed him to review Rashid's expense reports for the preceding six months.  (Dunayer Dec. ¶ 17.)

19.     Dunayer determined that over the course of six months, Rashid submitted fourteen personal expenses totaling $7,828.86.  (Dunayer Dec. ¶ 18.)  These included ten charges to La Contessa that were described as meals with portfolio company personnel, a $1,900 charge to a vendor named "Triple Crown Maffuci Stor" for a portfolio company research report, and three charges to Citi Habitat II for research.  (Dunayer Dec. ¶ 18.)  Donnelly stated that he met with Rashid in 2010 and told him that it was "unacceptable" to submit personal expenses as business expenses.  (Donnelly Dec. ¶ 9.)  Donnelly states that Rashid agreed not to do so, and to reimburse Apollo for amounts that were improperly disbursed to him.  (Donnelly Dec. ¶ 9.) Dunayer recalls that Donnelly described his meeting with Rashid as a "come to Jesus" moment for Rashid.  (Dunayer Dec. ¶ 19.)

20.     Rashid disputes that Donnelly reprimanded him for his expense practices, and contends that instead, Donnelly spoke to him in a hallway and told him to speak with Dunayer about his expense reports.  (Rashid Dec. ¶ 16.)  Rashid testified that, prior to meeting with Dunayer, he "had never seen any expense reports before they had been submitted."  (Rashid Dec. ¶ 16.)  Rashid states that he "was eager" to fix any misallocation, did not intend to allocate personal expenses as business expenses, and immediately reimbursed Apollo for his personal expenses.  (Rashid Dec. ¶ 16.)  At trial, Rashid repeatedly stated that he did not recall subsequent conversations within Apollo about his expenses and denied knowledge as to the reimbursement process, including the identities of controllers for individual private-equity funds.  (Tr. 924-25.)  When asked whether he took any steps to ensure that his personal expenses were not being billed to individual private equity funds, he answered, "I don't believe I did."  (Tr. 933.)

21.     None of the falsely claimed business expenses in 2010 or before form the basis for a finding a violation of section 206 of the Advisers Act.  They were received into evidence as possible bearing on Rashid's state of mind, i.e. his knowledge, intent and the absence of mistake, during the relevant limitations period.

22.     In mid-2012, Rashid's expense practices were flagged for a second time, after Gatsik and Dunayer learned that Rashid had attempted to expense $3,500 from the Beverly Hills clothing store Ermenegildo Zegna and $400 in charges from Bliss Spa, with the explanation that they were holiday gifts for portfolio company executives.  (Dunayer Dec. ¶¶ 20-26.)  Donnelly testified that he confronted Rashid about his expenses, which Rashid disputes.  (Donnelly Dec. ¶ 11, 13; Rashid Dec. ¶ 16.) The Court credits Donnelly's testimony on this point and finds it to be more credible than that of Rashid.

23.     Donnelly then directed a review of Rashid's expenses over the previous year, which revealed that Rashid had classified approximately $7,000 in personal expenses as business expenses.  (Donnelly Dec. ¶ 12.)  This included reimbursement for airfare to fly Rashid and his wife to Rio de Janeiro for a New Year's trip.  (Donnelly Dec. ¶ 12.)

24.     According to Donnelly, he spoke to Rashid and told him that it was "completely unacceptable" to seek reimbursement for personal charges as business expenses. (Donnelly Dec. ¶ 13.)  Donnelly states that Rashid acknowledged that the expenses were personal and asserted that they were submitted in error.  (Donnelly Dec. ¶ 13.)  Rashid agreed to repay the expenses.  (Donnelly Dec. ¶ 13.)  In Rashid's telling, he discussed the expenses with Dunayer, and "immediately" agreed to pay for all personal expenses.  (Rashid Dec. ¶ 16.)

25.     Dunayer testified that he met with Rashid, as did his supervisor Mona Breed, who had the job title of Head of Shared Services at Apollo.  (Dunayer Dec. ¶ 3.)  As recounted by Dunayer, Rashid acknowledged that his charges to Zegna and Bliss Spa were personal in nature and not gifts for portfolio company executives.  (Dunayer Dec. ¶ 27.) Dunayer also testified that Rashid acknowledged that he sometimes submitted large numbers of taxi receipts for reimbursement without attempting to discern whether the receipts were his own or those of his girlfriend.  (Dunayer Dec. ¶ 28.)  Rashid subsequently paid Apollo $7,072.36 as reimbursement for his personal expenses.  (Dunayer Dec. ¶ 29.)

26.     In August 2012, Apollo retained the law firm Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss") to assist in a review of its firmwide expense-allocation procedures.  (DX 15.)  In May 2013, it retained Paul Weiss to specifically review expenses submitted by Rashid.  (Finzi Dec. ¶ 5.)  Paul Weiss, in turn, retained BDO Consulting ("BDO") to conduct a forensic review of Rashid's expenses.  (Finzi Dec. ¶ 27.)

27.     Rashid retained the law firm Crowell & Moring to represent him during the review.  (Rashid Dec. ¶ 21.)  Rashid testified that he wanted to "settle my dispute with Apollo as quickly as possible and get back to working at Apollo."  (Rashid Dec. ¶ 21.)

28.     During the course of the Paul Weiss investigation, Rashid reviewed and commented upon numerous expenses, including certain specific expenses that were in issue at trial.  In many instances, he classified certain expenses as personal in nature and agreed to repay them.  By Rashid's count, he commented on more than 700 disputed expenses.  (Rashid Proposed Findings ¶¶ 82-85.)  Rashid asserts that he was eager to resolve any expense disputes and was willing to reimburse payments regardless of whether he considered them to be actually personal in nature.  (Id. ¶ 88.)

29.     After Rashid attended a July 1, 2013 meeting with Paul Weiss, Apollo suspended Rashid with pay and placed him on leave.  (Finzi Dec. ¶ 24.)  Ultimately, Rashid entered into a separation agreement with Apollo on January 8, 2014, with an effective date of February 28, 2014.  (DX 34.)

30.     At trial, the SEC came forward with evidence of thirty-two specific incidents in which Rashid falsely described personal expenses as reimbursable business expenses and submitted them for reimbursement from either a private-equity fund or a portfolio company. These included expenses for airfare, hotels and restaurant meals.  In each instance, Rashid's claimed business expenses were contradicted by contemporaneous e-mails or the testimony of portfolio-company executives, each of whom credibly denied either their attendance at the event or meal described, or else denied that there was a legitimate business purpose underlying the expense.  The SEC asserted that the thirty-two instances were merely exemplars used to demonstrate the means and methods used by Rashid to charge personal expenses as business

expenses.

31.     The Court finds that Rashid engaged in a pattern of repeatedly, knowingly and falsely describing personal expenses as business expenses. This finding is based in significant part on the Court's assessment of the credibility of the SEC's witnesses, the lack of credibility of Rashid's explanations, the email chains that were written at or about the time of the events in question and the expense descriptions entered into PeopleSoft at Rashid's direction or with his acquiescence.

32.     Plaintiff's Exhibit 111 collects the data that Rashid, through his assistants, entered into PeopleSoft.  It is a spreadsheet originally drafted as part of the investigation conducted by Paul Weiss and BDO.  The SEC and Rashid stipulated that certain factual information contained in the spreadsheet, specifically including the descriptions of expenses, accurately reflects Rashid's entries into PeopleSoft.  (Tr. 163-64.)  The Court relies on Plaintiff's Exhibit 111 solely for factual information as to Rashid's PeopleSoft entries, specifically including transaction dates (column three), merchants (column four), long descriptions (column five), expense types (column seven), expense allocations (column ten) and transaction amounts (column twelve).  In citing to the "BDO #" listed in Plaintiff's Exhibit 111, the Court refers to the line identifications listed in the exhibit's second column.

33.     As will be discussed below, the Court does not place any evidentiary weight on Plaintiff's Exhibit 111 to the extent it recites conclusions reached by Paul Weiss and/or BDO as to whether Rashid's expenses were personal expenses or business expenses.

34.     The parties have stipulated that any violations of the Advisers Act between June 13, 2011 and June 2013 fall within the limitations period.  (JPTO at 2-3.)  At trial, the SEC adduced additional evidence that Rashid submitted false expense reports prior to the

limitations period.  The Court has limited its consideration of expense reports outside the limitations period  to their potential to shed light on Rashid's state of mind during the limitations period.

July 22 and 23, 2011 Charges for a Room and Meals in Montreal.

35.    Rashid submitted several travel expenses incurred in Montreal, Canada over the weekend of July 22 and 23, 2011.  (PX 111 at BDO # 1241, 1244, 1253.)  These expenses were charged to Rashid's American Express corporate card as business expenses related to a portfolio company named Labrador, and were described as "lunch with Tom Larsen at Labrador" and two entries for "one night lodging in Montreal to meet with Labrador" for July 22 and 23, 2011.  (Id.)  The charges totaled $760.83 and were entered under the project codes for LabCorp and Welspun, both of which were portfolio companies.  (Id.)

36.    An e-mail chain dated Thursday, July 21, 2011, with the subject line "Jason's Bachelor Party," reflects that Rashid was in Montreal that weekend in order to attend a friend's bachelor party.  (PX 204.)  An e-mail from a non-party inquired into "logistics for dinners" and stated, "I would stay in Ali [Rashid] and Patrick's room."  (PX 204.)  That person also stated, "Ali [Rashid] is back- stopping all costs for me."  (PX 204.)  A later response stated, "Going to be a great weekend."  (PX 204.)  A separate e-mail chain, on which Rashid was copied, referred to the attendees' accommodations at the Hotel du Vogue, Montreal.  (PX 226.) Kevin M. Pierce, an expert in accounting retained by the SEC, testified that Hotel du Vogue did business through LJC Development Corp., which was listed on Rashid's expense report as the vendor for his Montreal hotel expenses.  (Tr. 647; PX 111 at BDO # 1244, 1253.)

37.    At trial, Rashid indicated confusion as to why one of the expenses was

allocated to Welspun and not Labrador.[4]  (Tr. 949.)  He testified that the bachelor-party weekend coincided with business in the region, including Friday meetings with personnel from companies called Champion Minerals and Alderon Resources.  (Tr. 1165-68.)  Rashid could not recall whether he submitted any expense for a restaurant meeting, and testified that he did not have meetings on that Saturday.  (Tr. 1168.)  The Court also heard testimony from Jason Haim, who described himself as a close friend to Rashid, and whose bachelor party was held that weekend. (Tr. 1315-20.)  Haim testified that Rashid attended some but not all of the events planned for that weekend.  (Tr. 1317.)

38.     The Court accepts that Rashid may have attended some business meetings that Friday, but his submissions falsely described group bachelor party lodging on Friday and Saturday nights as "lodging in Montreal to meet with Labrador."  (PX 111 at BDO # 1244, 1253.)  Rashid conceded that he did not conduct business that Saturday and contemporaneous e-mails reflect a social purpose to the weekend portion of the trip.

39.     The Court finds by a preponderance of the evidence that Rashid knew the expenses related to the Montreal bachelor party were personal expenses but knowingly and falsely submitted them as business expenses.

<u>November 2011 Charges for Expenses Related to Wedding Attendance.</u>

40.     Rashid submitted numerous expenses in November 2011 related to airfare, hotel rooms, meals, drinks and car services in Miami, Florida.  (PX 111 at BDO #1442-43, 1454-64, 1466.)  His expense reports stated that the expenses were incurred in connection with work for Metals USA, with explanations referencing a "Metals USA meeting" and "metals usa trip."  (<u>Id.</u>)  For example, there was a charge of $110.84 arising from 2201 Collins Nightclub

---

[4] Rashid testified that Labrador is a region with iron ore deposits, and indicated that Apollo was considering investments in a number of companies in the region.  (Tr. 1165.)  Welspun was based in India.  (Tr. 24.)

MA on November 3, 2011, described as "drinks in miami for metals usa meeting."  (Id. #

1458.)  There were also three charges of $425 from VII MP Miami Hotel Owner for November

3, 4 and 5, 2011, described as "hotel in miami for metals usa meeting."  (Id. # 1454, 1460,

1463.)  Rashid also submitted expenses of $921.75 and $674.70 for flights to and from

California for a "QDI meeting," and listed QDI – Fund III as the reimbursable project.  (Id.

1442-43.)  In all, Rashid charged approximately $3,806.69 in business expenses from

November 3, 2011 through November 6, 2011.

    41.  Rashid's American Express billing statements include entries of October

29, 2011 for flights of  $921.75 and $674.70 between New York City airports and Miami-area

airports.  (PX 158B at 683, 685.)  At trial, Rashid confirmed that his flights were between

Florida and New York for the wedding of his friend, Jason Haim, and not for a QDI meeting in

California.  (Tr. 1040-42.)  E-mails confirm that Haim's wedding occurred on November 5,

2011 in Miami, which coincided with the hotel rooms that Rashid expensed from November 3

to 5.  (PX 230.)  Rashid also charged as a business expense a $143.09 meal of November 3,

2011 as "dinner in Miami for metals usa meeting" at Fontainebleau Resorts.  (PX 111 at BDO

#1457; PX 158B at 686 (credit card expense of $143.09 at "Fontainebleau Hakkas Miami

Beach").)  An e-mail chain of October 30, 2011 between Rashid and friends discusses a dinner

reservation for Hakkasan restaurant, with Rashid stating, "Hakkasan is fantastic, actually

havent been to the one at Fontainbleu but that place is hot," and a friend replying, "I feel

slightly lame for going to a chain, but it's a european chain so I got over it."  (PX 231.)  At

trial, Rashid agreed that none of the dinner attendees was affiliated with Metals USA.  (Tr.

1046-47.)

    42.  After Rashid submitted his business expenses for the Miami weekend, his

administrative assistant inquired whether the expenses should actually be allocated to Metals

USA, and Rashid confirmed that they should because he "[h]ad to stay down there for Metals

USA for the weekend with Lourenco [Goncalves] so should be all work."  (Tr. 1048; PX 232.)

At trial, Rashid testified that Metals USA "was 30 minutes away" and that he had meetings

with Goncalves on Thursday and Friday that week.  (Tr. 1050.)  Rashid testified, "The

description here with respect to the trip was on me, yes."  (Tr. 1052.)  He explained that he

"spent a good portion of" Thursday and Friday with Metals USA personnel, but that "I did not

have business that weekend that I recall, no."  (Tr. 1052.)  Rashid acknowledged that he had

been "inaccurate" to claim that Metals USA work required him to stay in Miami through the

weekend.  (Tr. 1053.)

      43.    The Court accepts that Rashid may have attended some business meetings

on the Thursday and Friday of that week and incurred some legitimate business expenses as a

result.  However, he acknowledged that he inaccurately identified his flights as being to

California for QDI business and inaccurately claimed that he needed to remain for the weekend

in order to meet with Goncalves.  At the least, Rashid misrepresented a business purpose for

his weekend hotel room and Hakkasan dinner charge, and caused or acquiesced in the entry of

the QDI project code, even though QDI played no role in that trip.

      44.    The Court finds by a preponderance of the evidence that Rashid falsely

submitted personal expenses related to the Miami wedding as business expenses relating to

QDI.

August 2011 Charge for San Francisco Air Fare.

      45.    Rashid submitted a business expense of August 2, 2011 for $1,866

allocated to Metals USA with the description "JFK to SFO – Metals USA."  (PX 111 at BDO #

1270.)  However, contemporaneous e-mails reflect that the purpose of that trip was to attend to personal issues following a death in the family of Rashid's wife.  In an e-mail chain dated August 2, 2011, Rashid wrote to friends stating that his wife's brother had died and that "[w]e are headed to SF now."  (PX 71.)  Subsequent e-mails in the chain discussed plans to pick up Rashid and family from the airport, and a separate e-mail chain discussed funeral arrangements and accommodations.  (PX 71, 72.)

46.     At trial, Rashid confirmed that the participants on the e-mail chain were friends and former classmates and that none was affiliated with Metals USA.  (Tr. 936, 938-39.) He testified that the family death was "why we ended up going to San Francisco."  (Tr. 938-39.) He testified that he informed his assistant that he attended a Metals USA meeting while in San Francisco.  (Tr. 940.)  The Court finds that Rashid, who was aware that his expenses had been scrutinized in the past by Apollo management, reviewed his submitted expenses and discussed them with his assistant and caused or acquiesced in the entry of a project code relating to Metals USA.

47.     Rashid also testified that, after the burial service, he met in San Francisco with an employee of Goldman Sachs to discuss the potential future sale of Metals USA, and that his trip combined business with a personal matter.  (Tr. 1172-73.)  The SEC notes that this meeting is not corroborated by any e-mails, expense claims or correspondence, and that Rashid's wife did not recall him conducting business during the trip.  (Tr. 766-67.)  However, even assuming that Rashid attended a business meeting during the San Francisco trip, he testified that the family death was "why we ended up going to San Francisco," and the date of the expense for his flight matches contemporaneous e-mails describing the personal nature of his trip.

48.     The Court finds by a preponderance of the evidence that Rashid falsely submitted a personal expense for airfare as a business expense related to Metals USA.

Rashid's Charges in Brazil over New Year's 2011-12.

49.     Rashid submitted as a business expense $10,049.10 for airfare on a Delta flight described as "flight to paris for ascometals trip," and caused or acquiesced in the entry of a project code relating to Ascometal SA.  (PX 111 at BDO # 1590.)  He also submitted an expense for "flight to Atlanta for Reaolgy tirp [sic]" in the amount of $447.10.  (Id. at BDO # 1592.)  He also submitted various hotel-room expenses "hotel in rio for realogy trip," with project codes entered for Realogy.  (Id. at BDO # 1601-07, 1609-12.)  Other expenses included a $203.01 "Intercity flight for Reaoly [sic] trip" and a $177.51 expense described as "car service for asco metals trip in Rio."  (Id. at BDO # 1608, 1613.)  Rashid caused or acquiesced in the entry of a project code relating to Realogy, except that the flight and car service were assigned to Ascometal SA.

50.     The Court finds that the expense described as "flight to paris for ascometals trip" falsely described the expense, which was for a flight to Brazil.  (See, e.g., PX 199 (e-mails between Rashid and his assistant discussing Rashid's expenses in Brazil).)  Rashid urges that these entries reflect data-entry errors on the part of his assistant and that they reflect a misunderstanding of Rashid's work, noting that Ascometals is a French company and that Rashid was in Brazil for work on Metals USA.  (Rashid Proposed Findings ¶¶ 129, 138.) [5]

51.     Lourenco Goncalves, the CEO of Metals USA, testified that Rashid informed him that he would be in Brazil over the 2011 holidays, and that Goncalves invited him

---

[5] Realogy CFO Anthony Hull testified that there was no business reason for Rashid to perform Realogy-related work on that trip.  (Hull Dec. ¶¶ 40-41.)

to visit his home in Brazil.  (Goncalves Dec. ¶ 14.)  Goncalves testified that Rashid joined his

family for dinner and that Rashid stayed in their home for at least one night.  (Goncalves Dec. ¶

15.)  Goncalves describes the visit as "purely social.  Rashid had no business purpose for this trip

to Brazil related to Metals USA and we did not conduct business together in Brazil."  (Goncalves

Dec. ¶ 15.)  On cross-examination, Goncalves reiterated that Rashid "told me he was there on

vacation."  (Tr. 495.)  Goncalves agreed that, during the course of their conversations on that

visit, topics would "extend sometimes into general discussions about the metals industry in

general or the mining industry . . . ."  (Tr. 495.)

    52. The Court finds by a preponderance of the evidence that, even if the entry

of project codes for Ascometals and Realogy were the product of a data-entry error, the expenses

sought reimbursement for personal expenses, and were submitted with the false assertion that

they were business expenses.  Goncalves testified that Rashid's time with him was purely social

and that Rashid had described his trip as a vacation.  Neither Rashid or Goncalves identified

issues relevant to Metals USA that were discussed or resolved on the trip.  Even if, as Goncalves

testified, their conversations occasionally veered into subjects that touched on the metals or

mining industries, such fleeting conversations did not warrant reimbursement for a Metals USA

project, let alone for projects attributable to Ascometals or Realogy.

The March 2013 NCAA Basketball Tournament.

    53. Rashid submitted a business expense for $170 from "National RR PSGR

Corp." on March 21, 2013, describing it as "Rail ticket for bus travel to philadelphia re metals

usa" and caused or acquiesced in the entry of a project code relating to Metals USA.[6]  (PX 111 at

---

[6] The SEC's proposed findings of fact and conclusions of law categorize this expense as being outside the limitations period.  However, March 2013 is within the parties' stipulated limitations period, with runs from June 13, 2011 to June 2013.

BDO # 2697.)  However, Rashid sent an e-mail on March 17, 2013 stating that, "I am definitely

going to Philly" to attend a game of the NCAA basketball tournament.  (PX 222 at 6.)  The e-

mail was part of a lengthy chain discussing the tournament and the logistics of attending the

game in person.  (PX 222.)  Rashid's ticket expense was incurred on a Thursday, and the e-mail

chain discussed group get-togethers on the Thursday and Friday of that week.  (Id.)

54.     The Court finds by a preponderance of the evidence that the $170 expense

was falsely claimed as a business expense appropriately related to Metals USA when in truth and

in fact it was a personal expense incurred for the purpose of a social visit to Philadelphia.

Rashid's January 2013 Super Bowl Trip.

55.     Rashid submitted a business expense for $1,548.90 in airfare from New

York to New Orleans on January 29, 2013, stating that it was for "business meetings in

Louisiana."  (PX 111 at BDO # 2537.)  Rashid caused or acquiesced in the entry of a project

code relating to Quality Distribution, Inc.  (Id.)

56.     At trial, Rashid testified that one of his acquaintances was an employee of

the San Francisco 49ers, which played in the Super Bowl that year.  (Tr. 1022.)  He testified that

he bought two game tickets directly from his friend.  (Tr. 1022.)  When asked by his counsel to

identify the primary purpose of his Louisiana trip, Rashid answered, "The Super Bowl."  (Tr.

1185.)  Other than airfare, Rashid did not submit expenses for this trip.

57.     Rashid testified that he attended the Super Bowl for networking purposes

related to Apollo.  (Tr. 1184, 1186.)  He stated, "The Super Bowl is a great place to meet a large

number of business contacts in one location."  (Rashid Dec. ¶ 13.)  Gary Enzor, the CEO of QDI,

hosted what he described as "a social brunch for some of its outside legal associates" over the

Super Bowl weekend.  (Enzor Dec. ¶ 8.)  Enzor testified that he invited Rashid to the brunch

because he "knew Rashid would be in town . . . ."  (Enzor Dec. ¶ 8.)  Enzor testified, "I did not

invite Mr. Rashid to the Super Bowl.  He told me he was coming to the Super Bowl."  (Tr. 993.)

Enzor stated that he invited Rashid to the brunch because Rashid was a director of QDI, and

because an outside attorney, Lance Ostendorf, was expected to attend.  (Tr. 993.)

       58.    Rashid testified that he attended an additional event with Ostendorf.  (Tr.

1185.)  Rashid testified that Ostendorf was a "relatively prominent lawyer in the New Orleans

area" who was advising Apollo on "other potential investment opportunities . . . ."  (Tr. 1185.)

Rashid states that he "spent a significant amount of time" with Ostendorf during the Super Bowl

trip.  (Rashid Dec. ¶ 13.)

       59.    While Rashid attended some functions that related to the business of

Apollo, the only such event related to QDI was the brunch organized by Enzor, who testified that

he extended an invitation to Rashid after Rashid told him that he would be in New Orleans for

the Super Bowl.  Neither Rashid nor Enzor described any work that Rashid performed for QDI

on the trip.  As to Ostendorf, Rashid vaguely describes discussions related to Apollo in general

and not the work of QDI.  Therefore, even if Rashid's activities over the Super Bowl weekend

included work discussions connected to Apollo as a whole, it was still a misrepresentation to

seek reimbursement for "business meetings in Louisiana" related to a QDI project.

       60.    The Court finds that Rashid deliberately used the happenstance of Enzor

and Ostendorf's presence in New Orleans at or about the time of the Super Bowl as a false

justification for seeking reimbursement of a personal trip.  The Court finds by a preponderance

of the evidence that Rashid falsely submitted the expense of his air fare to the Super Bowl as a

business expense relating to QDI.

<u>Rashid's Thanksgiving 2012 Expenses from Bal Harbour, Florida.</u>

61.     Rashid submitted a variety of expenses incurred in Bal Harbour, Florida and caused or acquiesced in the entry of a project code relating to Metals USA.  (PX 111 at BDO # 2323, 2325, 2327, 2335, 2346.)  They included several hotel expenses "for business meetings with Metals USA" and one "client dinner with meals [sic] usa in florida – Alid [sic] Rashid, Lourenco Goncalves, Keith Koci, Robert McPherson, Bob Weinrich."  (Id.)

62.     As to the purported "client dinner," Rashid confirmed at trial that this expense "was actually the bill for [his] family's Thanksgiving day dinner," and explained, "I think it inaccurately got billed to the wrong hotel room."  (Tr. 1007.)  Rashid testified that during this trip, he stayed at the St. Regis Resort Hotel for four nights.  (Tr. 1009.)  He testified that during this trip, he saw Goncalves "[a]t least two, if not three times," and specifically spent a day with Goncalves and his family.  (Tr. 1009.)  Rashid testified that he and his assistant "did not have conversations about things getting billed to a fund."  (Tr. 1010.)

63.     Goncalves testified that in or around November 2012, Rashid told him that he would be in Bal Harbour, Florida for Thanksgiving, with his mother, father and sister.  (Goncalves Dec. ¶ 16.)  Goncalves was building a new house about an hour from Bal Harbour, and Rashid asked if he could show the new house to his parents.  (Goncalves Dec. ¶ 16.)  Rashid brought his parents and sister to the home that Goncalves was renting during the construction process.  (Goncalves Dec. ¶ 17.)  Goncalves testified that "[t]his visit was entirely social and had no business purpose," and included a tour of the under-construction home and a boat ride.  (Goncalves Dec. ¶ 18.)  Goncalves testified that he never asked Rashid to come to Florida, and that while "for sure" they discussed business over that weekend, their visit was primarily social, "[e]specially with family around, that would be more social also because of that."  (Tr. 502.)  He

testified that his business discussion with Rashid were not urgent, and could have been raised over the phone or at a future meeting.  (Tr. 502-03.)

64.     Although Rashid's conversations with Goncalves may have sometimes touched on business matters, Goncalves credibly testified that such business discussions were non-urgent, and that the social nature of their interactions was underscored by the presence of numerous family members.  Moreover, Rashid's explanation that the bill for his family's hotel dinner was innocently attributed to the wrong hotel room is entirely non-credible, given that his description of the expense described a Metals USA dinner attended by personnel from the company.

65.     The Court finds by a preponderance of the evidence that Rashid falsely submitted expenses related to this trip as business expenses and caused or acquiesced in the entry of a project code for Metals USA.

The February 2013 Lion Restaurant Group charge of $1,542.98.

66.     Rashid submitted a February 14, 2013 business expense of $1,542.98, describing it as "Meals – Clients" billable to QDI.  (PX 111 at BDO # 2575.)  The description stated: "Dinner meeting with Quality Distribution team: Ali Rashid, Steve Atwood, John Wilson, Gary Enzor, Denny Copeland, Thomas Finkbiner, Johnathan Gold, Troy Joseph, Bo Leslie, Timothy Page."  (Id.)

67.     At trial, Rashid testified that this submission was in error, and should have reflected that the expense was incurred for an employee's going-away party, which was attended by Apollo personnel.  (Tr. 1215-16.)  He stated that "[t]he charge had obviously been inadvertently described . . . ."  (Tr. 1216.)  Rashid testified that he would have been "happy" to pay for the event himself if the party was not reimbursable to Apollo itself.  (Tr. 1216.)  Having

been caught redhanded in charging a personal expense as a business expense, and in the context of his other false submissions, his claim of inadvertence is entitled to little weight.

68.     The Court finds by a preponderance of the evidence that Rashid falsely submitted the expense of a colleague's going-away party as a business expense arising from a dinner with QDI employees and leadership.

June 17, 2011 Charge of $359.37 for Dinner at Spasso Restaurant.

69.     Rashid submitted as a business expense a $359.37 charge at Spasso restaurant on June 17, 2011, describing it as "Dinner at Spasso with Metals USA – McPerson [sic], Goncalves" under the project name Metals, USA.  (PX 111 at BDO # 1169.)

70.     However, contemporaneous emails show that Rashid joined his friends for dinner at Spasso, and that he picked up the dinner tab because he was the "last man" to arrive. (PX 105.)  An e-mail chain dated June 16, 2011 included individuals with no discernable connection to Metals, USA discussing a 7:30 reservation at Spasso, their outdoor table, and the statement, "I heard dinner is on the last man who gets here!!!"  (PX 105.)  Rashid replied that he had been delayed at the office and was stuck in traffic.  (PX 105.)

71.     In addition, Metals USA CEO Lourenco Goncalves testified that on occasions when he met Rashid for meals, he paid for the meals and Rashid did not.  (Goncalves Dec. ¶ 10.)  At trial, Rashid confirmed that Goncalves did not attend the meal at Spasso.  (Tr. 958.)

72.     Rashid has urged that this was a dinner with "industry colleagues" and therefore constituted a legitimate business expense, pointing out that other attendees were employed in the finance industry.  (Rashid Proposed Findings ¶¶ 61, 145.)  At trial, Rashid confirmed that at least one of the attendees, Chirag Shah, was a personal friend.  (Tr. 958.)  It is,

of course, possible that professional issues may have been discussed at his dinner with friends. But that possibility does not explain the fact that Rashid caused or acquiesced in the entry of a project code relating to Metals USA and falsely described the meal as a business dinner with Metals USA executives.

73.    The Court finds by a preponderance of the evidence that Rashid falsely submitted an expense report for the Spasso dinner, and caused or acquiesced in the entry of a project code for Metals USA.

Additional Restaurant Expenses.

74.    The Court finds by a preponderance of the evidence that, for each expense identified in Findings of Fact 75 through 97, Rashid knowingly and falsely claimed that there was a business purpose behind the expense and caused or acquiesced in the entry of a project code for a portfolio company.   Rashid's work relating to a portfolio company was an integral part of his investment advisory services to a private-equity fund that was heavily invested in the portfolio company and it was reasonably foreseeable to him that these expenses would be borne by the fund directly or indirectly.

75.    June 21, 2011 dinner of $199.93 (PX 111 at BDO #1181).  Rashid described this expense as "dinner with Troy from QDI" and " caused or acquiesced in the entry of a project code for QDI – Fund III."  (Id.)  Joseph Troy of QDI testified that he did not attend such a dinner and that "I do not recall Rashid ever paying for a meal that I attended."  (Troy Dec. ¶¶ 9, 13; Tr. 546.)  Troy states that he was not in New York on June 21, 2011, and was instead traveling from Florida to Maine on a personal trip.  (Troy Dec. ¶ 13.)

76.    July 9, 2011 dinner of $197.92 (PX 111 at BDO #1218).  Rashid described this expense for dinner at Chinois on Main restaurant as "dinner with Enzor" and caused or

acquiesced in the entry of a project code for "QDI – Fund III."  (Id.)  Enzor testified that he was

not in New York on that date, and instead was with family in or around Chicago.  (Enzor Dec. ¶

25.)

      77.    July 11, 2011 dinner of $140.94 (PX 111 at BDO #1221).  Rashid

described this expense for a restaurant operated by Barolo Ltd. as "dinner with Smith" and

caused or acquiesced in the entry of a project code for Metals USA.  (Id.)  William Smith of

Metals USA testified that he was not present at that dinner and does not recall ever having a

dinner alone with Rashid.  (Smith Dec. ¶ 8; see also Tr. 974 ("I've never been to a restaurant

named Barolo, and as I said before, I have never had a dinner alone with Mr. Rashid.").)

      78.    July 14, 2011 dinner of $344 (PX 111 at BDO # 1229).  Rashid described

this expense from a restaurant operated by Cerulean Management LLC as "dinner with Hull and

Smith" and caused or acquiesced in the entry of a project code for Realogy.  (Id.)  Both Hull and

Smith testified that they never attended such a dinner, with Smith stating that he had never

attended a small-group dinner with Rashid.  (Hull Dec. ¶ 33; Tr. 517.)

      79.    August 16, 2011 dinner of $265.09 (PX 111 at BDO # 1292).  Rashid

described this expense at Fig & Olive restaurant as "Dinner with Beddows and Vaughn –

Welspun" and caused or acquiesced in the entry of a project code for the portfolio company

Welspun.  (Id.)  However, contemporaneous e-mails of that same date reflect plans for a dinner

at Fig & Olive that was to be "in honor of Ruhi's birthday," with no one named Beddows or

Vaughn included among the e-mails' recipients.  (PX 38.)  At trial, Rashid testified, "I'm not

sure I know Beddows at all . . . .  I also don't know Vaughn . . . ."  (Tr. 943.)

      80.    September 1, 2011 dinner charge of $311 (PX 111 at BDO # 1316).

Rashid described this expense from Providence Restaurant Management LLC as "Dinner for

QDI – Enzor, Troy," and caused or acquiesced in the entry of a project code for Quality

Distribution, Inc.  (Id.)  Enzor testified that he was not at such a dinner, and was in Brandon,

Florida on this date.  (Enzor Dec. ¶ 27.)  Troy similarly testified that he was in Tampa, Florida

for a post-operative doctor's appointment.  (Troy Dec. ¶ 14.)

   81. <u>October 5, 2011 dinner charge of $120.88</u> (PX 111 at BDO # 1384).

Rashid described this expense from Honey Jar Inc. as "business meal for ascometals," and

caused or acquiesced in the entry of a project code for Ascometal SA.  (Id.)  In e-mails of that

same date, Rashid, his wife and a friend discussed an 8 p.m. dinner reservation at a restaurant

called Apiary.  (PX 202 at Bates No. 2880-81.)  Susanne P. Cleary, a forensic accountant at

BDO, testified that Apiary's address matched the address of Honey Jar Inc.  (Cleary Dec. ¶

12(b).)

   82. <u>December 12, 2011 dinner charge of $259.55</u> (PX 111 at BDO # 1563).

Rashid described this expense at Made in Italy Restaurant as "Dinner in London for asco metals

meeting with Mr. Goenke," and caused or acquiesced in the entry of a project code for

Ascometal SA.  (Id.)  In contemporaneous e-mails of the same date, Rashid and friends discussed

meeting for dinner at a London restaurant called Made in Italy, after weighing various other

cuisine options.  (PX 73.)  No one named Goenke was on the e-mail chain.

   83. <u>March 12, 2012 dinner charge of $1,174.30</u> (PX 111 at BDO # 1752).

Rashid submitted a March 12, 2012 business expense of $1,174.30 from Lucky 13 Associates

LLC, describing it as "dinner for Metals USA with Laurenco Goncalves, Keith Koci and Robert

McPherson."  (PX 111 at BDO # 1752.)  Rashid caused or acquiesced in the entry of a project

code for Metals USA.  (Id.)  Goncalves testified that he did not recall Rashid every paying for a

diner.  (Goncalves Dec. ¶ 12.)  Koci testified that he had no recollection of the dinner and that his

own expense reports indicate he was not in New York City in March 2012.  (Koci Dec. ¶ 6.)

84.     March 20, 2012 dinner charge of $351.42 (PX 111 at BDO # 1777).

Rashid described this expense from Gramercy Tavern Corp. as "dinner with richard smith for

realogy meeting," and caused or acquiesced in the entry of a project code for Realogy.  (Id.)

Richard Smith testified that he did not recall ever having dinner alone with Rashid.  (Smith Dec.

¶ 10.)  Contemporaneous e-mails reflect that on this same date, Rashid was planning to meet his

sister for dinner at Gramercy Tavern, after the two weighed the comparative ambience of another

well-known Manhattan restaurant, Daniel.  (PX 40.)

85.     March 30, 2012 dinner charge of $173.91 (PX 111 at BDO # 1788).

Rashid described this expense from ABC Restaurant as "Realogy dinner with Richard Smith"

and caused or acquiesced in the entry of a project code for Realogy.  (Id.)  Smith testified that he

did not recall ever having dinner alone with Rashid.  (Smith Dec. ¶ 10.)  Contemporaneous e-

mails reflect that the dinner was at Rashid's "favorite restaurant" with his parents, who were

visiting from California.  (PX 41; Tr. 1018-19.)

86.     April 7, 2012 dinner charge of $210 (PX 111 at BDO # 1819).  Rashid

described this expense from Craft LLC as "dinner whilew orking [sic] on Realogy with Don

Casey and Seth Truwit ," and caused or acquiesced in the entry of a project code for Realogy

(Id.)  Casey testified that on this date, which was a Saturday, he was in Massachusetts for his

son's basketball game.  (Casey Dec. ¶ 7.)  Truwit testified that he was not in New York City on

that date.  (Truwit Dec. ¶ 13.)

87.     April 9, 2012 dinner charge of $220.53 (PX 111 at BDO # 1823).  Rashid

described this charge from When Its Chile Its Hot as "dinner while working on Realogy with

Richard Smith and Tony Hull," and caused or acquiesced in the entry of a project code for

Realogy.  (Id.)  Hull testified that he did not have dinner with Rashid on this date.  (Hull Dec. ¶

34.)

88.    April 21, 2012 dinner charge of $434.19 (PX 111 at BDO # 1837).  Rashid

described this charge from August Ventures LLC as "dinner with QDI – Gary Enzore [sic] and

Joe Troy," and caused or acquiesced in the entry of a project code for Quality Distribution, Inc.

(Id.)  Enzor and Troy both testified that they were in Tampa, Florida on that night for a QDI-

related golf event.  (Enzor Dec. ¶ 28; Troy Dec. ¶ 15.)

89.    April 27, 2012 dinner charge of $181.52 (PX 111 at BDO # 1850).  Rashid

described this charge from 218, LLC as "dinner with Gary Enzor – QDI," and caused or

acquiesced in the entry of a project code for Quality Distribution, Inc.  (Id.)  Enzor testified that

he was in Tampa, Florida that weekend.  (Enzor Dec. ¶ 29.)

90.    April 28, 2012 dinner charge of $296.54 (PX 111 at 1852).  Rashid

described this charge to Superior Restaurant as "meal with Lourenco Goncalves and Keith Koci

Metals USA" and caused or acquiesced in the entry of a project code for Metals USA.  (Id.)

Both Goncalves and Koci deny that they were at this dinner.  (Goncalves Dec. ¶ 12; Koci Dec. ¶

7.)

91.    April 30, 2012 dinner charge of $152.93 (PX 111 at BDO # 1856).  Rashid

described this charge to Mr. Jonesing LP at "meals while working on metals usa" and caused or

acquiesced in the entry of a project code relating to Metals USA.  (Id.)  An e-mail chain of that

same date between Rashid and his friends discussed an 8:30 p.m. dinner reservation at Acme

restaurant, with Rashid noting that "[i]t is a very tough res[ervation]" and congratulating his

friend on reserving a table.  (PX 202 at Bates No. 2931-32.)  Cleary testified that Mr. Jonesing, LP is the business name for Acme restaurant.  (Cleary Dec. ¶ 12(d).)

92.  <u>August 14, 2012 dinner charge of $332.28</u> (PX 111 at BDO # 2097).  This charge reflects an out-of-pocket expense at an unnamed restaurant, which was described as "QDI dinner =: Johnathan Gold, Gearld [sic] Detter, Bo Leslie, Steve ttwood [sic], Denny Copeland, Gary Enzor, Thomas inkbiner [sic], Debbie Kend," and caused or acquiesced in the entry of a project code for Quality Distribution Inc.  (<u>Id.</u>)  Enzor testified that, by August 2012, Detter, Leslie, Copeland and Finkbiner had all departed QDI and thus would have had no reason to attend a business dinner with Rashid.  (Enzor Dec. ¶ 31.)  Enzor testified that he was in Tampa, Florida on the night of this dinner.  (Enzor Dec. ¶ 30.)

93.  <u>October 9, 2012 dinner charge of $248.26</u> (PX 111 at BDO # 2192).  Rashid described this charge to Koi NY as "Dinner with Realogy re: IPO discussion (Ryan Gorman, David Weaving)," and caused or acquiesced in the entry of a project code relating to Realogy.  (<u>Id.</u>)  E-mails from that date between Rashid and his wife discuss a dinner with "Patrick and Irene," "pickign [sic] them up from harvard club" and whether to go out for Japanese, Asian or Mediterranean cuisine.  (PX 202 at Bates No. 2948.)  In a separate chain of that same day, Rashid and his wife e-mailed Irene K. Hong about dinner plans, including a suggestion that they dine at Koi.  (<u>Id.</u> at Bates No. 2950.)

94.  <u>October 26, 2012 dinner charge of $148.30</u> (PX 111 at BDO # 2246).  Rashid described this charge to 1170 Broadway Tenant LLC as "Dinner with metals usa – ali rashid & Lourenco Goncalves," and caused or acquiesced in the entry of a project code relating to Metals USA.  (<u>Id.</u>)  Goncalves testified that Rashid never paid for any meal with him.  (Goncalves Dec. ¶ 12.)

95.    October 28, 2012 dinner charge of $250.13 (PX 111 at BDO # 2251).

Rashid described this charge to 228 West 10th St. LLC as "dinner with QDI – ali rashid, John Wilson, Johnathan Gold & Joseph Troy," and caused or acquiesced in the entry of a project code relating to Quality Distribution, Inc.  (Id.)  Troy testified that he was not in New York on this date, and that Jonathan Gold was a former general counsel to QDI who had departed the company prior to the date of this dinner.  (Troy Dec. ¶ 16; Tr. 547-48.)

96.    December 13, 2012 lunch charge of $930.10 (PX 111 at BDO # 2399).

Rashid described this charge from RBS Bar Inc. as "Lunch with Metals USA board, Ali Rashid, Lourenco Goncalves, Robert McPherson, Will Smith, John Baldwin, Joseph Powers, Mark Steven," and caused or acquiesced in the entry of a project code relating to Metals USA.  (Id.)  Smith testified that to the best of his recollection, he did not have lunch with Rashid on this date.  (Smith Dec. ¶ 6.)  Goncalves testified that Rashid never paid for any meal with him.  (Goncalves Dec. ¶ 12.)

97.    February 15, 2013 lunch charge of $243.44 (PX 111 at BDO # 2583).

Rashid described this charge from Nobu 57 LLC as "Lunch meeting with Metals USA team – Ali Rashid, William Bennett, Lourenco Goncalves, Will Smith and John Hagerman," and caused or acquiesced in the entry of a project code relating to Metals USA.  (Id.)  Smith testified that he has never been to lunch at Nobu, and that he has never met anyone named Hagerman or Bennett.  (Tr. 974; Smith Dec. ¶ 7.)  Again, Goncalves testified that Rashid never paid for any meal with him.  (Goncalves Dec. ¶ 12.)

Additional Personal Expenses Outside the Limitations Period.

98.    The SEC also adduced evidence that Rashid submitted personal expenses as business expenses prior to the commencement of the limitations period on June 13, 2011.

This evidence is relevant only as to determining Rashid's state of mind, i.e. knowledge, intent, and absence of mistake, during the limitations period.

99.     In each of the following instances, the Court finds by a preponderance of the evidence that Rashid submitted charges for the reimbursement of personal expenses, and that there was no business purpose behind these expenses.  Unless otherwise noted, the evidence in each of the following examples is contained in Plaintiff's Exhibit 327.

100.    The Burger Joint lunch.  Rashid submitted a receipt for out-of-pocket expenses on January 4, 2011 totaling $45 for the Burger Joint at Le Parker Meridien, with handwritten notes stating, "Lunch Metals USA / Bob Weinrich / Dan Henneke."  The expense was input to PeopleSoft with the description, "Lunch with Bob Weinrich and Dan Henneke to discuss Metals USA results."  However, e-mails between Rashid and his sister on that same date discuss meeting at Burger Joint at 1:30 p.m., the fact that the restaurant was cash-only, and its location.  At trial, Rashid testified that the receipt "does look to be in my handwriting," and stated, "I do not recall that meal at all, sir."  (Tr. 796.)

101.    The clothing purchase at Ermenegildo Zegna.  Rashid submitted four expenses dated January 12, 2011 from the Ermenegildo Zegna store in Beverly Hills ("Zegna"), totaling $3,850, with the explanation that they were for gifts to senior executives at Apollo portfolio companies.  (PX 111 at BDO # 790-93.)  Of these expenses, $600 was caused or acquiesced in the entry of a project code relating to Alteri, $1,200 to Metals USA, $1,100 to QDI - Fund III and $950 to Realogy.  (Id.)  However, on January 12, 2011, $3,850 was deposited on a Zegna account in the name of Rashid's father, Haroon Rashid.  (PX 81.)  At trial, Rashid testified, "I don't recall that, making that specific charge, but can't imagine it would have been anyone but me."  (Tr. 832.)  Rashid also testified that he wanted to purchase gifts at Zegna for

portfolio company executives.  (Tr. 835.)  A receipt reflects that on that same date, approximately 31 minutes after the deposit of $3,850, a total charge of $2,671 was made against the account for a $1,497 two-piece suit, $297 for "long formal trouser," $265 for crewneck knitwear, $537 for "long jacket-blouson," and a $75 delivery charge.  (PX 81.)  A separate receipt of that same date reflects the purchase of a $105 tie.  (Id.)  Rashid testified, "I do not believe that I purchased the ties that I ended up giving on that date, no, or the gifts that I ended up giving on that date, no."  (Tr. 837.)  Rashid was unable to recall details about the $3,850 transaction, but testified that he believed he gave Zegna-purchased ties to portfolio company executives.  (Tr. 839-41.)

102.     Joel Lehnhoff, a representative of Ermenegildo Zegna in Beverly Hills, testified at trial justifying Rashid's version of events.  (Tr. 389-429.)  Among other things, an undated and handwritten receipt made out to "Rashid" with the description "Ties for Gifts / 35 / $3500" was faxed by Zegna to Rashid's assistant on or about May 2, 2012.  (PX 77.)  Lehnhoff testified that he handwrote the receipt at Rashid's request, and that it reflected a previous deposit for the purchase of ties to be made at a later date.  (Tr. 394-95.)  The Court finds this testimony to be not creditable and crafted to cover for a valued customer.

103.     The going-away dinner.  Rashid submitted an April 1, 2011 expense of $216.19 from Don NYC Inc., describing it as "QDI dinner meeting with Enzor."  Contemporaneous e-mails from that date described a farewell dinner and karaoke night at Don Bogan BBQ and Wine Bar in Manhattan attended by Rashid and his friends, with no obvious connection to QDI or Apollo.

104.     Rashid's dinner with his wife.  Rashid submitted a January 28, 2011 expense of $266.46 from Cerulean Management LLC, describing it as a "Realogy dinner with

Don Casey and Seth Truwitt."  An entry from Rashid's work calendar reflects that the dinner

was with his wife.  Casey and Truwit both denied that they attended such a dinner.  (Casey Dec.

¶¶ 5-6; Truwit Dec. ¶ 11.)

105.  The Brother Jimmy's outing.  Rashid submitted a July 11, 2010 expense of

$147.92 from Brother Jimmy's NYC, describing it as "Lunch with QDI lawyers."  On that date,

which was a Sunday, Rashid sent an e-mail at 11:33 a.m. to three friends, stating, "Everyone still

up for meeting at brother jimmy's at 1pm?  I am going to eat there so we can hold down table

until the match starts."  At trial, Rashid confirmed that this event was "an outing" to watch a

soccer game with his friends.  (Tr. 1062-63.)

Admissions by Rashid Summarized in the So-Called "Master Spreadsheet"
in Connection with an Internal Investigation.

106.  The parties have made much of certain statements from Rashid that are

cataloged in a trial exhibit that the parties have referred to as the "Master Spreadsheet."  (PX 24.)

The internal investigation conducted by Paul Weiss and BDO endeavored to identify which

expenses claimed by Rashid were legitimate business expenses and which were personal.  As

mentioned, Rashid retained outside counsel from Crowell & Moring during this investigation.

(Finzi Dec. ¶¶ 25-27.)  As part of the internal investigation, Rashid self-identified 988 personal

expenses totaling $220,796.87 for which he had obtained reimbursement as business expenses.

(DX 15 at 18.)  Many of those expenses fall outside the limitations period.  The "Master

Spreadsheet" was received into evidence at trial, subject to Rashid's objection.

107.  Rashid has moved to exclude the so-called "Master Spreadsheet" pursuant

to Rule 408, Fed. R. Evid., arguing that his concessions were over-inclusive and made in the

context of a "settlement dispute" with Apollo over his anticipated departure from Apollo.

Rashid also has contended that he was eager to put the issue of his expenses behind him, and that

his willingness to agree that the expenses were personal in nature should not be equated to a factual admission of liability.  The SEC urges that Rashid's classifications of personal expenses are admissible statements of a party opponent, and that there was no contemplation of litigation between Apollo and Rashid at the time he made those classifications.  The Court concludes based upon the trial testimony that the statements were neither part of an offer of compromise, nor made in the course of a compromise negotiation nor otherwise constitute a prohibited use under Rule 408, Fed. R. Evid.  They were properly received into evidence.

108.   The Court concludes that concessions by Rashid in reclassifying an expense as a personal expense that is reflected in the Master Spreadsheet has probative value in showing Rashid's lack of diligence and due care .  The Court does not consider any specific concession by Rashid during the course of Apollo's internal investigation as determinative of the personal nature of a particular expense and acknowledges that Rashid, as he testified, took an over-inclusive approach in classifying expenses as personal in nature, based on a desire to expedite the review process and continue his employment at Apollo.  But, the 998 self-identified instances of charging a personal expense as a business expense, even if that number is substantially discounted and due consideration is given that many are outside the limitations period, are a potent admission by Rashid, a fiduciary to the funds, of his wholesale lack of diligence and due care in failing to ensure that no personal expenses were charged as business expenses.

109.   Similarly, there is no need for the Court to rely on the 2013 calculations of Suzanne Cleary, a forensic accountant at BDO who conducted a review of Rashid's expenses and identified $29,654 worth of personal charges taken during the limitations period.  (PX 334.) While the Court has reviewed and discussed specific expenses identified by Cleary, the Court

need not rely on any aggregate or summary findings about Rashid's personal expenses.

110.   The Court also need not engage in the exercise of calculating the total number of expenses falsely submitted by Rashid or the full amount of reimbursement.  The SEC does not seek restitution or disgorgement from Rashid, although it contends that, during the limitations period, Rashid submitted a total of 440 separate personal expenses, totaling $113,062.11.  (SEC Prop. Findings ¶ 5.)

111.   The Court places no weight on the findings of BDO or Paul Weiss. Further, in analyzing and finding 32 specific instances of false business expenses, the Court has found it unnecessary to rely on Rashid's admission concerning the specific expense during the internal investigation.

112.   The trial record amply demonstrates that Rashid intentionally submitted false expense reports.  In 2010, he was admonished not to submit personal expenses for reimbursements, after a purported business-dinner expense was learned to be a personal charge to La Contessa hair salon.  Rashid acknowledged that he had submitted a total of $7,828.86 in personal expenses, and promised that he would not seek reimbursement for personal expenses in the future.  Rashid does not dispute that he was challenged in 2010 on the submission of his expense reports and that he repaid the $7,828.86 in personal expenses.  While Rashid disputes that he was directly admonished by Donnelly, who was Apollo's CFO at the time, a reasonable and prudent person in Rashid's position would have thereafter devoted extra care and attention to the accuracy of his expense reports, and would have been especially careful not to submit personal expenses for reimbursement.

113.   But Rashid was not deterred.  From June 2011 through June 2013, he continued to submit personal expenses as business expenses.  Weighed in their entirety, Rashid's

expense reports contained a pattern of lies.  He commonly fabricated attendees and business purposes for expensive restaurant dinners, repeatedly naming portfolio company executives who credibly testified that they were halfway across the country on the dates of the dinners.  In some instances, he identified attendees who had left the portfolio company's employment months or even years before the dinner.  The consistency and precision of Rashid's statements are strong evidence of his intent to lie, and to intentionally submit personal expenses as business expenses. Rashid's testimony and argument have attempted to characterize certain expenses as a product of liberally interpreting expense policies, but that is rebutted by a pattern of submitting false and fraudulent business expenses with fabricated factual assertions, which negate the claims of innocent mistakes.

114.    The Court also rejects Rashid's assertion that his false expense reports can be explained by the mistakes and misunderstandings of his administrative assistants.  He testified that his assistants viewed the preparation of expense reports as "a 'menial' task" to be completed "as quickly as possible," and that they seldom questioned him about expense details.  (Rashid Dec. ¶ 6.)  Rashid's testimony was contradicted by three of his former assistants, Barbara Feehan, Beth Gatsik and Nicole La Mons, each of whom testified at trial. Each testified that they did not perform guesswork if the purpose of an expense was unclear, and that they entered details about an expense only if they personally booked Rashid's reservations or were able to reconstruct entries from his work calendar.  (Feehan Dec. ¶¶ 18-19, 23; Gatsik Dec. ¶ 10; La Mons Dec. ¶¶ 12-13.)  Each testified that they questioned Rashid when details about an expense were unclear, and this testimony was supported by e-mail correspondence and printouts of draft expense reports with comments in Rashid's handwriting.  (Feehan Dec. ¶ 21; Gatsik Dec. ¶ 10-12; La Mons Dec. ¶¶ 17-20;  PX 87 at 41253, 140, 141, 198, 199, 210.)  The Court found the

testimony of Feehan, Gastik and Le Mons to be clear, detailed and credible.  Rashid's attempt to shift some of the blame to his assistants is unpersuasive.

115.   The Court also rejects Rashid's explanation that because some of his social outings were attended by friends who happened to be finance professionals, he believed that they served a networking purposes and were appropriately charged as business expenses. Even assuming that Rashid believed that these dinners and bar nights had a business purpose, that does not explain why his expense reports falsely listed their attendees and portfolio company affiliations.  If Rashid had actually believed that such outings were appropriate business expenses, he would have accurately named the attendees.

The Phony Business Expenses Were Paid by the Funds Advised by Rashid.

116.   Through the testimony of Crossen, the SEC proved by a preponderance of the evidence that Rashid's expenses were reimbursed by Apollo's private equity funds.  Thus, although Rashid seemingly believed that his expenses would be reimbursed by an Apollo management fund, they were in truth borne by investors.

117.   While the SEC comfortably proved that Rashid knowingly submitted false expense reports, it did not prove by a preponderance of the evidence that Rashid knew that his expenses would be paid by a fund he advised.  Apollo's written guidance did not explain the expense allocation and reimbursement process to employees.

118.   James Crossen testified that in 2017, in his position as CFO for Private Equity and Real Assets, he directed and oversaw a review of Rashid's expenses.  (Crossen Dec. ¶ 14.)  Two of the review's purposes were especially important to this trial: first, to determine whether expenses that were deemed "personal" to Rashid had actually been invoiced and billed to Apollo's private equity funds, and second, to verify that those funds actually reimbursed

Rashid's personal expenses.  (Crossen Dec. ¶¶ 15-16.)  As Crossen described: "As a general matter, when invoices to Funds are generated, any reimbursed expense in PeopleSoft attributable to that fund code is then automatically billed to the fund in question – but we wished to verify that."  (Crossen Dec. ¶ 15.)  Crossen testified that, based on his review, "all" expenses that Rashid had allocated to portfolio companies or private equity funds were "billed to the Funds, or special purpose vehicles affiliated with the Funds."  (Crossen Dec. ¶ 17.)

119.    Crossen testified about the method used to connect Rashid's expenses to invoices sent to funds and their payment of reimbursements, using five specific charges as exemplars.  (Tr. 689-706; PX 183, 326A.)  He stated that reviewers looked to Rashid's expense submissions, and then tracked invoices issued by the relevant Apollo management companies to the respective fund controllers.  (Tr. 690.)  The invoices attached line-item Excel tables that reflected individual expenses, including those submitted by Rashid.  (Tr. 694 & PX 183.)  The tables listed Rashid's name, the portfolio company named in his expense report, the amount of the charge and the description of the charge.  (Tr. 694-95; PX 183.)  Crossen testified that the tables included hundreds of rows of individual line items.  (Tr. 695.)  Crossen testified that for each of Rashid's expenses that was retroactively classified as personal, his review team confirmed that the expense was paid by a fund.  (Tr. 696.)  In later questioning, Crossen again confirmed that every expense that was classified as personal in Plaintiff's Exhibit 111 was specifically reimbursed by a fund.  (Tr. 728.)  That Crossen used five exemplars from the expense-review process to demonstrate how the tracing process worked, which are summarized in the demonstrative exhibit at Plaintiff's Exhibit 326A, did not undermine the validity of his conclusions.

Rashid Was Recklessly Indifferent to the Consequences to the Funds.

120.    The SEC has proven that the 32 phony business expenses were in fact charged to the funds.  But the trial record does not contain any written guidance or official training or conversation with Rashid on allocation of expenses to the funds.

121.    Crossen testified that entry of a project code corresponding to a portfolio company on PeopleSoft did not dictate that the portfolio company would pay the expense. Instead, the Accounts Receivable Department billed the expense to the private-equity fund that was being advised about its investment in the portfolio company.  (Tr. 683-89.) Based on the testimony of Crossen, it appears that private-equity funds were billed regardless of the nature of the expense, in contradiction to the limited partnership agreements that governed the funds.  The limited partnership agreements that created the funds provided that expenses related to monitoring the fund would be borne by the Apollo-affiliated management company.  (PX 150-55, 185.)  Crossen's testimony, however, described a process where the Accounts Receivable Department charged all expenses to the relevant private equity fund, even those that should have been allocated to the Apollo management company.

122.    Rashid testified that he understood at the time of submitting expenses that expenses would be borne by an Apollo management company.  (Tr. 1103-04.)  Rashid also testified that he took no steps to make sure that his expenses were not being billed to funds because he did not know that they could be billed to funds.  (Tr. 933-35, 1004-06.)

123.    The Court does not credit Rashid's testimony that he believed the expenses were paid by an Apollo management company.   Rashid's testimony is an after-the-fact construct to avoid liability under the securities laws.  The Court finds that Rashid was recklessly indifferent concerning who would pay his phony business expenses as long as it was not him.

124.     Rashid claims that his professions of ignorance about the role of funds in the reimbursement process is supported by the fact that in November 2010, he wrote out a check to Apollo Management for $7,828.86 in order to repay the personal expenses that were discovered after he submitted the expense for the La Contessa hair salon.  (PX 89.)  But writing a single check to Apollo made perfect sense.  It was Apollo that passed the expenses on to the funds and it was Apollo that could give the funds a corresponding credit or refund. Writing a reimbursement check to Apollo does not establish that it bore the loss directly.

125.     The Court acknowledges that Marc Becker, who had the same job title as Rashid, and Apollo's current and former CFOs, Martin Kelly and Eugene Donnelly, described only broad and generic understandings of the reimbursement process, including the apparent misapprehension that certain expenses were borne by Apollo management companies, when, in fact, they were paid by private-equity funds.  (Tr. 43-50, 78-79, 82-83; Donnelly Dec. ¶ 5.)  But none of them had the same reason as Rashid to ensure that no fund was billed for an expense because they, unlike Rashid, were not submitting false business expenses.

126.     While significant blame still resides with the practices of Apollo itself, Rashid's falsehoods to his employer began a chain of events that operated as a fraud upon investors in the private equity funds.

127.     The funds had every reason to believe that the expenses tendered to them as business expenses were legitimate business expenses, but they were, in fact, personal expenses of Rashid.  Rashid's deliberate actions in submitting personal expenses as business expenses had the effect of operating as a fraud on the funds.

128.     The Court finds that Rashid intentionally submitted false expense reports, but that he did not do so with the specific intent of defrauding the private equity funds he

advised.  However, it was reasonably foreseeable to Rashid that in causing or acquiescing in the entry of a project code for a portfolio company that the expense would be borne directly by the fund or indirectly by charging it to the portfolio company in which it was heavily invested. Again, Rashid was utterly indifferent to who paid the false business expense as long as it was not him.

129.    The Court finds that Rashid engaged in a long-running practice of knowingly and falsely submitting personal expenses as business expenses and that practice operated as a fraud or deceit upon private-equity funds he advised.  Rashid as a senior partner of Apollo, he had the ability to ensure, by drilling down within Apollo, that none of his false business expenses were paid by the funds. This, of course, would have been a perilous course for Rashid to take because it would likely have been a red flag raising suspicions that he was cheating on his expenses.  The funds Rashid advised were, in fact, deceived and defrauded because they actually paid Rashid's personal expenses, believing that they were business expenses.  Rashid was recklessly indifferent in failing to ensure that the funds were protected from the impact of his defalcations.  Alternatively, if he was not recklessly indifferent, he was at least negligent in failing to protect the funds from the consequences of his thefts which were reasonably foreseeable to him.

**CONCLUSIONS OF LAW.**

1.    Section 206(1) makes it "unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly – (1) to employ any device, scheme, or artifice to defraud any client or prospective client . . . ."  15 U.S.C. §§ 80b-6(1).

2.    As discussed, section 206(1) requires proof of a defendant's scienter, and

"[s]cienter is established if it is shown that the defendants acted with a 'mental state embracing intent to deceive, manipulate, or defraud.'"  Moran, 922 F. Supp. at 891 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976)).  Scienter under section 206(1) may also be proved by evidence of recklessness.  See, e.g., Dembski, 726 Fed. App'x at 844.  Conduct is reckless when it "'is highly unreasonable'" and "'represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quoting In Re Carter-Wallace, Inc. Secs. Litig., 220 F.3d 36, 39 (2d Cir. 2000)).  The scienter requirement may be satisfied through evidence of "'conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.'"  Setzer v. Omega Healthcare Inv'rs, Inc., 968 F.3d 204, 214-15 (2d Cir. 2020) (quoting Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000)).

        3.      The SEC failed to prove that Rashid knew the source of reimbursement for his expenses, and therefore failed to prove that he knowingly and intentionally sought reimbursement from the funds he advised.

        4.      Rashid's lies to Apollo are different than the public misrepresentations that sometimes arise in a fraud-on-the-market case.  In such cases, a defendant's false public statements, uttered with a reckless indifference to the truth, directly affect share value and cause injury to shareholders.  See, e.g., Setzer, 968 F.3d at 215-16 (reviewing allegations of recklessness relating to public statements that misled investors about company's financial condition).  The inaccuracy of such public misstatements, made with a reckless indifference to the truth, "approximat[e] actual intent" to mislead shareholders.  Id.  But here, Rashid's reckless indifference to the source of his reimbursements does not approximate an actual intent to defraud

the funds.  After Rashid submitted his false expense reports, Apollo's Accounts Receivable

Department demanded reimbursement from the funds, based on the portfolio companies listed in

Rashid's research codes.  Rashid lied about his expenses and demonstrated a reckless

indifference to the source of his reimbursements, but that recklessness did not approximate an

actual intent to defraud the funds.  Apollo's procedures in its Accounts Receivable Department,

and specifically its practice of seeking reimbursement from funds based on an employee's entry

of portfolio company research codes, deserve significant blame for the fact that Rashid's

expenses were ultimately paid by the funds.

   5. The Court therefore finds that the SEC failed to prove by a preponderance

of the evidence that Rashid violated section 206(1).

   6. For the same reasons, the Court finds that the SEC failed to prove by a

preponderance of the evidence that Rashid aided and abetted a violation of section 206(1).

Section 209(f) of the Advisers Act creates liability for "any person that knowingly or recklessly

has aided, abetted, counseled, commanded, induced, or procured a violation of any provision of

this subchapter . . . ."  15 U.S.C. § 80b-9(f).

   7. To prove that Rashid is liable for aiding and abetting a violation of section

206(1), the SEC must prove by a preponderance of the evidence "(1) the existence of a securities

law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this

violation on the part of the aider and abettor; and (3) substantial assistance by the aider and

abettor in the achievement of the primary violation."  DiBella, 587 F.3d at 566.  "Consistent with

the specific text of section 209(f), either knowledge or recklessness may suffice for purposes of

aiding-and-abetting liability."  SEC v. Westport Capital Markets LLC, 408 F. Supp. 3d 93, 109

(D. Conn. 2019).  "Satisfaction of the knowledge requirement will depend on the theory of

primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render 'substantial assistance.'" DiBella, 587 F.3d at 566 (quotation marks and alterations omitted).

8. For the reasons explained as to the 206(1) claim, the Court finds that the SEC's evidence of Rashid's reckless indifference to the source of his reimbursement did not reflect recklessness approximating actual knowledge that the funds were reimbursing his expenses. The Court further finds that the SEC has not proved that Apollo, as a purported primary violator, acted with an intent to defraud the funds. The Court therefore finds that the SEC failed to prove by a preponderance of the evidence that Rashid is liable for aiding and abetting a violation of section 206(1) by Apollo.

9. Section 206(2) makes it unlawful "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . ." 15 U.S.C. § 80b-6(2). "The extent of conduct subject to liability under the Advisers Act is broad." Treadway, 430 F. Supp. 2d at 338. "Consistent with this broad understanding of liability, the Advisers Act makes it unlawful to 'engage in any transaction . . . which operates as a fraud.' That is, any transaction that functions or otherwise results in a fraud is punishable under this provision. Thus, the Advisers Act holds liable negligent acts." DiBella, 587 F.3d at 569. An investment adviser is liable under section 206(2) if he violates "an affirmative obligation 'to employ reasonable care to avoid misleading' his clients." SEC v. Batterman, 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30, 2002) (Preska, J.) (quoting Capital Gains Research Bureau, 375 U.S. at 194).

10. The Court has found that Rashid knowingly and falsely claimed personal expenses as business expenses, that the false business expenses were charged to and paid by

funds he advised and that he was recklessly indifferent to the source of payment of the fake

business expenses, and that this pattern of conduct operated as a fraud upon the funds he advised.

These findings of fact support the conclusion of law that Rashid is liable pursuant to section

206(2) of the Advisers Act.

11.     Alternatively, if Rashid was not recklessly indifferent in failing to ensure

that the source of payment of the fake business expenses was not one of the funds he advised, he

was at least negligent in failing to do so.  Rashid's pattern of conduct in knowingly and falsely

submitting personal expenses as business expenses which were, in fact, paid by the funds

operated as a fraud on the funds he advised and would still support his liability under section

206(2), even if he was negligent in failing to take steps to ensure that the funds did not pay those

expenses.  The Court has found that it was reasonably foreseeable that the funds could be the

source of payment.

12.     Because the Court finds that Rashid is liable for a primary violation of

section 206(2), it need not reach the SEC's argument that he should be found liable on the

alternative grounds of aiding and abetting a section 206(2) violation by Apollo.

**REMEDIES.**

I.      <u>Rashid Is Enjoined from Committing a Future Violation of Section 206.</u>

"Once the district court has found federal securities law violations, it has broad

equitable power to fashion appropriate remedies."  <u>SEC v. Frohling</u>, 851 F.3d 132, 138 (2d Cir.

2016) (quotation marks omitted).  The SEC urges that the Court should issue an order

permanently restraining and enjoining Rashid and all persons in active concert or participation

with him from violating section 206 of the Advisers Act, pursuant to section 209(d) of the Act,

15 U.S.C. § 80b-9(d).  It separately urges that Rashid should pay a civil monetary penalty

pursuant to section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), and specifically advocates

for a maximum tier-three monetary penalty totaling $750,000.

To obtain injunctive relief, the Advisers Act provides that a court "shall" issue a

decree, restraining order, or permanent or temporary injunction "[u]pon a showing that such

person has engaged . . . in any such act or practice" constituting a violation of the Advisers Act.

15 U.S.C. § 80b-9(d).  The Second Circuit has held that this language "require[s] a finding of

'likelihood' or 'propensity' to engage in future violations."  SEC v. Commonwealth Chem. Sec.,

Inc., 574 F.2d 90, 99 (2d Cir. 1978) (citing Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,

480 F.2d 341, 394 (2d Cir. 1973)).  However, "a trial judge is vested with considerable discretion

in granting injunctive relief pursuant to this section.  There need be only a reasonable likelihood

that the activity complained of will be repeated."  SEC v. Materia, 745 F.2d 197, 200 (2d Cir.

1984); see also SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972)

("[F]raudulent past conduct gives rise to an inference of a reasonable expectation of continued

violations.").

Among the other factors a court considers in determining whether there is a

reasonable likelihood of future violations are: (1) that the defendant has been found liable; (2)

the degree of scienter; (3) the isolated or repeated nature of the violations; (4) whether defendant

has accepted blame for his conduct; and (5) whether the nature of defendant's occupation makes

it likely have he will have opportunities to commit future violations.  SEC v. Cavanagh, 155 F.3d

129, 135 (2d Cir. 1998) (citation omitted).  "[F]raudulent past conduct gives rise to an inference

of a reasonable expectation of continued violations."  Manor Nursing Ctrs., Inc., 458 F.2d at

1100.

The Court comfortably finds that a permanent injunction against Rashid's future

violations of section 206 is warranted.  Rashid submitted numerous false expense reports over a period of years.  That he continued to do so after the matter was brought to his attention in 2010 demonstrates that he did not alter his behavior even after learning that his employer had become aware of his false statements.  While the SEC failed to prove that Rashid had actual knowledge that his expenses were being borne by investors, it demonstrated a reckless indifference on the part of Rashid, and his willingness to advance untruths even after being exposed.  Rashid already has a history of maintaining a course of misconduct following its discovery.  The evidence amply justifies the entry of an injunction against any future violation of section 206 by Rashid.

II.     Tier-One Civil Monetary Penalties Totaling $240,000 Are Warranted.

Section 209(e) of the Advisers Act provides for the assessment of civil monetary penalties against persons who violate the statute.  15 U.S.C. § 80b-9(e)(2).  It provides for three tiers of penalties in the respective maximum amounts of $7,500, $75,000 and $150,000 per violation.  Id.; 17 C.F.R. § 201.1001, Table I col. 4, at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm (adjusting statutory penalties for violations between March 2009 and March 2013).

Civil penalties issued pursuant to the federal securities laws may have a punitive or deterrent purpose.  SEC v. Razmilovic, 738 F.3d 14, 38-39 (2d Cir. 2013).  "In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition."  SEC v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)

(Holwell, J.).  These factors "have not been deemed an exhaustive list by this Court and are not to be taken as talismanic."  <u>SEC v. Rajaratnam</u>, 918 F.3d 36, 45 (2d Cir. 2019).  Courts may consider a defendant's wealth, his refusal to admit wrongdoing, and his lack of cooperation with authorities.  <u>SEC v. Alpine Sec. Corp.</u>, 413 F. Supp. 3d 235, 245 (S.D.N.Y. 2019) (Cote, J.).

        The highest, third-tier penalty is assessed for a violation of the Advisers Act that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. § 80b-9(e)(2)(C).  A second-tier penalty may be assessed for the same conduct, except there is no requirement that the defendant's actions resulted in loss.  <u>Id.</u> § 80b-9(e)(2)(B).  There is no requirement that a first-tier penalty be a product of deliberate or reckless misconduct, and "[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances."  15 U.S.C. § 80b-9(2)(A).

        Courts have discretion to determine what constitutes a separate violation, which may vary from case to case.  In a case brought under the Securities Act and the Exchange Act, the Second Circuit noted that the district court appropriately counted each unlawful trade as a separate violation.  <u>SEC v. Pentagon Capital Mgmt. PLC</u>, 725 F.3d 279, 288 n.7 (2d Cir. 2013).  In <u>Alpine Securities Corporation</u>, Judge Cote ordered first-tier penalties to each of the defendant's 2,720 violations of an obligation to file suspicious activity reports.  413 F. Supp. 3d at 250.

        The SEC urges that Rashid should be assessed five third-tier civil penalties of $150,000 each, reflecting that false expenses were passed on to each of Fund III, Fund V, Fund VI, Fund VII and the ANRP.  Rashid urges that his penalty should be limited to a single second-tier fine of $75,000.

As the Court has already discussed at length, it is persuaded that Rashid engaged in a course of conduct that involved repeatedly lying over the course of several years.  His behavior continued even after being caught.  These were not isolated incidents, and were not, as Rashid sometimes argued, a product of poor judgment calls or a liberal interpretation of what was permissible under Apollo's expense guidelines.  The Court particularly notes that, even through post-trial submissions, Rashid has attempted to pin blame on his administrative assistants for purportedly engaging in guesswork when recording his expenses on PeopleSoft, while simultaneously acknowledging responsibility on his own part for not monitoring them more carefully.  The Court finds that Rashid's behavior was egregious, reckless, and recurrent, and that his acknowledgment of responsibility was less than resounding.

At the same time, there is no dispute that Rashid cooperated with Apollo's internal investigation of his expenses.  He voluntarily repaid all expenses that Apollo identified to be personal in nature, totaling approximately $290,000, including expenses that fall outside the limitations period.  (Tr. 295, 556, 718.)  The Court credits Rashid's testimony that during the internal investigation conducted by Paul Weiss and BDO, Rashid adopted an over-inclusive approach to agreeing that all flagged expenses were personal in nature, even when he lacked a specific memory of an expense.  (Rashid Dec. ¶ 22.)  Rashid credibly explains that he did so based on the impression that if he cooperated, he was "very likely to be able to get [his] job back."  (Rashid Dec. ¶ 20.)  In weighing an appropriate civil penalty, the Court affords some weight to Rashid's cooperation with the Apollo investigation and his apparent acceptance of responsibility within the Company itself.

The Court also considers it important that the policies and procedures within Apollo contributed heavily to any act of fraud that was effected on investors in the Apollo funds.

Apollo, and not Rashid, put in place a policy of invoicing expenses to funds that, pursuant to the limited partnership agreements, seemingly should have been borne by Apollo's own management companies. The practices of the Accounts Receivable Department, which were seemingly unknown to Apollo's employees, also deserve significant blame.

At trial, the SEC proved by a preponderance of the evidence that Rashid submitted false expense reports pertaining to thirty-two separate meals or trips. As noted, the Court has some flexibility in determining which conduct qualifies as a violation for the purpose of assessing a civil penalty. The SEC has urged that the Court view the invoicing of each separate fund as its own violation, whereas Rashid has urged that his entire course of his conduct be viewed as a single, unitary violation.

For the purposes of calculating Rashid's civil penalty, the Court concludes that the punitive and deterrent purposes of the securities laws are best served by assessing a $7,500 tier-one civil penalty for each of the thirty-two separate trips or meals that the SEC proved at trial to be have been personal in nature. Trips that included the submission of multiple expenses (e.g., lodging, flight and meals for the Miami wedding) shall constitute a single violation for penalty purposes, as they were all submitted under the umbrella of a single trip. An aggregate penalty of $240,000 is a significant sum that takes into account Rashid's serial dishonesty while also recognizing that the fraud effected upon Apollo's private-equity funds also appears to be attributable in part to internal Apollo practices that were unknown to Rashid.

The Court therefore directs that Rashid be assessed a civil penalty of $7,500 for each of the thirty-two violations of section 206 that were proved at trial, for an aggregate penalty of $240,000.

CONCLUSION.

The Court finds that the SEC proved by a preponderance of the evidence that

Rashid violated section 206(2) of the Advisors Act.  Rashid shall be permanently enjoined from

any and all future violations of section 206.  Rashid shall separately be assessed a civil penalty of

$7,500 for each of the thirty-two violations proved at trial, in a total amount of $240,000.

The SEC shall file a Proposed Final Judgment within seven days.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       September 23, 2020